## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUZETTE WALKER | : | |
| Plaintiff, | : | |
| v. | : | CIVIL ACTION NO.: 15-4031 |
| VERIZON SERVICES CORPORATION and VERIZON PENNSYLVANIA INC. | : | |
| Defendants | : | |

### ORDER

**AND NOW,** this _____ day of _____, 2016, upon consideration of Defendants' Motion for Summary Judgment, and Plaintiff's Response thereto, it is hereby **ORDERED** that Defendants' Motion is **DENIED**.

BY THE COURT:

_____
The Honorable Harvey Bartle III, U.S.D.J.

## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SUZETTE WALKER | : |
| | : |
|      Plaintiff, | : |
| | :     CIVIL ACTION NO.: 15-4031 |
|     v. | : |
| | : |
| VERIZON SERVICES CORPORATION | : |
|    and | : |
| VERIZON PENNSYLVANIA INC. | : |
| | : |
|     Defendants | : |
| | : |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Suzette Walker ("Ms. Walker" or "Plaintiff"), by and through her undersigned Counsel hereby submits the instant Brief in Response to Defendants' Motion for Summary Judgment.

Respectfully Submitted,

**KARPF, KARPF & CERUTTI, P.C.**

*/s/ Christine E. Burke*
Christine E. Burke, Esq.
3331 Street Road
Two Greenwood Square
Suite 128
Bensalem, PA 19020
Counsel for Plaintiff
215-639-0810

Date: October 28, 2016

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………………...………………....i

I.      INTRODUCTION ……………………...………………………….………….…..1

II.     STATEMENT OF FACTS. …………...………………………….………………....3

III.    LEGAL ANALYSIS… ………………...………………………...……....25

        A) Summary Judgement Standard……………………………………….....25

        B) Legal Argument…………………….......................................................26

        (a) Ms. Walker can establish her age & race discrimination claims……………26

        (b) Ms. Walker can establish her retaliation claims……………………………..34

III.    CONCLUSION ………………….…...………………………………….…..……37

## TABLE OF AUTHORITIES

**Cases**

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970).........26

*Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 249 (3d Cir.2002) ................................................27

*Anderson v. Consolidated Rail Corp.*, 2000 WL 1201534, at *5 (E.D.Pa.,2000) ........................29

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)……………………………………….....26

*Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir.1994) ......................................................27

*Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 699 (3d Cir. 1995) ....................................................28

*Bell v. Prefix, Inc.*, 321 Fed.Appx. 423 (6th Cir. 2009) ................................................................31

*Bernhard v. Brown & Brown of Lehigh Valley, Inc.*, 720 F.Supp.2d 694, 703 (E.D. Pa. 2010)...36

*Blair v. Henry Filters, Inc.,* 505 F.3d 517, 534 (6th Cir. 2007) ....................................................31

*Brown v. Boeing Co.*, 468 F.Supp.2d 729, 734 (E.D.Pa.,2007) ....................................................27

*Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 151 (3d Cir.2004) ...........................36

*Cutcher v. Kmart Corp.*, 364 Fed.Appx. 183 (6th Cir. 2010) ........................................................31

*EEOC v. Grane Healthcare Co.*, 2014 U.S. Dist. LEXIS 28477, 9-11, 29 Am. Disabilities Cas.

(BNA) 655 (W.D. Pa. Mar. 6, 2014); 29 CFR §1630.2(j)(1)(vii) ............................................36

*Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) ..........................................34

*Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994) ...............................................................29,33

*Gelover v. Lockheed Martin*, 971 F.Supp. 180, 181 (E.D.Pa.1997) ..............................................26

*Hormann v. NW Sign Industries, Inc.*, 2009 WL 2751027, at *3 (D.N.J.,2009) ..........................28

*Johnson v. Penske Truck Leasing Co.*, 949 F. Supp. 1153, 1172, 1996 U.S. Dist. LEXIS 19383

(D.N.J. 1996) ...........................................................................................................................29

*Josey v. John R. Hollingsworth Corp.*, 996

F.2d 632, 638-39 (3d Cir. 1993) ....................................................................................33

*Kachmar v. Sungard Data Sys.,* 109 F.3d 173, 177 (3d Cir. 1997)................................34

*Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 307 (3d Cir., 2012) ......35

*Marzano v. Computer Science Corp.,* 91 F.3d 497, 509-10 (3d Cir. 1996) ...................26

*Massarsky v. General Motors Corp.,* 706 F.2d 111, 118 (3d Cir.), *cert. denied,* 464 U.S. 937, 104

S.Ct. 348, 78 L.Ed.2d 314 (1983) ..........................................................................28

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-588 .......26

*Matthews v. Commonwealth Edison Co.,* 128 F.3d 1194, 1195 (7th Cir.1997) ............32

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) ............................................28

*McKenna v. Pacific Rail Service,* 32 F.3d 820, 825 (3d Cir.1994) ...............................28

*Metzger v. Osbeck,* 841 F.2d 518, 521 (3d Cir.1988)......................................................3

*O'Hare v. McLean Packaging and Trucking*, WL 3207277 (D.N.J. 2009)(Rodriguez, J.)..........31

*Poff v. Prudential Ins. Co. of Am.,* 911 F.Supp. 856, 861 (E.D.Pa.1996) ....................30

*Reeves v. Sanderson Plumbing Products, Inc.*, 120 S.Ct. 2097, 2112, 530 U.S. 133, 154

(U.S.,2000)..............................................................................................................29

*Sempier v. Johnson & Higgins,* 45 F.3d 724, 728 (3d Cir.) ..........................................27

*Shannon v. City of Philadelphia,* No. 98-5277, 1999 WL 1065210 (E.D.Pa. Nov. 23, 1999)......36

*Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061 (3d Cir.1996) (en banc), *cert.*

*denied,* 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997) .........................29

*Showalter v. Univ. of Pittsburgh Med. Ctr.,* 190 F.3d 231, 234 (3d Cir.1999) .............27

*Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).......26

*Simpson v. Kay Jewelers,* 142 F.3d 639, 644 n. 5 (3d Cir.1998).....................................33

*Smith v. Thomas Jefferson University*, 2006 WL 1887984, at *3 (E.D.Pa.,2006) ........27

*Sorba v. Pennsylvania Drilling Co.,* 821 F.2d 200, 205 (3d Cir. 1987)..........................................34

*Steward v. Sears, Roebuck & Co.*, 231 Fed. Appx., 201 (3d. Cir., 2007) ......................................30

*Stewart v. Rutgers, State Univ.,* 120 F.3d 426, 431 (3d Cir. 1997) ................................................28

*Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093, 67

    L.Ed.2d 207 (1981) ....................................................................................................................27

*Torre v. Casio, Inc.,* 42 F.3d 825, 829 (3d Cir.1994) .....................................................................27

*Tucker v. County of Monmouth,* 159 Fed.Appx. 405 (3d Cir. 2005).............................................35

*United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962) ..............................................................26

*Waddell v. Small Tube Products, Inc.,* 799 F.2d 69, 73 (3d Cir. 1986)..........................................35

*Walden v. St. Gobain Corp.,* 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004).......................................26

*Weldon v. Kraft, Inc.,* 896 F.2d 793, 798 (3d Cir.1990) .................................................................31

**Statutes**

29 U.S.C. § 2615(a) .........................................................................................................................32

42 U.S.C. § 12111(9)(B)...................................................................................................................36

Fed. R. Civ. P. 56(c) ........................................................................................................................25

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SUZETTE WALKER                          :
                                        :
          Plaintiff,                    :
                                        :      CIVIL ACTION NO.: 15-4031
     v.                                 :
                                        :
VERIZON SERVICES CORPORATION            :
     and                                :
VERIZON PENNSYLVANIA INC.               :
                                        :
          Defendants                    :
                                        :

### PLAINTIFF'S BRIEF IN OPPOSITION TO
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

After 37 years of employment, Ms. Walker was informed that she was being subject to a Reduction in Force (RIF) in April of 2015. As she was a 56-year-old black employee (chosen in lieu of her all non-black and many significantly younger peers), and who had availed herself of FMLA leave & accommodations in the time frame preceding the RIF, Ms. Walker pursued claims against her former employer (Verizon Services Corporation & Verizon Pennsylvania Inc., *hereinafter* collectively referred to as "Verizon") for discrimination and retaliation. Specifically, Ms. Walker alleges that she was subject to impermissible age discrimination in violation of the Age Discrimination & Employment Act (ADEA), race discrimination in violation of 42 U.S.C. § 1981 ("Section 1981") & Title VII of the Civil Rights Act of 1964 ("Title VII"), as well as retaliation for taking a federally protected leave of absence under the Family & Medical Leave Act ("FMLA") and seeking reasonable accommodations under the Americans with Disabilities Act, as amended ("ADA"); she also pursues all mirroring state claims under the Pennsylvania Human

1

Relations Act (PHRA). Ex. A.[1]

Plaintiff does not dispute that Verizon faced an economic need to implement a legitimate RIF during the period at issue, which ultimately impacted 13 employees within Verizon's Engineering Department under Ms. Walker's respective Director: Joseph Muccilo (as well as numerous other employees from other departments not at issue in this suit). Verizon created a particular "model" for use in implementing this RIF, presumably so as to avoid the prospect that management could simply pick and choose who they wanted to impact without regard for age, race, medical leave, or any other protected characteristics. This "sophisticated, multi-layered approach," is good in theory – however, it is literally impossible for Verizon to argue to this Court that it actually implemented the "model," as it relates to Ms. Walker. Management's decision to pick Ms. Walker for the RIF over nearly 30 other employees holding the exact same position was not based on this model, as admitted by their own managers during depositions (in fact, the one manager directly involved concedes he simply *made up his own RIF model*). The ultimate RIF documentation for each "Business Case," created by Human Resources, and utilized for record keeping purposes (which Defendant Verizon ultimately asks this Court to rely upon), was created after the fact -- once management already made their decision and supplied Ms. Walker's name for impact.

The facts unequivocally show that *in spite of* Verizon's clear written directives to utilize legitimate and documented RIF protocols, two (2) Engineering Managers, Brian Magee & Carl

---

[1] Ms. Walker also pleaded a claim for disability discrimination, however, as it appeared during discovery that it was the taking of time off which management took into account in assessing her performance, she has agreed to focus exclusively on the FMLA/ADA/PHRA Retaliation claims in that regard, and waives argument on the separate ADA/PHRA disability discrimination claim.

Gross, participated in a single telephone call where they decided that Ms. Walker would be the individual impacted from their two (2) respective teams of Engineers. This, however, was despite objective performance indictors demonstrating that Ms. Walker was a clear competitor among these two (2) teams, and that one gentleman stayed over Ms. Walker who had actually been placed on a formal performance improvement plan during 2014 (white, 12 years her junior, who hadn't taken FMLA). Verizon would like this Court <u>as a matter of law</u>, to rest is decision on Magee's after-the-fact *subjective conclusory assertions* about why they ultimately chose Ms. Walker, and thus make credibility determinations about the propriety of management's choice in this regard.[2] It is also noteworthy that *nowhere* within Defendant's Motion do they mention any of the comparators' performance, their races, respective ages, or taking of leave.

Based on the facts adduced during discovery, this RIF case is not appropriate for summary judgment as a matter of law. A jury should be the finders of fact, asked to assess why management <u>strayed from its standard RIF protocols</u>, and despite over three (3) decades of positive performance, selected the 56-year-old black Engineer, who in the full preceding calendar year had exhausted her FMLA leave, and further availed herself of protections under the ADA by seeking a modified work schedule (in the form of reduced hours) over others equally if not less capable in the position than she.

## II.    STATEMENT OF FACTS

Ms. Walker is an African American female, who maintains a bachelor's degree in Finance,

---

[2] It is well settled that determination of one's state of mind is not appropriate for summary judgment. *Metzger v. Osbeck,* 841 F.2d 518, 521 (3d Cir.1988) ("a court should be reluctant to grant a motion for summary judgment when resolution of the dispositive issue requires a determination of state of mind, for in such cases much depends upon the credibility of witnesses testifying as to their own states of mind, and assessing credibility is a delicate matter best left to the fact finder.").

3

and a Master's Degree in Business Technology.  Ex. A, at ¶ 3; Ex. B., at pp. 124:17-125:9.[3]  In total, she was employed with Verizon for 37 years. Ex. B., at p. 153:16-20.  Ms. Walker was, at all relevant times, assigned to work at Verizon's 900 Race Street Philadelphia, PA location, and was working within the Engineering Department for at least 30 years.[4]   While she escalated through numerous positions over the years, from Assignment Technician, to Network Engineer, to Supervisor of Network Engineering, to Section Manager of Networking Engineering, her most recent promotion was in or about 2012 to the position of "Engineering Specialist," also referred to as "Engineering Specialist III." [5]  Ex. C; Ex. B, at pp. 121:25-122:6.

In terms of the managerial hierarchy, at all relevant times, Joseph Muccilo was the Director of the Engineering Department for all of Pennsylvania & Delaware.  Ex. F., at p. 7:12-17; Ex. B., at p. 28:6-10. Muccilo was responsible for seven (7) Engineering Managers, including Magee, Gross, Healy, Septak, Silinskie, Smail and Smith.  Ex. B., a tp. 95:2-7.  Magee, Gross, Septak, and Salinskie, were all considered "turf managers," each assigned to oversee a particular group of engineers, which engineers were assigned their own respective geographic "turfs."  Ex. B., at pp. 114:12-16; 115:4-8.   Gross & Magee shared responsibility for Eastern PA & Delaware, and they would actually "swap" engineers at times for developmental purposes or business needs.[6]  (Septak and Salinsky were responsible for an entirely different geographic region, including Central and Western, PA). Id.[7]

From in or about 2008 through her separation (a period of 7 years), Ms. Walker was

---

[3] All Exhibits referenced *herein* are attached with a separate Appendix of Exhibits.
[4] Ex. B., at 44:17-23; Ex. C; Ex. D, at Response No.: 7; Ex. E, at p. 11:14-17.
[5] The change from "Engineering Specialist" to "Engineering III Specialist," was in title only.  Ex E., at p. 13:10-14.
[6] *Id.* at pp. 29:9-11; 144:7-145:2; 154:1-6; 170:12-15; Ex. G, at pp. 8:19-24; 9:1-14; 10:12-14.
[7] Smail and Smith's teams performed entirely different functions, as Smail supervised "Provisioners" and Smith oversaw a team of "Planners." Ex B., at pp. 114:22-115:4; 149:1-7.

4

predominantly supervised by Brian Magee. Ex. B, at p. 9:15-24; Ex E., at p. 11:14-17.  Magee never issued Ms. Walker a single instance of discipline or any form of corrective action, and concedes he had no basis to do so. Ex. E., at p. 43:10-21. Verizon's formal performance reviews rate as follows: "Leading," "Performing," "Developing," and "New." Ex. E, at p. 46:11-20; Ex. I (at p. 7). In terms of his Ms. Walker's most recent performance evaluations before the 2013 and 2014 evaluations that Verizon was asked to consider for purposes of the RIF protocols, Ms. Walker received a "Performing" rating on each one, which indicates "Employee sustained performance meeting objectives, requirement and expectations and periodically exceeding them." Ex. H (2009-2012 attached collectively *hereto*)(Magee concedes that it is rare that he gives a score of "Leading" to his employees. Ex. E at p. 47:1-5).    The feedback summary in her 2012 annual evaluation (issued to her in February of 2013) noted:

> "Suzette brings several years experience to the department and provides quality work.  Suzette had a small drafting team and 2 Assignment Technicians.  In her position, she not only works for her direct manager, but also all the other managers that she interacts with and supports.  Suzette is a performer.  Suzette worked extremely hard to ensure that the district DS0 orders were processed and that the orders were flowing.  Suzette has been reassigned to an engineer in the Philadelphia office."

Ex. H, at p. 843.

For a little over one (1) year, beginning in late December 2012 through early 2014, Ms. Walker was assigned to perform as an Engineer in the Conduit/Highway Department.[8] In this role, she was responsible for deploying, repairing and answering requests for customer's use of Verizon's underground conduit (a medium which houses the cables) throughout the City of Philadelphia. Ex. E, at pp. 30:17-24; 50:19-23. She was required to respond to requests related to

---

[8] Ex. I, at p. 5; Ex E, at pp. 30:7-16; 31:12-14.

any construction which may interfere with the conduit, requests for growth, moving or repairing the conduit, as well as third party vendor requests to lease the conduit. *Id.*, at p. 31:3-9.  Magee thought she was well suited for the role, because she previously worked as a drafting supervisor, which required intimate knowledge of the City's permit process, and overseeing and posting conduit drawings. *Id.*, at pp. 69:18-70:2.

Several months into this new role, however, on or about April 26, 2013, Ms. Walker underwent surgery as a result of a dislocated and fractured shoulder. Ex. B. at p. 46:12-18; Ex J. All requests for medical leave at Verizon are run through its third-party administrator: Metlife. Ex. E, at pp. 48:22-49:4. (Magee has no authority to approve or deny medical leave requests and contends that same are "out of his universe." Ex E, at pp. 54:23-55:6).  Initially, Metlife approved Ms. Walker for her shoulder surgery and recovery from April 26, 2013 through June 9, 2013 (approved as FMLA leave).  Ex J.  Ms. Walker thereafter requested and was approved to extend her leave through July 14, 2013.  Ex. K.   Magee informed Ms. Walker that if she did not return to work following her approved FMLA leave, she would no longer have a position with Verizon. Ex B., at p. 45:25-46:8.

Therefore, Ms. Walker returned to work on a part-time basis (only 4 hours per day) beginning July 15, 2013. Ex., B, at p. 47:14-23; Ex. L. She continued working limited hours from her return in July 2013 through in or about September of 2013. Ex. E., at p. 62:3-6. Although Ms. Walker's physician recommended that she gradually increase her hours (working 5 hrs a day through October 1, 2013, 6 hrs a day through November 1, 2013 and back up to 8 hrs a day as of December 1, 2013)(Ex M), Magee reiterated to Ms. Walker that she needed to return full duty, or she would no longer have a position. Ex. B, at p. 49:6-21; Exhibit N (reporting to Metlife that her

supervisor told her she needed to return full/time full duty).   Magee vehemently denies that he

*ever* informed Ms. Walker she had to return to work full duty. Ex. E, at p. 59:1-5. Therefore, Ms.

Walker returned to work in a full-time capacity. Ex. B., at p. 52:24:53:1.[9]

On August 5, 2013, Magee completed her mid-year review, which evaluated her

performance from January 1 through June 30. Ex. I, at p. 5.  Within the manager comments area,

he stated:

> "Suzette was moved to Conduct/Highway in the first half of the year due to existing
> knowledge of conduct and the City Permit process.  GPIS review has been a
> positive transition, but conduit design has been hard to transition.  **Suzette has
> missed time due to an injury, which has made the transition difficult**.  The
> conduit area is still set up for the former Conduit Engineer and I have received
> complaints about the conduit mailbox being full.   We are not where the
> Conduit/Highway team needs to be at this time."

*Id.*

At year end, Magee rated her "Developing" <u>for the first time in her career</u>. *Id.*, at p. 7; Ex

B., at pp. 83:5-24-84:3.  Magee inaccurately noted that she had been in the role *all* of 2013 (with

no mention of her FMLA protected leave or modified work schedule), and instead criticized her

for letting the "Contract Engineer" oversee the department. (*During the times that Ms. Walker

was out of work, an on-site contractor, Gerry Slattery, had been assigned to handle her job

responsibilities*. Ex. E, at p. 50:7-13).   Despite that she was completely out of work for nearly

three (3) full months in 2013, and only worked 4 hours-days thereafter for another three (3) months

through September 2013, Magee admitted that he was unwilling to give any consideration to this

---

[9] Magee's contention that she *had to* return to work full time or forfeit her position, without so much as a discussion
on the topic, is violative of the ADA and the good faith interactive process required of an employer to determine if
such a reasonable accommodation is feasible. Further, the FMLA regulation specifically contemplates an employer's
obligation to comply with the ADA in the event FMLA leave is exhausted.  29 C.F.R. 825.216(c). Magee's insistence
that she come back or forfeit her job is *some* evidence a juror would consider as to his animus for her leave, which
should be weighed in connection with the entire record.

fact in connection with her 2013 year-end evaluation. Ex. E., at p. 63:16-24. Verizon's reviews expressly suggest to management that "<u>authorized absences</u>" removing an individual from the workplace for an extended period of time may warrant a different rating called "New," (undoubtedly so as not to tarnish their performance score or impact compensation for exercising federally protected rights).[10]

In addition to the fact that she had missed significant time due to her shoulder injury, Ms. Walker conveyed that she was doing nearly everything she could to get the back log done, but it was difficult due to the fact that her predecessor left behind a lot of previously designed projects that still weren't finished Ex. B., at pp. 89:21-90:7. Ms. Walker, *herself*, took the initiate to assign a lot of the backlog to external contractors, which was effective and resolved the problems existent in that department. Ex. B., at pp. 90:10-91:1-13. (Defendant's Motion improperly suggests she was placed on some sort of action plan, which is demonstrably false).

In April of 2014, Ms. Walker transitioned out of doing Conduit/Highway work, and was assigned to work as a "turf engineer," i.e. responsible for survey & design of high band width (HBW) orders for a particular geographic turf. Ex. B., at p. 94:5-10; Ex E., at pp. 29:17-30:6. She was not transitioned based on any performance reasons, but rather because Magee had an open turf position and he wanted her to fill it; Magee also knew she had performed a as "turf engineer" before. Ex. B, at pp. 94:15-20; 95:13-19; Ex. E., at pp. 81:24-82:1. Walker's assigned turf was a portion of the City of Philadelphia (Baldwin, Chestnut Hill, Davenport, Germantown, Ivy Ridge,

---

[10] Attendance was a huge consideration within the Engineering Department, and employees generally went out of their way to note their positive attendance within their "Employee Accomplishments Section," including in 2014 "<u>**zero medical absences**</u>," "0 days absent," "no absences," "0 absences, 100% perfect attendance." Ex O. (clearly suggesting that same was frowned upon). Carl Gross conceded that Engineers cannot maintain their respective workloads if they aren't there. Ex. G., at p. 64:17-21.

Poplar & Waverly).  Ex. B., at p. 95:25-96:3; Ex. P, at p, 815.[11]  (Ms. Walker remained in her role as turf engineer through her separation.  Ex. E, at p. 41:1-11).

A turf engineer responsible is responsible for the design and maintenance of the telecommunications network; the infrastructures were either copper (the old network), or a fiber network. Ex. B., at pp. 94:21-24, 122:21-23.  Ms. Walker handled HBW, FiOS[12] orders, cell site construction, maintaining and repairing copper customers, and dealing with the new high rise buildings in Philadelphia, with FiOS/FTTP (Fiber to the Premises) being the primary service.  Ex. B., at pp. 95:2-7; 110:8-9 (FTTP/FiOS are used interchangeably).[13]  Ms. Walker was responsible for all residential and business requests for service, whether new, changes to existent facilities, and was responsible for all customer interactions for her assigned turf. Ex E., at p. 39:6-16.  FiOs orders could include larger jobs, handled by an entirely separate group within Verizon but might lie within her turf (in which case she was responsible for monitoring or assisting what was already underway), and she handled smaller scale FiOS jobs.  Ex. B., at p. 105:7-19.

It was made clear through all levels of management that Engineering Specialists were hyper-focused on HBW orders, as they were the revenue generators.  Ex. B., at pp. 98:24-99:6; Ex., at p. 126:3-8.  Procedurally, the Specialists were responsible for handling a Service Request

---

[11] This was by no means Ms. Walker's first experience with either FiOs or HBW; she had experience with FiOs in a supervisory capacity, beginning in 2010 when Verizon first initiated FiOS, as she was responsible for ensuring the FiOS network jobs were properly posted in the database, and all errors were resolved (she had also attended numerous classes and training session on FiOS). Ex. B., at pp. 108:3-17; 109:6-9.  HBW had been in existence for some time and Ms. Walker was first exposed to it when she started performing HBW orders back in the mid-1990's.  Ex. B., at pp. 99:21-100:8; 101:8-18.  She continued performing HBW thereafter for approximately 4 years through 2000. Id.
[12] Fiber Optic Service.
[13] Verizon's goal was to move away from the old copper network, but Engineering Specialists were still responsible for replacing and repairing damaged copper and maintaining it in areas where FTPP was not available. Ex. B., at pp. 117:21-118:24.  Even though it was dying out, maintaining the old copper network, and if possible transitioning that customer to the new network, still encompassed a large portion of Ms. Walker's job (nearly 50% of her time spent). Id., and pp. 119:8-21; 120:15-17.

("SR") submitted through the Request Net system, investigating to determine what the customer's capabilities were, performing field surveys, and then designing the job.  Ex. B., at pp. 1022:2-10. <u>"Fac Verification" was a metric used to measure the processing of HBW orders, i.e. the amount of time from when an order comes through Request Net, through when it is held by the Engineers and ultimately sent to the next team.</u>  Ex E., at pp. 125:21-23; 75:12-76:4. This FAC Verification (also referred to as the SR Interval) **was the top priority**.  Ex G., at p. 49:15-19.  The primary goal was to increase the number of jobs issued *within 8 days of application*.  *Id*., at p. 50:15-22.  This process was referred to as "interval reduction."  *Id*., at p. 71:16-18.

Management admits that the <u>"biggest goal for the year" [that being 2014] was FAC Verification</u>.  Ex. G., at pp. 47:5-10; 72:8-11.   Management was, in fact, counseling employees that they would have to sacrifice actual performance based on workloads, because reducing the SR Interval was the "first priority."  Ex. G., at p. 49:3-14; Ex Q, at p. 1000.  The directive to make this a top priority came directly from the upper leadership team.  Ex. G., at p. 72:12-18.

By mid-year reviews, issued on or about August 8, 2014, Ms. Walker's positive performance was noted: "Suzette your numbers look good considering your time in the Turf.  Take ownership of your Turf, and learn as much as you can during the remainder of this year on HBW. <u>If you can get your Fac Verification under 8 (hers was 10.3 at mid-year, and the District Average was 18.314), you will be making a big contribution to the team.</u>"  Ex. R at p. 15.  In fact, by September of 2014, Magee actually re-assigned a portion of her team member: Steve Murphy's work to Ms. Walker because Murphy was not performing.  Ex. B., at p. 78:5-18.  This actually resulted in an expansion of Ms. Walker's territory in the Philadelphia area.  Ex. B., at pp. 78:19-

---

[14] I.e. she was doing significantly better than the <u>entire District's Average</u>, which included Magee, Gross, Septak, and Salinskie (all over the state of PA & DE). *Supra*.

10

79:12. (And a jury would reasonably conclude because she was more than competent in handling her job duties, as well as other another person's turf work load).

By February 25, 2015, when the 2014 year-end reviews came out, Ms. Walker' performance was directly on target. Ex. R., at p. 16. Her Fac Verification score was 8.4 vs the team's average of 12.7. Magee noted: "Suzette continued to grow into the Turf role in 2014. **She took HBW focus and moved her facility verification number to metric**. Suzette utilizes and manages SOW [statement of work] contractors well, but would benefit from completing more HBW surveys herself. Also, greater focus on the end product of the Contractors' product is necessary." *Id*. Performance reviews directly impact compensation, and managers have a direct say in merit bases increases. Ex. E., at pp. 158:21-23; 159:4-10. In March of 2015, Ms. Walker's performance based pay increase went from $90,834.00 to $93,560 – i.e. an increase of nearly 4% of her salary. Ex. E., at pp. 160:19-161:2.

Magee admitted in his deposition that in considering who he should select for the RIF, he first he looked at the performance appraisals, and focused on the metrics. Ex. E., at pp. 133:3-13. As to Magee's team members, their metric scores for 2014 were as follows (with pertinent commentary included *herein*):[15]

**Carl Bowman:**

2014 mid-year: 21.6 vs. 18.2 (team) "Carl, your results are fine, save your Facility

---

[15] For ease of review, each evaluation is 8 pages in length; a review of same will reveal that in most, if not all of the evaluations (with the exception of David Perry), the only area where the managers input comments are in the Mid-Year Manager Comments Section (complied in early to mid-August of each calendar year), and the Manager Comments Year-End Section (complied the February following the end of the calendar year at issue). **A review of both mid-year and year-end 2014 reviews very clearly demonstrates what management relayed in litigation: Fac Verification was the # 1 focus**. Finally, the inclusion FAC Verification scores within the employees' formal evaluations, did not occur until 2014. Ex. E., at p. 26:18-23 (which is why the 2013 scores cannot be included *herein*).

Verification number.  <u>The target is 8 and you are on the wrong side of the Team's average.</u> <u>There is not a more important target for you in the 2nd half of the year</u>.  We need to have more frequent communication on your daily held SRs." Ex. S, at p. 307.

2014 year-end:  14.8 vs. 12.7 (team).  "Carl has made noticeable improvements in Customer contact.  His knowledge of SR process has also improved.  <u>He needs to continue to put effort into driving down the Facility Verification hours</u>." Ex S, at p. 308.

** (Walkers Fac Verification scores were better, at 10.3 at mid-year and 8.4 at year end).

**Earnest A. Padovani**

2014 mid-year – 25 vs. 18.2 (team) ("Your numbers are solid except for Facility Verification.  Our target is 8 and you are on the wrong side of the Team's Average.  You have gained a lot of experience on HBW in the first half of the year, you need to put it into action and reduce this interval.  We are going to have to set up more frequent conversation on your held SR.").  Ex. T, at p. 349.

2014 year-end 16.5 vs. 12.7 (team) "Ernie needs to work on Customer communication; it is your responsibility to keep customers informed and stay in contact.  It is too easy in today's world to stay connected, this cannot be a fail point.  Ernie needs to get under his facility verification time, he should not be about the Team's average by 4 days." Ex. T, at p. 350.

** (Walkers Fac Verif. scores were better, at 10.3 at mid-year and 8.4 at year end).

**George  Zang**

2014 mid-year – 18.2 (team) vs. 24.7 ("George you have gotten the State Highway jobs under control, now you have to get the Facility Verification interval under 8 days.

12

You are currently much higher than our District Average.  We are going to have to have more frequent conversations on your held SR.") Ex. U, at p. 371.

2014 year-end – 16.9 vs. 12.7 (team)("George needs to continue to learn and improve on SR and HBW responses."). *Id.*

** (Walkers Fac Verif. scores were better, at 10.3 at mid-year and 8.4 at year end).

**Joseph Scelsa**

2014 mid-year – 18.2 (team) vs. 21.1 ("Joe, you are producing solid numbers in all categories except Facility Verification.  Your average is above the Team's average and far away from the goal of 8 days.  I know we have talked about it before, but you have to get more aggressive with moving these orders.").  Ex. V, at p. 413.

2014 year-end – 12.7 (team) vs. 17.9 ("Joe's facility verification metric was disappointing; a greater improvement from the Mid-Year was expected.  Joe handled a decent volume in his district which included HBW and FTTP.  His Customer interactions were positive.  Joe is properly engaged in communication with Field Forces and stays current in the progress of the field.  In 2015, Joe needs to stay current with District Initiatives, particularly around decreasing intervals.") Ex. V, at p. 414.

** (Walkers Fac Verif. scores were better, at 10.3 at mid-year and 8.4 at year end).

**Joseph Hui**

2014 mid-year – 18.2 (team) vs. 32 ("Joe, your numbers are solid except for the Facility Verification number.  We have to work on reducing that interval down to 8 days.  You have gained a lot of HBW experience over the last year, you have to put that experience to action.  Insert yourself into this process and make this change happen").  Ex.

13

W, at p. 434.

2014 year-end – 25.2 vs. 12.7 (team)("Joe made progress in 2014 on HBW process, but was unable to significantly reduce the Facility Verification Interval.  Joe also got his first introduction to FTTP Greenfields in 2014, which was a[n] apartment complex where we were very late in serving.  These two items are the priority going forward and Joe needs to improve his knowledge and response to both disciplines.  Joe was also late responding to Grade Requests on multiple occasions, this must be rectified in 2015").  Ex W, at p. 435.

** (Walkers Fac Verif. scores were better, at 10.3 at mid-year and 8.4 at year end).

**Mary T. Curtain**

2014 mid-year – 18.2 (team) vs. 19.3 ("Mary you have very good results,, except for Fac Verification.  19.3 is not acceptable.  With your volume of orders and years in that turf, I would except to see more Fac Yes replies.   We need to have more frequent conversation on your held SRs.").  Ex X., at p. 476.

2014 year-end – 13.4 v. 12.7 (team) (praised for SR's handled, and collaborative team work, key asset to Delaware).  *Id.*

** (Walkers Fac Verif. scores were better, at 10.3 at mid-year and 8.4 at year end).

**Maria Cesare**

2014 mid-year – 18.2 (team) vs. 13.8  (Maria, your numbers are great so far this year.  They reflect your hard work and dedication!!  Your Facility Verification is better than the Team's Average, but I need it to lower, the goal is 8 calendar days.  Please continue along this path success is near!!).  Ex Y., at p. 455.

2014 year-end – 12.5 v. 12.7 (team)(although able to move the Facility Verification

14

below team average, "fell short of moving it below the metric of 8 days," and continues to grow in the turf role, took leadership with an intern . . . .) *Id.* at 456.

** (Walkers Fac Verif. scores were better, at 10.3 at mid-year and 8.4 at year end).

### Steve Murphy

2014 mid-year – 20.5 vs. 18.2 (team)  ("Your numbers are strong save your Fac Verification results.  Your target Fac Verification is 8 days and you are North of the Team's Average of 18.2 days. You have to get more aggressive with moving the SRs.") Ex. Z, at p. 541.

2014 year-end – 15.7 v. 12.7 (team)("Steve managed to reduce his Facility Verification interval, but still fell short of beating the Team's Average; this cannot continue into 2015.  Steve also struggled with the FTTP component of his Locust Turf Area; in 2015 he will face a lessened demand and he must gain traction on changing the timetable of his deliverables.  The last area of concern is the chronic late responses to Grading Updates. Steve has talent and has done many positive items in 2014, but he needs to dig in and fix the negative trends.")  Ex. Z, at p. 542.

** (Walkers Fac Verif. were better, at 10.3 at mid-year and 8.4 at year end). Further, as referenced in or about September of 2014, Magee actually re-assigned a portion of Steve Murphy's work to Ms. Walker because Murphy was not doing performing. Ex. B., at p. 78:5-18. This contention is clearly bolstered by the negative feedback Magee inserted above into Murphy's year-end evaluation.

### Scott Panichelli

2014 mid-year – 18.2 (team) vs. 15.2 ("Scott, your results are solid.  Your Fac

Verification number was a nice surprise.  Keep up the good work and continue to drive that interval down.  8 is the goal for Fac Verification, lets make it happen by increasing the Fac Yes replies").  Ex. AA, at p. 520.

2014 year-end – 8.6 vs. 12.7 (team)("Scott did well with the demands and changes in procedures in 2014.  He made a solid contribution to the Team with his Facility Verification hours").  *Id.* at 521.

** (Walkers Fac Verif. were better, at 10.3 at mid-year and 8.4 at year end).

**John Shubrook**

2014 mid-year – 18.2 (team) vs. 15.1 ("The Fac Verification number is good, but still needs to go lower.  8 days is the target that I need you to attain.  You have the skills and education, you can figure this out.")  Ex. BB, at p. 391.

2014 year-end – 7.9 vs. 12.7 (team)("John made a significant contribution to the HBW improvements projects of 2014.  <u>He managed to pull up his Facility Verification number under the 2014 Objective</u>.").  *Id.* at 392.

** (Walker's Fac Verif at mid-year was better, at 10.3, and only a .5% difference for year-end).

**Paul Klauss** (The only one on the team to receive a score of leading on the 2013 eval)(Ex. DD, at p. 23)

2014 mid-year: 18.2 (team) v. 9.1 ("Paul your numbers look great.  Your volumes are high and you are doing fantastic with your Facility Verification Objective").  Ex. CC, at p. 498.

2014 year-end: 7.9 vs. 12.7 (team) (praised for "succeed[ing] in moving his Facility Verification number below the objective of 8 days.  Paul owns the SR process, his,

16

knowledge, experience and tenacity have put him in the elite category") Ex. CC, at p. 499.
** (Walker's FAC Ver. #'s were close in line, with 10.3 vs 9.1 and 8.4 vs. 7.9).

**Thomas Hodge** (The only one on the team to receive a score of leading on the 2014 eval)(Ex. DD, at p. 23)

> 2014 mid-year: 18.2 (team) v. 4.8 ("Tom, your numbers look great and you are crushing the Facility Verification Objective") Ex. EE, at p. 564.

> 2014 year-end: 5.4 vs. 12.7 (team)("Tom lead by example, reducing his Facility Verification interval down below target."). *Id.* at p. 565.

Walker concedes that Hodge was very knowledgeable about the job, with a special focus on HBW, who also provided training as needed when she was assigned her turf in April 2014. Ex. B., at p. 105:20-106:25.

**David Perry** (the newest on Magee's team. Ex B., at p. 171:8-11).

> 2014 mid-year: did not even receive a rating, due to his sheer newness in the role. Ex FF. at p. 326.

> 2014 year-end: 5.4 (above metric) vs. 12.7 (team)("completed six months in Engineering . . . . made solid progress on learning the systems and flow of Engineering. Dave must keep an open dialogue with myself, his teammates and our staff to ensure he continues down a positive path." *Id.* at, p. 327 (As, Perry was on a formal Performance Improvement Plan ("PIP") in 2014)[16]

**Anthony Portolese** (no metrics as he assumed Walker's prior Conduit/Highway role which did not involve a Fac Verif. measure. His evaluation, at both mid-year and year-end

---

[16] Perry's formal PIP plan is discussed further, *infra.*

demonstrates that Portolese was new to the role, and Magee was hoping he would expand his knowledge Engineering by assuming this role). Ex GG.  He came into Engineering shortly before Perry (and thus was second newest to the team).  Ex. DD, at p. 23.

Therefore, of 13 people actually ranked on her team for Fac. Verification, she exceeded 10 of those employees, and was on par with one.  (Thomas Hodge blew everyone out of the water – or "crushed it" as per Magee).

As to Carl Gross' team, who were specifically compared to Walker to determine if she stayed or went (*infra*):

Ed Boudman 2014 year-end, it was indicated that Gross would like to see Ed Boudman improve on percentage of jobs issued within the 8 days of application, "his percentage this year was 31 % - putting him in the bottom third of our district."  Ex. HH, at p. 875.

Paul Mulhern, 2014 year-end, expressed the same sentiment, except, Mulhern's FAC Verification score was the "third lowest in the district," (and he therefore did worse than Boudman).  Ex. II; Ex. G., at p. 52:5-21.  Plaintiff only cites these as examples where mention is made, as Gross didn't include the actual numeric metrics at mid-year and year-end as Magee did.

Quite disingenuously, Magee's first comments for Walker's RIF documentation specifically related to FAC Verification: "Suzette['s] Request Net Knowledge is still developing (YTD FAC Verification 19 compared to Team average 10)."  Ex. DD., at p. 18.  It would be difficult for a jury to conclude that this was anything but misleading, especially in light of the fact that at both mid-year in August of 2014 and end year, administered in February of 2014 – she exceeded nearly ALL but three of her team members in FAC Verification Scores.  *Supra.*  Even though Magee appears to have cherry picked a low month, as discussed *ad nausea*, her scores were

18

10.3 vs. 18.3 (team) in August, and 8.4 in February 2014 (which Magee concedes was metric) v. 12.7 (team) – and according, to Magee: good scores. Ex. E., at pp. 134:11-13; 121:9-12. Despite that the metrics show devastating FAC Verif. scores for her peers on a consistent basis throughout 2014 (*supra*),[17] no mention is made of their poor scores anywhere in the RIF comments documents for any of them. Ex. DD, at pp. 18-21. Looking at this alone, it would appear that her 19 for a particular month was an outlier, which is demonstrably false.

Also, in Magee's commentary section supporting her RIF (DD, at p. 18), he makes a point to mention that she received a "D rating," (i.e developing for 2013), as she hadn't "learned the core engineering role as quickly as expected." *Id.* This a.) makes no mention of being out for 3 months, and 3 months more working only 4 hrs a day, and b.) in David Perry's comments area – he makes NO mention of the fact that David Perry *also* received a "D rating," – nor that David Perry had been placed on a formal PIP. Ex. DD., at p. 20.

The only individuals who had a "developing" on an evaluation out of the respective teams for 2013 or 2014 were Walker and Perry. Ex DD, at pp 22-23; Ex. G., at p.73:9-13.   While Ms. Walker was notably out on a protected FMLA leave of absence, and working a modified work schedule a large majority of the 2013 year (i.e from April 26, 2013 through September 2013), and admittedly new to her role in Conduit/Highway in the first instance, Perry not only received a "Developing" rating on his 2013 year-end evaluation, but as of February 25, 2014 – he was still on a formal Performance Improvement Plan. Ex LL.[18] "Significant result improvements must

---

[17] I.e. varying in the highest ranges of: 21, 21.6, 24, 25, 25, 32.

[18] The performance concerns with Perry are riddled throughout the manager comments sections, "discipline and holding the technicians accountable for their results must improve," "although JDP was improved Dec. over Jan., there is still room for improvement," and certain responsibilities were actually removed from his techs simply to reach production requirements, "the overall rework of this group must improve. None of the objectives have been met YTD," "Dave's day needs to have a more designed structure for this [tracking his associate] to be accomplished. It is imperative that what is being asked for is what is being delivered." Ex LL.

happen quickly in 2014 in order for Dave to be removed from this plan." Ex LL., at p. 321.  Despite Perry's glaring performance problems, and notwithstanding the fact that he had only been in the Engineering Department for approximately six (6) months (Ex. FF at p. 327) when the RIF came about, Magee commented that he ranked him above Ms. Walker because he thought Perry was simply "gaining knowledge more quickly." Ex. DD., at p. 20.

As to knowledge of HBW (an area Magee appeared to criticize Walker about in his commentary for rate & rankings (Ex. DD, at p. 18), while Scelsa received a "performing" rating for his 2013 year-end eval, Magee noted that "the HBW role is the area that Joe must improve upon; he must become independent with SR movement, survey and design completion." Ex. MM., at p. 405.  Padovani too received a "performing" rating for his 2013 year-end eval, but Magee specifically noted that he "has room for growth on HBW/HiCap issues, which is essential for success in the coming year." Ex NN. at p. 341.  Finally, it was expressly stated in the rate and rankings from that Perry (the newest employee) "still needs to expand his knowledge of HBW service types and design of those orders." Ex. DD, at p. 20.

Finally, the primary "critique" from Magee within her final review was for her use of contractors, yet management admitted during litigation that their engineers were *supposed* to use contractors, as they were a "tool," "to get the job done." Ex. G., at p. 54:3-19.  Use of contractors helped generate revenue more quickly, in fact, the engineers were generally praised for the use of contractors: "Sam utilizes contractors as much as possible to get the jobs issued, therefore bringing in the revenue as soon as possible." Ex. JJ, at 879.  And another, Dave Dehaven: he "has made an effort to reduce costs by utilizing best practices, such as using contractors when possible.  The effective use of contractors greatly reduces the overall cost of each work order." Ex. KK, at p.

20

898.

**The RIF:**

During the first quarter of 2015 (he estimates sometime in March of 2015), Mr. Magee

participated in a telephone call with Director Muccilo and all of the other Engineering Managers,

*wherein*, Muccilo informed them that a RIF was going to take place. Ex. E., at pp. 130:4-14;

132:2-4. Magee was subsequently informed by Muccilo that he would have to select one (1)

person on his team for impact. Ex., at pp. 141:18-21; 145:3-7. This directive changed, however,

and Muccilo informed Mr. Magee that it did not have to be someone on his team; instead, Mucillo

directed him to meet with Carol Gross, "because the number for Eastern, PA, [and] Delaware is

just one now, **so you and Carl have to come up with, you know, who should be RIF'd**." Ex. E.,

at. pp. 142:1-7; 145:3-7.[19] As previously referenced, these two managers shared responsibility for

Eastern PA & DE, and both managed Engineering III Specialists.

When Magee contacted Gross, Gross told him that the Engineer he would select for the

RIF would be Ed McIntosh. Ex. E., at pp. 142:22-143:4. When asked if anyone on Gross' team

was actually ranked in order to come up with this proposed employee, Magee testified:

> "All I know is what he told me. **He said he picked Ed McIntosh because he was**
> **the newest on his team. He felt like everyone on his team was, you know, great,**
> **and he felt Ed was great - he just said he had no other way to split it**."

Ex E., at pp. 145:18-146:1. (Gross conceded that Magee's testimony was accurate; "Q: So did you

pick Ed McIntosh because he was the least senior on your team? A: Yes." Ex G., at p. 45:12-

---

[19] Within verified Interrogatories, Verizon alleges that Magee and Muccilo made the decision to end Ms.Walker's
employment (and made no mention of Gross). Ex.OO, at Rog. No.: 3(A). Muccilo was very clear that he only saw
Walker's name appear on a list for impact, and never saw her rate & rank. Ex. F., at pp. 54:14-57:12. (Defendant's
Brief inaccurately suggests Muccilo made some kind of meaningful review of the rate & ranks – he never saw
them). *Id.*

46:1-6.[20]  Once Gross said who he would select and how made his RIF decision (i.e. <u>based on</u>

<u>seniority</u>),[21] the two decided that Walker would be the preferred candidate for impact.  Ex. E., at

p. 172:3-16 ("we both used personal knowledge of each person.  We both are very familiar with

both of those individuals.")  "We just talked about, you know, what both of them bring to the team

and going forward what is the best, and I made the decision.  I felt as though if that was my team,

which one day that all could be my team, Carl Gross' area, the way things are going I felt like what

is the best team for me."  Ex. E., at p. 173:5-18.

Gross admits he didn't rank his team with any of the HR business partners (and certainly

not as per the "sophisticated multi layered approach" touted in litigation) **and contends he simply**

**made up his own method**.  Ex. G., at p. 34:18-35:1-9.  He was asked:

> Q:  "What process were you given to rank your team members or did you come up with
> your own process?
>
> A:  **"I came up with my own process."**
> . . . . . .
>
> Q:  Where did you put this information?
>
> A:  Where did I put it?  I didn't put it anywhere. "

*Id*. at pp. 35:10-13; 36:20-22.  When asked where he would have maintained a record (of his "own

process") of ranking his employees, he contends that he put them on a list and turned them in to a

woman named Diane Redilla (and shared it with no one else).  *Id*., at p. 40:4-22; 41:14-42:15.

When  asked  to  turn  this  over  in  discovery,  Verizon's  counsel  confirmed,  that  no  such

---

[20] This was the last conversation Gross had with anyone about the RIF, and no one on his team was ultimately impacted (because they went with Walker).  Ex. G., at p. 69:5-17.  **These conversations are conveniently omitted from** **Verizon's Motion to this Court as they are strenuously arguing that their managers followed their well-designed** **RIF protocol.**
[21] Ed MacIntosh was, in fact, the newest on Gross' team – and came into the Department *right before the RIF*.  Ex. B., at p. 175:18-23.

documentation exists.  Exhibit PP (Verizon searched its records, and no such documents were sent to Redilla; and "[t]here were no RIF reports generated for Carl Gross' team as part of the RIF in which Suzette was affected.").

On Tuesday, March 31, 2015, the HR Business Partner, Melissa Parker, emailed upper management, including Muccilo, identifying that she was providing a "template" (Exhibit QQ) for them, "to submit employee names to me, so that I can create the cases for you." Exhibit RR.  She then recapped the process as follows:

Step 1: Mike (staffing employee) will consolidate the names on the attached spreadsheet and send to [her] by COB Wednesday;

Step 2: [she] creates a business case in the system;

Step 3: [she] send the respective Director the assigned RIF business case #(s)

Step 4: Director/Selection Manager goes into system and rate and ranks employees and add comments as appropriate." Ex. RR.

On Thursday, April 2, 2015, Mike, the staffing employee, emailed Ms. Parker the list of all those individuals who would be impacted by the RIF.  Ex. RR (and attachment).  Walker is contained on the RIF list, as one (1) of 13 Engineers to be impacted under Muccilo, the only one (1) to be impacted on Magee's team, and no one was listed for impact from Gross' team.  Id. (at attachment)(as Magee & Gross decided that of the two (2) respective teams, Walker would go).

In creating a "business case," Parker goes into the system, and types in job code(s), and from those codes, the system automatically populates the proposed comparator names in the system for ranking.  Ex. SS., at p. 36:13-23.  When asked where she obtained the job code(s) for Ms. Walker's case, she testified that Mr. Magee provided it to her "in the template back to me."

*Id.*, at p. 38:6-11. The template form completed by management, however, <u>contains no job codes</u>. Ex QQ (template blank); Ex. RR (template completed). Instead, it appears as though she simply typed in the job code for Mr. Magee (CTNGT2)(which would populate only to those individuals specifically assigned to Mr. Magee's team). Ex. SS., at p. 31:3-12.

In the Business Case Parker generated for Ms. Walker, labeled 102777, it only included only those 15 other employees on <u>Magee's</u> specific team. Ex DD (at pp. 22-23). Verizon, however, confirmed in verified supplemental interrogatory responses that Ms. Walker wasn't simply sized up against Magee's team and that Business Case 102777 should include those Engineering III Specialists supervised by *either* Magee *or* Gross. Ex TT. Rog. No.: 6. Although their verified interrogatories state that the Business Case 102777 contains all those Engineering III Specialists under Magee and Gross (Ex. TT) – the Business Case Parker created very clearly <u>only includes the 14 other employees under Magee</u>. Ex. DD. Parker could not explain why a Business Case was never created for Gross' team as well. Ex. SS, at p. 36:5-12.

At this point, Parker's having created the "Business Case," <u>she now has management complete the rate and rank of employees</u> (which is what the Court can review within Exhibit DD, at pp. 22-23). At this stage, the allocation of "points" and adding commentary (if the manager so decides) is completely futile, as the managers have *already picked their respective candidates* and Walker had already been slotted for lay off, based on the clear decision already made between Magee and Gross.

On April 23, 2015, Ms. Walker was notified by Magee that she was being subject to the RIF. Ex. B., at p. 9:7-17. During the relevant time period, Magee had 15 individuals on his team.

24

Ex. B., at pp. 95:14-23.[22]  Besides Ms. Walker - they were all Caucasian, and one (1) was Asian. *Id.*, at pp. 128:12-129:19; Ex. DD  (*cf.* w/ Ex.  UU).  As to Gross' team, 13 individuals in total, they were all Caucasian and one (1) was Hispanic.  Ex. G., at pp. 38:15-40: (*cf* with Ex. UU).   As to Magee's team, 7 members were significantly younger than Ms. Walker (one by 25 years, one by 15, three by 12 years, one by 11 years, one by 10 years) and three younger by 4 years, one by 2 years, and three employees who were older than Ms. Walker.  *Cf* Ex. DD and Ex. UU. As to Gross' team, four members were significantly younger (one by 24 years, one by 16 years, two by 12 years), 8 others were all younger than Ms. Walker by between 1 to 5 years younger (and one was older). Ex. G., at pp. 38:15-40: (*cf* with Ex. UU).    Finally, neither Gross or Magee could point to anyone else on their respective teams who took medical leaves in 2013 or 2014.  Ex. G., at pp. 64:22-65:3; Ex. E., at pp. 129:20-130:4.[23]

### III.   LEGAL ANALYSIS

#### A. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In considering a motion for summary judgment, "a court does not resolve factual disputes or make credibility determinations, and must view facts and inferences in

---

[22] There was also a 16th "team member," but this person was essentially an intern, part of Verizon's development leadership program for a one year term.  Ex. E., at p. 95:10-23.
[23] Despite that Verizon alleged in written discovery that they "have not transferred any employees into the Engineering III Specialist title at 900 Race Street location since Plaintiff's separation," (Ex. VV, at Doc. Response No.: 11, at p. 2), Magee testified otherwise. Since Ms. Walker was RIF'd from the department in April 2015, he has gained two (2) new Engineering III Specialists on his team, both Band 7 Salary levels, which both occurred "**at the beginning of this year**." Ex. B., at pp. 155:2-24; 158:9-15 (i.e. before Verizon supplied this blatantly false discovery response).  This type of blatant contradiction certainly speaks Verizon's veracity.

the light most favorable to the party opposing the motion." *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

The moving party bears the burden of proving that no genuine issue of material fact is in dispute. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970). A genuine issue is established if a reasonable jury could return a verdict for the non-moving party based on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

"[O]n summary judgment, the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-588 (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962)). "If reasonable minds can differ as to the import of proffered evidence that speaks to an issue of material fact, summary judgment should not be granted." *Gelover v. Lockheed Martin,* 971 F.Supp. 180, 181 (E.D.Pa.1997).[24]

**B.  Legal Argument:**

**a.)  Ms. Walker can establish her claims of race and age discrimination**

Defendants do not contend that Ms. Walker cannot establish a prima facie case as to her ADEA age & Section 1981/Title VII/PHRA race discrimination claims; instead, they argue that

---

[24] "In employment discrimination cases, the summary judgment standard is 'applied with added rigor' because 'intent and credibility are crucial issues.'" *Walden v. St. Gobain Corp.,* 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) *quoting Stewart v. Rutgers, State Univ.,* 120 F.3d 426, 431 (3d Cir. 1997). "Employment discrimination cases center around a single question: why did the employer take an adverse employment action against Mr. Schatzan? Because this 'is clearly a factual question,' *Chipollini,* 814 F.2d at 899, summary judgment is in fact rarely appropriate in this type of case. Simply 'by pointing to evidence which calls into question the defendant's intent, the Mr. Schatzan raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment.' *Id. See Sempier,* 45 F.3d at 732-33 (cases in which Mr. Schatzan attacks employer's stated reasons for adverse employment action 'must be resolved by a jury and cannot be resolved on summary judgment')." *Marzano v. Computer Science Corp.,* 91 F.3d 497, 509-10 (3d Cir. 1996).

she cannot adduce any evidence of pretext.[25] For purposes of completeness, however, Plaintiff briefly addresses the *prima facie* case.

Normally, to make out a prima facie case for race discrimination, a plaintiff "must make four showings: (1) that she is a member of a protected class, (2) that she is qualified for her position, (3) that she has suffered an adverse employment action, and (4) that she suffered such action under circumstances giving rise to an inference of discrimination. *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 249 (3d Cir.2002); *Simpson v. Kay Jewelers*, 142 F.3d 639, 644 n. 5 (3d Cir.1998). In reduction-in-force cases, the fourth element is relaxed, *Torre v. Casio, Inc.*, 42 F.3d 825, 831 (3d Cir.1994), and instead "the plaintiff must show that the employer retained 'unprotected workers.'" *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 234 (3d Cir.1999) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir.1994))." *Brown v. Boeing Co.*, 468 F.Supp.2d 729, 734 (E.D.Pa.,2007)(citations in original)(J. Robreno articulating standard for race RIF case). As part of the fourth element, the plaintiff must identify retained employees who were "similarly situated" to the plaintiff, that is, they worked in the same area and in approximately the same position. *Smith v. Thomas Jefferson University*, 2006 WL 1887984, at *3 (E.D.Pa.,2006)(citing *Anderson* 297 F.3d at 249-50)(J. Padova articulating the same fourth element for age & race RIF cases).

A plaintiff's burden to establish a *prima facie* case "is not intended to be onerous." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir.) (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *see also Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir.1994) (describing *prima facie case* as "relatively simple");

---

[25] Verizon addressed the age and race discrimination claims last in their Brief, despite that these were the first Counts in Ms. Walker's Complaint (Ex A, at Counts I, II, and III), and appears they did so as they have the least elements in dispute and present clear factual issues on the determination of pre-text.

*McKenna v. Pacific Rail Service,* 32 F.3d 820, 825 (3d Cir.1994) (same); *Massarsky v. General Motors Corp.,* 706 F.2d 111, 118 (3d Cir.), *cert. denied,* 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983)). (describing *prima facie case* as "easily made out").

Likely the reason why Defendant Verizon did not attack Ms. Walker's ability to establish a *prima facie* case as to either her age or race discrimination claims, is because Ms. Walker can demonstrate that every single person retained over her (all Engineering III Specialists under Magee & Gross) were outside her protected class of African American.[26]   Further, she can demonstrate that Verizon retained significantly younger employees (all Engineering III Specialists under Magee & Gross), 11 in total who were between 10 and 25 years younger than Ms. Walker (and others still at least 4-5 years younger). *Id.*[27]

## PRETEXT

"The Court today holds that an employment discrimination plaintiff may survive judgment as a matter of law by submitting two categories of evidence: first, evidence establishing a "prima facie case," as that term is used in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); and second, evidence from which a rational factfinder could

---

[26] Ex. E., pp. 128:12-129:19; Ex. G., at pp. 38:15-40, *cf* with Ex. UU.

[27] *See Barber v. CSX Distrib. Servs.,* 68 F.3d 694, 699 (3d Cir. 1995) (eight year difference between plaintiff and comparator could support a finding that the comparator was "sufficiently younger" than the plaintiff to permit an inference of age discrimination);*Sempier v. Johnson & Higgins,* 45 F.3d 724, 729-30 (3d Cir. 1995) (concluding that the combined difference in age between plaintiff and four-years-younger and ten-years-younger coworkers was clearly sufficient to satisfy the fourth prong of a prima facie case by raising an inference of age discrimination); *and see Steward v. Sears, Roebuck & Co.*, 231 Fed. Appx., 201 (3d. Cir., 2007)(reversing district court grant of summary judgment where the average ages of employees who replaced was only 6.75 years younger than the plaintiff); *and see Hormann v. NW Sign Industries, Inc.*, 2009 WL 2751027, at *3 (D.N.J.,2009)(where plaintiff was 68, and "of the thirteen retained employees, nine were 38 and younger, and the other four employees were 42, 42, 44, and 50. This evidence is sufficient to raise a jury question as to whether NW Sign retained sufficiently younger employees). Further, in ADEA cases, a plaintiff can show that the other workers who were retained were "sufficiently younger" than the plaintiff to create an inference of age discrimination, even if those other workers were also within the class protected by the ADEA, that is, they were older than forty. *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 236 (3d Cir.1999); 29 U.S.C. § 631(a).

conclude that the employer's proffered explanation for its actions was false. Because the Court of Appeals in this case plainly, and erroneously, required the plaintiff to offer some evidence beyond those two categories, no broader holding is necessary to support reversal." *Reeves v. Sanderson Plumbing Products, Inc.*, 120 S.Ct. 2097, 2112, 530 U.S. 133, 154 (U.S.,2000); *and see Anderson v. Consolidated Rail Corp.*, 2000 WL 1201534, at *5 (E.D.Pa.,2000).

To defeat summary judgment when the defendant answers the plaintiff's *prima facie case* with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative factor of the employer's action. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994); *see also Woodson*, 109 F.3d at 920 n. 2; *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061 (3d Cir.1996) (en banc), *cert. denied*, 521 U.S. 1129, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997). "The fact-finder may infer from the combination of the prima facie case, and its own rejection of the employer's proffered reason, that the employer engaged in the adverse employment action for an invidious reason." *Johnson v. Penske Truck Leasing Co.*, 949 F. Supp. 1153, 1172, 1996 U.S. Dist. LEXIS 19383 (D.N.J. 1996).

Foremost, the single fact that makes Defendant's arguments contained in their brief improper for purposes of summary judgment, is that they are asking this Court to determine a significant material factual issue: whether or not a jury would actually accept that the managers at issue here *actually* followed the RIF protocol laid out through HR (or made the decision at whim). Despite that Verizon had in place legitimate RIF criterion and rate & rank procedures, the two managers directly at issue (Magee & Gross) were asked to get together and select one (1) employee

29

from both of their respective teams, and they a.) simply decided amongst themselves who would go, and b.) allegedly made up their own personal criterion. If, in fact, Gross & Magee were going to canvas their respective teams *properly*, there should be fully completed rate & rankings for both groups of Engineering Specialists.   There aren't, however, as Gross admitted that he "come up with his own process." *Sic* Ex. G., at p. 35:10-13.   Also, although he alleged through self-serving testimony that he conducted his own "rate & rank," (which a jury need not even credit) -- when asked to corroborate that a single document in the whole world exists that would establish same, he could not. Ex PP.   Even looking at Magee's formal rankings (Ex.DD)(which were ultimately compiled by HR)[28] – they do not establish the legitimacy in ultimately choosing Walker, as there were individuals on Gross' team who were specifically compared to her, and were able to keep their jobs based on Gross and Magee's decision that everyone on their respective teams were better candidates for retention than she.   This is certainly evidence a jury would consider as evidence of pre-text. *See Poff v. Prudential Ins. Co. of Am.,* 911 F.Supp. 856, 861 (E.D.Pa.1996) (noting that "[a]n employer's failure to follow procedure assists a plaintiff's case [of employment discrimination] if such violation, in conjunction with other evidence (such as evidence showing that the policy was disparately applied), tends to show that the proffered reason [for an adverse employment action] is not credible") (citations omitted).

The record is completely silent on whether or not any of Gross' team had any formal of discipline (which would certainly impact their scores – or should have, but no one ever did a rate & rank).   All of the columns that are laid out in the rank and rank document for these engineers,

---

[28] Magee never even *saw* Ex. DD (the rate & rankings form) until the day before his deposition in this matter when his Counsel showed it to him. Ex. E., at p. 14:1-16. Further, he admits that some of the comments in that document *aren't even his words*. *Id.* at p. 148:5-7.

including credo, technical knowledge, primary skill set proficiency, are sorely lacking for Gross' team, who again, was specifically compared up against Ms. Walker when these managers determined that Ms. Walker would lose her job out of the lot.   In *O'Hare v. McLean Packaging and Trucking*, WL 3207277 (D.N.J. 2009)(Rodriguez, J.), the District Court denied a motion for summary judgment as to the plaintiff's FMLA retaliation claim wherein the employer alleged the plaintiff was terminated due to a reduction in force ("RIF").   One major factor considered by the Court in denying summary judgment was the defendant's inability to demonstrate with any specificity how neutral criteria was supposedly <u>applied across-the-board</u> when deciding who was to be laid off in the alleged RIF.   *See also Bell v. Prefix, Inc.*, 321 Fed.Appx. 423 (6th Cir. 2009)([i]n denying summary judgment in an alleged RIF case, the Court explained "[Defendant] does not appear to have adopted a formal structure for its RIF or used any objective process or criteria in selecting employees for inclusion. Rather, [Defendant] appears to have discharged whomever [it] liked whenever [it] liked. This supports a finding of pretext because the RIF's discretionary nature provided an opportunity for discriminatory intent to influence [Defendant's] decisions"), citing, *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 534 (6th Cir. 2007); *Cutcher v. Kmart Corp.*, 364 Fed.Appx. 183 (6th Cir. 2010)(Reversing district court's grant of summary judgment in substantial part as to FMLA claims in alleged RIF where employer could not produce documents or information to support objectively and equally applied criteria and reasons for the plaintiff's inclusion in the alleged RIF).

The Third Circuit has warned that a reviewing court should very carefully scrutinize **<u>subjective</u>** criteria even when it's applied across the board, let alone when it is applied only selectively as in this case. *See Weldon v. Kraft, Inc.*, 896 F.2d 793, 798 (3d Cir.1990) (Subjective

31

evaluations of performance "are more susceptible of abuse and more likely to mask pretext" than objective job qualifications.) (internal quotation marks omitted).  In the context of discrimination claims, i.e. an ADA case: "[a] RIF is not an open sesame to discrimination against a disabled person.  Even if the employer has a compelling reason wholly unrelated to the disabilities of any of its employees to reduce the size of its work force, this does not entitle it to use the occasion as a convenient opportunity to get rid of its disabled workers." *Matthews v. Commonwealth Edison Co.,* 128 F.3d 1194, 1195 (7th Cir.1997) (citation omitted). Nor can it be an opportunity to get rid of workers who exercise their FMLA right to take medical leave for serious medical conditions. *See* 29 U.S.C. § 2615(a). *Id.*  Although the rankings for the performance evaluations for 2013 and 2014 (i.e. leading (5), performing (3), developing (1) dictate input of certain numerical scores, the remaining categories, scored from 1 through 5, i.e. "credo," or "technical knowledge," are all *entirely subjective and within management's sole discretion.* Ex. E, at p. 127:19-23.

It is hard to conceive, or a jury may not credit, Magee's conclusory assertion that Ms. Walker earned lower numerical scores in these categories against other employees who *had just come into the Engineering Department*, while she had been there for 30 + years.  By way of example, Portolese (white, age 31) had just returned to the Engineering Department after working a supervisor over in the construction field. Ex. E., at pp. 23:3-20; 87:17-88:11.  It was specifically noted in his review that he was new to the role, and Magee was hoping he would expand his knowledge Engineering. Ex. GG.  Perry (white, 12 years Ms. Walker's junior), also new to the Engineering Department, was previously working as a supervisor in customer ops. *Id.* at p. 179:3-9.  Due to the fact that he was on an active PIP plan less than a year before the RIF occurred, his review cautioned that he maintain communication with his supervisor and teammates in order to

32

<u>stay on a good path</u>.  Ex. FF.

      The Third Circuit has explained that to prove pretext, a plaintiff may rely on the employer's

disparate treatment of the employee. *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 638-39

(3d Cir. 1993); *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 644-45 (3d Cir.

1998), *citing Fuentes v. Perskie,* 32 F.3d 759, 765 (3d Cir. 1994).   Most pertinent in this Court's

consideration is that despite any subjective assertions about Ms. Walker's capabilities (despite a

track record of demonstrated performance to the contrary for 30 + years), the 2014 performance

evaluations for her team, and various individuals on Gross' team, demonstrate that from any

objective stand point -- she was a prime competitor among her peers.  Without re-hashing the same

factual arguments laid out above at some length respecting FAC Verification scores, and criticisms

of her peers, Plaintiff will simply re-iterate two (2) essential points.  (1) Management made clear

that Fac Verification was **the top priority**.  Any review of the manager comments throughout

2014 clearly shows that Magee devoted a significant portion of his comments specifically to Fac

Ver scores and his team's successes or failures in that regard. (2) In 2014, Ms. Walker Fac Ver.

scores surpassed a large majority of her peers on Magee's team, and records show that at least two

(2) of Gross' team members' Fac Ver. scores were in the <u>bottom of the District</u>.  Accepting as true

that Fac Ver was a top priority and the number one goal (as couched by management) and that Ms.

Walker far surpassed her own team <u>and was within metric as of late February 2014</u> (at or about

the time the RIF took place), terminating her for performance reasons appears demonstrably

false.29

---

[29] This case is quite comparable to the Third Circuit's ruling in *Tomasso* at 708, where the Court found that the Plaintiff adduced sufficient evidence of pretext in a RIF case by pointing to external evidence, such as earlier evaluations and objective facts that discredited the purported poor performance points articulated by his employer. *and see Sheridan*

In addition, inconsistent testimony from material witnesses is a sufficient basis to discredit an employer's purported nondiscriminatory reasons for termination.  *See, e.g., Sorba v. Pennsylvania Drilling Co.,* 821 F.2d 200, 205 (3d Cir. 1987) ("the testimony of the movant's witnesses was inconsistent regarding whether they believed [the Plaintiff's] performance caused the unsatisfactory job results").  Magee and Parker provided <u>conflicting testimony</u> about how discipline scores were compiled for Magee's RIF candidates.  Magee alleged that the discipline or "corrective action" column was not something he compiled, bur rather, was done through the "system." Ex. E., at pp. 18:19-19:4.  Parker testified otherwise, and that it was management's job to scour their own employee files and be candid about whether or not any discipline, including written warnings, existed for any of their employees. Ex. SS., at pp. 45:22-46:15.  A jury would certainly question Magee's candor in this regard, as Perry was on a formal Performance Improvement Plan as of February, 2014, and no mention was even made of that in the RIF commentary area.  (Ex. DD)(even though he went out of his way to mention that Walker had received a "D rating," but did not disclose this under Perry's comment section, where he specifically put remarks).

### b.) FMLA Retaliation/ADA/PHRA Retaliation Claims

In *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000), the Third Circuit reiterated that the existence of a causal link between protected activity and an adverse employment action "must be considered with a careful eye to the specific facts and circumstances encountered." There are no exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference. *Kachmar v. Sungard Data Sys.,* 109 F.3d 173, 177 (3d Cir.

---

*at* 1073–74 (3d Cir.1996) (en banc) (stating that an employee could show pretext in part by adducing "affirmative evidence of her own accomplishments," including awards, a promotion, and a salary increase).

1997); *see also Waddell v. Small Tube Products, Inc.,* 799 F.2d 69, 73 (3d Cir. 1986).

In this particular RIF case, the 2013 and 2014 reviews were specifically "weighted" as part of the rate & rankings. Ex. DD, at pp 22-23. Out of all her peers, Ms. Walker's scores apparently suffered, in receiving a 1 (for Developing) vs. a 3 (for all those who received Performing). Magee, in justifying his choice for impact, highlighted the fact that she received a "D" rating in 2013 in his comments area. *Id.*, at p. 18 (tho not even mention Perry's D rating). The record clearly demonstrates that this was the first "Developing" rating she had ever received in her entire career with Verizon – in over 30 years. In 2013, she was working in a new role - Conduit Highway- and her supervisor explicitly referenced in her 2013 year-end review that the transition was made difficult *because* she was out for her shoulder injury. "GPIS review has been a positive transition, but conduit design has been hard to transition. Suzette missed time due to an injury, which has made the transition difficult.") Ex. II, at p. 5. "[E]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under 'no fault' attendance policies." *See Tucker v. County of Monmouth*, 159 Fed.Appx. 405 (3d Cir. 2005); *Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 307 (3d Cir., 2012)(in finding sufficient evidence of causation, "[s]ince UPMC's position statement stated that Lichtenstein's attendance problems were one of the reasons it terminated Lichtenstein, a trier-of-fact could infer that UPMC considered Lichtenstein's January 3rd absence as a negative factor in its termination decision.").

Ms. Walker not only missed time from April 26, 2013 through July 14, 2013 on a block basis under the FMLA, even after her FMLA leave expired, she continued to work a modified 4-

hr per day schedule thereafter through September 2013 (her protected activity under the ADA).[30]

In spite of her negative evaluation from Magee, including that her need for time off for her shoulder impacted her transition within the Department, and multiple times telling her she had to come back full duty or forfeit her position, *supra*, it was Metlife who approved the modified work schedule as part of its third party evaluation process. It was not up to Magee, and he concedes that was all completely "outside of his Universe." (I.e. Verizon touts approving this leave, though Magee had nothing to do with this "generosity"). Verizon's discussion about temporal proximity as a pertinent consideration here misses the mark. Management was specifically *looking back* to the 2013 evaluation in its ranking of the employees at issue.

If a reasonable jury were to conclude that absent her 2013 negative evaluation, for which she was absent a *considerable amount of the year*, i.e. nearly 6 months (3 on a block leave basis, and 3 on a modified work schedule), that she may not have fallen at the bottom of the rankings, they could readily conclude by a preponderance of evidence that her taking of FMLA/ADA time off was a determinative factor in Verizon's decision to impact her employment vs. anyone else who did not receive a "D" rating in 2013 or 2014. Plaintiff does not reiterate the bases for sufficient evidence of pre-text, as same is discussed *supra*, and is equally applicable to the retaliation claims.

---

[30] *See .e.g. Bernhard v. Brown & Brown of Lehigh Valley, Inc.*, 720 F.Supp.2d 694, 703 (E.D. Pa. 2010.)(Pratter, J.)(wherein this Court explained that a period of up to 3 months off from work can constitute a reasonable accommodation), citing, *Conoshenti v. Public Serv. Elec. & Gas Co.,* 364 F.3d 135, 151 (3d Cir.2004)("[T]he federal courts that have permitted a leave of absence as a reasonable accommodation under the ADA have reasoned ... that applying such a reasonable accommodation at the present time would enable the employee to perform his essential job functions in the near future."); *see also Shannon v. City of Philadelphia*, No. 98-5277, 1999 WL 1065210, at *6 (E.D.Pa. Nov. 23, 1999) ("Viewing the evidence in the light most favorable to [plaintiff], the court finds that a reasonable jury could conclude that [plaintiff's] request for an additional three months of unpaid leave for medical treatment was a reasonable accommodation."). A "part-time or modified" work schedule," constitute reasonable accommodations. 42 U.S.C. § 12111(9)(B).; *EEOC v. Grane Healthcare Co.,* 2014 U.S. Dist. LEXIS 28477, 9-11, 29 Am. Disabilities Cas. (BNA) 655 (W.D. Pa. Mar. 6, 2014); 29 CFR §1630.2(j)(1)(vii).

III. <u>**CONCLUSION**</u>

Based on the foregoing analysis, Ms. Walker respectfully requests that this Court deny

Defendants' Motion for Summary Judgment in its entirety.


Respectfully Submitted,

**KARPF, KARPF & CERUTTI, P.C.**

*/s/ Christine E. Burke* _____
Christine E. Burke, Esq.
3331 Street Road
Two Greenwood Square; Suite 128
Bensalem, PA 19020
215-639-0801
Attorney for Plaintiff


Date: October 28, 2016

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SUZETTE WALKER : | |
| : | |
| Plaintiff, : | CIVIL ACTION NO.: 15-4031 |
| : | |
| v. : | |
| : | |
| VERIZON SERVICES CORPORATION : | |
| and : | |
| VERIZON PENNSYLVANIA INC. : | |
| : | |
| Defendants : | |

## CERTIFICATION

I certify on the date set forth below that I served Defendants with a copy of Plaintiff's

Response to Defendants' Motion for Summary Judgment at the following address via ECF as

follows:

Joel S. Barras, Esq.
Valerie E. Brown, Esq.
Reed Smith LLP
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA  19103
jbarras@reedsmith.com
vbrown@reedsmith.com

/s/ Christine E. Burke_____
Christine E. Burke

Dated: October 28, 2016

38