# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Suzette Walker | : | |
| 2748 N. Judson Street | : | CIVIL ACTION |
| Philadelphia, PA 19132 | : | |
| | : | No. 15-4031 |
| Plaintiff, | : | |
| | : | |
| v. | : | **JURY TRIAL DEMANDED** |
| | : | |
| VERIZON SERVICES CORPORATION | : | |
| 1 Verizon Way | : | |
| Basking Ridge, NJ, 07920 | : | |
| and | : | |
| VERIZON PENNSYLVANIA LLC. | : | |
| 1717 Arch Street | : | |
| Philadelphia, PA 19103 | : | |
| | : | |
| Defendants | : | |

## SECOND AMENDED CIVIL ACTION COMPLAINT

Plaintiff, Suzette Walker, (hereinafter referred to as "Plaintiff"), by and through her undersigned counsel, hereby avers as follows:

### I. Introduction

1.  Plaintiff initiates the instant action to redress violations by Defendants of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, as amended ("Title VII" – 42 U.S.C.S §§ 2000a *et. seq.*), the Americans with Disabilities Act, as Amended ("ADAAA" ), the Age Discrimination in Employment Act ("ADEA" -29 U.S.C. §§ 621 *et. seq.*), and the Family and Medical Leave Act ("FMLA" - 29 U.S.C. §§2601 *et. seq.*) and Plaintiff's corresponding Pennsylvania state law claims.   Plaintiff was unlawfully terminated and suffered damages more fully described herein.

## II.    Jurisdiction and Venue

2.      This action is initiated pursuant to 42 U.S.C. Section 1981. This Court may properly maintain personal jurisdiction over Defendants because Defendants' contacts with this State and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in International Shoe Co. v. Washington, 326 U.S. 310 (1945) and its progeny. This Court has supplemental jurisdiction over Plaintiff's state-law claim(s) because such claim(s) arise out of the same common nucleus of operative facts as his federal claims asserted herein.

3.      The United States District Court for the Eastern District of Pennsylvania has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under laws of the United States.

4.      Venue is properly laid in this District pursuant to 28 U.S.C. sections 1391(b)(1) and (b)(2), because Defendants reside in and/or conduct business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

## III.    Parties

5.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

6.      Plaintiff is an adult with an address as set forth above.

7.      Defendants are for-profit legal entities engaged in the business of providing a wide range of cable, internet and telecommunication services internationally.

8.     Upon information and belief, because of their interrelation of operations, common ownership or management, centralized control of labor relations, common ownership of financial controls, and other factors, Defendant Entities are sufficiently interrelated and integrated in their activities, labor relations, ownership and management that they may be treated as a single and/or joint employer for purposes of the instant action.

9.     At all times relevant herein, Defendants acted by and through their agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for the benefit of Defendants.

## IV.     Factual Background

10.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11.     Plaintiff is a fifty-seven (57) year old African American female.

12.     Plaintiff was hired by Defendants on or about July 3, 1978.

13.     Plaintiff has held various positions during her tenure with Defendants; however, her most recent position was as an Engineer III Specialist.

14.     In her most recent position, Plaintiff was generally responsible for the design of telecommunication infrastructure for various residential and business services.

15.     This was a vital role within Defendants' Network Operations Engineering Department, which role existed for a least a decade, and this role (and corresponding job responsibilities) continue to be performed in the department where Plaintiff previously worked.

16.     In total, Plaintiff worked for Defendants for over thirty-six (36) years before she was subject to a purported reduction in force (*hereinafter* the "RIF") on or about April 23, 2015.

17.     Defendants informed Plaintiff that her position was being eliminated because the company was going in a different direction and/or the focus of the company is changing.

18.     However, Plaintiff worked at a location (900 Race Street, Philadelphia PA) with six (6) other people, all of whom were non black employees, and were not selected for this RIF.

19.     In fact, in or about May or June of 2014 (the second quarter of that year), Defendants brought in a Caucasian individual, David Perry, to perform the same/similar job responsibilities as Plaintiff.

20.     The other six (6) individuals in Plaintiff's Department at her same office location were as follows:   Anthony Portolese (Caucasian); Joseph Hui (Asian), Steven Murphy (Caucasian), Thomas Hodge (Caucasian), Maria Cesare (Caucasian) and David Perry (Caucasian).

21.     Plaintiff had more experience within the engineering department than many of these six (6) individuals; for example, Cesare only had 4 years in the engineering department with Defendants; Perry was an outside foreman and wasn't within engineering previously; and Portolese had only been in engineering for approximately six (6) years.

22.     Plaintiff had the most seniority of anyone within her department at the 900 Race Street Location, and had been with the engineering Department for at least 30 years.

23.     Defendants allege that performance was a criterion used to assess individuals selected for the RIF.

24.     However, Plaintiff's most recent performance evaluation (for 2014) reflects that Defendants' management found her to be performing at a level of "sustained performance meeting objectives, requirements and expectations and periodically exceeding them."

4

25.    Shortly before Plaintiff's RIF, her performance was so stellar that she received a 3% raise, and a significant bonus.

26.    Plaintiff had no discipline such that this would have impacted her ability to remain with the company in comparison to her Caucasian peers.

27.    In addition, despite that the company was "going in a different direction," Plaintiff's job functions were absorbed equally by Joe Scelsa (Caucasian) and Anthony Portolese (Caucasian) who held the same title as Plaintiff in the engineering department.

28.    Steve Murphy (Caucasian) working in Plaintiff's department, at the same location, was admonished for poor performance, and actually had some of his job responsibilities removed which were provided to Plaintiff and another employee in or about the Fall of 2014; yet this individual retained his job over Plaintiff.

29.    Joe Scelsa (Caucasian) and Ernest Padovani (Caucasian), both holding the same title as Plaintiff within the engineering department, were dressed down for performance based reasons, yet they retained their positions.

30.    During Plaintiff's employment, and within her department, management scrutinized her time and attendance differently than that of her non-black peers.  Defendants' management kept a watchful eye over Plaintiff's lunch breaks, and working time, whereas various Caucasian department peers would leave the workplace freely and take well over normal break periods without any type of scrutiny.

31.    In addition, at or about the time Plaintiff was subject to a RIF, Defendants RIF'd one black employee, Deidre Johns, within the engineering department who held the position as "engineering consultant"; despite that Ms. Johns' position was purportedly "laid off," Defendants filled the position with a Caucasian male employee by the name of Matt Kehr.

32.     Within Plaintiff's organization, Plaintiff is aware that a Caucasian employee in 2014 had been subject to a RIF (Edward McIntosh), however, Defendants immediately found another position for him within the company (in a completely different department – as an Engineering III Specialist) and therefore, this individual's jobs with Defendants was not otherwise impacted.

33.     Despite availabilities within the engineering department, which postings are available for viewing, and Plaintiff's efforts to find another job within the company, she has not been successful (despite her tenure and positive work performance history within the company).

### Count I
### Violations of 42 U.S.C. Section 1981
### - Racial Discrimination –

34.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

35.     Plaintiff believes Defendants committed violations of 42 U.S.C. Section 1981 for terminating her based on race, where Defendants blatantly hired and retained Caucasian individuals who were either a.) not as qualified as Plaintiff or b.) more properly suited for any purported RIF, based on performance or other objective measurable criterion.

36.     Plaintiff's termination therefore constitutes unlawful discrimination under 42 U.S.C. Section 1981.

### Count II
### Violations of Title VII of the Civil Rights Act of 1964, as amended ("Title VII")
### - Racial Discrimination –

37.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

38.     Plaintiff believes Defendants committed violations of Title VII for terminating her based on race, where Defendants blatantly hired and retained Caucasian individuals who were either a.) not as qualified as Plaintiff or b.) more properly suited for any purported RIF, based on performance or other objective measurable criterion.

Plaintiff's termination.

39.     Plaintiff's termination therefore constitutes unlawful discrimination under 42 U.S.C. Section 1981.

## Count III
## Violations of the Age Discrimination in Employment Act ("ADEA")
### - Age Discrimination –

40.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

41.     Plaintiff is an individual over the age of forty (40), and was fully qualified to perform the functions of her job (and did so with positive feedback from management for many years).

42.     However, Defendants hired and retained substantially younger candidates to fulfill her job duties, while selecting Plaintiff for a lay off instead of these aforementioned younger employees (despite Plaintiff's lack of discipline, tenure and track record for positive performance).

43.     Plaintiff therefore believes Defendants committed violations of ADEA by using her age as a determinative factor in its decision to select her for a lay off.

44.     Plaintiff properly exhausted her administrative remedies to proceed with her ADEA claims, as she timely filed a charge of discrimination with the EEOC, filed the instant claims within 90 days of receiving notice of her right to sue.

## Count IV
## Violations of the Americans with Disabilities Act, as Amended ("ADA")
### – Disability Discrimination/Retaliation –

45.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

46.     During Plaintiff's employment with Defendants, she Plaintiff suffered from varying disabilities, including but not limited to a shoulder injury beginning in or about April of 2013, which injury required surgery, ongoing treatment and therapy.

47.     During all relevant times *herein*, Plaintiff's shoulder injury substantially limited her ability to perform various major life activities, including but not limited to working, lifting, and performing certain manual tasks.

48.     Due to Plaintiff's shoulder injury, she requested reasonable accommodations in the form of time off from work (for doctors' appointments related to the injury, surgery and recovery time).

49.     Plaintiff was out of work for her shoulder injury from on or about April 26, 2013 through on or about July 15, 2013.

50.     During the time that Plaintiff was out on leave, and providing periodic updates to her employer, including that she may need to work on a part time basis until her shoulder injury subsided, Plaintiff was made aware that her manager was threatening that she either return full time or not at all.

51.     Plaintiff was also made aware that her health problems were raised during team meetings, including inquiries and concerns by management respecting Plaintiff's recovery time and inability to return to work in prompt fashion.

52.     Plaintiff believes Defendants committed violations of ADA by selecting her as a lay off candidate because of her then existing health problems and/or in retaliation for requesting medical accommodations (versus others who did not).

53.     Plaintiff properly exhausted her administrative remedies to proceed with her ADA claims, as she timely filed a charge of discrimination with the EEOC, filed the instant claims within 90 days of receiving notice of her right to sue.

**Count V**
**Violations of the Family and Medical Leave Act ("FMLA")**
**– Retaliation –**

54.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

55.     Plaintiff was an eligible employee under the definitional terms of the Family and Medical Leave Act, 29 U.S.C. § 2611(a)(i)(ii).

56.     Plaintiff requested leave from Defendants, her employer, with whom she had been employed for at least twelve months pursuant to the requirements of 29 U.S.C.A § 2611(2)(i).

57.     Plaintiff had at least 1,250 hours of service with the Defendants during her last full year of employment.

58.     Defendants are engaged in an industry affecting commerce and employs fifty (50) or more employees for each working day during each of the twenty (20) or more calendar work weeks in the current or proceeding calendar year, pursuant to 29 U.S.C.A § 2611(4)(A)(i).

59.     Plaintiff was entitled to receive leave pursuant to 29 U.S.C.A § 2612 (a)(1) for a total of twelve (12) work weeks of leave on an intermittent or block basis.

60.     Plaintiff took FMLA-qualifying leave from on or about April 26, 2013 through on or about July 15, 2013.

61.     Although Defendant allowed Plaintiff to return to work following her FMLA leave, Plaintiff was then selected for a lay-off despite an unblemished record, positive work performance, while others who had not recently taken FMLA leave were not selected for the lay off.

62.     Therefore, Plaintiff believes that her FMLA leave was a motivating factor in their decision to select her for a lay off, verses other individuals within her department.

## Count VI
### Violations of the Pennsylvania Human Relations Act ("PHRA")
### Racial Discrimination, Age Discrimination, Disability Discrimination/Retaliation

63.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full. Plaintiff re-asserts and re-alleges those facts set forth above with respect to Counts I through IV, which also constitute violations of the PHRA.

64.     Plaintiff has properly exhausted her administrative remedies in order to proceed with her PHRA claims, as she properly dual filed her EEOC charge with the Pennsylvania Human Relations Commission, and waited one full year thereafter before proceeding with her PHRA claims in state or federal court.

**WHEREFORE**, Plaintiff prays that this Court enter an order providing that:

A.     Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority. Plaintiff should be accorded those benefits illegally withheld from the date she first suffered the aforesaid unlawful actions at the hands of Defendants until the date of verdict;

B.      Plaintiff is to be awarded punitive damages, and/or liquidated as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious and outrageous conduct, and to deter Defendants or other employers from engaging in such misconduct in the future;

C.      Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to emotional distress damages);

D.      Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

E.      Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law;

F.      Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable law.  Plaintiff has also endorsed this demand on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

**KARPF, KARPF, & CERUTTI, P.C.**

By:     */s Christine E. Burke*
_____
Ari R. Karpf, Esq.
Christine E. Burke, Esq.
3331 Street Road
Two Greenwood Square, Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated: May 31, 2016

# Exhibit B

# In the Matter of:

WALKER

VS.

VERIZON SERVICES CORPORATION, ET AL.

---

SUZETTE WALKER

August 25, 2016

---



**DTI** Court Reporting Solutions

Washington, DC – Phone: 800.292.4789 – Fax: 202.861.3425

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE EASTERN DISTRICT OF PENNSYLVANIA
             - - - - -
 3
 4  SUZETTE WALKER            NO. 15-4031
 5         vs.
 6  VERIZON SERVICES
    CORPORATION
 7         and
    VERIZON PENNSYLVANIA, INC.
 8
             - - - - -
 9
10        Thursday, August 25, 2016
11
             - - - - -
12
13        Oral Deposition of SUZETTE WALKER,
14  taken at the law offices of Reed Smith, LLP,
15  Three Logan Square, 1717 Arch Street, Suite
16  3100, Philadelphia, Pennsylvania, commencing at
17  11:21 a.m., by and before Robin L. Clark,
18  Registered Professional Reporter and Notary
19  Public in and for the Commonwealth of
20  Pennsylvania.
21           - - - - -
22
23
24  Job No.: WDC-095861
25
```

**2**

```
 1  APPEARANCES:
 2
 3      KARPF, KARPF & CERUTTI, P.C.
        BY:  JONATHAN W. CHASE, ESQ.
 4      3331 Street Road
        Two Greenwood Square
 5      Suite 128
        Bensalem, Pennsylvania 19020
 6      215-639-0801
        jchase@karpf-law.com
 7           For the Plaintiff
 8
 9      REED SMITH, LLP
        BY: SARA BEGLEY, ESQ.
10      and VALERIE BROWN, ESQ.
        1717 Arch Street, Suite 3100
11      Philadelphia, Pennsylvania 19103
        215-851-8100
12      sbegley@reedsmith.com
             For the Defendant
13
14  ALSO PRESENT:
15      HARVETTA NERO, ESQ.
16
             - - - - -
17
18
19
20
21
22
23
24
25
```

**3**

```
 1              I N D E X
 2
 3  WITNESS                              PAGE
 4  SUZETTE WALKER
      BY MS. BEGLEY:                      6
 5
 6
 7
 8           E X H I B I T S
 9  NUMBER       DESCRIPTION         MARKED
10  Walker
11  Exhibit 1    Charge of Discrimination    12
12  Exhibit 2    2013 Evaluation Bates       82
                 Def_Walker_001 to 007
13
     Exhibit 3   Corporate Technology &      96
14               Network Functional
                 Capabilities Document Bates
15               Def_Walker_024
16  Exhibit 4    2014 Performance Evaluation 126
                 Bates Def_Walker_008 to 017
17
     Exhibit 5   Packet Bates P1 to P18     151
18
     Exhibit 6   Unemployment Document Bates 180
19               P46 to P47
20  Exhibit 7    Cochran Letter dated       183
                 8/18/16
21
     Exhibit 8   2015 Tax Returns Bates P143 194
22               to P150
23  Exhibit 9    2014 Tax Return Bates P40  199
                 to P44
24
25
```

**4**

```
 1   E X H I B I T S, continued:
 2  NUMBER       DESCRIPTION         MARKED
 3  Walker
 4
     Exhibit 10   2013 Tax Return Bates P34    202
 5                to P39
     Exhibit 11   2012 Tax Return Bates P28    203
 6                to P33
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

SUZETTE WALKER - 8/25/2016

5

DEPOSITION SUPPORT INDEX

1
2
- - - - -
3
4     Direction to Witness Not to Answer
5     Page  Line
6     NONE
7     Request for Production of Documents
8     Page  Line
9     21     11
10    182    15
11    Question Marked
12    Page  Line
13    NONE
14
15
16
17
18
19
20
21
22
23
24
25

6

- - - - -
STIPULATION OF COUNSEL
- - - - -
        It is hereby stipulated and agreed
by and between counsel that the
reading, signing, certification,
sealing and filing are waived; and that
all objections, except as to the form
of the questions, are reserved until
the time of trial.
        - - - - -
        SUZETTE WALKER, having been duly
sworn, was examined and testified as
follows:
        - - - - -
BY MS. BEGLEY:
        Q.  Good morning, Mrs. Walker.  My name
is Sara Begley and I represent Verizon in the
lawsuit that you have filed against it.  As you
know, you just took the oath and you're going
to testify truthfully, honestly and completely,
correct?
        A.  Yes.
        Q.  I can already tell you have a soft
voice and so it will be important for you to do

7

two things.  One, speak loudly enough so that I
can hear you and the court reporter can hear
you and I might ask you from time to time to
raise your voice, just so that the record is
clear.
        The other issue, and I don't
think this is going to be a problem with the
two of us, would be that I ask you to allow me
to complete my question before you answer so
that our very capable court reporter can take
down both my question and your answer as she is
preparing a transcript of today's testimony.
        To the extent that you don't
understand my question, or you need
clarification, please ask me to do so and I'll
do my best to give you a clear question and I
expect a clear and complete response.
        From time to time, your counsel
may object and his objection will be on the
record.  I may ask you, following his
objection, to answer my question.  Unless he
directs you not to answer the question, which
would be very unusual, you're to go ahead and
answer the question.  Is that understood?
        A.  Yes.

8

        Q.  If you would like to take a break
during the day, that's completely fine.  And we
will take a break for you to get a bite or if
you need to use the restroom.  My only request
is that if we're in a line of questioning, that
we complete that line before we take a break.
Are you under a doctor's supervision at this
time?
        A.  No.
        Q.  Are you taking any kind of
medication today?
        A.  No.
        Q.  When was the last time you took any
kind of medication?
        A.  Weeks ago.
        Q.  Weeks ago.  Okay.  So you're in
good health; is that right?
        A.  Yes.
        Q.  There's nothing that would inhibit
or restrict your ability to sit today, listen
to my questions and and answer honorably and
honestly, correct?
        A.  No.
        Q.  Let me make sure, I think the
answer to that should be yes.  Let's make sure

SUZETTE WALKER - 8/25/2016

9

1   we're right about that.  You're here today in
2   good shape, right?
3       A.  Yes.
4       Q.  And you're able to listen to my
5   questions and answers them honestly?
6       A.  Yes.
7       Q.  Good.  Now we're on the saw page.
8   So you were notified of a reduction in force
9   and the termination of your employment on
10  April 23, 2015; is that correct?
11      A.  Yes.
12      Q.  And you made a notation of that in
13  your personal calendar, correct?
14      A.  Yes.
15      Q.  And who notified you of the
16  reduction in force?
17      A.  Brian Magee.
18      Q.  Brian Magee at that time was your
19  manager, correct?
20      A.  Yes.
21      Q.  And Brian had been your manager
22  since 2008, correct?
23      A.  Off and on.
24      Q.  Off and on.  You had one other
25  manager during the period of time between 2008

10

1   and your termination date, which was effective
2   5/23/2015, correct?
3       A.  Correct.
4       Q.  And that manager was Patricia
5   McCoach, right?
6       A.  Yes.
7       Q.  And it looks like you reported to
8   Patricia sometime in the 2012 period, right?
9       A.  Yes.
10      Q.  And my records indicate that you
11  reported to her December 9, 2012; is that
12  right?
13      A.  Yes.
14      Q.  For how long did you report to
15  Patricia?
16      A.  I can't give you an exact time.
17      Q.  Was it for a year or was it for
18  less than a year?
19      A.  I don't want to guess.
20      Q.  Ballpark, you can, I'm not asking
21  you to guess, but was it for months or was it
22  for years?
23      A.  Maybe a year.
24      Q.  You filed a charge of
25  discrimination with the EEOC and dual filed

11

1   that charge with the PHRC on May 28, 2015,
2   correct?
3       A.  Yes.
4       Q.  And your final date of employment
5   at Verizon was May 22, 2015, correct?
6       A.  Yes.
7       Q.  So your charge was filed within a
8   week of your last day of employment at Verizon,
9   correct?
10      A.  Yes.
11      Q.  Did you have counsel at this time?
12      A.  Yes.
13      Q.  And who was your counsel?
14      A.  Karpf, Karpf and Cerutti.
15      Q.  And was there a specific lawyer at
16  the law firm that you were worked with at the
17  time you filed your charge with the PHRC?
18      A.  Yes.
19      Q.  And who was that?
20      A.  Christine Burke.
21      Q.  So I'm going to put you before you
22  Exhibit 1, which is the Charge of
23  Discrimination and some attached documents from
24  the administrative agency and take a look at
25  Exhibit 1, please and is that your signature?

12

1       A.  Yes --
2       Q.  -- Ms. Walker, at the bottom of the
3   page?
4       A.  Yes.
5       Q.  It is, right?
6       A.  Yes.
7            - - - - -
8           (Charge of Discrimination marked
9           Walker Exhibit 1 for identification.)
10           - - - - -
11  BY MS. BEGLEY:
12      Q.  So the document, the first page
13  that is on Exhibit 1, who prepared this
14  document?  Who typed it up, do you know?
15      A.  My lawyer did.
16      Q.  And you provided the information to
17  your lawyer, correct?
18      A.  Yes.
19      Q.  And after receiving this type of
20  document from your lawyer, you signed the
21  document two times on 5/19/15, correct?
22      A.  Yes.
23      Q.  And let's read what it says at the
24  bottom, at the left-hand side of page 1 of
25  Exhibit 1, it states I want this charge filed

SUZETTE WALKER - 8/25/2016

Pages 13 to 16

13

1    with the EEOC and the state or local agency, if
2    any.  And then it goes onto say, in the second
3    sentence after the first paragraph, I declare
4    under penalty of perjury that the foregoing is
5    true and correct.  And then you sign, correct?
6        A.  Yes.
7        Q.  And then on the right-hand side of
8    the bottom of the page, it says again, I swear
9    or affirm that I have read the above charge and
10   that it is true to the best of my knowledge,
11   information and belief.  And that is your
12   signature once again, correct?
13       A.  Yes.
14       Q.  And it's dated 5/19/15, right?
15       A.  Yes.
16       Q.  Let's turn to the next page of
17   Exhibit 1, page 2.  That is your signature in
18   the right-hand side of page 2, correct?
19       A.  Yes.
20       Q.  And again, at the bottom of this
21   document and it's also dated 5/19/15, correct?
22       A.  Yes.
23       Q.  And this paper was also filed with
24   your Charge of Discrimination, correct?
25       A.  Yes.

14

1        Q.  And it says once again, I
2    understand that false statements in this
3    complaint are made subject to the penalties of
4    18 Pa.C.S. Section 4904, relating to unsworn
5    falsification to authorities, right?  That's
6    what it says, right?
7        A.  Yes.
8        Q.  And that's where you signed your
9    signature and dated the document, correct?
10       A.  Yes.
11       Q.  So on three separate spaces on your
12   Charge of Discrimination, you affirmed that the
13   information that you provided in your Charge of
14   Discrimination was true and correct, right?
15       A.  Yes.
16       Q.  And you understood there were
17   penalties for not making correct statements,
18   correct?
19       A.  Yes.
20       Q.  So let's look at page 1 of the
21   Charge of Discrimination.  At the top of the
22   page, you have your personal information,
23   correct?
24       A.  Yes.
25       Q.  And the second box on page 1 of the

15

1    Charge of Discrimination, you have the
2    information about Verizon, correct?
3        A.  Yes.
4        Q.  And the third box on page 1 of
5    Exhibit 1 it says cause of discrimination,
6    check appropriate box, boxes and here you check
7    race, right?
8        A.  Uh-huh, yes.
9        Q.  Retaliation?
10       A.  Yes.
11       Q.  Age?
12       A.  Yes.
13       Q.  And disability, correct?
14       A.  Yes.
15       Q.  And all of that is true and
16   correct, right, that's what you believed?
17       A.  Yes.
18       Q.  Date discrimination took place, so
19   in the second box, you have latest/all, right
20   and under that, in that box, you have
21   April 2015, correct?
22       A.  Yes.
23       Q.  And under earliest, you don't have
24   any dates, correct?
25       A.  Yes.

16

1        Q.  And in the continuing action you
2    don't check, under the continuing action, you
3    don't check that box either, right?
4        A.  Right.
5        Q.  So the latest and all dates that
6    discrimination took place were April 2015,
7    correct?
8        A.  Yes.
9        Q.  Excuse me, that's what you have in
10   this document, right?
11       A.  Yes.
12       Q.  And that is true and correct?
13       A.  Right.  Yes.
14       Q.  That all discrimination took place
15   in August 2015; is that correct?  So let me, so
16   all dates that discrimination took place
17   against you were in April 2015, correct?
18   That's what you have on this box, right?
19       A.  In the box, yes.
20       Q.  Yes.  And that you swore under
21   penalty of perjury was true and correct, right?
22       A.  Yes.
23       Q.  So let's look at the statement of
24   particulars.  It says, I, Suzette Walker, do
25   hereby bring this charge against my former

SUZETTE WALKER - 8/25/2016

17

1  employer for race, age, and disability
2  discrimination, right?  That's what it says,
3  right?
4      A.  Yes.
5      Q.  On the second paragraph it says, "I
6  worked for respondents for over 30 years and
7  from almost a decade as a local manager.
8  Respondents contend that my job was subject to
9  a legitimate reduction in force; however,
10  respondents hired and/or retained both
11  non-black and younger candidates to assume my
12  job responsibilities."  That's your claim,
13  right?  Is that right?
14      A.  Yes.
15      Q.  You go on to say, further, during
16  the last year of my employment, I put
17  respondents on notice of a disability and a
18  need for accommodation.  Right?
19      A.  Yes.
20      Q.  So the last year of your employment
21  was 2014, correct?
22      A.  Uh-huh.
23      Q.  Is that right?
24      A.  Yes.
25      Q.  Despite, let's go on, despite that,

18

1  respondents contend that certain criterion was
2  used to evaluate proper candidates for this
3  RIF, my tenure and performance was well above
4  that of many of my peers who are not subject to
5  a reduction in force.  Finally, respondents'
6  RIF, R-I-F, included a large majority of black
7  employees over the age of 40 and who had not
8  recently medical sought accommodation or
9  notified respondents of disabilities such as I
10  had.  That's what you allege, correct?
11      A.  Yes.
12      Q.  Your final statement is, "Based on
13  the foregoing, I believe respondents' RIF was
14  based on race and/or age and/or my
15  disabilities."  That's what you allege; is that
16  correct?
17      A.  Yes.
18      Q.  "I also respectfully request that
19  the charge be dual filed with the Pennsylvania
20  Human Relations Commission."  That is your
21  entire complaint filed with the EEOC, correct?
22      A.  Yes.
23      Q.  And so up at the top of the space
24  it says the particulars are, looking at where
25  you have your statement of particulars, the

19

1  particulars are and it says if additional space
2  is needed, extra sheets can be attached, right?
3      A.  Yes.
4      Q.  And you don't attach any extra
5  sheets, right?
6      A.  No.
7      Q.  So this is your entire statement
8  and your entire allegations against Verizon in
9  your Charge of Discrimination, correct?
10      A.  Yes.
11      Q.  Your final sentence in your
12  allegations where it says, finally,
13  respondents' RIF included a large majority of
14  black employees over the age of 40 and who had
15  not recently sought medical accommodations or
16  notified respondents of disabilities such as I.
17  Who are these individuals that you're referring
18  to?  What information do you have that the RIF
19  included a large majority of black employees?
20      A.  Other employees that I know of who
21  were RIFed at the same time who are black
22  employees.
23      Q.  So tell me, what information do you
24  have that the RIF included a large majority of
25  black employees over the age of 40, what facts

20

1  I'm looking for, what facts do you have that
2  this RIF included a large majority of black
3  employees that were over the age of 40?
4      A.  You want an actual document?
5      Q.  No, I want the facts in your head
6  that you based your statement under penalty of
7  perjury that was true and correct who these
8  individuals were?
9      A.  There were at least ten employees
10  who were black who were RIFed at the same time
11  that I was.
12      Q.  Who are these individuals, can you
13  tell me?
14      A.  I can give you some of their names.
15      Q.  Okay.
16      A.  I can't give you all of their names
17  right now off top of my head.  I would have to
18  check my documents.
19      Q.  What documents, what documents do
20  you have that you could check?
21      A.  I jotted the names down in my
22  planner somewhere.  I just have to find it.
23      Q.  So would it be in your calendar
24  that you produced to us?
25      A.  No, it's not in the calendar.  The

SUZETTE WALKER - 8/25/2016

Pages 21 to 24

21

1  only thing in my calendar is work pertaining to
2  Verizon.
3       Q.  So tell me where is your planner?
4       A.  It's at home.
5       Q.  Did you provide your planner to
6  your counsel?
7       A.  No.
8       Q.  So if you have information about
9  your cause of action and individuals --
10      A.  I will provide it.
11      Q.  Thank you.  So we would like you to
12  do that immediately if you would.
13      A.  Not a problem.
14      Q.  So tell me when did you start
15  maintaining a planner?
16      A.  I've always had a planner.
17      Q.  And what sort of information do you
18  include in the planner?
19      A.  Just my doctors' appointments and
20  lawyers' appointments and physical exams,
21  things of that nature.
22      Q.  So the calendar that was provided
23  to us, was that just a work calendar?
24      A.  That is a work calendar.
25      Q.  And was that a document that you

22

1  kept at work?
2       A.  Yes.
3       Q.  So you have a separate personal
4  planner, correct?
5       A.  Yes.
6       Q.  That you keep other information,
7  including information about your meetings with
8  your lawyers and some information about your
9  lawsuit, correct?
10      A.  Yes.
11      Q.  Including information regarding
12  other black employees that were terminated in
13  connection with the RIF, right?
14      A.  Yes.
15      Q.  So that would be relevant to this
16  lawsuit and we ask and you've agreed to produce
17  it to your counsel.
18          How many employees were involved
19  in this RIF, do you know?
20      A.  I cannot give you that number.
21      Q.  Did you ever know?
22      A.  No.
23      Q.  So how did you know the large
24  majority were black employees over the age of
25  40?

23

1       A.  That because I deal with those
2  departments and that's how I knew those
3  individuals.
4       Q.  That's not my question.  I
5  understand that you knew there were black
6  employees that were RIFed, correct?
7       A.  Yes.
8       Q.  And you have the names in your
9  planner, correct?
10      A.  Yes.
11      Q.  My question to you is, if you don't
12  know the number of employees that were RIFed,
13  how do you know that a large majority of them
14  were black and over 40?
15      A.  I can only tell you about the
16  departments that I was in and worked with.
17      Q.  So that statement is not true then,
18  the statement that the RIF included a large
19  majority of black employees over 40, you don't
20  have that information, right?  Are you reading
21  the document, Mrs. Walker?
22      A.  Yes.
23      Q.  I'm sorry, go ahead.  Take your
24  time.
25      A.  Could you repeat your question, I'm

24

1  sorry.?
2       Q.  Sure.  So I'm going to read once
3  again the final factual allegation or the
4  almost final factual allegation.  Let me
5  restate that.  The last sentence in
6  paragraph 2, "Finally, respondents' RIF
7  included a large majority of black employees
8  over the age of 40, and who had not recently
9  sought medical accommodations or notified
10  respondents of disabilities such as I had."
11  Right?  That's what it says, right?
12      A.  Yes.
13      Q.  So my question to you is, do you
14  know how many employees were involved in the
15  RIF who were -- whose positions were terminated
16  as a result of the RIF?
17      A.  Totally?
18      Q.  Yes.
19      A.  No.
20      Q.  So you don't have that information,
21  correct?
22      A.  Correct.
23      Q.  And you never had that information,
24  correct?
25      A.  Never provided.

SUZETTE WALKER - 8/25/2016

Pages 25 to 28

---

**25**

1  Q. And so you don't -- your statement
2  that the RIF included a large majority of black
3  employees over the age of 40, you don't have
4  information to make, to draw that conclusion,
5  do you?
6          MR. CHASE: Objection. You
7      can answer.
8  BY MS. BEGLEY:
9      Q. Right. You don't have that
10  information, so you can't make, you don't have
11  information about the overall RIF, so you can't
12  conclude that a large majority of black
13  employees over the age of 40 were selected for
14  the RIF, can you?
15         MR. CHASE: Objection.
16         THE WITNESS: No.
17  BY MS. BEGLEY:
18     Q. And so what did you base this
19  statement upon that you knew of certain
20  individuals in your group who were
21  African-American and were RIFed; is that right?
22     A. Based on the people that were, that
23  I was aware of that they were in each
24  department that I dealt with that were RIFed
25  were black.

---

**26**

1      Q. And so and in your journal, what do
2  you call it, your planner?
3      A. Planner.
4      Q. In your planner, you have the name
5  of those black employees, correct?
6      A. Yes.
7      Q. And can you tell me off the top of
8  your head now who those black employees are?
9      A. I can give you five.
10     Q. Can you please do that?
11     A. Diedre Johns.
12     Q. Diedre Johns. Okay. Where was
13  Diedre employed?
14     A. In engineering.
15     Q. Engineering. How old was she?
16     A. Forty-one, 42. I can't tell you.
17  She was over 40.
18     Q. Over 40. And you know that she
19  didn't have any medical issues and didn't take
20  leave in the last two years of her employment,
21  didn't have a disability, do you know that?
22     A. I can't tell you that.
23     Q. You don't know whether she has a
24  disability or not, correct?
25     A. No.

---

**27**

1      Q. Next. Who?
2      A. Brian Newman.
3      Q. Brian Newman. How old is Brian?
4      A. Over 40.
5      Q. Do you have any information as to
6  whether Brian had taken any kind of medical
7  leave or had any disability?
8      A. I can't make that conclusion.
9      Q. Because you don't have that
10  information, correct?
11     A. Correct.
12     Q. And you never had that information,
13  correct?
14     A. No.
15     Q. Who is next?
16     A. Kevin Johnson.
17     Q. But you said no. Did you ever have
18  information --
19     A. I said no.
20     Q. You never had, so it's just the way
21  I posed the question. So I'm just restating it
22  for purposes of the record. So did you ever
23  have information about Brian Newman's medical
24  condition or whether he had a disability?
25     A. No.

---

**28**

1      Q. Thank you. Next?
2      A. Kevin Johnson.
3      Q. Kevin Johnson. And Kevin was also
4  in engineering?
5      A. No, he was in construction.
6      Q. Construction. And Kevin was
7  African-American?
8      A. Yes.
9      Q. Over 40?
10     A. Yes.
11     Q. Are you aware of whether he had a
12  disability?
13     A. No.
14     Q. Aware of whether he had taken
15  leave?
16     A. No.
17     Q. Who else do you know?
18     A. The name just went right out of my
19  head. The name just flew out of my head.
20     Q. You have four. I have Diedre
21  Johns, Brian Newman, Kevin Johnson, did I miss
22  one?
23         MR. CHASE: No.
24         THE WITNESS: To be
25      accurate, I would rather get my

---

SUZETTE WALKER - 8/25/2016

Pages 29 to 32

---

29

1     planner.
2  BY MS. BEGLEY:
3        Q.  That's fine.  So as you sit here
4  today, you can't recall any other
5  African-American employees that were involved
6  and terminated as a result of a RIF; is that
7  correct?
8        A.  Correct.
9        Q.  Your statement the, last portion of
10  the sentence in the charge where it says,
11  you're referring to the majority of black
12  employees over 40 who had been RIFed and you
13  said who had not recently sought medical
14  accommodation or notified respondents of
15  disabilities such as I had.
16            You do not now and did not at the
17  time you signed this Charge of Discrimination
18  have any information about whether any of the
19  African-American employees, black employees
20  that you knew had sought medical accommodations
21  or had notified respondents of disabilities?
22        A.  No.
23        Q.  So that statement is not a true and
24  correct statement, right?  That is not a true
25  and correct statement; is that correct?

---

30

1        A.  Could you repeat that question?
2        Q.  So my question is, you just
3  identified three African-American employees,
4  correct?
5        A.  Yes.
6        Q.  And in your charge, you said the
7  individuals, the black employees that were
8  subjected to the RIF were over the age of 40
9  and had not recently sought medical
10  accommodations or notified respondents of the
11  disabilities such as I had.  That's what it
12  says, right?
13        A.  Correct.
14        Q.  And my question to you is, you
15  don't presently have -- no, strike that.  At
16  the time that you signed this document on
17  5/19/15, you did not have any information about
18  whether any of the black employees that you
19  knew, whether they had not recently sought
20  medical accommodations or notified respondents
21  of disabilities?
22        A.  They did not disclose that
23  information.
24        Q.  So you never had that information,
25  correct?

---

31

1        A.  No.
2        Q.  So that allegation, you have no
3  firsthand knowledge of, correct?
4        A.  No.
5        Q.  All right.  And so where you say, I
6  swear and affirm that I've read the above
7  charge and that it is true and correct to the
8  best of my knowledge, information and belief,
9  that portion of the sentence is not true and
10  correct to the best of your knowledge,
11  information and belief, right?
12            MR. CHASE:  Objection.  You
13        can answer.
14            THE WITNESS:  Repeat that.
15  BY MS. BEGLEY:
16        Q.  So we're looking just at the
17  second --
18        A.  No, could you repeat your question?
19  I want to make sure I understand what you're
20  saying.
21        Q.  That's absolutely fine.  You have
22  no information about the, whether any black
23  employees that were subject to the RIF had
24  sought a medical accommodation or notified
25  respondents, or notified Verizon that they had

---

32

1  disabilities, correct?
2        A.  Correct.
3        Q.  But you have a statement in here,
4  in your Charge of Discrimination and the
5  statement says that the large majority of black
6  employees over the age of 40 and who had not
7  recently sought medical accommodations or
8  notified respondents of disabilities such as I
9  had.
10        A.  Right.
11        Q.  You have no information to prove
12  that that is a true and correct statement, do
13  you?
14        A.  I can't prove they sought medical
15  accommodations, no.
16        Q.  So that is not a correct statement,
17  correct?
18            MR. CHASE:  Objection.
19            THE WITNESS:  That is a
20        correct statement.  I have no knowledge
21        of them seeking medical attention, no
22        knowledge.
23  BY MS. BEGLEY:
24        Q.  That's not what you said.  Right?
25  That's not what you attested to.  You said the

---

33

1  large majority of black employees over the age
2  of 40 and who had not recently sought medical
3  accommodations or notified respondents of
4  disabilities, that's what you said, right?
5       A.  Correct.
6       Q.  And you had no information to --
7  and you had no information now to prove that
8  that statement is true, do you?
9       A.  No.
10      Q.  Turn to page 3 of the EEOC charge,
11  please.  And up at, actually it's page 2 --
12  it's page 4, it's the fourth page in the
13  document that you have.
14           MR. CHASE:  P57 just so
15      we're on the same page.
16  BY MS. BEGLEY:
17      Q.  P57, thank you, counsel.  And up at
18  the top, it says look for work if you are out
19  of work, correct?
20      A.  Correct.
21      Q.  And this is a document that you
22  received in connection with filing the Charge
23  of Discrimination with the EEOC, right?
24      A.  Yes.
25      Q.  And at some time in the late

34

1  May 2015 time frame, right?
2       A.  Yes.
3       Q.  Because you filed it May 28.  So up
4  at the top of this sheet you received from the
5  EEOC, it says "If you lost your job or were not
6  hired due to discrimination, you may be
7  entitled to the pay or wages you lost.
8  However, you cannot receive lost wages unless
9  you can show that you looked for another job to
10  replace the one you lost or were denied due to
11  discrimination.  In order to prove you searched
12  for work, you must keep copies of all letters,
13  e-mails or other evidence of your job search."
14  Right?
15      A.  Yes.
16      Q.  So you understood from the first
17  day that you filed this document that you had
18  an affirmative obligation to go out and look
19  for a job, right?
20      A.  Yes.
21      Q.  And to keep all records of your
22  efforts to do so, right?
23      A.  Yes.
24      Q.  What documents or information did
25  you have in your possession on the date that

35

1  you filed your Charge of Discrimination?
2           MR. CHASE:  Any document or
3      related to the case?
4           MS. BEGLEY:  Relating to
5      this case.
6           THE WITNESS:  I don't
7      understand the question.
8  BY MS. BEGLEY:
9       Q.  So you filed the Charge of
10  Discrimination and you signed it on May 19,
11  2015, correct?
12      A.  Yes.
13      Q.  And so my question is, did you rely
14  on any documents from your employment to
15  prepare this Charge of Discrimination or to
16  provide information to your counsel regarding
17  your Charge of Discrimination?
18      A.  I don't understand the question.
19      Q.  Here's your Charge of
20  Discrimination Exhibit 1, it's the document,
21  flip it over, it's the document right in front
22  of you?
23      A.  Yes.
24      Q.  Did you rely on any kind of
25  documentation, any documents either from your

36

1  employment, in your journal to prepare this
2  document, the Charge of Discrimination?
3       A.  The actual form that I was given by
4  my manager stating that I was being RIFed.
5       Q.  So that was the RIF package; is
6  that right?
7       A.  Yes.
8       Q.  Anything else?
9       A.  No.
10      Q.  And that was the most critical
11  document, right?
12      A.  Yes.
13      Q.  Because that was the basis for your
14  claim of discrimination against Verizon,
15  correct?
16      A.  Yes.
17      Q.  So in your, so I would like you to
18  look at your statement of particulars, if you
19  would.
20           MR. CHASE:  It's the first
21      page.
22  BY MS. BEGLEY:
23      Q.  That's the first page.  Right.  You
24  don't make any statement in this document that
25  during the course of your employment you were

SUZETTE WALKER - 8/25/2016

37

 1   discriminated against, other than the RIF,
 2   correct?
 3        A.  Yes.
 4        Q.  Excuse me?
 5        A.  I'm sorry, yes, correct.
 6        Q.  And there's no allegation in your
 7   Charge of Discrimination that anyone at Verizon
 8   threatened your job when you were on FMLA leave
 9   in 2013, correct?
10        A.  Not in this document.
11        Q.  And that was the document, again,
12   that you signed under penalty of perjury,
13   correct?
14        A.  Correct.
15        Q.  And you make no allegation and make
16   no statement in your Charge of Discrimination
17   that anyone at Verizon watched you more closely
18   than other employees with respect, with respect
19   to taking time off for lunch or taking time out
20   of the office, correct?
21        A.  Not in this document.
22        Q.  And you make no statement that
23   during your employment you were ever treated
24   differently because of your race, do you?
25        A.  Not in this document.

38

 1        Q.  And you make no allegation in your
 2   Charge of Discrimination that you were ever
 3   discriminated against on the basis of your
 4   disability, do you?
 5        A.  Not on this document.
 6        Q.  And in your Charge of
 7   Discrimination, you make no claim that you were
 8   retaliated against for taking FMLA leave in
 9   2013, do you?
10            MR. CHASE:  Objection.  You
11        can answer.
12            THE WITNESS:  Not in the
13        particulars of this document.
14   BY MS. BEGLEY:
15        Q.  And again, this was a statement
16   that you signed under penalty of perjury that
17   it was a true and correct statement, correct?
18        A.  Correct.
19        Q.  And it is also a statement that you
20   signed within, you signed on 5/19/2015, which
21   was a week before your last day of employment,
22   correct, which was 5/22/15, right?
23        A.  Correct.
24        Q.  And you signed this under and at
25   the advice of counsel, correct?

39

 1        A.  Correct.
 2        Q.  And you signed it when, again,
 3   right at the time that your employment was
 4   terminating with Verizon, correct?
 5        A.  Yes.
 6        Q.  When events were fresh in your
 7   mind, correct?
 8        A.  Yes.
 9        Q.  And certainly the events were more
10   fresh in your mind when you signed this
11   document in May 19, 2015, than when you filed
12   your Amended Complaint more than a year later
13   on 6/20/16, correct?
14        A.  No.
15        Q.  Why is that, you're telling me that
16   your --
17        A.  Those events are glued in my mind.
18        Q.  The events are glued in your mind?
19        A.  Yes.
20        Q.  So they were fresh in your mind on
21   5/19/15 when you signed this document under
22   penalty of perjury, correct; is that right?
23        A.  Yes.
24        Q.  They were glued into your mind on
25   that date; is that right?

40

 1        A.  Yes.
 2        Q.  Yes, we have that as your answer?
 3        A.  Yes.
 4        Q.  I'm having a hard time hearing you.
 5   And then they remained glued in your mind on
 6   6/20/2016, correct, when your Amended Complaint
 7   was filed?  Oh, pardon me, let me get my dates
 8   right, they were glued in your mind on
 9   5/21/2016 almost a year after you filed the
10   charge, when you filed your Amended Complaint;
11   is that right?  You don't have it in front of
12   you.
13        A.  No.
14        Q.  So you filed your Amended
15   Complaint, your Second Amended Complaint on
16   5/31/16.  One, more than one year after you
17   filed your Charge of Discrimination.  Right?
18        A.  Yes.
19        Q.  But the facts were glued in your
20   mind from day one of your termination, correct?
21        A.  Yes.
22        Q.  In your Charge of Discrimination,
23   you don't make any allegation that Mr. Magee
24   threatened your job when you were on disability
25   leave, do you?

SUZETTE WALKER - 8/25/2016

41

1    A.  No.
2    Q.  In your Charge of Discrimination,
3  you don't make any allegation that Magee and
4  others discussed your disability when you were
5  on disability leave, do you?
6    A.  No.
7    Q.  In your Charge of Discrimination,
8  you make no allegation of any kind of comments
9  by Magee of race, age or disability
10  discrimination, do you?
11    A.  No.
12    Q.  And again, your sole complaint in
13  your charge relates to your termination and the
14  reduction in force, correct?
15    A.  Correct.
16    Q.  And you allege that Verizon
17  retained employees that were less qualified and
18  younger than you.  So let's take a look at
19  that.
20    A.  Excuse me, may I have some more
21  water?
22    Q.  Absolutely.  Why don't you just
23  keep that over there.  So you make a couple of
24  statements that I would like to go over with
25  you in your Charge of Discrimination.  First,

42

1  you state in the second portion of the first
2  sentence of paragraph 2, "Respondents contend
3  that my job was subject to a legitimate
4  reduction in force; however, respondents hired
5  and/or retained both non-black and younger
6  candidates to assume my job responsibilities."
7  Who are you referring to in that statement?
8    A.  Anthony Portolese.  And Joe Scelsa
9  and David Perry.
10    Q.  How do you spell Joe's last name?
11    A.  S-C-E-L-S-A.
12    Q.  And Portolese, Scelsa and Perry,
13  they were all younger than you?
14    A.  Yes.
15    Q.  Any over 40?
16    A.  Out of those three?
17    Q.  Yes.
18    A.  No.
19    Q.  What's your date of birth?
20    A.  1/6/59.
21    Q.  We share the same birth year.  So
22  you're 57?
23    A.  Yes.
24    Q.  And do you have any idea of the
25  ages of Portolese, Scelsa or Perry?

43

1    A.  I believe they're 10 -- Portolese
2  is 25 years younger and I believe Joe Scelsa
3  and Dave Perry, I'm not sure.  I know they're
4  ten years or more younger.
5    Q.  And do you have any facts to
6  support that they were retained because of
7  their age?
8    A.  No.
9    Q.  You also say they are non-black.
10  So these three individuals, Portolese, Scelsa
11  and Perry are non-black; is that correct?
12    A.  Yes.
13    Q.  Do you have any facts to support
14  that they were retained because they are
15  non-black?
16    A.  No.
17    Q.  And who is it that, who is the
18  individual that you believe made this decision?
19    A.  Brian Magee.
20    Q.  And just Brian Magee; is that
21  correct?
22    A.  And Joe Mucillo.
23    Q.  And Joe Mucillo?
24    A.  Yes.
25    Q.  And what facts do you have that

44

1  Brian Magee retained Portolese, Scelsa and
2  Perry because they are younger than you?
3    A.  None.
4    Q.  And what facts do you have that
5  Brian Magee retained Portolese, Scelsa and
6  Perry because they are not black?
7    A.  No actual facts.
8    Q.  And what facts do you have that
9  Magee retained any of the employees that
10  weren't subject to the RIF because they are not
11  black?
12    A.  None.
13    Q.  What facts do you have that Magee
14  retained any of the employees in the unit
15  because they are younger than you?
16    A.  Would you repeat that?
17    Q.  Sure.  So your unit was called, you
18  were an Engineer III, correct?
19    A.  Correct.
20    Q.  And what was your unit called?
21    A.  Just Philadelphia.
22    Q.  Philadelphia area?
23    A.  Area.
24    Q.  Philadelphia area.  So a number of
25  Engineer IIIs were retained and you were

SUZETTE WALKER - 8/25/2016

45

1    terminated, correct?
2        A.  Correct.
3        Q.  So my question to you is can you
4    identify any specific facts that Brian Magee
5    retained any of the Engineer IIIs because
6    they're not black?
7        A.  The entire group of 13 people,
8    there's one Asian and everyone else is not
9    black.
10       Q.  So just the fact that they are not
11   black, correct?
12       A.  Yes.
13       Q.  You have no facts to support that
14   he retained them because they were white and
15   Asian, right?
16       A.  No.
17       Q.  And you have no facts to support
18   that Brian retained the group of Engineer IIIs
19   because they're younger than you, correct,
20   because of their age?  You have no facts to
21   support that age was a factor that he
22   considered in retaining the group of Engineer
23   IIIs?
24       A.  No.
25       Q.  You have no facts to support that

46

1    Brian selected you because you took disability
2    leave, correct?
3        A.  From a statement that he made to
4    me.
5        Q.  What was that statement?
6        A.  That if I didn't return to work
7    after my FMLA, I would no longer have a
8    position.
9        Q.  But you returned, correct?
10       A.  I had to.
11       Q.  But you returned to -- so you had,
12   so let's talk about this.  This is in 2013,
13   April of 2013 you had surgery for your
14   shoulder, correct?
15       A.  Correct.
16       Q.  You had a dislocation and a
17   shoulder fracture, correct?
18       A.  Yes.
19       Q.  You received surgery from Dr. Getz
20   from the Rothman Institute, correct?
21       A.  Yes.
22       Q.  Dr. Getz gave you a certain period
23   of time you had to be out on leave and Verizon
24   through MetLife approved that initial request,
25   correct?

47

1        A.  Yes.
2        Q.  Through your doctor, you requested
3    an extension of your FMLA leave and Verizon
4    through MetLife approved that leave, correct?
5        A.  Yes.
6        Q.  You through, you requested an
7    opportunity to come back to work on a reduced
8    schedule, initially five hours per day and
9    Verizon through MetLife approved that reduction
10   in hours, the return to work at a reduced
11   hourly pace, correct?
12       A.  No.
13       Q.  They didn't?
14       A.  I did return for four hours a day
15   first.
16       Q.  Okay.
17       A.  And then I went back to the doctor
18   and he said I should return for five hours a
19   day.
20       Q.  So when you first came back for
21   four days and Verizon allowed you to do so,
22   correct?
23       A.  Four hours a day.
24       Q.  Four hours a day.  What am I
25   saying?

48

1        A.  You said four days.
2        Q.  Pardon me.  Thank you for
3    correcting me.  So you initially returned from
4    your FMLA leave on a reduced schedule, correct?
5        A.  Yes.
6        Q.  Initially, it was four hours per
7    day five days a week, correct?
8        A.  Yes.
9        Q.  And that was what the doctor had
10   ordered, correct?
11       A.  Yes.
12       Q.  And Verizon accepted that, correct?
13       A.  Yes.
14       Q.  You continued that for a period of
15   time?
16       A.  Yes.
17       Q.  Is that right?  And then you
18   increased the hours to five hours per day five
19   days a week; is that correct?
20       A.  No.
21       Q.  What --
22       A.  I was not allowed to increase it to
23   five hours a day.
24       Q.  And why was that?
25       A.  Because I was told that I had to

SUZETTE WALKER - 8/25/2016

Pages 49 to 52

49

1  come back to work or there would no longer be a
2  position.
3      Q.  And was this after, so you had
4  already returned to work at that point, right?
5      A.  Yes.
6      Q.  So you were working for a period of
7  time --
8      A.  Yes.
9      Q.  -- when you received notification
10  that you needed to return to full duty,
11  correct?
12      A.  Yes.
13      Q.  And who notified you of your
14  obligation to return to full duty?
15      A.  Brian Magee.
16      Q.  And what did Brian say to you and
17  when?
18      A.  He told me that when I went in to
19  speak to him about returning at five hours a
20  day, he said that I had to return full-time or
21  else there would be no position available.
22      Q.  And did he tell you that MetLife
23  had contacted him the day before he talked with
24  you --
25      A.  No.

50

1      Q.  -- and told you that your -- that
2  your reduced schedule opportunity had maxed
3  out?
4      A.  No.
5      Q.  You did talk with, let's see who
6  you talked with.  So on, you dealt with a
7  specific individual, Kimberly Astorga who is a
8  short-term disability claims specialist at
9  MetLife, correct?
10      A.  Yes.
11      Q.  And you talked with Kimberly the
12  entire time you were out on leave and through
13  your return to work, correct?
14      A.  Yes.
15      Q.  Kimberly called you on
16  September 17, 2013, at 1:43 p.m. and she
17  notified you that effective 10/1/2013, you no
18  longer had the opportunity to work reduced
19  hours per your work plan and that you would
20  need to return full-time or go back out on
21  short-term disability.  And she asked you to
22  call her back, correct?
23      A.  No.
24      Q.  Okay.  So --
25      A.  That was after I had spoken to

51

1  Brian Magee that she called me.
2      Q.  Well, she left you a voice message
3  and asked you to call her back and gave your
4  you her phone number?
5      A.  I never spoke to her.
6      Q.  So on the very next day after
7  Kimberly let you a message on 9/17/13,
8  Mr. Magee was notified by Kimberly Astorga that
9  you had reached your max for reduced hours of
10  12 weeks allowed and that period would end on
11  10/4/2013 and that you needed to return to work
12  full-time or go back out on short-term
13  disability.  And that she had left you a
14  message to return her call.
15          And then you called Kimberly on
16  9/18/2013 account, and at that time, Kimberly
17  told you that she had tried calling you and you
18  stated to Kimberly that your supervisor told
19  you that you needed to return full-time full
20  duty on 10/7/2013 as the employer only allows
21  12 weeks of reduced hours.  She said you
22  indicated that you understood and that you need
23  to speak with your doctor and you would have
24  your doctor send an updated medical.
25          MR. CHASE:  Is this a

52

1  question or a story?  I'm not sure.
2  BY MS. BEGLEY:
3      Q.  I'm reading to her MetLife's
4  records and I'm going to have her confirm her
5  conversation with Kimberly.  And that you told
6  Kimberly that you are still not 100 percent and
7  you have six more weeks and the employee, you,
8  told Kimberly that you would let her know what
9  was going on after you talked with your doctor.
10  Do you recall that conversation with Kimberly?
11      A.  Yes.
12      Q.  Yes?
13      A.  Uh-huh.
14      Q.  And then you returned full-time
15  after that, correct?
16      A.  Uh-huh.
17      Q.  You didn't go out on short-term
18  disability, right?
19      A.  No.
20      Q.  You were given the opportunity if
21  you chose to go out on short-term disability,
22  correct?
23      A.  Yes.
24      Q.  But you made a decision to come
25  back to work full-time?

SUZETTE WALKER - 8/25/2016

Pages 53 to 56

53

1    A.  I had to.
2    Q.  You had to or you could have gone
3  on short-term disability, right?
4    A.  Yes.
5    Q.  So you made a decision to come back
6  to work full-time, right?
7    A.  Yes.
8    Q.  From 2008 to your termination in
9  2015, May 22 -- no, no, that's not it.  From
10 the date of, from 2008 until the date you were
11 notified of the reduction in force, which was
12 April, according to your calendar, April 23,
13 2015, you never reported any complaint of any
14 nature to anyone in HR about Mr. Magee,
15 correct?
16   A.  Correct.
17   Q.  From 2008 till April 23, 2015, you
18 never complained to anyone that Mr. Magee
19 discriminated against you, correct?
20   A.  Correct.
21   Q.  From 2008 till April 23, 2015, you
22 never complained to HR or to anyone at Verizon
23 that Mr. Magee retaliated against you for
24 taking disability leave, correct?
25   A.  No.  I'm sorry.  Yes.

54

1    Q.  From 2008 till April 23, 2015, you
2  never complained to anyone that Mr. Magee
3  discriminated against you on the basis of your
4  disability, correct?
5    A.  Correct.
6    Q.  You never complained to anyone from
7  2008 till April 23, 2015 that Mr. Magee engaged
8  in any kind of conduct that was unfair,
9  correct?
10   A.  No.
11   Q.  Did you report to someone that
12 Mr. Magee engaged in unfair conduct to you?
13   A.  No.
14   Q.  You never did?
15   A.  No.
16   Q.  So maybe my question isn't clear,
17 so let me just ask it one more time.  Did you
18 ever between 2008 and April 23, 2015, the date
19 that you were notified of the reduction in
20 force, make a complaint to anyone of any nature
21 against Mr. Magee?
22   A.  No.
23   Q.  Between 2008 and April 23, when you
24 were notified of the RIF, had you ever made a
25 complaint to anyone at Verizon that anyone ever

55

1  discriminated against you during your course of
2  employment at Verizon?
3    A.  No.
4    Q.  April 26, 2013, you took FMLA for a
5  shoulder injury, correct?
6    A.  Repeat, could you repeat that date?
7    Q.  Yeah, I believe it's April 26 --
8    A.  April 26.
9    Q.  -- 2013, correct?
10   A.  Yes.
11   Q.  So that's two years prior to the
12 termination of your employment, correct?
13   A.  Yes.
14   Q.  You took leave for a shoulder
15 injury, right?
16   A.  Yes.
17   Q.  And it was a dislocated shoulder
18 and a shoulder fracture; is that right?
19   A.  Yes.
20   Q.  And you had, what was it,
21 arthroscopic surgery or some other surgery?
22   A.  It was arthroscopic.
23   Q.  Arthroscopic surgery.  And when you
24 first went to Dr. Getz at Rothman, did he say
25 it was pretty common surgery?

56

1    A.  No.
2    Q.  What did he say?
3    A.  He said he hadn't seen anything,
4  all that at one time before.  He wasn't, he
5  said he didn't realize it was that advanced.
6    Q.  That advanced.  What does that mean
7  that advanced?
8    A.  Where my shoulder was hanging out
9  of the socket as well as the fracture and the
10 torn rotator cuff.
11   Q.  And how did that occur?  Did you
12 have an injury?
13   A.  I got hit in the arm at a SEPTA
14 station.
15   Q.  With what?
16   A.  The turnstile.
17   Q.  With the turnstile?
18   A.  No, the --
19   Q.  Oh, going through a turnstile?
20   A.  Yes.
21   Q.  And did you go to the hospital when
22 you had that injury?
23   A.  No, I didn't think it was that bad.
24   Q.  And when did that injury occur?
25   A.  April 1st.

SUZETTE WALKER - 8/25/2016

57

1    Q. April 1st of?
2    A. 2013.
3    Q. Of 2013. Did you take any leave
4  between April 1st, 2013 and April 26?
5    A. No.
6    Q. So you continued your normal
7  schedule; is that right?
8    A. Yes.
9    Q. You didn't make any report to
10  anyone at Verizon that you had been injured on
11  April 1st, did you?
12    A. I told them I was in pain, that I
13  had hurt my arm, but that was it.
14    Q. You didn't take any time off until
15  you had your surgery; is that right?
16    A. Correct.
17    Q. Was the injury at SEPTA, were you
18  during working hours?
19    A. No.
20    Q. Were you on your way home?
21    A. Yes.
22    Q. Did you report it to SEPTA and make
23  a claim against SEPTA?
24    A. No, because the person, there was
25  nobody at the booth or anything and when I

58

1  called SEPTA, they said, well, they needed to
2  check things out and they never got back to me.
3    Q. Well, couldn't they have pulled
4  videotape or something?
5    A. They told me they couldn't, there
6  was no cameras where I was.
7    Q. Was it something that was defective
8  about the turnstile or did someone push it or
9  what happened?
10    A. She kicked the turnstile.
11    Q. The woman ahead of you?
12    A. Yes.
13    Q. And so that is, that injury that
14  you suffered on April 1st was the injury that
15  was repaired on April 26?
16    A. Yes.
17    Q. And did your insurance cover all of
18  it?
19    A. Yes.
20    Q. Did you feel that you were wronged
21  on April 1st when it occurred?
22    A. Yes.
23    Q. But there was no redress after you
24  had contacted SEPTA?
25    A. No.

59

1    Q. Did you think of filing a lawsuit
2  against them?
3    A. Yes and no. I didn't think it was
4  as bad as it turned out to be.
5    Q. Once you learned how bad it was,
6  and that you had to have surgery and had to be
7  out of work and you were in pain according to
8  your records with Dr. Getz, you were in pain,
9  didn't you think it was worthwhile to seek
10  advice as to whether you had a lawsuit?
11    A. I did, but I didn't.
12    Q. Did you talk to any lawyer about
13  the injury?
14    A. No.
15    Q. I saw from your interrogatories
16  that you have only been involved in one other
17  lawsuit and it was years ago and it involved an
18  accident that your son was involved in?
19    A. Yes.
20    Q. Is that right?
21    A. Yes.
22    Q. So you haven't been involved in any
23  other lawsuits, this is the only lawsuit you've
24  ever filed; is that correct?
25    A. Yes.

60

1    Q. The one against Verizon. From the
2  date of your termination, which is April 23 to
3  the present, you have not -- what's the date
4  that you left? What was your final day on the
5  job?
6    A. May 22.
7    Q. May 22. So from May 22, 2015, to
8  the present, so we're at the end of
9  August 2016, more than a year, have you had any
10  employment?
11    A. No.
12    Q. Anyplace?
13    A. No.
14    Q. And so what, how do you spend your
15  time?
16    A. I look for jobs. And I volunteer.
17    Q. And where do you volunteer?
18    A. At the school. At the church.
19    Q. What school is that?
20    A. St. Martin de Porres.
21    Q. So what do you do at, is it St.
22  Marks?
23    A. St. Martin de Porres.
24    Q. So what do you do at St. Martin?
25    A. When they have events I help clean

SUZETTE WALKER - 8/25/2016

Pages 61 to 64

61

1    up, set up.
2        Q.   How often is that?
3        A.   Maybe once or twice a month.
4        Q.   And then you also volunteer at your
5    church?
6        A.   Uh-huh.
7        Q.   And what church is that?
8        A.   The Charles Memorial Baptist
9    Church.
10       Q.   And how often do you volunteer and
11   in what capacity?
12       A.   Whenever needed, whether it's
13   cleanup, monitoring, helping with different
14   items.  It depends on what's needed.
15       Q.   So a couple of times a month?
16       A.   Once or twice a month, yes.
17       Q.   Do you have kids?
18       A.   Yes.
19       Q.   How old are your kids?
20       A.   Thirty-four.
21       Q.   Thirty-four?
22       A.   Yes.
23       Q.   Is your -- is it a son or a
24   daughter?
25       A.   Son.

62

1        Q.   Son.  Does he live at home?
2        A.   No.
3        Q.   Are you married?
4        A.   Yes.
5        Q.   And what's your husband's name?
6        A.   Eric.
7        Q.   Eric what?
8        A.   Walker.
9        Q.   Eric Walker.  How long have you
10   been married to Eric?
11       A.   Thirty-six years.
12       Q.   And where do you live?
13       A.   In north Philadelphia.
14       Q.   And are you at the same address
15   that you were at when you were employed by
16   Verizon?
17       A.   Yes.
18       Q.   And what is that?
19       A.   2748 Judson Street.
20       Q.   And how long have you lived at that
21   address?
22       A.   Thirty-four years.
23       Q.   And do you own your home?
24       A.   Yes.
25       Q.   Do you have any mortgage on the

63

1    home?
2        A.   No.
3        Q.   Do you own any other properties?
4        A.   No.
5        Q.   What does Eric do for a living?
6        A.   He's retired.
7        Q.   And how old is he?
8        A.   Fifty-seven.
9        Q.   Where is he retired from?
10       A.   The state.
11       Q.   Of Pennsylvania?
12       A.   Yes.
13       Q.   And what did he do while he was
14   working?
15       A.   He worked for the Commonwealth as
16   a -- Labor and Industry.
17       Q.   I'm sorry?
18       A.   In Labor and Industry.
19       Q.   And does he have an full pension
20   and retirement package from the state?
21       A.   Yes.
22       Q.   Does it include medical benefits?
23       A.   No.
24       Q.   How do you cover your medical
25   benefits?

64

1        A.   I pay for them.
2        Q.   And out of what money do you pay
3    for them?
4        A.   My 401K.
5        Q.   And how much is in your 401K?
6        A.   I have no idea right now.
7        Q.   Is it invested someplace?
8        A.   Yes.
9        Q.   And where is it invested?
10       A.   At SCI.
11       Q.   Do you have any other sources of
12   income?
13       A.   No.
14       Q.   Other than -- is your only source
15   of income your 401K and your husband's pension?
16       A.   Uh-huh.  Yes, I'm sorry, yes.
17       Q.   And has, how do you live day to
18   day?  Are you living day to day on your 401K
19   and your husband's pension?
20       A.   Yes.
21       Q.   Do either one of you have any plans
22   of getting a job?
23       A.   I'm job hunting now.
24       Q.   Have you hired a recruiter, an
25   outplacement company to help you find a job?

SUZETTE WALKER - 8/25/2016

Pages 65 to 68

65

1      A.  No.  I actually search on various
2  sites.  I have been on a couple job interviews,
3  but I actively search every day.
4      Q.  And what job sites do you actively
5  search every day?
6      A.  CareerBuilder, Indeed, Monster,
7  ZipRecruiter, LinkLine, various other ones.
8      Q.  And what type of positions are you
9  looking for?
10      A.  Anything.
11      Q.  Are you looking for a certain
12  region, like the City of Philadelphia?
13      A.  In Philadelphia, yes.
14      Q.  Is your husband, he's still a
15  relatively young man.  Because of your current
16  situation that you're not working, is he
17  looking to go back to work?
18      A.  Yes.
19      Q.  Does he have any other source of
20  income?  Does he do any side jobs?
21      A.  No, not anymore.
22      Q.  And so since when, did he have side
23  jobs before?
24      A.  2013.
25      Q.  And what did he do in 2013?

66

1      A.  He was a mechanic.
2      Q.  And is he a skilled mechanic, a
3  licensed mechanic?
4      A.  Yes.
5      Q.  So he could go back to being a
6  mechanic if he chose?
7      A.  Yes.
8      Q.  But you have been able to make ends
9  meet and he hasn't needed to do that between
10  2013 and today's date?
11      A.  Yes.
12      Q.  Is he associated with a garage or
13  does he own a garage?
14      A.  He's associated with a garage.
15      Q.  And what garage is that?
16      A.  It's a small garage owned by a
17  friend.
18      Q.  And what's the friend's name?
19      A.  Mark.  I can't think of his last
20  name.
21      Q.  And where is his garage located?
22      A.  Broad and Pike Streets.
23      Q.  So you were terminated in 2015, and
24  from 2015 until now, he hasn't been working as
25  a mechanic despite the fact that he's licensed

67

1  to do so and has a garage he can work out of?
2      A.  Sometimes he can, but lately, it's
3  been a problem.
4      Q.  What's been a problem?
5      A.  His father just died.
6      Q.  How did his father die?
7      A.  Cancer.
8      Q.  Cancer?
9      A.  Yes.
10      Q.  Did you two take care of the
11  father?
12      A.  Yes.
13      Q.  Did he live in your home while he
14  was sick?
15      A.  No.
16      Q.  Where did he live?
17      A.  Around the corner.
18      Q.  I can't hear you.
19      A.  Around the corner.
20      Q.  Around the corner.  Is your
21  father's mom still alive?
22      A.  No.
23      Q.  So who else helped you take care of
24  the father?
25      A.  Just my husband, myself and my

68

1  brother-in-law.
2      Q.  You allege in your complaint that
3  you've suffered emotional distress as a result
4  of your termination.  Are you treating with a
5  physician for your emotional distress?
6      A.  No.
7      Q.  No.  Did you ever go to a
8  psychiatrist, a psychologist, any kind of
9  medical healthcare provider regarding the
10  emotional distress that you were, that you
11  claim you're suffering from?
12      A.  No.
13      Q.  Have you taken any kind of
14  medication from the time you were terminated to
15  the present to help with the emotional distress
16  that you're suffering from?
17      A.  Repeat that.
18      Q.  Yeah.  Have you taken any
19  medication, so you claim that you're suffering
20  from emotional distress; is that right?
21      A.  Yes.
22      Q.  And tell me what that emotional
23  distress is that you've suffered from as a
24  result of your termination?
25      A.  Just the whole concept of working

SUZETTE WALKER - 8/25/2016

Pages 69 to 72

---

69

1  for years, doing and giving 150 percent and
2  then being told you're no longer needed, that
3  we're going in a different direction and having
4  to get back into the job market after being out
5  of it for 37 years.  Working for the same
6  company, doing various jobs, now jumping back
7  into a job market that's very slim and it's
8  very hard to find a job after you get a certain
9  age.  So it's very frustrating and very, it
10  disenlightened me.
11      Q.  I couldn't hear you.
12      A.  I'm disenlightened as to finding
13  another job, but I'm still searching.
14      Q.  And you have been searching really
15  from day one?
16      A.  Diligently.
17      Q.  And you're looking for a job; is
18  that right?
19      A.  Yes.
20      Q.  You want to work?
21      A.  Yes, I love to work.
22      Q.  Have you also been looking to go
23  back to school?
24      A.  Yes.
25      Q.  I've seen something from an

---

70

1  American International University online, tell
2  me about that?
3      A.  I figured I would go into a
4  different direction.
5      Q.  What direction is that?
6      A.  Hospitalization.
7      Q.  So in the like the healthcare
8  field?
9      A.  In that field, yes.
10      Q.  And what would you do?  Would it be
11  nursing or admin?  What would it be?
12      A.  Whatever I can become involved in.
13      Q.  Did you apply for a job at Comcast?
14      A.  No.
15      Q.  Why not?
16      A.  I feel a little, I still hold a
17  sense of one, a kinship with Verizon products.
18      Q.  How would you describe your
19  relationship with Brian Magee?
20      A.  I thought we had a good working
21  relationship.
22      Q.  And so until he terminated you, you
23  never had an issue with him, correct?
24      A.  Never.
25      Q.  And Brian's boss?

---

71

1      A.  Mr. Mucillo.
2      Q.  Mr. Mucillo, how much did you
3  interact with him?
4      A.  Only when there was a customer
5  service issue.
6      Q.  And how would you describe your
7  relationship during your employment with Mr.
8  Mucillo?
9      A.  I never really spoke to him.
10      Q.  I can't hear you.
11      A.  I never really spoke to him.  Just
12  professional, common courtesy and respect.
13      Q.  So perfectly fine, correct?
14      A.  Correct.
15      Q.  And you never made a complaint
16  about Mr. Mucillo during your employment at
17  Verizon, correct?
18      A.  No.
19      Q.  And you have no facts to support
20  that Mr. Mucillo engaged in any kind of
21  discrimination against you on the basis of your
22  race, your age or your disability, correct?
23      A.  No.
24      Q.  So let me just state that.  Do you
25  have any facts that Mr. Mucillo discriminated

---

72

1  against you on the basis of your age, your
2  race, your disability?
3      A.  No.
4      Q.  In terms of, you identified three
5  people who you believe were treated more
6  favorably than you.  Is there anyone else other
7  than the three that you identified, Perry,
8  Portolese and Scelsa, any other employees that
9  you believe were treated more favorably than
10  you?  You told me Portolese, Scelsa and Perry.
11      A.  I don't understand the question.
12      Q.  Yeah.  So in your Charge of
13  Discrimination, you said that the company
14  retained employees that were less qualified and
15  younger than you and you identified those three
16  individuals when I asked you who they were.  Is
17  there any other employee that you feel that
18  Brian treated better than you because of their
19  race?
20          MR. CHASE:  Objection.  You
21  can answer.
22          THE WITNESS:  I could not
23  make a statement about how he treated
24  someone else unless I saw what he did
25  in front of me.  I could not make a

---

SUZETTE WALKER - 8/25/2016

73

1      statement like that.
2  BY MS. BEGLEY:
3      **Q.   And you never observed Brian doing**
4  **anything that you believed was racist, correct?**
5      A.  Once.
6      **Q.   What was that?**
7      A.  It's not, it's not really racist.
8  He asked someone when they planned on retiring
9  and how long would they plan on working.
10     **Q.   And who --**
11     A.  How long did they plan on working.
12     **Q.   And when did he make that comment?**
13     A.  He made the comment, it was around
14 the time that the managers were discussing the
15 people they wanted to RIF.
16     **Q.   And were you there?**
17     A.  I was sitting in the seat next to
18 the person.
19     **Q.   Were you aware of the fact that**
20 **there was a RIF that was going to take place?**
21     A.  Yes, they told us.
22     **Q.   So you knew that individuals were**
23 **going to be RIFed, correct?**
24     A.  Yes.
25     **Q.   And so who was present when he made**

74

1  **that statement?**
2      A.  The person he was talking to Joseph
3  Hui.
4      **Q.   I'm sorry, who --**
5      A.  Joseph Hui.
6      **Q.   Hui, H-E-W --**
7      A.  H-U-E -- I'm sorry, H-U-I, I'm
8  sorry and Steven Murphy was sitting there.
9      **Q.   So he, just so I'm clear, Brian**
10 **made a comment, it was you, Hardy --**
11     A.  Hui.
12     **Q.   Hui, was there another person and**
13 **Murphy?**
14     A.  And Murphy, just the three of us.
15     **Q.   Just the three of you and Brian**
16 **asked H-U-I, Hui when he was thinking of**
17 **retiring, was that the comment?**
18     A.  Yes.
19     **Q.   And what did Hui say?**
20     A.  He didn't say anything, he just
21 looked at him.
22     **Q.   And is Hui African-American?**
23     A.  No, he's Asian.
24     **Q.   Asian.  And how old is Hui?**
25     A.  He's older than I am.

75

1      **Q.   And was Hui an Engineer III?**
2      A.  Yes.
3      **Q.   And was Hui RIFed?**
4      A.  No.
5      **Q.   And so it related to his age, not**
6  his race, correct?
7      A.  I believe so.
8      **Q.   You believe that it was with**
9  respect to his age; is that right?
10     A.  Yes.
11     **Q.   Did you have a conversation with**
12 **Hui about the comment?**
13     A.  No.
14     **Q.   But he never, Mr. Magee never made**
15 **that comment to you, did he?**
16     A.  No.
17     **Q.   Never asked you about when you were**
18 **going to retire, did he?**
19     A.  No.
20     **Q.   Did you report that comment to**
21 **anyone at HR?**
22     A.  No.
23     **Q.   Did you say to Mr. Magee you**
24 **thought it was not a proper question?**
25     A.  No.

76

1      **Q.   Did you say anything to Mr. Hui**
2  **about the question?**
3      A.  Yes.
4      **Q.   What did you say?**
5      A.  I asked him how he felt about it.
6      **Q.   And what did Mr. Hui say?**
7      A.  He said it was just Brian being
8  Brian.
9      **Q.   And so from what you understood,**
10 **Mr. Hui was not offended; is that correct?**
11     A.  He was offended, he just wouldn't
12 say.  You could tell from his -- he turned beat
13 red.
14     **Q.   It was your perception he was**
15 **offended; is that right?**
16     A.  Yes.
17     **Q.   But he didn't tell you that he was;**
18 **is that right?**
19     A.  Yes.
20     **Q.   And when you asked him, he just**
21 **said that was Brian being Brian?**
22     A.  Yes.
23     **Q.   And that was the complete**
24 **conversation that you had with Mr. Hui; is that**
25 **right?**

SUZETTE WALKER - 8/25/2016

77

1  A.  Yes.
2      Q.  Any other comments that you heard
3  Mr. Magee make during your employment that you
4  felt were inappropriate?
5      A.  I can't recall right now.
6      Q.  Any statements that Mr. Mucillo
7  ever made that you felt were inappropriate?
8      A.  I've never been within range of Mr.
9  Mucillo.
10     Q.  And those are the two people that
11 you believe had discriminated against you; is
12 that right?
13     A.  Yes.
14         MR. CHASE:  Objection.
15         MS. BEGLEY:  Excuse me?
16         MR. CHASE:  You can answer.
17         THE WITNESS:  Yes.
18 BY MS. BEGLEY:
19     Q.  And so I just want you to, are
20 there any other facts that you believe support
21 that you were discriminated against on the
22 basis of your race, your age, your disability
23 or the fact that you took FMLA leave that you
24 haven't already told me about?
25     A.  I'm sorry, I'm thinking.

78

1      Q.  Take your time.  Take your time.
2  You've already told me these facts are in your
3  head like glue.  So I want you to make sure
4  you've told me everything.
5      A.  Oh, on an occasion, when work was
6  not being done properly by Steve Murphy, he
7  took Steve's work and he gave it, half of it, a
8  portion of it to me and to someone else.  And I
9  felt that when he gave it to me, he knew that I
10 was capable of getting the job done.
11     Q.  Okay.
12     A.  And it kind of surprised me that he
13 knew I would get the work done, but in the same
14 breath, he's saying that our services are no
15 longer needed.
16     Q.  So tell me when you got the work
17 that was initially assigned to Steve?
18     A.  It was in 2014, September of 2014.
19     Q.  And what was that work?  What was
20 the assignment?
21     A.  And it was an additional area to
22 include, an additional area that was added to
23 the areas of Philadelphia that I already was
24 responsible for.
25     Q.  So he expanded your territory

79

1  responsibilities?
2      A.  Yes.
3      Q.  And in September of 2014; is that
4  correct?
5      A.  Yes.
6      Q.  And the work had initially been
7  assigned to Mr. Murphy, correct?
8      A.  Yes.
9      Q.  And you felt that that was a
10 positive statement about your performance,
11 correct?
12     A.  Yes.
13     Q.  And so my question to you is, are
14 there any other facts that you believe support
15 that you were discriminated against on the
16 basis of your age, your race, your disability,
17 or your request for FMLA leave that you haven't
18 already shared with me?
19     A.  No.
20     Q.  So let's talk, you received
21 performance evaluations during your course of
22 employment and working for Mr. Magee, correct?
23     A.  Yes.
24     Q.  And between 2008 and I guess your
25 last one was 2014, correct?  Your last

80

1  performance evaluation was 2014; is that right?
2      A.  Yes.
3      Q.  During that period, you received
4  annual performance evaluations and I believe
5  all of them were signed by Mr. Magee; is that
6  right?
7      A.  The ones from 2008 to 2014?
8      Q.  Yes.
9      A.  I believe one was signed by
10 Patricia McCoach.
11     Q.  So other than the one signed by
12 McCoach, you were evaluated by Mr. Magee during
13 that time period, right?
14     A.  Yes.
15     Q.  And you can correct me if I am
16 wrong, but I believe every single evaluation
17 between 2008 and 2014 that Mr. Magee prepared,
18 he gave you an evaluation ranking or rating of
19 "performing," which was the second highest,
20 correct?
21     A.  Yes.
22     Q.  All except one, right?
23     A.  Yes.
24     Q.  And your final evaluation from
25 Mr. Magee, he gave you a performing, correct?

81

1    A.  Yes.
2    Q.  And it's, I think it's my
3  understanding and you can confirm what your
4  understanding is, that Mr. Magee didn't give
5  out leadings, which is the highest evaluation
6  rating very often, right?
7    A.  He always gave out a leading.
8    Q.  He always gave out a leading, to
9  whom?
10    A.  I know I gave one to Tom Hodge and
11  want to Paul clause.
12    Q.  And one to Paul who?
13    A.  Klauss, K-L-A-U-S-S.
14    Q.  But "performing" was a good, solid
15  evaluation, correct?
16    A.  Yes.
17    Q.  And you did receive one rate of
18  "developing," which means performance did not
19  meet objectives, requirements and expectations.
20  Some or all were not met and improvement is
21  needed.  That's the description of developing,
22  correct?
23    A.  I'm not sure.
24    Q.  So can I have a copy?  So I guess
25  this is Exhibit 2.

82

1       MS. BROWN:  Yes.
2       - - - - -
3       (2013 Evaluation Bates
4       Def_Walker_001 to 007 marked Walker
5       Exhibit 2 for identification.)
6       - - - - -
7  BY MS. BEGLEY:
8    Q.  So this is Exhibit 2 and this is
9  your performance evaluation for year-end
10  performance 2013.
11       MR. CHASE:  May I ask who
12  that is?
13       MS. BEGLEY:  Yes, please.
14       MS. NERO:  Harvetta Nero,
15  assistant general counsel for Verizon.
16       MR. CHASE:  Nice to meet
17  you.
18       MS. BEGLEY:  And this is
19  Ms. Walker.
20       Take an opportunity
21  Mrs. Walker to look at your performance
22  evaluation for 2014.
23       Off the record.
24       - - - - -
25  (Discussion was held off the record.)

83

1       - - - - -
2       MR. CHASE:  Are you done
3  reviewing?
4  BY MS. BEGLEY:
5    Q.  Did you take a look, Ms. Walker?
6  It's a chance to kind of quiet everything down
7  for a minute.  So we're looking at a
8  performance evaluation for 2013 and if you look
9  at the very last page of the document, it says
10  employee and the signatures are electronic
11  signatures and yours is dated 2/24/2014,
12  correct?
13    A.  Yes.
14    Q.  And the manager is Brian Magee and
15  the signature is of the same date, correct?
16    A.  Yes.
17    Q.  All right.  So did you meet with
18  Mr. Magee to discuss this evaluation?
19    A.  Yes.
20    Q.  And where did you meet?
21    A.  In his office.
22    Q.  This was the first time that
23  Mr. Magee had given you a developing, correct?
24    A.  Yes.
25    Q.  And your prior performance

84

1  evaluations under him had been at the
2  performing level, correct?
3    A.  Yes.
4    Q.  So I'm sure you were not pleased to
5  receive a developing; is that right?
6    A.  Yes.
7    Q.  What did Mr. Magee say to you about
8  the rating?
9    A.  He said that stuff, items were
10  getting, not getting done or missed and that
11  things were getting out of hand.
12    Q.  And what did you say to him?
13    A.  I explained to him that due to
14  being out, there was a lot I had to adjust to
15  and we were meeting our demands and resolving
16  our issues as quickly and positively as
17  possible.  That I had not received any
18  complaints about anything being missed, dealing
19  with the large major projects that we had going
20  on at that time.
21    Q.  So look through this document with
22  me, please.  Because I want to make sure that I
23  understand the document.  It appears that and
24  let's go, I'm going to count from the back.
25  The third page from the back, which is Bates

SUZETTE WALKER - 8/25/2016

85

1    labeled at the bottom defendant Walker 005.  It
2    appears that this is a mid, there's a midyear
3    review on this page; is that correct?
4         A.  Yes.
5         Q.  And so your evaluation for the
6    entire year Exhibit 2 contains both a midyear
7    and an end-of-year evaluation, correct?  So
8    Section 3 is a midyear?
9         A.  Yes.
10        Q.  And Section 4 is an end of year.
11   So let's look at Section 3 together, please.
12   It says period, January 1 through June 30,
13   correct, that's in the middle of the page?
14        A.  Uh-huh.
15        Q.  And it says Suzette, this is
16   Manager Performance Summary, "Suzette was moved
17   to conduit/highway in the first half of the
18   year due to existing knowledge of conduit and
19   the city permit process."  That's what it says,
20   right?
21        A.  Yes.
22        Q.  And that's true, right?
23        A.  Yes.
24        Q.  It then goes on to say "GPIS review
25   has been a positive transition, but conduit

86

1    design has been hard to transition.  Suzette
2    has missed time due to an injury, which has
3    made the transition difficult.  The conduit
4    area is still set up for the former conduit
5    engineer and I have received complaints about
6    the "conduit."  Right, that's what it says, the
7    conduit mailbox being full, right?  That's what
8    it says, right?
9         A.  Yes.
10        Q.  So here he says that GPIS review
11   has been a positive transition, but he says
12   conduit design has been hard to transition,
13   right?
14        A.  Yes.
15        Q.  So at the bottom of the page, it
16   goes on to say, "We are not where the
17   conduit/highway team needs to be at this time."
18   And the last sentence says, "The
19   Philadelphia/Delaware team has a mixed results
20   on the FOC metric, missing DS1 and OCN, making
21   DS3 and ethernet --"
22        A.  Ethernet.
23        Q.  "-- ethernet.  The
24   Philadelphia/Delaware team is also missing the
25   capital metric."  So he's talking about both

87

1    your performance and the team's performance at
2    this situation, correct?
3         A.  In Philadelphia and Delaware, yes.
4         Q.  And so that the team as a whole was
5    succeeding in some areas and not doing so great
6    in others, correct?
7         A.  Yes.
8         Q.  So as of the, in the middle of the
9    year, you had an understanding that you were
10   doing fine with the GPIS review, that has been
11   a positive transition, but the conduit design
12   has been hard to transition, right?  That's
13   what he said to you?
14        A.  Yes.
15        Q.  The end of the year, so and it's on
16   Section 4, year-end review, which contains the
17   January 1 through December 31, so the full year
18   review.  In the second paragraph, Magee said
19   "Suzette made a transition at the end of 2012
20   to the conduit department from a supervisory
21   role, she remained with conduit all of 2013."
22   Correct, that's what it says?
23        A.  Yes.
24        Q.  So when did you, do you know the
25   date, did you start in December 2012, is that

88

1    when you started --
2         A.  Yes.
3         Q.  -- in the conduit department?  And
4    you took leave at the end of April, so you had
5    several months on the job before your leave,
6    correct?
7         A.  Yes.
8         Q.  And then you returned in July from
9    your leave, correct?
10        A.  Yes.
11        Q.  All right.  So you were only out a
12   couple of months?
13        A.  Yes.
14        Q.  But you were employed, you know,
15   you were employed the rest of the year and on
16   the job the rest of the year, right?
17        A.  Yes.
18        Q.  So it says, Magee says "In the new
19   job, Suzette adapted to the conflict management
20   function that she was previously outsourced."
21   And it goes on to say "The core function
22   conduit design was not performed by Suzette to
23   the level necessary to demonstrate ownership.
24   This assignment was an opportunity for growth,
25   but Suzette kept to a comfort zone and allowed

SUZETTE WALKER - 8/25/2016

89

1  the contract engineer to run the conduit
2  department."  That's what he said, right?
3      A.  That's what he said.
4      Q.  And he had made a reference at the
5  midyear that the conduit design had been hard
6  to transition, so again, he's referencing the
7  core function of conduit design that he wasn't
8  satisfied with your level of performance,
9  correct?
10      A.  Yes.
11      Q.  And you discussed this during your
12  meeting with him in February of 2014, correct?
13      A.  Yes.
14      Q.  And what did you tell him other
15  than what you've already testified to?
16      A.  I told him that I was doing all the
17  work that I could to get the performance up to
18  par, considering that we were dealing with past
19  major projects that were designed by other
20  people.
21      Q.  And what did he say?
22      A.  He said, he said just do, get the
23  stuff done.
24      Q.  And did you feel he was being
25  supportive?

90

1      A.  No.
2      Q.  And in what way was he not being
3  supportive?
4      A.  He didn't understand the fact that
5  it was so much work that was behind, that was
6  left by prior, the prior occupant of the job
7  that it was impossible for us to do everything.
8      Q.  Did you tell him that?
9      A.  Yes.
10      Q.  And so when you left the meeting,
11  did you have an action plan with him of what
12  you were going to do?
13      A.  Yes.  I did discuss an action plan.
14  That's why some items were contracted out to
15  alleviate some of that extra burden.
16      Q.  So you told him what the problems
17  were when you met with him in person, correct?
18      A.  Yes.
19      Q.  And you and he agreed to an action
20  plan, right?
21      A.  Yes.
22      Q.  Which included assigning some of
23  the work to external contractors; is that
24  right?
25      A.  Yes.

91

1      Q.  And you felt that that was a good
2  and effective plan, correct?
3      A.  Yes.
4      Q.  And did it resolve some of the
5  problems?
6      A.  Yes.
7      Q.  And were you satisfied with that
8  action plan and its success?
9      A.  Yes.
10      Q.  And did Mr. Magee follow up with
11  you in any way to say that he was not
12  satisfied?
13      A.  No.
14      Q.  Did he ever follow up and tell you
15  he was satisfied?
16      A.  No.
17      Q.  But that was a single evaluation
18  that you received that was lower than
19  satisfactory, correct?
20      A.  Yes.
21      Q.  And did you feel that your
22  employment from that period forward was
23  positive?
24      A.  Yes.
25      Q.  After your performance evaluation

92

1  on February 24, 2014, did you make any
2  complaint to HR about your evaluation?
3      A.  No.
4      Q.  Did you make any complaint to
5  anyone that you felt that your evaluation was
6  retaliation for taking FMLA leave?
7      A.  No.
8      Q.  Did you make a complaint to anyone
9  that you believed your 2013 performance
10  evaluation was based, was just based on
11  discrimination due to your disability?
12      A.  No.
13      Q.  Did you make a complaint to anyone
14  that your 2013 evaluation was in any way
15  unfair?
16      A.  No, I didn't file a complaint.
17      Q.  And in fact, you came up with an
18  action plan that you thought was successful
19  after your discussion with Mr. Magee, correct?
20      A.  Yes.
21      Q.  So you ended the discussion on a
22  good note; is that right?
23      A.  Yes.
24      Q.  In 2014, so during the year of
25  2014, you took on a new role; is that right?

93

1       A.  Yes.
2       Q.  So you moved away from the
3   conduit/highway which had been a pretty
4   difficult assignment, right?
5       A.  Not really difficult.
6       Q.  Well, difficult because you said
7   that there was all that backlog that hadn't
8   been handled, right?
9       A.  It was different.
10      Q.  It was different, it was a lot of
11  work, right?
12      A.  Yes.
13      Q.  And a lot of work and
14  responsibilities due to the plate that you were
15  served when you took on the responsibility and
16  work that had not been performed in the past,
17  is that your testimony?
18      A.  Say that again.
19      Q.  Yeah.  So when you took on the
20  conduit/highway, you believed that the person,
21  your predecessor had not performed the
22  responsibilities that they needed to; is that
23  correct?
24      A.  They left a lot of open gaps.
25      Q.  And so you were assigned those open

94

1   gaps and that was responsibilities that
2   ultimately had to be shared with outside
3   contractors, correct?
4       A.  Yes.
5       Q.  So 2014, you are transitioned to a
6   new position; is that correct?
7       A.  April 2014, yes.
8       Q.  April 2014.  And what new position
9   were you transitioned to?
10      A.  Engineer specialist.
11      Q.  And can you tell me what are the
12  job duties, and is that an Engineer Specialist
13  III or just an engineer specialist?
14      A.  Engineer Specialist III.
15      Q.  And how was that transition
16  effectuated?  How were you given that job
17  responsibility?
18      A.  Mr. Magee came to me and said
19  someone was leaving, there was a position open
20  and he would like me to take it.
21      Q.  And what were the job duties of an
22  Engineer III?
23      A.  The job duties are the design and
24  maintenance of the telecommunications network.
25      Q.  Can you tell me a little bit more

95

1   about what that job entailed?
2       A.  It entails handling high bandwidth,
3   FIOS orders, cell site construction, copper
4   network, existing copper network and dealing
5   with large scale customers for the new
6   building, high rise buildings with FTPP being
7   the primary service.  That's about it.
8       Q.  And so did you understand those job
9   responsibilities would be associated with the
10  Engineer Specialist III position when Mr. Magee
11  came to you or did he describe them to you?
12      A.  He described them.
13      Q.  And what did you think about this
14  opportunity?
15      A.  I think it was a wonderful
16  opportunity.
17      Q.  So you were looking forward to
18  making the transition to this new job?
19      A.  Yes.
20      Q.  And give me the date again in 2014?
21      A.  I believe it was April 15, '14,
22  2014.  It was April 2014.
23      Q.  April 2014?
24      A.  Yes.
25      Q.  And were you responsible for the

96

1   City of Philadelphia?
2       A.  Yes.  A portion.  A territory of
3   the City of Philadelphia.
4       Q.  I'm going to give you a document.
5   I would like you to tell me whether you've ever
6   seen this document before.  And this will be
7   Plaintiff's Exhibit 3.  And it's Bates labeled
8   Defendant Walker 0024 and I don't know that the
9   back document is Bates labeled.  So just take a
10  look Mrs. Walker and take your time, because I
11  would like you to explain this document to me
12  - - - - -
13
14      (Corporate Technology & Network
15      Functional Capabilities Document Bates
16      Def_Walker_024 marked Walker Exhibit 3
17      for identification.)
18      - - - - -
19      THE WITNESS:  It's just four
20  pages?
21      MS. BROWN:  Yes.
22      MS. BEGLEY:  Yes, four
23  pages.
24      THE WITNESS:  Thank you.
25

SUZETTE WALKER - 8/25/2016

97

1   BY MS. BEGLEY:
2       Q.  All right.
3           MR. CHASE:  Can I just ask a
4   question real quick?
5           MS. BEGLEY:  Sure.
6           MR. CHASE:  The two
7   documents that aren't Bates labeled,
8   should I assume those would be 25 and
9   26?
10          MS. BROWN:  They are
11  produced.  Yes, they are 26 and 27
12  actually, yes.
13  BY MS. BEGLEY:
14      Q.  So you've had time to take a look
15  at the document, Mrs. Walker?
16      A.  Yes.
17      Q.  Can you tell me what this is?  Have
18  you seen this before?
19      A.  I've seen this once.
20      Q.  So I don't know if it's one
21  document or two, but let's look at the first
22  two pages.  So it's the first page, which is
23  Bates labeled 24.  It says Corporate Technology
24  and Network Functional Capabilities.  So what
25  is this, can you tell me?

98

1       A.  This is actually what each grouping
2   is responsible for.
3       Q.  So --
4       A.  And what they're being assessed at,
5   the abilities to do these different items.
6       Q.  So in terms of the job duties that
7   you were performing in 2013 and 2014, which
8   category would you have been assessed under?
9       A.  Well, really some of -- all of
10  these.
11      Q.  Go through and tell me, would you
12  just tell me and we can identify them?
13      A.  The development and architecture,
14  you had to be aware of that in order to do the
15  job.  You had to know what you were installing
16  at people's -- at the customer's locations, how
17  they worked.  The capabilities of the
18  equipment.
19          Under knowledge of existing and
20  emerging technologies, you had to know the
21  technology you were using, how it affected the
22  landscape of a customer's bill and how it
23  impacted the technology you were using.
24      Q.  And in the 2013/2014 time period,
25  what was the technology that you guys were

99

1   focused on what was?
2       A.  High bandwidth and, what is it
3   called, just flew out of my head.
4       Q.  Take your time.
5       A.  We were doing a lot of high
6   bandwidth work.
7       Q.  And can you tell me what that
8   means?  What does high bandwidth work mean?
9       A.  High bandwidth is technology that
10  has a certain speed to allow a customer, for
11  instance, we did a lot of work with the City of
12  Philadelphia.  They had several locations that
13  needed to be interconnected, so that's the type
14  of service we would sell to them.  And high
15  bandwidth had varying speeds that we used and
16  depending on what existed at the customer prem
17  at the time, whether we would reuse what was
18  there or implement another type of technology
19  to allow them better control of their
20  facilities.
21      Q.  And how long had high bandwidth
22  been an existing and important technology that
23  Verizon was selling to customers?
24      A.  I couldn't tell you the time frame,
25  but it's been around for quite sometime.

100

1       Q.  And what is your background and
2   knowledge and experience in dealing with high
3   bandwidth?
4       A.  I came into using high bandwidth
5   when I originally started doing the orders.
6       Q.  So when was that?
7       A.  That was when I became an AT in
8   1996.
9       Q.  And specifically what were you
10  doing with respect to high bandwidth in 1996?
11      A.  In 1996, we were monitoring the
12  systems.  There was light span and different
13  types of technology that were used then.  And
14  we had to build certain things into the
15  database, the corporate database to allow
16  customers' facilities to work.
17      Q.  What other -- so that was 1996?
18      A.  Yes.  That was my first touch.
19      Q.  That was your first touch with high
20  bandwidth.  What other experience between 1996
21  and 2015 were you dealing with high bandwidth?
22      A.  And then I was taken away from it
23  and brought back to it in 2014.
24      Q.  So your first touch was in 1996 and
25  then in between '96 and 2014, you were taken

SUZETTE WALKER - 8/25/2016

101

1    away from high bandwidth and in 2014, was that
2    April 15, 2015, when you became an Engineering
3    Specialist III that you returned to high
4    bandwidth?
5        A.   Yes.  I'm sorry, 1996, it was for
6    like four years, from 1996 to like 2000
7    something, I'm sorry.
8        Q.   That's fine.  And that was exactly
9    what you had described to me in terms of what
10   your job responsibilities were in that time
11   period with respect to high bandwidth, correct?
12       A.   Yes.
13       Q.   And so from 2000 to 2014, you
14   weren't connected with high bandwidth, correct?
15       A.   Yes.
16       Q.   You weren't doing high bandwidth
17   work?
18       A.   Correct.
19       Q.   And in April 2015, when Magee came
20   to you and offered you the Engineer Specialist
21   III position, you returned to dealing with high
22   bandwidth, correct?
23       A.   Yes.
24       Q.   And that was from your perspective,
25   an exciting opportunity, right?

102

1        A.   Yes.
2        Q.   And with respect to the Engineer
3    III position, what work were you doing that
4    related to high bandwidth?
5        A.   We had to do SRs, which a customer
6    would put in a request for services.  We would
7    receive the SR, we would investigate, see what
8    the customer needed as far as capability.  We
9    would go out and do a field survey and then we
10   would come back and design the job.
11       Q.   And so how much of that particular
12   job, the Engineer Specialist III position were
13   you dealing with high bandwidth?
14       A.   Oh, a large portion.
15       Q.   So could you put a --
16       A.   Because that was the premier.
17       Q.   That was the premier product?
18       A.   Yes.
19       Q.   And that was kind of the cutting
20   edge, right?
21       A.   Yes.
22       Q.   And the future of services Verizon
23   was providing; is that right?
24       A.   Yes.
25       Q.   So when you say a large portion of

103

1    the Engineer Specialist III position was
2    dealing with high bandwidth, could you put a
3    ballpark percentage?
4        A.   I would say 45 percent.
5        Q.   And did you need to work with
6    others to be able to provide that service?
7    Were there contractors or engineers or were
8    there other individuals that you worked with to
9    provide that service to customers?
10       A.   Yes.
11       Q.   And who was that?
12       A.   I had to work with the outside
13   forces, other engineers in other departments as
14   far as ordering supplies and getting things
15   done and planners and several different groups
16   you had to work with.
17       Q.   So the outside engineers, who were
18   they?
19       A.   The foremen.
20       Q.   I'm sorry?
21       A.   The foremen, outside foremen.
22       Q.   Outside foremen?
23       A.   Yes.
24       Q.   Did you have a particular person
25   assigned to you?

104

1        A.   No.
2        Q.   And then what about when you said
3    the other engineers, were they the only
4    engineers?
5        A.   Like planners.
6        Q.   Planners?
7        A.   Engineers.
8        Q.   And any particular people you were
9    working with in April --
10       A.   MaryAnn Bruno.
11       Q.   Who is it?
12       A.   MaryAnn Bruno was my planner.
13       Q.   Anyone else that you worked with in
14   providing high bandwidth to customers?
15       A.   We also had to work with a group
16   that they forwarded the orders to us.  When we
17   finished with the order, we had to send the
18   order back to them to move it along.  I believe
19   that was Mr. Zielinski's group.
20       Q.   And were your relationships with
21   all these people positive?
22       A.   Yes.
23       Q.   So I had asked you when we looked
24   into this box of existing technologies, so you
25   came up with high bandwidth and you said there

SUZETTE WALKER - 8/25/2016

105

1    was another, but you couldn't remember what it
2    was.
3        A.  And we did FIOS.
4        Q.  Was the second one you were
5    thinking of?
6        A.  Yes, I'm sorry.
7        Q.  That's fine.  So FIOS, what were
8    your responsibilities with respect to providing
9    FIOS to customers?
10       A.  That position was twofold.
11       Q.  Tell me.
12       A.  Because the larger jobs were
13   initiated by another group, but they were
14   initiated within my territory.  So you had to
15   sometimes monitor or perform duties in
16   conjunction with what was going on.  And then
17   you had the day-to-day new buildings that were
18   designed on a smaller scale that needed to be
19   addressed.
20       Q.  Did you have to engage in any kind
21   of training to take on this Engineer Specialist
22   III position?
23       A.  Yes.
24       Q.  And what was that training?
25       A.  I was trained with the high

106

1    bandwidth, I was trained with Thomas Hodge.
2        Q.  How do you spell that last name?
3        A.  H-O-D-G-E.
4        Q.  And what did Hodge, like what was
5    Hodge's job?
6        A.  He was a Specialist III.
7        Q.  And how much time did you and Hodge
8    spend together with him teaching you how to
9    perform the job?
10       A.  A little less than a month.
11       Q.  Less than a month?
12       A.  Yes.
13       Q.  Was it daily?
14       A.  Basically.
15       Q.  Did he come on the job with you and
16   show you how to do the work?
17       A.  We went on a couple of surveys,
18   yes.
19       Q.  And was he helpful?
20       A.  Very.
21       Q.  Was he knowledgeable?
22       A.  Very.
23       Q.  And did he have a special focus on
24   HBW that he was able to teach you?
25       A.  Yes.

107

1        Q.  Was there anyone else that had a
2    specialized background or focus on HPW in the
3    Engineer III Specialist group?
4        A.  Paul Klauss and Steve Murphy.
5        Q.  Did you ever work with any of them
6    in HBW?
7        A.  Yes.
8        Q.  What did you do?
9        A.  Steve Murphy and I would go out on
10   surveys and survey his jobs and my jobs at the
11   same time.
12       Q.  And he had a specialized knowledge
13   in HBW from your perspective?
14       A.  In certain realms.
15       Q.  And how about with Paul, did you
16   work with Paul directly?
17       A.  I would talk to him on the phone
18   about different things.
19       Q.  And was he helpful?
20       A.  Yes.
21       Q.  And knowledgeable?
22       A.  Yes.
23       Q.  What about FIOS, what was your
24   background and experience -- and let me
25   rephrase.  How big a percentage of your job was

108

1    dealing with FIOS?
2        A.  I would say 20 percent.
3        Q.  20 percent.  And what was your
4    background and experience in selling FIOS and
5    dealing with FIOS?
6        A.  FIOS, I saw from a supervisory
7    position initially.
8        Q.  When was that?
9        A.  That was prior to 2000 -- that was
10   in 2010.  I believe.  When they first initiated
11   FIOS in some of my areas.
12       Q.  And from a supervisory perspective,
13   what did you do with FIOS?
14       A.  The network that would use FIOS,
15   going in and making sure that jobs were posted
16   properly in the database and that any errors
17   that existed were resolved.
18       Q.  So what year was that, I'm sorry?
19       A.  I think that was 2010.
20       Q.  2010.  And that's when you were
21   section manager, right?
22       A.  Yes.
23       Q.  Is that right?
24       A.  Team leader supervisor?
25       Q.  Yeah, I have -- you have a couple

SUZETTE WALKER - 8/25/2016

109

1  of jobs in 2010.  So you have supervisor
2  network engineering and then section manager
3  network engineering, both in 2010.
4       A.  Yes.  That was really all the same
5  job.
6       Q.  And so what other background and
7  experience did you have in dealing with FIOS?
8       A.  Numerous classes we had to attend,
9  training, as far as the FIOS concept.
10      Q.  Was there any special additional
11  information that you had to learn as an
12  Engineer III to manage and supply support on
13  the FIOS end?
14      A.  Yes.  We went to weekly meetings
15  concerning updates and changes in procedure.
16      Q.  And who conducted those weekly
17  meetings?
18      A.  They were done by Lori Andrews and
19  team.
20      Q.  And --
21      A.  And her team.
22      Q.  So who is Lori Andrews?
23      A.  She's I believe an Engineer IV.
24      Q.  Were there any individuals in the
25  Engineer Specialist III group that had a

110

1  particular focus or expertise in FIOS?
2       A.  Paul Klauss.
3       Q.  Paul Klauss.  Anyone else that you
4  know of?
5       A.  I'm trying to think of his last
6  name.  Brian Henry.  He was not in the group.
7  He was in an actual FTTP group.
8       Q.  What does FTTP mean?
9       A.  Fiber to the premise.
10      Q.  So fiber to the premise, what did
11  that have to do with FIOS?
12      A.  That is FIOS.
13      Q.  That is FIOS?
14      A.  Yes.
15      Q.  And so why did we use the two
16  names?  Why do you use FTTP and FIOS?
17      A.  That's just terminology.
18      Q.  And again, tell me, what percentage
19  of the Engineer Specialist III was FIOS for
20  you?
21      A.  About 20, 25 percent.
22      Q.  And was there any area in this FIOS
23  FTTP realm that you felt you needed additional
24  training or assistance in order to perform your
25  job?

111

1       A.  No.
2       Q.  Were there any aspects of supplying
3  this service that you felt challenging or
4  difficult?
5       A.  Dealing with large scale buildings
6  that someone else was designing.
7       Q.  And tell me what the issues were?
8       A.  Their design plan was usually
9  different than what we would have suggested.
10  And there were a lot of complaints from
11  building owners.
12      Q.  When you had these issues, did you
13  bring them to anyone's attention or did you
14  engage anyone to help you out?
15      A.  I discussed the problems with
16  Mr. Magee.
17      Q.  And what did he say?
18      A.  And we would come up with a plan
19  and resolve the issue and forward it to the
20  team that handled the actual FIOS, the
21  selection of the contractors that performed
22  FIOS FTTP and resolve it in that manner.
23      Q.  And they were outside individuals,
24  correct?
25      A.  Correct.

112

1       Q.  And again, with the outside
2  individuals, did you, was there anyone in
3  particular that you worked with, any outside
4  contractor that you worked with in particular?
5       A.  No.
6       Q.  So it was just whoever was
7  available?
8       A.  It was whoever she selected.
9       Q.  When you say she, who?
10      A.  Lori Andrews.
11      Q.  And you had a good relationship
12  with Lori, correct?
13      A.  Yes.
14      Q.  Let's look at your evaluation for
15  2014.
16          MR. CHASE:  Before you get
17      to that, could we take a five-minute
18      break?
19          MS. BEGLEY:  Sure.  Sure.
20      - - - - -
21      (A recess was taken at this time.)
22      - - - - -
23  BY MS. BEGLEY:
24      Q.  Let's go back to the document
25  that's in front of you, Exhibit 3, because you

SUZETTE WALKER - 8/25/2016

113

1    were identifying some of the areas that you
2    were responsible for performing jobs in 2013
3    and 2014.  Is there anything else?  You looked
4    at development and architecture.  You looked at
5    knowledge of existing and emerging
6    technologies.  Anything else on this document
7    that you want to share with me that you were
8    responsible for knowing, and utilizing and
9    performing your job during this period of time?
10        A.  The job really entailed touching on
11   all of these contents in some way, shape or
12   form.
13        Q.  So are there any categories where
14   you focused more in your final position as an
15   Engineer III than others?
16        A.  The last one, implementation and
17   asset management.
18        Q.  Go through that with me, please,
19   and tell me what your responsibilities were in
20   that category?
21        A.  Configuration and installation,
22   end-to-end testing.  The outside people did
23   that to make sure everything worked properly.
24   Facilities/data center managed that, we didn't
25   have anything to do with it, but the facilities

114

1    itself.
2             Under network/system operations
3    and security, at times, we had to resolve
4    outage problems.
5             Standards, procedures, tools and
6    compliance processes, we had a large part in
7    that, because when something changed, you had
8    to create new standards and procedures.
9        Q.  Anything else?
10        A.  When placing certain materials, you
11   had to keep in mind the security and integrity
12   of your customer's premise as far as access to
13   different things and other companies having
14   access to your equipment.  You had to keep that
15   in mind as well.
16        Q.  As an Engineer III, did you have a
17   plan for each of your projects where all these
18   issues were identified?
19        A.  I think whenever you looked at a
20   job, you just automatically ticked off from A
21   to Z the importance of following procedure,
22   making sure you understand what the customer
23   wants, making sure you can provide the customer
24   with what they need in a timely manner and a
25   specific location while keeping in mind the

115

1    security of our network.
2        Q.  There wasn't a checklist, it was
3    just something that in terms of learning how to
4    do the job you understood all of the elements
5    and criteria to perform the job, correct?
6        A.  I didn't have a checklist in
7    writing, no.
8        Q.  But you knew which each of the
9    responsibilities were --
10        A.  Yes.
11        Q.  -- in terms of performing the job.
12   So then let's just look at the, look at the
13   next page, please, on Exhibit 3.  And it says
14   Functional Capability Expectations by Job
15   Family.  Can you tell me what this is?  And
16   it's broken down into job family, technology,
17   network engineer and ops.  So you were the
18   network engineer and ops, correct?
19        A.  Yes.
20        Q.  And the Xes in the box are
21   knowledge of existing and emerging
22   technologies.  And you said basically the
23   knowledge of existing and emerging technologies
24   was HBW and FIOS or FTTP, correct?
25        A.  Yes.

116

1        Q.  Any others, are there any other
2    existing or emerging technologies that were
3    critical in performing the Engineering III
4    Specialist position?
5        A.  Product development and innovation,
6    because as times go on, new equipment comes
7    out, so you decide to do things with new
8    equipment and also you keep in mind the -- with
9    the work force diminishing who is going to do
10   the services for the customer.  So that does
11   come into play.
12        Q.  And so when you say the work force
13   diminishing, what does that mean?
14        A.  The outside work force was
15   diminishing.
16        Q.  And why was that?
17        A.  They were downsizing outside
18   people.
19        Q.  So your external resources were now
20   limited as the company was limiting its use of
21   outside, what were they, outside engineers,
22   outside contractors?
23        A.  No, they were outside technicians.
24        Q.  Outside technicians?
25        A.  Yes.

117

1    Q.  So as the work force diminished as
2  a network engineer, you had more
3  responsibilities; is that right?
4       A.  Yes.  You had to design things,
5  more use, better guidance and knowledge of your
6  equipment.
7       Q.  So you had, the position was
8  evolving in terms of responsibilities you had
9  as an Engineering III Specialist, right?
10      A.  Constantly.  Constantly.
11      Q.  So let me just get it straight.
12  HBW, FIOS, FTTP, those were the knowledge of
13  the existing technologies, correct?
14      A.  Yes.
15      Q.  That you had to be up to speed on.
16  And then you were also committed to focusing on
17  knowledge and understanding of product
18  development and innovation as this was an
19  evolving field, right?
20      A.  Yes.
21      Q.  Copper, where did copper fit into
22  this whole world?
23      A.  Copper would be existing --
24      Q.  Existing?
25      A.  -- technology.  Because we were no

118

1  longer placing new copper, if possible.  I mean
2  in some aspects, you still had to repair
3  damaged copper and maintain it in areas where
4  FTPP was not available.  So that was like in
5  the areas, territory that I handled, that was
6  like 50 percent of my job.
7       Q.  50 percent of your job was what?
8       A.  Maintaining the copper network in
9  the areas that did not have FTPP.
10      Q.  But that wasn't, maintaining copper
11  wasn't an emerging technology --
12      A.  No.
13      Q.  -- is that right?
14      A.  No.
15      Q.  And that was something that --
16      A.  Was going to disappear.
17      Q.  Was going to disappear and probably
18  pretty quickly disappeared, right, with FTPP?
19      A.  Yes.
20      Q.  But during the period of time you
21  were there, there was still some responsibility
22  to repair damaged copper and replace damaged
23  copper?
24      A.  Yes.
25      Q.  But that wasn't a future

119

1  technology, correct?
2       A.  No.
3       Q.  And copper was really a thing of
4  the past; is that right?
5       A.  Technically.
6       Q.  And when you say technically, what
7  does that mean?
8       A.  It still had to be maintained.
9       Q.  And from your perspective though,
10  you said 50 percent of your job, what do you
11  mean was dealing with copper?
12      A.  50 percent was dealing with as the
13  copper network failed, trying to get those
14  individuals into the FTTP grouping.
15      Q.  So when you were alerted of a
16  particular job that had failing, damaged
17  copper, your goal was to replace it with FTTP,
18  correct?
19      A.  Yes, if possible.
20      Q.  If possible?
21      A.  If possible.
22      Q.  And how often was it possible?
23      A.  It became more and more possible as
24  time went on.
25      Q.  And why is that?

120

1       A.  Because the infrastructure was
2  being built.
3       Q.  And is this during 2014 that it was
4  being built?
5       A.  In that area that I was dealing
6  with, yes.
7       Q.  And do you have an understanding of
8  what the plan was in terms of total
9  infrastructure being built for FTTP?
10      A.  Well, it kept getting pushed back,
11  so I don't really know what the actual plan
12  was.  We met weekly to discuss what we could
13  do, how far we could go and everything depends
14  on budget.
15      Q.  But the goal was to move away from
16  copper and move into FTTP?
17      A.  Yes.
18      Q.  And build an infrastructure to
19  accommodate that, right?
20      A.  Yes.
21      Q.  So let's go to the next page of
22  Exhibit 3, please, which is page 3.  And up at
23  the top it says Job Family:  Network
24  Engineering and Operations and under
25  Engineering III Specialist, it says it's a Band

SUZETTE WALKER - 8/25/2016

121

1    7T; is that correct?
2         A.   Yes.
3         Q.   From 2008 to 2015, can you tell me
4    the different bands you were in?
5         A.   I couldn't tell you, I really don't
6    remember.
7         Q.   Were you promoted by Brian Magee at
8    any time?
9         A.   No.
10        Q.   No.  So in 2010, you weren't
11   promoted by Brian Magee?
12        A.   No.
13        Q.   All right.  So let me just look
14   through your jobs quickly, just so I'm clear.
15        A.   Oh yes.  Yes, I went from a
16   supervisor to an engineer.
17        Q.   Okay.
18        A.   I'm sorry.
19        Q.   That's okay.  So you started out
20   with Magee in 2008 as a supervisor network
21   engineer and then in 2010, you went to a
22   section manager networking engineer, was that a
23   promotion?
24        A.   No.
25        Q.   So then you went to a section

122

1    manager network engineer to a specialist
2    network engineer?
3         A.   That was a promotion.
4         Q.   That was a promotion.  So that was
5    in 2012?
6         A.   Okay.
7         Q.   And do you know whether there was a
8    band increase along with that?
9         A.   I'm not sure.
10        Q.   So let's look at this page 3 of
11   Exhibit 3 where it says Engineering III
12   Specialist.  And up at the top it says Job
13   Family:  Network Engineering and Operations,
14   responsible for design, implementation and
15   operation of advanced network infrastructure
16   and systems.  So the advanced network
17   infrastructures, what does that mean?  Do you
18   know?
19        A.   I don't know what they mean by
20   that.
21        Q.   Well, what was the infrastructure?
22        A.   The infrastructure was the copper
23   network and the fiber network.
24        Q.   And the advanced network, would
25   that be the fiber network?

123

1         A.   It could be.
2         Q.   So let's look at Engineer III and
3    I'm having a hard time reading this, because it
4    is so small.  I need new glasses.  So it says
5    provides operational or technical support in
6    the development, analysis and maintenance of
7    systems, software, processes, products, or
8    equipment.  Generally follows
9    established/documented approaches to issues and
10   problems.
11        A.   That's four.
12             MS. BROWN:  Do you want me
13        to read three?
14             MS. BEGLEY:  You are
15        kidding.  Delete all of that.  Yeah, I
16        need someone else to read it.  I can't.
17        So I'm going to have my colleague
18        Valerie read three, because it's too
19        small for me to read.
20             MS. BROWN:  Provides
21        resolution to diverse range of complex
22        problems.  Data analysis requires
23        selection of methods and techniques for
24        obtaining information and reaching
25        solutions.  And independent evaluation

124

1    of multiple interrelated factors.
2    BY MS. BEGLEY:
3         Q.   So that's under work complexity,
4    would you agree that that was the
5    responsibility of the Engineer III specialist?
6         A.   Yes.
7         Q.   And then under Enterprise
8    Leadership capabilities, it says leadership
9    differ by band, so there's no statement under
10   there.  And then if we move down to functional
11   capabilities of the Engineer III, I'm going to
12   read from the correct column this time,
13   generally has learning proficiency in all of
14   the relevant knowledge and skills.
15             And under education, it says BS
16   preferred or equivalent, or equivalent work
17   experience.  Do you have a bachelor's degree?
18        A.   Yes.
19        Q.   And when did you receive your
20   bachelor's degree?
21        A.   In '96 I believe.
22        Q.   When was it?
23        A.   I believe it was '96.
24        Q.   1996.  You graduated from college
25   with a BS?

SUZETTE WALKER - 8/25/2016

Pages 125 to 128

125

1    A.  Yes.
2    Q.  And what college was that?
3    A.  Temple.
4    Q.  And what was your, what was your
5  degree?
6    A.  Finance.
7    Q.  Finance.  Any advanced degree?
8    A.  A master's degree in business
9  technology.
10    Q.  And when did you receive that?
11    A.  2006.
12    Q.  You were employed by Verizon at the
13  time?
14    A.  Pardon me?
15    Q.  You were employed by Verizon at the
16  time you received your master's degree?
17    A.  Yes.
18    Q.  Did Verizon in any way pay or
19  reimburse you for your tuition?
20    A.  Yes.
21    Q.  So how many years did it take you
22  to get your master's?
23    A.  Two.
24    Q.  Did you go to night school?
25    A.  Yes.

126

1    Q.  And did they reimburse you for all
2  your tuition?
3    A.  They paid.
4    Q.  They paid for it?
5    A.  Yes.
6    Q.  And then under experience, Valerie,
7  I'm going back to you, because I can't see that
8  number.
9        MS. BROWN:  Generally three
10  plus years in related discipline.
11  BY MS. BEGLEY:
12    Q.  So is that your understanding of
13  the individual contributors from a technical
14  perspective for that job?
15    A.  This is the first time I'm seeing
16  this paper.
17    Q.  All right.  So let's now go to your
18  2014 performance evaluation.  So this is
19  Exhibit 4.
20        - - - - -
21        (2014 Performance Evaluation Bates
22        Def_Walker_008 to 017 marked Walker
23        Exhibit 4 for identification.)
24        - - - - -
25

127

1  BY MS. BEGLEY:
2    Q.  So let's look at the second page of
3  Exhibit 4.  And toward the bottom of the page,
4  at the second to last paragraph, it says
5  Requestnet to maintain effectiveness.  What's
6  Requestnet?
7    A.  Requestnet is where you receive
8  your SRs for service requests.
9    Q.  Your service requests?
10    A.  Yes, it comes from a database.
11    Q.  And so the first bullet says adjust
12  to the FTTP workflow process between
13  departments to meet the HHs past expectations.
14  What does that mean?  Do you know?
15    A.  Oh, FTTP came through a system and
16  from department to department, HHs are
17  households.
18    Q.  Households?
19    A.  Households.  And you were given
20  certain expectations of how many households you
21  needed to pass.
22    Q.  Is it residences or is it something
23  else?
24    A.  It could be residences.  It could
25  be businesses.  It depends.

128

1    Q.  And two down it says resolve
2  FTTP-based problems using the proper processes
3  to alleviate missing HHs.  What does that mean?
4    A.  That means that in the database you
5  had to update certain information in the system
6  telling how many households a particular work
7  product would pass in order for it to count.
8  Those household numbers had to be included so
9  that you can keep a current record of how many
10  households that work really encompassed.
11    Q.  If you can page back to the
12  document that is defendant Walker 012 at the
13  bottom of the page, like three or four pages
14  back.
15    A.  What are we in --
16    Q.  On the same document, like go back
17  and at the bottom of the page it says 012,
18  that's the page I'm looking for.  And looking
19  for the section that says Improve the Customer
20  Experience.  So under Improve the Customer
21  Experience, it says improve network
22  availability, description and measures, what
23  does that mean, do you know?
24    A.  Where do you see that?
25    Q.  I'm going to point to where I'm

129

1    looking at.  Here's that page, under
2    description and measures, it says improve
3    network availability.  This is part of your
4    job.  Do you see it or no?
5        A.  I'm see it.  I'm trying to think
6    what it's about.
7        Q.  Yeah.  Take your time.
8        A.  I'm sorry.
9        Q.  That's okay.  Take your time.
10        A.  I'm not sure what he meant by that.
11        Q.  What would be the, what was the
12    network available to your customers in the 2014
13    time frame?  What network are we talking about?
14        A.  It depended on the portion of the
15    territory you were in.  And what type of,
16    whether it was a business or a regular
17    residential customer.  A lot of the businesses
18    were on networks that would have picked up high
19    bandwidth.  A lot of the regular customers,
20    some in certain areas were able to pick up
21    FTTP.  But then there was still that large
22    number that were not in range of either one, so
23    you would have to build to that particular
24    customer using one or the other items.
25    Depending on what was more conducive to the end

130

1    result the customer was looking for.
2        Q.  When you say one or the other item,
3    would it be --
4        A.  The fiber or the high bandwidth.
5        Q.  But those are the only two networks
6    that you were looking to provide to customers;
7    is that right?
8        A.  Unless it was a cell site.
9        Q.  And what does that mean?
10        A.  A cell site.
11        Q.  And what does that mean?
12        A.  Where AT&T or some other customer
13    was building a cell site and we had to provide
14    service to that particular cell site.
15        Q.  And what kind of service would that
16    be?
17        A.  That's like a high bandwidth type
18    thing.
19        Q.  So it's all pretty much, everything
20    that you were doing in terms of customer
21    servicing was FTTP and high bandwidth.  Is that
22    right?
23        A.  In most cases, yes.
24        Q.  Unless it was repairing --
25        A.  Right, the copper.

131

1        Q.  -- the copper?
2        A.  Yes.
3        Q.  But even in that situation it was
4    as the infrastructure grew, it was replacing
5    the copper?
6        A.  We were trying to get away from it.
7        Q.  So you were moving away from
8    copper, right?
9        A.  Yes.
10        Q.  Down at the bottom of the page, it
11    says employee accomplishments/status.  Do you
12    see that section?
13        A.  Yes.
14        Q.  And it says PA One Call
15    contractors -- contractor calls for locates,
16    markups and dig ups.  Direct, and it looks like
17    design prints to the proper engineers to
18    expedite the completion of new developments in
19    PA.  Respond to design requests.  And then
20    there's processed and it has a bunch of numbers
21    under it.  Does this reference your performance
22    specifically, do you know?
23        A.  Yes.
24        Q.  It does?
25        A.  Yes.

132

1        Q.  So can you tell me what all this
2    means?
3        A.  This talks about design requests
4    could be from City of Philadelphia, PennDOT,
5    different utilities.  As far as invoicing, that
6    could be payment to contractors and vendors for
7    certain items.  PARS are requests that are put
8    in for issuing work out to vendors.
9        Q.  Okay.
10        A.  Designs from contractors are, in
11    some cases, they could be the major jobs that I
12    was speaking of from FTTP.  They could be the
13    movement that's going on now over on Vine
14    Street, the moving the bridges.  It could be
15    something of that type.  The GPIS request --
16        Q.  What is that, what is a GPIS
17    request?
18        A.  GPIS is something, the state, the
19    City of Philadelphia has a system whenever you
20    do work in the City of Philadelphia, you have
21    to go into the system called GPIS.  You have to
22    insert what you're trying to do, where you're
23    trying to do it with all the particulars,
24    footage, how far you're going.  And the system
25    sends out e-mail notices to all the utilities

SUZETTE WALKER - 8/25/2016

133

1  within the area of your work.
2     Q.  So the numbers that are here, the
3  metrics that are here, it says processed and
4  then there are a bunch of numbers?
5     A.  Yes.
6     Q.  Can you tell me what those numbers
7  mean?
8     A.  Those are probably my numbers.
9     Q.  And so can you tell me whether
10  those are good numbers, like were they --
11    A.  Well, they have to be good numbers.
12    Q.  And why is that?
13    A.  Because these are all the items
14  that I received.
15    Q.  I can't hear you.
16    A.  When I put the numbers in for him,
17  these are all the items that I worked on during
18  my period of time.
19    Q.  So you believe those are positive
20  metrics regarding your employment; is that
21  right?
22    A.  Yes.
23    Q.  Go onto the next page and it says
24  30 3rd party request?
25    A.  30 3rd party requests are when

134

1  companies would initiate a process of placing
2  their utilities on Verizon poles.
3     Q.  Okay.
4     A.  So we had to address those issues.
5  So we had 30 actual requests.
6     Q.  And under that there's again a
7  number of metrics, 15 PA One Call requests with
8  conduit prints, 50 service orders problems,
9  four PennDOT milling jobs.
10    A.  The 15PA One Call requests are
11  requests that were put in by Verizon for
12  conduit prints.
13    Q.  And was this your specific
14  performance?
15    A.  Yes.
16    Q.  Let's go down to Simplify Products,
17  Policies and Processes.  And employee
18  accomplishments/status.  Do you see that
19  section?
20    A.  Yes.
21    Q.  And it says tell me, is this
22  information that you provided or that Mr. Magee
23  provided?
24    A.  I provided.
25    Q.  You provided it?

135

1     A.  Yes.
2     Q.  So all of those statements provide
3  assistance with new processes and procedures?
4     A.  He put in the last item.
5     Q.  Which one did he put in?
6     A.  Process TLS and VON orders within
7  the eight-day constraints.
8     Q.  What does that mean?
9     A.  That means I process the order
10  within a shorter time that we were given to do
11  the work.
12    Q.  So he's asking you to do, to
13  process TLS and VON orders in a shorter period
14  of time --
15    A.  Yes.
16    Q.  -- which was eight-day time
17  constraints, right?
18    A.  Yes.
19    Q.  And what about the section right
20  above that, provide information on problems
21  from FIOS customers to the proper individuals
22  to provide customer satisfaction.  Was that
23  something you put in there?
24    A.  Yes.
25    Q.  Let's go to the next page.  And

136

1  this is under Fuel our Culture, Description and
2  Measures on Employee Development, job related
3  training.  And it says complete two training
4  courses.  So are these the training courses?
5  There's one listed.
6     A.  Yes.
7     Q.  Did you complete that training
8  course?
9     A.  Yes.
10    Q.  Yes?
11    A.  Yes.
12    Q.  Was there another that you missed?
13    A.  There was another there.
14    Q.  Did you complete another training
15  course?
16    A.  That is really two.
17    Q.  Okay.
18    A.  It should be underneath.
19    Q.  That's fine.  All right.  So then
20  it says Recognition, Employee
21  Accomplishments/Status, ESSM for session.  What
22  does this mean?  Are these just training
23  programs?
24    A.  Those are the training courses.
25    Q.  That you participated in?

137

1      A.  Yes.  Training courses and major
2  products I had to oversee.
3      Q.  So let's go to the next page, which
4  is at the bottom of the page defendant Walker
5  015 and again Section 3 is the midyear review,
6  January 1 through June 30.  And in the midyear,
7  Manager Performance Summary, Magee states
8  "Suzette, your numbers look good considering
9  your time on the turf.  Take ownership of your
10  turf and learn as much as you can during the
11  remainder of this year on HBW."  So he's
12  telling you to learn more during the remainder
13  of the year on high bandwidth?
14      A.  Yes.
15      Q.  And did you agree that that was an
16  area where you needed and wanted to learn more?
17      A.  I wanted to learn more.
18      Q.  And he was directing you to do so
19  during your review?
20      A.  Yes.
21      Q.  It then goes along to say "If you
22  can get your FAC verification under eight, you
23  will be making a big contribution to the team.
24  What does that mean?  What's an FAC
25  verification?

138

1      A.  Facilities verifications.
2      Q.  Can you tell me what it means
3  though, getting it under 8?
4      A.  Facilities verifications is part of
5  an SR process where you actually contact the
6  customer, do the survey, come back and design
7  the print and issue it all in under eight days.
8      Q.  Under eight days?
9      A.  Yes.
10      Q.  And where were you at this point,
11  do you know, in midyear?
12      A.  No.
13      Q.  So let's look above.  It says,
14  district averages versus your averages at
15  midyear, print issued, so the district was 136
16  and yours was 111.  What does that mean?
17      A.  I issued 111 prints.
18      Q.  And the district average was 136,
19  right?
20      A.  Yes.
21      Q.  Hours issued, and the district was
22  6503 and yours was 3137.  What does that mean?
23      A.  I have no idea about those hours.
24      Q.  Then it says number of ODN HH and
25  it says 97 versus zero.  What is an ODN?

139

1      A.  I can't remember at this time.
2      Q.  You had zero, why did you have
3  zero?
4      A.  I can't remember.
5      Q.  Do you know what, I mean do you
6  know what it's referring to and why you only
7  had zero?
8      A.  Yeah, I can't remember what it is.
9      Q.  What about NWC HH, the group had
10  223 on the average, you had 166?
11      A.  Basically I really wasn't involved
12  in a lot of FTTP jobs at that point of the
13  year.  I didn't start really doing FTTP work
14  until later in the year.
15      Q.  When was it that you really started
16  doing FTTP work?
17      A.  After I would say like July,
18  August, around there that I really started to
19  step up, because the area that I received from
20  Mr. Murphy was actually involved in FTTP work.
21  And that's when it started -- no, that was
22  September.
23      Q.  September?
24      A.  Yes.  That's when I really started
25  to have fiber to the prem jobs.

140

1      Q.  So September of 2014 when the work
2  was transitioned from Murphy, that's when you
3  really started doing FTTP work --
4      A.  A lot of FTTP work, yes.
5      Q.  -- is that right?  And did you have
6  to do any training to be able to assume that
7  responsibility for FTTP in September?
8      A.  I had to train as I did it.
9  Because there was no time to actually sit for
10  weeks at a time.  The work had to be done.
11      Q.  So were you looking forward to
12  taking on this new responsibility of FTTP work
13  in September of 2014?
14      A.  Yes, yes.
15      Q.  And when Magee brought this to you,
16  did you tell him you were looking forward to
17  taking on this responsibility?
18      A.  Yes.
19      Q.  And did he tell you you're going to
20  have to learn it as you go?
21      A.  Yes.
22      Q.  And did you say, well, I need
23  training of some sort?  What was the discussion
24  about how you would get the training you needed
25  to do the job?

SUZETTE WALKER - 8/25/2016

141

1    A.  The discussion was I knew the
2  people who, the actual group who handled FTTP.
3  And I had people within my group, Paul Klauss
4  was there and he stepped up and he said
5  whatever you need and that's how we did it.
6    Q.  And so from September 2014 on, you
7  had a significant focus that you hadn't
8  previously on FTTP, correct?
9    A.  Right.
10   Q.  And your team, the team helped you
11 learn how to do it?
12   A.  We worked as a team.
13   Q.  And you felt that that was
14 successful, the team was supporting you?
15   A.  Yes.  And not including the
16 meetings we had every week and training
17 sessions online.
18   Q.  So you had actual hands-on training
19 from Paul Klauss and others; is that right?
20   A.  From the FTTP group, yes.
21   Q.  From September on?
22   A.  Yes.
23   Q.  So let's go down, it says average
24 of FAC verification, 18.2 versus 10.3.  Right?
25   A.  Yes.

142

1    Q.  So you were a ten, right?
2    A.  Yes.
3    Q.  SR numbers, 25 versus six.  What
4  does that mean?
5    A.  Oh, the average person got 25 and I
6  only got six.
7    Q.  And what is an SR?
8    A.  SR is the request that comes in for
9  facilities, be it DS1, DS2, high bandwidth.
10 That's what the SR is.  It's the customer
11 request for facilities.
12   Q.  So how would those come in?
13   A.  They he come in over the database.
14   Q.  So you --
15   A.  As a customer requests service, the
16 SR comes in, you go in and look and see what's
17 in your area and you pick it.
18   Q.  Did he expect you to take on more
19 than 6 SRs?
20   A.  It's based on your area.  Your
21 territory.
22   Q.  That's fine.  Let's go to the
23 final, I believe it's the almost final page,
24 second to last page and this is Section 4,
25 year-end review.  And the manager performance

143

1  summary says your average of FAC verification
2  8.4 versus 12.7 team's average, right?
3    A.  Uh-huh.
4    Q.  And then your number of SRs 25
5  versus 57 team's average, right?
6    A.  Uh-huh.
7        MS. NERO:  You have to give
8    a verbal response.
9  BY MS. BEGLEY:
10   Q.  And Magee's statement in your
11 performance evaluation, has Suzette
12 continued --
13   A.  Oh, I'm sorry.
14   Q.  What did I --
15       MS. NERO:  She's saying
16   uh-huh and you're not telling her yes
17   for the record.
18       MS. BEGLEY:  Oh, thank you
19   for being co-counsel.
20       MS. NERO:  Yeah, I try.
21 BY MS. BEGLEY:
22   Q.  Suzette continued to grow into the
23 turf role in 2014.  These are Magee's comments.
24 She took the HBW focus and moved her facility
25 verification number to metric.  Suzette

144

1  utilizes and manages the SOW contractors well,
2  but would benefit from completing more of the
3  HBW surveys herself.  Also greater focuser on
4  the end product of the contractors' product is
5  necessary.  So that was the complete statement
6  of Mr. Magee, correct, for your performance
7  between January 1, 2014 and end of year
8  December 31, correct?
9    A.  Yes.
10   Q.  So let's break it down a little
11 bit.  So his first statement is that you
12 continued to grow into the turf role in 2014
13 and that was a new role, right?
14   A.  Yes.
15   Q.  And again, it was April 2014 when
16 you were assigned that job?
17   A.  Yes.
18   Q.  So you're only in it a portion of
19 the year, correct?
20   A.  Yes.
21   Q.  He goes on to say she took the HBW
22 focus and moved her facility verification
23 number to metric, correct.
24       He also says that you utilize and
25 manage the SOW contractors well, but would

SUZETTE WALKER - 8/25/2016

145

1  benefit from completing more of the HBW surveys
2  yourself.  What does that mean?
3      A.  Statement of work contractors went
4  out and did a lot of the surveys and --
5      Q.  Were these the guys that were being
6  eliminated?
7      A.  No, no, these were actual --
8      Q.  Were they Verizon?
9      A.  -- contractors, yes.
10      Q.  But he wanted you to complete more
11  of the HBW surveys yourself, what did --
12      A.  I did a lot of the surveys.  I
13  explained to him that a lot of in my area, a
14  lot of the surveys were blanket surveys where
15  it was the City of Philadelphia, you had to do
16  eight different locations.  So when I had jobs
17  like that, I did all of those myself.  If they
18  were like random jumping from one area of
19  Philadelphia down to the other area, I couldn't
20  cover all those at one time and still maintain
21  the FTTP process and the SRs, it was impossible
22  and he told us, we were project managers.  We
23  were supposed to manage the work the best that
24  we could and get it done.
25      Q.  So did you have that discussion

146

1  with him when you met with him?
2      A.  Yes.
3      Q.  And did he accept your explanation?
4      A.  He says then something, I have to
5  put something on the back burner.  And I
6  explained to him to meet the dates with the
7  volume of work that I had, I had to do what was
8  best for customers to get the job done and out,
9  issued and processed immediately.
10      Q.  And what did he say?
11      A.  He said okay.
12      Q.  Did you think your meeting with him
13  was positive and you met with him February 25,
14  2015, to discuss the 2014 evaluation, was it a
15  positive meeting?
16      A.  Yes.  He understood what I was
17  trying to say.
18      Q.  And did you feel that you were
19  communicating effectively with him?
20      A.  Yes.
21      Q.  And that he was listening?
22      A.  Yes, he was listening.
23      Q.  And did you feel it was a positive
24  meeting?
25      A.  Yes.

147

1      Q.  And then the last sentence says and
2  "Also greater focuser on the end product of the
3  contractors' product is necessary."  What is
4  that?
5      A.  That's the large scale jobs I was
6  discussing earlier.  And taking the time to
7  review all of their work and the problems that
8  existed when they provided the end product.
9      Q.  What's the end product, what is
10  that?
11      A.  The end product is a large scale
12  design that shows the actual building of a
13  network inside the customer premise of a large
14  scale building making sure that the design is
15  proper for the installation of the service as
16  far as accessibility and the equipment that's
17  being placed.
18      Q.  And this contractor, is this still
19  a SOW contractor or is it another contractor?
20      A.  No, it's another contractor.
21      Q.  Are these the contractors that are
22  diminishing and being used less?
23      A.  No.
24      Q.  So these are still contractors?
25      A.  Yes.

148

1      Q.  What kind of contractors are these?
2      A.  These are contractors that Lori
3  Andrews hires to do these large scale jobs.
4      Q.  So your overall rating for 2014 was
5  performing, correct?
6      A.  Yes.
7      Q.  And you were happy with that
8  evaluation, correct?
9      A.  Yes.
10      Q.  Anything else in your meeting with
11  Mr. Magee regarding your 2014 evaluation, any
12  other comments that he made, any comments that
13  you made to him about your evaluation, about
14  your job performance?
15      A.  No.
16      Q.  About your future?
17      A.  No, just discussed how we should
18  continue to make things better.
19      Q.  Can you tell me about the meeting
20  that you had with Mr. Magee on April 23, 2015,
21  where he notified you that your position was
22  being eliminated?
23      A.  What do you want to know?
24      Q.  So how was that meeting set up?
25  Did someone call you and tell you?

SUZETTE WALKER - 8/25/2016

149

1   A.  No.
2       Q.  So how did the meeting occur?
3   A.  I walked into the office and he
4   walked, he walked toward me and he said I need
5   to speak to you.  We went into the conference
6   room and he explained what was going on.  He
7   said the company was going in a different
8   direction.  He gave me all the package that he
9   was supposed to give me and he asked me did I
10  want to stay and I left.
11      Q.  So that was it, that was your only
12  discussion?
13  A.  That was it.
14      Q.  How long did it take?
15  A.  About ten minutes.
16      Q.  You didn't ask him any questions?
17  A.  I asked him how did they come to
18  the decision.
19      Q.  And what did he say?
20  A.  He didn't say anything.
21      Q.  Did you, so you left and did you go
22  home or what did you do?
23  A.  I walked around.
24      Q.  Did you talk with anyone else?
25  A.  No.

150

1       Q.  Did you alert anyone of the fact
2   that you were impacted by the reduction in
3   force?
4   A.  Not until the next day.
5       Q.  So then did you come back to work
6   the next day or two?
7   A.  No.
8       Q.  And did he tell you that you could
9   stop working immediately?
10  A.  Yes.
11      Q.  Did he tell you, you had to stop
12  working immediately?
13  A.  He said that I didn't have to do
14  anything else.
15      Q.  And you understood that the
16  effective date for your termination was May 22?
17  A.  Yes.
18      Q.  About a month later, right?
19  A.  Yes.
20      Q.  And that you would be paid through
21  that period of time, correct?
22  A.  Yes.
23      Q.  Did he tell you that you have the
24  opportunity to look for other jobs at the
25  company?

151

1   A.  Yes, he did.
2       Q.  Did he give you anyone's name in HR
3   that you should contact to talk about job
4   opportunities?
5   A.  It was all on the paperwork.
6       Q.  It was all in the paperwork?
7   A.  Yes.
8       Q.  So you took the package.  Can I
9   have a copy of the package, please and this
10  will be Plaintiff's Exhibit 5.
11          - - - - -
12          (Packet Bates P1 to P18 marked
13          Walker Exhibit 5 for identification.)
14          - - - - -
15  BY MS. BEGLEY:
16      Q.  So take a look, Mrs. Walker, at
17  Plaintiff's Exhibit 5, which is the packet that
18  was given to you by Mr. Magee on April 23,
19  2015, in connection with the reduction in force
20  and confirm that this is the package that you
21  did receive.
22  A.  Yes.
23      Q.  And so when he handed you the
24  package and did you look at the package at all
25  when he sat and met with you on that date?

152

1   A.  Yes.
2       Q.  You did look at it?
3   A.  Yes.
4       Q.  And did you ask him any questions
5   about it?
6   A.  No.
7       Q.  Did he say if you have questions,
8   you can come back to me, did he --
9   A.  No.
10      Q.  Did he say he was sorry to notify
11  you of the fact that your job was terminated?
12  A.  Yes.
13      Q.  And what did you say to him?
14  A.  I didn't say anything.
15      Q.  I mean did he tell you that he had
16  enjoyed working with you?
17  A.  Yes.
18      Q.  Did you cry?
19  A.  No.
20      Q.  Was he visibly upset?
21  A.  Yes.
22      Q.  And you believed that was true, he
23  was upset, right?
24  A.  Yes.
25      Q.  When you paged through the package,

SUZETTE WALKER - 8/25/2016

153

1  did you see there was information about career
2  transition services that would have been
3  provided to you?
4       A.  Yes.
5       Q.  Did you ever contact Lee Hecht
6  Harrison?  Did you ever contact Lee Hecht
7  Harrison?
8       A.  No.
9       Q.  There was information about pension
10 and how to obtain a pension estimate.  Do you
11 have a pension from Verizon?
12      A.  Yes.
13      Q.  And what's the amount of your
14 pension, do you know?
15      A.  I couldn't tell you.
16      Q.  Were you retirement eligible at the
17 time that you received notice of the reduction
18 in force?  You were employed for how many
19 years, 30 years?
20      A.  Thirty-six, 37 years.
21      Q.  So you were retirement eligible?
22      A.  Yes.
23      Q.  Full retirement?
24      A.  Yes.
25      Q.  Have you tapped into your

154

1  retirement at all?
2       A.  Just my, some of my investments.
3       Q.  Does your retirement include any
4  medical?
5       A.  Yes.
6       Q.  It does?
7       A.  Yes, you pay for it though.
8       Q.  And are you utilizing that?
9       A.  Yes.
10      Q.  So you're receiving your medical
11 through Verizon?
12      A.  Yes.
13      Q.  And what do you have to pay for it?
14 What is it per month?
15      A.  Like $350 a month, 314, something
16 like that.
17      Q.  So your husband's state retirement
18 from the State of Pennsylvania, does he have
19 all of his medical coverage?
20      A.  No.
21      Q.  So is he with that 300, are you
22 covering your husband?
23      A.  Yes.
24      Q.  Do you have any other dependents?
25      A.  No.

155

1       Q.  You said you have a child who is
2  34, 36?
3       A.  Yes, 34.
4       Q.  Thirty-four.  Is it a son or a
5  daughter?
6       A.  Son.
7       Q.  Do you have grandchildren?
8       A.  Yes.
9       Q.  And where do they all live?
10      A.  With their father.
11      Q.  With their father?
12      A.  Father and their mother.
13      Q.  Oh, your grandchildren, so how old
14 are your grandchildren?
15      A.  My granddaughter is eight.
16      Q.  And do they live close to you?
17      A.  No.
18      Q.  Are you close to your son?
19      A.  I don't live close to him, no.
20      Q.  No, are you close to him in terms
21 of a relationship?
22      A.  Yes.
23      Q.  Are where does he live?
24      A.  He lives in Manayunk.
25      Q.  In Manayunk.  And you're in the

156

1  City of Philadelphia?
2       A.  Yes.
3       Q.  That's pretty close.
4       A.  Kind of.
5       Q.  How often do you see your
6  granddaughter?
7       A.  Every two weeks.
8       Q.  Every two weeks.  Do you ever do
9  any babysitting?
10      A.  Sometimes.
11      Q.  So you if you page back to
12 attachment A, it indicates that had you signed
13 the release agreement, you would have been
14 entitled to $69,271 in severance, correct?
15      A.  What page is that?
16      Q.  It's page 12.
17      A.  Yes.
18      Q.  And you chose not to sign the
19 release agreement, correct?
20      A.  Correct.  I'm sorry, correct.
21      Q.  What efforts did you make
22 internally to obtain a job and what specific
23 jobs did you apply for at Verizon once you were
24 notified of the fact that you were being
25 impacted by the reduction in force?

SUZETTE WALKER - 8/25/2016

157

1      A.  There were only two jobs in the
2  system in Pennsylvania.  No, one job in
3  Pennsylvania and one job was in New Jersey.  It
4  was, it was an administrative, Human Resources
5  administrator in Piscataway and the only --
6  there were no -- no, that's wrong.  There were
7  no jobs in Pennsylvania.
8      Q.  So there were no jobs posted in
9  Pennsylvania between April 23, 2015, and
10 May 22, 2015; is that right?
11     A.  Right.  None that I had the
12 specific qualifications for.
13     Q.  So did you apply for any jobs?
14     A.  Yes, I did.
15     Q.  What jobs did you apply for?
16     A.  That was the one in Piscataway for
17 I believe it was an office, what was it
18 called --
19     Q.  The HR administrative job?
20     A.  Yes.
21     Q.  Once your termination date was
22 effective, the May 22nd date, were you still
23 permitted to apply for jobs at Verizon?
24     A.  Not through the Verizon website.
25     Q.  But you could do it otherwise?

158

1      A.  Through Indeed.
2      Q.  Through what?
3      A.  Through Indeed.com.
4      Q.  And did you do that?  Did you do
5  that?
6      A.  When jobs came up and I looked for
7  them, yes, but there was nothing available.
8      Q.  So from the date of your
9  termination, notice of termination, April 23,
10 2015, until today, how many jobs at Verizon
11 have you applied for?
12     A.  None.
13     Q.  Have you had conversation, you
14 identified three other African-American
15 employees that were impacted by the reduction
16 in force and their employment was terminated
17 and you say you know of five, correct?
18     A.  Yes.
19     Q.  Have you discussed your case with
20 any of those individuals?
21     A.  No.
22     Q.  Have any of those individuals filed
23 lawsuits against the company?
24     A.  I believe so.
25     Q.  Who?

159

1      A.  Kevin Johnson.
2      Q.  Kevin Johnson.  And who else?
3      A.  I can't tell you.  I don't know
4  about the other two.
5      Q.  And how do you know Kevin Johnson
6  had a lawsuit against the company?
7      A.  He told me.
8      Q.  And when did you last talk with
9  Kevin Johnson?
10     A.  September of, this is 2016?
11     Q.  September 2015?
12     A.  Wait a minute.  Wait a minute.  I
13 believe I spoke to him in March of 2016.
14     Q.  2016?
15     A.  Yes.
16     Q.  And can you tell me the nature of
17 the discussion with him in 2016?
18     A.  He just asked me, it was just basic
19 friendly conversation about what we were doing.
20     Q.  And did you tell him you had a
21 lawsuit?
22     A.  No.
23     Q.  But he told you he had a lawsuit?
24     A.  Yes.
25     Q.  And what did he say he was suing

160

1  for?
2      A.  He didn't say.
3      Q.  He didn't say?
4      A.  No.
5      Q.  Did he say he was suing for race
6  discrimination?
7      A.  He didn't say.
8      Q.  Do you know who he's represented
9  by?
10     A.  No.
11     Q.  Since.  All right.  So I asked you
12 did you discuss the fact that you were, your
13 employment was terminated on April 23rd and I
14 said did you discuss it with anyone on that
15 date and other than your discussion with Magee,
16 you had no discussions with anyone on that date
17 that you were terminated, correct?
18     A.  No one at Verizon.
19     Q.  So who outside of Verizon, just
20 your husband?
21     A.  My husband and my son.
22     Q.  And you son.  And the next day, did
23 you have conversations with anyone regarding
24 your termination?
25     A.  No.  I didn't talk to anyone within

SUZETTE WALKER - 8/25/2016

161

1  Verizon the next day.
2      Q.  So from April 23, 2015, to the
3  present, who have you talked with about either
4  your employment at Verizon or the termination
5  of your employment?
6      A.  Just my lawyer.
7      Q.  From April 23, 2015, to the
8  present, who have you discussed your lawsuit
9  with?
10     A.  No one.
11     Q.  So you haven't talked to any former
12 Verizon employee, current or former Verizon
13 employee about your lawsuit?
14     A.  No.
15     Q.  Are you aware of whether you're --
16 whether the law firm that is representing you
17 has reached out to any current or former
18 employee of Verizon to discuss your lawsuit?
19     A.  No, I don't.
20     Q.  And you can't tell me that because
21 you don't know or for some other reason?
22     A.  I don't know.
23     Q.  Have you, is it your intention to
24 call any former or present Verizon employees as
25 witnesses in your lawsuit?

162

1      A.  I can't answer that.
2      Q.  And why is that, why can't you
3  answer it?
4      A.  I don't know.
5      Q.  Well, is there anyone that you feel
6  have facts that would support your claim of
7  that your -- that your selection for
8  termination in connection with the RIF was
9  based on some type of discrimination, either
10 your race, your disability, your age or the
11 fact that you took FMLA leave?
12     A.  The people I work with.
13     Q.  So what facts would they have?  And
14 when you say the people you work with --
15     A.  They would be able to tell the type
16 of work I did and also the type of treatment I
17 received, whether it was negative or positive,
18 they would know.
19     Q.  And so in terms of that negative
20 and positive treatment, you've identified all
21 the negative treatment that you have received
22 during your employment, correct?
23     A.  Yes.
24     Q.  Yes?
25     A.  Yes.

163

1      Q.  And you identified the positive
2  treatment that you received as well, correct?
3      A.  Yes.
4      Q.  And so when you say the people that
5  you worked with would know about that, are
6  those the Engineer IIIs?
7      A.  Yes.
8      Q.  Yes?
9      A.  Anyone that worked at 900 Race,
10 anyone who worked at 900 Race on that floor.
11     Q.  So it's the Engineer IIIs, who
12 else?
13     A.  You have drafters.  You have
14 planners.  You have third party, I can't think
15 of what they're called, third party group.
16     Q.  And out of all those people on the
17 floor at 900 Race, did you have any
18 conversation with anyone about the fact that
19 you were RIFed?
20     A.  No.
21     Q.  And did you have any conversation
22 with any of them about the fact that you filed
23 a lawsuit?
24     A.  No.
25     Q.  And so I am going to name some

164

1  individuals that you have listed on your
2  initial disclosure of people who have
3  information regarding your claims of
4  discrimination and your termination.  Kelly
5  Blunt, Engineer III, correct?  You have her
6  identified.
7      A.  Yes.
8      Q.  What information does Kelly have?
9      A.  She worked closely with me and in
10 that office and other offices I worked at.
11     Q.  And so what specific information
12 does she have of any claim of discrimination
13 that you have?
14     A.  The actual, the people that were
15 RIFed over the past three or four years who has
16 been RIFed and their ethnicity.
17     Q.  And how do you know she would know
18 this?
19     A.  Because she worked in that
20 organizations on which they worked.
21     Q.  And did you ever have any
22 discussions with Kelly about people who have
23 been RIFed?
24     A.  Yes.
25     Q.  Yes did you say?

SUZETTE WALKER - 8/25/2016

165

1    A.   Yes.
2    Q.   Tell me what those discussions
3    were?
4    A.   The discussion was about who was
5    RIFed over the past four years.
6    Q.   And when did you have that
7    discussion?
8    A.   Before the actual RIF day.
9    Q.   Did you think you were going to be
10   RIFed?
11   A.   No.
12   Q.   Who did you think was going to be
13   RIFed?
14   A.   I couldn't say.
15   Q.   But you knew someone was going to
16   be RIFed in the group, right?
17   A.   Yes.
18   Q.   And that was made clear to your
19   group that someone was going to be RIFed,
20   correct?
21   A.   Yes.
22   Q.   And tell me what Kelly said to you
23   when you discussed who was RIFed during the
24   past four years?
25   A.   We talked about how many people had

166

1    been RIFed over the past three years.
2    Q.   And how many were RIFed over the
3    last four years?
4    A.   I believe we said 12.
5    Q.   Twelve.  And when did you have this
6    discussion, right at the time of the RIF?
7    A.   No, before the RIF in February of
8    2014.
9    Q.   February 2014.
10   A.   I'm sorry.
11   Q.   February 2015?
12   A.   Yes.
13   Q.   And that was when the RIF was, when
14   you understood that a RIF was going to take
15   place that year?
16   A.   Yes, that was the meeting.
17   Q.   And so who conducted the meeting
18   and what was said at the meeting?
19   A.   Mr. Magee held the meeting.
20   Q.   What did he say?
21   A.   He told us that a RIF was coming
22   and people had to be off payroll by May 22.
23   The decision would be made and we would be told
24   on April 23 and that we had to be available in
25   the office at the time.

167

1    Q.   And so what is Kelly Blunt's
2    ethnicity?
3    A.   African-American.
4    Q.   And what did Kelly, you and Kelly
5    Blunt talk about in terms of the 12 people that
6    had been laid off?
7    A.   We were talking about working with
8    them and how we didn't expect them to be RIFed.
9    Q.   And were the 12 individuals that
10   you were talking about, were they
11   African-American?
12   A.   Some were.
13   Q.   And were some white?
14   A.   Yes.
15   Q.   And what was the breakdown, do you
16   know?
17   A.   I can't remember right now.
18   Q.   Were you talking about who had been
19   RIFed in general or were you talking about the
20   race and ethnicity of those who had been RIFed?
21   A.   Talking about the RIF in general.
22   Q.   And was it that you were surprised
23   about the people who were RIFed?
24   A.   Yes.
25   Q.   And why were you surprised and why

168

1    was she surprised?  What was the conversation
2    about?
3    A.   The total conversation was the fact
4    that with all of the work that needed to be
5    done, we were surprised that so many people
6    were let go.
7    Q.   So it was the volume of individuals
8    impacted that you were both surprised by,
9    correct?
10   A.   Yes.
11   Q.   And you did not have a discussion
12   about the race of the people impacted?
13   A.   No, that wasn't even part of the
14   conversation.
15   Q.   And Kelly was retained; is that
16   right?
17   A.   Yes.
18   Q.   And is Kelly still an employee of
19   Verizon?
20   A.   Yes.
21   Q.   And how old is Kelly?
22   A.   She's in her forties.
23   Q.   In her forties.  Is she a long time
24   Verizon employee?
25   A.   Yes, I believe she has 20 plus

SUZETTE WALKER - 8/25/2016

169

1   years.
2       Q.   George Dutton, what does George
3   Dutton know about your claim of conversation?
4       A.   George Dutton is an outside
5   foreman, but he has retired.
6       Q.   Have you had any conversation with
7   George Dutton about your termination or your
8   lawsuit?
9       A.   About my termination.
10      Q.   What was the discussion about your
11  termination?
12      A.   He said he couldn't believe it.
13      Q.   Was he, so he's an outside foreman.
14  Who does he work for?
15      A.   He worked for, what's his name, I
16  believe he worked for Dennis Coyle.
17      Q.   I can't hear you.
18      A.   I believe he worked with Dennis
19  Coyle.
20      Q.   Dennis Coyle.  So when did you talk
21  with George?
22      A.   I talked with George in, right
23  after the RIF, about a month later.
24      Q.   Did you call him up?
25      A.   No, he called me.

170

1       Q.   Were you friendly?
2       A.   Yes.
3       Q.   And what did he say?
4       A.   He said that he couldn't believe
5   with all the work that I did and dedication of
6   getting the job done that I was let go.
7       Q.   And does George have a lawsuit
8   against the company, do you know?
9       A.   No, I don't know.
10      Q.   And did you ask him if he would be
11  a witness?
12      A.   No.
13      Q.   Did you talk with him about, did
14  you tell him that you felt that you were
15  discriminated against?
16      A.   No.
17      Q.   Did he say anything about you being
18  discriminated against?
19      A.   Yes.
20      Q.   What did he say?
21      A.   He said that he didn't believe that
22  the people that they held should have been
23  held.  That the last person in, the last person
24  that was brought into the office should have
25  been gone.

171

1       Q.   So his opinion was it should have
2   been based on seniority; is that right?
3       A.   Yes.
4       Q.   Did he say anything specifically
5   about discrimination they believed you were
6   discriminated against?
7       A.   No.
8       Q.   David Perry, what does David know
9   about your claims of discrimination?
10      A.   He's the last person who came to
11  the office.
12      Q.   So that was the person that George
13  was talking about that he felt should have
14  been --
15      A.   Yes.
16      Q.   What does David know, have you had
17  any conversations with David about your belief
18  that you were discriminated against?
19      A.   No.
20      Q.   No.  Okay.  Tony Portolese, what
21  does he know about your claims of
22  discrimination?  Did you have any conversations
23  with him about --
24      A.   I haven't spoken to him.
25      Q.   Joseph Hui, you've identified

172

1   before.  Did you have any conversations with
2   Joseph about your termination?
3       A.   Yes.
4       Q.   And what was that?  Can you tell me
5   when you had those conversations and what those
6   conversations were?
7       A.   We had a conversation a week or two
8   later.
9       Q.   And did he call you?
10      A.   Yes.
11      Q.   And what did he say?
12      A.   He was upset.  And he said that he
13  didn't understand how they selected people.
14  That there was not -- the information wasn't
15  forthcoming.
16      Q.   Did you say anything that you felt
17  you were discriminated against?
18      A.   No.
19      Q.   Did he say he thought you were
20  discriminated against?
21      A.   He said I was treated unfairly.
22      Q.   And did he say why he felt you were
23  treated unfairly?
24      A.   No.
25      Q.   Did he say that it should have been

SUZETTE WALKER - 8/25/2016

173

1   seniority as well?
2       A.  Yes.
3       Q.  And is that why he thought you were
4   treated unfairly, that the last in should have
5   been the one terminated as opposed to someone
6   with seniority?
7       A.  Yes.
8       Q.  Did he say anything else?
9       A.  No.
10      Q.  What about Steven Murphy?
11      A.  I haven't spoken to him.
12      Q.  What about Thomas Hodge?  Thomas
13  was the one who provided some training to you,
14  right?
15      A.  The only time I spoke to him was
16  just to say hello.
17      Q.  Maria Cesare?
18      A.  I've never spoken to her.  Are we
19  talking about the RIF, no.
20      Q.  So my question about all these
21  people that are identified on your
22  self-executing disclosure is what information
23  did they have about your claim of
24  discrimination and/or about your termination.
25  Maria Cesare, does she have any information

174

1   about your claims of discrimination that you
2   know of?
3       A.  Just my capability of doing the
4   job.
5       Q.  Matt Kehr, K-E-H-R, what does Matt
6   know about your claims of discrimination?
7       A.  Matt works in another department.
8   He replaced Diedre Johns.
9       Q.  Is he a white employee?
10      A.  Yes.
11      Q.  Have you had any conversations with
12  him about your termination?
13      A.  No.
14      Q.  Any conversations about your
15  lawsuit?
16      A.  Yes.
17      Q.  Diedre Johns was someone who was
18  terminated by another RIF?
19      A.  Yes.
20      Q.  And you didn't work directly with
21  Diedre or did you?
22      A.  No, by the same RIF.
23      Q.  Oh, by the same RIF.  And so Diedre
24  is African-American; is that right?
25      A.  Diedre.

175

1       Q.  And did you have conversations with
2   Diedre about your termination?
3       A.  No.
4       Q.  Did she have conversations with you
5   about her termination?
6       A.  No.
7       Q.  Did you ever have any discussion
8   about your belief that you were discriminated
9   against?
10      A.  With her, no.
11      Q.  Did she ever have any conversations
12  with you that she felt she was discriminated
13  against?
14      A.  No.
15      Q.  Did you ever talk with anyone about
16  Diedre Johns?
17      A.  No.
18      Q.  Ed Macintosh, who is that?
19      A.  Ed Macintosh is an Engineer III who
20  came in the department right before the RIF.
21      Q.  Right before the RIF.  Did he
22  report to Magee?
23      A.  No, Mr. Gross.
24      Q.  Mr. Gross.  Did you have any
25  firsthand knowledge of Ed Macintosh's

176

1   employment?
2       A.  He left a group called the CSSC in
3   Delaware and came to engineering.
4       Q.  How old is Macintosh?
5       A.  He's over 40.
6       Q.  I can't hear you.
7       A.  He's over 40.
8       Q.  How long was he employed at
9   Verizon, do you know?
10      A.  I couldn't tell you.
11      Q.  Do you know if he had any
12  disability or ever took a leave of absence?
13      A.  Not that I know of.
14      Q.  And is he Caucasian?
15      A.  Yes.
16      Q.  What information does he have about
17  your claims of discrimination?
18      A.  When Ed came into the building,
19  when Ed came into engineering, they made a
20  position for him to come in.  He had previously
21  been in engineering years ago.  So when the RIF
22  came, he was already brought back to
23  engineering, so we didn't -- I didn't
24  understand how can you have a RIF and you just
25  brought people in.

SUZETTE WALKER - 8/25/2016

Pages 177 to 180

---

177

1      Q.   Was the RIF already announced when
2  Ed was brought back?
3      A.   Yes.
4      Q.   So it was prior to the RIF being
5  announced?
6      A.   Yes.
7      Q.   So prior to February 2015, correct?
8      A.   Yes.
9      Q.   Do you know when he came in?
10     A.   Not exactly, no.
11     Q.   Brian Magee, we know, there's
12 nothing else that Brian knows or Brian said to
13 you or you said to Brian that you haven't
14 testified to?
15     A.   Correct.
16     Q.   So we have everything that we need
17 to know about Brian in terms of your claim of
18 discrimination, right and your termination,
19 right?
20     A.   Yes.
21     Q.   Is that yes?
22     A.   Yes, I'm sorry, yes.
23     Q.   I just want to give you the chance
24 to tell me everything.
25     A.   Yes.

---

178

1      Q.   All right. Ernest Padovani?
2      A.   Yes.
3      Q.   Who is Ernest?
4      A.   Ernest is an Engineer III who works
5  in Delaware.
6      Q.   And what does Ernest know about
7  your claims of termination and discrimination?
8      A.   He's just one of the group.
9      Q.   Did you ever have any conversations
10 with him about either your complaint or your
11 termination?
12     A.   No.
13     Q.   Did he ever try to contact you?
14     A.   No.
15     Q.   Joe Scelsa?
16     A.   Scelsa.
17     Q.   Scelsa, sorry.  What does Joe know
18 about your claim of discrimination?
19     A.   Joe is one of the people that took
20 the work that I had.  He's one of the two that
21 is now performing the work I had.
22     Q.   So he knows that you were
23 terminated, obviously?
24     A.   Yes.
25     Q.   What does he know about your claim

---

179

1  of discrimination, anything?
2      A.   Nothing.  He can only profess to my
3  work ethic.
4      Q.   And how can he profess as to your
5  work ethic?
6      A.   I worked for him for years.
7      Q.   Did you have a good relationship
8  with him?
9      A.   Yes.
10     Q.   You indicated that you have your
11 planner where you had kept notes and
12 information.  Do you have any other documents
13 that you kept information either about your
14 lawsuit?
15     A.   No.
16     Q.   About your employment?
17     A.   No.
18     Q.   Just your planner?
19     A.   Yes.
20     Q.   And we're reminding counsel that we
21 would like a copy of that.
22          You applied for unemployment
23 compensation?
24     A.   Yes.
25     Q.   So this will be Plaintiff's Exhibit

---

180

1  6 I think.
2          - - - - -
3          (Unemployment Document Bates P46 to
4          P47 marked Walker Exhibit 6 for
5          identification.)
6          - - - - -
7  BY MS. BEGLEY:
8      Q.   And can you take a look at
9  Exhibit 6, Mrs. Walker?  So it looks like from
10 the document that you applied for unemployment
11 comp on 5/24/15; is that right?
12     A.   Yes.
13     Q.   So it was two days after the
14 termination of your effective date, right, your
15 termination effective date, right?
16     A.   Yes.
17     Q.   And you were granted unemployment
18 comp; is that correct?
19     A.   Yes.
20     Q.   Did you file an application for
21 unemployment comp?
22     A.   Yes.
23     Q.   Yeah.  So I don't have a copy of
24 that.  I don't know whether we received a copy
25 or not.  Do you have a copy of your application

---

181

1   for unemployment compensation?
2       A.  I believe I do.
3       Q.  If you haven't given it to your
4   counsel, will you do so?
5       A.  I think I sent her a copy, but I'll
6   send another one.
7       Q.  And so in looking at this document
8   it appears that you received total wages of
9   98,478; is that correct?
10      A.  Yes.
11      Q.  So is that the amount that you
12  received from the State of Pennsylvania?
13      A.  No, no.
14      Q.  So what amount did you receive from
15  the State of Pennsylvania for unemployment
16  compensation?
17      A.  In the fourth paragraph down.
18      Q.  Fourth paragraph down.  Your
19  benefit entitlement, your max benefit
20  entitlement, it's 14,898, is that what you
21  received?
22      A.  Yes.
23      Q.  Did you have to attend any kind of
24  hearing?
25      A.  No.

182

1       Q.  Or were you just given that amount?
2       A.  I was given that amount and I had
3   to attend a class.
4       Q.  And you had to provide information
5   that you were making an effort to obtain
6   employment, correct?
7       A.  Yes.
8       Q.  And what kind of documents did you
9   provide to unemployment comp?
10      A.  They told me to make a list of the
11  jobs I applied.
12      Q.  And did you provide a list to
13  unemployment comp?
14      A.  Yes.
15      Q.  Oh, I don't believe we have that
16  document either.  We'll mark it on the
17  transcript and would like that document as
18  well.
19          I just wanted to go back to, I
20  had mentioned earlier I saw a document that you
21  had communicated with a college, the
22  international online college.  Here, let me get
23  the correct name.  On Thursday, August 18,
24  2016, so just recently, you had communicated
25  with AIU, which is American Intercontinental

183

1   university about an online educational program.
2   Did you ever contact, return that communication
3   from Ernest Cochran about an opportunity to go
4   back to school?
5       A.  No, there's supposed to speak next
6   week.
7       Q.  And what are you going to speak
8   about?
9       A.  About the healthcare industry.
10      Q.  And we're going to just make this
11  as an exhibit since we're talking about it.
12  That will be Exhibit 7.
13          - - - - -
14          (Cochran Letter dated 8/18/16
15          marked Walker Exhibit 7 for
16          identification.)
17          - - - - -
18  BY MS. BEGLEY:
19      Q.  When did you first reach out and
20  contact AIU about continuing your education?
21      A.  I believe that was the 15th.
22      Q.  The 15th.  Okay.  And you have a
23  call scheduled to talk with Mr. Cochran for
24  next week?
25      A.  Yes.  I'm going to talk to him next

184

1   week.
2       Q.  When next week are you talking to
3   him?
4       A.  I believe, I believe Wednesday, the
5   31st.
6       Q.  Is there a communication that
7   confirms that you're going to be calling him?
8       A.  No, I just left a message for him.
9       Q.  And what degree are you going to be
10  pursuing?
11      A.  I'm looking for a degree in nursing,
12  not nursing, LPN.
13      Q.  An LPN?
14      A.  Uh-huh.
15      Q.  And is this an online degree or
16  would this be actually going to school and
17  attending classes?
18      A.  Online.
19      Q.  Online.  And how long does this
20  program take to obtain the L PN degree?
21      A.  We didn't get into the particulars.
22      Q.  Since you already have a college
23  degree and a master's, why would you become an
24  LPN?  Why wouldn't you go ahead and try to
25  become an RN if you're going to get into

185

1  healthcare?
2      A. I need a job, so I need to be
3  trained in something that I can do right away
4  and then go farther after I achieved that
5  degree.
6      Q. And do you know how long it takes
7  to get this LPN degree?
8      A. After looking online, I think it
9  said 18, 18 months to two years.
10     Q. And what's the tuition?
11     A. We didn't get into that either.
12     Q. And how would you pay for the
13 tuition?
14     A. I'd have to take money out of my
15 401K.
16     Q. Other than what you've already
17 communicated to me in the earlier part of the
18 day about those three individuals that were
19 retained that you feel you're more qualified
20 than, are there any other people that were
21 retained that you believe you are more
22 qualified than?
23     A. Those are the main three.
24     Q. So it was, I'm going to
25 mispronounce his name again, Scelsa, Perry and

186

1  I think it's Tony Portolese. Or is that it?
2      A. Yes.
3      Q. Is that it?
4      A. Yes.
5      Q. I just want to make sure we're on
6  the same page.
7          And then I might have asked you
8  this, and if I did, forgive me, have you talked
9  with Brian Newman about your lawsuit --
10     A. No.
11     Q. -- or the fact you feel you have
12 been discriminated against?
13     A. No.
14     Q. Do you know whether Brian Newman
15 has a suit against the company?
16     A. No.
17     Q. Is there anyone else in your family
18 that you've discussed your lawsuit with?
19     A. My husband.
20     Q. You've testified earlier about the
21 emotional distress you have experienced as a
22 result of your termination. Have you ever
23 talked with anyone about the emotional distress
24 that you've experienced or is there anyone who
25 has knowledge of this?

187

1      A. Just my minister of the church.
2      Q. And what's the minister's name?
3      A. Carl Cunningham.
4      Q. Carl Cunningham?
5      A. No, Reverend Cunningham.
6      Q. Reverend Cunningham. And how does
7  Reverend Cunningham know about the emotional
8  distress you've experienced?
9      A. We've talked about how you perceive
10 yourself as doing a good job and you find that
11 other people don't think you're doing a good
12 job, but you know you're giving your all and
13 how you have to step back and just live day to
14 day, because you can't change it. Things like
15 that.
16     Q. And so did you go to him for any
17 kind of spiritual therapy over the years?
18     A. Yes, yes.
19     Q. And when did you start doing that?
20     A. When, back when my mother-in-law
21 died.
22     Q. And when was that?
23     A. 2009.
24     Q. 2009. So how often did you meet
25 with Reverend Cunningham for spiritual advice?

188

1      A. Whenever I start to feel that
2  things were piling up.
3      Q. And so and again, I'm sorry, I
4  didn't hear you, was it when your mother-in-law
5  died?
6      A. Yes.
7      Q. And so that was 2008 did you say?
8      A. 2009.
9      Q. 2009, you started seeking spiritual
10 guidance from Reverend Cunningham?
11     A. Yes.
12     Q. And then when were things piling
13 up? What other things were occurring in your
14 life?
15     A. I was just dealing with the
16 day-to-day problems after my mother-in-law
17 died.
18     Q. And what were those problems?
19     A. Disgruntled family members and just
20 things of that nature.
21     Q. And why were family members
22 disgruntled?
23     A. They felt that they were not
24 rewarded when she passed away.
25     Q. And were you and your -- was there

SUZETTE WALKER - 8/25/2016

189

1    a will or an estate and were you and your
2    husband recipients?
3        A.  My husband.
4        Q.  Your husband was responsible for
5    the estate?
6        A.  Yes.
7        Q.  And did your husband receive the
8    largest percent from the estate?
9        A.  Yes.
10       Q.  And were there brothers and sisters
11   who weren't happy with that?
12       A.  Not brothers and sisters, but
13   grandchildren.
14       Q.  Grandchildren.  Was your husband
15   the only living son --
16       A.  No.
17       Q.  -- child?  What about the other
18   children, did they receive from the estate?
19       A.  Yes.
20       Q.  But did your husband receive the
21   most since he was the executor?
22       A.  Not really, no.
23       Q.  Did you and your husband help to
24   take care of your mother-in-law?
25       A.  Yes.

190

1        Q.  And what was her reason for death?
2    What happened to her?
3        A.  Lung cancer.
4        Q.  Lung cancer.  And did you help
5    nurse her through that period of time?
6        A.  Yes.
7        Q.  I'm sure that was stressful.
8        A.  Yes.
9        Q.  And sad for both you and your
10   husband.
11       A.  Yes.
12       Q.  How involved were you in helping to
13   nurse your mother-in-law between, you know, the
14   time that she was diagnosed and her death?
15       A.  I was responsible from the time I
16   got home from work until I put her to bed
17   around ten, 11:00 o'clock.
18       Q.  Does she live with you?
19       A.  No, she lived down the street.
20       Q.  Did she live with her husband?
21       A.  No.
22       Q.  So the father-in-law was not
23   married to your mother-in-law; is that right?
24       A.  Right.
25       Q.  And so when your mother-in-law

191

1    died, she was not married; is that right?
2        A.  No.
3        Q.  And so her whole estate was
4    distributed to her family?
5        A.  Yes.
6        Q.  And how much did you and your
7    husband receive from that?
8        A.  Nothing.
9        Q.  Nothing?
10       A.  Nothing.
11       Q.  So why were the other kids, why
12   were the grandkids disgruntled?
13       A.  Because they felt they didn't get
14   enough.
15       Q.  Well, how could you not get enough,
16   if you guys as the children didn't receive
17   anything.  Was her house bequeathed to you?
18       A.  My son.
19       Q.  To your son.  And is that what they
20   were upset about?
21       A.  Yes.
22       Q.  And what was the value of the
23   house?
24       A.  I have no idea.
25       Q.  Does your son own the house still?

192

1        A.  Yes.
2        Q.  But he doesn't live at the house?
3        A.  No.
4        Q.  Does he rent the house out?
5        A.  Yes.
6        Q.  Did he ever live in the house?
7        A.  No.
8        Q.  And your husband got nothing?
9        A.  No.
10       Q.  And then you took care of your
11   father-in-law, right?
12       A.  Yes.
13       Q.  And when your father-in-law died,
14   did money come to you and your husband as a
15   result of his passing?
16       A.  No.
17       Q.  What other things came down on you
18   that you needed to go and talk to Reverend
19   Cunningham about?
20       A.  Just not being able to find a job
21   was getting a little stressful.
22       Q.  And how often did you go to
23   Cunningham about these issues?
24       A.  I went to him twice.
25       Q.  Twice.  And can you tell me when

SUZETTE WALKER - 8/25/2016

193

1  the two times?
2       A.  In, right after it happened, right
3  after the RIF and in I believe September of
4  2015.
5       Q.  And why did you go to him in
6  September of 2015?
7       A.  Because it seemed like I couldn't
8  find a job.  So that's when I started
9  volunteering and mentoring.
10      Q.  And did he suggest you do that?
11      A.  No, he told me to do what I was
12  meant to do.
13      Q.  And what was that?
14      A.  Volunteer and mentor.
15      Q.  And did you believe that was true,
16  that was what you should be doing?
17      A.  Yes.
18      Q.  And is that what you've kind of
19  dedicated your life to, volunteering and
20  mentoring?
21      A.  Yes.
22      Q.  Can we just take the tax returns
23  and have her take a look at the tax returns,
24  please.  So you provided your tax returns.
25  This is eight, am I right?

194

1            - - - - -
2       (2015 Tax Returns Bates P143 to
3       P150 marked Walker Exhibit 8 for
4       identification.)
5            - - - - -
6  BY MS. BEGLEY:
7       Q.  Mrs. Walker, please take a look at
8  Exhibit 8, tax return for 2015 and if you look
9  at, let's just look at the first page for 2015
10  says wages, tips and other compensation,
11  $51,000.  And Social Security wages it says
12  53,904 and the employer is Verizon.  What is,
13  is this from what, is this a retirement
14  payment?  What is it?
15      A.  53,904?
16      Q.  Yes.  Or is it for the first half
17  of the year?
18      A.  That's the first half of the year.
19      Q.  So this is your, so 53 was what you
20  were paid prior to the effective date of
21  May 22, 2015, correct?
22      A.  Yes.
23      Q.  On page 2 under pensions and
24  annuities, we have $3,697, is that your
25  husband's pension?

195

1       A.  Yes.
2       Q.  And then we have unemployment comp
3  of 14,638, right.  And that's the unemployment
4  compensation that you received; is that
5  correct?
6       A.  Yes.
7       Q.  Under the refunds, it looks like
8  you got a refund of $6,500; is that right?
9       A.  Uh-huh.
10      Q.  Under both your occupation and your
11  spouse's occupation, it says you're retired.
12  Have you retired from employment at Verizon?
13  Have you filled out the necessary papers to be
14  considered retired from Verizon?
15      A.  What necessary papers?
16      Q.  In order to receive retirement
17  funds from Verizon, pension and retirement
18  funds.
19      A.  I received my pension.
20      Q.  Your pension?
21      A.  Yes, my pension has rolled over.
22      Q.  Has rolled over?
23      A.  Yes.
24      Q.  When did you start receiving it?
25      A.  January 2015.

196

1       Q.  January 2015, so on your tax
2  returns, you've identified to the federal
3  government that you're an engineer and you're
4  retired, correct?
5       A.  Yes.
6       Q.  And you have a tax accountant that
7  prepares this document for you?
8       A.  Yes.
9       Q.  Who is that?
10      A.  James, James Evans.
11      Q.  Who is it, I can't hear you?
12      A.  James Abans.
13      Q.  And where is he?
14      A.  In New Jersey.
15      Q.  In New Jersey.  Where in New
16  Jersey?
17      A.  In Deptford.
18      Q.  And how do you spell his last name?
19      A.  A-B-A-N-S.
20      Q.  And and is he in a service, does he
21  work for a service?
22      A.  No.
23      Q.  He's an individual?
24      A.  Yes.
25      Q.  Under employee business expenses

SUZETTE WALKER - 8/25/2016

197

1  and reimbursements, vehicle expenses, did you
2  have a company car?
3        A.  No.
4        Q.  So the vehicle expense, what was
5  that for?
6        A.  Using my car to do surveys.
7        Q.  To do surveys.  Okay.  And then
8  total expenses, we have, so parking fees, tolls
9  was that also to do your job?
10        A.  Yes.
11        Q.  Were those expenses reimbursed by
12  Verizon?
13        A.  The only time they were reimbursed
14  is when I was using a Verizon vehicle.
15        Q.  Noncash charitable contributions.
16  Let's go to the last page.  Okay.  So it looks
17  like and so all of this is your joint return,
18  right?
19        A.  Yes.
20        Q.  So if you look in the middle of the
21  page, first of all, you've got Salvation Army,
22  Salvation Army, Bargain Thrift, Bargain Thrift.
23  Did you donate clothes and books and shoes?
24        A.  Clothes, furniture, a whole bunch
25  of stuff.

198

1        Q.  And then it says, note, if the
2  amount claimed as a deduction for the item is
3  500 or less, you don't have to complete.  So
4  for the first one, you have 6/6/2015, how
5  acquired by donor purchased, donors' cost on
6  the adjusted basis.  It says $3,985 and then
7  fair market value I898.  What did you donate
8  that was valued at almost $4,000?
9        A.  A bedroom set.
10        Q.  I can't hear you.
11        A.  A bedroom set.
12        Q.  And then for 7/14/2015, so about a
13  month later, you donated another almost $4,000
14  worth of items.  What were those?
15        A.  Coats, suits, books, shoes, a whole
16  bunch of stuff, electronics.
17        Q.  How did you come up with that
18  almost $4,000 of contributions?
19        A.  Because some of it was new and they
20  were just laying around, so we got rid of it.
21        Q.  And then 11/20, three months later,
22  another $3,600, what was that, what were those
23  contributions?
24        A.  That was for furniture and stuff my
25  son at left at my house.

199

1        Q.  So that was your son's property,
2  right?
3        A.  No, it was mine.  He gave it to me.
4        Q.  He gave it to you.  And again, how
5  did you come up with the value?  They're all
6  over $3,500 in the same year, so between June
7  and January, you have about $15,000 total in
8  that six-month period of contributions.  That's
9  a lot.  That's lot of money of contributions.
10  How did you come up with all those numbers?
11        A.  Everything was prorated at a fair
12  market value.
13        Q.  And do you have receipts for this
14  stuff?
15        A.  Yes.
16        Q.  Let's just go through your others.
17  So all of the information that you provided on
18  your tax return is true and correct, right?
19        A.  Yes.
20              MS. BEGLEY:  For 2014, it
21        will be nine.
22              - - - - -
23              (2014 Tax Return Bates P40 to P44
24        marked Walker Exhibit 9 for
25        identification.)

200

1              - - - - -
2  BY MS. BEGLEY:
3        Q.  So for 2014, again, this is a joint
4  tax return, correct, for you and Eric Walker
5  and your total wages are 87,888, correct?
6        A.  Yes.
7        Q.  It doesn't look like anything for
8  your husband, right, your husband had no income
9  during this period?  Let's just see.  Oh, the
10  pension, so pension and annuities, your husband
11  had $4,371; is that correct?
12        A.  Yes.
13        Q.  Is that what he receives a year?
14        A.  Yes.
15        Q.  And in 2014, that was your full
16  Verizon salary, correct?
17        A.  Yes.  Excuse me, that, that 4,000,
18  that included annuity.
19        Q.  Annuity too?
20        A.  Yes, with a pension.
21        Q.  And so then let's look again at
22  your last page of charitable contributions.
23  And again, every single contribution that you
24  made, you made one in March, in June, in
25  September.  So in a less than six-month period,

SUZETTE WALKER - 8/25/2016

201

1  you have, again, right under $4,000 each
2  donation, you make as the donor's cost is
3  $4,000.  So that seems to be the number that
4  you contribute every single time you make a
5  donation, it's right under $4,000?
6          A.  We purchase --
7          Q.  Who came up with those numbers?
8          A.  We purchase furniture from a thrift
9  store.  We refinished it and then we donate it
10  back.
11          Q.  You purchase it, you refinish it,
12  so you purchase the furniture for 4,000?
13          A.  No, no, no, no, we purchase a lot
14  of furniture.  We refinished it.  And donated
15  it back.  Not all of this is furniture.
16          Q.  Who decides this number of right
17  under $4,000 for when of your, the costs of the
18  items that you're donating?
19          A.  I do.
20          Q.  You do?
21          A.  Yes.
22          Q.  And how do you come up with that
23  number each time?
24          A.  From the receipts from where I
25  purchased stuff.

202

1          Q.  And you have all of those receipts?
2          A.  Yes.
3          Q.  And obviously, the information you
4  provided to the federal government is true and
5  correct in both instances; is that right?
6          A.  Yes.
7              MS. BEGLEY:  So now we're
8          going to look at Exhibit 10, which is
9          your 2013 tax return.
10              - - - - -
11          (2013 Tax Return Bates P34 to P39
12          marked Walker Exhibit 10 for
13          identification.)
14              - - - - -
15  BY MS. BEGLEY:
16          Q.  And your 2013 tax return, again, is
17  a joint tax return with your husband Eric.
18  Your wages, tips and other compensation is
19  87,951.  You have a pension and annuity of
20  $4,331.  And here we go with charitable
21  contributions again.  The second to last page.
22  And for your charitable contributions, again,
23  you're under that $4,000 mark for each one.
24  And again, it's right under, so you made three
25  contributions and it looks like you do it the

203

1  same time each year, you do it in March, June
2  and September as you had in 2014.  And again,
3  each contribution you value at right under
4  $4,000, three, so $12,000 of contributions in a
5  six-month time frame each time 3995, 3895 and
6  3875 and you determine the number, right?
7          A.  Yes.
8              MS. BEGLEY:  We are at
9          Exhibit number 11.
10              - - - - -
11          (2012 Tax Return Bates P28 to  P33
12          marked Walker Exhibit 11 for
13          identification.)
14              - - - - -
15  BY MS. BEGLEY:
16          Q.  And so this is your, this is
17  Exhibit 11.  This is your 2012 joint tax
18  return.  Your wages, tips and compensation are
19  84,339.  The pension and annuities is 4292.
20  And if we look at your contributions, again, in
21  March, June and September, you have
22  contributions again that you value at right
23  under $4,000 each time.  With a final
24  contribution in January or the first
25  contribution in January of 500 bucks for an

204

1  auction bid.  Again, you're the one who
2  determined the value of your contributions were
3  right under $4,000, correct?
4          A.  Yes.
5          Q.  You have alleged punitive damages
6  against Verizon that Verizon acted maliciously
7  when they terminated you.  Can you tell me any
8  factual basis you have for your allegation that
9  you're entitled to punitive damages?
10          A.  I'm sorry, could you repeat that?
11          Q.  So you have alleged in your
12  complaint that you're entitled to punitive
13  damages.  And my question to you is can you
14  tell me a factual basis of why you believe
15  you're entitled to punitive damages relating to
16  the termination of your employment?
17              MR. CHASE:  Objection.  You
18          can answer.
19              THE WITNESS:  The fact that
20          I did not plan on retiring.  And if I
21          had known it was coming, I would have
22          made better choices, because I didn't
23          plan on paying for benefits, insurance
24          and all these extra expenses that came
25          through, which I now have to live, take

SUZETTE WALKER - 8/25/2016

205

1        out of my investments from my 401K.  So
2        it's, it's a hardship.  It really is a
3        hardship.  But I'm trying to make it
4        work.
5   BY MS. BEGLEY:
6        Q.   So you've got the monthly
7   healthcare bill that's about $300?
8        A.   314.
9        Q.   314.  And then what's the -- is it
10  life insurance?
11       A.   Life insurance is 253 every
12  quarter.
13       Q.   253 each quarter.  And was that
14  something that was paid by Verizon before?
15       A.   No, we contributed, but it wasn't,
16  if, it's a difference between living off of a
17  monthly income as opposed to having a salary
18  come in every two weeks.
19       Q.   And then what, what are the, are
20  there other expenses that you're paying each
21  month that you haven't told me about yet?
22       A.   No.  Just those two major ones.
23           MS. BEGLEY:  I don't have
24       any other questions.  Does counsel have
25       questions?

206

1           MR. CHASE:  I have nothing.
2           MS. BEGLEY:  All right.
3       Thank you very much, Mrs. Walker.
4       Thank you for being with us today.  We
5       appreciate it.
6           THE WITNESS:  The planner.
7       The planner, you still want the
8       planner.
9           MS. BEGLEY:  I still want
10      the planner, yes and we'll write to
11      counsel about that.
12          THE WITNESS:  Okay.
13          MS. BEGLEY:  All right.  But
14      if you provide it, that would be
15      fantastic.  Thanks so much.
16          - - - - -
17      (Whereupon, the deposition was
18      concluded at 2:59 p.m.)
19          - - - - -
20
21
22
23
24
25

207

1              C E R T I F I C A T I O N
2
3
4           I HEREBY CERTIFY that the proceedings
5   and evidence are contained fully and accurately
6   in the stenographic notes taken by me upon the
7   foregoing matter on August 25, 2016, and that
8   this is a correct transcript of same.
9
10
11
12
13
14   _____
15           Robin L. Clark
     Registered Professional Reporter
16
17
18
19
20
21      (The foregoing certification of this
22   transcript does not apply to any reproduction
23   of the same by any means unless under the
24   direct control and/or supervision of the
25   certifying reporter.)

DTI Court Reporting Solutions - Washington, DC

## A

**A-B-A-N-S** 196:19
**a.m** 1:17
**Abans** 196:12
**abilities** 98:5
**ability** 8:20
**able** 9:4 66:8 103:6 106:24 129:20 140:6 162:15 192:20
**absence** 176:12
**absolutely** 31:21 41:22
**accept** 146:3
**accepted** 48:12
**access** 114:12,14
**accessibility** 147:16
**accident** 59:18
**accommodate** 120:19
**accommodation** 17:18 18:8 29:14 31:24
**accommodatio...** 19:15 24:9 29:20 30:10,20 32:7,15 33:3
**accomplishme...** 131:11 134:18 136:21
**account** 51:16
**accountant** 196:6
**accurate** 28:25
**accurately** 207:5
**achieved** 185:4
**acquired** 198:5
**acted** 204:6
**action** 16:1,2 21:9 90:11,13 90:19 91:8 92:18
**actively** 65:3,4

**actual** 20:4 36:3 44:7 110:7 111:20 120:11 134:5 141:2,18 145:7 147:12 164:14 165:8
**adapted** 88:19
**added** 78:22
**additional** 19:1 78:21,22 109:10 110:23
**address** 62:14,21 134:4
**addressed** 105:19
**adjust** 84:14 127:11
**adjusted** 198:6
**admin** 70:11
**administrative** 11:24 157:4,19
**administrator** 157:5
**advanced** 56:5,6 56:7 122:15,16 122:24 125:7
**advice** 38:25 59:10 187:25
**affirm** 13:9 31:6
**affirmative** 34:18
**affirmed** 14:12
**African-Amer...** 25:21 28:7 29:5,19 30:3 74:22 158:14 167:3,11 174:24
**age** 15:11 17:1 18:7,14 19:14 19:25 20:3 22:24 24:8 25:3,13 30:8 32:6 33:1 41:9 43:7 45:20,21

**69:9 71:22** 72:1 75:5,9 77:22 79:16 162:10
**agency** 11:24 13:1
**ages** 42:25
**ago** 8:15,16 59:17 176:21
**agree** 124:4 137:15
**agreed** 6:4 22:16 90:19
**agreement** 156:13,19
**ahead** 7:23 23:23 58:11 184:24
**AIU** 182:25 183:20
**alert** 150:1
**alerted** 119:15
**alive** 67:21
**allegation** 24:3,4 31:2 37:6,15 38:1 40:23 41:3,8 204:8
**allegations** 19:8 19:12
**allege** 18:10,15 41:16 68:2
**alleged** 204:5,11
**alleviate** 90:15 128:3
**allow** 7:8 99:10 99:19 100:15
**allowed** 47:21 48:22 51:10 88:25
**allows** 51:20
**Amended** 39:12 40:6,10,14,15
**American** 70:1 182:25
**amount** 153:13

**181:11,14** 182:1,2 198:2
**analysis** 123:6 123:22
**and/or** 17:10 18:14,14 42:5 173:24 207:24
**Andrews** 109:18 109:22 112:10 148:3
**announced** 177:1,5
**annual** 80:4
**annuities** 194:24 200:10 203:19
**annuity** 200:18 200:19 202:19
**answer** 5:4 7:9 7:11,21,22,24 8:21,25 25:7 31:13 38:11 40:2 72:21 77:16 162:1,3 204:18
**answers** 9:5
**Anthony** 42:8
**anymore** 65:21
**anyone's** 111:13 151:2
**Anyplace** 60:12
**APPEARANC...** 2:1
**appears** 84:23 85:2 181:8
**application** 180:20,25
**applied** 158:11 179:22 180:10 182:11
**apply** 70:13 156:23 157:13 157:15,23 207:22
**appointments** 21:19,20

**appreciate** 206:5
**approaches** 123:9
**appropriate** 15:6
**approved** 46:24 47:4,9
**April** 9:10 15:21 16:6,17 46:13 53:12,12,17,21 54:1,7,18,23 55:4,7,8 56:25 57:1,4,4,11 58:14,15,21 60:2 88:4 94:7 94:8 95:21,22 95:23 101:2,19 104:9 144:15 148:20 151:18 157:9 158:9 160:13 161:2,7 166:24
**Arch** 1:15 2:10
**architecture** 98:13 113:4
**area** 44:22,23,24 78:21,22 86:4 110:22 120:5 133:1 137:16 139:19 142:17 142:20 145:13 145:18,19
**areas** 78:23 87:5 108:11 113:1 118:3,5,9 129:20
**arm** 56:13 57:13
**Army** 197:21,22
**arthroscopic** 55:21,22,23
**Asian** 45:8,15 74:23,24
**asked** 50:21 51:3 72:16 73:8 74:16 75:17

76:5,20 104:23
149:9,17
159:18 160:11
186:7
**asking** 10:20
135:12
**aspects** 111:2
118:2
**assessed** 98:4,8
**asset** 113:17
**assigned** 78:17
79:7 93:25
103:25 144:16
**assigning** 90:22
**assignment**
78:20 88:24
93:4
**assistance**
110:24 135:3
**assistant** 82:15
**associated** 66:12
66:14 95:9
**assume** 17:11
42:6 97:8
140:6
**Astorga** 50:7
51:8
**AT&T** 130:12
**attach** 19:4
**attached** 11:23
19:2
**attachment**
156:12
**attend** 109:8
181:23 182:3
**attending**
184:17
**attention** 32:21
111:13
**attested** 32:25
**auction** 204:1
**August** 1:10
16:15 60:9
139:18 182:23
207:7

**authorities** 14:5
**automatically**
114:20
**availability**
128:22 129:3
**available** 49:21
112:7 118:4
129:12 158:7
166:24
**average** 138:18
139:10 141:23
142:5 143:1,2
143:5
**averages** 138:14
138:14
**aware** 25:23
28:11,14 73:19
98:14 161:15

---
**B**

**B** 3:8 4:1
**babysitting**
156:9
**bachelor's**
124:17,20
**back** 47:7,17,20
49:1 50:20,22
51:3,12 52:25
53:5 58:2
65:17 66:5
69:4,6,23
84:24,25 96:9
100:23 102:10
104:18 112:24
120:10 126:7
128:11,14,16
138:6 146:5
150:5 152:8
156:11 176:22
177:2 182:19
183:4 187:13
187:20 201:10
201:15
**background**
100:1 107:2,24

**108**:4 109:6
**backlog** 93:7
**bad** 56:23 59:4,5
**ballpark** 10:20
103:3
**band** 120:25
122:8 124:9
**bands** 121:4
**bandwidth** 95:2
99:2,6,8,9,15
99:21 100:3,4
100:10,20,21
101:1,4,11,14
101:16,22
102:4,13 103:2
104:14,25
106:1 129:19
130:4,17,21
137:13 142:9
**Baptist** 61:8
**Bargain** 197:22
197:22
**base** 25:18
**based** 18:12,14
20:6 25:22
92:10,10
142:20 162:9
171:2
**basic** 159:18
**basically** 106:14
115:22 139:11
**basis** 36:13 38:3
54:3 71:21
72:1 77:22
79:16 198:6
204:8,14
**Bates** 3:12,14,16
3:17,18,21,23
4:4,6 82:3
84:25 96:7,9
96:15 97:7,23
126:21 151:12
180:3 194:2
199:23 202:11
203:11

**beat** 76:12
**bed** 190:16
**bedroom** 198:9
198:11
**Begley** 2:9 3:4
6:16,18 12:11
25:8,17 29:2
31:15 32:23
33:16 35:4,8
36:22 38:14
52:2 73:2
77:15,18 82:7
82:13,18 83:4
96:22 97:1,5
97:13 112:19
112:23 123:14
124:2 126:11
127:1 143:9,18
143:21 151:15
180:7 183:18
194:6 199:20
200:2 202:7,15
203:8,15 205:5
205:23 206:2,9
206:13
**belief** 13:11 31:8
31:11 171:17
175:8
**believe** 18:13
43:1,2,18 55:7
72:5,9 75:7,8
77:11,20 79:14
80:4,9,16
95:21 104:18
108:10 109:23
124:21,23
133:19 142:23
157:17 158:24
159:13 166:4
168:25 169:12
169:16,18
170:4,21 181:2
182:15 183:21
184:4,4 185:21
193:3,15

**204**:14
**believed** 15:16
73:4 92:9
93:20 152:22
171:5
**benefit** 144:2
145:1 181:19
181:19
**benefits** 63:22
63:25 204:23
**Bensalem** 2:5
**bequeathed**
191:17
**best** 7:16 13:10
31:8,10 145:23
146:8
**better** 72:18
99:19 117:5
148:18 204:22
**bid** 204:1
**big** 107:25
137:23
**bill** 98:22 205:7
**birth** 42:19,21
**bit** 94:25 144:11
**bite** 8:3
**black** 18:6 19:14
19:19,21,25
20:2,10 22:12
22:24 23:5,14
23:19 24:7
25:2,12,25
26:5,8 29:11
29:19 30:7,18
31:22 32:5
33:1 44:6,11
45:6,9,11
**blanket** 145:14
**Blunt** 164:5
167:5
**Blunt's** 167:1
**books** 197:23
198:15
**booth** 57:25
**boss** 70:25

**bottom** 12:2,24
13:8,20 85:1
86:15 127:3
128:13,17
131:10 137:4
**box** 14:25 15:4,6
15:19,20 16:3
16:18,19
104:24 115:20
**boxes** 15:6
**break** 8:1,3,6
112:18 144:10
**breakdown**
167:15
**breath** 78:14
**Brian** 9:17,18,21
27:2,3,3,6,23
28:21 43:19,20
44:1,5 45:4,18
46:1 49:15,16
51:1 70:19
72:18 73:3
74:9,15 76:7,8
76:21,21 83:14
110:6 121:7,11
177:11,12,12
177:13,17
186:9,14
**Brian's** 70:25
**bridges** 132:14
**bring** 16:25
111:13
**Broad** 66:22
**broken** 115:16
**brother-in-law**
68:1
**brothers** 189:10
189:12
**brought** 100:23
140:15 170:24
176:22,25
177:2
**BROWN** 2:10
82:1 96:21
97:10 123:12

123:20 126:9
**Bruno** 104:10,12
**BS** 124:15,25
**bucks** 203:25
**budget** 120:14
**build** 100:14
120:18 129:23
**building** 95:6
111:11 130:13
147:12,14
176:18
**buildings** 95:6
105:17 111:5
**built** 120:2,4,9
**bullet** 127:11
**bunch** 131:20
133:4 197:24
198:16
**burden** 90:15
**Burke** 11:20
**burner** 146:5
**business** 125:8
129:16 196:25
**businesses**
127:25 129:17

─────────
        **C**
─────────
**C** 207:1,1
**calendar** 9:13
20:23,25 21:1
21:22,23,24
53:12
**call** 26:2 50:22
51:3,14 131:14
134:7,10
148:25 161:24
169:24 172:9
183:23
**called** 44:17,20
50:15 51:1,15
58:1 99:3
132:21 157:18
163:15 169:25
176:2
**calling** 51:17

184:7
**calls** 131:15
**cameras** 58:6
**cancer** 67:7,8
190:3,4
**candidates**
17:11 18:2
42:6
**capabilities** 3:14
96:15 97:24
98:17 124:8,11
**capability** 102:8
115:14 174:3
**capable** 7:10
78:10
**capacity** 61:11
**capital** 86:25
**car** 197:2,6
**care** 67:10,23
189:24 192:10
**career** 153:1
**CareerBuilder**
65:6
**Carl** 187:3,4
**case** 35:3,5
158:19
**cases** 130:23
132:11
**categories**
113:13
**category** 98:8
113:20
**Caucasian**
176:14
**cause** 15:5 21:9
**cell** 95:3 130:8
130:10,13,14
**center** 113:24
**certain** 18:1
25:19 46:22
65:11 69:8
99:10 100:14
107:14 114:10
127:20 128:5
129:20 132:7

**certainly** 39:9
**certification** 6:6
207:21
**CERTIFY** 207:4
**certifying**
207:25
**Cerutti** 2:3
11:14
**Cesare** 173:17
173:25
**challenging**
111:3
**chance** 83:6
177:23
**change** 187:14
**changed** 114:7
**changes** 109:15
**charge** 3:11
10:24 11:1,7
11:17,22 12:8
12:25 13:9,24
14:12,13,21
15:1 16:25
18:19 19:9
29:10,17 30:6
31:7 32:4
33:10,22 35:1
35:9,15,17,19
36:2 37:7,16
38:2,6 40:10
40:17,22 41:2
41:7,13,25
72:12
**charitable**
197:15 200:22
202:20,22
**Charles** 61:8
**CHASE** 2:3 25:6
25:15 28:23
31:12 32:18
33:14 35:2
36:20 38:10
51:25 72:20
77:14,16 82:11
82:16 83:2

97:3,6 112:16
204:17 206:1
**check** 15:6,6
16:2,3 20:18
20:20 58:2
**checklist** 115:2,6
**child** 155:1
189:17
**children** 189:18
191:16
**choices** 204:22
**chose** 52:21 66:6
156:18
**Christine** 11:20
**church** 60:18
61:5,7,9 187:1
**city** 65:12 85:19
96:1,3 99:11
132:4,19,20
145:15 156:1
**claim** 17:12
36:14 38:7
57:23 68:11,19
162:6 164:12
169:3 173:23
177:17 178:18
178:25
**claimed** 198:2
**claims** 50:8
164:3 171:9,21
174:1,6 176:17
178:7
**clarification**
7:15
**Clark** 1:17
207:15
**class** 182:3
**classes** 109:8
184:17
**clause** 81:11
**clean** 60:25
**cleanup** 61:13
**clear** 7:5,16,17
54:16 74:9
121:14 165:18

close 155:16,18
 155:19,20
 156:3
closely 37:17
 164:9
clothes 197:23
 197:24
co-counsel
 143:19
Coats 198:15
Cochran 3:20
 183:3,14,23
colleague 123:17
college 124:24
 125:2 182:21
 182:22 184:22
column 124:12
Comcast 70:13
come 47:7 49:1
 52:24 53:5
 102:10 106:15
 111:18 116:11
 138:6 142:12
 142:13 149:17
 150:5 152:8
 176:20 192:14
 198:17 199:5
 199:10 201:22
 205:18
comes 116:6
 127:10 142:8
 142:16
comfort 88:25
coming 166:21
 204:21
commencing
 1:16
comment 73:12
 73:13 74:10,17
 75:12,15,20
comments 41:8
 77:2 143:23
 148:12,12
Commission
 18:20

committed
 117:16
common 55:25
 71:12
Commonwealth
 1:19 63:15
communicated
 182:21,24
 185:17
communicating
 146:19
communication
 183:2 184:6
comp 180:11,18
 180:21 182:9
 182:13 195:2
companies
 114:13 134:1
company 64:25
 69:6 72:13
 116:20 149:7
 150:25 158:23
 159:6 170:8
 186:15 197:2
compensation
 179:23 181:1
 181:16 194:10
 195:4 202:18
 203:18
complained
 53:18,22 54:2
 54:6
complaint 14:3
 18:21 39:12
 40:6,10,15,15
 41:12 53:13
 54:20,25 68:2
 71:15 92:2,4,8
 92:13,16
 178:10 204:12
complaints
 84:18 86:5
 111:10
complete 7:9,17
 8:6 76:23

136:3,7,14
 144:5 145:10
 198:3
completely 6:21
 8:2
completing
 144:2 145:1
completion
 131:18
complex 123:21
complexity
 124:3
compliance
 114:6
concept 68:25
 109:9
concerning
 109:15
conclude 25:12
concluded
 206:18
conclusion 25:4
 27:8
condition 27:24
conducive
 129:25
conduct 54:8,12
conducted
 109:16 166:17
conduit 85:18,25
 86:3,4,6,7,12
 87:11,20,21
 88:3,22 89:1,5
 89:7 134:8,12
conduit/highw...
 85:17 86:17
 93:3,20
conference
 149:5
Configuration
 113:21
confirm 52:4
 81:3 151:20
confirms 184:7
conflict 88:19

conjunction
 105:16
connected
 101:14
connection
 22:13 33:22
 151:19 162:8
considered
 45:22 195:14
considering
 89:18 137:8
Constantly
 117:10,10
constraints
 135:7,17
construction
 28:5,6 95:3
contact 138:5
 151:3 153:5,6
 178:13 183:2
 183:20
contacted 49:23
 58:24
contained 207:5
contains 85:6
 87:16
contend 17:8
 18:1 42:2
contents 113:11
continue 148:18
continued 4:1
 48:14 57:6
 143:12,22
 144:12
continuing 16:1
 16:2 183:20
contract 89:1
contracted
 90:14
contractor 112:4
 131:15 147:18
 147:19,19,20
contractors
 90:23 94:3
 103:7 111:21

116:22 131:15
 132:6,10 144:1
 144:25 145:3,9
 147:21,24
 148:1,2
contractors'
 144:4 147:3
contribute 201:4
contributed
 205:15
contribution
 137:23 200:23
 203:3,24,25
contributions
 197:15 198:18
 198:23 199:8,9
 200:22 202:21
 202:22,25
 203:4,20,22
 204:2
contributors
 126:13
control 99:19
 207:24
conversation
 52:5,10 75:11
 76:24 158:13
 159:19 163:18
 163:21 168:1,3
 168:14 169:3,6
 172:7
conversations
 160:23 171:17
 171:22 172:1,5
 172:6 174:11
 174:14 175:1,4
 175:11 178:9
copies 34:12
copper 95:3,4
 117:21,21,23
 118:1,3,8,10
 118:22,23
 119:3,11,13,17
 120:16 122:22
 130:25 131:1,5

131:8
**copy** 81:24
151:9 179:21
180:23,24,25
181:5
**core** 88:21 89:7
**corner** 67:17,19
67:20
**corporate** 3:13
96:14 97:23
100:15
**CORPORATI...**
1:6
**correct** 6:22
8:22 9:10,13
9:19,22 10:2,3
11:2,5,9 12:17
12:21 13:5,5
13:12,18,21,24
14:9,14,17,18
14:23 15:2,13
15:16,21,24
16:7,12,15,17
16:21 17:21
18:10,16,21
19:9 20:7 22:4
22:9 23:6,9
24:21,22,24
26:5,24 27:10
27:11,13 29:7
29:8,24,25,25
30:4,13,25
31:3,7,10 32:1
32:2,12,16,17
32:20 33:5,19
33:20 35:11
36:15 37:2,5,9
37:13,14,20
38:17,17,18,22
38:23,25 39:1
39:4,7,13,22
40:6,20 41:14
41:15 43:11,21
44:18,19 45:1
45:2,11,19

46:2,9,14,15
46:17,20,25
47:4,11,22
48:4,7,10,12
48:19 49:11
50:9,13,22
52:15,22 53:15
53:16,19,20,24
54:4,5,9 55:5,9
55:12 57:16
59:24 70:23
71:13,14,17,22
73:4,23 75:6
76:10 79:4,7
79:11,22,25
80:15,20,25
81:15,22 83:12
83:15,23 84:2
85:3,7,13 87:2
87:6,22 88:6,9
89:9,12 90:17
91:2,19 92:19
93:23 94:3,6
101:11,14,18
101:22 111:24
111:25 112:12
115:5,18,24
117:13 119:1
119:18 121:1
124:12 141:8
144:6,8,19
148:5,8 150:21
156:14,19,20
156:20 158:17
160:17 162:22
163:2 164:5
165:20 168:9
177:7,15
180:18 181:9
182:6,23
194:21 195:5
196:4 199:18
200:4,5,11,16
202:5 204:3
207:8

**correcting** 48:3
**cost** 198:5 201:2
**costs** 201:17
**counsel** 6:2,5
7:18 11:11,13
21:6 22:17
33:17 35:16
38:25 82:15
179:20 181:4
205:24 206:11
**count** 84:24
128:7
**couple** 41:23
61:15 65:2
88:12 106:17
108:25
**course** 36:25
55:1 79:21
136:8,15
**courses** 136:4,4
136:24 137:1
**court** 1:1 7:2,10
**courtesy** 71:12
**cover** 58:17
63:24 145:20
**coverage** 154:19
**covering** 154:22
**Coyle** 169:16,19
169:20
**create** 114:8
**criteria** 115:5
**criterion** 18:1
**critical** 36:10
116:3
**cry** 152:18
**CSSC** 176:2
**cuff** 56:10
**Culture** 136:1
**Cunningham**
187:3,4,5,6,7
187:25 188:10
192:19,23
**current** 65:15
128:9 161:12
161:17

**customer** 71:4
99:10,16 102:5
102:8 114:22
114:23 116:10
128:19,20
129:17,24
130:1,12,20
135:22 138:6
142:10,15
147:13
**customer's**
98:16,22
114:12
**customers** 95:5
99:23 103:9
104:14 105:9
129:12,19
130:6 135:21
146:8
**customers'**
100:16
**cutting** 102:19

——————
**D**

**D** 3:1
**daily** 106:13
**damaged** 118:3
118:22,22
119:16
**damages** 204:5,9
204:13,15
**Data** 123:22
**database** 100:15
100:15 108:16
127:10 128:4
142:13
**date** 10:1 11:4
15:18 34:25
39:25 42:19
53:10,10 54:18
55:6 60:2,3
66:10 83:15
87:25 95:20
150:16 151:25
157:21,22

158:8 160:15
160:16 180:14
180:15 194:20
**dated** 3:20 13:14
13:21 14:9
83:11 183:14
**dates** 15:24 16:5
16:16 40:7
146:6
**daughter** 61:24
155:5
**Dave** 43:3
**David** 42:9
171:8,8,16,17
**day** 8:2 11:8
34:17 38:21
40:20 47:8,14
47:19,23,24
48:7,18,23
49:20,23 51:6
60:4 64:17,18
64:18,18 65:3
65:5 69:15
150:4,6 160:22
161:1 165:8
185:18 187:13
187:14
**day-to-day**
105:17 188:16
**days** 47:21 48:1
48:7,19 138:7
138:8 180:13
**de** 60:20,23
**deal** 23:1
**dealing** 84:18
89:18 95:4
100:2,21
101:21 102:13
103:2 108:1,5
109:7 111:5
119:11,12
120:5 188:15
**dealt** 25:24 50:6
**death** 190:1,14
**decade** 17:7

December 10:11
 87:17,25 144:8
decide 116:7
decides 201:16
decision 43:18
 52:24 53:5
 149:18 166:23
declare 13:3
dedicated
 193:19
dedication 170:5
deduction 198:2
Def_Walker_0...
 3:12 82:4
Def_Walker_0...
 3:16 126:22
Def_Walker_0...
 3:15 96:16
defective 58:7
defendant 2:12
 85:1 96:8
 128:12 137:4
degree 124:17
 124:20 125:5,7
 125:8,16 184:9
 184:11,15,20
 184:23 185:5,7
Delaware 87:3
 176:3 178:5
Delete 123:15
demands 84:15
demonstrate
 88:23
denied 34:10
Dennis 169:16
 169:18,20
department
 25:24 87:20
 88:3 89:2
 127:16,16
 174:7 175:20
departments
 23:2,16 103:13
 127:13
depended

129:14
dependents
 154:24
depending 99:16
 129:25
depends 61:14
 120:13 127:25
deposition 1:13
 5:1 206:17
Deptford 196:17
describe 70:18
 71:6 95:11
described 95:12
 101:9
description 3:9
 4:2 81:21
 128:22 129:2
 136:1
design 86:1,12
 87:11 88:22
 89:5,7 94:23
 102:10 111:8
 117:4 122:14
 131:17,19
 132:3 138:6
 147:12,14
designed 89:19
 105:18
designing 111:6
Designs 132:10
despite 17:25,25
 66:25
determine 203:6
determined
 204:2
developing
 81:18,21 83:23
 84:5
development
 98:13 113:4
 116:5 117:18
 123:6 136:2
developments
 131:18
diagnosed

190:14
die 67:6
died 67:5 187:21
 188:5,17 191:1
 192:13
Diedre 26:11,12
 26:13 28:20
 174:8,17,21,23
 175:2,16
differ 124:9
difference
 205:16
different 61:13
 69:3 70:4 93:9
 93:10 98:5
 100:12 103:15
 107:18 111:9
 114:13 121:4
 132:5 145:16
 149:7
differently 37:24
difficult 86:3
 93:4,5,6 111:4
dig 131:16
Diligently 69:16
diminished
 117:1
diminishing
 116:9,13,15
 147:22
direct 131:16
 207:24
directing 137:18
direction 5:4
 69:3 70:4,5
 149:8
directly 107:16
 174:20
directs 7:22
disabilities 18:9
 18:15 19:16
 24:10 29:15,21
 30:11,21 32:1
 32:8 33:4
disability 15:13

17:1,17 26:21
 26:24 27:7,24
 28:12 38:4
 40:24 41:4,5,9
 46:1 50:8,21
 51:13 52:18,21
 53:3,24 54:4
 71:22 72:2
 77:22 79:16
 92:11 162:10
 176:12
disappear
 118:16,17
disappeared
 118:18
discipline
 126:10
disclose 30:22
disclosure 164:2
 173:22
discriminated
 37:1 38:3
 53:19 54:3
 55:1 71:25
 77:11,21 79:15
 170:15,18
 171:6,18
 172:17,20
 175:8,12
 186:12
discrimination
 3:11 10:25
 11:23 12:8
 13:24 14:12,14
 14:21 15:1,5
 15:18 16:6,14
 16:16 17:2
 19:9 29:17
 32:4 33:23
 34:6,11 35:1
 35:10,15,17,20
 36:2,14 37:7
 37:16 38:2,7
 40:17,22 41:2
 41:7,10,25

71:21 72:13
 92:11 160:6
 162:9 164:4,12
 171:5,9,22
 173:24 174:1,6
 176:17 177:18
 178:7,18 179:1
discuss 83:18
 90:13 120:12
 146:14 160:12
 160:14 161:18
discussed 41:4
 89:11 111:15
 148:17 158:19
 161:8 165:23
 186:18
discussing 73:14
 147:6
discussion 82:25
 92:19,21
 140:23 141:1
 145:25 149:12
 159:17 160:15
 165:4,7 166:6
 168:11 169:10
 175:7
discussions
 160:16 164:22
 165:2
disenlightened
 69:10,12
disgruntled
 188:19,22
 191:12
dislocated 55:17
dislocation
 46:16
distress 68:3,5
 68:10,15,20,23
 186:21,23
 187:8
distributed
 191:4
district 1:1,1
 138:14,15,18

138:21
**diverse** 123:21
**doctor** 47:2,17
48:9 51:23,24
52:9
**doctor's** 8:7
**doctors'** 21:19
**document** 3:14
3:18 12:12,14
12:20,21 13:21
14:9 16:10
20:4 21:25
23:21 30:16
33:13,21 34:17
35:2,20,21
36:2,11,24
37:10,11,21,25
38:5,13 39:11
39:21 83:9
84:21,23 96:4
96:6,9,11,15
97:15,21
112:24 113:6
128:12,16
180:3,10 181:7
182:16,17,20
196:7
**documentation**
35:25
**documents** 5:7
11:23 20:18,19
20:19 34:24
35:14,25 97:7
179:12 182:8
**doing** 69:1,6
73:3 87:5,10
89:16 99:5
100:5,10
101:16 102:3
130:20 139:13
139:16 140:3
159:19 174:3
187:10,11,19
193:16
**donate** 197:23

198:7 201:9
**donated** 198:13
201:14
**donating** 201:18
**donation** 201:2
201:5
**donor** 198:5
**donor's** 201:2
**donors'** 198:5
**downsizing**
116:17
**Dr** 46:19,22
55:24 59:8
**drafters** 163:13
**draw** 25:4
**DS1** 86:20 142:9
**DS2** 142:9
**DS3** 86:21
**dual** 10:25 18:19
**due** 34:6,10
84:13 85:18
86:2 92:11
93:14
**duly** 6:12
**duties** 94:12,21
94:23 98:6
105:15
**Dutton** 169:2,3
169:4,7
**duty** 49:10,14
51:20

_____
**E**
**E** 3:1,8 4:1 207:1
**e-mail** 132:25
**e-mails** 34:13
**earlier** 147:6
182:20 185:17
186:20
**earliest** 15:23
**EASTERN** 1:1
**Ed** 175:18,19,25
176:18,19
177:2
**edge** 102:20

**education**
124:15 183:20
**educational**
183:1
**EEOC** 10:25
13:1 18:21
33:10,23 34:5
**effective** 10:1
50:17 91:2
150:16 157:22
180:14,15
194:20
**effectively**
146:19
**effectiveness**
127:5
**effectuated**
94:16
**effort** 182:5
**efforts** 34:22
156:21
**eight** 137:22
138:7,8 145:16
155:15 193:25
**eight-day** 135:7
135:16
**either** 16:3 35:25
64:21 129:22
161:3 162:9
178:10 179:13
182:16 185:11
**electronic** 83:10
**electronics**
198:16
**elements** 115:4
**eligible** 153:16
153:21
**eliminated** 145:6
148:22
**emerging** 98:20
113:5 115:21
115:23 116:2
118:11
**emotional** 68:3,5
68:10,15,20,22

186:21,23
187:7
**employed** 26:13
62:15 88:14,15
125:12,15
153:18 176:8
**employee** 52:7
72:17 83:10
131:11 134:17
136:2,20
161:12,13,18
168:18,24
174:9 196:25
**employees** 18:7
19:14,19,20,22
19:25 20:3,9
22:12,18,24
23:6,12,19
24:7,14 25:3
25:13 26:5,8
29:5,12,19,19
30:3,7,18
31:23 32:6
33:1 37:18
41:17 44:9,14
72:8,14 158:15
161:24
**employer** 17:1
51:20 194:12
**employment** 9:9
11:4,8 17:16
17:20 26:20
35:14 36:1,25
37:23 38:21
39:3 55:2,12
60:10 71:7,16
77:3 79:22
91:22 133:20
158:16 160:13
161:4,5 162:22
176:1 179:16
182:6 195:12
204:16
**encompassed**
128:10

**end-of-year** 85:7
**end-to-end**
113:22
**ended** 92:21
**ends** 66:8
**engage** 105:20
111:14
**engaged** 54:7,12
71:20
**engineer** 44:18
44:25 45:5,18
45:22 75:1
86:5 89:1
94:10,12,13,14
94:22 95:10
101:20 102:2
102:12 103:1
105:21 107:3
109:12,23,25
110:19 113:15
114:16 115:17
115:18 117:2
121:16,21,23
122:1,2 123:2
124:5,11 163:6
163:11 164:5
175:19 178:4
196:3
**engineering**
26:14,15 28:4
101:2 109:2,3
116:3 117:9
120:24,25
122:11,13
176:3,19,21,23
**engineers** 103:7
103:13,17
104:3,4,7
116:21 131:17
**enjoyed** 152:16
**entailed** 95:1
113:10
**entails** 95:2
**Enterprise** 124:7
**entire** 18:21 19:7

19:8 45:7
50:12 85:6
**entitled** 34:7
156:14 204:9
204:12,15
**entitlement**
181:19,20
**equipment**
98:18 114:14
116:6,8 117:6
123:8 147:16
**equivalent**
124:16,16
**Eric** 62:6,7,9,10
63:5 200:4
202:17
**Ernest** 178:1,3,4
178:6 183:3
**errors** 108:16
**ESQ** 2:3,9,10,15
**ESSM** 136:21
**established/do...**
123:9
**estate** 189:1,5,8
189:18 191:3
**estimate** 153:10
**ethernet** 86:21
86:22,23
**ethic** 179:3,5
**ethnicity** 164:16
167:2,20
**evaluate** 18:2
**evaluated** 80:12
**evaluation** 3:12
3:16 80:1,16
80:18,24 81:5
81:15 82:3,9
82:22 83:8,18
85:5,7 91:17
91:25 92:2,5
92:10,14
112:14 123:25
126:18,21
143:11 146:14
148:8,11,13

**evaluations**
79:21 80:4
84:1
**Evans** 196:10
**events** 39:6,9,17
39:18 60:25
**evidence** 34:13
207:5
**evolving** 117:8
117:19
**exact** 10:16
**exactly** 101:8
177:10
**examined** 6:13
**exams** 21:20
**exciting** 101:25
**Excuse** 16:9 37:4
41:20 77:15
200:17
**executor** 189:21
**exhibit** 3:11,12
3:13,16,17,18
3:20,21,23 4:4
4:6 11:22,25
12:9,13,25
13:17 15:5
35:20 81:25
82:5,8 85:6
96:7,16 112:25
115:13 120:22
122:11 126:19
126:23 127:3
151:10,13,17
179:25 180:4,9
183:11,12,15
194:3,8 199:24
202:8,12 203:9
203:12,17
**existed** 99:16
108:17 147:8
**existing** 85:18
95:4 98:19
99:22 104:24
113:5 115:21
115:23 116:2

117:13,23,24
**expanded** 78:25
**expect** 7:17
142:18 167:8
**expectations**
81:19 115:14
127:13,20
**expedite** 131:18
**expense** 197:4
**expenses** 196:25
197:1,8,11
204:24 205:20
**experience** 100:2
100:20 107:24
108:4 109:7
124:17 126:6
128:20,21
**experienced**
186:21,24
187:8
**expertise** 110:1
**explain** 96:11
**explained** 84:13
145:13 146:6
149:6
**explanation**
146:3
**extension** 47:3
**extent** 7:13
**external** 90:23
116:19
**extra** 19:2,4
90:15 204:24

-------

**F**

**F** 207:1
**FAC** 137:22,24
141:24 143:1
**facilities** 99:20
100:16 113:25
138:1,4 142:9
142:11
**Facilities/data**
113:24
**facility** 143:24

144:22
**fact** 45:10 66:25
73:19 77:23
90:4 92:17
150:1 152:11
156:24 160:12
162:11 163:18
163:22 168:3
186:11 204:19
**factor** 45:21
**factors** 124:1
**facts** 19:25 20:1
20:5 40:19
43:5,13,25
44:4,7,8,13
45:4,13,17,20
45:25 71:19,25
77:20 78:2
79:14 162:6,13
**factual** 24:3,4
204:8,14
**failed** 119:13
**failing** 119:16
**fair** 198:7
199:11
**false** 14:2
**falsification** 14:5
**family** 115:15,16
120:23 122:13
186:17 188:19
188:21 191:4
**fantastic** 206:15
**far** 102:8 103:14
109:9 114:12
120:13 132:5
132:24 147:16
**farther** 185:4
**father** 67:5,6,11
67:24 155:10
155:11,12
**father's** 67:21
**father-in-law**
190:22 192:11
192:13
**favorably** 72:6,9

**February** 89:12
92:1 146:13
166:7,9,11
177:7
**federal** 196:2
202:4
**feel** 58:20 70:16
72:17 89:24
91:21 146:18
146:23 162:5
185:19 186:11
188:1
**fees** 197:8
**felt** 76:5 77:4,7
78:9 79:9 91:1
92:5 110:23
111:3 141:13
170:14 171:13
172:16,22
175:12 188:23
191:13
**fiber** 110:9,10
122:23,25
130:4 139:25
**field** 70:8,9
102:9 117:19
**Fifty-seven** 63:8
**figured** 70:3
**file** 92:16 180:20
**filed** 6:19 10:24
10:25 11:7,17
12:25 13:23
18:19,21 34:3
34:17 35:1,9
39:11 40:7,9
40:10,14,17
59:24 158:22
163:22
**filing** 6:7 33:22
59:1
**filled** 195:13
**final** 11:4 18:12
19:11 24:3,4
60:4 80:24
113:14 142:23

142:23 203:23
**finally** 18:5
  19:12 24:6
**Finance** 125:6,7
**find** 20:22 64:25
  69:8 187:10
  192:20 193:8
**finding** 69:12
**fine** 8:2 29:3
  31:21 71:13
  87:10 101:8
  105:7 136:19
  142:22
**finished** 104:17
**FIOS** 95:3 105:3
  105:7,9 107:23
  108:1,4,5,6,11
  108:13,14
  109:7,9,13
  110:1,11,12,13
  110:16,19,22
  111:20,22
  115:24 117:12
  135:21
**firm** 11:16
  161:16
**first** 12:12 13:3
  34:16 36:20,23
  41:25 42:1
  47:15,20 55:24
  83:22 85:17
  97:21,22
  100:18,19,24
  108:10 126:15
  127:11 144:11
  183:19 194:9
  194:16,18
  197:21 198:4
  203:24
**firsthand** 31:3
  175:25
**fit** 117:21
**five** 26:9 47:8,18
  48:7,18,18,23
  49:19 158:17

**five-minute**
  112:17
**flew** 28:19 99:3
**flip** 35:21
**floor** 163:10,17
**FMLA** 37:8 38:8
  46:7 47:3 48:4
  55:4 77:23
  79:17 92:6
  162:11
**FOC** 86:20
**focus** 106:23
  107:2 110:1
  141:7 143:24
  144:22
**focused** 99:1
  113:14
**focuser** 144:3
  147:2
**focusing** 117:16
**follow** 91:10,14
**following** 7:20
  114:21
**follows** 6:14
  123:8
**footage** 132:24
**fora** 184:11
**force** 9:8,16 17:9
  18:5 41:14
  42:4 53:11
  54:20 116:9,12
  116:14 117:1
  150:3 151:19
  153:18 156:25
  158:16
**forces** 103:13
**foregoing** 13:4
  18:13 207:7,21
**foreman** 169:5
  169:13
**foremen** 103:19
  103:21,21,22
**forgive** 186:8
**form** 6:8 36:3
  113:12

**former** 16:25
  86:4 161:11,12
  161:17,24
**forthcoming**
  172:15
**forties** 168:22,23
**Forty-one** 26:16
**forward** 91:22
  95:17 111:19
  140:11,16
**forwarded**
  104:16
**four** 28:20 47:14
  47:21,23,24
  48:1,6 96:19
  96:22 101:6
  123:11 128:13
  134:9 164:15
  165:5,24 166:3
**fourth** 33:12
  181:17,18
**fracture** 46:17
  55:18 56:9
**frame** 34:1
  99:24 129:13
  203:5
**fresh** 39:6,10,20
**friend** 66:17
**friend's** 66:18
**friendly** 159:19
  170:1
**front** 35:21
  40:11 72:25
  112:25
**frustrating** 69:9
**FTPP** 95:6 118:4
  118:9,18
**FTTP** 110:7,8
  110:16,23
  111:22 115:24
  117:12 119:14
  119:17 120:9
  120:16 127:12
  127:15 129:21
  130:21 132:12

139:12,13,16
  139:20 140:3,4
  140:7,12 141:2
  141:8,20
  145:21
**FTTP-based**
  128:2
**Fuel** 136:1
**full** 49:10,14
  51:19 63:19
  86:7 87:17
  153:23 200:15
**full-time** 49:20
  50:20 51:12,19
  52:14,25 53:6
**fully** 207:5
**function** 88:20
  88:21 89:7
**functional** 3:14
  96:15 97:24
  115:14 124:10
**funds** 195:17,18
**furniture** 197:24
  198:24 201:8
  201:12,14,15
**further** 17:15
**future** 102:22
  118:25 148:16

─────────
**G**

**gaps** 93:24 94:1
**garage** 66:12,13
  66:14,15,16,21
  67:1
**general** 82:15
  167:19,21
**generally** 123:8
  124:13 126:9
**George** 169:2,2
  169:4,7,21,22
  170:7 171:12
**getting** 64:22
  78:10 84:10,10
  84:11 103:14
  120:10 138:3

170:6 192:21
**Getz** 46:19,22
  55:24 59:8
**give** 7:16 10:16
  20:14,16 22:20
  26:9 81:4
  95:20 96:4
  143:7 149:9
  151:2 177:23
**given** 36:3 52:20
  83:23 94:16
  127:19 135:10
  151:18 181:3
  182:1,2
**giving** 69:1
  187:12
**glasses** 123:4
**glue** 78:3
**glued** 39:17,18
  39:24 40:5,8
  40:19
**go** 7:23 17:15,25
  23:23 34:18
  41:24 50:20
  51:12 52:17,21
  56:21 65:17
  66:5 68:7
  69:22 70:3
  84:24 98:11
  102:9 107:9
  112:24 113:18
  116:6 120:13
  120:21 125:24
  126:17 128:16
  132:21 133:23
  134:16 135:25
  137:3 140:20
  141:23 142:16
  142:22 149:21
  168:6 170:6
  182:19 183:3
  184:24 185:4
  187:16 192:18
  192:22 193:5
  197:16 199:16

202:20
**goal** 119:17
120:15
**goes** 13:2 85:24
86:16 88:21
137:21 144:21
**going** 6:20 7:7
11:21 24:2
52:4,9 56:19
69:3 73:20,23
75:18 84:19,24
90:12 96:4
105:16 108:15
116:9 118:16
118:17 123:17
124:11 126:7
128:25 132:13
132:24 140:19
149:6,7 163:25
165:9,12,15,19
166:14 183:7
183:10,25
184:7,9,16,25
185:24 202:8
**good** 6:17 8:17
9:2,7 70:20
81:14 91:1
92:22 112:11
133:10,11
137:8 179:7
187:10,11
**government**
196:3 202:4
**GPIS** 85:24
86:10 87:10
132:15,16,18
132:21
**graduated**
124:24
**grandchildren**
155:7,13,14
189:13,14
**granddaughter**
155:15 156:6
**grandkids**

191:12
**granted** 180:17
**great** 87:5
**greater** 144:3
147:2
**Greenwood** 2:4
**grew** 131:4
**Gross** 175:23,24
**group** 25:20
45:7,18,22
104:15,19
105:13 107:3
109:25 110:6,7
139:9 141:2,3
141:20 163:15
165:16,19
176:2 178:8
**grouping** 98:1
119:14
**groups** 103:15
**grow** 143:22
144:12
**growth** 88:24
**guess** 10:19,21
79:24 81:24
**guidance** 117:5
188:10
**guys** 98:25 145:5
191:16

───────
**H**
**H** 3:8 4:1
**H-E-W** 74:6
**H-O-D-G-E**
106:3
**H-U-E** 74:7
**H-U-I** 74:7,16
**half** 78:7 85:17
194:16,18
**hand** 84:11
**handed** 151:23
**handled** 93:8
111:20 118:5
141:2
**handling** 95:2

**hands-on** 141:18
**hanging** 56:8
**happened** 58:9
190:2 193:2
**happy** 148:7
189:11
**hard** 40:4 69:8
86:1,12 87:12
89:5 123:3
**hardship** 205:2
205:3
**Hardy** 74:10
**Harrison** 153:6
153:7
**Harvetta** 2:15
82:14
**HBW** 106:24
107:6,13
115:24 117:12
137:11 143:24
144:3,21 145:1
145:11
**head** 20:5,17
26:8 28:19,19
78:3 99:3
**health** 8:17
**healthcare** 68:9
70:7 183:9
185:1 205:7
**hear** 7:2,2 67:18
69:11 71:10
133:15 169:17
176:6 188:4
196:11 198:10
**heard** 77:2
**hearing** 40:4
181:24
**Hecht** 153:5,6
**held** 82:25
166:19 170:22
170:23
**hello** 173:16
**help** 60:25 64:25
68:15 111:14
189:23 190:4

**helped** 67:23
141:10
**helpful** 106:19
107:19
**helping** 61:13
190:12
**Henry** 110:6
**HH** 138:24
139:9
**HHs** 127:13,16
128:3
**high** 95:2,6 99:2
99:5,8,9,14,21
100:2,4,10,19
100:21 101:1,3
101:11,14,16
101:21 102:4
102:13 103:2
104:14,25
105:25 129:18
130:4,17,21
137:13 142:9
**highest** 80:19
81:5
**hired** 17:10 34:6
42:4 64:24
**hires** 148:3
**hit** 56:13
**Hodge** 81:10
106:1,4,7
173:12
**Hodge's** 106:5
**hold** 70:16
**home** 21:4 57:20
62:1,23 63:1
67:13 149:22
190:16
**honestly** 6:21
8:22 9:5
**honorably** 8:21
**hospital** 56:21
**Hospitalization**
70:6
**hourly** 47:11
**hours** 47:8,10,14

47:18,23,24
48:6,18,18,23
49:19 50:19
51:9,21 57:18
138:21,23
**house** 191:17,23
191:25 192:2,4
192:6 198:25
**household** 128:8
**households**
127:17,18,19
127:20 128:6
128:10
**HPW** 107:2
**HR** 53:14,22
75:21 92:2
151:2 157:19
**Hui** 74:3,5,6,11
74:12,16,19,22
74:24 75:1,3
75:12 76:1,6
76:10,24
171:25
**Human** 18:20
157:4
**hunting** 64:23
**hurt** 57:13
**husband** 65:14
67:25 154:22
160:20,21
186:19 189:2,3
189:4,7,14,20
189:23 190:10
190:20 191:7
192:8,14 200:8
200:8,10
202:17
**husband's** 62:5
64:15,19
154:17 194:25

───────
**I**
**I898** 198:7
**idea** 42:24 64:6
138:23 191:24

**identification**
12:9 82:5
96:17 126:23
151:13 180:5
183:16 194:4
199:25 202:13
203:13
**identified** 30:3
72:4,7,15
114:18 158:14
162:20 163:1
164:6 171:25
173:21 196:2
**identify** 45:4
98:12
**identifying**
113:1
**III** 44:18 75:1
94:13,14,22
95:10 101:3,21
102:3,12 103:1
105:22 106:6
107:3 109:12
109:25 110:19
113:15 114:16
116:3 117:9
120:25 122:11
123:2 124:5,11
164:5 175:19
178:4
**IIIs** 44:25 45:5
45:18,23 163:6
163:11
**immediately**
21:12 146:9
150:9,12
**impacted** 98:23
150:2 156:25
158:15 168:8
168:12
**implement** 99:18
**implementation**
113:16 122:14
**importance**
114:21

**important** 6:25
99:22
**impossible** 90:7
145:21
**improve** 128:19
128:20,21
129:2
**improvement**
81:20
**inappropriate**
77:4,7
**include** 21:18
63:22 78:22
154:3
**included** 18:6
19:13,19,24
20:2 23:18
24:7 25:2
90:22 128:8
200:18
**including** 22:7
22:11 141:15
**income** 64:12,15
65:20 200:8
205:17
**increase** 48:22
122:8
**increased** 48:18
**Indeed.com**
158:3
**independent**
123:25
**INDEX** 5:1
**indicate** 10:10
**indicated** 51:22
179:10
**indicates** 156:12
**individual** 43:18
50:7 126:13
196:23
**individuals**
19:17 20:8,12
21:9 23:3
25:20 30:7
43:10 72:16

73:22 103:8
109:24 111:23
112:2 119:14
135:21 158:20
158:22 164:1
167:9 168:7
185:18
**industry** 63:16
63:18 183:9
**information**
12:16 13:11
14:13,22 15:2
19:18,23 21:8
21:17 22:6,7,8
22:11 23:20
24:20,23 25:4
25:10,11 27:5
27:10,12,18,23
29:18 30:17,23
30:24 31:8,11
31:22 32:11
33:6,7 34:24
35:16 109:11
123:24 128:5
134:22 135:20
153:1,9 164:3
164:8,11
172:14 173:22
173:25 176:16
179:12,13
182:4 199:17
202:3
**infrastructure**
120:1,9,18
122:15,21,22
131:4
**infrastructures**
122:17
**inhibit** 8:19
**initial** 46:24
164:2
**initially** 47:8
48:3,6 78:17
79:6 108:7
**initiate** 134:1

**initiated** 105:13
105:14 108:10
**injured** 57:10
**injury** 55:5,15
56:12,22,24
57:17 58:13,14
59:13 86:2
**innovation**
116:5 117:18
**insert** 132:22
**inside** 147:13
**installation**
113:21 147:15
**installing** 98:15
**instance** 99:11
**instances** 202:5
**Institute** 46:20
**insurance** 58:17
204:23 205:10
205:11
**integrity** 114:11
**intention** 161:23
**interact** 71:3
**interconnected**
99:13
**Intercontinental**
182:25
**internally**
156:22
**international**
70:1 182:22
**interrelated**
124:1
**interrogatories**
59:15
**interviews** 65:2
**invested** 64:7,9
**investigate**
102:7
**investments**
154:2 205:1
**invoicing** 132:5
**involved** 22:18
24:14 29:5
59:16,17,18,22

70:12 139:11
139:20 190:12
**issue** 7:6 70:23
71:5 111:19
138:7
**issued** 138:15,17
138:21 146:9
**issues** 26:19
84:16 111:7,12
114:18 123:9
134:4 192:23
**issuing** 132:8
**item** 130:2 135:4
198:2
**items** 61:14 84:9
90:14 98:5
129:24 132:7
133:13,17
198:14 201:18
**IV** 109:23

_____

**J**

**James** 196:10,10
196:12
**January** 85:12
87:17 137:6
144:7 195:25
196:1 199:7
203:24,25
**jchase@karpf...**
2:6
**Jersey** 157:3
196:14,15,16
**job** 1:24 17:8,12
34:5,9,13,19
37:8 40:24
42:3,6 60:5
64:22,23,25
65:2,4 69:4,7,8
69:13,17 70:13
78:10 88:5,16
88:19 90:6
94:12,16,21,23
95:1,8,18 98:6
98:15 101:10

102:10,12
106:5,9,15
107:25 109:5
110:25 113:9
113:10 114:20
115:4,5,11,14
115:16 118:6,7
119:10,16
120:23 122:12
126:14 129:4
136:2 140:25
144:16 146:8
148:14 151:3
152:11 156:22
157:2,3,19
170:6 174:4
185:2 187:10
187:12 192:20
193:8 197:9
**jobs** 60:16 65:20
65:23 69:6
105:12 107:10
107:10 108:15
109:1 113:2
121:14 132:11
134:9 139:12
139:25 145:16
147:5 148:3
150:24 156:23
157:1,7,8,13
157:15,23
158:6,10
182:11
**Joe** 42:8 43:2,22
43:23 178:15
178:17,19
**Joe's** 42:10
**Johns** 26:11,12
28:21 174:8,17
175:16
**Johnson** 27:16
28:2,3,21
159:1,2,5,9
**joint** 197:17
200:3 202:17

203:17
**JONATHAN**
2:3
**Joseph** 74:2,5
171:25 172:2
**jotted** 20:21
**journal** 26:1
36:1
**Judson** 62:19
**July** 88:8 139:17
**jumping** 69:6
145:18
**June** 85:12
137:6 199:6
200:24 203:1
203:21

―――――――
**K**
**K-E-H-R** 174:5
**K-L-A-U-S-S**
81:13
**Karpf** 2:3,3
11:14,14
**keep** 22:6 34:12
34:21 41:23
114:11,14
116:8 128:9
**keeping** 114:25
**Kehr** 174:5
**Kelly** 164:4,8,22
165:22 167:1,4
167:4 168:15
168:18,21
**kept** 22:1 88:25
120:10 179:11
179:13
**Kevin** 27:16
28:2,3,3,6,21
159:1,2,5,9
**kicked** 58:10
**kidding** 123:15
**kids** 61:17,19
191:11
**Kimberly** 50:7
50:11,15 51:7

51:8,15,16,18
52:5,6,8,10
**kind** 8:10,14
27:6 35:24
41:8 54:8 68:8
68:13 71:20
78:12 83:6
102:19 105:20
130:15 148:1
156:4 181:23
182:8 187:17
193:18
**kinship** 70:17
**Klauss** 81:13
107:4 110:2,3
141:3,19
**knew** 23:2,5
25:19 29:20
30:19 73:22
78:9,13 115:8
141:1 165:15
**know** 6:20 12:14
19:20 22:19,21
22:23 23:12,13
24:14 26:18,21
26:23 28:17
43:3 52:8
81:10 87:24
88:14 96:8
97:20 98:15,20
110:4 120:11
122:7,18,19
127:14 128:23
131:22 138:11
139:5,6 148:23
153:14 158:17
159:3,5 160:8
161:21,22
162:4,18 163:5
164:17,17
167:16 169:3
170:8,9 171:8
171:16,21
174:2,6 176:9
176:11,13

177:9,11,17
178:6,17,25
180:24 185:6
186:14 187:7
187:12 190:13
**knowing** 113:8
**knowledge** 13:10
31:3,8,10
32:20,22 85:18
98:19 100:2
107:12 113:5
115:21,23
117:5,12,17
124:14 175:25
186:25
**knowledgeable**
106:21 107:21
**known** 204:21
**knows** 177:12
178:22

―――――――
**L**
**L** 1:17 184:20
207:15
**labeled** 85:1
96:7,9 97:7,23
**Labor** 63:16,18
**laid** 167:6
**landscape** 98:22
**large** 18:6 19:13
19:19,24 20:2
22:23 23:13,18
24:7 25:2,12
32:5 33:1
84:19 95:5
102:14,25
111:5 114:6
129:21 147:5
147:11,13
148:3
**larger** 105:12
**largest** 189:8
**late** 33:25
**lately** 67:2
**latest** 16:5

**latest/all** 15:19
**law** 1:14 11:16
161:16
**lawsuit** 6:19
22:9,16 59:1
59:10,17,23
159:6,21,23
161:8,13,18,25
163:23 169:8
170:7 174:15
179:14 186:9
186:18
**lawsuits** 59:23
158:23
**lawyer** 11:15
12:15,17,20
59:12 161:6
**lawyers** 22:8
**lawyers'** 21:20
**laying** 198:20
**leader** 108:24
**leadership** 124:8
124:8
**leading** 81:7,8
**leadings** 81:5
**learn** 109:11
137:10,12,16
137:17 140:20
141:11
**learned** 59:5
**learning** 115:3
124:13
**leave** 26:20 27:7
28:15 37:8
38:8 40:25
41:5 46:2,23
47:3,4 48:4
50:12 53:24
55:14 57:3
77:23 79:17
88:4,5,9 92:6
162:11 176:12
**leaving** 94:19
**Lee** 153:5,6
**left** 51:2,13 60:4

90:6,10 93:24
149:10,21
176:2 184:8
198:25
**left-hand** 12:24
**legitimate** 17:9
42:3
**let's** 8:25 12:23
13:16 14:20
16:23 17:25
41:18 46:12
50:5 79:20
84:24 85:11
97:21 112:14
112:24 115:12
120:21 122:10
123:2 126:17
127:2 134:16
135:25 137:3
138:13 141:23
142:22 144:10
194:9 197:16
199:16 200:9
200:21
**Letter** 3:20
183:14
**letters** 34:12
**level** 84:2 88:23
89:8
**licensed** 66:3,25
**life** 188:14
193:19 205:10
205:11
**light** 100:12
**limited** 116:20
**limiting** 116:20
**line** 5:5,8,12 8:5
8:6
**LinkLine** 65:7
**list** 182:10,12
**listed** 136:5
164:1
**listen** 8:20 9:4
**listening** 146:21
146:22

**little** 70:16 94:25
106:10 144:10
192:21
**live** 62:1,12
64:17 67:13,16
155:9,16,19,23
187:13 190:18
190:20 192:2,6
204:25
**lived** 62:20
190:19
**lives** 155:24
**living** 63:5 64:18
189:15 205:16
**LLP** 1:14 2:9
**local** 13:1 17:7
**located** 66:21
**locates** 131:15
**location** 114:25
**locations** 98:16
99:12 145:16
**Logan** 1:15
**long** 10:14 62:9
62:20 73:9,11
99:21 149:14
168:23 176:8
184:19 185:6
**longer** 46:7 49:1
50:18 69:2
78:15 118:1
**look** 11:24 14:20
16:23 33:18
34:18 36:18
41:18 60:16
82:21 83:5,8
84:21 85:11
96:10 97:14,21
112:14 115:12
115:12 121:13
122:10 123:2
127:2 137:8
138:13 142:16
150:24 151:16
151:24 152:2
180:8 193:23

194:7,8,9
197:20 200:7
200:21 202:8
203:20
**looked** 34:9
74:21 104:23
113:3,4 114:19
158:6
**looking** 18:24
20:1 31:16
65:9,11,17
69:17,22 83:7
95:17 128:18
128:18 129:1
130:1,6 140:11
140:16 181:7
184:11 185:8
**looks** 10:7
131:16 180:9
195:7 197:16
202:25
**Lori** 109:18,22
112:10,12
148:2
**lost** 34:5,7,8,10
**lot** 84:14 93:10
93:13,24 99:5
99:11 111:10
129:17,19
139:12 140:4
145:4,12,13,14
199:9,9 201:13
**loudly** 7:1
**love** 69:21
**lower** 91:18
**LPN** 184:12,13
184:24 185:7
**lunch** 37:19
**Lung** 190:3,4

_____
**M**
**Macintosh**
175:18,19
176:4
**Macintosh's**

175:25
**Magee** 9:17,18
40:23 41:3,9
43:19,20 44:1
44:5,9,13 45:4
49:15 51:1,8
53:14,18,23
54:2,7,12,21
70:19 75:14,23
77:3 79:22
80:5,12,17,25
81:4 83:14,18
83:23 84:7
87:18 88:18
91:10 92:19
94:18 95:10
101:19 111:16
121:7,11,20
134:22 137:7
140:15 144:6
148:11,20
151:18 160:15
166:19 175:22
177:11
**Magee's** 143:10
143:23
**mailbox** 86:7
**main** 185:23
**maintain** 118:3
127:5 145:20
**maintained**
119:8
**maintaining**
21:15 118:8,10
**maintenance**
94:24 123:6
**major** 84:19
89:19 132:11
137:1 205:22
**majority** 18:6
19:13,19,24
20:2 22:24
23:13,19 24:7
25:2,12 29:11
32:5 33:1

**making** 14:17
86:20 95:18
108:15 114:22
114:23 137:23
147:14 182:5
**maliciously**
204:6
**man** 65:15
**manage** 109:12
144:25 145:23
**managed** 113:24
**management**
88:19 113:17
**manager** 9:19,21
9:25 10:4 17:7
36:4 83:14
85:16 108:21
109:2 121:22
122:1 137:7
142:25
**managers** 73:14
145:22
**manages** 144:1
**Manayunk**
155:24,25
**manner** 111:22
114:24
**March** 159:13
200:24 203:1
203:21
**Maria** 173:17,25
**mark** 66:19
182:16 202:23
**marked** 3:9 4:2
5:11 12:8 82:4
96:16 126:22
151:12 180:4
183:15 194:3
199:24 202:12
203:12
**market** 69:4,7
198:7 199:12
**Marks** 60:22
**markups** 131:16
**married** 62:3,10

190:23 191:1
**Martin** 60:20,23
60:24
**MaryAnn**
104:10,12
**master's** 125:8
125:16,22
184:23
**materials** 114:10
**Matt** 174:5,5,7
**matter** 207:7
**max** 51:9 181:19
**maxed** 50:2
**McCoach** 10:5
80:10,12
**mean** 56:6 99:8
110:8 116:13
118:1 119:7,11
122:17,19
127:14 128:3
128:23 130:9
130:11 133:7
135:8 136:22
137:24 138:16
138:22 139:5
142:4 145:2
152:15
**means** 81:18
99:8 128:4
132:2 135:9
138:2 207:23
**meant** 129:10
193:12
**measures** 128:22
129:2 136:2
**mechanic** 66:1,2
66:3,6,25
**medical** 18:8
19:15 24:9
26:19 27:6,23
29:13,20 30:9
30:20 31:24
32:7,14,21
33:2 51:24
63:22,24 68:9

154:4,10,19
**medication** 8:11
8:14 68:14,19
**meet** 66:9 81:19
82:16 83:17,20
127:13 146:6
187:24
**meeting** 84:15
89:12 90:10
146:12,15,24
148:10,19,24
149:2 166:16
166:17,18,19
**meetings** 22:7
109:14,17
141:16
**members** 188:19
188:21
**Memorial** 61:8
**mentioned**
182:20
**mentor** 193:14
**mentoring** 193:9
193:20
**message** 51:2,7
51:14 184:8
**met** 81:20 90:17
120:12 146:1
146:13 151:25
**methods** 123:23
**MetLife** 46:24
47:4,9 49:22
50:9
**MetLife's** 52:3
**metric** 86:20,25
143:25 144:23
**metrics** 133:3,20
134:7
**mid** 85:2
**middle** 85:13
87:8 197:20
**midyear** 85:2,6
85:8 89:5
137:5,6 138:11
138:15

**milling** 134:9
**mind** 39:7,10,17
39:18,20,24
40:5,8,20
114:11,15,25
116:8
**mine** 199:3
**minister** 187:1
**minister's** 187:2
**minute** 83:7
159:12,12
**minutes** 149:15
**mispronounce**
185:25
**missed** 84:10,18
86:2 136:12
**missing** 86:20,24
128:3
**mixed** 86:19
**mom** 67:21
**money** 64:2
185:14 192:14
199:9
**monitor** 105:15
**monitoring**
61:13 100:11
**Monster** 65:6
**month** 61:3,15
61:16 106:10
106:11 150:18
154:14,15
169:23 198:13
205:21
**monthly** 205:6
205:17
**months** 10:21
88:5,12 185:9
198:21
**morning** 6:17
**mortgage** 62:25
**mother** 155:12
**mother-in-law**
187:20 188:4
188:16 189:24
190:13,23,25

**move** 104:18
120:15,16
124:10
**moved** 85:16
93:2 143:24
144:22
**movement**
132:13
**moving** 131:7
132:14
**Mucillo** 43:22,23
71:1,2,8,16,20
71:25 77:6,9
**multiple** 124:1
**Murphy** 74:8,13
74:14 78:6
79:7 107:4,9
139:20 140:2
173:10

─────────
**N**
**N** 3:1 207:1
**name** 6:17 26:4
28:18,19 42:10
62:5 66:18,20
106:2 110:6
151:2 163:25
169:15 182:23
185:25 187:2
196:18
**names** 20:14,16
20:21 23:8
110:16
**nature** 21:21
53:14 54:20
159:16 188:20
**necessary** 88:23
144:5 147:3
195:13,15
**need** 7:14 8:4
17:18 50:20
51:22 103:5
114:24 123:4
123:16 140:22
141:5 149:4

177:16 185:2,2
**needed** 19:2
49:10 51:11,19
58:1 61:12,14
66:9 69:2
78:15 81:19
93:22 99:13
102:8 105:18
110:23 127:21
137:16 140:24
168:4 192:18
**needs** 86:17
**negative** 162:17
162:19,21
**Nero** 2:15 82:14
82:14 143:7,15
143:20
**network** 3:14
94:24 95:4,4
96:14 97:24
108:14 109:2,3
115:1,17,18
117:2 118:8
119:13 120:23
121:20 122:1,2
122:13,15,16
122:23,23,24
122:25 128:21
129:3,12,13
147:13
**network/system**
114:2
**networking**
121:22
**networks** 129:18
130:5
**never** 24:23,25
27:12,20 30:24
51:5 53:13,18
53:22 54:2,6
54:14 58:2
70:23,24 71:9
71:11,15 73:3
75:14,14,17
77:8 173:18

| | | | | |
|---|---|---|---|---|
| **new** 88:18 92:25 94:6,8 95:5,18 105:17 114:8 116:6,7 118:1 123:4 131:18 135:3 140:12 144:13 157:3 196:14,15,15 198:19 | 143:4,25 144:23 201:3 201:16,23 203:6,9 **numbers** 128:8 131:20 133:2,4 133:6,8,10,11 133:16 137:8 142:3 199:10 201:7 | **occurring** 188:13 **OCN** 86:20 **ODN** 138:24,25 **offended** 76:10 76:11,15 **offered** 101:20 **office** 37:20 83:21 149:3 157:17 164:10 166:25 170:24 171:11 | 183:1 184:15 184:18,19 185:8 **open** 93:24,25 94:19 **operation** 122:15 **operational** 123:5 **operations** 114:2 120:24 122:13 **opinion** 171:1 | 116:21,22,23 116:24 160:19 169:4,13 **outsourced** 88:20 **overall** 25:11 148:4 **oversee** 137:2 **owned** 66:16 **owners** 111:11 **ownership** 88:23 137:9 |
| **Newman** 27:2,3 28:21 186:9,14 **Newman's** 27:23 **Nice** 82:16 **night** 125:24 **nine** 199:21 **non-black** 17:11 42:5 43:9,11 43:15 **Noncash** 197:15 **normal** 57:6 **north** 62:13 **Notary** 1:18 **notation** 9:12 **note** 92:22 198:1 **notes** 179:11 207:6 **notice** 17:17 153:17 158:9 **notices** 132:25 **notification** 49:9 **notified** 9:8,15 18:9 19:16 24:9 29:14,21 30:10,20 31:24 31:25 32:8 33:3 49:13 50:17 51:8 53:11 54:19,24 148:21 156:24 **notify** 152:10 **number** 3:9 4:2 22:20 23:12 44:24 51:4 126:8 129:22 134:7 138:24 | **Numerous** 109:8 **nurse** 190:5,13 **nursing** 70:11 184:11,12 **NWC** 139:9 ——— **O** ——— **O** 207:1 **o'clock** 190:17 **oath** 6:20 **object** 7:19 **objection** 7:19 7:21 25:6,15 31:12 32:18 38:10 72:20 77:14 204:17 **objections** 6:8 **objectives** 81:19 **obligation** 34:18 49:14 **observed** 73:3 **obtain** 153:10 156:22 182:5 184:20 **obtaining** 123:24 **obviously** 178:23 202:3 **occasion** 78:5 **occupant** 90:6 **occupation** 195:10,11 **occur** 56:11,24 149:2 **occurred** 58:21 | **opportunities** 151:4 **opportunity** 47:7 50:2,18 52:20 82:20 88:24 95:14,16 101:25 150:24 183:3 **opposed** 173:5 205:17 **ops** 115:17,18 **Oral** 1:13 **order** 34:11 98:14 104:17 104:18 110:24 128:7 135:9 195:16 **ordered** 48:10 **ordering** 103:14 **orders** 95:3 100:5 104:16 134:8 135:6,13 **organizations** 164:20 **originally** 100:5 **outage** 114:4 **outplacement** 64:25 **outside** 94:2 103:12,17,21 103:22 111:23 112:1,3 113:22 116:14,17,21 | ——— **P** ——— **P.C** 2:3 **p.m** 50:16 206:18 **P1** 3:17 151:12 **P143** 3:21 194:2 **P150** 3:22 194:3 **P18** 3:17 151:12 **P28** 4:6 203:11 **P33** 4:6 203:11 **P34** 4:4 202:11 **P39** 4:5 202:11 **P40** 3:23 199:23 **P44** 3:23 199:23 **P46** 3:19 180:3 **P47** 3:19 180:4 **P57** 33:14,17 **PA** 131:14,19 134:7 **Pa.C.S** 14:4 **pace** 47:11 **package** 36:5 63:20 149:8 151:8,9,20,24 151:24 152:25 **packet** 3:17 151:12,17 **Padovani** 178:1 **page** 3:3 5:5,8 5:12 9:7 12:3 12:12,24 13:8 13:16,17,18 |

Additional entries in first column continue: **offices** 1:14 164:10 **Oh** 40:7 56:19 78:5 102:14 121:15 127:15 142:5 143:13 143:18 155:13 174:23 182:15 200:9 **okay** 8:16 20:15 26:12 47:16 50:24 78:11 121:17,19 122:6 129:9 132:9 134:3 136:17 146:11 171:20 183:22 197:7,16 206:12 **old** 26:15 27:3 61:19 63:7 74:24 155:13 168:21 176:4 **older** 74:25 **once** 13:12 14:1 24:2 59:5 61:3 61:16 73:5 97:19 156:23 157:21 **ones** 65:7 80:7 205:22 **online** 70:1 141:17 182:22

14:20,22,25
15:4 33:10,11
33:12,12,15
36:21,23 83:9
84:25 85:3,13
86:15 97:22
115:13 120:21
120:22 122:10
127:2,3 128:11
128:13,17,18
129:1 131:10
133:23 135:25
137:3,4 142:23
142:24 156:11
156:15,16
186:6 194:9,23
197:16,21
200:22 202:21
**paged** 152:25
**pages** 96:20,23
97:22 128:13
**paid** 126:3,4
150:20 194:20
205:14
**pain** 57:12 59:7
59:8
**paper** 13:23
126:16
**papers** 195:13
195:15
**paperwork**
151:5,6
**par** 89:18
**paragraph** 13:3
17:5 24:6 42:2
87:18 127:4
181:17,18
**pardon** 40:7
48:2 125:14
**parking** 197:8
**PARS** 132:7
**part** 114:6 129:3
138:4 168:13
185:17
**participated**

136:25
**particular**
102:11 103:24
104:8 110:1
112:3,4 119:16
128:6 129:23
130:14
**particulars**
16:24 18:24,25
19:1 36:18
38:13 132:23
184:21
**party** 133:24,25
163:14,15
**pass** 127:21
128:7
**passed** 188:24
**passing** 192:15
**Patricia** 10:4,8
10:15 80:10
**Paul** 81:11,12
107:4,15,16
110:2,3 141:3
141:19
**pay** 34:7 64:1,2
125:18 154:7
154:13 185:12
**paying** 204:23
205:20
**payment** 132:6
194:14
**payroll** 166:22
**peers** 18:4
**penalties** 14:3,17
**penalty** 13:4
16:21 20:6
37:12 38:16
39:22
**PennDOT** 132:4
134:9
**Pennsylvania**
1:1,7,16,20 2:5
2:11 18:19
63:11 154:18
157:2,3,7,9

181:12,15
**pension** 63:19
64:15,19 153:9
153:10,11,14
194:25 195:17
195:19,20,21
200:10,10,20
202:19 203:19
**pensions** 194:23
**people** 25:22
45:7 72:5
73:15 77:10
89:20 104:8,21
113:22 116:18
141:2,3 162:12
162:14 163:4
163:16 164:2
164:14,22
165:25 166:22
167:5,23 168:5
168:12 170:22
172:13 173:21
176:25 178:19
185:20 187:11
**people's** 98:16
**perceive** 187:9
**percent** 52:6
69:1 103:4
108:2,3 110:21
118:6,7 119:10
119:12 189:8
**percentage**
103:3 107:25
110:18
**perception**
76:14
**perfectly** 71:13
**perform** 105:15
106:9 110:24
115:5
**performance**
3:16 18:3
79:10,21 80:1
80:4 81:18
82:9,10,21

83:8,25 85:16
87:1,1 89:8,17
91:25 92:9
126:18,21
131:21 134:14
137:7 142:25
143:11 144:6
148:14
**performed** 88:22
93:16,21
111:21
**performing**
80:19,25 81:14
84:2 98:7
113:2,9 115:11
116:3 148:5
178:21
**period** 9:25 10:8
46:22 48:14
49:6 51:10
80:3,13 85:12
91:22 98:24
101:11 113:9
118:20 133:18
135:13 150:21
190:5 199:8
200:9,25
**perjury** 13:4
16:21 20:7
37:12 38:16
39:22
**permit** 85:19
**permitted**
157:23
**Perry** 42:9,12,25
43:3,11 44:2,6
72:7,10 171:8
185:25
**person** 57:24
73:18 74:2,12
90:17 93:20
103:24 142:5
170:23,23
171:10,12
**personal** 9:13

14:22 22:3
**perspective**
101:24 107:13
108:12 119:9
126:14
**pertaining** 21:1
**Philadelphia**
1:16 2:11
44:21,22,24
62:13 65:12,13
78:23 87:3
96:1,3 99:12
132:4,19,20
145:15,19
156:1
**Philadelphia/...**
86:19,24
**phone** 51:4
107:17
**PHRC** 11:1,17
**physical** 21:20
**physician** 68:5
**pick** 129:20
142:17
**picked** 129:18
**Pike** 66:22
**piling** 188:2,12
**Piscataway**
157:5,16
**place** 15:18 16:6
16:14,16 73:20
166:15
**placed** 147:17
**placing** 114:10
118:1 134:1
**Plaintiff** 2:7
**Plaintiff's** 96:7
151:10,17
179:25
**plan** 50:19 73:9
73:11 90:11,13
90:20 91:2,8
92:18 111:8,18
114:17 120:8
120:11 204:20

204:23
**planned** 73:8
**planner** 20:22
  21:3,5,15,16
  21:18 22:4
  23:9 26:2,3,4
  29:1 104:12
  179:11,18
  206:6,7,8,10
**planners** 103:15
  104:5,6 163:14
**plans** 64:21
**plate** 93:14
**play** 116:11
**please** 7:15
  11:25 26:10
  33:11 82:13
  84:22 85:11
  113:18 115:13
  120:22 151:9
  193:24 194:7
**pleased** 84:4
**plus** 126:10
  168:25
**PN** 184:20
**point** 49:4
  128:25 138:10
  139:12
**poles** 134:2
**Policies** 134:17
**Porres** 60:20,23
**portion** 29:9
  31:9 42:1 78:8
  96:2 102:14,25
  129:14 144:18
**Portolese** 42:8
  42:12,25 43:1
  43:10 44:1,5
  72:8,10 171:20
  186:1
**posed** 27:21
**position** 46:8
  49:2,21 94:6,8
  94:19 95:10
  101:21 102:3

102:12 103:1
105:10,22
108:7 113:14
116:4 117:7
148:21 176:20
**positions** 24:15
  65:8
**positive** 79:10
  85:25 86:11
  87:11 91:23
  104:21 133:19
  146:13,15,23
  162:17,20
  163:1
**positively** 84:16
**possession** 34:25
**possible** 84:17
  118:1 119:19
  119:20,21,22
  119:23
**posted** 108:15
  157:8
**predecessor**
  93:21
**preferred** 124:16
**prem** 99:16
  139:25
**premier** 102:16
  102:17
**premise** 110:9
  110:10 114:12
  147:13
**prepare** 35:15
  36:1
**prepared** 12:13
  80:17
**prepares** 196:7
**preparing** 7:12
**present** 2:14
  60:3,8 68:15
  73:25 161:3,8
  161:24
**presently** 30:15
**pretty** 55:25
  93:3 118:18

130:19 156:3
**previously** 88:20
  141:8 176:20
**primary** 95:7
**print** 138:7,15
**prints** 131:17
  134:8,12
  138:17
**prior** 55:11
  83:25 90:6,6
  108:9 177:4,7
  194:20
**probably** 118:17
  133:8
**problem** 7:7
  21:13 67:3,4
**problems** 90:16
  91:5 111:15
  114:4 123:10
  123:22 128:2
  134:8 135:20
  147:7 188:16
  188:18
**procedure**
  109:15 114:21
**procedures**
  114:5,8 135:3
**proceedings**
  207:4
**process** 85:19
  127:12 134:1
  135:6,9,13
  138:5 145:21
**processed**
  131:20 133:3
  146:9
**processes** 114:6
  123:7 128:2
  134:17 135:3
**produce** 22:16
**produced** 20:24
  97:11
**product** 102:17
  116:5 117:17
  128:7 144:4,4

147:2,3,8,9,11
**Production** 5:7
**products** 70:17
  123:7 134:16
  137:2
**profess** 179:2,4
**professional**
  1:18 71:12
  207:15
**proficiency**
  124:13
**program** 183:1
  184:20
**programs**
  136:23
**project** 145:22
**projects** 84:19
  89:19 114:17
**promoted** 121:7
  121:11
**promotion**
  121:23 122:3,4
**proper** 18:2
  75:24 128:2
  131:17 135:21
  147:15
**properly** 78:6
  108:16 113:23
**properties** 63:3
**property** 199:1
**prorated** 199:11
**prove** 32:11,14
  33:7 34:11
**provide** 21:5,10
  35:16 103:6,9
  114:23 130:6
  130:13 135:2
  135:20,22
  182:4,9,12
  206:14
**provided** 12:16
  14:13 21:22
  24:25 134:22
  134:23,24,25
  147:8 153:3

173:13 193:24
  199:17 202:4
**provider** 68:9
**provides** 123:5
  123:20
**providing**
  102:23 104:14
  105:8
**psychiatrist** 68:8
**psychologist**
  68:8
**Public** 1:19
**pulled** 58:3
**punitive** 204:5,9
  204:12,15
**purchase** 201:6
  201:8,11,12,13
**purchased** 198:5
  201:25
**purposes** 27:22
**pursuing** 184:10
**push** 58:8
**pushed** 120:10
**put** 11:21 17:16
  102:6,15 103:2
  132:7 133:16
  134:11 135:4,5
  135:23 146:5
  190:16

---

**Q**

**qualifications**
  157:12
**qualified** 41:17
  72:14 185:19
  185:22
**quarter** 205:12
  205:13
**question** 5:11
  7:9,11,14,16
  7:21,22,24
  23:4,11,25
  24:13 27:21
  30:1,2,14
  31:18 35:7,13

35:18 45:3
52:1 54:16
72:11 75:24
76:2 79:13
97:4 173:20
204:13
**questioning** 8:5
**questions** 6:9
8:21 9:5
149:16 152:4,7
205:24,25
**quick** 97:4
**quickly** 84:16
118:18 121:14
**quiet** 83:6
**quite** 99:25

**R**

**R** 207:1
**R-I-F** 18:6
**race** 15:7 17:1
18:14 37:24
41:9 71:22
72:2,19 75:6
77:22 79:16
160:5 162:10
163:9,10,17
167:20 168:12
**racist** 73:4,7
**raise** 7:4
**random** 145:18
**range** 77:8
123:21 129:22
**ranking** 80:18
**rate** 81:17
**rating** 80:18
81:6 84:8
148:4
**reach** 183:19
**reached** 51:9
161:17
**reaching** 123:24
**read** 12:23 13:9
24:2 31:6
123:13,16,18

123:19 124:12
**reading** 6:6
23:20 52:3
123:3
**real** 97:4
**realize** 56:5
**really** 69:14 71:9
71:11 73:7
93:5 98:9
109:4 113:10
119:3 120:11
121:5 128:10
136:16 139:11
139:13,15,18
139:24 140:3
189:22 205:2
**realm** 110:23
**realms** 107:14
**reason** 161:21
190:1
**recall** 29:4 52:10
77:5
**receipts** 199:13
201:24 202:1
**receive** 34:8
81:17 84:5
102:7 124:19
125:10 127:7
151:21 181:14
189:7,18,20
191:7,16
195:16
**received** 33:22
34:4 46:19
49:9 79:20
80:3 84:17
86:5 91:18
125:16 133:14
139:19 153:17
162:17,21
163:2 180:24
181:8,12,21
195:4,19
**receives** 200:13
**receiving** 12:19

154:10 195:24
**recess** 112:21
**recipients** 189:2
**Recognition**
136:20
**record** 7:4,20
27:22 82:23,25
128:9 143:17
**records** 10:10
34:21 52:4
59:8
**recruiter** 64:24
**red** 76:13
**redress** 58:23
**reduced** 47:7,10
48:4 50:2,18
51:9,21
**reduction** 9:8,16
17:9 18:5
41:14 42:4
47:9 53:11
54:19 150:2
151:19 153:17
156:25 158:15
**Reed** 1:14 2:9
**reference** 89:4
131:21
**referencing** 89:6
**referring** 19:17
29:11 42:7
139:6
**refinish** 201:11
**refinished** 201:9
201:14
**refund** 195:8
**refunds** 195:7
**regarding** 22:11
35:16 68:9
133:20 148:11
160:23 164:3
**region** 65:12
**Registered** 1:18
207:15
**regular** 129:16
129:19

**reimburse**
125:19 126:1
**reimbursed**
197:11,13
**reimbursements**
197:1
**related** 35:3 75:5
102:4 126:10
136:2
**relates** 41:13
**relating** 14:4
35:4 204:15
**Relations** 18:20
**relationship**
70:19,21 71:7
112:11 155:21
179:7
**relationships**
104:20
**relatively** 65:15
**release** 156:13
156:19
**relevant** 22:15
124:14
**rely** 35:13,24
**remainder**
137:11,12
**remained** 40:5
87:21
**remember** 105:1
121:6 139:1,4
139:8 167:17
**reminding**
179:20
**rent** 192:4
**repair** 118:2,22
**repaired** 58:15
**repairing** 130:24
**repeat** 23:25
30:1 31:14,18
44:16 55:6,6
68:17 204:10
**rephrase** 107:25
**replace** 34:10
118:22 119:17

**replaced** 174:8
**replacing** 131:4
**report** 10:14
54:11 57:9,22
75:20 175:22
**reported** 10:7,11
53:13
**reporter** 1:18
7:2,10 207:15
207:25
**represent** 6:18
**represented**
160:8
**representing**
161:16
**reproduction**
207:22
**request** 5:7 8:4
18:18 46:24
79:17 102:6
132:15,17
133:24 142:8
142:11
**requested** 47:2,6
**Requestnet**
127:5,6,7
**requests** 127:8,9
131:19 132:3,7
133:25 134:5,7
134:10,11
142:15
**requirements**
81:19
**requires** 123:22
**reserved** 6:9
**residences**
127:22,24
**residential**
129:17
**resolution**
123:21
**resolve** 91:4
111:19,22
114:3 128:1
**resolved** 108:17

resolving 84:15
resources 116:19
  157:4
respect 37:18,18
  71:12 75:9
  100:10 101:11
  102:2 105:8
respectfully
  18:18
Respond 131:19
respondents
  17:6,8,10,17
  18:1,9 19:16
  24:10 29:14,21
  30:10,20 31:25
  32:8 33:3 42:2
  42:4
respondents'
  18:5,13 19:13
  24:6
response 7:17
  143:8
responsibilities
  17:12 42:6
  79:1 93:14,22
  94:1 95:9
  101:10 105:8
  113:19 115:9
  117:3,8
responsibility
  93:15 94:17
  118:21 124:5
  140:7,12,17
responsible
  78:24 95:25
  98:2 113:2,8
  122:14 189:4
  190:15
rest 88:15,16
restate 24:5
restating 27:21
restrict 8:20
restroom 8:4
result 24:16 29:6
  68:3,24 130:1

186:22 192:15
results 86:19
retained 17:10
  41:17 42:5
  43:6,14 44:1,5
  44:9,14,25
  45:5,14,18
  72:14 168:15
  185:19,21
retaining 45:22
retaliated 38:8
  53:23
retaliation 15:9
  92:6
retire 75:18
retired 63:6,9
  169:5 195:11
  195:12,14
  196:4
retirement 63:20
  153:16,21,23
  154:1,3,17
  194:13 195:16
  195:17
retiring 73:8
  74:17 204:20
return 3:23 4:4
  4:6 46:6 47:10
  47:14,18 49:10
  49:14,20 50:13
  50:20 51:11,14
  51:19 183:2
  194:8 197:17
  199:18,23
  200:4 202:9,11
  202:16,17
  203:11,18
returned 46:9,11
  48:3 49:4
  52:14 88:8
  101:3,21
returning 49:19
returns 3:21
  193:22,23,24
  194:2 196:2

reuse 99:17
Reverend 187:5
  187:6,7,25
  188:10 192:18
review 85:3,24
  86:10 87:10,16
  87:18 137:5,19
  142:25 147:7
reviewing 83:3
rewarded
  188:24
rid 198:20
RIF 18:3,6,13
  19:13,18,24
  20:2 22:13,19
  23:18 24:6,15
  24:16 25:2,11
  25:14 29:6
  30:8 31:23
  36:5 37:1
  44:10 54:24
  73:15,20 162:8
  165:8 166:6,7
  166:13,14,21
  167:21 169:23
  173:19 174:18
  174:22,23
  175:20,21
  176:21,24
  177:1,4 193:3
RIFed 19:21
  20:10 23:6,12
  25:21,24 29:12
  36:4 73:23
  75:3 163:19
  164:15,16,23
  165:5,10,13,16
  165:19,23
  166:1,2 167:8
  167:19,20,23
right 8:17 9:1,2
  10:5,8,12 12:5
  13:14 14:5,6
  14:14 15:7,16
  15:19 16:3,4

16:10,13,18,21
  17:2,3,13,13
  17:18,23 19:2
  19:5 20:17
  22:13 23:20
  24:11,11 25:9
  25:21 28:18
  29:24 30:12
  31:5,11 32:10
  32:24 33:4,23
  34:1,14,19,22
  35:21 36:6,11
  36:23 38:22
  39:3,22,25
  40:8,11,17
  45:15 48:17
  49:4 52:18
  53:3,6 55:15
  55:18 57:7,15
  59:20 64:6
  68:20 69:18
  75:9 76:15,18
  76:25 77:5,12
  80:1,6,13,22
  81:6 83:17
  84:5 85:20,22
  86:6,7,8,13
  87:12 88:11,16
  89:2 90:20,24
  92:22,25 93:4
  93:8,11 97:2
  101:25 102:20
  102:23 108:21
  108:23 117:3,9
  117:19 118:13
  118:18 119:4
  120:19 121:13
  126:17 130:7
  130:22,25
  131:8 133:21
  135:17,19
  136:19 138:19
  140:5 141:9,19
  141:24 142:1
  143:2,5 144:13

144:23 150:18
  152:23 157:10
  157:11 160:11
  165:16 166:6
  167:17 168:16
  169:22 171:2
  173:14 174:24
  175:20,21
  177:18,19
  178:1 180:11
  180:14,15
  185:3 190:23
  190:24 191:1
  192:11 193:2,2
  193:25 195:3,8
  197:18 199:2
  199:18 200:8
  201:1,5,16
  202:5,24 203:3
  203:6,22 204:3
  206:2,13
right-hand 13:7
  13:18
rise 95:6
RN 184:25
Road 2:4
Robin 1:17
  207:15
role 87:21 92:25
  143:23 144:12
  144:13
rolled 195:21,22
room 149:6
rotator 56:10
Rothman 46:20
  55:24
run 89:1

_____
        S
_____
S 3:8 4:1
S-C-E-L-S-A
  42:11
sad 190:9
salary 200:16
  205:17

Salvation 197:21
197:22
Sara 2:9 6:18
sat 151:25
satisfaction
135:22
satisfactory
91:19
satisfied 89:8
91:7,12,15
saw 9:7 59:15
72:24 108:6
182:20
saying 31:20
47:25 78:14
143:15
says 12:23 13:8
14:1,6 15:5
16:24 17:2,5
18:24 19:1,12
24:11 29:10
30:12 32:5
33:18 34:5
83:9 85:12,15
85:19 86:6,8
86:10,11,18
87:22 88:18,18
97:23 115:13
120:23,25
122:11,12
123:4 124:8,15
127:4,11 128:1
128:17,19,21
129:2 131:11
131:14 133:3
133:23 134:21
136:3,20
138:13,24,25
141:23 143:1
144:24 146:4
147:1 194:10
194:11 195:11
198:1,6
sbegley@reed...
2:12

scale 95:5
105:18 111:5
147:5,11,14
148:3
Scelsa 42:8,12
42:25 43:2,10
44:1,5 72:8,10
178:15,16,17
185:25
schedule 47:8
48:4 50:2 57:7
scheduled
183:23
school 60:18,19
69:23 125:24
183:4 184:16
SCI 64:10
sealing 6:7
search 34:13
65:1,3,5
searched 34:11
searching 69:13
69:14
seat 73:17
second 13:2
14:25 15:19
17:5 31:17
40:15 42:1
80:19 87:18
105:4 127:2,4
142:24 202:21
section 14:4 85:8
85:10,11 87:16
108:21 109:2
121:22,25
128:19 131:12
134:19 135:19
137:5 142:24
security 114:3
114:11 115:1
194:11
see 50:5 102:7
126:7 128:24
129:4,5 131:12
134:18 142:16

153:1 156:5
200:9
seeing 126:15
seek 59:9
seeking 32:21
188:9
seen 56:3 69:25
96:6 97:18,19
selected 25:13
46:1 112:8
172:13
selection 111:21
123:23 162:7
self-executing
173:22
sell 99:14
selling 99:23
108:4
send 51:24
104:17 181:6
sends 132:25
seniority 171:2
173:1,6
sense 70:17
sent 181:5
sentence 13:3
19:11 24:5
29:10 31:9
42:2 86:18
147:1
separate 14:11
22:3
SEPTA 56:13
57:17,22,23
58:1,24
September
50:16 78:18
79:3 139:22,23
140:1,7,13
141:6,21
159:10,11
193:3,6 200:25
203:2,21
served 93:15
service 71:5 95:7

99:14 103:6,9
111:3 127:8,9
130:14,15
134:8 142:15
147:15 196:20
196:21
services 1:6
78:14 102:6,22
116:10 153:2
servicing 130:21
session 136:21
sessions 141:17
set 61:1 86:4
148:24 198:9
198:11
severance
156:14
shape 9:2 113:11
share 42:21
113:7
shared 79:18
94:2
sheet 34:4
sheets 19:2,5
shoes 197:23
198:15
short-term 50:8
50:21 51:12
52:17,21 53:3
shorter 135:10
135:13
shoulder 46:14
46:17 55:5,14
55:17,18 56:8
show 34:9
106:16
shows 147:12
sick 67:14
side 12:24 13:7
13:18 65:20,22
sign 13:5 156:18
signature 11:25
13:12,17 14:9
83:15
signatures 83:10

83:11
signed 12:20
14:8 29:17
30:16 35:10
37:12 38:16,20
38:20,24 39:2
39:10,21 80:5
80:9,11 156:12
significant 141:7
signing 6:6
Simplify 134:16
single 80:16
91:17 200:23
201:4
sisters 189:10,12
sit 8:20 29:3
140:9
site 95:3 130:8
130:10,13,14
sites 65:2,4
sitting 73:17
74:8
situation 65:16
87:2 131:3
six 52:7 142:3,6
six-month 199:8
200:25 203:5
skilled 66:2
skills 124:14
slim 69:7
small 66:16
123:4,19
smaller 105:18
Smith 1:14 2:9
Social 194:11
socket 56:9
soft 6:24
software 123:7
sole 41:12
solid 81:14
solutions 123:25
someplace 64:7
son 59:18 61:23
61:25 62:1
155:4,6,18

160:21,22
189:15 191:18
191:19,25
198:25
**son's** 199:1
**sorry** 23:23 24:1
37:5 53:25
63:17 64:16
74:4,7,8 77:25
101:5,7 103:20
105:6 108:18
121:18 129:8
143:13 152:10
156:20 166:10
177:22 178:17
188:3 204:10
**sort** 21:17
140:23
**sought** 18:8
19:15 24:9
29:13,20 30:9
30:19 31:24
32:7,14 33:2
**source** 64:14
65:19
**sources** 64:11
**SOW** 144:1,25
147:19
**space** 18:23 19:1
**spaces** 14:11
**span** 100:12
**speak** 7:1 49:19
51:23 149:5
183:5,7
**speaking** 132:12
**special** 106:23
109:10
**specialist** 50:8
94:10,12,13,14
95:10 101:3,20
102:12 103:1
105:21 106:6
107:3 109:25
110:19 116:4
117:9 120:25

122:1,12 124:5
**specialized**
107:2,12
**specific** 11:15
45:4 50:7
114:25 134:13
156:22 157:12
164:11
**specifically**
100:9 131:22
171:4
**speed** 99:10
117:15
**speeds** 99:15
**spell** 42:10 106:2
196:18
**spend** 60:14
106:8
**spiritual** 187:17
187:25 188:9
**spoke** 51:5 71:9
71:11 159:13
173:15
**spoken** 50:25
171:24 173:11
173:18
**spouse's** 195:11
**Square** 1:15 2:4
**SR** 102:7 138:5
142:3,7,8,10
142:16
**SRs** 102:5 127:8
142:19 143:4
145:21
**St** 60:20,21,23
60:24
**standards** 114:5
114:8
**start** 21:14 87:25
139:13 187:19
188:1 195:24
**started** 88:1
100:5 121:19
139:15,18,21
139:24 140:3

188:9 193:8
**state** 13:1 42:1
63:10,20 71:24
132:18 154:17
154:18 181:12
181:15
**stated** 51:18
**statement** 16:23
18:12,25 19:7
20:6 23:17,18
25:1,19 29:9
29:23,24,25
32:3,5,12,16
32:20 33:8
36:18,24 37:16
37:22 38:15,17
38:19 42:7
46:3,5 72:23
73:1 74:1
79:10 124:9
143:10 144:5
144:11 145:3
**statements** 14:2
14:17 41:24
77:6 135:2
**states** 1:1 12:25
137:7
**stating** 36:4
**station** 56:14
**stay** 149:10
**stenographic**
207:6
**step** 139:19
187:13
**stepped** 141:4
**Steve** 78:6,17
107:4,9
**Steve's** 78:7
**Steven** 74:8
173:10
**stipulated** 6:4
**STIPULATION**
6:2
**stop** 150:9,11
**store** 201:9

**story** 52:1
**straight** 117:11
**street** 1:15 2:4
2:10 62:19
132:14 190:19
**Streets** 66:22
**stressful** 190:7
192:21
**strike** 30:15
**stuff** 84:9 89:23
197:25 198:16
198:24 199:14
201:25
**subject** 14:3
17:8 18:4
31:23 42:3
44:10
**subjected** 30:8
**succeeding** 87:5
**success** 91:8
**successful** 92:18
141:14
**suffered** 58:14
68:3,23
**suffering** 68:11
68:16,19
**suggest** 193:10
**suggested** 111:9
**suing** 159:25
160:5
**suit** 186:15
**Suite** 1:15 2:5,10
**suits** 198:15
**summary** 85:16
137:7 143:1
**supervision** 8:7
207:24
**supervisor** 51:18
108:24 109:1
121:16,20
**supervisory**
87:20 108:6,12
**supplies** 103:14
**supply** 109:12
**supplying** 111:2

**support** 5:1 43:6
43:13 45:13,17
45:21,25 71:19
77:20 79:14
109:12 123:5
162:6
**supporting**
141:14
**supportive**
89:25 90:3
**supposed** 145:23
149:9 183:5
**sure** 8:24,25
24:2 31:19
43:3 44:17
52:1 78:3
81:23 84:4,22
97:5 108:15
112:19,19
113:23 114:22
114:23 122:9
129:10 147:14
186:5 190:7
**surgery** 46:13,19
55:21,21,23,25
57:15 59:6
**surprised** 78:12
167:22,25
168:1,5,8
**survey** 102:9
107:10 138:6
**surveys** 106:17
107:10 144:3
145:1,4,11,12
145:14,14
197:6,7
**Suzette** 1:4,13
3:4 6:12 16:24
85:15,16 86:1
87:19 88:19,22
88:25 137:8
143:11,22,25
**swear** 13:8 31:6
**swore** 16:20
**sworn** 6:13

**system** 127:15
128:5 132:19
132:21,24
157:2
**systems** 100:12
122:16 123:7

**T**

**T** 3:8 4:1 207:1,1
**take** 7:10 8:1,3,6
11:24 23:23
26:19 41:18
57:3,14 67:10
67:23 73:20
78:1,1 82:20
83:5 94:20
96:9,10 97:14
99:4 105:21
112:17 125:21
129:7,9 137:9
142:18 149:14
151:16 166:14
180:8 184:20
185:14 189:24
193:22,23
194:7 204:25
**taken** 1:14 27:6
28:14 68:13,18
100:22,25
112:21 207:6
**takes** 185:6
**talk** 46:12 50:5
59:12 79:20
107:17 149:24
151:3 159:8
160:25 167:5
169:20 170:13
175:15 183:23
183:25 192:18
**talked** 49:23
50:6,11 52:9
161:3,11
165:25 169:22
186:8,23 187:9
**talking** 74:2

86:25 129:13
167:7,10,18,19
167:21 171:13
173:19 183:11
184:2
**talks** 132:3
**tapped** 153:25
**tax** 3:21,23 4:4,6
193:22,23,24
194:2,8 196:1
196:6 199:18
199:23 200:4
202:9,11,16,17
203:11,17
**teach** 106:24
**teaching** 106:8
**team** 86:17,19
86:24 87:4
108:24 109:19
109:21 111:20
137:23 141:10
141:10,12,14
**team's** 87:1
143:2,5
**technical** 123:5
126:13
**technically**
119:5,6
**technicians**
116:23,24
**techniques**
123:23
**technologies**
98:20 104:24
113:6 115:22
115:23 116:2
117:13
**technology** 3:13
96:14 97:23
98:21,23,25
99:9,18,22
100:13 115:16
117:25 118:11
119:1 125:9
**telecommunic...**

94:24
**tell** 6:24 19:23
20:13 21:3,14
23:15 26:7,16
26:22 49:22
68:22 70:1
76:12,17 78:16
89:14 90:8
91:14 94:11,25
96:5 97:17,25
98:11,12 99:7
99:24 105:11
110:18 111:7
113:19 115:15
121:3,5 132:1
133:6,9 134:21
138:2 140:16
140:19 148:19
148:25 150:8
150:11,23
152:15 153:15
159:3,16,20
161:20 162:15
165:2,22
170:14 172:4
176:10 177:24
192:25 204:7
204:14
**telling** 39:15
128:6 137:12
143:16
**Temple** 125:3
**ten** 20:9 43:4
142:1 149:15
190:17
**tenure** 18:3
**terminated**
22:12 24:15
29:6 45:1
66:23 68:14
70:22 152:11
158:16 160:13
160:17 173:5
174:18 178:23
204:7

**terminating**
39:4
**termination** 9:9
10:1 40:20
41:13 53:8
55:12 60:2
68:4,24 150:16
157:21 158:9,9
160:24 161:4
162:8 164:4
169:7,9,11
172:2 173:24
174:12 175:2,5
177:18 178:7
178:11 180:14
180:15 186:22
204:16
**terminology**
110:17
**terms** 72:4 98:6
101:9 115:3,11
117:8 120:8
130:20 155:20
162:19 167:5
177:17
**territory** 78:25
96:2 105:14
118:5 129:15
142:21
**testified** 6:13
89:15 177:14
186:20
**testify** 6:21
**testimony** 7:12
93:17
**testing** 113:22
**thank** 21:11
28:1 33:17
48:2 96:24
143:18 206:3,4
**Thanks** 206:15
**therapy** 187:17
**thing** 21:1 119:3
130:18
**things** 7:1 21:21

58:2 84:11
100:14 103:14
107:18 114:13
116:7 117:4
148:18 187:14
188:2,12,13,20
192:17
**think** 7:7 8:24
56:23 59:1,3,9
66:19 81:2
95:13,15
108:19 110:5
114:19 129:5
146:12 163:14
165:9,12 180:1
181:5 185:8
186:1 187:11
**thinking** 74:16
77:25 105:5
**third** 15:4 84:25
163:14,15
**Thirty-four**
61:20,21 62:22
155:4
**Thirty-six** 62:11
153:20
**Thomas** 106:1
173:12,12
**thought** 70:20
75:24 92:18
172:19 173:3
**threatened** 37:8
40:24
**three** 1:15 14:11
30:3 42:16
43:10 72:4,7
72:15 74:14,15
123:13,18
126:9 128:13
158:14 164:15
166:1 185:18
185:23 198:21
202:24 203:4
**thrift** 197:22,22
201:8

| | | | | |
|---|---|---|---|---|
| **Thursday** 1:10 | 61:15 114:3 | 136:24 137:1 | 143:23 144:12 | 72:11 84:23 |
| 182:23 | 116:6 193:1 | 140:6,23,24 | **turn** 13:16 33:10 | 90:4 95:8 |
| **ticked** 114:20 | **tips** 194:10 | 141:16,18 | **turned** 59:4 | 114:22 172:13 |
| **till** 53:17,21 54:1 | 202:18 203:18 | 173:13 | 76:12 | 176:24 |
| 54:7 | **TLS** 135:6,13 | **transcript** 7:12 | **turnstile** 56:16 | **understanding** |
| **time** 6:10 7:3,3 | **today** 8:11,20 | 182:17 207:8 | 56:17,19 58:8 | 81:3,4 87:9 |
| 7:18,18 8:8,13 | 9:1 29:4 | 207:22 | 58:10 | 117:17 120:7 |
| 9:18,25 10:16 | 158:10 206:4 | **transition** 85:25 | **Twelve** 166:5 | 126:12 |
| 11:11,17 19:21 | **today's** 7:12 | 86:1,3,11,12 | **twice** 61:3,16 | **understood** 7:24 |
| 20:10 23:24 | 66:10 | 87:11,12,19 | 192:24,25 | 14:16 34:16 |
| 29:17 30:16 | **told** 48:25 49:18 | 89:6 94:15 | **two** 2:4 7:1,8 | 51:22 76:9 |
| 33:25 34:1 | 50:1 51:17,18 | 95:18 153:2 | 12:21 26:20 | 115:4 146:16 |
| 37:19,19 39:3 | 52:5,8 57:12 | **transitioned** | 55:11 67:10 | 150:15 166:14 |
| 40:4 46:23 | 58:5 69:2 | 94:5,9 140:2 | 77:10 97:6,21 | **unemployment** |
| 48:15 49:7 | 72:10 73:21 | **treated** 37:23 | 97:22 110:15 | 3:18 179:22 |
| 50:12 51:16 | 77:24 78:2,4 | 72:5,9,18,23 | 125:23 128:1 | 180:3,10,17,21 |
| 54:17 56:4 | 89:16 90:16 | 172:21,23 | 130:5 136:3,16 | 181:1,15 182:9 |
| 57:14 60:15 | 145:22 159:7 | 173:4 | 150:6 156:7,8 | 182:13 195:2,3 |
| 68:14 73:14 | 159:23 166:21 | **treating** 68:4 | 157:1 159:4 | **unfair** 54:8,12 |
| 78:1,1 80:13 | 166:23 182:10 | **treatment** | 172:7 178:20 | 92:15 |
| 83:22 84:20 | 193:11 205:21 | 162:16,20,21 | 180:13 185:9 | **unfairly** 172:21 |
| 86:2,17 96:10 | **tolls** 197:8 | 163:2 | 193:1 205:18 | 172:23 173:4 |
| 97:14 98:24 | **Tom** 81:10 | **trial** 6:10 | 205:22 | **unit** 44:14,17,20 |
| 99:4,17,24 | **Tony** 171:20 | **tried** 51:17 | **twofold** 105:10 | **UNITED** 1:1 |
| 101:10 106:7 | 186:1 | **true** 13:5,10 | **type** 12:19 65:8 | **university** 70:1 |
| 107:11 112:21 | **tools** 114:5 | 14:14 15:15 | 99:13,18 | 183:1 |
| 113:9 118:20 | **top** 14:21 18:23 | 16:12,21 20:7 | 129:15 130:17 | **unsworn** 14:4 |
| 119:24 121:8 | 20:17 26:7 | 23:17 29:23,24 | 132:15 162:9 | **unusual** 7:23 |
| 123:3 124:12 | 33:18 34:4 | 31:7,9 32:12 | 162:15,16 | **update** 128:5 |
| 125:13,16 | 120:23 122:12 | 33:8 38:17 | **typed** 12:14 | **updated** 51:24 |
| 126:15 129:7,9 | **torn** 56:10 | 85:22 152:22 | **types** 100:13 | **updates** 109:15 |
| 129:13 133:18 | **total** 120:8 168:3 | 193:15 199:18 | | **ups** 131:16 |
| 135:10,14,16 | 181:8 197:8 | 202:4 | **U** | **upset** 152:20,23 |
| 137:9 139:1 | 199:7 200:5 | **truthfully** 6:21 | **uh-huh** 15:8 | 172:12 191:20 |
| 140:9,10 | **Totally** 24:17 | **try** 143:20 | 17:22 52:13,16 | **use** 8:4 108:14 |
| 145:20 147:6 | **touch** 100:18,19 | 178:13 184:24 | 61:6 64:16 | 110:15,16 |
| 150:21 153:17 | 100:24 | **trying** 110:5 | 85:14 143:3,6 | 116:20 117:5 |
| 166:6,25 | **touching** 113:10 | 119:13 129:5 | 143:16 184:14 | **usually** 111:8 |
| 168:23 173:15 | **train** 140:8 | 131:6 132:22 | 195:9 | **utilities** 132:5,25 |
| 190:5,14,15 | **trained** 105:25 | 132:23 146:17 | **ultimately** 94:2 | 134:2 |
| 197:13 201:4 | 106:1 185:3 | 205:3 | **underneath** | **utilize** 144:24 |
| 201:23 203:1,5 | **training** 105:21 | **tuition** 125:19 | 136:18 | **utilizes** 144:1 |
| 203:5,23 | 105:24 109:9 | 126:2 185:10 | **understand** 7:14 | **utilizing** 113:8 |
| **timely** 114:24 | 110:24 136:3,3 | 185:13 | 14:2 23:5 | 154:8 |
| **times** 12:21 | 136:4,7,14,22 | **turf** 137:9,10 | 31:19 35:7,18 | |

**V**

**Valerie** 2:10
 123:18 126:6
**value** 191:22
 198:7 199:5,12
 203:3,22 204:2
**valued** 198:8
**various** 65:1,7
 69:6
**varying** 99:15
**vehicle** 197:1,4
 197:14
**vendors** 132:6,8
**verbal** 143:8
**verification**
 137:22,25
 141:24 143:1
 143:25 144:22
**verifications**
 138:1,4
**Verizon** 1:6,7
 6:18 11:5,8
 15:2 19:8 21:2
 31:25 36:14
 37:7,17 39:4
 41:16 46:23
 47:3,9,21
 48:12 53:22
 54:25 55:2
 57:10 60:1
 62:16 70:17
 71:17 82:15
 99:23 102:22
 125:12,15,18
 134:2,11 145:8
 153:11 154:11
 156:23 157:23
 157:24 158:10
 160:18,19
 161:1,4,12,12
 161:18,24
 168:19,24
 176:9 194:12
 195:12,14,17
 197:12,14

200:16 204:6,6
 205:14
**versus** 138:14,25
 141:24 142:3
 143:2,5
**videotape** 58:4
**Vine** 132:13
**visibly** 152:20
**voice** 6:25 7:4
 51:2
**volume** 146:7
 168:7
**volunteer** 60:16
 60:17 61:4,10
 193:14
**volunteering**
 193:9,19
**VON** 135:6,13
**vs** 1:5

**W**

**W** 2:3
**wages** 34:7,8
 181:8 194:10
 194:11 200:5
 202:18 203:18
**Wait** 159:12,12
**waived** 6:7
**walked** 149:3,4
 149:4,23
**Walker** 1:4,13
 3:4,10 4:3 6:12
 6:17 12:2,9
 16:24 23:21
 62:8,9 82:4,19
 82:21 83:5
 85:1 96:8,10
 96:16 97:15
 126:22 128:12
 137:4 151:13
 151:16 180:4,9
 183:15 194:3,7
 199:24 200:4
 202:12 203:12
 206:3

**want** 10:19
 12:25 20:4,5
 31:19 69:20
 77:19 78:3
 81:11 84:22
 113:7 123:12
 148:23 149:10
 177:23 186:5
 206:7,9
**wanted** 73:15
 137:16,17
 145:10 182:19
**wants** 114:23
**wasn't** 56:4 89:7
 115:2 118:10
 118:11,25
 139:11 168:13
 172:14 205:15
**watched** 37:17
**water** 41:21
**way** 27:20 57:20
 90:2 91:11
 92:14 113:11
 125:18
**WDC-095861**
 1:24
**we'll** 182:16
 206:10
**we're** 8:5 9:1,7
 31:16 33:15
 60:8 69:3 83:7
 179:20 183:10
 183:11 186:5
 202:7
**We've** 187:9
**website** 157:24
**Wednesday**
 184:4
**week** 11:8 38:21
 48:7,19 141:16
 172:7 183:6,24
 184:1,2
**weekly** 109:14
 109:16 120:12
**weeks** 8:15,16

51:10,21 52:7
 140:10 156:7,8
 205:18
**went** 28:18
 47:17 49:18
 55:24 106:17
 109:14 119:24
 121:15,21,25
 145:3 149:5
 192:24
**weren't** 44:10
 101:14,16
 121:10 189:11
**white** 45:14
 167:13 174:9
**witness** 3:3 5:4
 25:16 28:24
 31:14 32:19
 35:6 38:12
 72:22 77:17
 96:19,24
 170:11 204:19
 206:6,12
**witnesses** 161:25
**woman** 58:11
**wonderful** 95:15
**work** 21:1,23,24
 22:1 33:18,19
 34:12 46:6
 47:7,10 49:1,4
 50:13,18,19
 51:11 52:25
 53:6 59:7
 65:17 67:1
 69:20,21 78:5
 78:7,13,16,19
 79:6 89:17
 90:5,23 93:11
 93:13,16 99:6
 99:8,11 100:16
 101:17 102:3
 103:5,12,16
 104:15 106:16
 107:5,16 116:9
 116:12,14

117:1 124:3,16
 128:6,10 132:8
 132:20 133:1
 135:11 139:13
 139:16,20
 140:1,3,4,10
 140:12 145:3
 145:23 146:7
 147:7 150:5
 162:12,14,16
 168:4 169:14
 170:5 174:20
 178:20,21
 179:3,5 190:16
 196:21 205:4
**worked** 11:16
 17:6 23:16
 63:15 98:17
 103:8 104:13
 112:3,4 113:23
 133:17 141:12
 163:5,9,10
 164:9,10,19,20
 169:15,16,18
 179:6
**workflow** 127:12
**working** 49:6
 57:18 63:14
 65:16 66:24
 68:25 69:5
 70:20 73:9,11
 79:22 104:9
 150:9,12
 152:16 167:7
**works** 174:7
 178:4
**world** 117:22
**worth** 198:14
**worthwhile** 59:9
**wouldn't** 76:11
 184:24
**write** 206:10
**writing** 115:7
**wrong** 80:16
 157:6

wronged 58:20

**X**

**X** 3:1,8 4:1
**Xes** 115:20

**Y**

**Yeah** 55:7 68:18
   72:12 93:19
   108:25 123:15
   129:7 139:8
   143:20 180:23
**year** 10:17,18,23
   17:16,20 39:12
   40:9,16 42:21
   60:9 85:6,10
   85:18 87:9,15
   87:17 88:15,16
   92:24 108:18
   137:11,13
   139:13,14
   144:7,19
   166:15 194:17
   194:18 199:6
   200:13 203:1
**year-end** 82:9
   87:16 142:25
**years** 10:22 17:6
   26:20 43:2,4
   55:11 59:17
   62:11,22 69:1
   69:5 101:6
   125:21 126:10
   153:19,19,20
   164:15 165:5
   165:24 166:1,3
   169:1 176:21
   179:6 185:9
   187:17
**young** 65:15
**younger** 17:11
   41:18 42:5,13
   43:2,4 44:2,15
   45:19 72:15

**Z**

**Z** 114:21
**zero** 138:25
   139:2,3,7
**Zielinski's**
   104:19
**ZipRecruiter**
   65:7
**zone** 88:25

**0**

**0024** 96:8
**005** 85:1
**007** 3:12 82:4
**012** 128:12,17
**015** 137:5
**017** 3:16 126:22

**1**

**1** 3:11 11:22,25
   12:9,13,24,25
   13:17 14:20,25
   15:4,5 35:20
   85:12 87:17
   137:6 144:7
**1/6/59** 42:20
**1:43** 50:16
**10** 4:4 43:1
   202:8,12
**10.3** 141:24
**10/1/2013** 50:17
**10/4/2013** 51:11
**10/7/2013** 51:20
**100** 52:6
**11** 4:6 5:9 203:9
   203:12,17
**11/20** 198:21
**11:00** 190:17
**11:21** 1:17
**111** 138:16,17
**12** 3:11 51:10,21
   156:16 166:4
   167:5,9
**12,000** 203:4
**12.7** 143:2
**126** 3:16

**128** 2:5
**13** 45:7
**136** 138:15,18
**14** 95:21
**14,638** 195:3
**14,898** 181:20
**15** 5:10 95:21
   101:2 134:7
**15-4031** 1:4
**15,000** 199:7
**150** 69:1
**151** 3:17
**15PA** 134:10
**15th** 183:21,22
**166** 139:10
**17** 50:16
**1717** 1:15 2:10
**18** 14:4 182:23
   185:9,9
**18.2** 141:24
**180** 3:18
**182** 5:10
**183** 3:20
**19** 35:10 39:11
**19020** 2:5
**19103** 2:11
**194** 3:21
**199** 3:23
**1996** 100:8,10,11
   100:17,20,24
   101:5,6 124:24
**1st** 56:25 57:1,4
   57:11 58:14,21

**2**

**2** 3:12 13:17,18
   24:6 33:11
   42:2 81:25
   82:5,8 85:6
   194:23
**2/24/2014** 83:11
**2:59** 206:18
**20** 108:2,3
   110:21 168:25
**2000** 101:6,13

108:9
**2006** 125:11
**2008** 9:22,25
   53:8,10,17,21
   54:1,7,18,23
   79:24 80:7,17
   121:3,20 188:7
**2009** 187:23,24
   188:8,9
**2010** 108:10,19
   108:20 109:1,3
   121:10,21
**2012** 4:6 10:8,11
   87:19,25 122:5
   203:11,17
**2013** 3:12 4:4
   37:9 38:9
   46:12,13 50:16
   55:4,9 57:2,3,4
   65:24,25 66:10
   82:3,10 83:8
   87:21 92:9,14
   98:7 113:2
   202:9,11,16
**2013/2014** 98:24
**2014** 3:16,23
   17:21 78:18,18
   79:3,25 80:1,7
   80:17 82:22
   89:12 92:1,24
   92:25 94:5,7,8
   95:20,22,22,23
   98:7 100:23,25
   101:1,13
   112:15 113:3
   120:3 126:18
   126:21 129:12
   140:1,13 141:6
   143:23 144:7
   144:12,15
   146:14 148:4
   148:11 166:8,9
   199:20,23
   200:3,15 203:2
**2015** 3:21 9:10

11:1,5 15:21
   16:6,15,17
   34:1 35:11
   39:11 53:9,13
   53:17,21 54:1
   54:7,18 60:7
   66:23,24
   100:21 101:2
   101:19 121:3
   146:14 148:20
   151:19 157:9
   157:10 158:10
   159:11 161:2,7
   166:11 177:7
   193:4,6 194:2
   194:8,9,21
   195:25 196:1
**2016** 1:10 60:9
   159:10,13,14
   159:17 182:24
   207:7
**202** 4:4
**203** 4:6
**21** 5:9
**215-639-0801**
   2:6
**215-851-8100**
   2:11
**22** 11:5 53:9
   60:6,7,7
   150:16 157:10
   166:22 194:21
**223** 139:10
**22nd** 157:22
**23** 9:10 53:12,17
   53:21 54:1,7
   54:18,23 60:2
   148:20 151:18
   157:9 158:9
   161:2,7 166:24
**23rd** 160:13
**24** 92:1 97:23
**25** 1:10 43:2
   97:8 110:21
   142:3,5 143:4

SUZETTE WALKER - 8/25/2016

233

146:13 207:7
**253** 205:11,13
**26** 55:4,7,8 57:4
  58:15 97:9,11
**27** 97:11
**2748** 62:19
**28** 11:1 34:3

---
**3**
---

**3** 3:13 33:10
  85:8,11 96:7
  96:16 112:25
  115:13 120:22
  120:22 122:10
  122:11 137:5
**3,500** 199:6
**3,600** 198:22
**3,697** 194:24
**3,985** 198:6
**30** 17:6 85:12
  133:24,25
  134:5 137:6
  153:19
**300** 154:21
  205:7
**31** 87:17 144:8
**3100** 1:16 2:10
**3137** 138:22
**314** 154:15
  205:8,9
**31st** 184:5
**3331** 2:4
**34** 155:2,3
**350** 154:15
**36** 155:2
**37** 69:5 153:20
**3875** 203:6
**3895** 203:5
**3995** 203:5
**3rd** 133:24,25

---
**4**
---

**4** 3:16 33:12
  85:10 87:16
  126:19,23

127:3 142:24
**4,000** 198:8,13
  198:18 200:17
  201:1,3,5,12
  201:17 202:23
  203:4,23 204:3
**4,331** 202:20
**4,371** 200:11
**40** 18:7 19:14,25
  20:3 22:25
  23:14,19 24:8
  25:3,13 26:17
  26:18 27:4
  28:9 29:12
  30:8 32:6 33:2
  42:15 176:5,7
**401K** 64:4,5,15
  64:18 185:15
  205:1
**42** 26:16
**4292** 203:19
**45** 103:4
**4904** 14:4

---
**5**
---

**5** 3:17 151:10,13
  151:17
**5/19/15** 12:21
  13:14,21 30:17
  39:21
**5/19/2015** 38:20
**5/21/2016** 40:9
**5/22/15** 38:22
**5/23/2015** 10:2
**5/24/15** 180:11
**5/31/16** 40:16
**50** 118:6,7
  119:10,12
  134:8
**500** 198:3
  203:25
**51,000** 194:11
**53** 194:19
**53,904** 194:12,15
**57** 42:22 143:5

---
**6**
---

**6** 3:4,18 142:19
  180:1,4,9
**6,500** 195:8
**6/20/16** 39:13
**6/20/2016** 40:6
**6/6/2015** 198:4
**6503** 138:22
**69,271** 156:14

---
**7**
---

**7** 3:20 183:12,15
**7/14/2015**
  198:12
**7T** 121:1

---
**8**
---

**8** 3:21 138:3
  194:3,8
**8.4** 143:2
**8/18/16** 3:20
  183:14
**82** 3:12
**84,339** 203:19
**87,888** 200:5
**87,951** 202:19

---
**9**
---

**9** 3:23 10:11
  199:24
**9/17/13** 51:7
**9/18/2013** 51:16
**900** 163:9,10,17
**96** 3:13 100:25
  124:21,23
**97** 138:25
**98,478** 181:9

# Exhibit C

| Effective Date | Job Title Held | Base Salary | Supervisor/Manager | Work Location |
|---|---|---|---|---|
| 5/23/2015 | Engineering III Specialist; Network Engineering & Operations | $93,560 | Brian Magee | 900 Race Street, Philadelphia, PA |
| 3/29/2015 | Engineering III Specialist; Network Engineering & Operations | $90,834 | Brian Magee | 900 Race Street, Philadelphia, PA |
| 6/23/2013 | Engineering III Specialist; Network Engineering & Operations | $90,834 | Brian Magee | 900 Race Street, Philadelphia, PA |
| 6/7/2013 | Specialist; Network Engineering | $90,834 | Brian Magee | 900 Race Street, Philadelphia, PA |
| 3/3/2013 | Specialist; Network Engineering | $86,349 | Brian Magee | 900 Race Street, Philadelphia, PA |
| 12/9/2012 | Specialist; Network Engineering | $86,349 | Brian Magee | 900 Race Street, Philadelphia, PA |
| 4/1/2012 | Section Manager; Network Engineering | $86,349 | Brian Magee | 900 Race Street, Philadelphia, PA |
| 12/9/2012 | Section Manager; Network Engineering | $86,349 | Patricia McCoach | 900 Race Street, Philadelphia, PA |
| 2/12/2012 | Section Manager; Network Engineering | $86,349 | Brian Magee | 900 Race Street, Philadelphia, PA |
| 11/13/2011 | Section Manager; Network Engineering | $82,349 | Brian Magee | 900 Race Street, Philadelphia, PA |
| 2/13/2011 | Section Manager; Network Engineering | $77,688 | Brian Magee | 900 Race Street, Philadelphia, PA |
| 12/26/2010 | Section Manager; Network Engineering | $77,688 | Brian Magee | 900 Race Street, Philadelphia, PA |
| 3/21/2010 | Supervisor; Network Engineering | $77,688 | Brian Magee | 900 Race Street, Philadelphia, PA |
| 2/14/2010 | Supervisor; Network Engineering | $74,700 | Brian Magee | 900 Race Street, Philadelphia, PA |
| 2/15/2009 | Supervisor; Network Engineering | $71,700 | Brian Magee | 900 Race Street, Philadelphia, PA |
| 2/17/2008 | Supervisor; Network Engineering | $68,500 | Brian Magee | 900 Race Street, Philadelphia, PA |
| 12/16/2007 | Supervisor; Network Engineering | $68,500 | Joseph Snyder | 900 Race Street, Philadelphia, PA |
| 2/18/2007 | Network Engineer - Network Engineering | $66,200 | Brian Koniers | 900 Race Street, Philadelphia, PA |
| 3/5/2006 | Network Engineer - Network Engineering | $64,300 | Brian Koniers | 900 Race Street, Philadelphia, PA |
| 6/3/2005 | Network Engineer - Network Engineering | $63,300 | Brian Koniers | 900 Race Street, Philadelphia, PA |
| 12/19/2004 | Network Engineer - Network Engineering | $63,300 | Brian Koniers | 900 Race Street, Philadelphia, PA |
| 8/1/2004 | Assignment Technician | $57,524 | Brian Koniers | 900 Race Street, Philadelphia, PA |
| 2/29/2004 | Assignment Technician | $56,402 | Brian Magee | 900 Race Street, Philadelphia, PA |
| 10/19/2003 | Assignment Technician | $56,402 | Brian Koniers | 900 Race Street, Philadelphia, PA |
| 3/8/2002 | Assignment Technician | $53,713.80 | Brian Koniers | 900 Race Street, Philadelphia, PA |
| 3/8/2001 | Assignment Technician | $52,147.80 | Brian Koniers | 900 Race Street, Philadelphia, PA |
| 3/3/2000 | Assignment Technician | $50,138.10 | Brian Koniers | 900 Race Street, Philadelphia, PA |

CONFIDENTIAL
Def_Walker_106

# Exhibit D

6.    **Identify any documents made or kept by Plaintiff from the commencement of her employment with Defendants to the present, including but not limited to, any notes, diaries, calendars or any other written material which in any way relates to: (a) Defendants' actions as alleged in any part of the Amended Complaint; (b) any conversations with employees or former employees of Defendants concerning the allegations of the Amended Complaint; and (c) any alleged unlawful conduct you experienced as a result of employment with Defendants.**

Plaintiff objects to this Interrogatory to the extent that it is ambiguous, vague, overbroad and/or not limited in temporal scope. Plaintiff was employed with Defendant for over 35 years, and much of that information has no bearing or relation to the issues in this suit. Without waiver and subject to said objections, Plaintiff refers Defendants to documents bates stamped P104 through P142 for responsive information.

7.    **Identify all facts that support your claim that Plaintiff was discriminated against based on her race.**

Plaintiff objects to this Interrogatory to the extent that it is calls for Plaintiff to make a legal conclusion. Without waiver and subject to said objection, Plaintiff states that including but not limited to the following facts support her claim that she was discriminated against based on her race:

Plaintiff worked at a location with approximately six other individuals who were non-black employees and were not selected for this reduction in force ("RIF") [Anthony Portolese, Joseph Hui, Steven Murphy, Thomas Hodge, Maria Cesare and David Perry]; In or about May/June 2014, Defendant brought in a Caucasian individual, David Perry, to perform the same/similar job responsibilities as Plaintiff; Plaintiff had more experience within the engineering department than any of the other six individuals, Plaintiff had more seniority of anyone within her department and had been with the engineering department for at least thirty years. If Defendants allege that performance was a criterion used to assess individuals for the RIF, this would not result in Plaintiff's selection for same. In or about 2014, Defendants' management found Plaintiff to be performing at a level of sustained performance meeting objectives, requirements and expectations and periodically exceeding them, she received a 3% raise and a significant bonus. Plaintiff also had no discipline that would have impacted her ability to remain with the company; however, Steven Murphy was admonished for poor performance and actually had some of his job responsibilities removed which were provided to Plaintiff and another employee in or about the Fall 2014, but was still retained over Plaintiff. Joe Scelsa/Anthony Padovani both holding the same title as Plaintiff, were dressed down for performance based reasons, yet they retained their positions.

Further, Plaintiff was subject to various forms of mistreatment selectively based on race. For example, Defendants' management kept a watchful eye over Plaintiff's lunch breaks and working time whereas various white department peers would leave the workplace freely and take well over normal break periods without any type of scrutiny. At or about the time Plaintiff was

6

# Exhibit E

Condensed Transcript
Testimony of:

BRIAN MAGEE

Date: June 30, 2016

Suzette Walker v. Verizon Services Corporation, et al.

No.:  USDC E.D.PA 15-4031

R&K Reporting Inc.
Court Reporting Services
P.O. Box 1372
Levittown, Pennsylvania 19058
Phone: 215-946-7009
email:  rkreporting@gmail.com

# BRIAN MAGEE

Pages 1 to 4

## Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2       .
 3
   SUZETTE WALKER        :  CIVIL ACTION
 4        Plaintiff,     :
                         :  NO. 15-4031
 5     v.                :
                         :
 6  VERIZON SERVICES     :
    CORPORATION          :
 7      and             :
    VERIZON PENNSYLVANIA, INC. :
 8        Defendants.    :
 9
10          Bensalem, Pennsylvania
11          June 30, 2016
12
13          Pretrial examination of BRIAN MAGEE,
14  taken on behalf of the Plaintiff at the Law
15  Offices of Karpf, Karpf & Cerutti, 3331 Street
16  Road, Bensalem, Pennsylvania, on the above
17  date, commencing at 12:13 p.m., before Linda A.
18  Ricciardi, Certified Court Reporter.
19
20
21
22          R&K REPORTING
            Court Reporting Services
23          PO Box 1372
            Levittown, Pennsylvania  19058-1372
24  Phone: 215-946-7009   Fax: 215-949-1867
```

## Page 2

```
 1  APPEARANCES:
 2    KARPF, KARPF & CERUTTI, P.C.
         BY:  CHRISTINE E. BURKE, ESQUIRE
 3            3331 Street Road
              Two Greenwood Square, Suite 128
 4            Bensalem, Pennsylvania 19020
              215-639-0801
 5            cburke@karpf-law.com
         -- Counsel for Plaintiff
 6
 7
 8    REED SMITH, LLP
         BY:  JOEL S. BARRAS, ESQUIRE
 9            2500 One Liberty Place
              Philadelphia, Pennsylvania 19103
10            215-851-8100
              jbarras@reedsmith.com
11       -- Counsel for Defendant
12
13
14
15
16
17
18
19
20
21
22
23
24
```

## Page 3

```
 1              I N D E X
 2  WITNESS                              PAGE
 3  BRIAN MAGEE
 4     By Ms. Burke                        4
 5
 6
 7
 8          E X H I B I T S
 9  MARKED    DESCRIPTION                 PAGE
10  Verizon-1  Bates stamp Def Walker 106   9
11  Verizon-2  Employee rating form        13
12  Verizon-3  Rate and sank scoring criteria  17
13  Verizon-4  Organization list           28
14  Verizon-5  2013 Performance review     42
15  Verizon-6  2014 Performance review     42
16  Verizon-7  Letter dated 5/16/13        49
17  Verizon-8  Claim activity              52
18  Verizon-9  Claim activity              56
19  Verizon-10 Doctor's note               57
20  Verizon-11 Claim activity              59
21  Verizon-12 Verification               137
22  Verizon-13 Defendant's Responses to   137
              Plaintiff's Interrogatories
23
24
```

## Page 4

```
 1          E X H I B I T S
 2  MARKED    DESCRIPTION                 PAGE
 3  Verizon-14 Bates stamp VZ Walker 755-813  146
 4  Verizon-15 Short term incentive plan   159
 5  Verizon-16 Bates stamp Def Walker 28-48  160
 6  Verizon-17 Corporate technology and    169
              network functional
 7            capabilities
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

BRIAN MAGEE

Page 5

1      (It is stipulated and agreed by
2  and between counsel for the respective parties
3  that the reading, signing, sealing,
4  certification and filing of the within
5  deposition be waived; and that all objections,
6  except as to the form of the question, be
7  reserved until the time of trial.)
8      -----
9      BRIAN MAGEE, after having
10  been first duly sworn, was examined and
11  testified as follows:
12      -----
13      EXAMINATION
14      -----
15  BY MS. BURKE:
16  Q.   I know I introduced myself off the
17  record, but just to put everything on record.
18  Again, my name is Christine Burke and I
19  represent Suzette Walker in a civil lawsuit
20  that she has brought against Verizon, her
21  former employer, and I am here to take your
22  deposition today.
23      For instruction purposes, have you ever
24  been deposed before?

Page 6

1  A.   One other time, 15, 20 years ago.
2  Q.   Was it in connection with your
3  employment at Verizon?
4  A.   No.
5  Q.   For a personal nature?
6  A.   Uh-huh, yes.
7  Q.   So that is the first instruction I will
8  give you, because it is important.  No matter
9  what your response is, just make sure that you
10  keep it verbal.  If you say uh-huh to me during
11  the course of the deposition, I know what you
12  are saying, but then when your attorney and I
13  read the dep at a later date we may argue over
14  what your response was, okay?
15  A.   Okay.
16  Q.   So no matter what, just make sure that
17  you verbalize any responses.  Even though we
18  are sitting here in a conference room setting,
19  do you understand the deposition is under oath
20  and this is a formal court proceeding?
21  A.   Yes, I do.
22  Q.   Is there any reason today at all that
23  you believe you may not be able to give
24  truthful and accurate testimony to the best of

Page 7

1  your recollection?
2  A.   No.
3  Q.   I say the best of your recollection,
4  because the purpose of the deposition is not to
5  trick you.  If the answer to your question is
6  that you don't know because you never did know,
7  then you can tell me that you don't know the
8  answer, okay, but if you can't remember
9  something, you can also tell me you can't
10  remember.  I don't want you to guess or
11  speculate about things that you have no
12  knowledge of, okay?
13  A.   Okay.
14  Q.   And I am sure your counsel will agree
15  with me.  Your counsel is entitled to and is
16  probably going to make objections during the
17  course of the deposition.  If you hear him make
18  an objection, then you just stop testifying at
19  that point because our court reporter can only
20  type down what one person is saying at one
21  time.  That way he can say why he takes issue
22  with my question and then he and I will work it
23  out.  Most likely you will be able to answer
24  all my questions, but for some reason he may

Page 8

1  not want you to answer a question, okay?
2  A.   Okay.
3  Q.   If you don't understand one of my
4  questions, it is confusing to you, you are not
5  sure what it is that I am asking, you would
6  like me to repeat it or clarify, I would like
7  you to let me know that you don't know what it
8  is that I am asking or you don't understand,
9  okay?
10  A.   Okay.
11  Q.   If you need, unfortunately your dep may
12  be a little longer than normal witness
13  depositions because of all the documents, but
14  if you need a break at some point then just let
15  me know that, and you can take a break at any
16  time.  If you need to take a phone call or
17  whatever the case may be, but if I ask a
18  particular question, I ask that you answer that
19  before you leave the room, okay?
20  A.   Okay.
21  Q.   Other than any communications that you
22  may have had with your counsel, did you
23  personally do anything to prepare for the
24  deposition today?

Page 9

1    A.    I reviewed just some, you know, what I,
2    the performance reviews from the last two
3    years.
4    Q.    For who?
5    A.    Suzette Walker.
6    Q.    When you say the last two years, are
7    you referring to her 2014 and 2013 review?
8    A.    Yes.
9    Q.    You are currently employed with
10   Verizon, correct?
11   A.    Correct.
12   Q.    Is your title right now manager of
13   engineering?
14   A.    Yes.
15   Q.    How long have you held that title?
16   A.    Since 2002.
17         (Whereupon Bates stamp Def Walker
18         106 was marked for identification as
19         Verizon-1.)
20   BY MS. BURKE:
21   Q.    Mr. Magee, our court reporter just
22   handed you what we marked Verizon-1. For your
23   reference if you look at the bottom right-hand
24   corner of this document, any document that I

Page 10

1    hand you today is going to have a Bates stamp
2    number on it, this one just for the record is
3    DEF Walker 106. So if you hear me refer to a
4    Bates stamp number to help you with these
5    documents that is what I will be talking about.
6    First of all, do you recognize this document?
7    A.    I have never seen this document before.
8    Q.    It is a document that was produced by
9    your counsel which appears to reflect various
10   job titles held by Suzette Walker since 2000.
11   So just take a moment to take a look at the job
12   titles, the identify of her salary,
13   supervisor/manager and her work location and
14   let me know when you are ready?
15   A.    Okay, I am ready.
16   Q.    So if you look at this document, it
17   indicates that you have been a supervisor or
18   manager of Ms. Walker beginning in or about
19   February of 2008. Do you see that?
20   A.    Yes, I do.
21   Q.    Do you believe that is accurate?
22   A.    I would say probably the December
23   because the name next to December is a
24   director.

Page 11

1    Q.    Joseph Snyder?
2    A.    Snyder. Supervisor, could be a
3    vacancy, but, yeah, I see where it says
4    February.
5    Q.    So do you believe sometime in either
6    early 2008 or late 2007 would be a fair
7    estimate of when you began supervising Suzette
8    Walker?
9    A.    Yes.
10   Q.    At any point prior to that time did you
11   have any supervisory responsibilities over Ms.
12   Walker?
13   A.    No.
14   Q.    For the entire period of time that you
15   have supervised her was she working out of the
16   900 Race Street location?
17   A.    Yes.
18   Q.    Now, during the course of discovery we
19   have been provided with two performance
20   evaluations for Ms. Walker, including her 2013
21   and 2014. Additional ones are forthcoming, but
22   since you started supervising Ms. Walker do you
23   believe you have been preparing formal
24   evaluations for her?

Page 12

1    A.    Yes.
2    Q.    Now, if you look at the entry for
3    December of 2012 there is a supervisor manager
4    listing there as Patricia McCoach. Do you see
5    that?
6    A.    Yes.
7    Q.    Do you know why that individual, if at
8    all, supervised Ms. Walker for that period of
9    time?
10   A.    I don't recall.
11   Q.    Was there a period of time at some
12   point in late 2012 that you did not oversee or
13   supervise Ms. Walker?
14   A.    According to this, yes.
15   Q.    Do you have any independent
16   recollection of that?
17   A.    I do not.
18   Q.    During the course of time that Ms.
19   Walker transitioned from supervisor network
20   engineering to section manager how did the
21   nature of her job responsibilities change?
22   A.    I don't think it changed.
23   Q.    Is it just a change in title only?
24   A.    I believe it is a title only change.

BRIAN MAGEE

Page 13

1    Q.    When she transitioned to specialist
2  network engineering did the nature and function
3  of her job duties change?
4    A.    Yes.
5    Q.    How did they change?
6    A.    She would no longer have been in charge
7  of associates, she wouldn't have been in a
8  supervisor role, she would have been in a
9  direct responsibility role.
10    Q.    When she changed title to Engineering
11  III Specialist how did the nature and function
12  of her job duties change, if at all?
13    A.    The specialist to the Engineer III was
14  just a title change.
15         (Whereupon employee rating form was
16         marked for identification as
17         Verizon-2.)
18  BY MS. BURKE:
19    Q.    Mr. Magee, you can keep Verizon-1 in
20  front of you now because I will ask you a
21  question about it after you had an opportunity
22  to look at something in this packet, but you
23  have just been provided with Verizon-2, which
24  is a list of rate and rank employees under your

Page 14

1  direct supervision.  Take a moment to look at
2  this document, including just the first four
3  pages for now.  First of all, do you recognize
4  those first four pages?
5    A.    I saw this for the first time yesterday
6  at the counsel's office.
7    Q.    Having the opportunity to take a look
8  at it right now, the first four pages, do you
9  believe it reflects the names of various
10  employees that are under your direct
11  supervision?
12    A.    Yes.
13    Q.    Including additional information about
14  their performance, right?
15    A.    Yes.
16    Q.    If you look at the last two pages of
17  this document, first let me know if you
18  recognize those final two pages?
19    A.    Yes, I do.
20    Q.    Did you see this for the first time
21  yesterday as well?
22    A.    No.
23    Q.    When was the first time that you saw
24  this document?

Page 15

1    A.    I completed portions of this document
2  during the, what we call the RIF period,
3  evaluating, you know, the employees.
4    Q.    Was it in this same format that we see
5  here or were you completing it in a different
6  format?
7    A.    I had the table, I would say.
8    Q.    Did the table have the same categories
9  that we see here including name, job title,
10  band, all the way through whether they were
11  going to be impacted or remained employed?
12    A.    I don't recall the final column.
13    Q.    The final column?
14    A.    Yeah, I don't recall that.
15    Q.    When you say you were inputting the
16  information, were you inputting the numerical
17  scores for performance based categories?
18    A.    The performance one, I guess.  Which
19  columns are you referring to?
20    Q.    Any of these numbers.  So let's just
21  use Scott Panichelli as an example.  The
22  numbers 3 all the way through the total score,
23  did you input those numerical scores?
24    A.    I did not input all of them.

Page 16

1    Q.    Which ones were you responsible for
2  inputting?
3    A.    The third, fourth, fifth, sixth,
4  seventh and eighth of the numbered sequence.
5         MR. BARRAS:  Can we just read off
6         the titles so there is no confusion?
7         MS. BURKE:  Yeah.
8  BY MS. BURKE:
9    Q.    So is it fair to say that respecting
10  the 2014 and 2015 performance entry, does that
11  number directly correlate with the score that
12  they received on their formal performance
13  evaluation?
14    A.    The 2014 and the 2015?
15    Q.    Yes.
16    A.    What I would say is yes, that is how I
17  see the correlation.
18         MR. BARRAS:  Can we first clarify
19         which columns --
20         MS. BURKE:  Yes.
21         MR. BARRAS:  -- he filled out?
22  BY MS. BURKE:
23    Q.    First of all, before we do that, your
24  understanding of 2014 PERF and 2015 PERF, that

R&K REPORTING, INC.

BRIAN MAGEE

Page 17

1  those categories reflect numbers which would be
2  obtained from their performance evaluation,
3  whether they were leading, performing or
4  developing?
5  A.    Yes.
6  Q.    Can we mark this?
7        (Whereupon rate and rank scoring
8        criteria was marked for identification
9        as Verizon-3.)
10  BY MS. BURKE:
11  Q.    Mr. Magee, if you take a look at is,
12  Verizon-3.
13        MR. BARRAS:  I'm sorry, you asked
14        him earlier which columns he filled
15        out, he answered the columns 3 through
16        8.  Can we identify what column is 3
17        and what column is 8?
18        MS. BURKE:  That is fine, I was
19        going to go back to it and go through
20        each column at a time, but.
21  BY MS. BURKE:
22  Q.    Your counsel wants clarification.  Out
23  of these columns starting with 2014 PERF and
24  underneath, and right now we are just using

Page 18

1  Scott Panichelli as an example.  Did you input
2  that number there?
3  A.    Repeat what you said.
4  Q.    Just using Scott Panichelli as an
5  example, where it says 2014 PERF, did you input
6  that 3 there?
7  A.    Not directly.
8  Q.    What about 2015 PERF?
9  A.    Not directly.
10  Q.    Primary skill?
11  A.    Yes.
12  Q.    Technical knowledge?
13  A.    Yes.
14  Q.    And Credo?
15  A.    Yes.
16  Q.    Others?
17  A.    Yes.
18  Q.    And corrective action?
19  A.    I don't recall filling that in.  There
20  is all zeros in it.
21  Q.    That just reflects whether or not they
22  had any on their file, right?
23  A.    Right.  It might have been automated,
24  HR might have, I don't recall that line now

Page 19

1  that I am looking at, and the totals would be
2  added up of all.
3  Q.    Did you do that, total them?
4  A.    No, I think the system did it.
5  Q.    Looking at the categories where it says
6  2014 and 2015 PERF for performance, I handed
7  you Verizon-3, can you take a look at Verizon-3
8  and let me know if you recognize that document?
9  A.    Yes, I have seen this before.
10  Q.    Now, this says performance rating 2013
11  and performance rating 2014.  Is those the two
12  years that you used to assess formal
13  performance reviews for the RIF?
14  A.    Yes.
15  Q.    If someone was leaving would you have
16  placed a 5 in the category next to that
17  person's name for that particular year?
18  A.    Yes.
19  Q.    If you look at the second page, it is
20  the last page of Exhibit 2, you see Paul
21  Klauss?
22  A.    Yes.
23  Q.    He was one of the few people that got a
24  5, right?

Page 20

1  A.    Yes.
2  Q.    Five reflects that he received a score
3  of leading on his performance evaluation,
4  correct?
5  A.    Yes.
6  Q.    Now, even though this category, and we
7  are looking at the document Bates stamp DEF
8  Walker 22, are you still with me on that page?
9  A.    Yes.
10  Q.    This says 2014 PERF and 2015 PERF.  Do
11  you believe that is accurate, that that is
12  where those scores came from?
13        MR. BARRAS:  Object just on the
14        basis that he testified he did not
15        complete these columns.  You can
16        answer.
17  BY MS. BURKE:
18  Q.    Do you believe that is accurate?
19  A.    I guess -- no, in what it is doing, no.
20  Q.    You would agree with me that in
21  assessing these particular employees and
22  gauging their performance you went based off of
23  annual year 2013 and 2014?
24  A.    Yes.  And I guess just the way I am

BRIAN MAGEE

Page 21

1  looking at this, because we do the performance
2  appraisals for 2013, we complete them in 2014,
3  and we complete the 2014 complete in 2015.
4  **Q.    Right, but just so the record is clear.**
5  A.    For the calendar year 2013 and 2014 is
6  what I used.
7  **Q.    Because at or about the time that Ms.**
8  **Walker was RIF'd in or about April of 2015 she**
9  **had not had her performance assessed for 2015**
10 **in any formal way, correct?**
11 A.    Correct.
12 **Q.    The only evaluations that you reviewed**
13 **before coming here were for calendar year 2013**
14 **and 2014, right?**
15 A.    Performance reviews, yes, 2013 and
16 2014.
17 **Q.    The reason why I gave you Verizon-2 in**
18 **the first instance I wanted to seek**
19 **clarification on something.  In the last two**
20 **pages of this document, are you still on Bates**
21 **stamp 22?**
22 A.    Yes, I am.
23 **Q.    Where it identifies job entry date, do**
24 **you see that?**

Page 22

1  A.    Yes.
2  **Q.    Do you know what that reflects?**
3  A.    No.
4  **Q.    The first exhibit that I gave you,**
5  **Verizon-1, the spreadsheet that I gave you, the**
6  **first one, if you look there and you check on**
7  **the 12/9/12 date that is identified for Ms.**
8  **Walker, was there some type of change or**
9  **department or anything that transpired in**
10 **December 2012 that you are aware?**
11 A.    That would have been when she was
12 changed from being a supervisor to a
13 specialist, which now is called engineer.  So
14 following this that is what I would see.
15 **Q.    Some of the job entry dates, which are**
16 **more recent than Ms. Walker's, and I will just**
17 **use David Perry as an example, if you go to the**
18 **last page of Verizon Exhibit 2, the packet.**
19 **You see David Perry's entry date, May 25, 2014?**
20 A.    Yes.
21 **Q.    Do you know what that reflects?**
22 A.    He also changed from a supervisor to an
23 engineer.
24 **Q.    Had he been under your supervision**

Page 23

1  before May of 2014?
2  A.    No.
3  **Q.    See Anthony Portolese?**
4  A.    Yes.
5  **Q.    Job entry date April 2014?**
6  A.    Yes.
7  **Q.    Do you know what that reflects?**
8  A.    It must have been when Anthony came
9  back to engineering.
10 **Q.    Where did he come from?**
11 A.    He was a supervisor.
12 **Q.    In the engineering department or**
13 **elsewhere?**
14 A.    No, elsewhere.
15 **Q.    At a different location than 900 Race**
16 **Street?**
17 A.    Yes.
18 **Q.    Was he under your direct supervision**
19 **immediately preceding 4/27/14?**
20 A.    No.
21 **Q.    Can you just take a moment to look at**
22 **your group of individuals and tell me if anyone**
23 **else besides David Perry or Anthony Portolese**
24 **was not under your supervision before their job**

Page 24

1  entry date?  Do you want me to go through them
2  with you one by one?
3  A.    Sure, if you like.  I'm sorry, I am
4  just thinking of Anthony, the 4/27, he did
5  change from a supervisor to an engineer that
6  date, that is just something that is not
7  striking me right with that April date.
8  **Q.    You don't believe that is an accurate**
9  **reflection of his job entry date under your**
10 **supervision at the 900 Race Street location?**
11 A.    Correct.
12 **Q.    Was there something else you were going**
13 **to say?**
14 A.    No, that date just kind of stuck in my
15 head.  The month doesn't look right.
16 **Q.    What month would you believe would be**
17 **more accurate?**
18 A.    I thought he came earlier in that year.
19 **Q.    Looking at the other individuals in the**
20 **list, let's look at the first page, Scott**
21 **Panichelli, do you see his job entry date of**
22 **March 4, 2012?**
23 A.    Yes.
24 **Q.    Was he under your supervision prior to**

BRIAN MAGEE

Page 25

1  that?
2  A.    Directly before, no.
3  Q.    Do you have any knowledge or
4  understanding of what the job entry date
5  reflects for Scott Panichelli?
6  A.    These dates don't reflect when they
7  were assigned to me.
8  Q.    Do you have any idea what they reflect?
9  A.    When their title seems like, yeah, I am
10 not finding a good correlation because I am
11 just looking at different ones.  Like Joe Hui,
12 Steve Murphy, I can't tell you what that job
13 entry date was referring to, sorry.
14 Q.    Was there some type of transition of
15 job duties for your engineers in your
16 department in or about 2013 because of Fios or
17 high band.
18 A.    No.  I don't understand the question.
19 Q.    Was there a reason why any of your
20 engineers changed from supervisors to
21 specialists?
22 A.    There was movement, all movement of
23 people associated with a downsizing, a RIF,
24 that I can see.

Page 26

1  Q.    So when Ms. Walker changed from a
2  supervisor to a specialist, at least based on
3  Verizon-1, that occurred sometime in 2012.  Do
4  you know why that happened?
5  A.    I think it was a consolidation of
6  functions, and she was a supervisor, I think
7  there wasn't enough people for her to
8  supervise.
9  Q.    So instead of supervising various
10 individuals did she take on the task they were
11 performing herself?
12 A.    No, she became an engineer with a
13 separate responsibility from supervision.
14 Q.    In reviewing all of the performance
15 evaluations can we call it your team, is that
16 fair?
17 A.    Yes.
18 Q.    For your team, for 2013 and 2014, I
19 noticed that the FAC verification and the SR
20 numbers only appear in the 2014 evaluations.
21 Do you know why that is?
22 A.    It could have been availability of a
23 report that came out then.
24 Q.    Were those numbers being monitored in

Page 27

1  2013?
2  A.    Yes.
3  Q.    Before we move on to the RIF, so as the
4  manager of engineering you are responsible for
5  a team of engineers?
6  A.    Yes.
7  Q.    How long has that been true for?
8  A.    Since approximately 2002.
9  Q.    What job function did you have with
10 Verizon immediately preceding 2002?
11 A.    I was a supervisor of drafters.
12 Q.    Were you promoted?
13 A.    Yes.
14 Q.    The 15 individuals identified as being
15 on your team, at least as of the time that they
16 were rated and ranked for the RIF that occurred
17 in or about April of 2015, has that number of
18 individuals on your team remained fairly
19 consistent since you were promoted to manager
20 of engineering?
21 A.    Since 2002?
22 Q.    Yeah.
23 A.    No.
24 Q.    How has that changed, did your team

Page 28

1  grow over the years?
2  A.    There has been a lot of changes to my
3  team, grew, responsibility increased, and I
4  would get additional people with that
5  responsibility.
6  Q.    Is it Joseph Muccilo, is that how you
7  say it?
8  A.    Muccilo.
9  Q.    He is your direct supervisor, correct?
10 A.    He is my director, yes.
11 Q.    Has he been your supervisor since in or
12 about 2002?
13 A.    No.
14 Q.    Or were you reporting to someone else?
15 A.    I reported to three other directors.
16 Q.    In the interim?
17 A.    Yes.
18 Q.    When did you start reporting to Joe?
19 A.    Approximately two years ago.
20        (Whereupon organization list was
21        marked for identification as
22        Verizon-4.)
23 BY MS. BURKE:
24 Q.    Mr. Magee, I am handing you what has

R&K REPORTING, INC.

Phone: 215-946-7009                    email: rkreporting@gmail.com

BRIAN MAGEE

Page 29

1    been marked Verizon Exhibit 4.  First of all,
2    take a look at this, let me know if you
3    recognize it?
4    A.    Yes.
5    Q.    What is this?
6    A.    This is a form that I created just to
7    share responsibilities of my team and their
8    contact numbers.
9    Q.    You have team members both in Delaware
10   and in Pennsylvania, correct?
11   A.    Yes.
12   Q.    Do you have anyone in Maryland?
13   A.    No.
14   Q.    Is it fair your team members are
15   assigned various territories?
16   A.    Yes, we call them turf.
17   Q.    Using Suzette Walker as an example, who
18   is at the bottom of the second page of this
19   document, do you know when she was assigned her
20   particular turf?
21   A.    At the beginning of 2014.
22   Q.    Were all turf assignments made
23   beginning of 2014?
24   A.    No.

Page 30

1    Q.    How did it come to be that Suzette
2    Walker obtained these particular turfs
3    beginning 2014?
4    A.    Moved her from one position to another.
5    Her responsibility changed and assigned her a
6    turf.
7    Q.    What position was she moved from and
8    to?
9    A.    She worked in the conduit department.
10   Q.    She moved from the conduit department
11   to a different?
12   A.    To a turf position.
13   Q.    Whether she was working in conduit or
14   then moved to turf, was she still considered an
15   engineering specialist at that point?
16   A.    Yes.
17   Q.    Could you describe for me what her job
18   responsibilities generally were while she was
19   working in the conduit position?
20   A.    The conduit highway, so the
21   responsibility is to, I guess, deploy, repair,
22   answer any requests for use of our underground
23   conduit.  Conduit is used to -- has a medium
24   for our cables to go in.  So if you need to get

Page 31

1    a cable from 5th Street to 6th Street I would
2    utilize the conduit.
3          So any construction that is happening
4    could interfere with our conduit, so you would
5    have to answer that request, respond to
6    requests either for growth of conduit, repair
7    of conduit or move of conduit.  It also entails
8    the leasing of our conduit to third party
9    providers.
10   Q.    You said leasing, right?
11   A.    Yes.
12   Q.    Do you know how long she worked in the
13   position handling conduit responsibilities?
14   A.    A little over a year.
15   Q.    So maybe late 2012 she started in that
16   role?
17   A.    I believe so.
18   Q.    If you look at Verizon-1.  Even though
19   it only reflects when titles change, if you
20   look at 12/9/2012, does that seem about right
21   when she started to take on the conduit role?
22   A.    Yes.
23   Q.    Then you identified that sometime
24   beginning in 2014 you moved her so she had a

Page 32

1    turf, right?
2    A.    Correct.
3    Q.    Before I move off of her job duties
4    respecting conduits, was she handling
5    residential customers, commercial customers or
6    both?
7    A.    In which role?
8    Q.    Conduit.
9    A.    Both.
10   Q.    So if a homeowner had an issue and
11   there was damage to a line or something, they
12   might make a call?
13   A.    It could, but that wasn't the norm.  It
14   would be more conduit pathway to feed a block
15   or feed, you know, a business.
16   Q.    Did she actually have to leave the
17   office to make site visits when she was working
18   in the conduit role?
19   A.    That would be a responsibility, yes.
20   Q.    Did she have the ability to work with
21   any contractors to also go out to these sites
22   and handle any of the functions associated with
23   her conduit role?
24   A.    Yes.

R&K REPORTING, INC.

BRIAN MAGEE

Page 33

1    Q.     Were they employed by Verizon or were
2    they independent contractors?
3    A.     They work for a, usually a payroll
4    company.
5    Q.     Do you call them contractors?
6    A.     Yes.  If it is on site it would be an
7    on-site contractor.
8    Q.     Are you familiar with employees that
9    have the title drafters or vocational
10   employees?
11   A.     Yes.
12   Q.     Did Ms. Walker use those types of
13   employees to assist her when she performed
14   conduit job functions?
15   A.     She could.
16   Q.     Did the position of drafters or
17   vocational employees, did they start to get
18   eliminated slowly?
19   A.     They were eliminated just by offer,
20   they wouldn't be -- new drafters weren't being
21   created, so attrition.
22   Q.     Are you familiar with the term
23   assignment technicians?
24   A.     Yes.

Page 34

1    Q.     Was Ms. Walker dealing with assignment
2    technicians while she was handling conduit
3    responsibilities?
4    A.     I don't see any need for conduit
5    position interact with assignment technician.
6    Q.     What about when she transitioned to
7    turf?
8    A.     You could interact with assignment
9    technician, but she was not over top of an
10   assignment technician.
11   Q.     What were the assignment technicians
12   utilized for?
13   A.     Primary function of assignment
14   technician was to work in our assignment
15   systems with the copper network to assign
16   customer addresses to term roles and facilities
17   so that service orders, customer service orders
18   could flow through.
19   Q.     So did they work within the office?
20   A.     They are primary office workers.
21   Q.     I am just using this as an example,
22   Jerry Rogers was he a contractor that Ms.
23   Walker worked with?
24   A.     He was an off-site contractor.

Page 35

1    Q.     What is the difference between an off
2    site and an on-site contractor?
3    A.     On site works usually for a payroll
4    company and is in the office using our
5    computers, interacting directly with the other
6    Verizon employees.
7           Off site is rarely, if ever, in an
8    office, a Verizon office.  They receive their
9    work via their employer, who the engineer sends
10   work to their employer and their employer
11   assigns the person to do the work.
12   Q.     So would Ms. Walker have worked with
13   Jerry Rogers, for example, when she was doing
14   conduit job duties or is that more so once she
15   was assigned a turf?
16   A.     She shouldn't really when she was the
17   conduit, like there would be no reason.  Jerry
18   Rogers should have been interacting with the
19   engineer.  The engineer would interact with
20   Suzette in the conduit position, but in the
21   engineer role she would be assigning work to a
22   company, and Jerry Rogers could be the person
23   who did that work and then would feed work back
24   to Suzette.

Page 36

1    Q.     It would be handled on Verizon's end?
2    A.     Correct.
3    Q.     Do you know the name of the company
4    that he worked for?
5    A.     The company that he worked for now is
6    called Cyneint.
7    Q.     How do you spell that?
8    A.     C-Y-N, I think it is E-I-N-T.
9    Q.     Oh Cyneint?
10   A.     Yes.  But they have changed names.  I
11   don't know what their name was in the '13, '14
12   year.
13   Q.     Who is handling Ms. Walker's turf now
14   that she is no longer employed with Verizon?
15   A.     Split between two people.
16   Q.     Who is handling it?
17   A.     Anthony Portolese handles Baldwin and
18   Poplar COs and Joe Scelsa handles the Chestnut
19   Hill, Davenport, Germantown and Ivy Ridge and
20   Waverly COs.
21   Q.     How do you determine how that turf
22   would be split up between those two
23   individuals?
24   A.     I look at, you know, what it entails,

Page 37

1  what it can handle, I make the decision based
2  upon what I know of the areas.
3  **Q.    Once you gave Mr. Portolese Baldwin and**
4  **Poplar, did he continue to perform conduit**
5  **highway work?**
6  A.    Yes, he did.
7  **Q.    So is he doing both?**
8  A.    Yes.
9  **Q.    Is Joe still handling the entire turf**
10  **from Ardmore to Glenolden?**
11  A.    He is handling besides the Philadelphia
12  offices he is handling Ardmore and Bala Cynwyd.
13  **Q.    Who obtained Kirkland down to**
14  **Glenolden?**
15  A.    I split those between Paul Klauss and
16  Ernie Padovani.
17  **Q.    Which ones did Paul Klauss get?**
18  A.    Larchmont, and the others were all in
19  Delaware County, so they all went to Ernie
20  Padovani who now has, covers Delaware County.
21  **Q.    Are Talleyville and Holly Oak in**
22  **Delaware County?**
23  A.    No, they are Delaware.  This front one
24  doesn't match the same date from the back one.

Page 38

1  **Q.    Oh, okay.**
2  A.    The COs, in the front, from in July of
3  2014 if we are looking at that, that is now how
4  the other COs are in July 2014.
5  **Q.    When you use the term CO, what do you**
6  **mean?**
7  A.    Each one of those names equates to a
8  central office at Verizon.  Central office is
9  where our switch is.
10  **Q.    So if we look at page 1, which appears**
11  **to have a date of January 2014, do you know**
12  **when Ms. Walker obtained a turf, since you said**
13  **it was the beginning of 2014, did she not get**
14  **her turf until July?**
15  A.    No, she would have gotten her turf in
16  the beginning of 2014.
17  **Q.    Do you maintain monthly lists similar**
18  **to what is contained in exhibit Verizon-4?**
19  A.    I make a change when something -- when
20  there is a change to the person or the turf.
21  **Q.    So do you have a current one then that**
22  **would reflect, for example, that Portolese's**
23  **handling Baldwin and Poplar now?**
24  A.    Yes.

Page 39

1  **Q.    You described for me what Ms. Walker's**
2  **job responsibilities were when she was handling**
3  **conduit job duties, do you recall that**
4  **testimony?**
5  A.    Yes.
6  **Q.    Then we talked about how she was**
7  **assigned a turf in early 2014.  Can you explain**
8  **what the nature of her job functions were once**
9  **she was assigned a turf?**
10  A.    Yes.  She was responsible in the turf
11  for all residential and business requests for
12  service, whether it be new service or requests
13  for changes to our, you know, facilities, and
14  all customer interactions.
15  **Q.    For that turf?**
16  A.    For that turf.
17  **Q.    Did each turf correlate with some**
18  **larger clients like SEPTA or the City of**
19  **Philadelphia or did everybody have a hand in**
20  **those clients?**
21  A.    Some, there is only one international
22  airport in Philadelphia, so that is only in one
23  person's turf.
24  **Q.    Give me an example, who has that, what**

Page 40

1  turf is that?
2  A.    In 2014 Steve Murphy.  So SEPTA is in
3  numerous turfs, they have offices, City of
4  Philadelphia has numerous offices across, so.
5  **Q.    So every day the number of inquiries**
6  **that you get from perspective clients changes**
7  **or current or existing clients changes, right?**
8  A.    I don't understand your question, I am
9  sorry.
10  **Q.    If someone wants something installed do**
11  **you call it a work order?**
12  A.    A work order would equate.  It is not
13  just -- so a work order would be when the
14  engineer needs construction to do work.  We
15  write a work order and that is how they perform
16  the work, construction or contract services.
17  **Q.    How are these engineers responsible for**
18  **implementing a design?**
19  A.    They would take in the information of
20  what the request is, they would gather the
21  information, reviewing records, field survey,
22  customer interaction, our record systems, and
23  then devise the answer to whatever the request
24  was.

BRIAN MAGEE

Page 41

1  Q.    The job responsibilities that you
2  identified that Ms. Walker was responsible for
3  when she was assigned a turf, did that remain
4  consistent throughout the duration of her
5  employment?
6  A.    Yes.
7  Q.    So from the time that she was assigned
8  a turf in early 2014 to when her position was
9  eliminated her job duties were fairly
10  consistent?
11  A.    Yes.
12  Q.    In terms of what she was responsible
13  for?
14  A.    Yes.
15  Q.    In order to take on the
16  responsibilities assigned with handling a turf,
17  was there any kind of required training or were
18  they supposed to have a working base knowledge
19  in order to do that, was it assumed?
20  A.    There would be -- training would be any
21  system, there would be on-the-job training with
22  assistance.  When we role out a new system we
23  usually have an online training system of it,
24  you know, everyone logs into the account and

Page 42

1  watches an instructor do it.
2       We have vendors that come in with new
3  equipment, explain the equipment, we have a
4  knowledge on the web that any material you can
5  search onto, you know, to learn about the
6  network.
7  Q.    Just so I understand, when she was
8  assigned a turf, it wasn't as though she was in
9  some kind of initial training introductory
10  period, she just received training as it was
11  necessary or available on the job?
12  A.    Correct.
13  Q.    Was that the same with respect to
14  anybody who was assigned a turf on your team?
15  A.    Yes.
16       (Whereupon 2013 and 2014
17  performance reviews were marked for
18  identification as Verizon-5 and 6.)
19  BY MS. BURKE:
20  Q.    Mr. Magee, let's look at the 2013
21  performance evaluation first, okay, we have
22  marked as Verizon-5, and also the 2014 one we
23  marked Verizon-6.  Are these the evaluations
24  you reviewed today before coming here?

Page 43

1  A.    Yes.
2  Q.    This format, how long has Verizon been
3  implementing or issuing these types of
4  evaluations to employees, has it been the same
5  format since you took your promotion in 2002 or
6  is this?
7  A.    Very similar format.  The systems have
8  changed and went from like paper based to
9  electronic.  Fairly similar.
10  Q.    Before we get into her evaluations, so
11  I am going to get into these with you because
12  they are the only ones that I currently have,
13  but I didn't see any actual corrective action
14  notices or discipline in any of the documents
15  provided for Ms. Walker.  Did you ever issue
16  her any kind of corrective action notices or
17  discipline?
18  A.    No.
19  Q.    Was it because you didn't think they
20  were warranted or no basis to issue discipline?
21  A.    No basis to issue discipline.
22  Q.    If, in fact, an employee is suffering
23  from a performance standpoint, does Verizon
24  have any tools that it may utilize, its

Page 44

1  supervisors I mean, to coach employees
2  including performance improvement plan,
3  anything of that sort?
4  A.    Yes.
5  Q.    Is it called a performance improvement
6  plan or do you call it something else?
7  A.    Performance improvement plan to the
8  best of my knowledge is what it is still
9  called.
10  Q.    Have you ever had the opportunity to
11  utilize that tool at Verizon?
12  A.    I have not.
13  Q.    How did you know about it then?
14  A.    Through our HR training.
15  Q.    Other than using the actual performance
16  review to give feedback to your team what other
17  method or manner do you give feedback to your
18  team members regarding their performance,
19  whether it is positive or negative?
20  A.    Usually one-on-one interaction.
21  Q.    Verbal coaching?
22  A.    Verbal.
23  Q.    If it is not the time of year that an
24  actual formal performance evaluation is to be

BRIAN MAGEE

Page 45

1 completed and you need to document the
2 performance in some way, how do you do that?
3 A.    I don't.
4 Q.    Do you keep any files on your team
5 members, personal notes of your own to log any
6 concerns that you have, anything?
7 A.    No.
8 Q.    So other than the typewritten
9 information that is actually contained in their
10 performance evaluations do you personally
11 create any other documents at all that would
12 memorialize how they are doing or any concerns
13 that you have?
14 A.    I don't create any, no.
15 Q.    Are you aware of anyone else at Verizon
16 who does?
17 A.    I am not.
18 Q.    Before you issue your performance
19 evaluations to your team members does Mr.
20 Muccilo review them or do you have authority to
21 do that without him?
22 A.    Before they are reviewed I have the
23 freedom to do that.
24 Q.    Do you, in fact, review the performance

Page 46

1 evaluations with Mr. Muccilo before you give
2 them to your team members?
3 A.    No.
4 Q.    Have you ever?
5 A.    No.
6 Q.    I am assuming there is a method where
7 you can go into the computer and type in the
8 comments that you think is appropriate for each
9 individual's performance review?
10 A.    Yes.
11 Q.    The last page of Verizon-5, which is
12 Ms. Walker's 2013 evaluation issued to her as
13 you suggested earlier, it is first part of the
14 next year, this leading, performing, developing
15 and new, do you know how long that system had
16 been in place or that you had utilized it for
17 your team?
18 A.    I think it has always been there from
19 the first time I did one, I think it has always
20 been those ratings.
21 Q.    So from in or about the first time you
22 started conducting performance evaluations?
23 A.    Or received one. I think I just
24 remember those always being there.

Page 47

1 Q.    I have seen the reviews that you issued
2 for your team, at least from 2013 to 2015, you
3 don't give out leading very often, is that
4 fair?
5 A.    That's fair.
6 Q.    Only when you believe they are truly
7 warranted?
8 A.    Yes.
9 Q.    Prior to issuing a developing to Ms.
10 Walker for this 2013 evaluation had you ever
11 given her a developing rating before?
12 A.    No.
13 Q.    This was the first time?
14 A.    Yes.
15 Q.    So if you look at the last page, these
16 are electronic signatures, right?
17 A.    Yes.
18 Q.    They are both dated on the same day, is
19 that at or about the time that you actually
20 reviewed it with the employee?
21 A.    Yes.
22 Q.    So if you look at this review, you gave
23 it to her in early February of 2014, correct?
24 A.    Correct.

Page 48

1 Q.    So that looking backwards for the
2 entire year of her performance for calendar
3 year 2013?
4 A.    Yes.
5 Q.    That is the way that it works. Do you
6 recall how many months Ms. Walker was out of
7 work for a medical leave in 2013?
8 A.    I don't know exactly, no.
9 Q.    Do you remember if she had some kind of
10 shoulder injury of some sort?
11 A.    She did tell me she had a shoulder
12 injury. That is not something we would
13 typically know. She told me in passing one
14 day.
15 Q.    Before or after she had the surgery?
16 A.    I am not sure if that was before or
17 after.
18 Q.    I can get out documents if you want.
19 Do you have any reason to disagree that she had
20 her surgery on or about April 26, 2013?
21 A.    I don't have any reason to doubt.
22 Q.    A request for medical leave, whether
23 they are covered by FMLA or short term
24 disability, that is through a third party with

R&K REPORTING, INC.

BRIAN MAGEE

Page 49

1    Verizon; is that correct?
2    A.    Yes.
3    Q.    Do you believe that to be MetLife?
4    A.    Yes.
5    Q.    What type of notification or
6    communication, if any, do you receive from
7    MetLife in connection with employees' requests
8    for approvals or denials of leave?
9    A.    Usually we will get an email saying
10   this person has been approved for leave, and it
11   gives the start and the end date.
12   Q.    I just want to establish some dates
13   here since we are looking at 2013.
14        (Whereupon letter dated May 16,
15        2013 was marked for identification as
16        Verizon-7.)
17   BY MS. BURKE:
18   Q.    Mr. Magee, these are MetLife letters
19   regarding requests for leaves that just reflect
20   dates in terms of her request.  So if you look
21   at the first letter, it is dated May 16, 2013,
22   but if you look in the first paragraph it
23   identifies the leave beginning date is April
24   26, 2013, and that she has been approved

Page 50

1    through June of 2013.  Do you see that?
2    A.    Yes.
3    Q.    Did you receive some kind of
4    notification that she, in fact, been approved
5    for leave through that period of time?
6    A.    I am sure I did, I don't recall.
7    Q.    Who, if anyone, was assigned to handle
8    her conduit responsibilities while she was out
9    of work from April through in or about June?
10   A.    The contractor.  There was a contractor
11   on site with her during that period, and he
12   would have just assumed the whole
13   responsibility.
14   Q.    What site are you referring to?
15   A.    900 Race Street.
16   Q.    Oh, one of the on-site contractors?
17   A.    Yes.
18   Q.    So when you say assumed her conduit
19   responsibility, for any number of calls that
20   came in for a particular territory?
21   A.    For the City of Philadelphia.  Her
22   responsibility in conduit would be City of
23   Philadelphia.
24   Q.    Do you remember who the on-site

Page 51

1    contractor was that soaked up those
2    responsibilities while she was out on leave?
3    A.    Gerry Slattery.
4    Q.    The whole time?
5    A.    I believe so.
6    Q.    Is he paid through payroll company?
7    A.    Yes.
8    Q.    Then if you look at the next notice.
9    A.    Gerry Slattery is no longer alive.
10   Q.    Oh, okay, thank you.
11   A.    Just in case, we tried to reach out to
12   him.
13   Q.    If you look at the second letter in
14   exhibit Verizon-7, it is dated June 6, 2013.
15   It looks like she made an additional leave
16   request which was approved to extend beyond the
17   June 9th initial date, which was June 10th
18   through July of 2013.  Do you see that?
19   A.    Yes.
20   Q.    Do you recall that she continued to
21   remain out of work through July of 2013?
22   A.    I have no reason to doubt that.
23   Q.    Then at some point thereafter what kind
24   of discussion, if any, was there about her

Page 52

1    returning to work with some kind of modified
2    work hours?
3    A.    None that I know of.
4    Q.    Did you speak with any MetLife
5    representatives by phone for any reason during
6    the time that Ms. Walker was seeking leave from
7    Verizon in 2013?
8    A.    No.
9    Q.    No, or you don't recall?
10   A.    No, I had no conversation.  The only
11   conversation that I would have had is they call
12   in to verify the person returned to work, so it
13   could have been, you know, that is normally the
14   only call I have with MetLife.
15   Q.    Do you remember a woman named Kimberly
16   Astorga?
17   A.    No.
18        (Whereupon claim activity was
19        marked for identification as
20        Verizon-8.)
21   BY MS. BURKE:
22   Q.    The claims record from MetLife.
23   Meaning every single contact they had with
24   either Verizon or Ms. Walker or her position

BRIAN MAGEE

Page 53

1  are logged into a system.  I don't expect you
2  to be familiar with this document, but if you
3  are you can let me know.  Do you recognize this
4  document?
5  A.    No.
6  Q.    So it is a series of claims notes, and
7  I only printed the pertinent ones for any
8  questions I have with you, but if you look
9  there is claim number, meaning which leave
10  request this relates to, and this is for one
11  particular claim in 2013.
12  A.    Okay.
13  Q.    Now, there is a comment section in
14  here, that will identify dates and who it is
15  completed by.  If you look at the entry on the
16  bottom of this first page, you and I a moment
17  ago were looking at a June 6, 2013 letter about
18  her approval through July.  Do you remember
19  that letter we were just looking at?
20  A.    Yes.
21  Q.    Here it says, in the subject comments
22  area, sent decision notice to ER, that means
23  employer, and ICM letter to EE, meaning
24  employee.  Do you see that?

Page 54

1  A.    Yes.
2  Q.    Here in the comment area decision
3  notification for Suzette Walker, and it gives
4  the claim number from Kimberly Astorga, and it
5  says to, if you turn to the next page, it has
6  your name there and then Joseph Snyder.  He was
7  the director at the time, correct?
8  A.    Yes.
9  Q.    So do you believe that that would
10  reflect that you, in fact, received the
11  decision letter?
12      MR. BARRAS:  Objection.  You can
13      answer.
14      THE WITNESS:  I would assume, yes,
15      I did.
16  BY MS. BURKE:
17  Q.    These letters that you and I were
18  looking at a moment ago, do you receive copies
19  of these?
20  A.    I believe it is all emails, so I am
21  sure I got the email.
22  Q.    Did it have an attachment to the email?
23  A.    I really -- when I get the MetLife, it
24  is not -- I have no control, it is out of my

Page 55

1  universe, I mean, so I look at it, I don't pay
2  particular attention to it.
3  Q.    No, I am not suggesting you have any
4  control over FMLA leave, you don't approve or
5  deny, correct?
6  A.    Correct.
7  Q.    MetLife says it is either approved or
8  denied, this is needed or that is needed, is
9  that fair?
10  A.    Yes.
11  Q.    They keep you in the loop, right?
12  A.    Yes.
13  Q.    They send you something via email, that
14  is your testimony?
15  A.    Yes.
16  Q.    What is it you are saying, you don't
17  pay too much attention to, is that fair?
18  A.    I look at the dates, I give it a
19  review, but I don't recall particular emails on
20  this matter.
21  Q.    As we sit here today do you still get
22  emails if, in fact, an employee is approved or
23  denied for FMLA?
24  A.    I don't think FMLA, like I believe I

Page 56

1  get an email still from MetLife saying that
2  person is approved from this date to this date
3  and then, you know, return because I just had
4  someone who is out, and I think I got just an
5  email, I think that is all I got.
6  Q.    So do you believe Joe Snyder might have
7  been the director in early 2013?
8  A.    Yes.
9      (Whereupon claim activity was
10      marked for identification as
11      Verizon-9.)
12  BY MS. BURKE:
13  Q.    This is another part of the claims
14  notes but for a different date.  If you go down
15  all the way at the bottom, July 16 3:38 p.m.
16  entry.  Do you see that?
17  A.    Yes.
18  Q.    In the subject comments area Ms.
19  Astorga puts ER, employer, confirmed EE
20  returned to work on Monday, 7/15/2013 working.
21  Comment, five hours per day, spoke with Brian.
22  Do you see that?
23  A.    Yes.
24  Q.    Does that help refresh your

BRIAN MAGEE

Page 57

1  recollection of whether or not you spoke with
2  anyone about any kind of limited work hours
3  that Ms. Walker would be working upon her
4  return from leave?
5  A.   Yes.
6  Q.    Do you have any reason to disagree that
7  you had a conversation with someone at MetLife
8  about Ms. Walker's return to work and what
9  hours she was, in fact, working?
10  A.   I have no reason to disagree.
11  Q.    How long was Ms. Walker permitted to
12  come back on a five hour per day work schedule?
13  A.   I don't know.
14  Q.    Was she asked to provide any medical
15  documentation to substantiate that she needed
16  to only work five hours a day?
17  A.   Not to me.
18  Q.    Do you know if that was provided to
19  someone else, either MetLife, HR, otherwise?
20  A.   I don't know.
21       (Whereupon doctor's note was marked
22       for identification as Verizon-10.)
23  BY MS. BURKE:
24  Q.    This is being marked as Verizon-10.  It

Page 58

1  is a September 10, 2013 note from Ms. Walker's
2  doctor, and in the prescription area identifies
3  Ms. Walker will be working five hour day on
4  10/1/13, six hour day on 11/1/13 and finally an
5  eight hour day on 12/1/13.  Do you see that?
6  A.   Yes.
7  Q.    Do you recall if that schedule actually
8  took place where Ms. Walker from October
9  through December of 2013 that her hours
10  steadily increased each month?
11  A.   I am sure they did, I don't recall that
12  to be exact, I don't recall.
13  Q.    If she did or didn't?
14  A.   Right.
15  Q.    Did you personally have any
16  conversations with Ms. Walker about what her
17  schedule would be, how many hours she would be
18  working?
19  A.   No.
20  Q.    Never discussed that once?
21  A.   She might have come and told me.  I
22  don't ever recall asking her any questions
23  about her schedule.  Once again, I feel all
24  that goes through MetLife.

Page 59

1  Q.    Did you speak with her at some point
2  and inform her that she had to come back to
3  work full duty?
4  A.   No.  I don't recall ever having a
5  conversation with her about that.
6  Q.    Did she ask if she could come back with
7  any kind of limited work hours or you don't
8  remember?
9  A.   I don't recall the conversation to
10  that.
11  Q.    So claim notes from September of 2013.
12  Can we mark this, please.
13       (Whereupon claim activity was
14       marked for identification as
15       Verizon-11.)
16  BY MS. BURKE:
17  Q.    This is yet another page of entries
18  from the claims notes.  If you look toward the
19  bottom here, it is an entry for 9/18/2013 at
20  9:45 a.m.  Are you at that entry?
21  A.   Uh-huh.
22  Q.    Sorry, you have to say yes or no out
23  loud even though I know what you mean.
24  A.   I'm sorry, please ask the question

Page 60

1  again.
2  Q.    I am making sure you are on the same
3  entry that I am, 9/18/2013 at 9:45 a.m.
4  A.   Yes, I'm looking at that now.
5  Q.    So this is a summary of an the employee
6  with Ms. Walker and I want to read it to you
7  and then I have a question for you.  In the
8  comments area CS told her she tried to call her
9  yesterday, employee stated that her supervisor
10  told her she needed to return full time full
11  duty on 10/7/2013.  ER, employer, only allows
12  12 weeks of reduced hours.  Then it talks
13  further what the employee discussed with
14  Kimberly Astorga.
15  A.   Okay.
16  Q.    Did Ms. Walker have any other
17  supervisors in September of 2013 besides you?
18  A.   No.  I kind of recall this.
19  Q.    What is your recollection of the
20  conversation with Ms. Walker regarding her
21  working?
22  A.   I believe I got a notice from MetLife
23  saying that, you know, basically what is
24  written here, that it only allows 12 weeks, and

BRIAN MAGEE

Page 61

1  I was told to communicate that to her.
2  **Q.  Who told you to communicate that to**
3  **her?**
4  A.  MetLife rep.
5  **Q.  Just from a math standpoint, 12 weeks**
6  **of leave, that is three months, so if she**
7  **started her leave April 26th, her leave would**
8  **have exhausted, all 12 weeks, as of July,**
9  **right?**
10  A.  I don't have a calendar in front of me
11  right now and a lot is being thrown at me.
12  Give me a calendar and I will -- do you want me
13  to count it out?
14  **Q.  So the only thing I was trying to**
15  **establish is when the 12 week period would have**
16  **ended from when she commenced her leave.  So if**
17  **her leave commenced on April 26, 2013, three**
18  **months from then, the entire month of May, June**
19  **and July, her 12 weeks would have exhausted**
20  **sometime in or about late July, correct?**
21  MR. BARRAS: Object.  You can
22  answer.
23  THE WITNESS: Counting 12 weeks
24  would be July 19th, if I am counting

Page 62

1  correctly on the calendar you provided.
2  BY MS. BURKE:
3  **Q.  So from the end of July up and through**
4  **September was she working in any limited hours**
5  **capacity or not?**
6  A.  I believe she was.
7  **Q.  So having now just looked at some of**
8  **these claims notes from MetLife and her**
9  **doctor's notes do you know if that continued up**
10  **until December 1st or did that stop sometime in**
11  **September or October?**
12  A.  Like I am going by memory.  I think
13  this conversation, and I think I told her to
14  call MetLife, and I think that was it.  I don't
15  recall what happened afterwards right now,
16  would have to -- I really don't recall what
17  happened afterwards.
18  **Q.  Did you personally have any**
19  **conversation with her about whether or not it**
20  **was feasible for her to work either six or**
21  **eight hours a day for the next several months?**
22  A.  No.
23  **Q.  Would she have been able to do that in**
24  **light of what her job responsibilities were?**

Page 63

1  A.  Without like a medical, I don't know
2  how that would have been done.
3  **Q.  Well, she gave this medical to someone,**
4  **right, V-10?**
5  MR. BARRAS: Objection.
6  THE WITNESS: Uh-huh.
7  BY MS. BURKE:
8  **Q.  You have to say yes or no, not uh-huh.**
9  MR. BARRAS: Objection.  You can
10  answer.
11  THE WITNESS: I would imagine she
12  gave that to -- she should have
13  submitted that to MetLife, that is not
14  handled, you know, by me.
15  BY MS. BURKE:
16  **Q.  So for the 2013 evaluation she was out**
17  **of work in 2013 from at least April 26, 2013 to**
18  **late July of 2013, correct?**
19  A.  Yes.
20  **Q.  Then was there any account given to**
21  **that fact within the 2013 performance**
22  **evaluation and your decision to rate her**
23  **developing?**
24  A.  No.

Page 64

1  **Q.  Are you on the 2013 evaluation, as far**
2  **as Verizon-5.  You can put those other ones**
3  **aside for now.**
4  A.  Yes.
5  **Q.  The areas identified objectives, and**
6  **you see this entire box here on DEF Walker**
7  **Bates stamp 2, page 2 of this?**
8  A.  Okay.
9  **Q.  Who puts all that information there?**
10  A.  It would be joint, both I would put
11  some and the employee would put some.
12  **Q.  This language is contained in here**
13  **above manager comments optional, on page 2, was**
14  **that the same language that was contained in**
15  **anybody's evaluation who was doing conduit**
16  **work?**
17  A.  So are you referring to the top block
18  on page 2?
19  **Q.  Yes.**
20  A.  They were all put in by Suzette.
21  **Q.  In terms of the objectives?**
22  A.  Well, that was Levin Decredo, and
23  employee accomplishment status, I think she
24  wrote all of that.

BRIAN MAGEE

Page 65

1    Q.    So the entire bullet point entry on
2    page 2, you believe Ms. Walker wrote that?
3    A.    Yes.
4    Q.    What about under accelerate revenue
5    growth, who inputted that information?
6    A.    I would have put in SFU Greenfields,
7    MDU/MTU overloads, MDU/MTU Greenfields and
8    support new products, expansion fiber to the
9    cell site.
10   Q.    What does SFU Greenfield stand for?
11   A.    Single family unit, Greenfield
12   associate with our Fios development.
13   Q.    What about MDU/MTU, what is that?
14   A.    Multi dwelling unit. The MDU is
15   residential, MTU is business and overlays are
16   an existing building to add the Fios facility
17   to an existing building.
18   Q.    In doing conduit work were you
19   measuring her YTD Fac Verification or not until
20   she had a turf?
21   A.    Not until she had a turf. She would
22   have been more in a support role in the conduit
23   department.
24   Q.    Doing survey and design for high

Page 66

1    bandwidth orders, was that something she was
2    doing in a conduit department or only when she
3    had a turf?
4    A.    Only when she had a turf.
5    Q.    Which part of her role in doing conduit
6    work was core engineering work?
7    A.    I'm sorry, say that again.
8    Q.    Which part of her job responsibilities
9    in doing this conduit work was core engineering
10   work?
11   A.    I think it would have been, should have
12   been all of it.
13   Q.    What aspects --
14   A.    Except for the part that is not -- I
15   would say core is the administration of the
16   third party work is more of an administrative
17   function and not core engineering work.
18   Q.    When you say administration of a third
19   party function getting Gerry Slattery involved?
20   A.    I don't know what you mean, getting
21   Gerry Slattery involved.
22   Q.    What do you mean by administration of a
23   third party function?
24   A.    That is the work for, if a select, a

Page 67

1    local exchange guy wants to lease our
2    facilities so that is a third party work, that
3    is an administrative function. A request comes
4    over, you reply to it, you send the work to a
5    contract services group, and then you go back
6    to the third party and give them the results.
7    Q.    So what aspects of the conduit then
8    were actually engineering work?
9    A.    Conduit work that is engineering is
10   any -- it is design, repair maintenance of that
11   pipe. The conduit, which is what the conduit
12   department is there for, that pipe that would
13   go to residential and business customers, that
14   we have in the public right of way or private
15   property.
16   Q.    Was she designing new pipes in certain
17   areas?
18   A.    That would have been her
19   responsibility, yes.
20   Q.    We are still in the box for accelerate
21   revenue growth, see where it says support new
22   products and global product expansion, FTTCS,
23   what is that?
24   A.    Fiber to the cell site.

Page 68

1    Q.    What does that mean?
2    A.    Cell sites are supported by fiber
3    facilities now. So anywhere you have a cell
4    tower you generally have fiber facilities up to
5    that cell tower, so that is the backbone of the
6    cell network.
7    Q.    Where it says employee
8    accomplishments/status, did she input that
9    information or did you?
10   A.    She did.
11   Q.    On the next page, Walker page 3, the
12   increased profit margin area, did you complete
13   all those entries or did she?
14   A.    Under description and measure?
15   Q.    Yeah.
16   A.    I would have completed those. Under
17   employee accomplishment and status sheet she
18   would have completed that.
19   Q.    On page 5 did you sit down with her in
20   August of 2013 to do a mid year?
21   A.    Yes.
22   Q.    Do you believe that this August 5, 2013
23   date is about right?
24   A.    Yes.

BRIAN MAGEE

Page 69

1  Q.    Is the employer required to sign at mid
2  year or no?
3  A.    No.
4  Q.    In the manager performance summary area
5  you completed that, right?
6  A.    Yes.
7  Q.    Suzette was moved to conduit/highway in
8  the first half of the year due to existing
9  knowledge of conduit and the City permit
10 process.  Do you see that?
11 A.    Yes.
12 Q.    The first half of the year, early 2013
13 or do you still think it was sometime in
14 December 2012 when she moved over to
15 conduit/highway?
16 A.    I think she was moved in that December
17 time frame.
18 Q.    How did she have existing knowledge of
19 conduit?
20 A.    She was the drafting supervisor, so the
21 drafters are involved in the City permit
22 process.  The drafters also are responsible at
23 that time frame to draw in the conduit drawings
24 and post it in it.  So as a supervisor you would

Page 70

1  have intimate knowledge of those items since
2  you are supervising those functions.
3  Q.    GPIS review has been a positive
4  transition.  What is GPIS?
5  A.    GPIS is the City of Philadelphia permit
6  system.
7  Q.    Conduit design has been hard to
8  transition.  What does that mean?
9  A.    She went towards more of the
10 administrative function and didn't -- wasn't
11 making advances into core functions of conduit
12 design.
13 Q.    Was she not doing the designs?
14 A.    I don't think she was doing the
15 designs.
16 Q.    Who was doing them then?
17 A.    I think she was giving it to the
18 contractor.  From that time period the
19 contractor making all the decisions.
20 Q.    Can you please read back his last
21 statement, please?
22      (Whereupon the court reporter read
23 back from the record.)
24 BY MS. BURKE:

Page 71

1  Q.    From what time period?
2  A.    During this review time.
3  Q.    Was that an on site or an off-site
4  contractor?
5  A.    On site contractor.
6  Q.    Was it Gerry Slattery?
7  A.    Yes.
8  Q.    He had been doing all her work while
9  she was out on medical leave, right?
10 A.    Yes, he did the work while she was on
11 medical leave.
12 Q.    You note she has missed some time due
13 to an injury.  Was that her shoulder injury?
14 A.    I would imagine that is what I am
15 referencing.  I didn't know what her injury
16 was, just due to an injury.
17 Q.    Which made the transition difficult.
18 The transition of having Ms. Walker take back
19 the job functions from Gerry Slattery?
20 A.    I think I just was documenting just
21 that is what, you know, happens.  She had
22 missed time during that period.
23 Q.    I am just wondering what the transition
24 is you refer to since you wrote this, which

Page 72

1  transition was made difficult?
2  A.    From supervisor role to conduit
3  engineer.
4  Q.    This says the conduit area is still set
5  up for the former conduit engineer and I have
6  received complaints about the conduit mailbox
7  being full.  Who is the former conduit
8  engineer?
9  A.    I believe it was Jim Conte.
10 Q.    Why did he leave the role?
11 A.    Took a supervisor role.
12 Q.    Is that a lateral move?
13 A.    They make more because they are
14 supervising.  They make more, their band is
15 bigger because they are supervising people.  He
16 took it for an outside technician who makes
17 more money, so your salary is kind of related
18 to their salary.
19 Q.    The conduit area is still set up for
20 the former conduit engineer, Jim Conte, how is
21 it still set up for him?
22 A.    Like wasn't -- I would say she didn't
23 move into that space, that is what it was.
24 Suzette didn't move into the spot, there is a

BRIAN MAGEE

Page 73

1  conduit cube, if I remember correctly, and she
2  didn't move right away over to the conduit cube
3  where the records, where -- well, there is some
4  records but they are other places too, but
5  where the contract engineer was sitting.  So
6  that cube has always been for the conduit
7  people.
8  Q.     The mailboxes, is that an email inbox
9  or a hard mailbox where things are placed?
10  A.     For it to be full it had to be a voice
11  mailbox.
12  Q.     So associated with a particular
13  extension?
14  A.     Yes.
15  Q.     For that cube?
16  A.     Yes.
17  Q.     Why didn't you ask her to move over to
18  the cube sometime in January then of 2013?
19  A.     I believe I did.
20  Q.     February, did you ask?
21  A.     I believe I asked her in that, you
22  know, that time of the whole transition, you
23  are going to conduit, expectation you would
24  move into conduit.

Page 74

1  Q.     You wanted her to physically move
2  somewhere, right?
3  A.     Yes.
4  Q.     You are saying this happened from
5  December all the way she went out on a medical
6  leave?
7  A.     I mentioned it, yeah, it was prolonged
8  time I know that.
9  Q.     Then did she ever move to that cube?
10  A.     Yes.
11  Q.     When?
12  A.     I can't give, pinpoint the exact date
13  of it.
14  Q.     Would you have any documentation
15  reflecting that you asked her to move to that
16  cube or needed her to sit there?
17  A.     No.
18  Q.     We are not where the conduit/highway
19  team needs to be at this time.  Who is the
20  conduit/highway team?
21  A.     It would be -- in this case it would
22  have been Suzette and Gerry.
23  Q.     Was Gerry doing everything that he
24  needed to do between April and July while she

Page 75

1  was completely out of work?
2  A.     Yes.
3  Q.     So as of August 5th she had only been
4  back to work several weeks from her medical
5  leave, right?
6  A.     Uh-huh.
7  Q.     Sorry, you have to say yes or no.
8  A.     I would say yes.
9  Q.     You are not even sure it was eight
10  hours a day, right?
11  A.     I am not sure of that time, correct.
12  Q.     When you put the Phila/Delaware team
13  has mixed results on the FOC metric, what does
14  that mean?
15  A.     That was my team at the time saying FOC
16  metric, so that is what the FOC stands for, we
17  call it FOC, which is the orders come in for
18  special services through a system called
19  request net, and the FOC time is the amount of
20  time it is held in engineering.  So when it
21  comes into the engineering to when we send it
22  to the next teams.
23  Q.     So when you say the
24  Philadelphia/Delaware team has mixed results on

Page 76

1  that metric, you mean your team as a whole, not
2  just Suzette Walker, correct?
3  A.     We are referring to the team as a
4  whole, yes.
5  Q.     They were missing DS1 and OCN?
6  A.     Correct.
7  Q.     What does that mean?
8  A.     DS1, OCN, DS3 and Ethernet are all
9  classes of services of specials.
10  Q.     What do you mean they were missing
11  them?
12  A.     So the FOC time, the amount of time it
13  was taking them for it to come in to answer,
14  they were over metric in those categories.
15  Q.     They weren't making the mark for the
16  capital metric either?
17  A.     Right, saying that we were over
18  spending capital, that is what that is saying.
19  Q.     I apologize, I think I asked you this
20  before.  When she was working doing conduit
21  highway, you weren't measuring her Fac
22  Verification or SR scores?
23  A.     Correct, because she wouldn't have been
24  answering every question, no.  She was in a

BRIAN MAGEE

Page 77

1 support role, so if an engineer was working one
2 and needed conduit, that would have been where
3 she would have came into it.
4 **Q.    When you sat down with her in August of**
5 **2013 regarding this review, did you tell her**
6 **that she was not supposed to continue utilizing**
7 **Gerry Slattery?**
8 A.    I directed her to, I wanted her to take
9 on the conduit role, take a greater emphasis on
10 the conduit role.  I wanted Gerry Slattery to
11 be just support.
12        Gerry Slattery as an on-site
13 contractor, we can only have for two and a half
14 years.  At the end of two and a half years he
15 has to leave.  So I needed someone to absorb
16 that conduit to have that conduit role after
17 Gerry would have been gone.
18 **Q.    Did you ever tell any of your engineers**
19 **that they were supposed to use the contractors**
20 **to get the work done because they are project**
21 **managers?**
22 A.    In the turf position?
23 **Q.    Either.**
24 A.    In the conduit position, no.

Page 78

1 **Q.    Not in the conduit but in turf?**
2 A.    Yes.
3 **Q.    Can you go to page 6, the year end**
4 **comments, DEF 006, I think it is the next page?**
5 A.    Okay, I am on that page now.
6 **Q.    Take as much time as you need to look**
7 **at the manager performance summary, and let me**
8 **know when you are ready.**
9 A.    Okay, I have reviewed it.
10 **Q.    Did you author this area?**
11 A.    Yes, I did.
12 **Q.    PA/Delaware had a very successful**
13 **results year in 2013, capital expense MDU/MTU,**
14 **prints issued, standard interval compliance**
15 **were all positive.  Do you see that?**
16 A.    Yes.
17 **Q.    Which roles contributed to those**
18 **positive results?**
19 A.    Engineering department, we all play a
20 part in that.
21 **Q.    Did Suzette Walker?**
22 A.    I am sure she played a part in that,
23 yes.
24 **Q.    If she didn't, you wouldn't have put it**

Page 79

1 **in her review, right?**
2 A.    I believe I put that on everyone's
3 review.
4 **Q.    I have the evaluations, you can look at**
5 **them if you want, I don't believe you put that**
6 **in everyone's review.  Do you agree with me**
7 **that you may not have?**
8 A.    Well --
9 **Q.    You can look, Anthony is the first one,**
10 **if you want to look at his as an example.  His**
11 **2013 year review.**
12 A.    PDFs?
13 **Q.    Yes.  I am just using Anthony because**
14 **he is the first.  So this first one, and just**
15 **for the record I am looking with the witness at**
16 **Portolese's 2013 review, starts with Bates**
17 **stamp 268.  So if we go to the final box that**
18 **we are looking at Ms. Walker for the year end,**
19 **manager comments.  Here is the mid year**
20 **summary, and here is the manager comments, they**
21 **start here.  Do you see that?**
22 A.    Yes, that is not me.
23 **Q.    You didn't fill this out?**
24 A.    Look through, but a lot of writing.

Page 80

1 Eugene Phelps signed it.
2 **Q.    So we will look at someone else's.  So**
3 **was Carl Bowman on your team for 2013?**
4 A.    Yes.
5 **Q.    So this is his 2013, okay, for Carl**
6 **Bowman, so if we go to the block area for the,**
7 **this is mid year, the year end, okay?**
8 A.    It looks very similar.
9 **Q.    Let's use that as a point of reference,**
10 **Bates stamp 299.  Are we looking at Carl**
11 **Bowman's?**
12 A.    Yes.
13 **Q.    When you say FOC intervals were**
14 **negative for both the district and sub district**
15 **teams, what does that mean?**
16 A.    So FOC once again is the time frame
17 when it comes into engineering to when the
18 special circuit leaves engineering.
19 **Q.    When you say both the district and the**
20 **sub district teams, what does that mean?**
21 A.    I would say first district I am talking
22 about PA, Delaware because in the beginning I
23 am talking about all PA, Delaware, where I am
24 just a sub district of PA, Delaware.

BRIAN MAGEE

Page 81

1   Q.      Oh, okay.
2   A.      So saying not only did all PA, but we,
3   hey, weren't a shining light, we also, you
4   know, were negative.
5   Q.      So that could include Carl Gross' team
6   as well then?
7   A.      The district. Carl Gross would be part
8   of the district.
9   Q.      Then you summarize here that she had
10  made a transition at the end of 2012 to the
11  conduit department from a supervisory role, and
12  remained with conduit all of 2013. Was it
13  expected at any point in time after she
14  transitioned out of conduit that she would go
15  back?
16  A.      Once I removed her in 2013?
17  Q.      Yeah.
18  A.      No, I would not have put her back
19  again.
20  Q.      Why did you give her a turf?
21  A.      I didn't think she -- the conduit role,
22  I don't think she flourished in it, and wanted
23  to give her a fresh start in 2014.
24  Q.      Did she do better in the other role?

Page 82

1   A.      She had been a turf engineer before.
2   Q.      Did she perform better in that role
3   than she did in the conduit role?
4   A.      She, I would say she performed better
5   than she did in the conduit role, yes.
6   Q.      When you say in the new job she adapted
7   to the conflict management function that was
8   previously outsourced, what does that mean?
9   A.      She put a lot of energy into that
10  administrative role of taking the request from
11  the third party, request to lease our conduit,
12  and she started doing that work. So that part,
13  yeah, the conflict management work she took
14  that on.
15  Q.      I apologize, what exactly did that
16  involve?
17  A.      So we have -- we get requests from
18  CLECs we call them, competitive local exchange
19  carriers, to lease our conduit, yes. So you would
20  get a request from the CLEC to utilize our
21  conduit from Market Street to Race Street via
22  9th Street, and you would package, you know,
23  what facilities we have on 9th Street between
24  those two points and send an email to contract

Page 83

1   services asking them to prove that there is an
2   available path, and then you would reply back
3   to the company that requested it and say there
4   is an available path or there is not an
5   available path.
6   Q.      When you say it was previously
7   outsourced, who was doing that role?
8   A.      We sent it -- it was just to an
9   off-site contractor.
10  Q.      We talked about this before, the final
11  thing you say here, the core function conduit
12  design was not performed by Suzette to the
13  level necessary to demonstrate ownership. Was
14  she doing any engineering work or not as much
15  as you would have liked her to do?
16  A.      Not as much as I would have liked her
17  to have done, yeah, and it is the decision, not
18  just doing it, but to be the decisionmaker.
19  Q.      This assignment was an opportunity for
20  growth, but Suzette kept a comfort zone and
21  allowed the contract engineer, is that Gerry
22  Slattery?
23  A.      Yes.
24  Q.      To run the conduit department?

Page 84

1   A.      Yes.
2   Q.      Who is the conduit department, just
3   Suzette and Gerry?
4   A.      Suzette and Gerry, yes.
5   Q.      How many days a week did Gerry work?
6   A.      I think Gerry was working four at that
7   time.
8   Q.      Eight hour days?
9   A.      Yes.
10  Q.      Or more?
11  A.      No, eight hour days, and he probably in
12  like spring and summer went to the four days
13  because he golfed.
14  Q.      What about the fall and winter?
15  A.      He worked probably five days a week.
16  Q.      Are you guessing or you believe that is
17  accurate?
18  A.      No, I am pretty sure that is accurate.
19  I can look back at the time sheet, but that was
20  kind of Gerry's MO.
21  Q.      Did you complete his time sheets?
22  A.      No.
23  Q.      Who verified his time?
24  A.      I would get an email to verify his

BRIAN MAGEE

Page 85

1   time.
2   **Q.**   **From payroll?**
3   A.   From payroll company I think at that
4   time.
5   **Q.**   **So you gave her a developing, correct?**
6   A.   Yes.
7   **Q.**   **The new rating, would that have been**
8   **applicable to Ms. Walker or that was only for**
9   **actual new hires?**
10   A.   That was for new hires.
11   **Q.**   **Do you have any recollection of what**
12   **Ms. Walker's feedback was as it pertained to**
13   **this year end evaluation?**
14   A.   I think she agreed.
15   **Q.**   **As of the time you presented it to her**
16   **in or about February of 2014 had she already**
17   **transitioned to the turf, her turf?**
18   A.   I am not sure of the exact date of it,
19   it could have been right around the same time.
20   **Q.**   **Let's take a break.**
21      (Whereupon a short recess was
22      taken.)
23   BY MR. BARRAS:
24   **Q.**   **Who started doing the conduit work that**

Page 86

1   **Ms. Walker was doing once she transitioned out**
2   **of that role?**
3   A.   Anthony Portolese.
4   **Q.**   **Did he continue to work with Gerry**
5   **Slattery?**
6   A.   He did.
7   **Q.**   **For how long?**
8   A.   Until Gerry's term expired.  I don't
9   have the exact date of it.
10   **Q.**   **Did that happen at some point?**
11   A.   Yes.
12   **Q.**   **At the natural expiration of the**
13   **contract term?**
14   A.   The two and a half years, yes.
15   **Q.**   **If you have Gerry Slattery identified**
16   **in your organizational chart, at least as of**
17   **July 2014, you believe he was still there then?**
18   A.   Yes.
19   **Q.**   **Did he stay with Mr. Portolese doing**
20   **conduit highway through the end of 2014?**
21   A.   I can't say at this time, you know,
22   without my record I can't say when he left.
23   **Q.**   **Well, we are in 2016 right now, last**
24   **year was 2015, was he still there last year?**

Page 87

1   A.   No.  He passed away, I believe in the
2   fall of 2015, and he was coming up on his like
3   year, because you have to be off payroll for a
4   year in order to even come back, so he had been
5   off, so he was probably there until like that
6   fall of 2014, yeah.
7   **Q.**   **Did another contractor take his**
8   **position?**
9   A.   Yes.
10   **Q.**   **Who would that have been?**
11   A.   Rich Sullivan is currently in that
12   position.
13   **Q.**   **When Ms. Walker worked with Mr.**
14   **Slattery did they work side by side?**
15   A.   Once she moved into the cube, yes, they
16   would have been across from each other.
17   **Q.**   **Did Portolese move over next to Gerry**
18   **Slattery?**
19   A.   Yes.
20   **Q.**   **When?**
21   A.   As soon as he came into the department.
22   **Q.**   **Was he already in your department at**
23   **that point or did he come over from somewhere**
24   **else?**

Page 88

1   A.   He came over from the supervisor role
2   in construction.
3   **Q.**   **Not even at 900 Race Street, right?**
4   A.   Right, he was not at 900 Race Street.
5   He was a supervisor with construction and he
6   came back to engineering in that first quarter,
7   what I remember the first quarter of 2014.  The
8   date you had was April, so maybe it was April
9   of 2015, I guess that is.  Or '14.
10   **Q.**   **'14?**
11   A.   '14.
12   **Q.**   **So he didn't already have a cube or**
13   **office space set up when he came over, did he?**
14   A.   I don't know what you mean.
15   **Q.**   **When he came over from construction?**
16   A.   Right, his cube was at a construction
17   garage prior.
18   **Q.**   **Did you automatically put him in the**
19   **conduit highway area?**
20   A.   Yes.
21   **Q.**   **Is Rich Sullivan sitting with him**
22   **still?**
23   A.   Yes.
24   **Q.**   **How is it that you monitor how much of**

BRIAN MAGEE

Page 89

1 the actual core contract work Portolese is
2 doing versus Sullivan?
3 A. Sullivan is doing all of the third
4 party work, and Anthony is doing all the
5 conduit work.
6 Q. How do you know that?
7 A. I interact with them.
8 Q. Just verbally?
9 A. Right. Well, at that time I would say
10 I changed the job positions this year to
11 accommodate a new responsibility I received
12 this year. So they are doing something
13 different than they did before starting January
14 of this year.
15 Q. January 2016 Mr. Portolese and Rich
16 Sullivan are doing something different?
17 A. Their roles are a little different,
18 yes. I have another contractor that came in
19 too, so there is two contractors and Anthony in
20 the same cubicle now.
21 Q. Doing conduit highway?
22 A. Doing parts of conduit highway.
23 Q. Who is the other contractor?
24 A. Mike Wagner.

Page 90

1 Q. Is that why Portolese's reviews don't
2 have any Fac Verification numbers and SR
3 numbers?
4 A. In?
5 Q. Because he was doing conduit work. I
6 didn't see it in any of his reviews actually.
7 A. He would have some, yes. I know he has
8 done some, like the City project, those two COs
9 that he has are not hot beds for that, they are
10 hot beds more for growth, like residential
11 growth, but you do get things for the City and
12 Temple University with those turfs.
13 Q. So it is your testimony that Rich
14 Sullivan is doing mostly third party work?
15 A. In what time period? I am talking
16 about today or are we talking about last year?
17 Q. Well, let's strike that. Let's go back
18 to Gerry Slattery. When Anthony took over the
19 role and he was working with Gerry Slattery,
20 when did Gerry Slattery stop doing core
21 contract work, if at all?
22 A. What we did is we started like phasing
23 out what Gerry was doing and Anthony taking the
24 larger role.

Page 91

1 Q. How long did that transition take?
2 A. I would say till Gerry, I think he was
3 out that year, so just kind of finished up, you
4 know, Gerry's term. I think they -- I tried
5 to, okay, who would do what areas, but Anthony
6 just started taking over, you know, any new
7 jobs that came in, and Gerry finished up with
8 ones that had been already there.
9 Q. Well, how fast did you want or did you
10 anticipate that Suzette Walker would be able to
11 transition into taking over the things that
12 Gerry was handling while she was out for three
13 months?
14 A. If she was out for three months she
15 wouldn't have been able to, you know, do the
16 work, she wasn't working.
17 Q. I meant when she came back?
18 A. Oh, immediately, yeah, same kind of
19 transition. It is not -- she didn't have --
20 she just had to start taking the new work over.
21 The work is existing, and we let the person
22 transition through, but anything new should
23 have been going through Suzette.
24 Q. Do you know what OSP engineering is?

Page 92

1 A. Outside plant.
2 Q. The design of the 18th Street location
3 that he was involved in, do you remember that
4 or no?
5 A. Where are you reading from?
6 Q. From his performance evaluation. I
7 will just read the entire entry for you.
8 A. Sure.
9 Q. For the end of the manager summary, for
10 his 2014 evaluation you said, Anthony will
11 expand his knowledge of OSP engineering with
12 his assignment to the conduit role in
13 Philadelphia. His education, experience and
14 decisionmaking ability are all put into
15 practice in this position, he made solid ground
16 in learning the new role and the processes
17 system associated with the permits and third
18 party. He also made a major impact on the
19 design of 18th Street location which protected
20 Verizon's interest and satisfied the
21 developer's needs. Does that help?
22 A. Yeah, it would have to be the Comcast
23 relocation job.
24 Q. Did he design that on his own or would

BRIAN MAGEE

Page 93

1 he have assistance from the on-site contractor?
2   A.   He would have designed that on his own.
3   Q.   Is there a report of some sort that
4 identifies by initial or employee number or
5 something who would have handled the
6 engineering responsibilities during the time
7 that Ms. Walker was doing conduit work, meaning
8 what she did versus what Gerry Slattery did?
9   A.   There is, like I see the print, so I
10 see what goes out to the field.  So is there...
11   Q.   Is the print either done by her or Mr.
12 Slattery?
13   A.   Right, it has the name of who does the
14 job on it.
15   Q.   Is that true also now that Anthony
16 Portolese is working with Rich Sullivan?
17   A.   Yes.
18   Q.   Or Mike Wagner?
19   A.   Yes.  Mike Wagner is not, just to
20 explain, so what happened in 2016, there is
21 further consolidation.  I was given the
22 responsibility to finish the Fios build in the
23 City of Philadelphia.  So with that
24 responsibility, you know, individuals came to

Page 94

1 work for me.
2   Q.   Before I get into her 2014 evaluation,
3 if you go into your computer now, you can move
4 it as close to you as you need, I want to go
5 into some of these spreadsheets and what they
6 reflect.  So one is labelled 8/17.  So this is
7 a spreadsheet provided by your counsel
8 recently.  I want to go through it with you.
9 If you go to the tab that says by engineer on
10 the bottom.
11   A.   I don't see that tab.
12   Q.   Oh, I am on 8/16, I apologize.  So for
13 the record we are looking at an Excel
14 spreadsheet, Bates stamp Walker 817.  At the
15 top left corner it identifies SR FAC verified
16 performance and print issued intervals.  Did
17 you create this spreadsheet?
18   A.   No.
19   Q.   Where does it come from?
20   A.   We have a staff support person who runs
21 reports.
22   Q.   This particular report, is this for a
23 month or a week?
24   A.   This is for a year from what I can

Page 95

1 tell.
2   Q.   The entire year of 2015?  It appears to
3 be for Gross, Hui and then yourself, Septak,
4 Salinsky, Smail and Smith.  Are these all
5 managers of engineering?
6   A.   They are all managers, but different
7 responsibilities, different geographies.
8   Q.   But all under Mucillo?
9   A.   Yes.
10   Q.   Let's go down just to your team, so if
11 you go down to the third entry, you see where
12 it says Magee?
13   A.   Yes.
14   Q.   These are all the engineers on your
15 team, correct?
16   A.   Yes.
17   Q.   There is 16 of them, is that Tamasse,
18 Daniel Tamasse an addition?
19   A.   He is an intern.  Intern might not be
20 the right term, he is like, it is called
21 Verizon development leadership program, and
22 they would do one a year in Verizon core, but
23 he is really a Verizon Wireless employee.
24   Q.   Was he doing the exact same thing as

Page 96

1 your other engineers were doing?
2   A.   He was learning, yes.
3   Q.   So could you explain to me what is
4 reflected in this chart?  So let's start with
5 the average facility verification, is it
6 business days?
7   A.   Yes.
8   Q.   SR create to SOP comp?
9   A.   Uh-huh.
10   Q.   Now, even though this says 2015, let's
11 just use Carl Bowman as an example, do you see
12 where his entry is on line 44?
13   A.   Yes.
14   Q.   There is a category 1, 2, 3, 4.  Do you
15 know what that reflects, and if you look under
16 1, there is 1 through 5, under 2 there is 5
17 through 8, under 3 there is 9 through 13 and
18 under 4 it is just 14 and 15.
19   A.   I'm sorry, I don't know where you are
20 looking on it.  Oh, okay.  I think this report
21 that we have is till April, the second week in
22 April, that is what I think we are looking at.
23   Q.   So you believe 1 is the month of
24 January, 2 February, 3 March, 4?

BRIAN MAGEE

Page 97

1   A.    I think this is a rolling report, and
2   just keeps adding weeks.  This must have come
3   in a week, you know, which I would say probably
4   came that, the third week in April.
5   Q.    Do they come in through email or?
6   A.    Email, yes.
7   Q.    How often do you get these type of
8   reports that we are looking at here?
9   A.    Every day we get some type of report.
10  Q.    Still using Carl Bowman for
11  consistency, okay?
12  A.    Uh-huh.
13  Q.    For the month of January, I guess there
14  were five weeks in that month, 2015, there are
15  three full weeks in January but only three days
16  in the first week.
17  A.    But this 2015 results he would start
18  that first week, by taking whatever numbers
19  came in that first week.
20  Q.    Oh, okay.
21  A.    Like this report is 2015, so it is
22  everything that came in in 2015.
23  Q.    So looking at Carl Bowman for week
24  number 1 in January it is blank.  What does

Page 98

1   that mean?
2   A.    He didn't answer any SRs.
3   Q.    What is an SR?
4   A.    An SR is a service request for a
5   special circuit.  I described earlier the FOC,
6   so this is what you are dealing with, that SR
7   is what your FOC.
8   Q.    Do you use SR and FOC interchangeably?
9   A.    No, they are two different.  SR is the
10  actual service request, which would have the
11  customer's name, address, what they are
12  ordering, when they want it due, and so that is
13  coming through the system request net.  The
14  engineers perform in the function of FOC, which
15  he is answering that SR.
16  Q.    So Bowman didn't answer any SRs in the
17  first week, could that have been because he was
18  out or you have no idea?
19  A.    I would say it might have been because
20  he is on vacation, not unusual, no.
21  Q.    But you wouldn't know that by looking
22  at this chart, you would have to cross
23  reference?
24  A.    I would have to look, yeah.

Page 99

1   Q.    Now, in week two he answered 14 SRs?
2   A.    No, that would be his average facility
3   verification business days of what he answered
4   that second week.
5   Q.    Can you read that back to me, please?
6         (Whereupon the court reporter read
7         back from the record.)
8   BY MS. BURKE:
9   Q.    So 14 is not the number he answered, it
10  is an average?
11  A.    It is the average.  So if you go over
12  to the right there is number of WRs, so two
13  were answered that week by Carl Bowman.
14  Q.    I see in the top area you are talking
15  about number of WRs?
16  A.    Right, in that column, line 39 has the
17  column headings.
18  Q.    I see that.  So for Carl Bowman if we
19  go across to week 2 it says two, that is how
20  many SRs he actually answered?
21  A.    Correct.
22  Q.    Then where does the average of 14 come
23  from?
24  A.    The report is doing that.  So it is

Page 100

1   taking the two, and it is looking at how much
2   time he took on the two and just averaging it
3   for this.  So that is happening behind the
4   scenes on this report.
5   Q.    So if we look at, just going down the
6   column down to the next one that has an entry,
7   Dave Perry, line 46.
8   A.    Yes.
9   Q.    His is a seven.  Do you see that?
10  A.    On the week two, yes.
11  Q.    If you go all the way down to his
12  number, his number of WRs is three.  So that
13  week he answered more SRs than Carl Bowman?
14  A.    That is what this would imply, yes.
15  That is what is being reported here.
16  Q.    In you reviewing these reports by
17  looking at the 14 there for Mr. Bowman and the
18  seven there for David Perry, what do you glean
19  from those numbers?
20  A.    Well, the facility verification is what
21  I would look at for what I see going out is
22  more I look at what ones are open each day.
23  Like I get a report that tells me all the ones
24  that need to be answered.  So that is what I

BRIAN MAGEE

Page 101

1   would review, you know, with the engineers.
2   Like here you have an open SR, where does it
3   stand, when can it be answered.
4       **Q.     Does this report show your open SRs?**
5       A.     It does not.  This is reflecting what
6   they answer and the timeliness of answering,
7   and then this is also showing the prints issued
8   metric showing if they issued the print on
9   time.
10      **Q.     All right, we didn't get there yet so**
11  **let's go to it then.  On line 39 in the middle,**
12  **the actual prints interval business days, is**
13  **that the average number of line days that it**
14  **actually took them to get print to the clients?**
15      A.     So from when they answered the SR to
16  when the print was issued, that is what that
17  would be a measure of.
18      **Q.     So sticking with Carl Bowman, week two**
19  **when it has a zero does it mean he got it out**
20  **on the same day?**
21      A.     It could be that he got it out before
22  the SR closed, that is what it could be, yeah.
23  There is also some SRs that you close that
24  might not need a work print, so you wouldn't

Page 102

1   have a work print.
2       **Q.     Because they already exist, right?**
3       A.     A facility, yes.  So meaning if it has
4   a work print it is going to construction, you
5   can do jobs that will just have -- we have
6   another title, system tech, so you do a
7   facility, yes, and they can run, jump or
8   replace cards, do things like that.  So that
9   quickens the time to get something in service.
10  So if you can do it, has a facility available,
11  yes, it is advantageous to do so.
12      **Q.     So right now just looking at week two**
13  **for Mr. Bowman and Mr. Perry, this average of**
14  **14 and an average of 7, and that it is zero**
15  **interval business days for Mr. Bowman and it is**
16  **10 for Mr. Perry, are you able to compare the**
17  **two qualitatively or no?**
18      A.     I wouldn't like on a week thing, like
19  at the end of the month, yeah, that is when I,
20  at the end of month I give it a little more.
21  Like we have a weekly call where I talk about
22  their jobs, their jobs open, and at the end of
23  the month I look to see, well, how did we do as
24  a team, how is everyone doing.

Page 103

1       **Q.     Do you receive an actual monthly report**
2   **that is different than your rolling reports?**
3       A.     No, it is one and the same, but I am
4   saying like the week, I would take note of it
5   more after January to look at than the
6   average at the end of January, what is the
7   average after February, what is the average
8   after March.
9       **Q.     So you have a full month for February,**
10  **right?**
11      A.     Right.
12      **Q.     In front of you.  The report that you**
13  **and I are looking at right now, is there any**
14  **way to look at the averages for February so**
15  **that I could understand what you would be**
16  **looking at to know how your employees sized up**
17  **against one another?**
18      A.     I don't in this report, no.  What I
19  would normally get, since these are coming out
20  weekly, this particular report, I would just
21  see the February report.
22      So like to see the end of February,
23  like there might be a way for the administrator
24  to, but I think he would just look for the

Page 104

1   February report too because I know he is
2   pulling multiple reports together to generate
3   this.
4       **Q.     Where are the February reports**
5   **maintained?**
6       A.     It is a rolling report so it is
7   whenever you are looking at it is when, like
8   you would look at a previous email to see what
9   it was, like the month before.
10      So like if this is the middle of
11  February, so this shows you where everyone
12  stood at the middle of February, the second
13  week of February.
14      **Q.     Right.  So I guess that is my question,**
15  **right now in June of 2016 what would I need to**
16  **look at to discuss with you how they did for**
17  **the month of February, your team?**
18      A.     I think you would need the report from
19  that first week in March, the end of February
20  report.
21      **Q.     Are you able to still pull that, do you**
22  **have access to it?**
23      A.     I don't think they can be pulled, it
24  would be what is stored, if someone has a

**R&K REPORTING, INC.**

BRIAN MAGEE

Page 105

1  stored report.
2  **Q.    Do you still have them stored in your**
3  **email?**
4  A.    I don't.  I guess I could go back, I
5  might have some in there, but in my delete file
6  I could certainly look.
7  **Q.    Regarding open jobs did you generate an**
8  **email to your team to summarize the call?**
9  A.    No, it was already, it is generated
10  every day.  Every morning that open SR report
11  goes out so whatever day I was having the call
12  I would just reference that report.  I wouldn't
13  distribute it because it was already going to
14  everyone.
15  **Q.    Is there any particular week at issue**
16  **here that you and I could look at to compare**
17  **how the employees did in your opinion as their**
18  **supervisor in looking at these numbers?**
19  A.    Well, we could compare, this report
20  sets up the second week of February, we could
21  see where everyone stood the second week in
22  February.
23  **Q.    So under the column 2 we can take a**
24  **look at week six?**

Page 106

1  A.    I think -- well, the way I would use
2  this, I would roll to the end and we have the
3  average facility business days as are created,
4  as that would be year to date, whichever date
5  this report came out and will tell where
6  everyone stood on that date.  And it would also
7  tell how many number of SWRs that they
8  answered.
9  **Q.    I want to make sure I am looking at the**
10  **same thing.**
11  A.    Since this is a roll report, that is as
12  of the second week of February they are the
13  numbers, average up for us.
14  **Q.    Now, when you put the Fac Verification**
15  **numbers into a performance evaluation, where**
16  **did you get them from?**
17  A.    From the report such as this.
18  **Q.    When you did it for mid year did you**
19  **pull them from the end of July for everyone?**
20  A.    Yeah, I should have done it, yeah,
21  whichever the last report I had so it would
22  have been the end of June is what I would have
23  been trying to calculate.
24      The end of year, I try to get the end

Page 107

1  of December number, yeah, I try to do it for
2  whatever period that we are discussing.
3  **Q.    So this we look at some averages as of**
4  **the second week of April, and it generated an**
5  **average for each one of your employees five**
6  **through 10.  Do you see that down the row?**
7  A.    Yes.  Wait a second, five through?
8  **Q.    Five, and it goes all the way down to**
9  **10 at the bottom.**
10  A.    Oh, yes, yes, okay.  I thought you were
11  saying that was the span of numbers, that is
12  why I was stopping.
13  **Q.    Is it better to be lower or higher?**
14  A.    Lower.
15  **Q.    The average actual print interval**
16  **business days, those averages, it starts with a**
17  **zero and goes all the way down to a two.  Do**
18  **you see that?**
19  A.    Yes.
20  **Q.    Is it better there to be lower?**
21  A.    Better to be low.
22  **Q.    I am doing this with you now so I don't**
23  **have to sit for hours when I go through these**
24  **on my own.  The number of WRs, what is that?**

Page 108

1  A.    The actual number of SRs that were
2  answered in that period.
3  **Q.    So you could look at that average,**
4  **though, and say or those numbers though and say**
5  **that the person who did 29 was way better than**
6  **the person that did three because what if the**
7  **person that did three only got three orders, is**
8  **that fair?**
9  A.    Yeah, it is a measuring stick.  It is
10  one of the things I look at.  If you are only
11  having three there would be something, better
12  be something else that you are doing.
13      So I am seeing on there the person at
14  three, if I can just scroll back and tell you
15  who it is.  So Scott Panichelli so, yes, he is
16  in Delaware, and he is handling all the FTTP in
17  high risk growth FTPP area.
18  **Q.    How would that impact his WR number?**
19  A.    Well, that area is mostly a residential
20  area, so you don't have businesses.  Businesses
21  will one day go to that area, I promise you,
22  but right now it is just residential units
23  being built there.
24  **Q.    Number of orders with Fac Verification**

BRIAN MAGEE

Page 109

1  to, what is PL?
2  A.    Which column are we?
3  Q.    Right after number of WRs.
4  A.    Percentage facility verification to
5  prints issued.
6  Q.    No, the one right before that, so
7  number of orders with fact to PL?
8  A.    Yes, to printed issued within eight
9  days.  So number of orders, so.
10  Q.    Oh, prints issued?
11  A.    Yeah, the number within eight days.
12  That interval of their prints being issued is
13  variable based upon the size of the job that is
14  demanded by answering the SR.  Like you could
15  have an SR that is just adding a piece of
16  electronics or you could have one that requires
17  you to run 5,000 feet of fiber.
18  Q.    Which could take more than eight days?
19  A.    Right.  It would be, that interval
20  could be 56 days so your prints issued metric
21  is longer because it is based upon your overall
22  interval.
23        So what we said in engineering is,
24  okay, no matter what, just try to get

Page 110

1  everything done within the eight days and we
2  felt like that, the sooner we get it out to
3  construction can help us get the overall job
4  done quicker.
5  Q.    So the gentleman that you were
6  referencing before because we were looking at
7  him with the threes, Scott Panichelli, if you
8  look at the number of orders that were done, I
9  guess within the eight day period, was all
10  three of his orders?
11  A.    Yeah, right.  Again, if you are going
12  to have a small volume that is what I would
13  want to see.
14  Q.    Now, some of these individuals are not
15  anywhere near the 100 percent, some are below
16  50 percent.  There is people at 15, 10, Suzette
17  Walker is at 19.  Now, obviously this isn't the
18  end of the month, but are there variables that
19  account for whether or not in your view that is
20  unacceptable?
21  A.    The eight days I don't think I ever
22  made a reference to that in like a performance
23  one.  To me that is related to your interval,
24  you get the size of your job, so the eight days

Page 111

1  was like an extra goal, hey, you know, it was
2  trying to relay the message to get these out as
3  soon as you can, but I didn't reference that
4  that I recall on a performance appraisal.
5  Q.    So this just might be easier, we are
6  still looking at the averages, and there is
7  only one person with a 19 percent average, that
8  is Suzette Walker, and only one person with a
9  19 in the column are for average facility
10  verification business days.  Do you see that?
11  A.    Uh-huh.
12  Q.    Where does the 19 come from if she had
13  16 WRs, is that the average number of days it
14  took her to complete her --
15  A.    The facility verification piece from
16  the SR create to the OSP complete, which we
17  call the FOC.  That is how long it took her to
18  do the FOC.
19  Q.    An average number of 19 days?
20  A.    Yes, on her 16 jobs, that is how I
21  would read that.
22  Q.    Do you know why her average actual
23  prints interval business days is zero?
24  A.    I would say that is because the prints

Page 112

1  are going out prior to the target.  So you
2  can't, like it could have been -- you are not
3  going to show negative days, so it could be
4  five days before you even had to issue it.  So
5  it is basically her average came in to that,
6  nothing was issued, you know, later.
7        So that could be -- it is tough because
8  it is taking the ones that are before the date
9  and the one after and it is coming out to zero.
10  Once again, I don't give that average prints
11  interval a big weight of it because of that
12  variable you are getting with it.
13  Q.    Looking at these averages which one do
14  you put the most emphasis on?
15  A.    I like the -- I look at the average
16  facility verification and the number of WRs.
17  They are the things that I key in on.  I look
18  at everything, but I key in on those in this
19  report.
20  Q.    So for the average facilities
21  verification the two was the best, that was for
22  Mr. Panichelli?
23  A.    Uh-huh.
24  Q.    But obviously he only had three --

BRIAN MAGEE

Page 113

1   A.   Right.
2   Q.   -- SRs.  So you weren't faulting him
3   for only having three?
4   A.   Correct.
5   Q.   WRs or SRs, right?
6   A.   Right.  In the big picture I use this
7   to assign turfs and, you know, what is going on
8   in the turfs.  We can never -- we can't cookie
9   cutter because we are dealing with set entities
10  in Philadelphia, eastern, south and Delaware,
11  and I can't control where things are built or
12  where they come in to, so I try to put the
13  turfs -- you are getting, you know, your
14  geography is covering all equal in the end that
15  I feel like everyone is busy.
16  Q.   317 for WRs is the grand total, do you
17  see that?
18  A.   Yes, done by my team.
19  Q.   Right.  Then under the Fac Verification
20  for business days at the bottom there is a 10,
21  is that the average for your team?
22  A.   As of this date, yes.
23  Q.   As of the second week of April?
24  A.   Yes.  My target would have been eight

Page 114

1   there.
2   Q.   Why is that?
3   A.   That is what was put out as our target,
4   you know, eight for a facility verification.
5   Q.   During the entire year 2015?
6   A.   I believe so.
7   Q.   That was the same eight business days
8   we were talking about before, though, right,
9   the goal was to get the information sent to the
10  client within eight business days?
11  A.   Correct.
12  Q.   So the gentleman below you, Silens?
13  A.   Salinsky.
14  Q.   Yeah.  Was he overseeing engineers as
15  well?
16  A.   Yes.
17  Q.   For that same time period his average
18  Fac Verification was seven, so I guess do they
19  do slightly better, his team?
20  A.   They are doing better than me on it,
21  yes.
22  Q.   The people who only have two
23  individuals are they doing different work like
24  Smail?

Page 115

1   A.   They do, they are called provisioners
2   so they do like a set role.  They are not doing
3   the same as a turf engineer, they are a
4   separate group.  Salinsky, Septak, Gross and
5   myself are turf managers.
6   Q.   Salinsky, Septak and Gross, you guys
7   were all turf managers?
8   A.   Yes.
9   Q.   Now, I notice in your list Portolese is
10  not on there, is that because he was doing
11  conduit work?
12  A.   I would say yes.
13  Q.   Now, I want to look at Ms. Walker's
14  2014 evaluation because that does have scores
15  that I want to chat with you now that I have an
16  understanding of how you were measuring things.
17  Here is your 2014 evaluation.  If you go to
18  page 15, I want to look at some of these
19  numbers with you.  Do you see where it says
20  prints issued, do you see that area there, the
21  first area, prints issued 136 versus 111?
22  A.   Yes.
23  Q.   Is 136 how many she issued?
24  A.   I would say yes.

Page 116

1   Q.   Is 111 the team average?
2   A.   Yes.
3   Q.   Hours issued.  What is hours issued?
4   A.   It is like you look at the -- oh, wait
5   a second, no, reverse that, because so the
6   first number is the district average.  Look at
7   the top district average versus your average at
8   mid year, so prints issued district average is
9   136, Suzette's would be 111.
10  Q.   Okay.
11  A.   So of these prints issued, like the
12  hours lets you know the scale, the size of the
13  job.  So the more hours the bigger the job, and
14  the bigger job would take more time to do.  So
15  you try to understand what people are doing and
16  what they have.
17        So the average of the team their hours
18  issued were 6,503 and Suzette was 3,137.  So
19  that would tell me she was doing smaller jobs,
20  which you don't have control of, it is what
21  area you are in, but it lets you know what is
22  the district, how busy is the district.
23  Q.   Is that for the entire district or just
24  your team?

R&K REPORTING, INC.

BRIAN MAGEE

Page 117

1  A.    That would be my district.
2  Q.    So that would not include like Gross,
3  for example?
4  A.    Correct.
5  Q.    ODNHH, what is that?
6  A.    ODN households is the, it is an FTTP
7  term of when the houses are say completed and
8  they are not yet ready for sale but they are
9  built.
10  Q.    She had zero, does that mean maybe she
11  didn't do any?
12  A.    That is what it would indicate, yes.
13  Q.    She may not have been assigned any
14  either, right?
15  A.    Right.
16  Q.    NWCHH?
17  A.    Network create household.  So they were
18  put in service.  So 166 units that weren't
19  available for Fios before now are available for
20  Fios as of this date.
21  Q.    Now, all those numbers that we just
22  looked at, prints issued all the way down to
23  number NWCHH, those numbers wouldn't impact
24  your view of performance because those are

Page 118

1  things beyond the employee's control, right?
2  A.    Right.  They would let me indicate what
3  is being worked on and what, you know, I am
4  always looking to, you know, right size turfs
5  so to look at what the person has on their
6  plate.
7  Q.    Then average of Fac Verification, 18.2,
8  that is the district average, right?
9  A.    Right.
10  Q.    Versus 10.3, that is her score?
11  A.    That was her mid year, yes.
12  Q.    So you told me earlier the lower the
13  better, right?
14  A.    Correct.
15  Q.    So was that a good Fac Verification
16  score?
17  A.    It was good when you look at the
18  numbers so it was on six orders.  So the volume
19  is small, but, no, I am not upset with the
20  10.3.
21  Q.    Then SR numbers, 25 versus 6.  Now, we
22  looked earlier, just as an example, in April of
23  2015 that Mr., is it Panichelli?
24  A.    Correct.

Page 119

1  Q.    He only had three orders and here she
2  has six.  Was there any view that you could
3  take of these particular numbers right here to
4  judge her performance or that wouldn't be
5  something that you would do with these standing
6  numbers alone?
7  A.    Well, looking just the standing
8  numbers, saying hey, it's looking decent for
9  this time of year for Suzette.
10  Q.    Based on her turf I guess?
11  A.    Six months in the turf and doing, yeah.
12  Q.    Suzette, your numbers look good
13  considering your time in the turf.  Take
14  ownership of your turf and learn as much as you
15  can during the remainder of this year on high
16  bandwidth; is that right?
17  A.    That's correct.
18  Q.    If you can get your Fac Verification
19  under 8 you will be making a big contribution
20  to the team.  Eight was the goal, right?
21  A.    Eight was the goal.
22  Q.    If we go to the next page, it says your
23  average of Fac Verification 8.4 versus 12.7
24  team's average.  Do you see that?

Page 120

1  A.    Yes.
2  Q.    So she didn't get it under 8 but she
3  got it pretty close, right?
4  A.    Pretty close.
5  Q.    So she made progress?
6  A.    Yes.
7  Q.    Your number of SRs 25 versus 57 team
8  average.  Now, does that number standing alone
9  mean anything to you or no?
10  A.    Yeah, just the volume is not great, but
11  she made effort to get that number towards
12  eight, I see effort there.
13  Q.    Well, my question, though, with respect
14  to both of her SR numbers, do you know how many
15  she actually could have accomplished up to the
16  August time period?
17  A.    I don't know what was still open at
18  that time or held.  You could have pending
19  orders that you are carrying from one month to
20  another.
21  Q.    But there is also varying reasons why
22  someone might carry an order from one month to
23  another, is that fair?
24  A.    Yes.

BRIAN MAGEE

Page 121

1    **Q.   I am still on page 16, are you still**
2 **there?**
3    A.   Yes.
4    **Q.   Suzette continued to grow into the turf**
5 **role in 2014.  She took the HBW, high**
6 **bandwidth, focus and moved her facility**
7 **verification number to metric.  What does that**
8 **mean?**
9    A.   I am saying that 8.4 to me was, you
10 know, close enough, especially it was under.
11 The 8.5 if I average it down, she brought it to
12 metric of the 8.
13    **Q.   When you say she took the high**
14 **bandwidth focus what do you mean?**
15    A.   Means she took the high bandwidth focus
16 so saying hey, this is what we are doing, and
17 she is working towards that end.
18    **Q.   Suzette utilizes and manages the SOW**
19 **contractors well.  What are SOW contractors?**
20    A.   They are the statement of work
21 contractors.
22    **Q.   How many was she working with, do you**
23 **know?**
24    A.   I have no idea.  Once again you send it

Page 122

1 to a firm, is the way it is supposed to work,
2 and they assign the workers.
3    **Q.   But would benefit from completing more**
4 **of the HBW surveys herself.  Does that mean**
5 **actually physically going on site to conduct a**
6 **survey?**
7    A.   Yes.  I view that as a way to learn the
8 full job.  To manage something you have to know
9 it because you are getting product back, you
10 have to check that product.
11    **Q.   So when we talked a little bit earlier**
12 **you told me that once in reference to turf you**
13 **did tell your employees use the contractors to**
14 **get more work done, they're project managers,**
15 **is that fair?**
16    A.   I recall saying something to that,
17 yeah.
18    **Q.   When you say greater focus on the end**
19 **product of the contractors' product is**
20 **necessary, what does that mean?**
21    A.   So with that statement I am talking to
22 a whole group of various degrees of knowledge.
23 So Suzette, she is utilizing the SOW
24 contractor, but at the same time she is not

Page 123

1 learning what is coming back.  Like it is
2 whatever is coming back to her is just coming
3 over to me and I am finding all the errors.  So
4 the wrong product is used, the system is not
5 filled out correctly, so there was -- and that
6 is what we encouraged her, to learn your turf,
7 learn your responsibility, before you start
8 sending it out you have to learn it.
9       And that turf is like a good turf to
10 learn in because you are not getting big
11 volumes so you can go and survey that number of
12 jobs, so 25 in a year broken over 12 months,
13 two a month, you could do that, and you could
14 learn while you are doing that, and then that
15 would help the end product.
16    **Q.   Why would any concerns over the product**
17 **come to your attention directly?**
18    A.   Because that is how everyone else
19 charges their time based upon this work print.
20 The work print is for construction to charge
21 their time, it is also for construction to what
22 materials to order, what materials to bring to
23 the job, and then it is our permanent asset
24 also that is going on our books.

Page 124

1       So the work print is a product that
2 engineering is responsible for delivering to
3 construction correctly.
4    **Q.   At what point in the process do you**
5 **review it then?**
6    A.   Before we go to construction.
7    **Q.   Do you review every single print that**
8 **all your engineers do?**
9    A.   In that time I was.
10    **Q.   Would you have any documentation that**
11 **would reflect any concerns with any prints that**
12 **were had with your engineers?**
13    A.   No, it would just be conversations and
14 just this, very focused on the product of the
15 contractors.  So reference it here saying what
16 you are getting back from the contractor you
17 have to, you know, spend more time reviewing
18 and managing them so that it is not me doing
19 it.
20       Also, once it is coming to me its going
21 to be late because now it is going back to the
22 engineer who is now going to send it back to
23 the vendor, and the whole time the clock is
24 ticking.

Page 125

1    Q.    Does every print come to you or not
2  then?
3    A.    At that time every print came to me.
4    Q.    So inevitably the print was going to
5  come to you at some point.  You are just saying
6  if changes needed to be made that would impact
7  the time?
8    A.    That is a negative to me, yes.
9    Q.    If, in fact, there are errors or
10  something is wrong with it, that is going to
11  overall impact the employee's average Fac
12  Verification number?
13    A.    This is for all types of work.  That is
14  just one subset of our work, it is all work
15  that is being reviewed.  So it is any job that
16  would have to go to construction.
17          So when we looked at, like in the mid
18  year that number was on there, so 111 prints,
19  those 111 prints are not just high bandwidth,
20  they are everything.
21    Q.    So is Fac Verification just for high
22  bandwidth?
23    A.    Yes, it is just one facet of what the
24  engineer does.

Page 126

1    Q.    Do the SOW contractors only do high
2  bandwidth?
3    A.    No.  High bandwidth was considered the
4  product because it was a revenue generator, and
5  that is why we put the emphasis on it for the
6  eight days, and the engineers, it was up to
7  them, but the engineers usually did the survey
8  of the high bandwidth themselves.
9    Q.    What is request net knowledge?
10    A.    Request net is where those specials
11  come over, the SRs, and request net knowledge
12  is manipulating that request net in order to
13  achieve FOC with the orders.
14    Q.    Why did you not give her a developing
15  rating on this particular evaluation?
16    A.    It was discussed, it was discussed.  I
17  felt like she, you know, the developing is also
18  a penalty, it has financial penalties to it,
19  and the performance, you know, is a better
20  rating, and I felt like, you know, fought for
21  her to give her encouragement.
22          I think she did enough to earn that
23  that year.  Was everything perfect, no, but I
24  think she did more in this role than she did in

Page 127

1  the conduit role to own it.
2    Q.    Did she deserve the performing rating?
3    A.    I gave it to her, so she deserved it.
4  I gave her what she deserved in my opinion.  I
5  just wanted to stress that it was, that the
6  development was on the table.
7    Q.    Was Mary Curtin the only one who got a
8  leading that year?
9    A.    I would have to look.
10    Q.    You can look at Verizon-2, that
11  exhibit, it is the rate and rank.  It is the
12  second column, it says 2013 but I think we
13  agreed that was for calendar year 2014.
14    A.    I don't see Mary Curtin, Tom Hodge.
15    Q.    I'm sorry, yes, Thomas Hodge, he was
16  the only one that warranted a leading in your
17  opinion.
18    A.    Yes.
19    Q.    The areas for primary skills, technical
20  knowledge and Credo and others, those numbers
21  you just provided based on in your discretion
22  you think were warranted?
23    A.    Yes.
24    Q.    Was that from a 1 to a 5?

Page 128

1    A.    I believe so.
2    Q.    What was the others category for?
3    A.    Other was the second, you know, FTTP
4  proficiency, survey and design.
5    Q.    Was that based on the Fac Verifications
6  course?
7    A.    No.
8    Q.    Was that just based on your personal
9  opinion about how proficient someone was with
10  FTTP and survey and design?
11    A.    Yes.
12    Q.    Your counsel is going to supply this
13  information, so I am only going to ask you for
14  your particular team of employees because there
15  is only 15 of them.
16          Scott Panichelli, is he Caucasian?
17    A.    I would say yes, I believe he is.
18    Q.    Mr. Hui, is he Caucasian, black, Asian?
19    A.    Asian.
20    Q.    What about Tom Hodge?
21    A.    Caucasian.
22    Q.    Steve Murphy?
23    A.    Caucasian.
24    Q.    Maria?

Page 129

1    A.    Caucasian.
2    Q.    **Mary?**
3    A.    Caucasian.
4    Q.    **Carl?**
5    A.    Caucasian.
6    Q.    **George?**
7    A.    Caucasian.
8    Q.    **Ernest?**
9    A.    Caucasian.
10   Q.    **What about John Shubrook?**
11   A.    Caucasian.
12   Q.    **Dave Perry?**
13   A.    Caucasian.
14   Q.    **Joe?**
15   A.    Caucasian.
16   Q.    **Paul?**
17   A.    Caucasian.
18   Q.    **And Anthony?**
19   A.    Caucasian.
20   Q.    **Do you know if any of these people we**
21   **just discussed took any form of family medical**
22   **leave in 2013 or 2014?**
23   A.    Off the top of my head I can't answer
24   that.

Page 131

1    A.    One.
2    Q.    **Was everybody on the conference call**
3    **given a specific number?**
4    A.    It wasn't given on that call, it was
5    given later.  We were told of the RIF and then
6    I received a subsequent call with my number.  I
7    don't know what other people were told.
8    Q.    **So as we sit here right now do you know**
9    **what Gross, Septak or Salinsky were told as to**
10   **how many people in their district would be**
11   **impacted by the RIF?**
12   A.    Only Carl Gross.
13   Q.    **What did you know about his district?**
14   A.    I know he was told one also.
15   Q.    **Were you told at any point in time that**
16   **if you had reason to disagree that someone**
17   **would be impacted that they would discuss with**
18   **you whether the employees could stay and there**
19   **was someone else impacted on a different team?**
20   A.    I would say that was an understanding,
21   stuff just goes -- I would say yes.  I am
22   trying to answer your question the best I can,
23   I think that question is a yes.
24   Q.    **Yes, I understand your answer.  So you**

Page 130

1    Q.    **Or if they came to you seeking any kind**
2    **of accommodations of any sort for a medical**
3    **issue, do you know?**
4    A.    Don't recall.
5    Q.    **When was the first time that you were**
6    **made aware by anyone that there was going to be**
7    **a RIF that would impact your part of the**
8    **organization?**
9    A.    It was in the first quarter of 2015.
10   Q.    **Who made you aware of that?**
11   A.    My director, Joe Muccilo.
12   Q.    **How?**
13   A.    Telephone conference call with all the
14   managers.
15   Q.    **Were you told how many people had to be**
16   **impacted in your group or was it discussed that**
17   **they all should be ranked and it would be**
18   **determined based on every respective ranking**
19   **who would stay and who would go?**
20   A.    I was told how many in my group I would
21   have to identify.
22   Q.    **You were given a specific number?**
23   A.    Yes.
24   Q.    **What number were you given?**

Page 132

1    were told first quarter of 2015?
2    A.    I think that is when it was.  So
3    sometime in the March time frame I think we
4    were told.
5    Q.    **How long did it take you to rank or**
6    **rate your employees, was this done in one day?**
7    A.    No.
8    Q.    **How long did it take you?**
9    A.    I probably spent, you know, I did it
10   over a course of a week, and probably spent,
11   probably about three to four hours on it.
12   Q.    **Do you have something in the system**
13   **where you know what their final rating was on a**
14   **review that is easier than going back and**
15   **pulling the electronic copies individually and**
16   **looking at the final page?**
17   A.    Yes.  There is a system, an HR system,
18   I can see everyone's rating, and I can go back
19   on anyone's review to look at.
20   Q.    **What is that program called?**
21   A.    Under HR performance appraisals.  I
22   don't know if that is the exact title, but you
23   go under performance.
24   Q.    **Besides the performance appraisals did**

BRIAN MAGEE

Page 133

1  you look at anything else when you were
2  performing this rate and rank of your team?
3  A.    Originally, no, I looked at the
4  performance appraisals first.
5  Q.    And then?
6  A.    And then as the process, you know,
7  continued I looked at all the metrics that were
8  available to me.
9  Q.    What were those?
10  A.    This one that you provided today, the
11  8/17 spreadsheet, but the date of it would have
12  been aligned to whatever date it was that I was
13  reviewing that.
14  Q.    In Verizon-2 you identify for Suzette
15  her YTD Fac Verification is 19 compared to team
16  average 10.  What month, week, what was that
17  for?
18  A.    It would have been whenever I was
19  filling this out or providing this information.
20  This was completed in conjunction with
21  telephone calls with the HR person.
22  Q.    But you pulled the report to check the
23  team average of what hers was at the time?
24  A.    Yes.

Page 134

1  Q.    It is different every month, right?
2  A.    Yes.  So it identifies the year to
3  date, is whatever the date was, it was the year
4  to date number as of that date I was doing
5  this.
6  Q.    Then her, I guess for her final
7  performance review her year, was this her year
8  to date in her final performance review, this
9  8.4 versus 12.7?
10  A.    Of 2014, yes, that was her.
11  Q.    So for her year to date for 2014 it was
12  pretty darn good, right?
13  A.    It was good.
14  Q.    David Perry, you put comments for him,
15  right?
16  A.    In this Exhibit 2?
17  Q.    Yeah, on page 3.
18  A.    Yes.
19  Q.    He had a D rating on one of his
20  evaluations, right?
21  A.    Yes, from the form I see, yes.
22  Q.    Why didn't you mention that in the
23  comments area?
24  A.    Why didn't I mention that?

Page 135

1  Q.    Yeah.  Because you had mentioned
2  Suzette had a D rating, right?
3  A.    Well, I didn't give the D rating to
4  Dave Perry, he wasn't in my group at that time.
5  Q.    Either way, was it your understanding
6  that in counting points ratings from calendar
7  year 2013 and 2014 are what counted?
8  A.    His does reflect that in the chart.  So
9  his D rating is calculated the same way as
10  Suzette's is for that year.
11  Q.    Was it your understanding that you did
12  not have to give comments for every employee?
13  A.    Yes.
14  Q.    Did you have to give comments where a 1
15  or 5 was issued on a performance rating?
16  A.    I believe so.
17  Q.    But in addition to that you gave
18  comments for others, though, what was that
19  based on?
20  A.    I don't recall.  This was in
21  conjunction, like I didn't specifically fill
22  this out, I worked with the HR person for this,
23  and she requested information of me and I
24  provided it.

Page 136

1  Q.    Is that she Melissa Parker?
2  A.    Yes.
3  Q.    Is she located at 900 Race Street?
4  A.    No.
5  Q.    Did you provide her anything via email
6  to make things easier?
7  A.    I may have.
8  Q.    Would they be in your delete folder or
9  active folder?
10  A.    I don't know if they are there.
11  Q.    Would you be able to check though?
12  A.    I will check.
13  Q.    You said something about being able to
14  check the delete folder for your stored monthly
15  reports?
16  A.    Uh-huh.
17  Q.    How often do you delete your emails?
18  A.    Daily, but my email deletes don't go
19  anywhere because it is under legal hold.
20  Q.    Now, are you familiar that
21  interrogatories were propounded or sent in this
22  case and there were certain responses given by
23  Verizon?
24  A.    No.

BRIAN MAGEE

Page 137

1  Q.    Do you remember signing like a
2  verification?
3  A.    Can I see that form?
4  Q.    Sure.
5        (Whereupon verification was marked
6        for identification as Verizon-12.)
7        THE WITNESS:  Yeah, I did sign
8  that, yes.
9  BY MS. BURKE:
10 Q.    What did you understand that you were
11 signing off on when you signed this
12 verification?
13 A.    It was whatever forms that I reviewed
14 in relation to that I said yes.  This is what
15 this is stating.
16 Q.    I am going to give you the
17 interrogatory that goes with that verification.
18 It is a lengthy document so I will point you to
19 a particular area.
20       (Whereupon defendants' responses to
21       plaintiff's interrogatories was marked
22       for identification as Verizon-13.)
23       THE WITNESS:  When you said
24       interrogatories I should have asked

Page 138

1        you, I didn't know what you were.
2  BY MS. BURKE:
3  Q.    That is fine.
4  A.    I thought you were talking about
5  something that I wasn't associated with.
6  Q.    No, that is okay.  These are a lengthy
7  document, but these were formal responses to
8  questions that were propounded by Ms. Walker
9  through her counsel.  Initially there is a set
10 of legal objections.  I am just going to point
11 your attention to one particular interrogatory,
12 and it is number 3, which starts on page 5, the
13 bottom of page 5.
14 A.    Uh-huh, I am on page 5.
15 Q.    So it seeks the identity of the
16 individuals who participated in the decision to
17 end Ms. Walker's employment, and then if you
18 look on page 6 in the response area there is a
19 legal objection made by your counsel, and then
20 it says Brian Magee and Joseph Muccilo
21 participated in the decision to end plaintiff's
22 employment with defendant.  Do you see that?
23 A.    Yes.
24 Q.    Did you and Joe ever have a

Page 139

1        conversation about whether or not to proceed
2  with Ms. Walker as an impacted employee?
3  A.    Yes, I would say I provided him the
4  name of who I selected.
5  Q.    What was the nature of that discussion?
6  A.    Just who the individual was and why I
7  made the selection.
8  Q.    Did he respond or provide any feedback
9  to you?
10 A.    I think from what I stated he said
11 okay.
12 Q.    Did you give him a full rundown of why
13 you picked her or you just said I picked
14 Suzette Walker?
15 A.    No, I gave him a rundown.
16 Q.    At some point you actually verbally
17 told Ms. Walker that her position was being
18 impacted?
19 A.    Yes.
20 Q.    What did you tell her when you sat her
21 down?
22 A.    I told her as I announced once we found
23 out there was a RIF, I told everyone there is a
24 RIF and the dates, and when she came in that

Page 140

1        morning I asked her to the office and told her
2  the RIF, today is the RIF day, and you are the
3  impacted employee.
4  Q.    What else did you say, if anything?
5  A.    I remember just talking through it.  Is
6  there something for me to read?  I don't recall
7  any big conversation, I just remember sitting
8  there with Suzette, impacted, and just
9  explaining what was going to happen.
10 Q.    Explaining procedurally what would
11 happen next?
12 A.    Right.
13 Q.    Did you tell her why she was picked?
14 A.    Specific of why she was picked?
15 Q.    Yeah.
16 A.    No, I don't think there was -- I don't
17 think it was requested.
18 Q.    Did you tell her that the company was
19 going in a different direction?
20 A.    I could have said the company, this is
21 something that I said to my team for the last
22 six, seven years that the company was changing,
23 we are no longer copper focused, we moved to a
24 fiber focus, and that is where we are at now.

BRIAN MAGEE

Page 141

1  Q.    Did you say that to her or you don't
2  know?
3  A.    I said that was my normal talk of where
4  we are at.  The technology has changed
5  everything.  It is not any of our faults, it is
6  just the technology has changed.
7           MR. BARRAS:  Can we go off the
8       record for a minute?
9           (Whereupon a discussion was held
10      off the record.)
11 BY MS. BURKE:
12 Q.    We were talking earlier about the
13 initial conversation with Mucillo about the
14 fact that there was going to be a RIF and that
15 at some point later you learned that it would
16 have to be one person from your team?
17 A.    Correct.
18 Q.    Did that change at some point and there
19 was any suggestion by Muccilo that it did not
20 have to be someone from your team specifically?
21 A.    Yes.
22 Q.    When did that change?
23 A.    Somewhere in that RIF period of, you
24 know, I would say near the end because there is

Page 142

1  like a 30 day notice to the employee.  So
2  before that 30 day notice when we had to settle
3  on names, I was called and said you have to get
4  with Carl Gross because the number for Eastern
5  PA, Delaware is just one now, so you and Carl
6  have to come up with, you know, who should be
7  RIFd.
8  Q.    How did you learn that information?
9  A.    A phone call.
10 Q.    Did you document it in any way?
11 A.    No.
12 Q.    Was it memorialized in an email at any
13 time?
14 A.    No, not that I know of.
15 Q.    At any point were you talking to either
16 Joe Muccilo or Carl Gross about the RIF and
17 potential perspective candidates to be impacted
18 via email?
19 A.    No.
20 Q.    Never?
21 A.    I don't believe so.
22 Q.    Did Gross actually give you a name of
23 someone that he had selected from his team or
24 did you both discuss Suzette Walker and just

Page 143

1  decide that she would be appropriate?
2  A.    He gave me a name from his team.
3  Q.    Who did he give you?
4  A.    Ed McIntosh.
5  Q.    Does he still work for Verizon?
6  A.    No.
7  Q.    Why not?
8  A.    I believe there was a RIF package that
9  he took.  I am not sure, it didn't impact my
10 team, but I believe he left under a RIF.
11 Q.    How long after the April 2015 RIF?
12 A.    That was in the fall of last year.
13 Q.    2015?
14 A.    Yeah.
15 Q.    Did he transition to another team than
16 Carl Gross's at some point?
17 A.    Ed McIntosh was an engineer, and then
18 he left engineering and went to be a supervisor
19 of construction or maintenance, I forget which
20 one, and then after that he was a supervisor of
21 the DRC, which are the --
22 Q.    I know what they are.
23 A.    Okay.
24 Q.    Did he leave engineering voluntarily?

Page 144

1  A.    When he went to become a supervisor?
2  Q.    Yeah.
3  A.    Yes.
4  Q.    What did he do, an internal transfer of
5  some sort?
6  A.    Yeah, he answered a job rec.
7  Q.    Did you and Carl Gross or Salinsky or
8  Septak ever swap employees amongst your team?
9  A.    Carl Gross and I have.
10 Q.    For what reasons?
11 A.    With other -- we've had people swap
12 between other teams.  Septak and Salinsky are
13 in central and western PA, but people have
14 moved across districts before, across other
15 managers, it is not uncommon for people to move
16 between managers.
17 Q.    You don't need a postal rec for that,
18 right?
19 A.    Right.
20 Q.    You just discuss it and then?
21 A.    It is usually associated with either a
22 job function that is needed or, you know,
23 changes happening in the organization.
24 Q.    Do you do it for developmental purposes

BRIAN MAGEE

Page 145

1  as well?
2  A.    Yes.
3  Q.    So Muccilo shared with you that it
4  didn't have to be someone on your team, it just
5  had to be someone between you and Gross in
6  Eastern?
7  A.    PA and Delaware, correct.
8  Q.    Did he rank his employees?
9  A.    I don't know.
10  Q.    So do you know if Ed McIntosh was
11  allegedly picked as a result of being ranked in
12  comparison to his team members?
13  A.    The only thing I know, we had a
14  conversation, I asked Carl who his person was,
15  told him who my person was, and we discussed,
16  said that, you know, their merits, why they got
17  to it, made it to the list.
18  Q.    Well, do you know if you ranked them or
19  no?
20  A.    All I know is what I told me.  He said
21  he picked Ed McIntosh because he was the newest
22  on his team.  He felt like everyone on his team
23  was, you know, great, and he felt Ed was
24  great -- he just said he had no other way to

Page 146

1  split it.
2        (Whereupon Bates stamp VZ Walker
3        755 through 813 was marked for
4        identification as Verizon-14.)
5  BY MS. BURKE:
6  Q.    We are looking at Verizon-14.  First of
7  all, just for familiarity purposes these very
8  first two pages which are Bates stamp Walker
9  755 to 756, this business case.
10  A.    Right.
11  Q.    Are you familiar with this type of
12  computer entry or this is not something you go
13  into?
14  A.    This is not something I would see.
15  Q.    Turning to the next document in this
16  exhibit, which is Bates stamp Walker 757.
17  These ratings appear to be completed by Meghan
18  Lose.  Do you know who that is?
19  A.    Yes, I do.
20  Q.    Is she a representative of HR or
21  manager?
22  A.    No, she is my counterpart, but she has
23  a different function in our district.
24  Q.    What is that function?

Page 147

1  A.    She is the IOF manager.
2  Q.    What does that mean?
3  A.    Interoffice facilities.
4  Q.    Does she oversee administrative staff?
5  A.    No, she oversees a team of engineers or
6  planners.  I would call them planners.
7  Q.    Are they Band 7T?
8  A.    They might be Vs.
9  Q.    T versus V is just a distinction of
10  exempt versus non exempt; is that correct?
11  A.    Correct.
12  Q.    If you and I look at the rate and rank
13  for your group, which was Verizon-2, it says
14  completed by Melissa Parker.  Do you see that?
15  A.    Yes, I did see that.
16  Q.    Did you even type any of this
17  information into the comments area?
18  A.    I don't believe I typed any of that
19  into the comments area, but it could have been
20  a verbal. I think she interviewed me over the
21  phone. I don't recall, and I will check if I
22  sent her an email, like with it written out,
23  but I know it wasn't in the system.
24        I had a phone call with Melissa where

Page 148

1  she, you know, questioned me on everything and
2  whether that was, she took that from our phone
3  call or she asked me to email her information,
4  I don't recall.
5        I do recognize some of that to be my
6  words, but then there is others in that that
7  are not my words.
8  Q.    These are all in numerical order by a
9  page standpoint, so if you flip to 762, please?
10  A.    Okay.
11  Q.    These all have business case numbers
12  associated with them.  Does the business case
13  number even mean anything to you?
14  A.    Not to me.
15  Q.    You think that is an HR associated
16  number, the RIF number?
17  A.    Yeah, right.  I think that comes over
18  to our team so that like my director and his
19  staff person would probably, you know,
20  intimately aware of that business case number
21  but not me.
22  Q.    Just looking at some of these names,
23  Linda Hauss, Steve Hunter, do you know who
24  their supervisor is?

BRIAN MAGEE

Page 149

1    A.    Doug Smith.  All these individuals are
2    planners.
3    Q.    What area is he responsible for?
4    A.    Pennsylvania, Delaware.
5    Q.    Not just eastern or western but the
6    whole state?
7    A.    Right.
8    Q.    Can you please --
9    A.    And I don't know -- like I don't know,
10   you know, this is my first seeing it, I don't
11   know like the RIF person, I was treated as a
12   stovepipe compared to him.  He was told I guess
13   a number, I was told a number.  So I don't
14   know, like Doug has a different title than
15   mine.
16   Q.    Okay.  Can you go to 769, please?
17   A.    Okay.
18   Q.    Charles Browning, Fraer and Gaunt, do
19   you recognize whose team they are on?
20   A.    Gary Smail.
21   Q.    What position did these people hold?
22   A.    They are provisioners.
23   Q.    Band 7?
24   A.    Yes.  I would say they are Ts.

Page 150

1    Q.    Do you know who John Dedra is?
2    A.    No, but I know Dedra Johns, maybe you
3    have it backwards.
4    Q.    Yeah, who is that?
5    A.    Dedra Johns worked in Philadelphia.
6    Q.    Was she a single incumbent meaning
7    there is no one to compare her position to?
8    A.    I would say yes.  She didn't work for
9    me.  I know she had a cube in the corner.
10   Q.    Do you know who she worked for?
11   A.    Cindy Sweppenheiser I believe.
12   Q.    Do you know if Sweppenheiser supervised
13   anyone else?
14   A.    Yes, she has a team of supervisors.
15   Q.    But that is not the function that Dedra
16   Johns was performing?
17   A.    Correct.
18   Q.    Can you go to page 778, please.  Okay,
19   that is self identified I don't need you to.
20   Page 783, are you there?
21   A.    Yes.
22   Q.    Feiler, Henry Westover, do you know
23   what team they are associated with?
24   A.    At that time they were on Jim, no,

Page 151

1    yeah, I guess.  Yeah, that is his last name.
2    Just from looking, Brian Henry now works for me
3    so does Tim Lennon.  It is Szewzyk, that is his
4    name.
5    Q.    S-E-P-T-A-C-K?
6    A.    No, that is Steve Septak.
7    Q.    So this person, different geographic
8    region than you, Gross and Salinsky?
9    A.    Jim Szewzyk, I hope I am saying the
10   names right, like he has the FTTP team, fiber
11   to the cell site team and Fios held orders.  He
12   administers that state, both Pennsylvania and
13   Delaware at the time.  He was responsible for
14   the overlay of the City of Philadelphia, which
15   in the start of this year that is what I
16   inherited, to finish that job.
17   Q.    The people that we were looking at,
18   page 783, who was their supervisor at the time?
19   A.    Jim Szewzyk.
20         MR. BARRAS:  Do you want me to
21   spell it?
22         MS. BURKE:  Yeah.
23         MR. BARRAS:  S-Z-E-W-Z-Y-K.  If I
24   can read this right.

Page 152

1    BY MS. BURKE:
2    Q.    Do you know what geographic area he was
3    responsible for?
4    A.    Pennsylvania, Delaware for those
5    functions I was given, like overlay of FTTP,
6    Fios held orders, fiber to the cell site.
7    Program management, like of programs he was in
8    charge of.
9    Q.    Are these engineers?
10   A.    Yes.
11   Q.    If you go to page 789, June Hooks, are
12   these under McCoach, Janet Prince?
13   A.    No, they are under Dawn Stampone.  I am
14   almost positive it is under Dawn Stampone.
15   Q.    794 through 798 are all your team, so
16   if you could just go to page 801.  Do you know
17   whose team these people are for, Broz, Hechler?
18   A.    I am not sure.  Just because like
19   movement of people from teams and since they
20   are western and central people.
21   Q.    Page 805, these people, Messick,
22   McHugh, do you know who their team, their
23   supervisor?
24   A.    This was Smail.  So I could go back,

BRIAN MAGEE

Page 153

1  are they from different times, the ones before?
2  **Q.     All of these allegedly are from April**
3  **23, 2015 or thereabouts.**
4  A.     Okay.  I am just saying based on the
5  face of the documents.
6  **Q.     If you go to 810, do you recognize any**
7  **of these names Miller, Blodniker, Bushkirk?**
8  A.     No, I don't recognize any of these
9  names.
10  **Q.     They are not Gross' team, are they?**
11  A.     Joe Snyder I do recognize him and Mark
12  Waselko, I dealt with them, they are Ron
13  Salinsky's team.
14  **Q.     He was part of the turf managers?**
15  A.     Correct.
16  **Q.     Were you told at any point from Joe**
17  **Muccio that you could also confer with**
18  **Salinsky to see if anybody could be pulled from**
19  **his team?**
20  A.     No.
21  **Q.     Salinsky's team, if you look at their**
22  **locations, none of them were Philadelphia,**
23  **correct?**
24  A.     Right, they are central PA.

Page 154

1  **Q.     So Septak and Gross, were they more**
2  **closer to the area that you were responsible**
3  **for?**
4  A.     Gross, Carl Gross and I share eastern
5  PA, Delaware, which used to be a turf, used to
6  be a director turf.
7  **Q.     How many employees did Gross have on**
8  **his team at the time that you guys were**
9  **conferring?**
10  A.     I can't tell you that.
11  **Q.     Septak, what location did he have?**
12  A.     Western PA and former GTE.
13  **Q.     I'm sorry, former what?**
14  A.     GTE.
15  **Q.     What is that?**
16  A.     That was a company that Verizon
17  purchased in the past and they still provide,
18  you know, the former GTE provides, you know,
19  telecom services in the geography.
20  **Q.     Was Septak on the initial call when**
21  **everybody was told that their team may be**
22  **impacted by the RIF?**
23  A.     Yes.
24  **Q.     Do you know if he did a rate and rank?**

Page 155

1  A.     I don't.
2  **Q.     What is Brian Henry doing for your**
3  **team?**
4  A.     Fiber to the print overlay of the City
5  of Philadelphia.
6  **Q.     Fiber to the what?**
7  A.     Fiber to the print, the overlay of the
8  City of Philadelphia clean up.
9  **Q.     Is he an engineering specialist?**
10  A.     Yes.
11  **Q.     Band 7?**
12  A.     Uh-huh.
13  **Q.     Tim Lennon, is he an engineer?**
14  A.     Yes.
15  **Q.     Band 7?**
16  A.     Yes.
17  **Q.     What is he doing for you?**
18  A.     Fiber to the print, overlay, clean up
19  City of Philadelphia.
20  **Q.     When did they come over to your team,**
21  **different times or the same time?**
22  A.     Same time.
23  **Q.     When was that?**
24  A.     Beginning of this year.

Page 156

1  **Q.     Have you gained, lost, traded anyone**
2  **else in the list of people that we haven't**
3  **talked about?**
4  A.     So John Shubrook was on that list.
5  **Q.     Let's go to Verizon-2 to make things**
6  **easy, and if you go to the second to the last**
7  **page.  We will get to Shubrook in a minute, but**
8  **from Scott Panichelli all the way down, are any**
9  **of these individuals no longer on your team?**
10  A.     No, they are all still on my team.
11  **Q.     Then the next page, are all these**
12  **individuals still on your team?**
13  A.     No.
14  **Q.     Who is not?**
15  A.     John Shubrook.
16  **Q.     Why not?**
17  A.     He took a promotion to the IOF team in
18  New Jersey.
19  **Q.     Who's handling his turf?**
20  A.     Right now Scott Panichelli and George
21  Zang.
22  **Q.     In addition to their prior**
23  **responsibilities?**
24  A.     Yes.

BRIAN MAGEE

Page 157

1  Q.    Anyone else on this list who is not on
2  your team anymore?
3  A.    No.
4  Q.    Was David Perry the newest person on
5  your team at the time of the RIF?
6  A.    Yes.
7  Q.    Was Anthony Portolese the second newest
8  at the time of the RIF?
9  A.    I don't think I can answer it like that
10 because like the movement of people, Anthony
11 was an engineer, like I hired Anthony as a
12 college intern, so that is where he started.  I
13 think he has close to 10 years now.  He left
14 engineer to go to construction and then came
15 back.  So I don't know if you are saying the
16 least amount of time in engineer or the least
17 amount of time under me.
18 Q.    No, I mean like, for example, even
19 though Suzette's job entry date says 12/2012,
20 we know she was under you since at least 2004,
21 right?
22 A.    No.
23 Q.    2008?
24 A.    Right, 2008.

Page 158

1  Q.    But, I mean, he didn't come back under
2  your supervision until 4/27/14, right?
3  A.    Correct, correct.
4  Q.    The exhibit we looked at a minute ago,
5  Verizon-14 did you ever look at any of these
6  rate and rank documents or is this the first
7  time you have seen them?
8  A.    First time I have seen them.
9  Q.    Did you have to put requisition numbers
10 out for Henry or Lennon or did they just
11 transfer in?
12 A.    They just transferred in.
13 Q.    Are they Engineering III Specialists?
14 A.    Yes, they are the same title.  Everyone
15 under me has the same title.
16 Q.    You talked earlier, and it is my
17 understanding that performance based pay
18 increases are based on a formula of some sort;
19 is that correct?
20 A.    I don't recall saying that.
21 Q.    That a performance evaluation could
22 impact someone's compensation?
23 A.    That is true.
24 Q.    Is it your understanding that the

Page 159

1  calculation of the amount of a performance
2  based increase is based on a formula of some
3  sort?
4  A.    Now, no.  What I know to be true is
5  your rating gives you a range that you could
6  achieve.
7  Q.    Then do you identify what the person
8  will be compensated in terms of their increase?
9  A.    I have say over that, yes.  In that
10 range.
11       (Whereupon short term incentive
12       plan was marked for identification as
13       Verizon-15.)
14 BY MS. BURKE:
15 Q.    We won't look at the first page that is
16 for Bands 5 and below.  If you look at the last
17 page, Bates stamp 52, this is for Band 6
18 through 9.  Are you familiar with this scale?
19 A.    No, I have not seen this scale before.
20 Q.    When you are determining what the
21 employee increase will be, do you understand
22 that there is a threshold that you can't go
23 below and a maximum that you can't go above?
24 A.    Yes.  There comes over to us, the

Page 160

1  employees fund it for a certain percent, and
2  then we have to keep within that fund, I have
3  to keep within my budget for my team and then
4  in the ranges of everyone, because some people
5  can't get more than a certain amount.  So,
6  yeah, it is just that I have never seen this
7  out.  I get to see mine, I never know what my
8  target or maximum will be, so now I can tell
9  whether I get a good raise or not now, thank
10 you.
11       (Whereupon Bates stamp Def Walker
12       28 through 48 was marked for
13       identification as Verizon-16.)
14 BY MS. BURKE:
15 Q.    This is compensation information for
16 Suzette Walker.  Are you familiar with these
17 screen shots of the computer system or no?
18 A.    In this format, no.
19 Q.    Were you aware that she received a pay
20 increase as of March 2015, March 29th?
21 A.    Yes, based upon 2016 performance, yes.
22 Q.    So her salary increased from 90,834 to
23 93,560.  What role did you play in determining
24 that percentage, which is roughly 4 percent or

BRIAN MAGEE

Page 161

1  less?
2  A.    I would say a direct role.
3  Q.    What did you use to determine how low
4  you could go, how high you could go?
5  A.    It would have been in the range that
6  was available to her, and then what my budget
7  was to spend.
8  Q.    Because of the five given to Tom Hodge
9  did he get to your recollection a pretty high
10 salary increase that year?
11 A.    Yes, he had a bigger range because of
12 his rating.
13 Q.    Over the course of Ms. Walker's years
14 with you there were periods of time where her
15 rate of pay did not change for several years,
16 was that because there was no funding to do
17 that or for other reasons.
18 A.    I don't recall unless they are from a
19 rating, like no change in the person's pay,
20 that is unusual. I don't recall that. Like
21 the only time that I would say she wouldn't
22 have gotten a raise would have been with the
23 development rating.
24 Q.    Can you go back to exhibit Verizon-1,

Page 162

1  please. Can you look at the base salary areas
2  and just let me know if you think that is
3  inaccurate or if there are situations where you
4  don't have the discretion to give increases to
5  your team overall because of finances that
6  year?
7  A.    Could you point out a year that you are
8  referencing on this sheet?
9  Q.    So if you look as an example, March
10 2010 she is at 77 and some change and she stays
11 at that rate up through February 2011.
12 A.    So she wouldn't have had a raise yet in
13 February of 2011. When you see that November
14 number in 2011 where she has 82,000 and she got
15 a $5,000 raise, approximately.
16 Q.    Why in November, though?
17 A.    Well, no, just because your, for
18 whatever reason the effective date she would
19 have got it in March, it is just being
20 reflected.
21     It is always late out in the year when
22 your raise would come and when you get the
23 bonus. You get the bonus first and the raise
24 comes later. The raise usually comes in that

Page 163

1  March time frame.
2      So like you don't show March, I am
3  saying in February it has been communicated to
4  her what her raise is going to be, but we don't
5  see it on this sheet until the November
6  showing.
7      I know from the supervisor, you know,
8  the supervisor had a bigger range and you
9  could, you know, move a person up faster than
10 you could as an engineer.
11 Q.    There is two additional spreadsheets
12 that I just want to ask you about quickly.
13 This one is probably easier, 8/18 to look at
14 first. This is just a laundry list of head
15 count of individuals in Joe Mucillo's
16 organization. I don't believe I need to ask
17 you anything about this particular one.
18     Finally, this one you can speak to. If
19 you go to 816. Are you with that spreadsheet?
20 Do you recognize what that is, Bates stamp 816,
21 that spreadsheet? Are you in the by engineer
22 tab?
23 A.    Yes.
24 Q.    So if you go by engineer and we go down

Page 164

1  to you, are you familiar with this chart?
2  A.    Yeah, this would have been end of year
3  2014.
4  Q.    Do you know what year this is?
5  A.    Yeah, I would say it is end of year.
6  Wait, yeah, 2014, end of year 2014.
7  Q.    What are you gauging that by?
8  A.    The reports changed to that format we
9  saw earlier in 2015. I like this report
10 better.
11 Q.    If you look at Suzette Walker, it looks
12 like that 8.4 is what was contained on her end
13 of year evaluation, right?
14 A.    Right, I was using the number, the
15 volume 802, so that is a full year of SRs, like
16 I know the volume number.
17 Q.    So the blue number up top next to the
18 12.7 is that the team average?
19 A.    That would be team average, yes.
20 Q.    Then Q code time, what is that?
21 A.    Q code time is when the SR comes in it
22 could get Q code, like a problem code saying
23 customer is not calling me back, the SR has an
24 error on it so I can't process it. So we would

BRIAN MAGEE

Page 165

1  measure like that time because, you know, it
2  would be, the longer it is on Q code is going
3  to affect your overall time.
4  Q.    So is it better to be below average on
5  average of total Q time?
6  A.    Yes.
7  Q.    So it was good if you were below 10.7?
8  A.    Yes.
9  Q.    Average of facility billed, was it good
10  to be above or below the 32.1?
11  A.    They didn't have any impact on that.
12  It is not a measure for them.
13  Q.    What about average of total SR to
14  build?
15  A.    Again, the part that the engineers have
16  to play would be the first and the second.  The
17  others measuring the construction and the total
18  length of time that was open, and I believe
19  that is why he changed this report in 2015 to
20  drop those things out.
21  Q.    The account of SR, that is total
22  amount, 802, that is not an average, right?
23  A.    Correct.
24  Q.    The actual number, that can't be

Page 166

1  indicative of their particular performance, for
2  example, this gentleman, James Parks, who had a
3  six, right?
4  A.    He passed away during the year so I
5  didn't hold it against him.
6  Q.    What about Tomasse with a 10, is that
7  because he was the intern?
8  A.    Intern.
9  Q.    What about David Perry with 20?
10  A.    His half year contribution.
11  Q.    What do you mean half year?
12  A.    Well, in 2014 is when he came.
13  Q.    So this particular report we have for
14  2014, you have for 2013 too, right?
15  A.    I don't know.  I don't recall what the
16  reports looked like in 2013.
17  Q.    But Suzette Walker's numbers wouldn't
18  be reflected on there because she was doing
19  conduit work, right?
20  A.    Correct.
21  Q.    Are you able to go to by CSX director.
22  So that is just scoring you as a manager under
23  directors?
24  A.    No, I think CXN would be the

Page 167

1  construction team.  So I think Jim's report,
2  the average facility billed is important
3  to them, but his report is pulling everything
4  at once.  So like the construction managers
5  would just care about column D because that is
6  the facility build from the time engineering is
7  giving it to them, that is how long it is
8  taking them to build it.
9  Q.    This is not reflective of your actual
10  employee's performance, this tab?
11  A.    It is the same information, it is just
12  geared towards the construction team instead of
13  engineering team.
14  Q.    Right.  Your director is not even in
15  this tab, right?
16  A.    Right.
17  Q.    By service type I see you are here in
18  each area?
19  A.    Right.  I was referring to this earlier
20  on the report, I made mention to DS1, DS3,
21  Ethernet, OCN, they are all different classes
22  of service.
23  Q.    This is just telling you how you size
24  up in comparison to your other engineering

Page 168

1  managers?
2  A.    Correct, in each of those categories.
3  Q.    Got it.  What does the SR build
4  intervals reflect?
5  A.    This is the raw data that you use to
6  pull the -- these are each of the managers so
7  there is my name, so this is my team, and you
8  see the month of April, so that is the data
9  from April.
10      It is each month's data that he used to
11  create that because you would get, you know,
12  the engineer would say wait a second this isn't
13  right so he would have the data there.  So this
14  would be going out to them also.
15  Q.    Is there even a way to associate that
16  data with a particular engineer, is it just
17  based on town?
18  A.    The central office.  So he has an
19  engineer column.
20  Q.    Now, this is what I was asking you
21  earlier, where it says design engineer in area
22  O, would that tell me who actually designed it
23  or whether it was Suzette Walker or her
24  contractor or would her name always be in that

BRIAN MAGEE

Page 169

1 column because she is the engineer responsible
2 for that turf?
3 A.    She is the engineer responsible for it.
4 Q.    This is the underlying raw data for the
5 tab by service, by engineer?
6 A.    By engineer.
7 Q.    Okay.
8         (Whereupon corporate technology and
9         network functional capabilities was
10         marked for identification as
11         Verizon-17.)
12 BY MS. BURKE:
13 Q.    I am handing you Verizon-17.  Can you
14 look at this document and let me know if you
15 recognize any of these documents at all?
16 A.    Yes.
17 Q.    What are they, let's start with the
18 first page?
19 A.    This I recall, this was all part of the
20 package to fill out the graph from what I
21 remember.
22 Q.    For the RIF?
23 A.    Yes.
24 Q.    Was this just for the engineering

Page 170

1 department?
2 A.    I don't know.  This is what I received.
3 Q.    If you go to the second page, is this
4 also a part of the packet you received in order
5 to assess, rate and rank your employees?
6 A.    Yes.
7 Q.    Did you make any handwritten notes or
8 anything?  I am just being repetitive for
9 completeness purposes when you would use these
10 charts.
11 A.    No.
12 Q.    At the time that you performed your
13 rate and rank it was for Band 7T Engineering
14 III Specialists?
15 A.    Yes.
16 Q.    The bottom there, functional
17 proficiency level, expert, advanced, applying,
18 learning, limited or not applicable, did you
19 rank your employees as to those categories?
20 A.    Which page are you on?
21 Q.    026.
22 A.    Could you repeat your question?
23 Q.    These expert, advance, applying,
24 learning, did you use these functional

Page 171

1 proficiency levels when you ranked your
2 employees?
3 A.    I don't recall doing that.
4 Q.    Because I saw you use the term, when
5 you talk about Tom Hodge you said his net
6 knowledge is advanced or you refer to someone
7 as an expert.  Is that just general terminology
8 you are used to from rating your employees or
9 did you actually have to put them in categories
10 pursuant to this list here on page 026?
11 A.    To be honest with you, page 026 I am
12 having trouble reading.
13 Q.    At the very bottom there it says
14 functional proficiency levels, and it labels
15 them expert, advanced, applying, learning,
16 limited, not applicable, and then it gives an
17 explanation for each.  Do you want me to read
18 you the explanation?
19 A.    I don't think that they need to write
20 anything.  Where you are seeing that, I think
21 those are my words.
22 Q.    This last page, this is not applicable
23 to any of your employees at the time of the
24 RIF, right, none of them were Band 7

Page 172

1 supervisors?
2 A.    That's correct.
3 Q.    Is there anything specific about the
4 conversation that you had with Carl Gross that
5 you can recall and share right now, about whose
6 team's employees would be impacted since it
7 only needed to be one?
8 A.    Besides what I said, I remember him
9 saying, how he selected it, asked okay, what
10 are the items that brought him to this list,
11 and then we both used personal knowledge of
12 each person.  We both are very familiar with
13 both of those individuals.
14 Q.    Gross did not supervise Walker,
15 correct?
16 A.    No, but he worked with Suzette Walker.
17 Q.    In the field or in the office?
18 A.    In the office, engineering.
19 Q.    Did he ever assist you in completing
20 any of her performance evaluations?
21 A.    No.
22 Q.    Did he express concerns to you about
23 the time period that Ms. Walker was out of the
24 office when she was trying to do the conduit

Page 173

1  role?
2  A.  No.
3  Q.  Because of a medical leave?
4  A.  No.
5  Q.  Did he give you specific reasons why he
6  thought Walker should go versus Ed McIntosh?
7  A.  No.
8  Q.  Or did you give him specific reasons
9  why?
10  A.  Well, I gave the reasons why I thought
11  Suzette should, he gave his for Ed Mac.  We
12  just talked about, you know, what both of them
13  bring to the team and going forward what is the
14  best, and I made the decision.
15      I felt as though if that was my team,
16  which one day that all could be my team, Carl
17  Gross's area, the way things are going I felt
18  like what is the best team for me.
19  Q.  So because you both had a general basis
20  to go from, did you discuss specifics or did he
21  just go with your judgement when you
22  recommended that it be Suzette?
23  A.  I went through specifics.
24  Q.  Did you give any specifics beyond what

Page 174

1  is contained in Verizon-2, the comment section
2  for Suzette?
3  A.  I think that kind of covers what I
4  talked about.
5  Q.  Dave Perry was still gaining knowledge
6  of the request of high bandwidth too, right?
7  A.  Yes.
8  Q.  You thought he still needed to expand
9  his knowledge of the HBW service and the design
10  of those orders, right?
11  A.  Yes.
12  Q.  Did you think he might grasp that more
13  quickly than Suzette?
14  A.  No, I think I put them as even in that.
15  I felt that he brought something additional to
16  the table that Suzette didn't bring to the
17  table.
18  Q.  What was it?
19  A.  His experience in the field, he was a
20  splicer from associate and then he was a
21  foreman, and I felt like he was bringing the
22  most up-to-date knowledge to what the field is
23  doing today.
24      So I felt like, yeah, I felt like he

Page 175

1  had knowledge of the actual construction of
2  some, which was a benefit to me.
3  Q.  When he got the 1 on his performance
4  review do you know what job function he was
5  performing?
6  A.  Supervisor.
7  Q.  Of what?
8  A.  He had customer ops, which was like the
9  maintenance organization.
10  Q.  Who was the employee who was out for a
11  prolonged period that you thought George Zang
12  was helpful in stepping up to the plate?
13  A.  James Parks.
14  Q.  James Parks?
15  A.  Yes.
16  Q.  Not on your team?
17  A.  No, he was on my team.  He is the one
18  that I said passed away earlier.
19  Q.  Oh, okay, thank you.  In David Perry's
20  performance evaluation in his mid year, if you
21  just gave him in the summary area average of
22  Fac Verification, would that be his average,
23  the team's average?
24  A.  Am I able to see?

Page 176

1  Q.  Yeah, it is page 326, under the
2  performance evaluations, it is a PDF,
3  comparative performance evaluations, if you
4  scroll to page 326.
5  A.  Right, they are straight, all those, I
6  believe all those are the average for our --
7  yeah, so I wrote it, the above numbers give you
8  an idea of measurable, the item that is the
9  hottest for the facility verification to be
10  complete within eight days, you have solid
11  experience you just need to learn the
12  engineering systems and process flows.  I would
13  like that you are asking questions and take
14  advantage of other engineers to gain
15  experience.  So what I wrote, the numbers, that
16  is where our team was at mid year.
17  Q.  But his, we would have to look at the
18  report, the monthly report?
19  A.  I think he came like right in that June
20  time period.  The end of May maybe he came.
21  Q.  5/25/2014 job entry date sound about
22  right?
23  A.  Yeah, sounds.
24  Q.  Have you ever issued any corrective

BRIAN MAGEE

Page 177

1   action to any of your engineers?
2   A.    No.
3   Q.    Why was Perry brought over to your team
4   in May of 2014?
5   A.    There was an opening, I forget the end
6   result of how it came because there was a lot
7   that was going on.  I remember, I think someone
8   left from my team, I had the opening for, but
9   in the end Carl and I were interviewing people
10  because I had an opening, he had an opening and
11  then however it transpired I lost my opening
12  that I did not have an opening any longer.
13      So Carl had one, and he made an offer
14  to someone and then that person's manager said
15  he wasn't releasable so Carl needed a person,
16  and one of my worker, Alex Ramos, had just
17  moved out the City of Philadelphia and said
18  could I go to Carl's area because he was paying
19  city wage tax and thought, you know, it ended
20  up being a good move for him.  Yeah, city wage,
21  and Carl's group now works from home so it
22  really worked out for him.
23  Q.    When did Ramos leave your team?
24  A.    I would have to.

Page 178

1   Q.    When in connection with David Perry
2   coming in?
3   A.    So Carl gave me his rec from Alex going
4   over, so I held Alex until Dave came in.  I
5   would say Alex transferred to Carl's after a
6   couple of weeks of Dave being here.
7   Q.    The organizational charts that you
8   shared, just for these brief intervals January
9   2014 and July of 2014, Verizon-4, that you
10  created.  Do you have them stored somewhere?
11  A.    Yes.
12  Q.    Where do you keep them?
13  A.    On my computer.  Alex came to me
14  through another consolidation, and I got that
15  responsibility and then, yeah, Alex left the
16  City, and that opened up this spot for me to
17  hire someone, and that was Dave Perry.  What
18  number was that?
19  Q.    Verizon-4.
20  A.    So the Delaware one, the earlier one
21  from this July would have been -- had Alex
22  Ramos on it.
23  Q.    July?
24  A.    This is July 7, 2014, so I would say

Page 179

1   whatever the other change was, whichever one
2   this replaced would have had Ramos on it.
3   Q.    But you still have that one that had
4   Ramos on it, right?
5   A.    I am sure I do.
6   Q.    Do you keep like a list of your team
7   members, phone numbers or something that would
8   show who the people were on your team at any
9   given time?
10  A.    I keep, I update a sheet like this
11  whenever there is a change on my team.  So this
12  is my -- I made this sheet.
13  Q.    But if you look at the first page,
14  though, it doesn't even show everybody on your
15  team, would that show if someone was added or
16  subtracted?
17  A.    This shows everyone that is on the
18  Delaware team, and the next one shows everyone
19  that was on the eastern PA and Philadelphia
20  team.
21  Q.    Do you keep these in an electronic
22  folder somewhere or a hard folder?
23  A.    Electronic.  Just so you can mark on
24  your sheet, Sam Reinhardt is a contractor, just

Page 180

1   in case, if you are looking at that on the
2   front page of Delaware.
3   Q.    He had an entire turf?
4   A.    Yes, that was from -- with James being
5   out I had to put him in.  He came in, you know,
6   he was a retiree came in to help out with James
7   being out.
8   Q.    Do you know who Matt Carey?
9   A.    He works for Cindy Sweppenheiser.
10  Q.    The same supervisor over Dedra Johns?
11  A.    Correct, Cindy is a manager.
12  Q.    Right.  What does Matt do?
13  A.    Third party like administration.
14  Q.    Similar to what Dedra Johns is doing?
15  A.    I don't know what Dedra did in the end,
16  I honestly don't.
17  Q.    After Ed McIntosh accepted, according
18  to your testimony, a RIF package did he work in
19  any other capacity for Verizon after that?
20  A.    Not -- I'm sorry, I hear he is working
21  for a contract company now.
22  Q.    Do you know one way or the other
23  whether or not he accepted another position
24  with Verizon after he took the RIF package?

BRIAN MAGEE

Page 181

1    A.    No, I know he doesn't work for Verizon
2    core.  He works for a company, a contract
3    company that does work.
4    **Q.    I don't have any further questions,**
5    **counsel may have follow up and he may not.**
6         MR. BARRAS:  No, nothing.
7              -----
8         (Witness excused.)
9    (Deposition concluded at 5:04 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 182

1              CERTIFICATION
2
3         I, Linda A. Ricciardi, hereby
4    certify that the foregoing is a true and
5    accurate transcript of the deposition of BRIAN
6    MAGEE, who was first sworn by me at the time,
7    place and on the date herein before set forth.
8         I further certify that I am
9    neither attorney nor counsel for, not related
10   to or employed by any of the parties to the
11   action in which this deposition was taken;
12   further, that I am not a relative or employee
13   of any attorney or counsel employed in this
14   case, nor am I financially interested in this
15   action.
16
17
18
19
20   _____
21        Linda A. Ricciardi
22   Court Reporter and Notary Public
23
24

**R&K REPORTING, INC.**

Phone: 215-946-7009                    email: rkreporting@gmail.com

BRIAN MAGEE

**A**

**a.m** 59:20 60:3
**ability** 32:20 92:14
**able** 6:23 7:23
  62:23 91:10,15
  102:16 104:21
  136:11,13 166:21
  175:24
**absorb** 77:15
**accelerate** 65:4
  67:20
**accepted** 180:17,23
**access** 104:22
**accommodate**
  89:11
**accommodations**
  130:2
**accomplished**
  120:15
**accomplishment**
  64:23 68:17
**accomplishments...**
  68:8
**account** 41:24
  63:20 110:19
  165:21
**accurate** 6:24 10:21
  20:11,18 24:8,17
  84:17,18 182:5
**achieve** 126:13
  159:6
**action** 1:3 18:18
  43:13,16 177:1
  182:11,15
**active** 136:9
**activity** 3:17,18,20
  52:18 56:9 59:13
**actual** 43:13 44:15
  44:24 85:9 89:1
  98:10 101:12
  103:1 107:15
  108:1 111:22
  165:24 167:9
  175:1
**adapted** 82:6

**add** 65:16
**added** 19:2 179:15
**adding** 97:2 109:15
**addition** 95:18
  135:17 156:22
**additional** 11:21
  14:13 28:4 51:15
  163:11 174:15
**address** 98:11
**addresses** 34:16
**administers** 151:12
**administration**
  66:15,18,22
  180:13
**administrative**
  66:16 67:3 70:10
  82:10 147:4
**administrator**
  103:23
**advance** 170:23
**advanced** 170:17
  171:6,15
**advances** 70:11
**advantage** 176:14
**advantageous**
  102:11
**affect** 165:3
**ago** 6:1 28:19 53:17
  54:18 158:4
**agree** 7:14 20:20
  79:6
**agreed** 5:1 85:14
  127:13
**airport** 39:22
**Alex** 177:16 178:3,4
  178:5,13,15,21
**aligned** 133:12
**alive** 51:9
**allegedly** 145:11
  153:2
**allowed** 83:21
**allows** 60:11,24
**amount** 75:19
  76:12 157:16,17
  159:1 160:5

165:22
**announced** 139:22
**annual** 20:23
**answer** 7:5,8,23 8:1
  8:18 20:16 30:22
  31:5 40:23 54:13
  61:22 63:10 76:13
  98:2,16 101:6
  129:23 131:22,24
  157:9
**answered** 17:15
  99:1,3,9,13,20
  100:13,24 101:3
  101:15 106:8
  108:2 144:6
**answering** 76:24
  98:15 101:6
  109:14
**Anthony** 23:3,8,23
  24:4 36:17 79:9
  79:13 86:3 89:4
  89:19 90:18,23
  91:5 92:10 93:15
  129:18 157:7,10
  157:11
**anticipate** 91:10
**anybody** 42:14
  153:18
**anybody's** 64:15
**anymore** 157:2
**anyone's** 132:19
**apologize** 76:19
  82:15 94:12
**appear** 26:20
  146:17
**APPEARANCES**
  2:1
**appears** 10:9 38:10
  95:2
**applicable** 85:8
  170:18 171:16,22
**applying** 170:17,23
  171:15
**appraisal** 111:4
**appraisals** 21:2

132:21,24 133:4
**appropriate** 46:8
  143:1
**approval** 53:18
**approvals** 49:8
**approve** 55:4
**approved** 49:10,24
  50:4 51:16 55:7
  55:22 56:2
**approximately** 27:8
  28:19 162:15
**April** 21:8 23:5
  24:7 27:17 48:20
  49:23 50:9 61:7
  61:17 63:17 74:24
  88:8,8 96:21,22
  97:4 107:4 113:23
  118:22 143:11
  153:2 168:8,9
**Ardmore** 37:10,12
**area** 53:22 54:2
  56:18 58:2 60:8
  68:12 69:4 72:4
  72:19 78:10 80:6
  88:19 99:14
  108:17,19,20,21
  115:20,21 116:21
  134:23 137:19
  138:18 147:17,19
  149:3 152:2 154:2
  167:18 168:21
  173:17 175:21
  177:18
**areas** 37:2 64:5
  67:17 91:5 127:19
  162:1
**argue** 6:13
**Asian** 128:18,19
**aside** 64:3
**asked** 17:13 57:14
  73:21 74:15 76:19
  137:24 140:1
  145:14 148:3
  172:9
**asking** 8:5,8 58:22

83:1 168:20
  176:13
**aspects** 66:13 67:7
**assess** 19:12 170:5
**assessed** 21:9
**assessing** 20:21
**asset** 123:23
**assign** 34:15 113:7
  122:2
**assigned** 25:7 29:15
  29:19 30:5 35:15
  39:7,9 41:3,7,16
  42:8,14 50:7
  117:13
**assigning** 35:21
**assignment** 33:23
  34:1,5,8,10,11,13
  34:14 83:19 92:12
**assignments** 29:22
**assigns** 35:11
**assist** 33:13 172:19
**assistance** 41:22
  93:1
**associate** 65:12
  168:15 174:20
**associated** 25:23
  32:22 73:12 92:17
  138:5 144:21
  148:12,15 150:23
**associates** 13:7
**assume** 54:14
**assumed** 41:19
  50:12,18
**assuming** 46:6
**Astorga** 52:16 54:4
  56:19 60:14
**attachment** 54:22
**attention** 55:2,17
  123:17 138:11
**attorney** 6:12 182:9
  182:13
**attrition** 33:21
**August** 68:20,22
  75:3 77:4 120:16
**author** 78:10

BRIAN MAGEE

**authority** 45:20
**automated** 18:23
**automatically**
  88:18
**availability** 26:22
**available** 42:11
  83:2,4,5 102:10
  117:19,19 133:8
  161:6
**average** 96:5 99:2
  99:10,11,22
  101:13 102:13,14
  103:6,7,7 106:3
  106:13 107:5,15
  108:3 111:7,9,13
  111:19,22 112:5
  112:10,15,20
  113:21 114:17
  116:1,6,7,7,8,17
  118:7,8 119:23,24
  120:8 121:11
  125:11 133:16,23
  164:18,19 165:4,5
  165:9,13,22 167:2
  175:21,22,23
  176:6
**averages** 103:14
  107:3,16 111:6
  112:13
**averaging** 100:2
**aware** 22:10 45:15
  130:6,10 148:20
  160:19

**B**

**B** 3:8 4:1
**back** 11:19 23:9
  35:23 37:24 57:12
  59:2,6 67:5 70:20
  70:23 71:18 75:4
  81:15,18 83:2
  84:19 87:4 88:6
  90:17 91:17 99:5
  99:7 105:4 108:14
  122:9 123:1,2

124:16,21,22
132:14,18 152:24
157:15 158:1
161:24 164:23
**backbone** 68:5
**backwards** 48:1
  150:3
**Bala** 37:12
**Baldwin** 36:17 37:3
  38:23
**band** 15:10 25:17
  72:14 147:7
  149:23 155:11,15
  159:17 170:13
  171:24
**Bands** 159:16
**bandwidth** 66:1
  119:16 121:6,14
  121:15 125:19,22
  126:2,3,8 174:6
**BARRAS** 2:8 16:5
  16:18,21 17:13
  20:13 54:12 61:21
  63:5,9 85:23
  141:7 151:20,23
  181:6
**base** 41:18 162:1
**based** 15:17 20:22
  26:2 37:1 43:8
  109:13,21 119:10
  123:19 127:21
  128:5,8 130:18
  135:19 153:4
  158:17,18 159:2,2
  160:21 168:17
**basically** 60:23
  112:5
**basis** 20:14 43:20
  43:21 173:19
**Bates** 3:10 4:3,5
  9:17 10:1,4 20:7
  21:20 64:7 79:16
  80:10 94:14 146:2
  146:8,16 159:17
  160:11 163:20

**beds** 90:9,10
**began** 11:7
**beginning** 10:18
  29:21,23 30:3
  31:24 38:13,16
  49:23 80:22
  155:24
**behalf** 1:14
**believe** 6:23 10:21
  11:5,23 12:24
  14:9 20:11,18
  24:8,16 31:17
  47:6 49:3 51:5
  54:9,20 55:24
  56:6 60:22 62:6
  65:2 68:22 72:9
  73:19,21 79:2,5
  84:16 86:17 87:1
  96:23 114:6 128:1
  128:17 135:16
  142:21 143:8,10
  147:18 150:11
  163:16 165:18
  176:6
**benefit** 122:3 175:2
**Bensalem** 1:10,16
  2:4
**best** 6:24 7:3 44:8
  112:21 131:22
  173:14,18
**better** 81:24 82:2,4
  107:13,20,21
  108:5,11 114:19
  114:20 118:13
  126:19 164:10
  165:4
**beyond** 51:16 118:1
  173:24
**big** 112:11 113:6
  119:19 123:10
  140:7
**bigger** 72:15
  116:13,14 161:11
  163:8
**billed** 165:9 167:2

**bit** 122:11
**black** 128:18
**blank** 97:24
**block** 32:14 64:17
  80:6
**Blodniker** 153:7
**blue** 164:17
**bonus** 162:23,23
**books** 123:24
**bottom** 9:23 29:18
  53:16 56:15 59:19
  94:10 107:9
  113:20 138:13
  170:16 171:13
**Bowman** 80:3,6
  96:11 97:10,23
  98:16 99:13,18
  100:13,17 101:18
  102:13,15
**Bowman's** 80:11
**box** 1:23 64:6 67:20
  79:17
**break** 8:14,15
  85:20
**Brian** 1:13 3:3 5:9
  56:21 138:20
  151:2 155:2 182:5
**brief** 178:8
**bring** 123:22
  173:13 174:16
**bringing** 174:21
**broken** 123:12
**brought** 5:20
  121:11 172:10
  174:15 177:3
**Browning** 149:18
**Broz** 152:17
**budget** 160:3 161:6
**build** 93:22 165:14
  167:6,8 168:3
**building** 65:16,17
**built** 108:23 113:11
  117:9
**bullet** 65:1
**Burke** 2:2 3:4 5:15

5:18 9:20 13:18
16:7,8,20,22
17:10,18,21 20:17
28:23 42:19 49:17
52:21 54:16 56:12
57:23 59:16 62:2
63:7,15 70:24
99:8 137:9 138:2
141:11 146:5
151:22 152:1
159:14 160:14
169:12
**Bushkirk** 153:7
**business** 32:15
  39:11 65:15 67:13
  96:6 99:3 101:12
  102:15 106:3
  107:16 111:10,23
  113:20 114:7,10
  146:9 148:11,12
  148:20
**businesses** 108:20
  108:20
**busy** 113:15 116:22

**C**

**C-Y-N** 36:8
**cable** 31:1
**cables** 30:24
**calculate** 106:23
**calculated** 135:9
**calculation** 159:1
**calendar** 21:5,13
  48:2 61:10,12
  62:1 127:13 135:6
**call** 8:16 15:2 26:15
  29:16 32:12 33:5
  40:11 44:6 52:11
  52:14 60:8 62:14
  75:17 82:18
  102:21 105:8,11
  111:17 130:13
  131:2,4,6 142:9
  147:6,24 148:3
  154:20

BRIAN MAGEE

**called** 22:13 36:6
  44:5,9 75:18
  95:20 115:1
  132:20 142:3
**calling** 164:23
**calls** 50:19 133:21
**candidates** 142:17
**capabilities** 4:7
  169:9
**capacity** 62:5
  180:19
**capital** 76:16,18
  78:13
**cards** 102:8
**care** 167:5
**Carey** 180:8
**Carl** 80:3,5,10 81:5
  81:7 96:11 97:10
  97:23 99:13,18
  100:13 101:18
  129:4 131:12
  142:4,5,16 143:16
  144:7,9 145:14
  154:4 172:4
  173:16 177:9,13
  177:15 178:3
**Carl's** 177:18,21
  178:5
**carriers** 82:19
**carry** 120:22
**carrying** 120:19
**case** 8:17 51:11
  74:21 136:22
  146:9 148:11,12
  148:20 180:1
  182:14
**categories** 15:8,17
  17:1 19:5 76:14
  168:2 170:19
  171:9
**category** 19:16 20:6
  96:14 128:2
**Caucasian** 128:16
  128:18,21,23
  129:1,3,5,7,9,11

129:13,15,17,19
**cburke@karpf-la-**
  2:5
**cell** 65:9 67:24 68:2
  68:3,5,6 151:11
  152:6
**central** 38:8,8
  144:13 152:20
  153:24 168:18
**certain** 67:16
  136:22 160:1,5
**certainly** 105:6
**certification** 5:4
  182:1
**Certified** 1:18
**certify** 182:4,8
**Cerutti** 1:15 2:2
**change** 12:21,23,24
  13:3,5,12,14 22:8
  24:5 31:19 38:19
  38:20 141:18,22
  161:15,19 162:10
  179:1,11
**changed** 12:22
  13:10 22:12,22
  25:20 26:1 27:24
  30:5 36:10 43:8
  89:10 141:4,6
  164:8 165:19
**changes** 28:2 39:13
  40:6,7 125:6
  144:23
**changing** 140:22
**charge** 13:6 123:20
  152:8
**charges** 123:19
**Charles** 149:18
**chart** 86:16 96:4
  98:22 135:8 164:1
**charts** 170:10 178:7
**chat** 115:15
**check** 22:6 122:10
  133:22 136:11,12
  136:14 147:21
**Chestnut** 36:18

**Christine** 2:2 5:18
**Cindy** 150:11 180:9
  180:11
**circuit** 80:18 98:5
**city** 39:18 40:3
  50:21,22 69:9,21
  70:5 90:8,11
  93:23 151:14
  155:4,8,19 177:17
  177:19,20 178:16
**civil** 1:3 5:19
**claim** 3:17,18,20
  52:18 53:9,11
  54:4 56:9 59:11
  59:13
**claims** 52:22 53:6
  56:13 59:18 62:8
**clarification** 17:22
  21:19
**clarify** 8:6 16:18
**classes** 76:9 167:21
**clean** 155:8,18
**clear** 21:4
**CLEC** 82:20
**CLECs** 82:18
**client** 114:10
**clients** 39:18,20
  40:6,7 101:14
**clock** 124:23
**close** 94:4 101:23
  120:3,4 121:10
  157:13
**closed** 101:22
**closer** 154:2
**coach** 44:1
**coaching** 44:21
**code** 164:20,21,22
  164:22 165:2
**college** 157:12
**column** 15:12,13
  17:16,17,20 99:16
  99:17 100:6
  105:23 109:2
  111:9 127:12
  167:5 168:19

169:1
**columns** 15:19
  16:19 17:14,15,23
  20:15
**Comcast** 92:22
**come** 23:10 30:1
  42:2 57:12 58:21
  59:2,6 75:17
  76:13 87:4,23
  94:19 97:2,5
  99:22 111:12
  113:12 123:17
  125:1,5 126:11
  142:6 155:20
  158:1 162:22
**comes** 67:3 75:21
  80:17 148:17
  159:24 162:24,24
  164:21
**comfort** 83:20
**coming** 21:13 42:24
  87:2 98:13 103:19
  112:9 123:1,2,2
  124:20 178:2
**commenced** 61:16
  61:17
**commencing** 1:17
**comment** 53:13
  54:2 56:21 174:1
**comments** 46:8
  53:21 56:18 60:8
  64:13 78:4 79:19
  79:20 134:14,23
  135:12,14,18
  147:17,19
**commercial** 32:5
**communicate** 61:1
  61:2
**communicated**
  163:3
**communication**
  49:6
**communications**
  8:21
**comp** 96:8

**company** 33:4 35:4
  35:22 36:3,5 51:6
  83:3 85:3 140:18
  140:20,22 154:16
  180:21 181:2,3
**comparative** 176:3
**compare** 102:16
  105:16,19 150:7
**compared** 133:15
  149:12
**comparison** 145:12
  167:24
**compensated** 159:8
**compensation**
  158:22 160:15
**competitive** 82:18
**complaints** 72:6
**complete** 20:15
  21:2,3,3 68:12
  84:21 111:14,16
  176:10
**completed** 15:1
  45:1 53:15 68:16
  68:18 69:5 117:7
  133:20 146:17
  147:14
**completely** 75:1
**completeness** 170:9
**completing** 15:5
  122:3 172:19
**compliance** 78:14
**computer** 46:7 94:3
  146:12 160:17
  178:13
**computers** 35:5
**concerns** 45:6,12
  123:16 124:11
  172:22
**concluded** 181:9
**conduct** 122:5
**conducting** 46:22
**conduit** 30:9,10,13
  30:19,20,23,23
  31:2,4,6,7,7,8,13
  31:21 32:8,14,18

32:23 33:14 34:2
34:4 35:14,17,20
37:4 39:3 50:8,18
50:22 64:15 65:18
65:22 66:2,5,9
67:7,9,11,11 69:9
69:19,23 70:7,11
72:2,4,5,6,7,19,20
73:1,2,6,23,24
76:20 77:2,9,10
77:16,16,24 78:1
81:11,12,14,21
82:3,5,11,19,21
83:11,24 84:2
85:24 86:20 88:19
89:5,21,22 90:5
92:12 93:7 115:11
127:1 166:19
172:24
**conduit/highway**
69:7,15 74:18,20
**conduits** 32:4
**confer** 153:17
**conference** 6:18
130:13 131:2
**conferring** 154:9
**confirmed** 56:19
**conflict** 82:7,13
**confusing** 8:4
**confusion** 16:6
**conjunction** 133:20
135:21
**connection** 6:2 49:7
178:1
**considered** 30:14
126:3
**considering** 119:13
**consistency** 97:11
**consistent** 27:19
41:4,10
**consolidation** 26:5
93:21 178:14
**construction** 31:3
40:14,16 88:2,5
88:15,16 102:4

110:3 123:20,21
124:3,6 125:16
143:19 157:14
165:17 167:1,4,12
175:1
**contact** 29:8 52:23
**contained** 38:18
45:9 64:12,14
164:12 174:1
**Conte** 72:9,20
**continue** 37:4 77:6
86:4
**continued** 51:20
62:9 121:4 133:7
**contract** 40:16 67:5
73:5 82:24 83:21
86:13 89:1 90:21
180:21 181:2
**contractor** 33:7
34:22,24 35:2
50:10,10 51:1
70:18,19 71:4,5
77:13 83:9 87:7
89:18,23 93:1
122:24 124:16
168:24 179:24
**contractors** 32:21
33:2,5 50:16
77:19 89:19
121:19,19,21
122:13 124:15
126:1
**contractors'** 122:19
**contributed** 78:17
**contribution**
119:19 166:10
**control** 54:24 55:4
113:11 116:20
118:1
**conversation** 52:10
52:11 57:7 59:5,9
60:20 62:13,19
139:1 140:7
141:13 145:14
172:4

**conversations**
58:16 124:13
**cookie** 113:8
**copies** 54:18 132:15
**copper** 34:15
140:23
**core** 66:6,9,15,17
70:11 83:11 89:1
90:20 95:22 181:2
**corner** 9:24 94:15
150:9
**corporate** 4:6 169:8
**CORPORATION**
1:6
**correct** 9:10,11
20:4 21:10,11
24:11 28:9 29:10
32:2 36:2 42:12
47:23,24 49:1
54:7 55:5,6 61:20
63:18 75:11 76:2
76:6,23 85:5
95:15 99:21 113:4
114:11 117:4
118:14,24 119:17
141:17 145:7
147:10,11 150:17
153:15,23 158:3,3
158:19 165:23
166:20 168:2
172:2,15 180:11
**corrective** 18:18
43:13,16 176:24
**correctly** 62:1 73:1
123:5 124:3
**correlate** 16:11
39:17
**correlation** 16:17
25:10
**COs** 36:18,20 38:2
38:4 90:8
**counsel** 2:5,11 5:2
7:14,15 8:22 10:9
17:22 94:7 128:12
138:9,19 181:5

182:9,13
**counsel's** 14:6
**count** 61:13 163:15
**counted** 135:7
**counterpart** 146:22
**counting** 61:23,24
135:6
**County** 37:19,20,22
**couple** 178:6
**course** 6:11 7:17
11:18 12:18 128:6
132:10 161:13
**court** 1:1,18,22
6:20 7:19 9:21
70:22 99:6 182:22
**covered** 48:23
**covering** 113:14
**covers** 37:20 174:3
**create** 45:11,14
94:17 96:8 111:16
117:17 168:11
**created** 29:6 33:21
106:3 178:10
**Credo** 18:14 127:20
**criteria** 3:12 17:8
**cross** 98:22
**CS** 60:8
**CSX** 166:21
**cube** 73:1,2,6,15,18
74:9,16 87:15
88:12,16 150:9
**cubicle** 89:20
**current** 38:21 40:7
**currently** 9:9 43:12
87:11
**Curtin** 127:7,14
**customer** 34:16,17
39:14 40:22
164:23 175:8
**customer's** 98:11
**customers** 32:5,5
67:13
**cutter** 113:9
**CXN** 166:24
**Cyneint** 36:6,9

**Cynwyd** 37:12

**D**

**D** 3:1 134:19 135:2
135:3,9 167:5
**Daily** 136:18
**damage** 32:11
**Daniel** 95:18
**darn** 134:12
**data** 168:5,8,10,13
168:16 169:4
**date** 1:17 6:13
21:23 22:7,19
23:5 24:1,6,7,9,14
24:21 25:4,13
37:24 38:11 49:11
49:23 51:17 56:2
56:2,14 68:23
74:12 85:18 86:9
88:8 106:4,4,6
112:8 113:22
117:20 133:11,12
134:3,3,4,4,8,11
157:19 162:18
176:21 182:7
**dated** 3:16 47:18
49:14,21 51:14
**dates** 22:15 25:6
49:12,20 53:14
55:18 139:24
**Dave** 100:7 129:12
135:4 174:5 178:4
178:6,17
**Davenport** 36:19
**David** 22:17,19
23:23 100:18
134:14 157:4
166:9 175:19
178:1
**Dawn** 152:13,14
**day** 40:5 47:18
48:14 56:21 57:12
57:16 58:3,4,5
62:21 75:10 97:9
100:22 101:20

105:10,11 108:21
110:9 132:6 140:2
142:1,2 173:16
**days** 84:5,8,11,12
84:15 96:6 97:15
99:3 101:12,13
102:15 106:3
107:16 109:9,11
109:18,20 110:1
110:21,24 111:10
111:13,19,23
112:3,4 113:20
114:7,10 126:6
176:10
**dealing** 34:1 98:6
113:9
**dealt** 153:12
**December** 10:22,23
12:3 22:10 58:9
62:10 69:14,16
74:5 107:1
**decent** 119:8
**decide** 143:1
**decision** 37:1 53:22
54:2,11 63:22
83:17 138:16,21
173:14
**decisionmaker**
83:18
**decisionmaking**
92:14
**decisions** 70:19
**Decredo** 64:22
**Dedra** 150:1,2,5,15
180:10,14,15
**Def** 3:10 4:5 9:17
10:3 20:7 64:6
78:4 160:11
**defendant** 2:11
138:22
**Defendant's** 3:22
**Defendants** 1:8
**defendants'** 137:20
**degrees** 122:22
**Delaware** 29:9

37:19,20,22,23
80:22,23,24
108:16 113:10
142:5 145:7 149:4
151:13 152:4
154:5 178:20
179:18 180:2
**delete** 105:5 136:8
136:14,17
**deletes** 136:18
**delivering** 124:2
**demanded** 109:14
**demonstrate** 83:13
**denials** 49:8
**denied** 55:8,23
**deny** 55:5
**dep** 6:13 8:11
**department** 22:9
23:12 25:16 30:9
30:10 65:23 66:2
67:12 78:19 81:11
83:24 84:2 87:21
87:22 170:1
**deploy** 30:21
**deposed** 5:24
**deposition** 5:5,22
6:11,19 7:4,17
8:24 181:9 182:5
182:11
**depositions** 8:13
**describe** 30:17
**described** 39:1 98:5
**description** 3:9 4:2
68:14
**deserve** 127:2
**deserved** 127:3,4
**design** 40:18 65:24
67:10 70:7,12
83:12 92:2,19,24
128:4,10 168:21
174:9
**designed** 93:2
168:22
**designing** 67:16
**designs** 70:13,15

**determine** 36:21
161:3
**determined** 130:18
**determining** 159:20
160:23
**developer's** 92:21
**developing** 17:4
46:14 47:9,11
63:23 85:5 126:14
126:17
**development** 65:12
95:21 127:6
161:23
**developmental**
144:24
**devise** 40:23
**difference** 35:1
**different** 15:5 23:15
25:11 30:11 56:14
89:13,16,17 95:6
95:7 98:9 103:2
114:23 131:19
134:1 140:19
146:23 149:14
151:7 153:1
155:21 167:21
**difficult** 71:17 72:1
**direct** 13:9 14:1,10
23:18 28:9 161:2
**directed** 77:8
**direction** 140:19
**directly** 16:11 18:7
18:9 25:2 35:5
123:17
**director** 10:24
28:10 54:7 56:7
130:11 148:18
154:6 166:21
167:14
**directors** 28:15
166:23
**disability** 48:24
**disagree** 48:19 57:6
57:10 131:16
**discipline** 43:14,17

43:20,21
**discovery** 11:18
**discretion** 127:21
162:4
**discuss** 104:16
131:17 142:24
144:20 173:20
**discussed** 58:20
60:13 126:16,16
129:21 130:16
145:15
**discussing** 107:2
**discussion** 51:24
139:5 141:9
**distinction** 147:9
**distribute** 105:13
**district** 1:1,1 80:14
80:14,19,20,21,24
81:7,8 116:6,7,8
116:22,22,23
117:1 118:8
131:10,13 146:23
**districts** 144:14
**doctor** 58:2
**doctor's** 3:19 57:21
62:9
**document** 9:24,24
10:6,7,8,16 14:2
14:17,24 15:1
19:8 20:7 21:20
29:19 45:1 53:2,4
137:18 138:7
142:10 146:15
169:14
**documentation**
57:15 74:14
124:10
**documenting** 71:20
**documents** 8:13
10:5 43:14 45:11
48:18 153:5 158:6
169:15
**doing** 20:19 35:13
37:7 45:12 64:15
65:18,24 66:2,5,9

70:13,14,16 71:8
74:23 76:20 82:12
83:7,14,18 85:24
86:1,19 89:2,3,4
89:12,16,21,22
90:5,14,20,23
93:7 95:24 96:1
99:24 102:24
107:22 108:12
114:20,23 115:2
115:10 116:15,19
119:11 121:16
123:14 124:18
134:4 155:2,17
166:18 171:3
174:23 180:14
**doubt** 48:21 51:22
**Doug** 149:1,14
**downsizing** 25:23
**drafters** 27:11 33:9
33:16,20 69:21,22
**drafting** 69:20
**draw** 69:23
**drawings** 69:23
**DRC** 143:21
**drop** 165:20
**DS1** 76:5,8 167:20
**DS3** 76:8 167:20
**due** 69:8 71:12,16
98:12
**duly** 5:10
**duration** 41:4
**duties** 13:3,12
25:15 32:3 35:14
39:3 41:9
**duty** 59:3 60:11
**dwelling** 65:14

**E**

**E** 2:2 3:1,8 4:1
**E-I-N-T** 36:8
**earlier** 17:14 24:18
46:13 98:5 118:12
118:22 122:11
141:12 158:16

164:9 167:19
168:21 175:18
178:20
**early** 11:6 39:7 41:8
47:23 56:7 69:12
**earn** 126:22
**easier** 111:5 132:14
136:6 163:13
**eastern** 1:1 113:10
142:4 145:6 149:5
154:4 179:19
**easy** 156:6
**Ed** 143:4,17 145:10
145:21,23 173:6
173:11 180:17
**education** 92:13
**EE** 53:23 56:19
**effective** 162:18
**effort** 120:11,12
**eight** 58:5 62:21
75:9 84:8,11
109:8,11,18 110:1
110:9,21,24
113:24 114:4,7,10
119:20,21 120:12
126:6 176:10
**eighth** 16:4
**either** 11:5 31:6
52:24 55:7 57:19
62:20 76:16 77:23
93:11 117:14
135:5 142:15
144:21
**electronic** 43:9
47:16 132:15
179:21,23
**electronics** 109:16
**eliminated** 33:18
33:19 41:9
**else's** 80:2
**email** 49:9 54:21,22
55:13 56:1,5 73:8
82:24 84:24 97:5
97:6 104:8 105:3
105:8 136:5,18

142:12,18 147:22
148:3
**emails** 54:20 55:19
55:22 136:17
**emphasis** 77:9
112:14 126:5
**employed** 9:9 15:11
33:1 36:14 182:10
182:13
**employee** 3:11
13:15 43:22 47:20
53:24 55:22 60:5
60:9,13 64:11,23
68:7,17 93:4
95:23 135:12
139:2 140:3 142:1
159:21 175:10
182:12
**employee's** 118:1
125:11 167:10
**employees** 13:24
14:10 15:3 20:21
33:8,10,13,17
35:6 43:4 44:1
103:16 105:17
107:5 122:13
128:14 131:18
132:6 144:8 145:8
154:7 160:1 170:5
170:19 171:2,8,23
172:6
**employees'** 49:7
**employer** 5:21 35:9
35:10,10 53:23
56:19 60:11 69:1
**employment** 6:3
41:5 138:17,22
**encouraged** 123:6
**encouragement**
126:21
**ended** 61:16 177:19
**energy** 82:9
**engineer** 13:13
22:13,23 24:5
26:12 35:9,19,19

35:21 40:14 72:3
72:5,8,20 73:5
77:1 82:1 83:21
94:9 115:3 124:22
125:24 143:17
155:13 157:11,14
157:16 163:10,21
163:24 168:12,16
168:19,21 169:1,3
169:5,6
**engineering** 9:13
12:20 13:2,10
23:9,12 27:4,20
30:15 66:6,9,17
67:8,9 75:20,21
78:19 80:17,18
83:14 88:6 91:24
92:11 93:6 95:5
109:23 124:2
143:18,24 155:9
158:13 167:6,13
167:24 169:24
170:13 172:18
176:12
**engineers** 25:15,20
27:5 40:17 77:18
95:14 96:1 98:14
101:1 114:14
124:8,12 126:6,7
147:5 152:9
165:15 176:14
177:1
**entails** 31:7 36:24
**entire** 11:14 37:9
48:2 61:18 64:6
65:1 92:7 95:2
114:5 116:23
180:3
**entities** 113:9
**entitled** 7:15
**entries** 59:17 68:13
**entry** 12:2 16:10
21:23 22:15,19
23:5 24:1,9,21
25:4,13 53:15

56:16 59:19,20
60:3 65:1 92:7
95:11 96:12 100:6
146:12 157:19
176:21
**equal** 113:14
**equate** 40:12
**equates** 38:7
**equipment** 42:3,3
**ER** 53:22 56:19
60:11
**Ernest** 129:8
**Ernie** 37:16,19
**error** 164:24
**errors** 123:3 125:9
**especially** 121:10
**ESQUIRE** 2:2,8
**establish** 49:12
61:15
**estimate** 11:7
**Ethernet** 76:8
167:21
**Eugene** 80:1
**evaluating** 15:3
**evaluation** 16:13
17:2 20:3 42:21
44:24 46:12 47:10
63:16,22 64:1,15
85:13 92:6,10
94:2 106:15
115:14,17 126:15
158:21 164:13
175:20
**evaluations** 11:20
11:24 21:12 26:15
26:20 42:23 43:4
43:10 45:10,19
46:1,22 79:4
134:20 172:20
176:2,3
**everybody** 39:19
131:2 154:21
179:14
**everyone's** 79:2,6
132:18

**exact** 58:12 74:12
85:18 86:9 95:24
132:22
**exactly** 48:8 82:15
**examination** 1:13
5:13
**examined** 5:10
**example** 15:21 18:1
18:5 22:17 29:17
34:21 35:13 38:22
39:24 79:10 96:11
117:3 118:22
157:18 162:9
166:2
**Excel** 94:13
**exchange** 67:1
82:18
**excused** 181:8
**exempt** 147:10,10
**exhausted** 61:8,19
**exhibit** 19:20 22:4
22:18 29:1 38:18
51:14 127:11
134:16 146:16
158:4 161:24
**exist** 102:2
**existing** 40:7 65:16
65:17 69:8,18
91:21
**expand** 92:11 174:8
**expansion** 65:8
67:22
**expect** 53:1
**expectation** 73:23
**expected** 81:13
**expense** 78:13
**experience** 92:13
174:19 176:11,15
**expert** 170:17,23
171:7,15
**expiration** 86:12
**expired** 86:8
**explain** 39:7 42:3
93:20 96:3
**explaining** 140:9,10

BRIAN MAGEE

**explanation** 171:17
171:18
**express** 172:22
**extend** 51:16
**extension** 73:13
**extra** 111:1

**F**

**Fac** 26:19 65:19
76:21 90:2 94:15
106:14 108:24
113:19 114:18
118:7,15 119:18
119:23 125:11,21
128:5 133:15
175:22
**face** 153:5
**facet** 125:23
**facilities** 34:16
39:13 67:2 68:3,4
82:23 112:20
147:3
**facility** 65:16 96:5
99:2 100:20 102:3
102:7,10 106:3
109:4 111:9,15
112:16 114:4
121:6 165:9 167:2
167:6 176:9
**fact** 43:22 45:24
50:4 54:10 55:22
57:9 63:21 109:7
125:9 141:14
**fair** 11:6 16:9 26:16
29:14 47:4,5 55:9
55:17 108:8
120:23 122:15
**fairly** 27:18 41:9
43:9
**fall** 84:14 87:2,6
143:12
**familiar** 33:8,22
53:2 136:20
146:11 159:18
160:16 164:1

172:12
**familiarity** 146:7
**family** 65:11 129:21
**far** 64:1
**fast** 91:9
**faster** 163:9
**faulting** 113:2
**faults** 141:5
**Fax** 1:24
**feasible** 62:20
**February** 10:19
11:4 47:23 73:20
85:16 96:24 103:7
103:9,14,21,22
104:1,4,11,12,13
104:17,19 105:20
105:22 106:12
162:11,13 163:3
**feed** 32:14,15 35:23
**feedback** 44:16,17
85:12 139:8
**feel** 58:23 113:15
**feet** 109:17
**Feiler** 150:22
**felt** 110:2 126:17,20
145:22,23 173:15
173:17 174:15,21
174:24,24
**fiber** 65:8 67:24
68:2,4 109:17
140:24 151:10
152:6 155:4,6,7
155:18
**field** 40:21 93:10
172:17 174:19,22
**fifth** 16:3
**file** 18:22 105:5
**files** 45:4
**filing** 5:4
**fill** 79:23 135:21
169:20
**filled** 16:21 17:14
123:5
**filling** 18:19 133:19
**final** 14:18 15:12,13

79:17 83:10
132:13,16 134:6,8
**finally** 58:4 163:18
**finances** 162:5
**financial** 126:18
**financially** 182:14
**finding** 25:10 123:3
**fine** 17:18 138:3
**finish** 93:22 151:16
**finished** 91:3,7
**Fios** 25:16 65:12,16
93:22 117:19,20
151:11 152:6
**firm** 122:1
**first** 5:10 6:7 10:6
14:2,3,4,5,8,17,20
14:23 16:18,23
21:18 22:4,6
24:20 29:1 42:21
46:13,19,21 47:13
49:21,22 53:16
69:8,12 79:9,14
79:14 80:21 88:6
88:7 97:16,18,19
98:17 104:19
115:21 116:6
130:5,9 132:1
133:4 146:6,8
149:10 158:6,8
159:15 162:23
163:14 165:16
169:18 179:13
182:6
**five** 20:2 56:21
57:12,16 58:3
84:15 97:14 107:5
107:7,8 112:4
161:8
**flip** 148:9
**flourished** 81:22
**flow** 34:18
**flows** 176:12
**FMLA** 48:23 55:4
55:23,24
**FOC** 75:13,15,16

75:17,19 76:12
80:13,16 98:5,7,8
98:14 111:17,18
126:13
**focus** 121:6,14,15
122:18 140:24
**focused** 124:14
140:23
**folder** 136:8,9,14
179:22,22
**follow** 181:5
**following** 22:14
**follows** 5:11
**foregoing** 182:4
**foreman** 174:21
**forget** 143:19 177:5
**form** 3:11 5:6 13:15
29:6 129:21
134:21 137:3
**formal** 6:20 11:23
16:12 19:12 21:10
44:24 138:7
**format** 15:4,6 43:2
43:5,7 160:18
164:8
**former** 5:21 72:5,7
72:20 154:12,13
154:18
**forms** 137:13
**formula** 158:18
159:2
**forth** 182:7
**forthcoming** 11:21
**forward** 173:13
**fought** 126:20
**found** 139:22
**four** 14:2,4,8 84:6
84:12 132:11
**fourth** 16:3
**Fraer** 149:18
**frame** 69:17,23
80:16 132:3 163:1
**freedom** 45:23
**fresh** 81:23
**front** 13:20 37:23

38:2 61:10 103:12
180:2
**FTPP** 108:17
**FTTCS** 67:22
**FTTP** 108:16 117:6
128:3,10 151:10
152:5
**full** 59:3 60:10,10
72:7 73:10 97:15
103:9 122:8
139:12 164:15
**function** 13:2,11
27:9 34:13 66:17
66:19,23 67:3
70:10 82:7 83:11
98:14 144:22
146:23,24 150:15
175:4
**functional** 4:6
169:9 170:16,24
171:14
**functions** 26:6
32:22 33:14 39:8
70:2,11 71:19
152:5
**fund** 160:1,2
**funding** 161:16
**further** 60:13 93:21
181:4 182:8,12

**G**

**gain** 176:14
**gained** 156:1
**gaining** 174:5
**garage** 88:17
**Gary** 149:20
**gather** 40:20
**gauging** 20:22
164:7
**Gaunt** 149:18
**geared** 167:12
**general** 171:7
173:19
**generally** 30:18
68:4

**generate** 104:2
  105:7
**generated** 105:9
  107:4
**generator** 126:4
**gentleman** 110:5
  114:12 166:2
**geographic** 151:7
  152:2
**geographies** 95:7
**geography** 113:14
  154:19
**George** 129:6
  156:20 175:11
**Germantown** 36:19
**Gerry** 51:3,9 66:19
  66:21 71:6,19
  74:22,23 77:7,10
  77:12,17 83:21
  84:3,4,5,6 86:4,15
  87:17 90:18,19,20
  90:23 91:2,7,12
  93:8
**Gerry's** 84:20 86:8
  91:4
**getting** 66:19,20
  112:12 113:13
  122:9 123:10
  124:16
**give** 6:8,23 39:24
  44:16,17 46:1
  47:3 55:18 61:12
  67:6 74:12 81:20
  81:23 102:20
  112:10 126:14,21
  135:3,12,14
  137:16 139:12
  142:22 143:3
  162:4 173:5,8,24
  176:7
**given** 47:11 63:20
  93:21 130:22,24
  131:3,4,5 136:22
  152:5 161:8 179:9
**gives** 49:11 54:3

159:5 171:16
**giving** 70:17 167:7
**glean** 100:18
**Glenolden** 37:10,14
**global** 67:22
**go** 17:19,19 22:17
  24:1 30:24 32:21
  46:7 56:14 67:5
  67:13 78:3 79:17
  80:6 81:14 90:17
  94:3,4,8,9 95:10
  95:11 99:11,19
  100:11 101:11
  105:4 107:23
  108:21 115:17
  119:22 123:11
  124:6 125:16
  130:19 132:18,23
  136:18 141:7
  146:12 149:16
  150:18 152:11,16
  152:24 153:6
  156:5,6 157:14
  159:22,23 161:4,4
  161:24 163:19,24
  163:24 166:21
  170:3 173:6,20,21
  177:18
**goal** 111:1 114:9
  119:20,21
**goes** 58:24 93:10
  105:11 107:8,17
  131:21 137:17
**going** 7:16 10:1
  15:11 17:19 24:12
  43:11 62:12 73:23
  91:23 100:5,21
  102:4 105:13
  110:11 112:1,3
  113:7 122:5
  123:24 124:20,21
  124:22 125:4,10
  128:12,13 130:6
  132:14 137:16
  138:10 140:9,19

141:14 163:4
  165:2 168:14
  173:13,17 177:7
  178:3
**golfed** 84:13
**good** 25:10 118:15
  118:17 119:12
  123:9 134:12,13
  160:9 165:7,9
  177:20
**gotten** 38:15 161:22
**GPIS** 70:3,4,5
**grand** 113:16
**graph** 169:20
**grasp** 174:12
**great** 120:10
  145:23,24
**greater** 77:9 122:18
**Greenfield** 65:10
  65:11
**Greenfields** 65:6,7
**Greenwood** 2:3
**grew** 28:3
**Gross** 81:7 95:3
  115:4,6 117:2
  131:9,12 142:4,16
  142:22 144:7,9
  145:5 151:8 154:1
  154:4,4,7 172:4
  172:14
**Gross'** 81:5 153:10
**Gross's** 143:16
  173:17
**ground** 92:15
**group** 23:22 67:5
  115:4 122:22
  130:16,20 135:4
  147:13 177:21
**grow** 28:1 121:4
**growth** 31:6 65:5
  67:21 83:20 90:10
  90:11 108:17
**GTE** 154:12,14,18
**guess** 7:10 15:18
  20:19,24 30:21

88:9 97:13 104:14
  105:4 110:9
  114:18 119:10
  134:6 149:12
  151:1
**guessing** 84:16
**guy** 67:1
**guys** 115:6 154:8

———————————

**H**

**H** 3:8 4:1
**half** 69:8,12 77:13
  77:14 86:14
  166:10,11
**hand** 10:1 39:19
**handed** 9:22 19:6
**handing** 28:24
  169:13
**handle** 32:22 37:1
  50:7
**handled** 36:1 63:14
  93:5
**handles** 36:17,18
**handling** 31:13
  32:4 34:2 36:13
  36:16 37:9,11,12
  38:23 39:2 41:16
  91:12 108:16
  156:19
**handwritten** 170:7
**happen** 86:10 140:9
  140:11
**happened** 26:4
  62:15,17 74:4
  93:20
**happening** 31:3
  100:3 144:23
**happens** 71:21
**hard** 70:7 73:9
  179:22
**Hauss** 148:23
**HBW** 121:5 122:4
  174:9
**head** 24:15 129:23
  163:14

**headings** 99:17
**hear** 7:17 10:3
  180:20
**Hechler** 152:17
**held** 9:15 10:10
  75:20 120:18
  141:9 151:11
  152:6 178:4
**help** 10:4 56:24
  92:21 110:3
  123:15 180:6
**helpful** 175:12
**Henry** 150:22
  151:2 155:2
  158:10
**hey** 81:3 111:1
  119:8 121:16
**high** 25:17 65:24
  108:17 119:15
  121:5,13,15
  125:19,21 126:1,3
  126:8 161:4,9
  174:6
**higher** 107:13
**highway** 30:20 37:5
  76:21 86:20 88:19
  89:21,22
**Hill** 36:19
**hire** 178:17
**hired** 157:11
**hires** 85:9,10
**Hodge** 127:14,15
  128:20 161:8
  171:5
**hold** 136:19 149:21
  166:5
**Holly** 37:21
**home** 177:21
**homeowner** 32:10
**honest** 171:11
**honestly** 180:16
**Hooks** 152:11
**hope** 151:9
**hot** 90:9,10
**hottest** 176:9

BRIAN MAGEE

**hour** 57:12 58:3,4,5 84:8,11
**hours** 52:2 56:21 57:2,9,16 58:9,17 59:7 60:12 62:4 62:21 75:10 107:23 116:3,3,12 116:13,17 132:11
**household** 117:17
**households** 117:6
**houses** 117:7
**HR** 18:24 44:14 57:19 132:17,21 133:21 135:22 146:20 148:15
**Hui** 25:11 95:3 128:18
**Hunter** 148:23

**I**

**ICM** 53:23
**idea** 25:8 98:18 121:24 176:8
**identification** 9:18 13:16 17:8 28:21 42:18 49:15 52:19 56:10 57:22 59:14 137:6,22 146:4 159:12 160:13 169:10
**identified** 22:7 27:14 31:23 41:2 64:5 86:15 150:19
**identifies** 21:23 49:23 58:2 93:4 94:15 134:2
**identify** 10:12 17:16 53:14 130:21 133:14 159:7
**identity** 138:15
**III** 13:11,13 158:13 170:14
**imagine** 63:11 71:14

**immediately** 23:19 27:10 91:18
**impact** 92:18 108:18 117:23 125:6,11 130:7 143:9 158:22 165:11
**impacted** 15:11 130:16 131:11,17 131:19 139:2,18 140:3,8 142:17 154:22 172:6
**implementing** 40:18 43:3
**imply** 100:14
**important** 6:8 167:2
**improvement** 44:2 44:5,7
**inaccurate** 162:3
**inbox** 73:8
**incentive** 4:4 159:11
**include** 81:5 117:2
**including** 11:20 14:2,13 15:9 44:2
**increase** 159:2,8,21 160:20 161:10
**increased** 28:3 58:10 68:12 160:22
**increases** 158:18 162:4
**incumbent** 150:6
**independent** 12:15 33:2
**indicate** 117:12 118:2
**indicates** 10:17
**indicative** 166:1
**individual** 12:7 139:6
**individual's** 46:9
**individually** 132:15
**individuals** 23:22

24:19 26:10 27:14 27:18 36:23 93:24 110:14 114:23 138:16 149:1 156:9,12 163:15 172:13
**inevitably** 125:4
**inform** 59:2
**information** 14:13 15:16 40:19,21 45:9 64:9 65:5 68:9 114:9 128:13 133:19 135:23 142:8 147:17 148:3 160:15 167:11
**inherited** 151:16
**initial** 42:9 51:17 93:4 141:13 154:20
**Initially** 138:9
**injury** 48:10,12 71:13,13,15,16
**input** 15:23,24 18:1 18:5 68:8
**inputted** 65:5
**inputting** 15:15,16 16:2
**inquiries** 40:5
**installed** 40:10
**instance** 21:18
**instruction** 5:23 6:7
**instructor** 42:1
**interact** 34:5,8 35:19 89:7
**interacting** 35:5,18
**interaction** 40:22 44:20
**interactions** 39:14
**interchangeably** 98:8
**interest** 92:20
**interested** 182:14
**interfere** 31:4
**interim** 28:16

**intern** 95:19,19 157:12 166:7,8
**internal** 144:4
**international** 39:21
**Interoffice** 147:3
**interrogatories** 3:22 136:21 137:21,24
**interrogatory** 137:17 138:11
**interval** 78:14 101:12 102:15 107:15 109:12,19 109:22 110:23 111:23 112:11
**intervals** 80:13 94:16 168:4 178:8
**interviewed** 147:20
**interviewing** 177:9
**intimate** 70:1
**intimately** 148:20
**introduced** 5:16
**introductory** 42:9
**involve** 82:16
**involved** 66:19,21 69:21 92:3
**IOF** 147:1 156:17
**issue** 7:21 32:10 43:15,20,21 45:18 105:15 112:4 130:3
**issued** 46:12 47:1 78:14 94:16 101:7 101:8,16 109:5,8 109:10,12,20 112:6 115:20,21 115:23 116:3,3,8 116:11,18 117:22 135:15 176:24
**issuing** 43:3 47:9
**item** 176:8
**items** 70:1 172:10
**Ivy** 36:19

**J**

**James** 166:2 175:13 175:14 180:4,6
**Janet** 152:12
**January** 38:11 73:18 89:13,15 96:24 97:13,15,24 103:5,6 178:8
**jbarras@reedsmi...** 2:10
**Jerry** 34:22 35:13 35:17,22
**Jersey** 156:18
**Jim** 72:9,20 150:24 151:9,19
**Jim's** 167:1
**job** 10:10,11 12:21 13:3,12 15:9 21:23 22:15 23:5 23:24 24:9,21 25:4,12,15 27:9 30:17 32:3 33:14 35:14 39:2,3,8 41:1,9 42:11 62:24 66:8 71:19 82:6 89:10 92:23 93:14 109:13 110:3,24 116:13 116:13,14 122:8 123:23 125:15 144:6,22 151:16 157:19 175:4 176:21
**jobs** 91:7 102:5,22 102:22 105:7 111:20 116:19 123:12
**Joe** 25:11 28:18 36:18 37:9 56:6 129:14 130:11 138:24 142:16 153:11,16 163:15
**JOEL** 2:8
**John** 129:10 150:1 156:4,15
**Johns** 150:2,5,16

180:10,14
**joint** 64:10
**Joseph** 11:1 28:6
  54:6 138:20
**judge** 119:4
**judgement** 173:21
**July** 38:2,4,14
  51:18,21 53:18
  56:15 61:8,19,20
  61:24 62:3 63:18
  74:24 86:17
  106:19 178:9,21
  178:23,24
**jump** 102:7
**June** 1:11 50:1,9
  51:14,17,17 53:17
  61:18 104:15
  106:22 152:11
  176:19

**K**

**Karpf** 1:15,15 2:2,2
**keep** 6:10 13:19
  45:4 55:11 160:2
  160:3 178:12
  179:6,10,21
**keeps** 97:2
**kept** 83:20
**key** 112:17,18
**Kimberly** 52:15
  54:4 60:14
**kind** 24:14 41:17
  42:9 43:16 48:9
  50:3 51:23 52:1
  57:2 59:7 60:18
  72:17 84:20 91:3
  91:18 130:1 174:3
**Kirkland** 37:13
**Klauss** 19:21 37:15
  37:17
**know** 5:16 6:11 7:6
  7:6,7 8:7,7,15 9:1
  10:14 12:7 14:17
  15:3 19:8 22:2,21
  23:7 26:4,21 29:2

29:19 31:12 32:15
  36:3,11,24 37:2
  38:11 39:13 41:24
  42:5 44:13 46:15
  48:8,13 52:3,13
  53:3 56:3 57:13
  57:18,20 59:23
  60:23 62:9 63:1
  63:14 66:20 71:15
  71:21 73:22 74:8
  78:8 81:4 82:22
  86:21 88:14 89:6
  90:7 91:4,6,15,24
  93:24 96:15,19
  97:3 98:21 101:1
  103:16 104:1
  111:1,22 112:6
  113:7,13 114:4
  116:12,21 118:3,4
  120:14,17 121:10
  121:23 122:8
  124:17 126:17,19
  126:20 128:3
  129:20 130:3
  131:7,8,13,14
  132:9,13,22 133:6
  136:10 138:1
  141:2,24 142:6,14
  143:22 144:22
  145:9,10,13,16,18
  145:20,23 146:18
  147:23 148:1,19
  148:23 149:9,9,10
  149:11,14 150:1,2
  150:9,10,12,22
  152:2,16,22
  154:18,18,24
  157:15,20 159:4
  160:7 162:2 163:7
  163:7,9 164:4,16
  165:1 166:15
  168:11 169:14
  170:2 173:12
  175:4 177:19
  180:5,8,15,22

181:1
**knowledge** 7:12
  18:12 25:3 41:18
  42:4 44:8 69:9,18
  70:1 92:11 122:22
  126:9,11 127:20
  171:6 172:11
  174:5,9,22 175:1

**L**

**labelled** 94:6
**labels** 171:14
**language** 64:12,14
**Larchmont** 37:18
**larger** 39:18 90:24
**late** 11:6 12:12
  31:15 61:20 63:18
  124:21 162:21
**lateral** 72:12
**laundry** 163:14
**Law** 1:14
**lawsuit** 5:19
**leadership** 95:21
**leading** 17:3 20:3
  46:14 47:3 127:8
  127:16
**learn** 42:5 119:14
  122:7 123:6,7,8
  123:10,14 142:8
  176:11
**learned** 141:15
**learning** 92:16 96:2
  123:1 170:18,24
  171:15
**lease** 67:1 82:11,19
**leasing** 31:8,10
**leave** 8:19 32:16
  48:7,22 49:8,10
  49:23 50:5 51:2
  51:15 52:6 53:9
  55:4 57:4 61:6,7,7
  61:16,17 71:9,11
  72:10 74:6 75:5
  77:15 129:22
  143:24 173:3

177:23
**leaves** 49:19 80:18
**leaving** 19:15
**left** 86:22 94:15
  143:10,18 157:13
  177:8 178:15
**legal** 136:19 138:10
  138:19
**length** 165:18
**lengthy** 137:18
  138:6
**Lennon** 151:3
  155:13 158:10
**let's** 15:20 24:20
  42:20 80:9 85:20
  90:17,17 95:10
  96:4,10 101:11
  156:5 169:17
**letter** 3:16 49:14,21
  51:13 53:17,19,23
  54:11
**letters** 49:18 54:17
**level** 83:13 170:17
**levels** 171:1,14
**Levin** 64:22
**Levittown** 1:23
**Liberty** 2:9
**light** 62:24 81:3
**liked** 83:15,16
**limited** 57:2 59:7
  62:4 170:18
  171:16
**Linda** 1:17 148:23
  182:3,21
**line** 18:24 32:11
  96:12 99:16 100:7
  101:11,13
**list** 3:13 13:24
  24:20 28:20 115:9
  145:17 156:2,4
  157:1 163:14
  171:10 172:10
  179:6
**listing** 12:4
**lists** 38:17

**little** 8:12 31:14
  89:17 102:20
  122:11
**LLP** 2:8
**local** 67:1 82:18
**located** 136:3
**location** 10:13
  11:16 23:15 24:10
  92:2,19 154:11
**locations** 153:22
**log** 45:5
**logged** 53:1
**logs** 41:24
**long** 9:15 27:7
  31:12 43:2 46:15
  57:11 86:7 91:1
  111:17 132:5,8
  143:11 167:7
**longer** 8:12 13:6
  36:14 51:9 109:21
  140:23 156:9
  165:2 177:12
**look** 9:23 10:11,16
  12:2 13:22 14:1,7
  14:16 17:11 19:7
  19:19 22:6 23:21
  24:15,20 29:2
  31:18,20 36:24
  38:10 42:20 47:15
  47:22 49:20,22
  51:8,13 53:8,15
  55:1,18 59:18
  78:6 79:4,9,10,24
  80:2 84:19 96:15
  98:24 100:5,21,22
  102:23 103:5,14
  103:24 104:8,16
  105:6,16,24 107:3
  108:3,10 110:8
  112:15,17 115:13
  115:18 116:4,6
  118:5,17 119:12
  127:9,10 132:19
  133:1 138:18
  147:12 153:21

158:5 159:15,16
162:1,9 163:13
164:11 169:14
176:17 179:13
**looked** 62:7 117:22
118:22 125:17
133:3,7 158:4
166:16
**looking** 19:1,5 20:7
21:1 24:19 25:11
38:3 48:1 49:13
53:17,19 54:18
60:4 79:15,18
80:10 94:13 96:20
96:22 97:8,23
98:21 100:1,17
102:12 103:13,16
104:7 105:18
106:9 110:6 111:6
112:13 118:4
119:7,8 132:16
146:6 148:22
151:2,17 180:1
**looks** 51:15 80:8
164:11
**loop** 55:11
**Lose** 146:18
**lost** 156:1 177:11
**lot** 28:2 61:11 79:24
82:9 177:6
**loud** 59:23
**low** 107:21 161:3
**lower** 107:13,14,20
118:12

**M**

**Mac** 173:11
**Magee** 1:13 3:3 5:9
9:21 13:19 17:11
28:24 42:20 49:18
95:12 138:20
182:6
**mailbox** 72:6 73:9
73:11
**mailboxes** 73:8

**maintain** 38:17
**maintained** 104:5
**maintenance** 67:10
143:19 175:9
**major** 92:18
**making** 60:2 70:11
70:19 76:15
119:19
**manage** 122:8
**management** 82:7
82:13 152:7
**manager** 9:12
10:18 12:3,20
27:4,19 64:13
69:4 78:7 79:19
79:20 92:9 146:21
147:1 166:22
177:14 180:11
**managers** 77:21
95:5,6 115:5,7
122:14 130:14
144:15,16 153:14
167:4 168:1,6
**manages** 121:18
**managing** 124:18
**manipulating**
126:12
**manner** 44:17
**March** 24:22 96:24
103:8 104:19
132:3 160:20,20
162:9,19 163:1,2
**margin** 68:12
**Maria** 128:24
**mark** 17:6 59:12
76:15 153:11
179:23
**marked** 3:9 4:2
9:18,22 13:16
17:8 28:21 29:1
42:17,22,23 49:15
52:19 56:10 57:21
57:24 59:14 137:5
137:21 146:3
159:12 160:12

169:10
**Market** 82:21
**Mary** 127:7,14
129:2
**Maryland** 29:12
**match** 37:24
**material** 42:4
**materials** 123:22,22
**math** 61:5
**Matt** 180:8,12
**matter** 6:8,16 55:20
109:24
**maximum** 159:23
160:8
**McCoach** 12:4
152:12
**McHugh** 152:22
**McIntosh** 143:4,17
145:10,21 173:6
180:17
**MDU** 65:14
**MDU/MTU** 65:7,7
65:13 78:13
**mean** 38:6 44:1
55:1 59:23 66:20
66:22 68:1 70:8
75:14 76:1,7,10
80:15,20 82:8
88:14 98:1 101:19
117:10 120:9
121:8,14 122:4,20
147:2 148:13
157:18 158:1
166:11
**meaning** 52:23 53:9
53:23 93:7 102:3
150:6
**means** 53:22
121:15
**meant** 91:17
**measurable** 176:8
**measure** 68:14
101:17 165:1,12
**measuring** 65:19
76:21 108:9

115:16 165:17
**medical** 48:7,22
57:14 63:1,3 71:9
71:11 74:5 75:4
129:21 130:2
173:3
**medium** 30:23
**Meghan** 146:17
**Melissa** 136:1
147:14,24
**members** 29:9,14
44:18 45:5,19
46:2 145:12 179:7
**memorialize** 45:12
**memorialized**
142:12
**memory** 62:12
**mention** 134:22,24
167:20
**mentioned** 74:7
135:1
**merits** 145:16
**message** 111:2
**Messick** 152:21
**method** 44:17 46:6
**MetLife** 49:3,7,18
52:4,14,22 54:23
55:7 56:1 57:7,19
58:24 60:22 61:4
62:8,14 63:13
**metric** 75:13,16
76:1,14,16 101:8
109:20 121:7,12
**metrics** 133:7
**mid** 68:20 69:1
79:19 80:7 106:18
116:8 118:11
125:17 175:20
176:16
**middle** 101:11
104:10,12
**Mike** 89:24 93:18
93:19
**Miller** 153:7
**mine** 149:15 160:7

**minute** 141:8 156:7
158:4
**missed** 71:12,22
**missing** 76:5,10
**mixed** 75:13,24
**MO** 84:20
**modified** 52:1
**moment** 10:11 14:1
23:21 53:16 54:18
**Monday** 56:20
**money** 72:17
**monitor** 88:24
**monitored** 26:24
**month** 24:15,16
58:10 61:18 94:23
96:23 97:13,14
102:19,20,23
103:9 104:9,17
110:18 120:19,22
123:13 133:16
134:1 168:8
**month's** 168:10
**monthly** 38:17
103:1 136:14
176:18
**months** 48:6 61:6
61:18 62:21 91:13
91:14 119:11
123:12
**morning** 105:10
140:1
**move** 27:3 31:7
32:3 72:12,23,24
73:2,17,24 74:1,9
74:15 87:17 94:3
144:15 163:9
177:20
**moved** 30:4,7,10,14
31:24 69:7,14,16
87:15 121:6
140:23 144:14
177:17
**movement** 25:22,22
152:19 157:10
**MTU** 65:15

Muccilo 28:6,8
  45:20 46:1 130:11
  138:20 141:19
  142:16 145:3
  153:17
Mucillo 95:8
  141:13
Mucillo's 163:15
Multi 65:14
multiple 104:2
Murphy 25:12 40:2
  128:22

**N**

N 3:1
name 5:18 10:23
  15:9 19:17 36:3
  36:11 54:6 93:13
  98:11 139:4
  142:22 143:2
  151:1,4 168:7,24
named 52:15
names 14:9 36:10
  38:7 142:3 148:22
  151:10 153:7,9
natural 86:12
nature 6:5 12:21
  13:2,11 39:8
  139:5
near 110:15 141:24
necessary 42:11
  83:13 122:20
need 8:11,14,16
  30:24 34:4 45:1
  78:6 94:4 100:24
  101:24 104:15,18
  144:17 150:19
  163:16 171:19
  176:11
needed 55:8,8
  57:15 60:10 74:16
  74:24 77:2,15
  125:6 144:22
  172:7 174:8
  177:15

needs 40:14 74:19
  92:21
negative 44:19
  80:14 81:4 112:3
  125:8
neither 182:9
net 75:19 98:13
  126:9,10,11,12
  171:5
network 4:6 12:19
  13:2 34:15 42:6
  68:6 117:17 169:9
never 7:6 10:7
  58:20 113:8
  142:20 160:6,7
new 33:20 39:12
  41:22 42:2 46:15
  65:8 67:16,21
  82:6 85:7,9,10
  89:11 91:6,20,22
  92:16 156:18
newest 145:21
  157:4,7
non 147:10
norm 32:13
normal 8:12 141:3
normally 52:13
  103:19
Notary 182:22
note 3:19 57:21
  58:1 71:12 103:4
notes 45:5 53:6
  56:14 59:11,18
  62:8,9 170:7
notice 51:8 53:22
  60:22 115:9 142:1
  142:2
noticed 26:19
notices 43:14,16
notification 49:5
  50:4 54:3
November 162:13
  162:16 163:5
number 10:2,4
  16:11 18:2 27:17

40:5 50:19 53:9
  54:4 93:4 97:24
  99:9,12,15 100:12
  100:12 101:13
  106:7 107:1,24
  108:1,18,24 109:3
  109:7,9,11 110:8
  111:13,19 112:16
  116:6 117:23
  120:7,8,11 121:7
  123:11 125:12,18
  130:22,24 131:3,6
  134:4 138:12
  142:4 148:13,16
  148:16,20 149:13
  149:13 162:14
  164:14,16,17
  165:24 178:18
numbered 16:4
numbers 15:20,22
  17:1 26:20,24
  29:8 90:2,3 97:18
  100:19 105:18
  106:13,15 107:11
  108:4 115:19
  117:21,23 118:18
  118:21 119:3,6,8
  119:12 120:14
  127:20 148:11
  158:9 166:17
  176:7,15 179:7
numerical 15:16,23
  148:8
numerous 40:3,4
NWCHH 117:16
  117:23

**O**

O 168:22
Oak 37:21
oath 6:19
Object 20:13 61:21
objection 7:18
  54:12 63:5,9
  138:19

objections 5:5 7:16
  138:10
objectives 64:5,21
obtained 17:2 30:2
  37:13 38:12
obviously 110:17
  112:24
occurred 26:3
  27:16
OCN 76:5,8 167:21
October 58:8 62:11
ODN 117:6
ODNHH 117:5
off-site 34:24 71:3
  83:9
offer 33:19 177:13
office 14:6 32:17
  34:19,20 35:4,8,8
  38:8,8 88:13
  140:1 168:18
  172:17,18,24
offices 1:15 37:12
  40:3,4
oh 36:9 38:1 50:16
  51:10 81:1 91:18
  94:12 96:20 97:20
  107:10 109:10
  116:4 175:19
okay 6:14,15 7:8,12
  7:13 8:1,2,9,10,19
  8:20 10:15 38:1
  42:21 51:10 53:12
  60:15 64:8 78:5,9
  80:5,7 81:1 91:5
  96:20 97:11,20
  107:10 109:24
  116:10 138:6
  139:11 143:23
  148:10 149:16,17
  150:18 153:4
  169:7 172:9
  175:19
on-site 33:7 35:2
  50:16,24 77:12
  93:1

on-the-job 41:21
once 35:14 37:3
  39:8 58:20,23
  80:16 81:16 86:1
  87:15 112:10
  121:24 122:12
  124:20 139:22
  167:4
one-on-one 44:20
ones 11:21 16:1
  25:11 37:17 43:12
  53:7 64:2 91:8
  100:22,23 112:8
  153:1
online 41:23
open 100:22 101:2
  101:4 102:22
  105:7,10 120:17
  165:18
opened 178:16
opening 177:5,8,10
  177:10,11,12
opinion 105:17
  127:4,17 128:9
opportunity 13:21
  14:7 44:10 83:19
ops 175:8
optional 64:13
order 40:11,12,13
  40:15 41:15,19
  87:4 120:22
  123:22 126:12
  148:8 170:4
ordering 98:12
orders 34:17,17
  66:1 75:17 108:7
  108:24 109:7,9
  110:8,10 118:18
  119:1 120:19
  126:13 151:11
  152:6 174:10
organization 3:13
  28:20 130:8
  144:23 163:16
  175:9

BRIAN MAGEE

**organizational**
  86:16 178:7
**Originally** 133:3
**OSP** 91:24 92:11
  111:16
**outside** 72:16 92:1
**outsourced** 82:8
  83:7
**overall** 109:21
  110:3 125:11
  162:5 165:3
**overlay** 151:14
  152:5 155:4,7,18
**overlays** 65:15
**overloads** 65:7
**oversee** 12:12 147:4
**overseeing** 114:14
**oversees** 147:5
**ownership** 83:13
  119:14

**P**

**P.C** 2:2
**p.m** 1:17 56:15
  181:9
**PA** 80:22,23,24
  81:2 142:5 144:13
  145:7 153:24
  154:5,12 179:19
**PA/Delaware** 78:12
**package** 82:22
  143:8 169:20
  180:18,24
**packet** 13:22 22:18
  170:4
**Padovani** 37:16,20
**page** 3:2,9 4:2
  19:19,20 20:8
  22:18 24:20 29:18
  38:10 46:11 47:15
  53:16 54:5 59:17
  64:7,13,18 65:2
  68:11,11,19 78:3
  78:4,5 115:18
  119:22 121:1

132:16 134:17
138:12,13,14,18
148:9 150:18,20
151:18 152:11,16
152:21 156:7,11
159:15,17 169:18
170:3,20 171:10
171:11,22 176:1,4
179:13 180:2
**pages** 14:3,4,8,16
  14:18 21:20 146:8
**paid** 51:6
**Panichelli** 15:21
  18:1,4 24:21 25:5
  108:15 110:7
  112:22 118:23
  126:18 156:8,20
**paper** 43:8
**paragraph** 49:22
**Parker** 136:1
  147:14
**Parks** 166:2 175:13
  175:14
**part** 46:13 56:13
  66:5,8,14 78:20
  78:22 81:7 82:12
  130:7 153:14
  165:15 169:19
  170:4
**participated** 138:16
  138:21
**particular** 8:18
  19:17 20:21 29:20
  30:2 50:20 53:11
  55:2,19 73:12
  94:22 103:20
  105:15 119:3
  126:15 128:14
  137:19 138:11
  163:17 166:1,13
  168:16
**parties** 5:2 182:10
**parts** 89:22
**party** 31:8 48:24
  66:16,19,23 67:2

67:6 82:11 89:4
90:14 92:18
  180:13
**passed** 87:1 166:4
  175:18
**passing** 48:13
**path** 83:2,4,5
**pathway** 32:14
**Patricia** 12:4
**Paul** 19:20 37:15,17
  129:16
**pay** 55:1,17 158:17
  160:19 161:15,19
**paying** 177:18
**payroll** 33:3 35:3
  51:6 85:2,3 87:3
**PDF** 176:2
**PDFs** 79:12
**penalties** 126:18
**penalty** 126:18
**pending** 120:18
**Pennsylvania** 1:1,7
  1:10,16,23 2:4,9
  29:10 149:4
  151:12 152:4
**people** 19:23 25:23
  26:7 28:4 36:15
  72:15 73:7 110:16
  114:22 116:15
  129:20 130:15
  131:7,10 144:11
  144:13,15 149:21
  151:17 152:17,19
  152:20,21 156:2
  157:10 160:4
  177:9 179:8
**percent** 110:15,16
  111:7 160:1,24
**percentage** 109:4
  160:24
**PERF** 16:24,24
  17:23 18:5,8 19:6
  20:10,10
**perfect** 126:23
**perform** 37:4 40:15

82:2 98:14
**performance** 3:14
  3:15 9:2 11:19
  14:14 15:17,18
  16:10,12 17:2
  19:6,10,11,13
  20:3,22 21:1,9,15
  26:14 42:17,21
  43:23 44:2,5,7,15
  44:18,24 45:2,10
  45:18,24 46:9,22
  48:2 63:21 69:4
  78:7 92:6 94:16
  106:15 110:22
  111:4 117:24
  119:4 126:19
  132:21,23,24
  133:4 134:7,8
  135:15 158:17,21
  159:1 160:21
  166:1 167:10
  172:20 175:3,20
  176:2,3
**performed** 33:13
  82:4 83:12 170:12
**performing** 17:3
  26:11 46:14 127:2
  133:2 150:16
  175:5
**period** 11:14 12:8
  12:11 15:2 42:10
  50:5,11 61:15
  70:18 71:1,22
  90:15 107:2 108:2
  110:9 114:17
  120:16 141:23
  172:23 175:11
  176:20
**periods** 161:14
**permanent** 123:23
**permit** 69:9,21 70:5
**permits** 92:17
**permitted** 57:11
**Perry** 22:17 23:23
  100:7,18 102:13

102:16 129:12
134:14 135:4
157:4 166:9 174:5
177:3 178:1,17
**Perry's** 22:19
  175:19
**person** 7:20 35:11
  35:22 38:20 49:10
  52:12 56:2 91:21
  94:20 108:5,6,7
  108:13 111:7,8
  118:5 133:21
  135:22 141:16
  145:14,15 148:19
  149:11 151:7
  157:4 159:7 163:9
  172:12 177:15
**person's** 19:17
  39:23 161:19
  177:14
**personal** 6:5 45:5
  128:8 172:11
**personally** 8:23
  45:10 58:15 62:18
**perspective** 40:6
  142:17
**pertained** 85:12
**pertinent** 53:7
**phasing** 90:22
**Phelps** 80:1
**Phila/Delaware**
  75:12
**Philadelphia** 2:9
  37:11 39:19,22
  40:4 50:21,23
  70:5 92:13 93:23
  113:10 150:5
  151:14 153:22
  155:5,8,19 177:17
  179:19
**Philadelphia/Del...**
  75:24
**phone** 1:24 8:16
  52:5 142:9 147:21
  147:24 148:2

179:7
**physically** 74:1
  122:5
**picked** 139:13,13
  140:13,14 145:11
  145:21
**picture** 113:6
**piece** 109:15 111:15
**pinpoint** 74:12
**pipe** 67:11,12
**pipes** 67:16
**PL** 109:1,7
**place** 2:9 46:16
  58:8 182:7
**placed** 19:16 73:9
**places** 73:4
**Plaintiff** 1:4,14 2:5
**plaintiff's** 3:22
  137:21 138:21
**plan** 4:4 44:2,6,7
  159:12
**planners** 147:6,6
  149:2
**plant** 92:1
**plate** 118:6 175:12
**play** 78:19 160:23
  165:16
**played** 78:22
**please** 59:12,24
  70:20,21 99:5
  148:9 149:8,16
  150:18 162:1
**PO** 1:23
**point** 7:19 8:14
  11:10 12:12 30:15
  51:23 59:1 65:1
  80:9 81:13 86:10
  87:23 124:4 125:5
  131:15 137:18
  138:10 139:16
  141:15,18 142:15
  143:16 153:16
  162:7
**points** 82:24 135:6
**Poplar** 36:18 37:4

38:23
**portions** 15:1
**Portolese** 23:3,23
  36:17 37:3 86:3
  86:19 87:17 89:1
  89:15 93:16 115:9
  157:7
**Portolese's** 38:22
  79:16 90:1
**position** 30:4,7,12
  30:19 31:13 33:16
  34:5 35:20 41:8
  52:24 77:22,24
  87:8,12 92:15
  139:17 149:21
  150:7 180:23
**positions** 89:10
**positive** 44:19 70:3
  78:15,18 152:14
**post** 69:24
**postal** 144:17
**potential** 142:17
**practice** 92:15
**preceding** 23:19
  27:10
**prepare** 8:23
**preparing** 11:23
**prescription** 58:2
**presented** 85:15
**Pretrial** 1:13
**pretty** 84:18 120:3
  120:4 134:12
  161:9
**previous** 104:8
**previously** 82:8
  83:6
**primary** 18:10
  34:13,20 127:19
**Prince** 152:12
**print** 93:9,11 94:16
  101:8,14,16,24
  102:1,4 107:15
  123:19,20 124:1,7
  125:1,3,4 155:4,7
  155:18

**printed** 53:7 109:8
**prints** 78:14 101:7
  101:12 109:5,10
  109:12,20 111:23
  111:24 112:10
  115:20,21 116:8
  116:11 117:22
  124:11 125:18,19
**prior** 11:10 24:24
  47:9 88:17 112:1
  156:22
**private** 67:14
**probably** 7:16
  10:22 84:11,15
  87:5 97:3 132:9
  132:10,11 148:19
  163:13
**problem** 164:22
**procedurally**
  140:10
**proceed** 139:1
**proceeding** 6:20
**process** 69:10,22
  124:4 133:6
  164:24 176:12
**processes** 92:16
**produced** 10:8
**product** 67:22
  122:9,10,19,21
  123:4,15,16 124:1
  124:14 126:4
**products** 65:8
  67:22
**proficiency** 128:4
  170:17 171:1,14
**proficient** 128:9
**profit** 68:12
**program** 95:21
  132:20 152:7
**programs** 152:7
**progress** 120:5
**project** 77:20 90:8
  122:14
**prolonged** 74:7
  175:11

**promise** 108:21
**promoted** 27:12,19
**promotion** 43:5
  156:17
**property** 67:15
**propounded** 136:21
  138:8
**protected** 92:19
**prove** 83:1
**provide** 57:14
  136:5 139:8
  154:17
**provided** 11:19
  13:23 43:15 57:18
  62:1 94:7 127:21
  133:10 135:24
  139:3
**providers** 31:9
**provides** 154:18
**providing** 133:19
**provisioners** 115:1
  149:22
**public** 67:14 182:22
**pull** 104:21 106:19
  168:6
**pulled** 104:23
  133:22 153:18
**pulling** 104:2
  132:15 167:3
**purchased** 154:17
**purpose** 7:4
**purposes** 5:23
  144:24 146:7
  170:9
**pursuant** 171:10
**put** 5:17 64:2,10,11
  64:20 65:6 75:12
  78:24 79:2,5
  81:18 82:9 88:18
  92:14 106:14
  112:14 113:12
  114:3 117:18
  126:5 134:14
  158:9 171:9
  174:14 180:5

**puts** 56:19 64:9

--------

## Q

**qualitatively**
  102:17
**quarter** 88:6,7
  130:9 132:1
**question** 5:6 7:5,22
  8:1,18 13:21
  25:18 40:8 59:24
  60:7 76:24 104:14
  120:13 131:22,23
  170:22
**questioned** 148:1
**questions** 7:24 8:4
  53:8 58:22 138:8
  176:13 181:4
**quickens** 102:9
**quicker** 110:4
**quickly** 163:12
  174:13

--------

## R

**R&K** 1:22
**Race** 11:16 23:15
  24:10 50:15 82:21
  88:3,4 136:3
**raise** 160:9 161:22
  162:12,15,22,23
  162:24 163:4
**Ramos** 177:16,23
  178:22 179:2,4
**range** 159:5,10
  161:5,11 163:8
**ranges** 160:4
**rank** 13:24 17:7
  127:11 132:5
  133:2 145:8
  147:12 154:24
  158:6 170:5,13,19
**ranked** 27:16
  130:17 145:11,18
  171:1
**ranking** 130:18
**rarely** 35:7
**rate** 3:12 13:24

BRIAN MAGEE

17:7 63:22 127:11
132:6 133:2
147:12 154:24
158:6 161:15
162:11 170:5,13
**rated** 27:16
**rating** 3:11 13:15
19:10,11 47:11
85:7 126:15,20
127:2 132:13,18
134:19 135:2,3,9
135:15 159:5
161:12,19,23
171:8
**ratings** 46:20 135:6
146:17
**raw** 168:5 169:4
**reach** 51:11
**read** 6:13 16:5 60:6
70:20,22 92:7
99:5,6 111:21
140:6 151:24
171:17
**reading** 5:3 92:5
171:12
**ready** 10:14,15 78:8
117:8
**really** 35:16 54:23
62:16 95:23
177:22
**reason** 6:22 7:24
21:17 25:19 35:17
48:19,21 51:22
52:5 57:6,10
131:16 162:18
**reasons** 120:21
144:10 161:17
173:5,8,10
**rec** 144:6,17 178:3
**recall** 12:10 15:12
15:14 18:19,24
39:3 48:6 50:6
51:20 52:9 55:19
58:7,11,12,22
59:4,9 60:18

62:15,16 111:4
122:16 130:4
135:20 140:6
147:21 148:4
158:20 161:18,20
166:15 169:19
171:3 172:5
**receive** 35:8 49:6
50:3 54:18 103:1
**received** 16:12 20:2
42:10 46:23 54:10
72:6 89:11 131:6
160:19 170:2,4
**recess** 85:21
**recognize** 10:6 14:3
14:18 19:8 29:3
53:3 148:5 149:9
153:6,8,11 163:20
169:15
**recollection** 7:1,3
12:16 57:1 60:19
85:11 161:9
**recommended**
173:22
**record** 5:17,17 10:2
21:4 40:22 52:22
70:23 79:15 86:22
94:13 99:7 141:8
141:10
**records** 40:21 73:3
73:4
**reduced** 60:12
**REED** 2:8
**refer** 10:3 71:24
171:6
**reference** 9:23 80:9
98:23 105:12
110:22 111:3
122:12 124:15
**referencing** 71:15
110:6 162:8
**referring** 9:7 15:19
25:13 50:14 64:17
76:3 167:19
**reflect** 10:9 17:1

25:6,8 38:22
49:19 54:10 94:6
124:11 135:8
168:4
**reflected** 96:4
162:20 166:18
**reflecting** 74:15
101:5
**reflection** 24:9
**reflective** 167:9
**reflects** 14:9 18:21
20:2 22:2,21 23:7
25:5 31:19 96:15
**refresh** 56:24
**regarding** 44:18
49:19 60:20 77:5
105:7
**region** 151:8
**Reinhardt** 179:24
**related** 72:17
110:23 182:9
**relates** 53:10
**relation** 137:14
**relative** 182:12
**relay** 111:2
**releasable** 177:15
**relocation** 92:23
**remain** 41:3 51:21
**remainder** 119:15
**remained** 15:11
27:18 81:12
**remember** 7:8,10
46:24 48:9 50:24
52:15 53:18 59:8
73:1 88:7 92:3
137:1 140:5,7
169:21 172:8
177:7
**removed** 81:16
**rep** 61:4
**repair** 30:21 31:6
67:10
**repeat** 8:6 18:3
170:22
**repetitive** 170:8

**replace** 102:8
**replaced** 179:2
**reply** 67:4 83:2
**report** 26:23 93:3
94:22 96:20 97:1
97:9,21 99:24
100:4,23 101:4
103:1,12,18,20,21
104:1,6,18,20
105:1,10,12,19
106:5,11,17,21
112:19 133:22
164:9 165:19
166:13 167:1,3,20
176:18,18
**reported** 28:15
100:15
**reporter** 1:18 7:19
9:21 70:22 99:6
182:22
**reporting** 1:22,22
28:14,18
**reports** 94:21 97:8
100:16 103:2
104:2,4 136:15
164:8 166:16
**represent** 5:19
**representative**
146:20
**representatives**
52:5
**request** 31:5 40:20
40:23 48:22 49:20
51:16 53:10 67:3
75:19 82:10,11,20
98:4,10,13 126:9
126:10,11,12
174:6
**requested** 83:3
135:23 140:17
**requests** 30:22 31:6
39:11,12 49:7,19
82:17
**required** 41:17 69:1
**requires** 109:16

**requisition** 158:9
**reserved** 5:7
**residential** 32:5
39:11 65:15 67:13
90:10 108:19,22
**respect** 42:13
120:13
**respecting** 16:9
32:4
**respective** 5:2
130:18
**respond** 31:5 139:8
**response** 6:9,14
138:18
**responses** 3:22 6:17
136:22 137:20
138:18
**responsibilities**
11:11 12:21 29:7
30:18 31:13 34:3
39:2 41:1,16 50:8
51:2 62:24 66:8
93:6 95:7 156:23
**responsibility** 13:9
26:13 28:3,5 30:5
30:21 32:19 50:13
50:19,22 67:19
89:11 93:22,24
123:7 178:15
**responsible** 16:1
27:4 39:10 40:17
41:2,12 69:22
124:2 149:3
151:13 152:3
154:2 169:1,3
**result** 145:11 177:6
**results** 67:6 75:13
75:24 78:13,18
97:17
**retiree** 180:6
**return** 56:3 57:4,8
60:10
**returned** 52:12
56:20
**returning** 52:1

revenue 65:4 67:21
  126:4
reverse 116:5
review 3:14,15 9:7
  44:16 45:20,24
  46:9 47:22 55:19
  70:3 71:2 77:5
  79:1,3,6,11,16
  101:1 124:5,7
  132:14,19 134:7,8
  175:4
reviewed 9:1 21:12
  42:24 45:22 47:20
  78:9 125:15
  137:13
reviewing 26:14
  40:21 100:16
  124:17 133:13
reviews 9:2 19:13
  21:15 42:17 47:1
  90:1,6
Ricciardi 1:18
  182:3,21
Rich 87:11 88:21
  89:15 90:13 93:16
Ridge 36:19
RIF 15:2 19:13
  25:23 27:3,16
  130:7 131:5,11
  139:23,24 140:2,2
  141:14,23 142:16
  143:8,10,11
  148:16 149:11
  154:22 157:5,8
  169:22 171:24
  180:18,24
RIF'd 21:8 142:7
right 9:12 14:8,14
  17:24 18:22,23
  19:24 21:4,14
  24:7,15 31:10,20
  32:1 40:7 47:16
  55:11 58:14 61:9
  61:11 62:15 63:4
  67:14 68:23 69:5

71:9 73:2 74:2
  75:5,10 76:17
  79:1 85:19 86:23
  88:3,4,16 89:9
  93:13 95:20 99:12
  99:16 101:10
  102:2,12 103:10
  103:11,13 104:14
  104:15 108:22
  109:3,6,19 110:11
  113:1,5,6,19
  114:8 117:14,15
  118:1,2,4,8,9,13
  119:3,16,20 120:3
  131:8 134:1,12,15
  134:20 135:2
  140:12 144:18,19
  146:10 148:17
  149:7 151:10,24
  153:24 156:20
  157:21,24 158:2
  164:13,14 165:22
  166:3,14,19
  167:14,15,16,19
  168:13 171:24
  172:5 174:6,10
  176:5,19,22 179:4
  180:12
right-hand 9:23
risk 108:17
Road 1:16 2:3
Rogers 34:22 35:13
  35:18,22
role 13:8,9 31:16,21
  32:7,18,23 35:21
  41:22 65:22 66:5
  72:2,10,11 77:1,9
  77:10,16 81:11,21
  81:24 82:2,3,5,10
  83:7 86:2 88:1
  90:19,24 92:12,16
  115:2 121:5
  126:24 127:1
  160:23 161:2
  173:1

roles 34:16 78:17
  89:17
roll 106:2,11
rolling 97:1 103:2
  104:6
Ron 153:12
room 6:18 8:19
roughly 160:24
row 107:6
run 83:24 102:7
  109:17
rundown 139:12,15
runs 94:20

---

### S

S 2:8 3:8 4:1
S-E-P-T-A-C-K
  151:5
S-Z-E-W-Z-Y-K
  151:23
salary 10:12 72:17
  72:18 160:22
  161:10 162:1
sale 117:8
Salinsky 95:4
  114:13 115:4,6
  131:9 144:7,12
  151:8 153:18
Salinsky's 153:13
  153:21
Sam 179:24
sank 3:12
sat 77:4 139:20
satisfied 92:20
saw 14:5,23 164:9
  171:4
saying 6:12 7:20
  49:9 55:16 56:1
  60:23 74:4 75:15
  76:17,18 81:2
  103:4 107:11
  119:8 121:9,16
  122:16 124:15
  125:5 151:9 153:4
  157:15 158:20

163:3 164:22
  172:9
says 11:3 18:5 19:5
  19:10 20:10 53:21
  54:5 55:7 67:21
  68:7 72:4 94:9
  95:12 96:10 99:19
  115:19 119:22
  127:12 138:20
  147:13 157:19
  168:21 171:13
scale 116:12 159:18
  159:19
Scelsa 36:18
scenes 100:4
schedule 57:12 58:7
  58:17,23
score 15:22 16:11
  20:2 118:10,16
scores 15:17,23
  20:12 76:22
  115:14
scoring 3:12 17:7
  166:22
Scott 15:21 18:1,4
  24:20 25:5 108:15
  110:7 128:16
  156:8,20
screen 160:17
scroll 108:14 176:4
sealing 5:3
search 42:5
second 19:19 29:18
  51:13 96:21 99:4
  104:12 105:20,21
  106:12 107:4,7
  113:23 116:5
  127:12 128:3
  156:6 157:7
  165:16 168:12
  170:3
section 12:20 53:13
  174:1
see 10:19 11:3 12:4
  14:20 15:4,9

16:17 19:20 21:24
  22:14,19 23:3
  24:21 25:24 34:4
  43:13 50:1 51:18
  53:24 56:16,22
  58:5 64:6 67:21
  69:10 78:15 79:21
  90:6 93:9,10
  94:11 95:11 96:11
  99:14,18 100:9,21
  102:23 103:21,22
  104:8 105:21
  107:6,18 110:13
  111:10 113:17
  115:19,20 119:24
  120:12 127:14
  132:18 134:21
  137:3 138:22
  146:14 147:14,15
  153:18 160:7
  162:13 163:5
  167:17 168:8
  175:24
seeing 108:13
  149:10 171:20
seek 21:18
seeking 52:6 130:1
seeks 138:15
seen 10:7 19:9 47:1
  158:7,8 159:19
  160:6
select 66:24
selected 139:4
  142:23 172:9
selection 139:7
self 150:19
send 55:13 67:4
  75:21 82:24
  121:24 124:22
sending 123:8
sends 35:9
sent 53:22 83:8
  114:9 136:21
  147:22
separate 26:13

BRIAN MAGEE

115:4
**SEPTA** 39:18 40:2
**Septak** 95:3 115:4
115:6 131:9 144:8
144:12 151:6
154:1,11,20
**September** 58:1
59:11 60:17 62:4
62:11
**sequence** 16:4
**series** 53:6
**service** 34:17,17
39:12,12 98:4,10
102:9 117:18
167:17,22 169:5
174:9
**services** 1:6,22
40:16 67:5 75:18
76:9 83:1 154:19
**set** 72:4,19,21 88:13
113:9 115:2 138:9
182:7
**sets** 105:20
**setting** 6:18
**settle** 142:2
**seven** 100:9,18
114:18 140:22
**seventh** 16:4
**SFU** 65:6,10
**share** 29:7 154:4
172:5
**shared** 145:3 178:8
**sheet** 68:17 84:19
162:8 163:5
179:10,12,24
**sheets** 84:21
**shining** 81:3
**short** 4:4 48:23
85:21 159:11
**shots** 160:17
**shoulder** 48:10,11
71:13
**show** 101:4 112:3
163:2 179:8,14,15
**showing** 101:7,8

163:6
**shows** 104:11
179:17,18
**Shubrook** 129:10
156:4,7,15
**side** 87:14,14
**sign** 69:1 137:7
**signatures** 47:16
**signed** 80:1 137:11
**signing** 5:3 137:1
137:11
**Silens** 114:12
**similar** 38:17 43:7
43:9 80:8 180:14
**single** 52:23 65:11
124:7 150:6
**sit** 55:21 68:19
74:16 107:23
131:8
**site** 32:17 33:6 35:2
35:3,7 50:11,14
65:9 67:24 71:3,5
122:5 151:11
152:6
**sites** 32:21 68:2
**sitting** 6:18 73:5
88:21 140:7
**situations** 162:3
**six** 58:4 62:20
105:24 118:18
119:2,11 140:22
166:3
**sixth** 16:3
**size** 109:13 110:24
116:12 118:4
167:23
**sized** 103:16
**skill** 18:10
**skills** 127:19
**Slattery** 51:3,9
66:19,21 71:6,19
77:7,10,12 83:22
86:5,15 87:14,18
90:18,19,20 93:8
93:12

**slightly** 114:19
**slowly** 33:18
**Smail** 95:4 114:24
149:20 152:24
**small** 110:12
118:19
**smaller** 116:19
**Smith** 2:8 95:4
149:1
**Snyder** 11:1,2 54:6
56:6 153:11
**soaked** 51:1
**solid** 92:15 176:10
**someone's** 158:22
**soon** 87:21 111:3
**sooner** 110:2
**SOP** 96:8
**sorry** 17:13 24:3
25:13 40:9 59:22
59:24 66:7 75:7
96:19 127:15
154:13 180:20
**sort** 44:3 48:10 93:3
130:2 144:5
158:18 159:3
**sound** 176:21
**sounds** 176:23
**south** 113:10
**SOW** 121:18,19
122:23 126:1
**space** 72:23 88:13
**span** 107:11
**speak** 52:4 59:1
163:18
**special** 75:18 80:18
98:5
**specialist** 13:1,11
13:13 22:13 26:2
30:15 155:9
**specialists** 25:21
158:13 170:14
**specials** 76:9
126:10
**specific** 130:22
131:3 140:14

172:3 173:5,8
**specifically** 135:21
141:20
**specifics** 173:20,23
173:24
**speculate** 7:11
**spell** 36:7 151:21
**spend** 124:17 161:7
**spending** 76:18
**spent** 132:9,10
**splicer** 174:20
**split** 36:15,22 37:15
146:1
**spoke** 56:21 57:1
**spot** 72:24 178:16
**spreadsheet** 22:5
94:7,14,17 133:11
163:19,21
**spreadsheets** 94:5
163:11
**spring** 84:12
**Square** 2:3
**SR** 26:19 76:22
90:2 94:15 96:8
98:3,4,6,8,9,15
101:2,15,22
105:10 109:14,15
111:16 118:21
120:14 164:21,23
165:13,21 168:3
**SRs** 98:2,16 99:1,20
100:13 101:4,23
108:1 113:2,5
120:7 126:11
164:15
**staff** 94:20 147:4
148:19
**stamp** 3:10 4:3,5
9:17 10:1,4 20:7
21:21 64:7 79:17
80:10 94:14 146:2
146:8,16 159:17
160:11 163:20
**Stampone** 152:13
152:14

**stand** 65:10 101:3
**standard** 78:14
**standing** 119:5,7
120:8
**standpoint** 43:23
61:5 148:9
**stands** 75:16
**start** 28:18 33:17
49:11 79:21 81:23
91:20 96:4 97:17
123:7 151:15
169:17
**started** 11:22 31:15
31:21 46:22 61:7
82:12 85:24 90:22
91:6 157:12
**starting** 17:23
89:13
**starts** 79:16 107:16
138:12
**state** 149:6 151:12
**stated** 60:9 139:10
**statement** 70:21
121:20 122:21
**STATES** 1:1
**stating** 137:15
**status** 64:23 68:17
**stay** 86:19 130:19
131:18
**stays** 162:10
**steadily** 58:10
**stepping** 175:12
**Steve** 25:12 40:2
128:22 148:23
151:6
**stick** 108:9
**sticking** 101:18
**stipulated** 5:1
**stood** 104:12
105:21 106:6
**stop** 7:18 62:10
90:20
**stopping** 107:12
**stored** 104:24 105:1
105:2 136:14

BRIAN MAGEE

178:10
stovepipe 149:12
straight 176:5
Street 1:15 2:3
  11:16 23:16 24:10
  31:1,1 50:15
  82:21,21,22,23
  88:3,4 92:2,19
  136:3
stress 127:5
strike 90:17
striking 24:7
stuck 24:14
stuff 131:21
sub 80:14,20,24
subject 53:21 56:18
submitted 63:13
subsequent 131:6
subset 125:14
substantiate 57:15
subtracted 179:16
successful 78:12
suffering 43:22
suggested 46:13
suggesting 55:3
suggestion 141:19
Suite 2:3
Sullivan 87:11
  88:21 89:2,3,16
  90:14 93:16
summarize 81:9
  105:8
summary 60:5 69:4
  78:7 79:20 92:9
  175:21
summer 84:12
supervise 12:13
  26:8 172:14
supervised 11:15
  12:8 150:12
supervising 11:7,22
  26:9 70:2 72:14
  72:15
supervision 14:1,11
  22:24 23:18,24

24:10,24 26:13
  158:2
supervisor 10:17
  11:2 12:3,19 13:8
  22:12,22 23:11
  24:5 26:2,6 27:11
  28:9,11 60:9
  69:20,24 72:2,11
  88:1,5 105:18
  143:18,20 144:1
  148:24 151:18
  152:23 163:7,8
  175:6 180:10
supervisor/mana...
  10:13
supervisors 25:20
  44:1 60:17 150:14
  172:1
supervisory 11:11
  81:11
supply 128:12
support 65:8,22
  67:21 77:1,11
  94:20
supported 68:2
supposed 41:18
  77:6,19 122:1
sure 6:9,16 7:14 8:5
  24:3 48:16 50:6
  54:21 58:11 60:2
  75:9,11 78:22
  84:18 85:18 92:8
  106:9 137:4 143:9
  152:18 179:5
surgery 48:15,20
survey 40:21 65:24
  122:6 123:11
  126:7 128:4,10
surveys 122:4
Suzette 1:3 5:19 9:5
  10:10 11:7 29:17
  30:1 35:20,24
  54:3 64:20 69:7
  72:24 74:22 76:2
  78:21 83:12,20

84:3,4 91:10,23
  110:16 111:8
  116:18 119:9,12
  121:4,18 122:23
  133:14 135:2
  139:14 140:8
  142:24 160:16
  164:11 166:17
  168:23 172:16
  173:11,22 174:2
  174:13,16
Suzette's 116:9
  135:10 157:19
swap 144:8,11
Sweppenheiser
  150:11,12 180:9
switch 38:9
sworn 5:10 182:6
SWRs 106:7
system 19:4 41:21
  41:22,23 46:15
  53:1 70:6 75:18
  92:17 98:13 102:6
  123:4 132:12,17
  132:17 147:23
  160:17
systems 34:15
  40:22 43:7 176:12
Szewzyk 151:3,9,19

— T —
T 3:8 4:1 147:9
tab 94:9,11 163:22
  167:10,15 169:5
table 15:7,8 127:6
  174:16,17
take 5:21 8:15,16
  10:11,11 14:1,7
  17:11 19:7 23:21
  26:10 29:2 31:21
  40:19 41:15 71:18
  77:8,9 78:6 85:20
  87:7 91:1 103:4
  105:23 109:18
  116:14 119:3,13

132:5,8 176:13
taken 1:14 85:22
  182:11
takes 7:21
talk 102:21 141:3
  171:5
talked 39:6 83:10
  122:11 156:3
  158:16 173:12
  174:4
talking 10:5 80:21
  80:23 90:15,16
  99:14 114:8
  122:21 138:4
  140:5 141:12
  142:15
talks 60:12
Talleyville 37:21
Tamasse 95:17,18
target 112:1 113:24
  114:3 160:8
task 26:10
tax 177:19
team 26:15,18 27:5
  27:15,18,24 28:3
  29:7,9,14 42:14
  44:16,18 45:4,19
  46:2,17 47:2
  74:19,20 75:12,15
  75:24 76:1,3 80:3
  81:5 95:10,15
  102:24 104:17
  105:8 113:18,21
  114:19 116:1,17
  116:24 119:20
  120:7 128:14
  131:19 133:2,15
  133:23 140:21
  141:16,20 142:23
  143:2,10,15 144:8
  145:4,12,22,22
  147:5 148:18
  149:19 150:14,23
  151:10,11 152:15
  152:17,22 153:10

153:13,19,21
  154:8,21 155:3,20
  156:9,10,12,17
  157:2,5 160:3
  162:5 164:18,19
  167:1,12,13 168:7
  173:13,15,16,18
  175:16,17 176:16
  177:3,8,23 179:6
  179:8,11,15,18,20
team's 119:24
  172:6 175:23
teams 75:22 80:15
  80:20 144:12
  152:19
tech 102:6
technical 18:12
  127:19
technician 34:5,9
  34:10,14 72:16
technicians 33:23
  34:2,11
technology 4:6
  141:4,6 169:8
telecom 154:19
telephone 130:13
  133:21
tell 7:7,9 23:22
  25:12 48:11 77:5
  77:18 95:1 106:5
  106:7 108:14
  116:19 122:13
  139:20 140:13,18
  154:10 160:8
  168:22
telling 167:23
tells 100:23
Temple 90:12
term 4:4 33:22
  34:16 38:5 48:23
  86:8,13 91:4
  95:20 117:7
  159:11 171:4
terminology 171:7
terms 41:12 49:20

64:21 159:8
**territories** 29:15
**territory** 50:20
**testified** 5:11 20:14
**testifying** 7:18
**testimony** 6:24 39:4
55:14 90:13
180:18
**thank** 51:10 160:9
175:19
**thereabouts** 153:3
**thing** 61:14 83:11
95:24 102:18
106:10 145:13
**things** 7:11 73:9
90:11 91:11 102:8
108:10 112:17
113:11 115:16
118:1 136:6 156:5
165:20 173:17
**think** 12:22 19:4
26:5,6 36:8 43:19
46:8,18,19,23
55:24 56:4,5
62:12,13,14 64:23
66:11 69:13,16
70:14,17 71:20
76:19 78:4 81:21
81:22 84:6 85:3
85:14 91:2,4
96:20,22 97:1
103:24 104:18,23
106:1 110:21
126:22,24 127:12
127:22 131:23
132:2,3 139:10
140:16,17 147:20
148:15,17 157:9
157:13 162:2
166:24 167:1
171:19,20 174:3
174:12,14 176:19
177:7
**thinking** 24:4
**third** 16:3 31:8

48:24 66:16,18,23
67:2,6 82:11 89:3
90:14 92:17 95:11
97:4 180:13
**Thomas** 127:15
**thought** 24:18
107:10 138:4
173:6,10 174:8
175:11 177:19
**three** 28:15 61:6,17
91:12,14 97:15,15
100:12 108:6,7,7
108:11,14 110:10
112:24 113:3
119:1 132:11
**threes** 110:7
**threshold** 159:22
**thrown** 61:11
**ticking** 124:24
**till** 91:2 96:21
**Tim** 151:3 155:13
**time** 5:7 6:1 7:21
8:16 11:10,14
12:9,11,18 14:5
14:20,23 17:20
21:7 27:15 41:7
44:23 46:19,21
47:13,19 50:5
51:4 52:6 54:7
60:10 69:17,23
70:18 71:1,2,12
71:22 73:22 74:8
74:19 75:11,15,19
75:20 76:12,12
78:6 80:16 81:13
84:7,19,21,23
85:1,4,15,19
86:21 89:9 90:15
93:6 100:2 101:9
102:9 114:17
116:14 119:9,13
120:16,18 122:24
123:19,21 124:9
124:17,23 125:3,7
130:5 131:15

132:3 133:23
135:4 142:13
150:24 151:13,18
154:8 155:21,22
157:5,8,16,17
158:7,8 161:14,21
163:1 164:20,21
165:1,3,5,18
167:6 170:12
171:23 172:23
176:20 179:9
182:6
**timeliness** 101:6
**times** 153:1 155:21
**title** 9:12,15 12:23
12:24 13:10,14
15:9 25:9 33:9
102:6 132:22
149:14 158:14,15
**titles** 10:10,12 16:6
31:19
**today** 5:22 6:22
8:24 10:1 42:24
55:21 90:16
133:10 140:2
174:23
**told** 48:13 58:21
60:8,10 61:1,2
62:13 118:12
122:12 130:15,20
131:5,7,9,14,15
132:1,4 139:17,22
139:23 140:1
145:15,20 149:12
149:13 153:16
154:21
**Tom** 127:14 128:20
161:8 171:5
**Tomasse** 166:6
**tool** 44:11
**tools** 43:24
**top** 34:9 64:17
94:15 99:14 116:7
129:23 164:17
**total** 15:22 19:3

113:16 165:5,13
165:17,21
**totals** 19:1
**tough** 112:7
**tower** 68:4,5
**town** 168:17
**traded** 156:1
**training** 41:17,20
41:21,23 42:9,10
44:14
**transcript** 182:5
**transfer** 144:4
158:11
**transferred** 158:12
178:5
**transition** 25:14
70:4,8 71:17,18
71:23 72:1 73:22
81:10 91:1,11,19
91:22 143:15
**transitioned** 12:19
13:1 34:6 81:14
85:17 86:1
**transpired** 22:9
177:11
**treated** 149:11
**trial** 5:7
**trick** 7:5
**tried** 51:11 60:8
91:4
**trouble** 171:12
**true** 27:7 93:15
158:23 159:4
182:4
**truly** 47:6
**truthful** 6:24
**try** 106:24 107:1
109:24 113:12
116:15
**trying** 61:14 106:23
111:2 131:22
172:24
**Ts** 149:24
**turf** 29:16,20,22
30:6,12,14 32:1

34:7 35:15 36:13
36:21 37:9 38:12
38:14,15,20 39:7
39:9,10,15,16,17
39:23 40:1 41:3,8
41:16 42:8,14
65:20,21 66:3,4
77:22 78:1 81:20
82:1 85:17,17
115:3,5,7 119:10
119:11,13,14
121:4 122:12
123:6,9,9 153:14
154:5,6 156:19
169:2 180:3
**turfs** 30:2 40:3
90:12 113:7,8,13
118:4
**turn** 54:5
**Turning** 146:15
**two** 2:3 9:2,6 11:19
14:16,18 19:11
21:19 28:19 36:15
36:22 77:13,14
82:24 86:14 89:19
90:8 98:9 99:1,12
99:19 100:1,2,10
101:18 102:12,17
107:17 112:21
114:22 123:13
146:8 163:11
**type** 7:20 22:8
25:14 46:7 49:5
97:7,9 146:11
147:16 167:17
**typed** 147:18
**types** 33:12 43:3
125:13
**typewritten** 45:8
**typically** 48:13

---

**U**

**uh-huh** 6:6,10
59:21 63:6,8 75:6
96:9 97:12 111:11

112:23 136:16
138:14 155:12
**unacceptable**
110:20
**uncommon** 144:15
**underground** 30:22
**underlying** 169:4
**underneath** 17:24
**understand** 6:19
8:3,8 25:18 40:8
42:7 103:15
116:15 131:24
137:10 159:21
**understanding**
16:24 25:4 115:16
131:20 135:5,11
158:17,24
**unfortunately** 8:11
**unit** 65:11,14
**UNITED** 1:1
**units** 108:22 117:18
**universe** 55:1
**University** 90:12
**unusual** 98:20
161:20
**up-to-date** 174:22
**update** 179:10
**upset** 118:19
**use** 15:21 22:17
30:22 33:12 38:5
77:19 80:9 96:11
98:8 106:1 113:6
122:13 161:3
168:5 170:9,24
171:4
**usually** 33:3 35:3
41:23 44:20 49:9
126:7 144:21
162:24
**utilize** 31:2 43:24
44:11 82:20
**utilized** 34:12 46:16
**utilizes** 121:18
**utilizing** 77:6
122:23

**V**

**v** 1:5 147:9
**V-10** 63:4
**vacancy** 11:3
**vacation** 98:20
**variable** 109:13
112:12
**variables** 110:18
**various** 10:9 14:9
26:9 29:15 122:22
**varying** 120:21
**vendor** 124:23
**vendors** 42:2
**verbal** 6:10 44:21
44:22 147:20
**verbalize** 6:17
**verbally** 89:8
139:16
**verification** 3:21
26:19 65:19 76:22
90:2 96:5 99:3
100:20 106:14
108:24 109:4
111:10,15 112:16
112:21 113:19
114:4,18 118:7,15
119:18,23 121:7
125:12,21 133:15
137:2,5,12,17
175:22 176:9
**Verifications** 128:5
**verified** 84:23
94:15
**verify** 52:12 84:24
**Verizon** 1:6,7 5:20
6:3 9:10 22:18
27:10 29:1 33:1
35:6,8 36:14 38:8
43:2,23 44:11
45:15 49:1 52:7
52:24 95:21,22,23
136:23 143:5
154:16 180:19,24
181:1
**Verizon's** 36:1

92:20
**Verizon-1** 3:10 9:19
9:22 13:19 22:5
26:3 31:18 161:24
**Verizon-10** 3:19
57:22,24
**Verizon-11** 3:20
59:15
**Verizon-12** 3:21
137:6
**Verizon-13** 3:22
137:22
**Verizon-14** 4:3
146:4,6 158:5
**Verizon-15** 4:4
159:13
**Verizon-16** 4:5
160:13
**Verizon-17** 4:6
169:11,13
**Verizon-2** 3:11
13:17,23 21:17
127:10 133:14
147:13 156:5
174:1
**Verizon-3** 3:12 17:9
17:12 19:7,7
**Verizon-4** 3:13
28:22 38:18 178:9
178:19
**Verizon-5** 3:14
42:18,22 46:11
64:2
**Verizon-6** 3:15
42:23
**Verizon-7** 3:16
49:16 51:14
**Verizon-8** 3:17
52:20
**Verizon-9** 3:18
56:11
**versus** 89:2 93:8
115:21 116:7
118:10,21 119:23
120:7 134:9 147:9

147:10 173:6
**view** 110:19 117:24
119:2 122:7
**visits** 32:17
**vocational** 33:9,17
**voice** 73:10
**volume** 110:12
118:18 120:10
164:15,16
**volumes** 123:11
**voluntarily** 143:24
**Vs** 147:8
**VZ** 4:3 146:2

**W**

**wage** 177:19,20
**Wagner** 89:24
93:18,19
**wait** 107:7 116:4
164:6 168:12
**waived** 5:5
**Walker** 1:3 3:10
4:3,5 5:19 9:5,17
10:3,10,18 11:8
11:12,20,22 12:8
12:13,19 20:8
21:8 22:8 26:1
29:17 30:2 33:12
34:1,23 35:12
38:12 41:2 43:15
47:10 48:6 52:6
52:24 54:3 57:3
57:11 58:3,8,16
60:6,16,20 64:6
65:2 68:11 71:18
76:2 78:21 79:18
85:8 86:1 87:13
91:10 93:7 94:14
110:17 111:8
138:8 139:2,14,17
142:24 146:2,8,16
160:11,16 164:11
168:23 172:14,16
172:23 173:6
**Walker's** 22:16

36:13 39:1 46:12
57:8 58:1 85:12
115:13 138:17
161:13 166:17
**want** 7:10 8:1 24:1
48:18 49:12 60:6
61:12 79:5,10
91:9 94:4,8 98:12
106:9 110:13
115:13,15,18
151:20 163:12
171:17
**wanted** 21:18 74:1
77:8,10 81:22
127:5
**wants** 17:22 40:10
67:1
**warranted** 43:20
47:7 127:16,22
**Waselko** 153:12
**wasn't** 26:7 32:13
42:8 70:10 72:22
91:16 131:4 135:4
138:5 147:23
177:15
**watches** 42:1
**Waverly** 36:20
**way** 7:21 15:10,22
20:24 21:10 45:2
48:5 56:15 67:14
74:5 100:11
103:14,23 106:1
107:8,17 108:5
117:22 122:1,7
135:5,9 142:10
145:24 156:8
168:15 173:17
180:22
**we've** 144:11
**web** 42:4
**week** 61:15 84:5,15
94:23 96:21 97:3
97:4,16,18,19,23
98:17 99:1,4,13
99:19 100:10,13

BRIAN MAGEE

101:18 102:12,18
103:4 104:13,19
105:15,20,21,24
106:12 107:4
113:23 132:10
133:16
**weekly** 102:21
103:20
**weeks** 60:12,24
61:5,8,19,23 75:4
97:2,14,15 178:6
**weight** 112:11
**went** 20:22 37:19
43:8 70:9 74:5
84:12 143:18
144:1 173:23
**weren't** 33:20
76:15,21 81:3
113:2 117:18
**western** 144:13
149:5 152:20
154:12
**Westover** 150:22
**whichever** 106:4,21
179:1
**winter** 84:14
**Wireless** 95:23
**witness** 3:2 8:12
54:14 61:23 63:6
63:11 79:15 137:7
137:23 181:8
**woman** 52:15
**wondering** 71:23
**words** 148:6,7
171:21
**work** 7:22 10:13
32:20 33:3 34:14
34:19 35:9,10,11
35:21,23,23 37:5
40:11,12,13,14,15
40:16 48:7 50:9
51:21 52:1,2,12
56:20 57:2,8,12
57:16 59:3,7
62:20 63:17 64:16

65:18 66:6,6,9,10
66:16,17,24 67:2
67:4,8,9 71:8,10
75:1,4 77:20
82:12,13 83:14
84:5 85:24 86:4
87:14 89:1,4,5
90:5,14,21 91:16
91:20,21 93:7
94:1 101:24 102:1
102:4 114:23
115:11 121:20
122:1,14 123:19
123:20 124:1
125:13,14,14
143:5 150:8
166:19 180:18
181:1,3
**worked** 30:9 31:12
34:23 35:12 36:4
36:5 84:15 87:13
118:3 135:22
150:5,10 172:16
177:22
**worker** 177:16
**workers** 34:20
122:2
**working** 11:15
30:13,19 32:17
41:18 56:20 57:3
57:9 58:3,18
60:21 62:4 76:20
77:1 84:6 90:19
91:16 93:16
121:17,22 180:20
**works** 35:3 48:5
151:2 177:21
180:9 181:2
**wouldn't** 13:7
33:20 76:23 78:24
91:15 98:21
101:24 102:18
105:12 117:23
119:4 161:21
162:12 166:17

**WR** 108:18
**write** 40:15 171:19
**writing** 79:24
**written** 60:24
147:22
**wrong** 123:4
125:10
**wrote** 64:24 65:2
71:24 176:7,15
**WRs** 99:12,15
100:12 107:24
109:3 111:13
112:16 113:5,16

---
**X**
---

**X** 3:1,8 4:1

---
**Y**
---

**yeah** 11:3 15:14
16:7 25:9 27:22
68:15 74:7 81:17
82:13 83:17 87:6
91:18 92:22 98:24
101:22 102:19
106:20,20 107:1
108:9 109:11
110:11 114:14
119:11 120:10
122:17 134:17
135:1 137:7
140:15 143:14
144:2,6 148:17
150:4 151:1,1,22
160:6 164:2,5,6
174:24 176:1,7,23
177:20 178:15
**year** 19:17 20:23
21:5,13 24:18
31:14 36:12 44:23
46:14 48:2,3
68:20 69:2,8,12
78:3,13 79:11,18
79:19 80:7,7
85:13 86:24,24
87:3,4 89:10,12
89:14 90:16 91:3

94:24 95:2,22
106:4,18,24 114:5
116:8 118:11
119:9,15 123:12
125:18 126:23
127:8,13 134:2,3
134:7,7,11 135:7
135:10 143:12
151:15 155:24
161:10 162:6,7,21
164:2,4,5,6,13,15
166:4,10,11
175:20 176:16
**years** 6:1 9:3,6
19:12 28:1,19
77:14,14 86:14
140:22 157:13
161:13,15
**yesterday** 14:5,21
60:9
**YTD** 65:19 133:15

---
**Z**
---

**Zang** 156:21
175:11
**zero** 101:19 102:14
107:17 111:23
112:9 117:10
**zeros** 18:20
**zone** 83:20

---
**0**
---

**006** 78:4
**026** 170:21 171:10
171:11

---
**1**
---

**1** 38:10 96:14,16,16
96:23 97:24
127:24 135:14
175:3
**10** 58:1 102:16
107:6,9 110:16
113:20 133:16
157:13 166:6
**10.3** 118:10,20

**10.7** 165:7
**10/1/13** 58:4
**10/7/2013** 60:11
**100** 110:15
**106** 3:10 9:18 10:3
**10th** 51:17
**11/1/13** 58:4
**111** 115:21 116:1,9
125:18,19
**12** 60:12,24 61:5,8
61:15,19,23
123:12
**12.7** 119:23 134:9
164:18
**12/1/13** 58:5
**12/2012** 157:19
**12/9/12** 22:7
**12/9/2012** 31:20
**12:13** 1:17
**128** 2:3
**13** 3:11 36:11 96:17
**136** 115:21,23
116:9
**137** 3:21,22
**1372** 1:23
**14** 36:11 88:9,10,11
96:18 99:1,9,22
100:17 102:14
**146** 4:3
**15** 6:1 27:14 96:18
110:16 115:18
128:15
**15-4031** 1:4
**159** 4:4
**16** 49:14,21 56:15
95:17 111:13,20
121:1
**160** 4:5
**166** 117:18
**169** 4:6
**17** 3:12
**18.2** 118:7
**18th** 92:2,19
**19** 110:17 111:7,9
111:12,19 133:15

BRIAN MAGEE

**19020** 2:4
**19058-1372** 1:23
**19103** 2:9
**19th** 61:24
**1st** 62:10

**2**

**2** 19:20 22:18 64:7
  64:7,13,18 65:2
  96:14,16,24 99:19
  105:23 134:16
**20** 6:1 166:9
**2000** 10:10
**2002** 9:16 27:8,10
  27:21 28:12 43:5
**2004** 157:20
**2007** 11:6
**2008** 10:19 11:6
  157:23,24
**2010** 162:10
**2011** 162:11,13,14
**2012** 12:3,12 22:10
  24:22 26:3 31:15
  69:14 81:10
**2013** 3:14 9:7 11:20
  19:10 20:23 21:2
  21:5,13,15 25:16
  26:18 27:1 42:16
  42:20 46:12 47:2
  47:10 48:3,7,20
  49:13,15,21,24
  50:1 51:14,18,21
  52:7 53:11,17
  56:7 58:1,9 59:11
  60:17 61:17 63:16
  63:17,17,18,21
  64:1 68:20,22
  69:12 73:18 77:5
  78:13 79:11,16
  80:3,5 81:12,16
  127:12 129:22
  135:7 166:14,16
**2014** 3:15 9:7 11:21
  16:10,14,24 17:23
  18:5 19:6,11

20:10,23 21:2,3,5
21:14,16 22:19
23:1,5 26:18,20
29:21,23 30:3
31:24 38:3,4,11
38:13,16 39:7
40:2 41:8 42:16
42:22 47:23 81:23
85:16 86:17,20
87:6 88:7 92:10
94:2 115:14,17
121:5 127:13
129:22 134:10,11
135:7 164:3,6,6
166:12,14 177:4
178:9,9,24
**2015** 16:10,14,24
  18:8 19:6 20:10
  21:3,8,9 27:17
  47:2 86:24 87:2
  88:9 95:2 96:10
  97:14,17,21,22
  114:5 118:23
  130:9 132:1
  143:11,13 153:3
  160:20 164:9
  165:19
**2016** 1:11 86:23
  89:15 93:20
  104:15 160:21
**215-639-0801** 2:4
**215-851-8100** 2:10
**215-946-7009** 1:24
**215-949-1867** 1:24
**22** 20:8 21:21
**23** 153:3
**25** 22:19 118:21
  120:7 123:12
**2500** 2:9
**26** 48:20 49:24
  61:17 63:17
**268** 79:17
**26th** 61:7
**28** 3:13 160:12
**28-48** 4:5

**29** 108:5
**299** 80:10
**29th** 160:20

**3**

**3** 15:22 17:15,16
  18:6 68:11 96:14
  96:17,24 134:17
  138:12
**3,137** 116:18
**3:38** 56:15
**30** 1:11 142:1,2
**317** 113:16
**32.1** 165:10
**326** 176:1,4
**3331** 1:15 2:3
**39** 99:16 101:11

**4**

**4** 3:4 24:22 29:1
  96:14,18,24
  160:24
**4/27** 24:4
**4/27/14** 23:19 158:2
**42** 3:14,15
**44** 96:12
**46** 100:7
**48** 160:12
**49** 3:16

**5**

**5** 19:16,24 68:19,22
  96:16,16 127:24
  135:15 138:12,13
  138:14 159:16
**5,000** 109:17
  162:15
**5/16/13** 3:16
**5/25/2014** 176:21
**5:04** 181:9
**50** 110:16
**52** 3:17 159:17
**56** 3:18 109:20
**57** 3:19 120:7
**59** 3:20
**5th** 31:1 75:3

**6**

**6** 42:18 51:14 53:17
  78:3 118:21
  138:18 159:17
**6,503** 116:18
**6th** 31:1

**7**

**7** 102:14 149:23
  155:11,15 171:24
  178:24
**7/15/2013** 56:20
**755** 146:3,9
**755-813** 4:3
**756** 146:9
**757** 146:16
**762** 148:9
**769** 149:16
**77** 162:10
**778** 150:18
**783** 150:20 151:18
**789** 152:11
**794** 152:15
**798** 152:15
**7T** 147:7 170:13

**8**

**8** 17:16,17 96:17
  119:19 120:2
  121:12
**8.4** 119:23 121:9
  134:9 164:12
**8.5** 121:11
**8/16** 94:12
**8/17** 94:6 133:11
**8/18** 163:13
**801** 152:16
**802** 164:15 165:22
**805** 152:21
**810** 153:6
**813** 146:3
**816** 163:19,20
**817** 94:14
**82,000** 162:14

**9**

**9** 3:10 96:17 159:18
**9/18/2013** 59:19
  60:3
**9:45** 59:20 60:3
**90,834** 160:22
**900** 11:16 23:15
  24:10 50:15 88:3
  88:4 136:3
**93,560** 160:23
**9th** 51:17 82:22,23

# Exhibit F

# Condensed Transcript
# Testimony of:

## JOSEPH MUCCILO

## Date: August 24, 2016

Suzette Walker v. Verizon Services Corporation, et al.

No.:  USDC E.D.PA 15-4031

R&K Reporting Inc.
PO Box 1372
Levittown, Pennsylvania 19058
Phone: 215-946-7009
Fax: 215-949-1867
Email: rkreporting@gmail.com

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3      .            *   *   *
 4   SUETTE WALKER                    :
                                      :
 5            v.                      :
                                      :
 6   VERIZON SERVICES CORPORATION     :
              and                     :
 7   VERIZON PENNSYLVANIA, INC.   :  NO. 15-4031
 8
 9                   *   *   *
10             August 24, 2016
11                   *   *   *
12
13        Oral deposition of JOSEPH MUCCILO,
14   held in the Law Offices of Karpf, Karpf &
15   Cerutti, PC, 3331 Street Road, Two Greenwood
16   Square, Suite 128, Bensalem, Pennsylvania
17   19020, commencing at 2:12 p.m., on the above
18   date, before Hope Agosto, a Professional Court
19   Reporter and a Notary Public.
20
                     *   *   *
21
22             R&K REPORTING
             Court Reporting Services
23              PO Box 1372
           Levittown, Pennsylvania 19058-1372
24   Phone (215) 946-7009    Fax (215) 949-1867
```

**2**

```
 1   A P P E A R A N C E S:
 2
 3      KARPF, KARPF & CERUTTI, PC
        BY:  CHRISTINE E. BURKE, ESQUIRE
 4      3331 Street Road
        Two Greenwood Square
 5      Suite 128
        Bensalem, Pennsylvania 19020
 6      (215) 639-0801
        CBurke@karpf-law.com
 7      -- Counsel for the Plaintiff
 8
 9      REED SMITH, LLP
        BY:  JOEL S. BARRAS, ESQUIRE
10      Three Logan Square
        1717 Cherry Street
11      Suite 3100
        Philadelphia, Pennsylvania 19103
12      (215) 241-7990
        JBarras@reedsmith.com
13      -- Counsel for the Defendants
14
15
16   A L S O  P R E S E N T:
17      HARVETTA NERO, ESQUIRE
        -- Assistant General Counsel, Verizon
18
19
20
21
22
23
24
```

**3**

```
 1                   *   *   *
 2                   INDEX
 3                   *   *   *
 4   WITNESS                          PAGE NO.
 5   JOSEPH MUCCILO
 6      By Ms. Burke                     4
 7
 8                   *   *   *
 9                 EXHIBITS
10                   *   *   *
11   NO.    DESCRIPTION              PAGE NO.
12   Muccilo-1  1/22/15 Email from Fowler re:   12
13             RE:  EWAs from 2 weeks ago,
             Not on list today
14   Muccilo-2  1/21/15 Email from Lippincott   15
             Re:  Work Stoppage Retainees -
15             We need to release more people
             To an EWA - need respond ASAP
16             please
17   Muccilo-3  3/23/15-3/26/15 Email Chain re:   16
             May Planning - Spreadsheet
18
     Muccilo-4  3/23/15-3/26/15 Email Chain re:   26
19             May Planning - Spreadsheet
20   Muccilo-5  3/20/15-3/26/15 Email Chain re:   32
             May Planning - Spreadsheet
21
     Muccilo-6  4/15/15-4/16/15 Email Chain re:   45
22             FW:  Pls Review:  Headcount
23   Muccilo-7  2/4/15 Email Chain re:            61
24
```

**4**

```
 1                   *   *   *
 2        (It is hereby stipulated and
 3        agreed by and between counsel for the
 4        respective parties that the signing,
 5        sealing, filing and certification are
 6        waived; and that all objections, except
 7        as to the form of the question, be
 8        reserved until the time of trial.)
 9                   *   *   *
10        JOSEPH MUCCILO, after having been
11        first duly sworn, was examined and
12        testified as follows:
13                   *   *   *
14             EXAMINATION
15                   *   *   *
16   BY MS. BURKE:
17        Q.   Mr. Muccilo, I introduced myself in
18   the lobby earlier.  I represent Suzette Walker
19   in a civil lawsuit that she has against Verizon
20   and I'm here to take your deposition based on
21   the nature of your position at the time and you
22   have been identified by both parties as a
23   witness who may have some information related
24   to the claims and defenses.
```

JOSEPH MUCCILO

5

1    A.   Yep.
2    Q.   Have you ever had your deposition
3  taken before?
4    A.   No.
5    Q.   I only ask so that I can give you
6  some clear instructions for the process.  It's
7  under oath and this is a formal court
8  proceeding.  Do you understand that?
9    A.   Yes.
10   Q.   Even though we're sitting in a
11  conference room?
12   A.   Uh-huh.
13   Q.   Hope is our court reporter.  She's
14  typing every single thing that you say.  No
15  matter what you say, just make sure your
16  response is truthful and that it's verbal.  So
17  when you say uh-huh to me, I understand what
18  you're saying right now, but then there might
19  be a problem at the later date.  All right?
20   A.   Got it.
21   Q.   You're represented by counsel today,
22  correct?
23   A.   Yes.
24   Q.   He's probably going to make a number

6

1  of objections because he take issue with the
2  way I ask the question.  Number one, let him
3  put his objection on the record so that he can
4  identify what he needs to say and then just
5  stop testifying at that point because our court
6  reporter can only type down what one person is
7  saying at a time.  Sometimes she'll try to do
8  both but it's very difficult.  Most often
9  you'll be able to answer the question even
10  if there's an objection made, but he'll give
11  you instruction if there's some reason he
12  doesn't want you to answer a question.  Okay?
13   A.   Okay.
14   Q.   If you don't understand a question
15  that I ask you, make sure that you let me know,
16  or it's confusing or ambiguous in some way or
17  you just don't know what it is that I'm asking.
18  All right?
19   A.   Okay.
20   Q.   Because if you answer the question,
21  I'll assume that you understood what it was
22  that I was asking.  I'm going to try to be
23  efficient with your deposition and get through
24  these documents quickly, but if you need a

7

1  break at some point, you can do that.  Just
2  answer the question that's pending before you
3  leave the room.  All right?
4    A.   Got it.
5    Q.   Is there any reason before we get
6  started that you think you can't give truthful
7  and accurate testimony?
8    A.   No.
9    Q.   Mr. Muccilo, are you currently
10  employed with Verizon?
11   A.   Yes.
12   Q.   What's your role right now?
13   A.   I'm the director of engineering for
14  Pennsylvania and Delaware.
15   Q.   How long has that been true for?
16   A.   I started it was right around the end
17  of February 2014, I think that's when I got
18  moved into the position.
19   Q.   Were you promoted into that role?
20   A.   Yes.
21   Q.   What was your most recent title
22  before that promotion?
23   A.   I was an engineering manager within
24  the -- what we call the video and in-home

8

1  network.
2    Q.   Your responsibilities totally changed
3  when you got the promotion, right?
4    A.   Yes.
5    Q.   Once you became the director of
6  engineering for the Pennsylvania and Delaware
7  area, did you report to the executive director?
8    A.   Yes, I did.
9    Q.   Was that Bill Bragg at the time?
10   A.   Yes.
11   Q.   Or William?
12   A.   That's correct.
13   Q.   Is that still true through today?
14   A.   No.
15   Q.   When did that change?
16   A.   It was I want to say around the
17  second half of 2015, I think.
18   Q.   Sometime after at least June of 2015?
19   A.   Yeah, I think it was right around
20  that time.
21   Q.   Was it after the RIF at issue for
22  Suzette Walker occurred in the spring of 2015?
23   A.   I believe I was still working for
24  Bill at that time.

JOSEPH MUCCILO

9

1    Q.   I'm just trying to get clarification
2  for purposes of this case.
3        Now, as the director of engineering
4  for the Pennsylvania and Delaware districts,
5  you have various directors that are underneath
6  of you, correct?
7    A.   Managers.
8    Q.   You call them managers?
9    A.   Yes.
10   Q.   Brian Magee would be a manager?
11   A.   Would be a manager.
12   Q.   Carl Gross would be a manager?
13   A.   Correct.
14   Q.   I already have a list of all their
15  names through the course of discovery and under
16  each manager they're responsible for
17  supervising a team of engineers, correct?
18   A.   Correct.
19   Q.   In terms of monitoring the day-to-day
20  work performance of the engineers, you delegate
21  that responsibility to your managers; is that
22  fair?
23   A.   Yes, I do.
24   Q.   Do you in any way, shape or form

10

1  complete performance evaluations for the
2  managers?
3    A.   For the managers, I do.
4    Q.   Strike that.  I mean for the
5  engineers.
6    A.   No, I don't do it for the engineers.
7    Q.   When it, in fact, came time to rank
8  the employees and assess their performance in
9  terms of putting them in a particular order, do
10  you think your managers were best suited to
11  make that assessment?
12   A.   Yes, I do.
13   Q.   You didn't question any of your
14  managers once that process transpired, did you?
15   A.   No.
16   Q.   I just want to backtrack from the
17  beginning when the concept of the RIF first
18  started that was going to take place in the
19  spring of 2015 and when in terms of your
20  awareness of numbers or the percentage in terms
21  of your headcount, how that had to be impacted.
22  Okay?
23   A.   Uh-huh.
24   Q.   Sorry, you have to say yes or no.

11

1    A.   Yes.
2    Q.   Do you remember when the concept of a
3  RIF which would impact your engineering
4  department for 2015 first came to your
5  attention?
6    A.   I'd be guessing.  It was right around
7  the end of the first quarter, I think.
8    Q.   Sometime in late 2014?
9    A.   No, I thought it was more -- I'm not
10  100 percent, but I thought it was more the
11  beginning of 2015.
12   Q.   When you base your quarters annually,
13  they're quarterly based on the calendar year,
14  right?
15   A.   Yes.
16   Q.   So when would the end of the first
17  quarter typically end?
18   A.   It would be March.
19   Q.   Would it be fair that you started to
20  discuss the prospect of a RIF and headcount
21  impact, et cetera, before March of 2015?
22   A.   I'm not 100 percent to be honest with
23  you.
24   Q.   No problem, we'll take a look at

12

1  documents.
2        * * *
3        (Whereupon, Exhibit Muccilo-1 was
4        marked for identification.)
5        * * *
6  BY MS. BURKE:
7    Q.   The way that the chronology of the
8  emails works when they're produced during
9  discovery generally is it's backwards, so the
10  first email in its order would be on the last
11  pages.  I stapled all these together for the
12  full email just so you could have the string in
13  case you asked, but ultimately, I wanted to
14  focus your attention on the first one at issue.
15  Take as much time as you need to review the
16  document and let me know when you're ready.
17   A.   Okay.
18   Q.   For context purposes, can you look at
19  the second page of this document that's Bates
20  stamped DEF Walker 3131?  At the bottom there
21  are Bates stamp numbers.  Do you see that?
22   A.   Yes.
23   Q.   These are a different Joe, Joe Freed.
24  Do you know who that is?

JOSEPH MUCCILO

13

1  A.  Not -- I mean, I know the name.
2  Q.  But not really familiar?
3  A.  No.
4  Q.  What about Clifford Foley, Jr.?
5  A.  Yes, I do know Cliff.
6  Q.  Who is Cliff?
7  A.  Cliff at the time was -- we were
8  working for Maureen Davis and Cliff was almost
9  like her staff manager, kind of helping, I
10  guess, you know, coordinate across all of her
11  directors.
12  Q.  When you say working under Maureen
13  Davis, was she above Bill Bragg, obviously?
14  A.  Yes.
15  Q.  Now, just for context, it doesn't
16  look like you're cc'ed on this email but I want
17  to discuss it with you.  As of January 21st,
18  2015, there's an email to these individuals and
19  toward the bottom it says Cliff, you gave me
20  your list of engineers to retain, but it
21  appears it is more than 36 percent you had
22  originally retained.  Originally, we had 63 or
23  64 sent to EWAs.  We need to meet that original
24  number.

14

1      If you turn the page here, Cliff
2  sends an email to Dorothy Fowler.  Do you know
3  who that is?
4  A.  Yes.
5  Q.  Who is that?
6  A.  She was working at the time for Bill
7  Bragg, so she was kind of Bill's staff person.
8  Q.  And he writes to her, the engineering
9  team needs to throttle back, plan as if we were
10  not provisioning, they need more from your
11  pool.  See below.
12      Did you ever see that email as
13  forward?
14  A.  Potentially.  I'm not 100 percent
15  sure.
16  Q.  Let's look at the top email.  You are
17  cc'ed on this one, right?
18  A.  Yes.
19  Q.  This is as of January 22nd, 2015.  It
20  identifies as of that date, attached is the
21  revised list of additional names that can be
22  released for EWA.  What did you understand EWA
23  to mean?
24  A.  EWA is emergency work stoppage

15

1  assignment.
2      Q.  The 155 retained engineers will allow
3  for basic support, maintenance and minimal
4  provisioning.  Was it your understanding that
5  155 would be retained just as to your
6  organization or under multiple different areas?
7  A.  It was multiple different areas.
8      Q.  As of this point, had you given
9  anyone any names on a list that you were not
10  intent on retaining?
11  A.  No, this was just an exercise of the
12  amount of people we needed to have working our
13  normal day business in case there was a work
14  stoppage.
15  Q.  So did this have any relation to the
16  RIF then?
17  A.  No.
18          * * *
19      (Whereupon, Exhibit Muccilo-2 was
20      marked for identification.)
21          * * *
22  BY MS. BURKE:
23      Q.  We're marking this as Muccilo-2.  It
24  looks like this is an email from Laura

16

1  Lippincott.  Do you know who that is?
2  A.  Yep, yes.
3  Q.  In terms of engineering retained
4  personnel, does this relate to the number of
5  individuals who had to be physically working in
6  the event of a work stoppage?
7  A.  This was -- it's a combination.  We
8  were trying to ballpark if there was a work
9  stoppage who would be retained working, you
10  know, our day-to-day stuff that we normally do
11  and then who would go out into the field to
12  actually do work.
13  Q.  No relation to the RIF though,
14  correct?
15  A.  No.
16          * * *
17      (Whereupon, Exhibit Muccilo-3 was
18      marked for identification.)
19          * * *
20  BY MS. BURKE:
21      Q.  Take as much time as you need and let
22  me know if this does, in fact, relate to the
23  RIF that was expected to take place.
24  A.  I do believe so.

JOSEPH MUCCILO

17

1    Q.   Then what role, if any, did Mike
2   Pescatore have in assisting with the RIF for
3   the engineering department?
4    A.   Mike helped solicit and compile
5   information as we moved through the process.
6    Q.   I'm going to step around and just
7   pull up the spreadsheet that goes with this so
8   that we can discuss what was attached to this
9   email. My apologies for stepping over you.
10    A.   No problem.
11    Q.   How often did you meet with Bragg for
12   staff meetings?
13    A.   It was almost -- maybe almost weekly.
14    Q.   So I guess at least as of March 20th,
15   on the second page of this exhibit, they're
16   going to discuss a headcount with you, or Bill
17   Bragg is, you and various other directors?
18    A.   Correct.
19    Q.   And May planning. Do you see that?
20    A.   Yes.
21    Q.   Then if we look to the first page
22   about three days later, that's the email from
23   Mike Pescatore. First attachment for reference
24   with targets. Second attachment is the

18

1   template we need to fill out with our plan. As
2   before, we will use the standard three
3   idea/actions: No backfill, consolidation,
4   performance. First of all, let's look at the
5   first attachment here, the one that says
6   worksheet.
7    A.   Yes.
8    Q.   The headcount, this is for the entire
9   organization under -- what's her name, who is
10   over Bragg?
11    A.   Maureen.
12    Q.   Is this for Maureen's organization?
13    A.   This looks like just Bill Bragg's.
14    Q.   Just as an example, if you're looking
15   under Mid Atlantic where it says 509 management
16   and 436, is that associates?
17    A.   Oh, okay, I see it. 509 management
18   employees, 436.5 associates, so that would be
19   under Bragg.
20    Q.   Just going further down that column
21   it says five directors. Were you one of the
22   five directors for the Mid Atlantic?
23    A.   Yes.
24    Q.   Then the managers were under those

19

1   various directors but would have included some
2   of your managers, right?
3    A.   It should have. I'm just trying to
4   go back to remember how many directors Bill
5   had. I don't know if that includes Bill or
6   not, I'm not sure.
7    Q.   Did you complete any of these
8   spreadsheets?
9    A.   I didn't, no.
10    Q.   They were just shared with you?
11    A.   Shared.
12    Q.   If you go to March plans, which is
13   the second tab, these are some of the
14   categories that Mr. Pescatore referenced. He
15   says no backfill, consolidation, performance.
16   Do you see that?
17    A.   Yes.
18    Q.   Now, looking at you, there's
19   executive director Bill Bragg and then for you
20   Joe Muccilo. Do you see that?
21    A.   Yep.
22    Q.   No backfill loss, there's a 2 there.
23   Do you know what that reflects?
24    A.   Well, just from reading the notes,

20

1   these were -- the two no backfill loss I think
2   were people leaving our portion of the business
3   and maybe going to -- for example, Hoover, he
4   got promoted to Verizon Wireless. So in terms
5   of our force planning, we kind of had that as
6   one of our reductions.
7    Q.   Which you were including from the
8   outset, right?
9    A.   Yes.
10    Q.   And this 1 here for performance, was
11   Szewczyk terminated for performance?
12    A.   So if you meant Jim Szewczyk, the
13   manager, he was the manager so from a
14   performance -- he had someone on his side for
15   performance. I guess we were labeling him as a
16   performance issue, so it looks like it was
17   Lorenza.
18    Q.   The employee?
19    A.   The employee.
20    Q.   That person was expected to be
21   terminated so they wouldn't be part of the --
22    A.   That person would be part of the
23   overall business case reduction.
24    Q.   Oh, okay. Do you know if that person

JOSEPH MUCCILO

21

1 was anticipated to be rated and ranked like
2 everyone else?
3     A.   I'm not 100 percent, but according to
4 the process, they probably should have been,
5 yes.
6     Q.   By looking at this spreadsheet, are
7 you able to identify if you were aware at this
8 point how many of your employees may need to be
9 impacted?
10     A.   No, no.
11     Q.   This was just giving some information
12 for planning of that?
13     A.   Yeah, it seems like we were just
14 running through different proposals.
15     Q.   And then the headcount detail tab,
16 that's every director that's under Bragg,
17 right?
18     A.   This is every management employee
19 under Bill Bragg.
20     Q.   In the middle of this email from
21 March 25th, which is two days later, that
22 you're cc'ed on, it's from Mike Pescatore,
23 team, very preliminary look at the HC options
24 review for New Jersey totaling 12 employees.

22

1 Does that mean anything to you?
2     A.   From what I recall, it was kind of
3 just the preliminary look at how New Jersey was
4 going to go about a reduction if their number
5 was 12, so kind of which groups would be
6 impacted and kind of what functions.
7     Q.   That doesn't relate to your
8 Pennsylvania/Delaware operation, right?
9     A.   No.
10     Q.   You might be able to do this yourself
11 and if you don't feel comfortable, I'll do it
12 for you.  To go into the next spreadsheet, all
13 you have to do is click this folder and the
14 next one down.  Do you see that?
15     A.   Okay.
16     Q.   4169, for the record, you're looking
17 at spreadsheet 4169?
18     A.   Yes.
19     Q.   Under March actions, is this
20 something that you created?
21     A.   I guess off of a template, yes.
22     Q.   Did you help input information into
23 this?
24     A.   I would say so, yes.

23

1     Q.   There's more people than just Bragg,
2 do you see that, under group?
3     A.   Yes.
4     Q.   And then the next level leader would
5 be the one down, so your name is contained in
6 some of these entries.  Do you see that?
7     A.   Yes.
8     Q.   I only see your name in two areas but
9 let's start with the one for PA no backfill.
10 Do you see that?
11     A.   Yes.
12     Q.   2. These are the same people we
13 discussed before, aren't they?
14     A.   It seems like it, yes.
15     Q.   And then PA consolidation 1, we
16 didn't discuss this one before, but what does
17 that reflect?
18     A.   Consolidating two different manager
19 groups, I guess maybe a potential to
20 consolidate within each one of their spaces.
21     Q.   At this point, was this just the
22 discussion about the headcount for management?
23     A.   This was just management.
24     Q.   And the spreadsheet also is

24

1 respecting management?
2     A.   Yes.
3     Q.   Did you do that first, the
4 discussions about headcounts for management and
5 assessing those proper counts before any 7T
6 band members were going to be impacted?
7     A.   When you say management, I'm talking
8 my managers and their employees.  So it's band
9 6 and band 7.
10     Q.   This would include band 7?
11     A.   Yes.
12     Q.   At this point though, had you had any
13 discussion about whether or not any of the
14 engineers underneath your managers were going
15 to be impacted and who?
16     A.   Not very specific names.  I mean, I
17 think we had some names based on certain
18 factors, like we knew someone was getting
19 promoted out.  So whatever our number was going
20 to be, that would be part of our number.  We
21 would take advantage of that.
22     Q.   That Lorenza, was that an actual
23 engineer under one of your managers or was it a
24 higher level employee?

JOSEPH MUCCILO

25

1      A.   It was an engineer under one of my
2   managers.
3      Q.   And that person was singled out
4   because there were, in fact, noted performance
5   concerns?
6      A.   I believe so.
7      Q.   Do you know if the person was on some
8   kind of PIP or something?
9      A.   Not that I recall.
10      Q.   Were you peripherally aware, based on
11   who their manager was, that they were having
12   problems with Lorenza?
13      A.   No, no, I think it was more of the
14   mind set, you know, of the whole ranking.
15      Q.   Do you know if ranking had occurred
16   at that point when Lorenza was even identified?
17      A.   No.
18      Q.   Do you know where his name even came
19   from? Did it come from you?
20      A.   It didn't came from me. It came from
21   my manager.
22      Q.   So as of this point, had you even
23   asked your managers to start ranking their
24   employees?

26

1      A.   No.
2      Q.   So are you 100 percent sure where
3   Lorenza's name came up in those spreadsheets?
4      A.   No, I think it was really just
5   initial planning around our preliminary first
6   pass at the numbers.
7      Q.   Was anyone else that was an engineer
8   named in these early RIF discussions based on
9   performance?
10      A.   Not that I know of, no.
11      Q.   Do you remember who Lorenza's actual
12   manager was?
13      A.   I thought it was Jim Szewczyk.
14      Q.   Do you know if Lorenza ultimately was
15   impacted by the RIF?
16      A.   I don't remember.
17      Q.   Mr. Lorenza, that's not the same
18   person as Ronald Lowe, is it?
19      A.   Shouldn't be, no.
20      Q.   He's not contained in the list of any
21   of the rate and ranks provided for all those
22   rated and ranked in your organization. Do you
23   know if he was picked in the outset to be
24   included in who would be released based on

27

1   performance?
2      A.   No, because I -- I'm not 100 percent.
3      Q.   And you're not even sure if he was
4   actually released as part of the RIF?
5      A.   That's correct.
6            *  *  *
7      (Whereupon, Exhibit Muccilo-4 was
8       marked for identification.)
9            *  *  *
10   BY MS. BURKE:
11      Q.   This is a continuation of emails,
12   just has an additional one at the top that
13   wasn't contained in the prior string. The last
14   email that you and I looked at identified
15   updates to second attachment, including PA high
16   level plans. Let's look at the top one.
17           Bill, that's William Bragg, right?
18      A.   Correct.
19      Q.   Final draft puts us at 35.
20   Individual plans may change depending on
21   detailed RIF planning efforts over the next
22   week. Please let me know if you want me to
23   send this to Shannon.
24           Where it says final draft puts us at

28

1   35, was it your understanding that 35
2   individuals may be impacted overall?
3      A.   I would -- I guess so.
4      Q.   Not sure?
5      A.   Not sure. I mean, I think at this
6   point we were -- I don't think we had a set
7   number and I think we were still just planning.
8           MR. BARRAS:  Don't guess on your
9      answers either.
10           MS. NERO:  Yeah, you're not
11      helping her.
12   BY MS. BURKE:
13      Q.   So you have no idea, just for the
14   record, 35, where that identifies a number of
15   employees to be impacted; is that fair?
16      A.   Correct.
17      Q.   I just want you to go to the
18   attachment for this, which is 4173 if you
19   navigate the folder.
20      A.   4173, okay.
21      Q.   In terms of March plans, that
22   particular tab, at least where you are
23   identified the backfill and performance areas
24   had not changed, right?

JOSEPH MUCCILO

29

1    A.  Correct.
2    **Q.  If you go down the chart where it's**
3  **still under you, no backfill loss is at 2,**
4  **consolidation 4, performance zero.  Do you know**
5  **what that chart is for?**
6    A.  Again, this was preliminary planning
7  I would say based around risk.
8    **Q.  Are you familiar with these charts?**
9  **Did you look at them when they were sent to**
10  **you?**
11    A.  Yes.
12    **Q.  The numbers identified here for no**
13  **backfill loss that don't have explanations, the**
14  **second chart down, do you know where those**
15  **numbers even come from?**
16    A.  It would have been somewhat of a --
17  you know what, I guess I'd be guessing.  I
18  don't know.
19    **Q.  If you go to the right, use the tool**
20  **bar to go all the way over, it starts out with**
21  **the highlights low risk plan, nine people.  Do**
22  **you see that?**
23    A.  Low risk, nine people.
24    **Q.  Low to medium risk plan, 17 people**

30

1  **(plus 8).  Higher risk plan, 23 people (plus**
2  **6).  Do you see that?**
3    A.  Yes.
4    **Q.  What was what did that reflect, those**
5  **varying degrees?**
6    A.  At this time we didn't have a
7  definitive number, so we were looking at
8  depending on the plan -- so low risk plan, this
9  is what we felt where we could reduce, and then
10  going into more of a medium risk and then a
11  high risk.  You can see the number of people
12  are increasing.
13    **Q.  It's just being discussed at this**
14  **point; no final determination as to how many**
15  **people?**
16    A.  No, just kind of planning.
17    **Q.  If you go to headcount detail.**
18    A.  I'm there.
19    **Q.  These individuals under headcount,**
20  **are these everyone under you or each of the**
21  **directors?**
22    A.  If I sum up all the lines, it's over
23  500 so it would be everyone under Bill.
24    **Q.  You yourself had a headcount just for**

31

1  **your Pennsylvania/Delaware area, right?**
2    A.  Eventually, I did, yes.
3    **Q.  What, as the process proceeded?**
4    A.  Correct.
5    **Q.  You're not sure what final draft puts**
6  **us on 35, right?**
7    A.  Correct.
8    **Q.  It doesn't look like it's divvied up**
9  **here unless you're able to tell based on the**
10  **spreadsheet.  Do you know if at this point you**
11  **had conveyed to any of your particular team**
12  **members how many people had to go?**
13    A.  At this point, no, it would have been
14  just ballparking.
15    **Q.  Did you give out ballparks to your**
16  **managers about how many people you thought had**
17  **to go before you actually knew?**
18    A.  No, we were mainly just planning
19  around -- you know, we tried to soften the
20  blow, I would say, looking for people that were
21  willing to leave.  So we kind of look at it
22  from that perspective to say, okay, if we got
23  to go down, what functions do we want to go
24  down and which people potentially fit in those

32

1  functions and, you know, is there a willingness
2  to leave or not.
3    **Q.  So as of this point, do you know if**
4  **you had directed any of your managers to**
5  **identify if people were willing to leave?**
6    A.  I don't think we were canvassing
7  anybody.  I think just based on historical
8  knowledge of, you know, people that were kind
9  of looking to retire.
10    **Q.  That had expressed an interest**
11  **previously?**
12    A.  Yeah, correct.
13    * * *
14    (Whereupon, Exhibit Muccilo-5 was
15    marked for identification.)
16    * * *
17  BY MS. BURKE:
18    **Q.  You can read the entire string.  It's**
19  **repetitive from other strings that we looked**
20  **at, at least the first couple.**
21    A.  Yes, I see that.
22    **Q.  So the first page is what has the new**
23  **strings, all right, just for purposes of**
24  **completeness.  At the top where you are, in**

JOSEPH MUCCILO

33

1    fact, cc'ed on the email from 3/26/15 it says,
2    HC options file sent to Shannon and Blair.
3    Adding Mid Atlantic Force v8 file with Colton's
4    update on the June plan tab.  Starting point
5    for this RIF is 499.  39 removed; 7.7 percent.
6         At this point, do you know if you had
7    a headcount for your own particular area or if
8    there was just a headcount for everyone under
9    Bragg, and that's 7.7 percent of individuals
10   under Bragg would be impacted or anticipated to
11   be?
12        A.  I don't -- I'm really not 100
13   percent.  I don't remember.
14        Q.  Let's look at the attachment.
15        A.  I guess I would just be assuming.
16        Q.  Do you have a rationale basis for
17   what you're saying?
18        A.  No, it looks like we have an initial
19   -- I would say it sounds like we had an initial
20   number.
21        Q.  For clarification, all I was saying
22   is, starting point for this RIF is 499.  You
23   didn't even have 499 people under, right?
24        A.  Correct.

34

1         Q.  That number looks more like a
2    headcount related to Bragg's organization,
3    right?
4         A.  Yeah.
5         Q.  And that 7.7 percent of those under
6    Bragg may be impacted?
7         A.  Yes, so yeah.
8         Q.  Do you know if at this point you knew
9    how many people you personally had to have
10   removed from your respective teams?
11        A.  Yeah, probably.
12        Q.  Can you tell by looking at this
13   email?
14        A.  Snow.
15        Q.  Let's take a look at the attachment,
16   which is 4179.
17        A.  4179?
18        Q.  Yes.
19        A.  Okay.
20        Q.  There are certain groups identified,
21   obviously, including Bragg, and then next to
22   yourself delineated here you're the director at
23   issue.  Do you see that?
24        A.  Yeah.  Are we looking at June or

35

1    March?
2         Q.  We're looking at March actions.
3         A.  March actions, okay.  Yeah, I see two
4    lines with my name on it.
5         Q.  It's the same information that you
6    and I looked at a few emails back, right?
7         A.  Correct.
8         Q.  What I don't see is Lorenza that was
9    discussed in terms of performance before.  Do
10   you notice that difference?
11        A.  Yes, I do.
12        Q.  Do you know if that changed at some
13   point, that individual's name contained in
14   these spreadsheets?
15        A.  Potentially, yeah.  I don't know the
16   timing of the different spreadsheets so --
17        Q.  I apologize if I asked you this
18   before.  Was Lorenza actually terminated from
19   his employment?
20        A.  I didn't remember.
21        Q.  I'm just looking at this one, it says
22   HC savings.  This number is higher than 35.  Do
23   you know what the HC category even stands for?
24        A.  It would be headcount.

36

1         Q.  Can you go to June actions, please?
2         A.  (Witness complies with request.)
3         Q.  This says potential HC, or headcount,
4    savings and it's higher, it says 97.  Do you
5    see that?
6         A.  Yes, I do.
7         Q.  If we look under your name, there's
8    certain areas identified respecting
9    consolidations?
10        A.  That's correct.
11        Q.  What was the purpose of those
12   entries?
13        A.  So this was, again, more planning
14   around when we did get a number, right, what
15   are some of the things that we can consolidate.
16   That was mainly most of our -- we were looking
17   to consolidate functions.
18        Q.  Let's just use third party billing as
19   an example.  You put 1 here, delay in
20   processing invoices, make ready work,
21   complaints and escalations, do you see that?
22        A.  Yes.
23        Q.  What were you going to do with
24   respect to third party billing?

JOSEPH MUCCILO

37

1      A.   For that one, it would just absorb
2    with the rest of the team and, obviously, you
3    know, the risk would be, you know, less people,
4    same amount of work, so there would be delays.
5      Q.   Oh, I see.  Would one person be
6    impacted then?
7      A.   Yeah, that's kind of how we said it
8    would be one person.  We could have one person
9    savings.
10      Q.   You have service orders.  Who
11    performed service orders?
12      A.   For this one associated under risks,
13    that would have been under my manager, Jim
14    Szewczyk.
15      Q.   Why would there be a 1 there then?
16      A.   We probably had multiple people doing
17    service orders and we felt we can consolidate.
18      Q.   The right-of-way, do you see that?
19      A.   Yep, same kind of logic.
20      Q.   Design and provisioning, there's a 3
21    there.  What was the purpose of that?
22      A.   That was an area we felt we could
23    outsource more of the work.  We were doing some
24    of it already and we felt we could accelerate

38

1    and do more of that.
2      Q.   Design and engineering?  You just
3    answered it.  I was just confirming.
4      A.   Well, one was design and
5    provisioning, right, that was the 3 that I was
6    answering to.  That's a separate group than
7    design engineering.
8      Q.   Which group did Suzette Walker fall
9    into?
10      A.   She would have fallen under design
11    engineering.
12      Q.   So you anticipated that you could
13    potentially let four people go that did that
14    function?
15      A.   Yes.
16      Q.   If you actually look for it's column
17    28, all the ones that relate to you, 28 all the
18    way to 34.  It's 12 people.  Do you see that?
19      A.   Yes, I do.
20      MR. BARRAS:  Object.  The
21      document speaks for itself but you
22      can answer.
23    BY MS. BURKE:
24      Q.   It's 12 people?

39

1      A.   It's 12 people.
2      Q.   Do you know if you ultimately ended
3    up releasing 12 people?
4      A.   I thought -- I thought we did more.
5      Q.   How many do you think you did?
6      A.   I thought we did either 13 or 14.
7      Q.   Do you know if these numbers ever
8    changed at some point?
9      A.   I don't know.
10      Q.   I'm going to give you Walker-14.  To
11    make this easier for you and your counsel, this
12    is a collection of all the business cases for
13    any individuals released under you as a
14    director.
15      A.   Okay.
16      Q.   Let's do this:  On the bottom
17    right-hand corner you notice there's Bates
18    stamp numbers.
19      A.   Yes.
20      Q.   You'll flip with me through the
21    pages, but if you go to 759, Thomas was
22    impacted, right?  Do you see it says IM?
23      A.   759, yes.
24      Q.   Then if you go to Page 766, Judy was

40

1    impacted, just one person?
2      A.   Yes.
3      MR. BARRAS:  Objection.  You can
4      answer.
5      THE WITNESS:  What was that?
6      MR. BARRAS:  I said objection but
7      you can answer.
8      THE WITNESS:  Yes.
9    BY MS. BURKE:
10      Q.   Then if you go to Page 772, Charles
11    Browning was impacted, right?
12      MR. BARRAS:  Objection.  You can
13      answer.
14      THE WITNESS:  Yes.
15    BY MS. BURKE:
16      Q.   Do you think Charles Browning was not
17    impacted?  Do you have any reason to disagree
18    with this document?
19      A.   No, I think he was.
20      Q.   The people I've asked you about so
21    far, were they impacted?
22      A.   Yeah, I think they were.
23      Q.   I think they were, too.
24      MR. BARRAS:  I agree.  I'm just

JOSEPH MUCCILO

41

1 saying the document speaks for
2 itself.
3 　　MS. BURKE: He's not sure if 12
4 people were impacted, 14, so we're
5 just going to count every one of them
6 if he's not able to do that.
7 　　MR. BARRAS: You can count every
8 one on Exhibit-14.
9 BY MS. BURKE:
10 　Q.　So I'm going keep going through this
11 with you. If you go to Page 775, this
12 particular employee, Deadra Johns, do you know
13 if she was a single incumbent under Cindy
14 Swipp?
15 　A.　Can you repeat that?
16 　Q.　Sure. Do you know who Deadra Johns
17 is?
18 　A.　Yes.
19 　Q.　Do you know if she was a single
20 incumbent based on her position?
21 　A.　I'm not sure.
22 　Q.　Do you even know what she did?
23 　A.　I -- I thought she did right-of-way.
24 　Q.　Do you know who Cindy Swipp is?

42

1 　A.　Yes, she's my manager.
2 　Q.　How many people did she oversee?
3 　A.　Well, she has management and
4 associates. I want to say six management and
5 close to 40 associates.
6 　Q.　If you go to Page 780, Glen Gross, he
7 was impacted, right?
8 　　MR. BARRAS: Objection. You can
9 answer.
10 　　THE WITNESS: Yes.
11 BY MS. BURKE:
12 　Q.　And then if you go to Page 786, Paul
13 Brood, do you see that?
14 　A.　Yes.
15 　Q.　Impacted?
16 　A.　Yes.
17 　Q.　And then if you go to Page 791,
18 Ronald Lowe?
19 　　MR. BARRAS: Objection. You can
20 answer.
21 　　THE WITNESS: Yes.
22 BY MS. BURKE:
23 　Q.　Was that person impacted?
24 　A.　Yes.

43

1 　Q.　If you go to Page 798, Suzette Walker
2 was impacted, right?
3 　A.　Yes.
4 　Q.　If you go to Page 802, was John
5 Brause impacted?
6 　A.　Yes.
7 　Q.　If you go to Page 807, was Melissa
8 McHugh impacted?
9 　A.　Yes.
10 　Q.　What about CW Messick, was that
11 person impacted?
12 　A.　Yes.
13 　Q.　Then Page 813, if you look under
14 Thomas Miller, was that person impacted?
15 　A.　Yes.
16 　Q.　So including the single incumbent is
17 12 people. Is there anyone else that I haven't
18 identified that you believe was impacted as a
19 result of the RIF under you being a director?
20 　A.　I thought John Healy.
21 　Q.　What did John Healy do?
22 　A.　He was a manager of mine.
23 　Q.　He wasn't rate or ranked, correct?
24 　A.　I don't remember.

44

1 　Q.　He wasn't in any of the boxes that
2 you and I looked at when you guys were first
3 discussing --
4 　A.　No.
5 　Q.　So other than the 12 people that you
6 and I looked at in Exhibit-14 and John Healy,
7 is there anyone else that you believe was
8 impacted that we have not discussed?
9 　A.　Not that I recall.
10 　Q.　So does 13 sound like an accurate
11 number?
12 　A.　Yeah, that's what I thought it was,
13 13 or 14. So 13 sounds accurate.
14 　Q.　I just want to make sure there's not
15 someone else that I'm not aware of.
16 　A.　Not that I'm aware of.
17 　Q.　The spreadsheet that we're looking at
18 here and these numbers and the reasons why
19 these particular numbers could be sacrificed,
20 is there any other occasion that you had a role
21 in creating these numbers or risks associated
22 with them?
23 　A.　Can you repeat that?
24 　Q.　Is there any other occasion besides

JOSEPH MUCCILO

45

1  this particular spreadsheet which is Bates
2  stamped 4179 where you identified which roles
3  could be impacted and what the risks were that
4  were associated with that impact?
5      A.  I mean, other than just ongoing
6  conversations with my managers, I don't think
7  there were any other additional updates to this
8  that would have been made.
9      Q.  When we were looking at the
10  performance and consolidation, design
11  engineering, that's what you identified that's
12  what Suzette Walker did?
13     A.  That would have been within the
14  design engineering groups.
15     Q.  You estimated that approximately four
16  would be subject to the RIF?
17     A.  That was kind of the high level plan.
18     Q.  Did that change at any point, any of
19  these numbers that we looked at?
20     A.  Yeah, potentially.
21     Q.  Potentially.  Did it or not?
22     A.  I don't remember if it did or not.
23                  * * *
24         (Whereupon, Exhibit Muccilo-6 was

46

1         marked for identification.)
2                  * * *
3  BY MS. BURKE:
4      Q.  This might give you some more
5  clarity.  First of all, you can take as much
6  time as you need to look at this particular
7  email.
8      A.  Okay.
9      Q.  On the first page of this email, it's
10  an email only from Diane Redilla to you.  Do
11  you see that?
12     A.  Yes.
13     Q.  And it's subject and it's a forward
14  please review headcount from another email from
15  Laura Lippincott.  Do you see that?
16     A.  Yes.
17     Q.  Now she's talking to you saying FYI,
18  we'll be at 165 including one VLDP.  What does
19  that stand for?
20     A.  That's a program we have.  It's a
21  Verizon leadership development program, so it's
22  headcount but it's not really our headcount
23  because they rotate to different parts of the
24  business.

47

1      Q.  Understood.  165 management by 5/25.
2  Do you see that?
3      A.  Yes.
4      Q.  And then the forward below from Laura
5  Lippincott to Diane, take as much time as you
6  need and let me know when you're ready for me
7  to ask you questions.
8      A.  I'm ready.
9      Q.  She gives various dates and what the
10  potential headcount will be as of certain
11  dates.  Do you see that?
12     A.  Yes.
13     Q.  The 5/25 says management headcount
14  will be at 165, 12 folks leave under the RIF.
15  Do you see that?
16     A.  Yes.
17     Q.  Does that comport with your
18  recollection?
19     A.  Yeah.
20     Q.  Well, you seem hesitant.
21     A.  No, I mean, it's just -- it seems
22  like it's a walk of our headcount.
23     Q.  And the 165, that's only as it
24  pertains to your organization?

48

1      A.  Yes, that's just -- yes.
2      Q.  So as of 5/25, your headcount would
3  be 165 and 12 people were leaving as per the
4  RIF?
5      A.  That's what it says.
6      Q.  You and I just counted a moment ago
7  the 12 people that were RIF'ed and the 13th you
8  told me was John Healy, right?
9      A.  Yes.
10     Q.  Do you know if John Healy was
11  impacted sometime before the actual rates and
12  ranks occurred?
13     A.  No, John really was an expression of
14  a willingness to leave.
15     Q.  Did he leave with a voluntary RIF
16  package?
17     A.  I guess you can call it that.
18     Q.  Or early retirement or something?
19     A.  It was part of, I guess, our RIF.
20     Q.  He volunteered?
21     A.  He expressed a willingness to go.
22     Q.  Did you force him out against his
23  will?
24     A.  No, he was willing to go and so I

JOSEPH MUCCILO

49

1  made the decision to consolidate my groups and
2  to use John as one of my reductions.
3      Q.   Now, did you hold individual calls
4  with each one of your managers about the number
5  of people that had to go or did you hold a
6  joint call with all your managers?  How did you
7  proceed once you knew how many people had to be
8  impacted?
9      A.   It was a joint call.
10     Q.   With each one of your managers?
11     A.   Yeah, all of my managers were on the
12  call.
13     Q.   What, if anything, did you relay to
14  them?
15     A.   Well, we have calls weekly, so it was
16  probably -- you know, it was a series of calls,
17  and as this progressed, more and more were
18  shared.  The initial call was probably, you
19  know, there's a reduction coming so let's start
20  planning around where we feel there's functions
21  we can either reduce or consolidate.
22     Q.   I'm going show you an exhibit that's
23  been marked as Gross-2.  Besides Magee and
24  Gross, you had other managers that oversaw

50

1  engineering 3 specialist, right?
2      A.   Yeah, all of my managers, I think,
3  oversee engineer 3 specialists.
4      Q.   In terms of the spreadsheets that you
5  monitored on either a daily, weekly or monthly
6  basis for facility verification -- do you know
7  what I'm talking about?
8      A.   Yes.
9      Q.   That was for all your managers and
10  their respective engineering specialists?
11     A.   Certain groups, yes.  Brian and Carl,
12  they're part of that group, yes.
13     Q.   Well, not just Brian and Carl, other
14  managers, right?
15     A.   Correct.
16     Q.   For the four engineering III
17  specialists that may be impacted, which groups
18  were you targeting?  Any in particular or was
19  it across the board?
20     A.   It should have been -- I think it was
21  across the board.
22     Q.   Healy was one of your managers at the
23  time, right?
24     A.   He was one of my managers.

51

1      Q.   Who took over his people, like Gary
2  Rodondo, Jeffrey --
3      A.   I merged John's group with Steve
4  Septak.
5      Q.   At the time that they were supposed
6  to look at their engineering III specialists
7  for this RIF, was Healy still employed or those
8  responsibilities were pushed over to Mr.
9  Septak?
10     A.   No, Healy was still employed.
11     Q.   So you'd be looking at Gross' team,
12  Healy's team, Magee's team, Septak's team and
13  Silinskie's team?
14     A.   Yes.
15     Q.   Would you be looking at Smail's as
16  well?
17     A.   Matt Gary's group does different
18  functions.
19     Q.   And you wouldn't be looking at
20  Smith's group for those four people, right?
21     A.   No, Smith's group had different
22  functions.
23     Q.   Of the four people, not everybody had
24  to, for example, come from Gross' group?  It

52

1  was just doing a rate and rank for all these
2  employees, right?
3      A.   Yes.
4      Q.   You're saying ideally that's what
5  should have occurred, right?
6      A.   Ideally, right.
7      Q.   You didn't do the rates and ranks,
8  did you?
9      A.   No, I did not.
10     Q.   You delegated that responsibility to
11  your group?
12     A.   Yes.
13     Q.   At some point, from Mike Pescatore,
14  were you provided an email that says have them
15  do the rate and rank and then give me a list of
16  names?
17     A.   I don't know if it was from Mike but
18  I would think that's how it went.
19     Q.   Let me grab the email first so
20  there's no confusion.  Here's Parker-1.  This
21  is an email dated March 31st, 2015 from Melissa
22  Parker.  Are you familiar with her in HR?
23     A.   Yes.
24     Q.   You're cc'ed on this email, right?

JOSEPH MUCCILO

---

53

1    A.   Yes.
2    Q.   Do you recall receiving this?
3    A.   Yes.
4    Q.   It says based on our call yesterday,
5  I have provided Mike with the template to
6  submit employee names to me so that I can
7  create the cases for you.  She wants it by
8  close of business tomorrow so then she
9  articulates the process.  Do you see that?
10   A.   Yes.
11   Q.   Where she references Mike, you see
12 Michael Pescatore is cc'ed on this email,
13 right?
14   A.   Yes.
15   Q.   No other Mikes are copied on this
16 email either in the to area or the cc, right?
17        MR. BARRAS:  Objection.  You can
18   answer.
19        THE WITNESS:  Correct.
20 BY MS. BURKE:
21   Q.   Do you think she's talking about any
22 other Mike?
23   A.   No.
24   Q.   Can you take a look at what's been

---

54

1  previously marked as Parker-2?  It's a lengthy
2  document.  I just want to know if you've ever
3  seen it before.
4    A.   I have.
5    Q.   Only during litigation or at the time
6  it was shared with management?
7    A.   Probably at the time, at the time it
8  was shared with management.
9    Q.   Is it your understanding that that
10 particular book is supposed to aid your
11 managers in their compilation of the rate and
12 rank?
13   A.   Yes.
14   Q.   In terms of your involvement in this
15 process, first of all, did you ever use that
16 book to rate and rank any engineering III
17 specialists?
18   A.   No.
19   Q.   Or IV specialists?
20   A.   No.
21   Q.   When, in fact, your managers rate and
22 ranked any of their team members, did you
23 personally review that information or you
24 understood that it was just shared with Mike

---

55

1  Pescatore or HR?
2    A.   I did not review the rate and ranks.
3  I would have seen the names of the impacted
4  individuals.
5    Q.   Let me pull this up for you.  For the
6  record, I'm going to show you what's Bates
7  stamped 2651, which was up on your computer
8  when you first came in today.  Take a look at
9  that.  Have you ever seen that document in that
10 format before, either blank or filled out?
11   A.   It looks familiar.
12   Q.   It looks familiar to you?
13   A.   Yeah.
14   Q.   Blank, filled out or both?
15        MR. BARRAS:  He's got an issue
16   with the way he can view it,
17   something about protected view.
18        MS. BURKE:  He can put enable.
19   You guys put a password on some of
20   these things though.
21 BY MS. BURKE:
22   Q.   Were you able to adjust it or not?
23   A.   Yes.
24   Q.   Are you familiar with it?

---

56

1    A.   Like I said, it looks familiar.  I
2  don't recall if I only saw it blank or filled
3  out.
4    Q.   Did you get a list of approximately
5  12 employees so that a business case could be
6  created?
7    A.   I knew the selected employees.  Then
8  what I don't recall is did I see an official
9  formal this sheet filled out with those people
10 on it.
11        MS. BURKE:  Can you read that
12   back, please, Hope?
13        * * *
14        (Whereupon, the court reporter
15   read back the pertinent testimony.)
16        * * *
17 BY MS. BURKE:
18   Q.   You didn't assist Melissa Parker in
19 actually creating the business case, did you?
20   A.   Maybe for mine, you know, for John
21 but not for the others.
22   Q.   For Healy, you mean?
23   A.   Yes.
24   Q.   Did you just take a look at them when

---

JOSEPH MUCCILO

57

1  they were finished?
2      A.   Like I said, I don't think I looked.
3  I just knew the impacted individuals.  I didn't
4  look at the specific --
5      Q.   You just knew what their names were
6  and they were on the list?
7      A.   Yes.
8      Q.   And you weren't questioning your
9  management's ability to rank them and identify
10 what they perceived to be the stronger or
11 weaker performers?
12     A.   Nope.
13     Q.   Did you perceive Gross and Magee's
14 team to be more beneficial to the business to
15 sacrifice people from just their respective
16 teams versus anybody else's?
17     A.   Can you say that again?
18     Q.   Did you think it was more beneficial
19 for Verizon to focus just on Gross and Magee's
20 teams in terms of pulling people for the RIF
21 from there versus any of the other managers we
22 discussed, Healy, Septak?
23         MR. BARRAS:  Objection.
24         THE WITNESS:  No, because we

58

1         pulled from all of them.
2  BY MS. BURKE:
3      Q.   Okay, I just wanted to make sure.
4  Just giving an example, if the four people were
5  all on Magee's team as the weakest link, so to
6  speak, based on performance, they got the
7  lowest scores, would that have impacted your
8  decision about where people came from or would
9  you have just shifted employees around?
10         MR. BARRAS:  Objection.  You can
11 answer.
12         THE WITNESS:  No, that's not how
13 we did it.  So we didn't lump all of
14 our engineers into one bucket and say
15 rate and rank them.  Because now
16 you're getting into different
17 manager's opinions of people that
18 don't work for them.  That's why we
19 consolidated that each design manager
20 rate and rank only their own team.
21 Then we had basically targets
22 assigned, I would say, for each
23 manager to reduce.
24 BY MS. BURKE:

59

1      Q.   With the engineering III specialists,
2  the managers that you would have had targets
3  assigned would be Gross, Healy, Magee, Septak
4  and Silinskie?
5      A.   Yes.
6      Q.   So that's five managers, right?
7      A.   That's five managers.
8      Q.   To your knowledge, only four
9  engineering III specialists had to go?
10     A.   Because we had other movements happen
11 during the course of all of this.
12     Q.   Right.  I'm just confirming it was
13 only four that were going to be impacted,
14 right?
15     A.   I believe so, yes.
16     Q.   Did you want at least one from each
17 team?
18     A.   That was the plan.  Then, again, as
19 things unfolded, we had people get promoted and
20 moved out, which impacted our headcount in a
21 positive way and obviously, it went down.  All
22 right, so those -- I don't remember exactly how
23 it played out, but if a manager lost someone
24 due to a promotion to another organization,

60

1  then I may not have been looking for them to
2  actually do a reduction because technically
3  they already took a reduction.
4      Q.   Whose team was that?
5      A.   I mean, earlier in the year, Steve
6  had one.
7      Q.   Septak?
8      A.   Septak, I believe he had Hoover get
9  promoted.
10     Q.   Which we saw in the documents, right?
11     A.   Yes.  Then I thought Carl Gross had
12 one as well.
13     Q.   Promotion?
14     A.   Promotion out.
15     Q.   Who was that?
16     A.   What was his name?  If I had a list,
17 I could probably --
18     Q.   Is it Ed Boudman?
19     A.   No.
20     Q.   Ed Battista?
21     A.   No.
22     Q.   Sam Capizzi?
23     A.   No.
24     Q.   Dave Dehaven?

## JOSEPH MUCCILO

61

1    A.   No.
2    Q.   **Chirag Jagwani?**
3    A.   Yes.
4    Q.   **He was promoted out?**
5    A.   Yeah.
6    Q.   **So did you tell Mr. Gross then that**
7  **he did not have to impact one of his employees**
8  **then?**
9    A.   Yeah, I don't exactly remember the
10  timing of it, but potentially yes, I think
11  that's how it happened.
12   Q.   **Did any of the employees that you**
13  **worked with ever express to you that there was**
14  **just a generalized fear among employees that if**
15  **they had a number of years of service they**
16  **would be targeted for a RIF?**
17   A.   Not that I recall, no.
18   Q.   **Did Laura Lippincott ever express**
19  **that concern to you?**
20   A.   Not that I recall but --
21              *  *  *
22        (Whereupon, Exhibit Muccilo-7 was
23        marked for identification.)
24              *  *  *

62

1  BY MS. BURKE:
2    Q.   **You can read the whole email string**
3  **if you want but I'm just focusing on the first**
4  **one that you're reading now.**
5    A.   All right.
6    Q.   **Do you remember her sharing that?**
7    A.   Yeah.
8    Q.   **Do you know if, in fact, that was an**
9  **opinion that was shared by your employees, that**
10 **if they had more years of service, that they**
11 **would be targeted for a RIF?**
12   A.   No, this was, I mean -- this is
13  something I was thinking of doing, you know, to
14  congratulate people on service anniversaries
15  and the concern was, you know, just -- I don't
16  even know.  I'm just trying to reread this but
17  it doesn't make a whole lot of sense.  It was
18  just comments around concerns of what people
19  may think when they hear that someone has X,
20  you know, number of years of service.
21   Q.   **I saw the preceding email strings.**
22 **Those charts for Gross, Exhibit Gross-2,**
23   A.   For Carl or Brian.
24   Q.   **You can put them together.  Every**

63

1  individual on Magee's team was either white or
2  one was Asian, right?
3        MR. BARRAS:  Objection.  You can
4     answer.
5        THE WITNESS:  I don't know.
6  BY MS. BURKE:
7    Q.   **You can look at the ethnic group**
8  **description area.**
9    A.   Okay.
10       MR. BARRAS:  Objection.  The
11    document speaks for itself.  You can
12    answer.
13 BY MS. BURKE:
14   Q.   **Do you see that?**
15   A.   I see that.
16   Q.   **They're all listed as white except**
17 **for Joseph Hui, who is Asian, right?**
18   A.   That's what the document says, yes.
19   Q.   **And none of those individuals were**
20 **impacted in connection with the RIF, right?**
21   A.   No.
22   Q.   **Now, do you have any reason to**
23 **disagree that Suzette Walker had 37 years of**
24 **service?**

64

1    A.   I have no idea.
2    Q.   **Do you have any reason to disagree**
3  **with that?**
4    A.   No.
5    Q.   **If you do, I can give you a**
6  **spreadsheet.  I'm just trying to save you the**
7  **time.**
8    A.   No, I'm just saying I have no idea.
9    Q.   **If I represent that to you, will**
10 **you agree with me for purposes of questioning**
11 **or do you want to look at the spreadsheet?**
12       MR. BARRAS:  I'm going to object.
13    The documents say what they say.  Why
14    don't we ask the questions and we'll
15    see if we need to go any further.
16 BY MS. BURKE:
17   Q.   **You can look at the numbers for the**
18 **years of service, but other than service Scott**
19 **Panicelli, she had more years of service than**
20 **every single one of them, right?**
21       MR. BARRAS:  Objection.
22       THE WITNESS:  Based on what you
23    were saying, yes.
24 BY MS. BURKE:

65

1      Q.   If you look at those individuals for
2  Carl Gross' team, they're all listed as white
3  except for Alex Ramos, who is Hispanic, right?
4          MR. BARRAS: Objection. You can
5      answer.
6          THE WITNESS: That's correct.
7  BY MS. BURKE:
8      Q.   Then other than the top three people
9  here on the list, would you agree with me that
10  Ms. Walker had more years of service than all
11  the other employees listed on this list?
12          MR. BARRAS: Objection. Document
13      speaks for itself. You can answer.
14          THE WITNESS: It was 37.3, you
15      said, right, for Ms. Walker?
16          MS. BURKE: I think that's
17      accurate but I said 37.
18          THE WITNESS: Then yes,
19      everything below 37.7.
20  BY MS. BURKE:
21      Q.   Ed Macintosh, do you know who that
22  was? He's not on the list. He was under Mr.
23  Gross during this period of time. Do you know
24  who he is?

66

1      A.   Yeah.
2      Q.   He ultimately voluntarily separated
3  from Verizon, do you recall that?
4      A.   I do.
5      Q.   Had you ever met Ed Macintosh before?
6      A.   Probably.
7      Q.   Do you know what he looks like would
8  you know if you fell over him?
9      A.   Probably, not.
10      Q.   Do you know if he's white, black
11  Hispanic?
12      A.   I don't.
13          MS. BURKE: Mr. Muccilo, I don't
14      have any further questions for you.
15      Your counsel may and he may not.
16          MR. BARRAS: I'm going to take a
17      two-minute break. Let me think about
18      it while I'm out.
19          *  *  *
20          (Whereupon, a brief recess was
21      held at this time.)
22          *  *  *
23          MR. BARRAS: I have no follow-up
24      questions.

67

1              *  *  *
2          (Witness excused.)
3              *  *  *
4          (Deposition concluded at
5  3:44 p.m.)
6              *  *  *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

68

1              *   *   *
2          C E R T I F I C A T I O N
3              *   *   *
4          I, Hope Agosto, Professional Court
5  Reporter and Notary Public for the Commonwealth
6  of Pennsylvania, do hereby certify the
7  foregoing to be a true and accurate transcript
8  of my original stenographic notes taken at the
9  time and place hereinbefore set forth.
10
11
12
13          _____
14          Hope Agosto
15          Court Reporter
16          Notary Public
17
18
19
20      (The foregoing certification of this
21  transcript does not apply to any reproduction
22  of the same by any means, unless under direct
23  control and/or supervision of the certifying
24  reporter.)

JOSEPH MUCCILO

**A**

ability 57:9
able 6:9 21:7
  22:10 31:9
  41:6 55:22
absorb 37:1
accelerate 37:24
accurate 7:7
  44:10,13 65:17
  68:7
actions 22:19
  35:2,3 36:1
actual 24:22
  26:11 48:11
Adding 33:3
additional 14:21
  27:12 45:7
adjust 55:22
advantage 24:21
ago 3:12 48:6
Agosto 1:18 68:4
  68:14
agree 40:24
  64:10 65:9
agreed 4:3
aid 54:10
Alex 65:3
allow 15:2
ambiguous 6:16
amount 15:12
  37:4
and/or 68:23
anniversaries
  62:14
annually 11:12
answer 6:9,12
  6:20 7:2 38:22
  40:4,7,13 42:9
  42:20 53:18
  58:11 63:4,12
  65:5,13
answered 38:3
answering 38:6
answers 28:9
anticipated 21:1

33:10 38:12
anybody 32:7
  57:16
apologies 17:9
apologize 35:17
appears 13:21
apply 68:21
approximately
  45:15 56:4
area 8:7 31:1
  33:7 37:22
  53:16 63:8
areas 15:6,7
  23:8 28:23
  36:8
articulates 53:9
ASAP 3:15
Asian 63:2,17
asked 12:13
  25:23 35:17
  40:20
asking 6:17,22
assess 10:8
assessing 24:5
assessment
  10:11
assigned 58:22
  59:3
assignment 15:1
assist 56:18
Assistant 2:17
assisting 17:2
associated 37:12
  44:21 45:4
associates 18:16
  18:18 42:4,5
assume 6:21
assuming 33:15
Atlantic 18:15
  18:22 33:3
attached 14:20
  17:8
attachment
  17:23,24 18:5
  27:15 28:18

33:14 34:15
attention 11:5
  12:14
August 1:10
aware 21:7
  25:10 44:15,16
awareness 10:20

**B**

back 14:9 19:4
  35:6 56:12,15
backfill 18:3
  19:15,22 20:1
  23:9 28:23
  29:3,13
backtrack 10:16
backwards 12:9
ballpark 16:8
ballparking
  31:14
ballparks 31:15
band 24:6,8,9,10
bar 29:20
BARRAS 2:9
  28:8 38:20
  40:3,6,12,24
  41:7 42:8,19
  53:17 55:15
  57:23 58:10
  63:3,10 64:12
  64:21 65:4,12
  66:16,23
base 11:12
based 4:20 11:13
  24:17 25:10
  26:8,24 29:7
  31:9 32:7
  41:20 53:4
  58:6 64:22
basic 15:3
basically 58:21
basis 33:16 50:6
Bates 12:19,21
  39:17 45:1
  55:6

Battista 60:20
beginning 10:17
  11:11
believe 8:23
  16:24 25:6
  43:18 44:7
  59:15 60:8
beneficial 57:14
  57:18
Bensalem 1:16
  2:5
best 10:10
Bill 8:9,24 13:13
  14:6 17:16
  18:13 19:4,5
  19:19 21:19
  27:17 30:23
Bill's 14:7
billing 36:18,24
black 66:10
Blair 33:2
blank 55:10,14
  56:2
blow 31:20
board 50:19,21
book 54:10,16
bottom 12:20
  13:19 39:16
Boudman 60:18
Box 1:23
boxes 44:1
Bragg 8:9 13:13
  14:7 17:11,17
  18:10,19 19:19
  21:16,19 23:1
  27:17 33:9,10
  34:6,21
Bragg's 18:13
  34:2
Brause 43:5
break 7:1 66:17
Brian 9:10 50:11
  50:13 62:23
brief 66:20
Brood 42:13

Browning 40:11
  40:16
bucket 58:14
Burke 2:3 3:6
  4:16 12:6
  15:22 16:20
  27:10 28:12
  32:17 38:23
  40:9,15 41:3,9
  42:11,22 46:3
  53:20 55:18,21
  56:11,17 58:2
  58:24 62:1
  63:6,13 64:16
  64:24 65:7,16
  65:20 66:13
business 15:13
  20:2,23 39:12
  46:24 53:8
  56:5,19 57:14

**C**

C 2:1 68:2,2
calendar 11:13
call 7:24 9:8
  48:17 49:6,9
  49:12,18 53:4
calls 49:3,15,16
canvassing 32:6
Capizzi 60:22
Carl 9:12 50:11
  50:13 60:11
  62:23 65:2
case 9:2 12:13
  15:13 20:23
  56:5,19
cases 39:12 53:7
categories 19:14
category 35:23
CBurke@kar...
  2:6
cc 53:16
cc'ed 13:16
  14:17 21:22
  33:1 52:24

53:12
**certain** 24:17
34:20 36:8
47:10 50:11
**certification** 4:5
68:20
**certify** 68:6
**certifying** 68:23
**Cerutti** 1:15 2:3
**cetera** 11:21
**Chain** 3:17,18
3:20,21,23
**change** 8:15
27:20 45:18
**changed** 8:2
28:24 35:12
39:8
**Charles** 40:10
40:16
**chart** 29:2,5,14
**charts** 29:8
62:22
**Cherry** 2:10
**Chirag** 61:2
**CHRISTINE**
2:3
**chronology** 12:7
**Cindy** 41:13,24
**civil** 4:19
**claims** 4:24
**clarification** 9:1
33:21
**clarity** 46:5
**clear** 5:6
**click** 22:13
**Cliff** 13:5,6,7,8
13:19 14:1
**Clifford** 13:4
**close** 42:5 53:8
**collection** 39:12
**Colton's** 33:3
**column** 18:20
38:16
**combination**
16:7

**come** 25:19
29:15 51:24
**comfortable**
22:11
**coming** 49:19
**commencing**
1:17
**comments** 62:18
**Commonwealth**
68:5
**compilation**
54:11
**compile** 17:4
**complaints**
36:21
**complete** 10:1
19:7
**completeness**
32:24
**complies** 36:2
**comport** 47:17
**computer** 55:7
**concept** 10:17
11:2
**concern** 61:19
62:15
**concerns** 25:5
62:18
**concluded** 67:4
**conference** 5:11
**confirming** 38:3
59:12
**confusing** 6:16
**confusion** 52:20
**congratulate**
62:14
**connection**
63:20
**consolidate**
23:20 36:15,17
37:17 49:1,21
**consolidated**
58:19
**Consolidating**
23:18

**consolidation**
18:3 19:15
23:15 29:4
45:10
**consolidations**
36:9
**contained** 23:5
26:20 27:13
35:13
**context** 12:18
13:15
**continuation**
27:11
**control** 68:23
**conversations**
45:6
**conveyed** 31:11
**coordinate**
13:10
**copied** 53:15
**corner** 39:17
**CORPORATI...**
1:6
**correct** 5:22
8:12 9:6,13,17
9:18 16:14
17:18 27:5,18
28:16 29:1
31:4,7 32:12
33:24 35:7
36:10 43:23
50:15 53:19
65:6
**counsel** 2:7,13
2:17 4:3 5:21
39:11 66:15
**count** 41:5,7
**counted** 48:6
**counts** 24:5
**couple** 32:20
**course** 9:15
59:11
**court** 1:1,18,22
5:7,13 6:5
56:14 68:4,15

**create** 53:7
**created** 22:20
56:6
**creating** 44:21
56:19
**currently** 7:9
**CW** 43:10

─────────

**D**
**daily** 50:5
**date** 1:18 5:19
14:20
**dated** 52:21
**dates** 47:9,11
**Dave** 60:24
**Davis** 13:8,13
**day** 15:13
**day-to-day** 9:19
16:10
**days** 17:22 21:21
**Deadra** 41:12,16
**decision** 49:1
58:8
**DEF** 12:20
**Defendants** 2:13
**defenses** 4:24
**definitive** 30:7
**degrees** 30:5
**Dehaven** 60:24
**Delaware** 7:14
8:6 9:4
**delay** 36:19
**delays** 37:4
**delegate** 9:20
**delegated** 52:10
**delineated** 34:22
**department** 11:4
17:3
**depending** 27:20
30:8
**deposition** 1:13
4:20 5:2 6:23
67:4
**description** 3:11
63:8

**design** 37:20
38:2,4,7,10
45:10,14 58:19
**detail** 21:15
30:17
**detailed** 27:21
**determination**
30:14
**development**
46:21
**Diane** 46:10
47:5
**difference** 35:10
**different** 12:23
15:6,7 21:14
23:18 35:16
46:23 51:17,21
58:16
**difficult** 6:8
**direct** 68:22
**directed** 32:4
**director** 7:13 8:5
8:7 9:3 19:19
21:16 34:22
39:14 43:19
**directors** 9:5
13:11 17:17
18:21,22 19:1
19:4 30:21
**disagree** 40:17
63:23 64:2
**discovery** 9:15
12:9
**discuss** 11:20
13:17 17:8,16
23:16
**discussed** 23:13
30:13 35:9
44:8 57:22
**discussing** 44:3
**discussion** 23:22
24:13
**discussions** 24:4
26:8
**DISTRICT** 1:1

1:2
**districts** 9:4
**divvied** 31:8
**document** 12:16
   12:19 38:21
   40:18 41:1
   54:2 55:9
   63:11,18 65:12
**documents** 6:24
   12:1 60:10
   64:13
**doing** 37:16,23
   52:1 62:13
**Dorothy** 14:2
**draft** 27:19,24
   31:5
**due** 59:24
**duly** 4:11

_____
          **E**
**E** 2:1,1,3,16,16
   68:2
**earlier** 4:18 60:5
**early** 26:8 48:18
**easier** 39:11
**EASTERN** 1:2
**Ed** 60:18,20
   65:21 66:5
**efficient** 6:23
**efforts** 27:21
**either** 28:9 39:6
   49:21 50:5
   53:16 55:10
   63:1
**else's** 57:16
**email** 3:12,14,17
   3:18,20,21,23
   12:10,12 13:16
   13:18 14:2,12
   14:16 15:24
   17:9,22 21:20
   27:14 33:1
   34:13 46:7,9
   46:10,14 52:14
   52:19,21,24

53:12,16 62:2
   62:21
**emails** 12:8
   27:11 35:6
**emergency**
   14:24
**employed** 7:10
   51:7,10
**employee** 20:18
   20:19 21:18
   24:24 41:12
   53:6
**employees** 10:8
   18:18 21:8,24
   24:8 25:24
   28:15 52:2
   56:5,7 58:9
   61:7,12,14
   62:9 65:11
**employment**
   35:19
**enable** 55:18
**ended** 39:2
**engineer** 24:23
   25:1 26:7 50:3
**engineering** 7:13
   7:23 8:6 9:3
   11:3 14:8 16:3
   17:3 38:2,7,11
   45:11,14 50:1
   50:10,16 51:6
   54:16 59:1,9
**engineers** 9:17
   9:20 10:5,6
   13:20 15:2
   24:14 58:14
**entire** 18:8 32:18
**entries** 23:6
   36:12
**escalations**
   36:21
**ESQUIRE** 2:3,9
   2:17
**estimated** 45:15
**et** 11:21

**ethnic** 63:7
**evaluations** 10:1
**event** 16:6
**Eventually** 31:2
**everybody** 51:23
**EWA** 3:15 14:22
   14:22,24
**EWAs** 3:12
   13:23
**exactly** 59:22
   61:9
**EXAMINATI...**
   4:14
**examined** 4:11
**example** 18:14
   20:3 36:19
   51:24 58:4
**excused** 67:2
**executive** 8:7
   19:19
**exercise** 15:11
**exhibit** 12:3
   15:19 16:17
   17:15 27:7
   32:14 45:24
   49:22 61:22
   62:22
**Exhibit-14** 41:8
   44:6
**EXHIBITS** 3:9
**expected** 16:23
   20:20
**explanations**
   29:13
**express** 61:13,18
**expressed** 32:10
   48:21
**expression** 48:13

_____
          **F**
**F** 68:2
**facility** 50:6
**fact** 10:7 16:22
   25:4 33:1
   54:21 62:8

**factors** 24:18
**fair** 9:22 11:19
   28:15
**fall** 38:8
**fallen** 38:10
**familiar** 13:2
   29:8 52:22
   55:11,12,24
   56:1
**far** 40:21
**Fax** 1:24
**fear** 61:14
**February** 7:17
**feel** 22:11 49:20
**fell** 66:8
**felt** 30:9 37:17
   37:22,24
**field** 16:11
**file** 33:2,3
**filing** 4:5
**fill** 18:1
**filled** 55:10,14
   56:2,9
**final** 27:19,24
   30:14 31:5
**finished** 57:1
**first** 4:11 10:17
   11:4,7,16
   12:10,14 17:21
   17:23 18:4,5
   24:3 26:5
   32:20,22 44:2
   46:5,9 52:19
   54:15 55:8
   62:3
**fit** 31:24
**five** 18:21,22
   59:6,7
**flip** 39:20
**focus** 12:14
   57:19
**focusing** 62:3
**folder** 22:13
   28:19
**Foley** 13:4

**folks** 47:14
**follow-up** 66:23
**follows** 4:12
**force** 20:5 33:3
   48:22
**foregoing** 68:7
   68:20
**form** 4:7 9:24
**formal** 5:7 56:9
**format** 55:10
**forth** 68:9
**forward** 14:13
   46:13 47:4
**four** 38:13 45:15
   50:16 51:20,23
   58:4 59:8,13
**Fowler** 3:12 14:2
**Freed** 12:23
**full** 12:12
**function** 38:14
**functions** 22:6
   31:23 32:1
   36:17 49:20
   51:18,22
**further** 18:20
   64:15 66:14
**FW** 3:22
**FYI** 46:17

_____
          **G**
**Gary** 51:1
**Gary's** 51:17
**General** 2:17
**generalized**
   61:14
**generally** 12:9
**getting** 24:18
   58:16
**give** 5:5 6:10 7:6
   31:15 39:10
   46:4 52:15
   64:5
**given** 15:8
**gives** 47:9
**giving** 21:11

JOSEPH MUCCILO

58:4
**Glen** 42:6
**go** 16:11 19:4,12
    22:4,12 28:17
    29:2,19,20
    30:17 31:12,17
    31:23,23 36:1
    38:13 39:21,24
    40:10 41:11
    42:6,12,17
    43:1,4,7 48:21
    48:24 49:5
    59:9 64:15
**goes** 17:7
**going** 5:24 6:22
    10:18 17:6,16
    18:20 20:3
    22:4 24:6,14
    24:19 30:10
    36:23 39:10
    41:5,10,10
    49:22 55:6
    59:13 64:12
    66:16
**grab** 52:19
**Greenwood** 1:15
    2:4
**Gross** 9:12 42:6
    49:24 57:13,19
    59:3 60:11
    61:6 62:22
    65:23
**Gross'** 51:11,24
    65:2
**Gross-2** 49:23
    62:22
**group** 23:2 38:6
    38:8 50:12
    51:3,17,20,21
    51:24 52:11
    63:7
**groups** 22:5
    23:19 34:20
    45:14 49:1
    50:11,17

**guess** 13:10
    17:14 20:15
    22:21 23:19
    28:3,8 29:17
    33:15 48:17,19
**guessing** 11:6
    29:17
**guys** 44:2 55:19

**H**

**half** 8:17
**happen** 59:10
**happened** 61:11
**HARVETTA**
    2:17
**HC** 21:23 33:2
    35:22,23 36:3
**he'll** 6:10
**headcount** 3:22
    10:21 11:20
    17:16 18:8
    21:15 23:22
    30:17,19,24
    33:7,8 34:2
    35:24 36:3
    46:14,22,22
    47:10,13,22
    48:2 59:20
**headcounts** 24:4
**Healy** 43:20,21
    44:6 48:8,10
    50:22 51:7,10
    56:22 57:22
    59:3
**Healy's** 51:12
**hear** 62:19
**held** 1:14 66:21
**help** 22:22
**helped** 17:4
**helping** 13:9
    28:11
**hereinbefore**
    68:9
**hesitant** 47:20
**high** 27:15 30:11

45:17
**higher** 24:24
    30:1 35:22
    36:4
**highlights** 29:21
**Hispanic** 65:3
    66:11
**historical** 32:7
**hold** 49:3,5
**honest** 11:22
**Hoover** 20:3
    60:8
**Hope** 1:18 5:13
    56:12 68:4,14
**HR** 52:22 55:1
**Hui** 63:17

**I**

**idea** 28:13 64:1
    64:8
**idea/actions**
    18:3
**ideally** 52:4,6
**identification**
    12:4 15:20
    16:18 27:8
    32:15 46:1
    61:23
**identified** 4:22
    25:16 27:14
    28:23 29:12
    34:20 36:8
    43:18 45:2,11
**identifies** 14:20
    28:14
**identify** 6:4 21:7
    32:5 57:9
**III** 50:16 51:6
    54:16 59:1,9
**IM** 39:22
**impact** 11:3,21
    45:4 61:7
**impacted** 10:21
    21:9 22:6 24:6
    24:15 26:15

28:2,15 33:10
    34:6 37:6
    39:22 40:1,11
    40:17,21 41:4
    42:7,15,23
    43:2,5,8,11,14
    43:18 44:8
    45:3 48:11
    49:8 50:17
    55:3 57:3 58:7
    59:13,20 63:20
**in-home** 7:24
**include** 24:10
**included** 19:1
    26:24
**includes** 19:5
**including** 20:7
    27:15 34:21
    43:16 46:18
**increasing** 30:12
**incumbent**
    41:13,20 43:16
**INDEX** 3:2
**individual** 27:20
    49:3 63:1
**individual's**
    35:13
**individuals**
    13:18 16:5
    28:2 30:19
    33:9 39:13
    55:4 57:3
    63:19 65:1
**information**
    4:23 17:5
    21:11 22:22
    35:5 54:23
**initial** 26:5
    33:18,19 49:18
**input** 22:22
**instruction** 6:11
**instructions** 5:6
**intent** 15:10
**interest** 32:10
**introduced** 4:17

**invoices** 36:20
**involvement**
    54:14
**issue** 6:1 8:21
    12:14 20:16
    34:23 55:15
**IV** 54:19

**J**

**Jagwani** 61:2
**January** 13:17
    14:19
**JBarras@reed...**
    2:12
**Jeffrey** 51:2
**Jersey** 21:24
    22:3
**Jim** 20:12 26:13
    37:13
**Joe** 12:23,23
    19:20
**JOEL** 2:9
**John** 43:4,20,21
    44:6 48:8,10
    48:13 49:2
    56:20
**John's** 51:3
**Johns** 41:12,16
**joint** 49:6,9
**Joseph** 1:13 3:5
    4:10 63:17
**Jr** 13:4
**Judy** 39:24
**June** 8:18 33:4
    34:24 36:1

**K**

**Karpf** 1:14,14
    2:3,3
**keep** 41:10
**kind** 13:9 14:7
    20:5 22:2,5,6
    25:8 30:16
    31:21 32:8
    37:7,19 45:17

**knew** 24:18
  31:17 34:8
  49:7 56:7 57:3
  57:5
**know** 6:15,17
  12:16,24 13:1
  13:5,10 14:2
  16:1,10,22
  19:5,23 20:24
  25:7,14,15,18
  26:10,14,23
  27:22 29:4,14
  29:17,18 31:10
  31:19 32:1,3,8
  33:6 34:8
  35:12,15,23
  37:3,3 39:2,7,9
  41:12,16,19,22
  41:24 47:6
  48:10 49:16,19
  50:6 52:17
  54:2 56:20
  62:8,13,15,16
  62:20 63:5
  65:21,23 66:7
  66:8,10
**knowledge** 32:8
  59:8

**L**

**L** 2:16
**labeling** 20:15
**late** 11:8
**Laura** 15:24
  46:15 47:4
  61:18
**Law** 1:14
**lawsuit** 4:19
**leader** 23:4
**leadership** 46:21
**leave** 7:3 31:21
  32:2,5 47:14
  48:14,15
**leaving** 20:2
  48:3

**lengthy** 54:1
**let's** 14:16 18:4
  23:9 27:16
  33:14 34:15
  36:18 39:16
  49:19
**level** 23:4 24:24
  27:16 45:17
**Levittown** 1:23
**lines** 30:22 35:4
**link** 58:5
**Lippincott** 3:14
  16:1 46:15
  47:5 61:18
**list** 3:13 9:14
  13:20 14:21
  15:9 26:20
  52:15 56:4
  57:6 60:16
  65:9,11,22
**listed** 63:16 65:2
  65:11
**litigation** 54:5
**LLP** 2:9
**lobby** 4:18
**Logan** 2:10
**logic** 37:19
**long** 7:15
**look** 11:24 12:18
  13:16 14:16
  17:21 18:4
  21:23 22:3
  27:16 29:9
  31:8,21 33:14
  34:15 36:7
  38:16 43:13
  46:6 51:6
  53:24 55:8
  56:24 57:4
  63:7 64:11,17
  65:1
**looked** 27:14
  32:19 35:6
  44:2,6 45:19
  57:2

**looking** 18:14
  19:18 21:6
  22:16 30:7
  31:20 32:9
  34:12,24 35:2
  35:21 36:16
  44:17 45:9
  51:11,15,19
  60:1
**looks** 15:24
  18:13 20:16
  33:18 34:1
  55:11,12 56:1
  66:7
**Lorenza** 20:17
  24:22 25:12,16
  26:14,17 35:8
  35:18
**Lorenza's** 26:3
  26:11
**loss** 19:22 20:1
  29:3,13
**lost** 59:23
**lot** 62:17
**low** 29:21,23,24
  30:8
**Lowe** 26:18
  42:18
**lowest** 58:7
**lump** 58:13

**M**

**Macintosh** 65:21
  66:5
**Magee** 9:10
  49:23 59:3
**Magee's** 51:12
  57:13,19 58:5
  63:1
**maintenance**
  15:3
**management**
  18:15,17 21:18
  23:22,23 24:1
  24:4,7 42:3,4

  47:1,13 54:6,8
**management's**
  57:9
**manager** 7:23
  9:10,11,12,16
  13:9 20:13,13
  23:18 25:11,21
  26:12 37:13
  42:1 43:22
  58:19,23 59:23
**manager's** 58:17
**managers** 9:7,8
  9:21 10:2,3,10
  10:14 18:24
  19:2 24:8,14
  24:23 25:2,23
  31:16 32:4
  45:6 49:4,6,10
  49:11,24 50:2
  50:9,14,22,24
  54:11,21 57:21
  59:2,6,7
**March** 11:18,21
  17:14 19:12
  21:21 22:19
  28:21 35:1,2,3
  52:21
**marked** 12:4
  15:20 16:18
  27:8 32:15
  46:1 49:23
  54:1 61:23
**marking** 15:23
**Matt** 51:17
**matter** 5:15
**Maureen** 13:8
  13:12 18:11
**Maureen's**
  18:12
**McHugh** 43:8
**mean** 10:4 13:1
  14:23 22:1
  24:16 28:5
  45:5 47:21
  56:22 60:5

  62:12
**means** 68:22
**meant** 20:12
**medium** 29:24
  30:10
**meet** 13:23
  17:11
**meetings** 17:12
**Melissa** 43:7
  52:21 56:18
**members** 24:6
  31:12 54:22
**merged** 51:3
**Messick** 43:10
**met** 66:5
**Michael** 53:12
**Mid** 18:15,22
  33:3
**middle** 21:20
**Mike** 17:1,4,23
  21:22 52:13,17
  53:5,11,22
  54:24
**Mikes** 53:15
**Miller** 43:14
**mind** 25:14
**mine** 43:22
  56:20
**minimal** 15:3
**moment** 48:6
**monitored** 50:5
**monitoring** 9:19
**monthly** 50:5
**moved** 7:18 17:5
  59:20
**movements**
  59:10
**Muccilo** 1:13 3:5
  4:10,17 7:9
  19:20 66:13
**Muccilo-1** 3:12
  12:3
**Muccilo-2** 3:14
  15:19,23
**Muccilo-3** 3:17

JOSEPH MUCCILO

74

16:17
**Muccilo-4** 3:18
27:7
**Muccilo-5** 3:20
32:14
**Muccilo-6** 3:21
45:24
**Muccilo-7** 3:23
61:22
**multiple** 15:6,7
37:16

**N**

**N** 2:1,16 68:2
**name** 13:1 18:9
23:5,8 25:18
26:3 35:4,13
36:7 60:16
**named** 26:8
**names** 9:15
14:21 15:9
24:16,17 52:16
53:6 55:3 57:5
**nature** 4:21
**navigate** 28:19
**need** 3:15,15
6:24 12:15
13:23 14:10
16:21 18:1
21:8 46:6 47:6
64:15
**needed** 15:12
**needs** 6:4 14:9
**NERO** 2:17
28:10
**network** 8:1
**new** 21:24 22:3
32:22
**nine** 29:21,23
**Nope** 57:12
**normal** 15:13
**normally** 16:10
**Notary** 1:19 68:5
68:16
**noted** 25:4

**notes** 19:24 68:8
**notice** 35:10
39:17
**number** 5:24 6:2
13:24 16:4
22:4 24:19,20
28:7,14 30:7
30:11 33:20
34:1 35:22
36:14 44:11
49:4 61:15
62:20
**numbers** 10:20
12:21 26:6
29:12,15 39:7
39:18 44:18,19
44:21 45:19
64:17

**O**

**O** 2:16 68:2
**oath** 5:7
**object** 38:20
64:12
**objection** 6:3,10
40:3,6,12 42:8
42:19 53:17
57:23 58:10
63:3,10 64:21
65:4,12
**objections** 4:6
6:1
**obviously** 13:13
34:21 37:2
59:21
**occasion** 44:20
44:24
**occurred** 8:22
25:15 48:12
52:5
**Offices** 1:14
**official** 56:8
**Oh** 18:17 20:24
37:5
**okay** 6:12,13,19

10:22 12:17
18:17 20:24
22:15 28:20
31:22 34:19
35:3 39:15
46:8 58:3 63:9
**once** 8:5 10:14
49:7
**ones** 38:17
**ongoing** 45:5
**operation** 22:8
**opinion** 62:9
**opinions** 58:17
**options** 21:23
33:2
**Oral** 1:13
**order** 10:9 12:10
**orders** 37:10,11
37:17
**organization**
15:6 18:9,12
26:22 34:2
47:24 59:24
**original** 13:23
68:8
**originally** 13:22
13:22
**outset** 20:8
26:23
**outsource** 37:23
**overall** 20:23
28:2
**oversaw** 49:24
**oversee** 42:2
50:3

**P**

**P** 2:1,1,16
**p.m** 1:17 67:5
**PA** 23:9,15
27:15
**package** 48:16
**page** 3:4,11
12:19 14:1
17:15,21 32:22

39:24 40:10
41:11 42:6,12
42:17 43:1,4,7
43:13 46:9
**pages** 12:11
39:21
**Panicelli** 64:19
**Parker** 52:22
56:18
**Parker-1** 52:20
**Parker-2** 54:1
**part** 20:21,22
24:20 27:4
48:19 50:12
**particular** 10:9
28:22 31:11
33:7 41:12
44:19 45:1
46:6 50:18
54:10
**parties** 4:4,22
**parts** 46:23
**party** 36:18,24
**pass** 26:6
**password** 55:19
**Paul** 42:12
**PC** 1:15 2:3
**pending** 7:2
**Pennsylvania**
1:2,7,16,23 2:5
2:11 7:14 8:6
9:4 68:6
**Pennsylvania/...**
22:8 31:1
**people** 3:15
15:12 20:2
23:1,12 29:21
29:23,24 30:1
30:11,15 31:12
31:16,20,24
32:5,8 33:23
34:9 37:3,16
38:13,18,24
39:1,3 40:20
41:4 42:2

43:17 44:5
48:3,7 49:5,7
51:1,20,23
56:9 57:15,20
58:4,8,17
59:19 62:14,18
65:8
**perceive** 57:13
**perceived** 57:10
**percent** 11:10,22
13:21 14:14
21:3 26:2 27:2
33:5,9,13 34:5
**percentage**
10:20
**performance**
9:20 10:1,8
18:4 19:15
20:10,11,14,15
20:16 25:4
26:9 27:1
28:23 29:4
35:9 45:10
58:6
**performed** 37:11
**performers**
57:11
**period** 65:23
**peripherally**
25:10
**person** 6:6 14:7
20:20,22,24
25:3,7 26:18
37:5,8,8 40:1
42:23 43:11,14
**personally** 34:9
54:23
**personnel** 16:4
**perspective**
31:22
**pertains** 47:24
**pertinent** 56:15
**Pescatore** 17:2
17:23 19:14
21:22 52:13

| | | | | |
|---|---|---|---|---|
| 53:12 55:1 | 36:3 47:10 | **protected** 55:17 | 54:22 | **reference** 17:23 |
| **Philadelphia** | **potentially** | **provided** 26:21 | **ranking** 25:14 | **referenced** 19:14 |
| 2:11 | 14:14 31:24 | 52:14 53:5 | 25:15,23 | **references** 53:11 |
| **Phone** 1:24 | 35:15 38:13 | **provisioning** | **ranks** 26:21 | **reflect** 23:17 |
| **physically** 16:5 | 45:20,21 61:10 | 14:10 15:4 | 48:12 52:7 | 30:4 |
| **picked** 26:23 | **preceding** 62:21 | 37:20 38:5 | 55:2 | **reflects** 19:23 |
| **PIP** 25:8 | **preliminary** | **Public** 1:19 68:5 | **rate** 26:21 43:23 | **relate** 16:4,22 |
| **place** 10:18 | 21:23 22:3 | 68:16 | 52:1,15 54:11 | 22:7 38:17 |
| 16:23 68:9 | 26:5 29:6 | **pull** 17:7 55:5 | 54:16,21 55:2 | **related** 4:23 34:2 |
| **Plaintiff** 2:7 | **previously** 32:11 | **pulled** 58:1 | 58:15,20 | **relation** 15:15 |
| **plan** 14:9 18:1 | 54:1 | **pulling** 57:20 | **rated** 21:1 26:22 | 16:13 |
| 29:21,24 30:1 | **prior** 27:13 | **purpose** 36:11 | **rates** 48:11 52:7 | **relay** 49:13 |
| 30:8,8 33:4 | **probably** 5:24 | 37:21 | **rationale** 33:16 | **release** 3:15 |
| 45:17 59:18 | 21:4 34:11 | **purposes** 9:2 | **read** 32:18 56:11 | **released** 14:22 |
| **planning** 3:17 | 37:16 49:16,18 | 12:18 32:23 | 56:15 62:2 | 26:24 27:4 |
| 3:19,20 17:19 | 54:7 60:17 | 64:10 | **reading** 19:24 | 39:13 |
| 20:5 21:12 | 66:6,9 | **pushed** 51:8 | 62:4 | **releasing** 39:3 |
| 26:5 27:21 | **problem** 5:19 | **put** 6:3 36:19 | **ready** 12:16 | **remember** 11:2 |
| 28:7 29:6 | 11:24 17:10 | 55:18,19 62:24 | 36:20 47:6,8 | 19:4 26:11,16 |
| 30:16 31:18 | **problems** 25:12 | **puts** 27:19,24 | **really** 13:2 26:4 | 33:13 35:20 |
| 36:13 49:20 | **proceed** 49:7 | 31:5 | 33:12 46:22 | 43:24 45:22 |
| **plans** 19:12 | **proceeded** 31:3 | **putting** 10:9 | 48:13 | 59:22 61:9 |
| 27:16,20 28:21 | **proceeding** 5:8 | | **reason** 6:11 7:5 | 62:6 |
| **played** 59:23 | **process** 5:6 | **Q** | 40:17 63:22 | **removed** 33:5 |
| **please** 3:16 | 10:14 17:5 | **quarter** 11:7,17 | 64:2 | 34:10 |
| 27:22 36:1 | 21:4 31:3 53:9 | **quarterly** 11:13 | **reasons** 44:18 | **repeat** 41:15 |
| 46:14 56:12 | 54:15 | **quarters** 11:12 | **recall** 22:2 25:9 | 44:23 |
| **Pls** 3:22 | **processing** 36:20 | **question** 4:7 6:2 | 44:9 53:2 56:2 | **repetitive** 32:19 |
| **plus** 30:1,1 | **produced** 12:8 | 6:9,12,14,20 | 56:8 61:17,20 | **report** 8:7 |
| **PO** 1:23 | **Professional** | 7:2 10:13 | 66:3 | **reporter** 1:19 |
| **point** 6:5 7:1 | 1:18 68:4 | **questioning** 57:8 | **receiving** 53:2 | 5:13 6:6 56:14 |
| 15:8 21:8 | **program** 46:20 | 64:10 | **recess** 66:20 | 68:5,15,24 |
| 23:21 24:12 | 46:21 | **questions** 47:7 | **recollection** | **Reporting** 1:22 |
| 25:16,22 28:6 | **progressed** | 64:14 66:14,24 | 47:18 | 1:22 |
| 30:14 31:10,13 | 49:17 | **quickly** 6:24 | **record** 6:3 22:16 | **represent** 4:18 |
| 32:3 33:4,6,22 | **promoted** 7:19 | | 28:14 55:6 | 64:9 |
| 34:8 35:13 | 20:4 24:19 | **R** | **Redilla** 46:10 | **represented** 5:21 |
| 39:8 45:18 | 59:19 60:9 | **R** 2:1,16 68:2 | **reduce** 30:9 | **reproduction** |
| 52:13 | 61:4 | **R&K** 1:22 | 49:21 58:23 | 68:21 |
| **pool** 14:11 | **promotion** 7:22 | **Ramos** 65:3 | **reduction** 20:23 | **request** 36:2 |
| **portion** 20:2 | 8:3 59:24 | **rank** 10:7 52:1 | 22:4 49:19 | **reread** 62:16 |
| **position** 4:21 | 60:13,14 | 52:15 54:12,16 | 60:2,3 | **reserved** 4:8 |
| 7:18 41:20 | **proper** 24:5 | 57:9 58:15,20 | **reductions** 20:6 | **respect** 36:24 |
| **positive** 59:21 | **proposals** 21:14 | **ranked** 21:1 | 49:2 | **respecting** 24:1 |
| **potential** 23:19 | **prospect** 11:20 | 26:22 43:23 | **REED** 2:9 | 36:8 |

respective 4:4
 34:10 50:10
 57:15
respond 3:15
response 5:16
responsibilities
 8:2 51:8
responsibility
 9:21 52:10
responsible 9:16
rest 37:2
result 43:19
retain 13:20
retained 13:22
 15:2,5 16:3,9
Retainees 3:14
retaining 15:10
retire 32:9
retirement 48:18
review 3:22
 12:15 21:24
 46:14 54:23
 55:2
revised 14:21
RIF 8:21 10:17
 11:3,20 15:16
 16:13,23 17:2
 26:8,15 27:4
 27:21 33:5,22
 43:19 45:16
 47:14 48:4,15
 48:19 51:7
 57:20 61:16
 62:11 63:20
RIF'ed 48:7
right 5:18,19
 6:18 7:3,12,16
 8:3,19 11:6,14
 14:17 19:2
 20:8 21:17
 22:8 27:17
 28:24 29:19
 31:1,6 32:23
 33:23 34:3
 35:6 36:14

38:5 39:22
40:11 42:7
43:2 48:8 50:1
50:14,23 51:20
52:2,5,6,24
53:13,16 59:6
59:12,14,22
60:10 62:5
63:2,17,20
64:20 65:3,15
right-hand
 39:17
right-of-way
 37:18 41:23
risk 29:7,21,23
 29:24 30:1,8
 30:10,11 37:3
risks 37:12
 44:21 45:3
Road 1:15 2:4
Rodondo 51:2
role 7:12,19 17:1
 44:20
roles 45:2
Ronald 26:18
 42:18
room 5:11 7:3
rotate 46:23
running 21:14

─────────
       S
─────────
S 2:1,9,16,16
sacrifice 57:15
sacrificed 44:19
Sam 60:22
save 64:6
savings 35:22
 36:4 37:9
saw 56:2 60:10
 62:21
saying 5:18 6:7
 33:17,21 41:1
 46:17 52:4
 64:8,23
says 13:19 18:5

18:15,21 19:15
27:24 33:1
35:21 36:3,4
39:22 47:13
48:5 52:14
53:4 63:18
scores 58:7
Scott 64:18
sealing 4:5
second 8:17
 12:19 17:15,24
 19:13 27:15
 29:14
see 12:21 14:11
 14:12 17:19
 18:17 19:16,20
 22:14 23:2,6,8
 23:10 29:22
 30:2,11 32:21
 34:23 35:3,8
 36:5,21 37:5
 37:18 38:18
 39:22 42:13
 46:11,15 47:2
 47:11,15 53:9
 53:11 56:8
 63:14,15 64:15
seen 54:3 55:3,9
selected 56:7
send 27:23
sends 14:2
sense 62:17
sent 13:23 29:9
 33:2
separate 38:6
separated 66:2
Septak 51:4,9
 57:22 59:3
 60:7,8
Septak's 51:12
series 49:16
service 37:10,11
 37:17 61:15
 62:10,14,20
 63:24 64:18,18

64:19 65:10
Services 1:6,22
set 25:14 28:6
 68:9
Shannon 27:23
 33:2
shape 9:24
shared 19:10,11
 49:18 54:6,8
 54:24 62:9
sharing 62:6
she'll 6:7
sheet 56:9
shifted 58:9
show 49:22 55:6
side 20:14
signing 4:4
Silinskie 59:4
Silinskie's 51:13
single 5:14 41:13
 41:19 43:16
 64:20
singled 25:3
sitting 5:10
six 42:4
Smail's 51:15
SMITH 2:9
Smith's 51:20,21
Snow 34:14
soften 31:19
solicit 17:4
somewhat 29:16
Sorry 10:24
sound 44:10
sounds 33:19
 44:13
spaces 23:20
speak 58:6
speaks 38:21
 41:1 63:11
 65:13
specialist 50:1
specialists 50:3
 50:10,17 51:6
 54:17,19 59:1

59:9
specific 24:16
 57:4
spreadsheet 3:17
 3:19,20 17:7
 21:6 22:12,17
 23:24 31:10
 44:17 45:1
 64:6,11
spreadsheets
 19:8 26:3
 35:14,16 50:4
sheet 56:9
spring 8:22
 10:19
Square 1:16 2:4
 2:10
staff 13:9 14:7
 17:12
stamp 12:21
 39:18
stamped 12:20
 45:2 55:7
stand 46:19
standard 18:2
stands 35:23
stapled 12:11
start 23:9 25:23
 49:19
started 7:6,16
 10:18 11:19
starting 33:4,22
starts 29:20
STATES 1:1
stenographic
 68:8
step 17:6
stepping 17:9
Steve 51:3 60:5
stipulated 4:2
stop 6:5
stoppage 3:14
 14:24 15:14
 16:6,9
Street 1:15 2:4
 2:10

JOSEPH MUCCILO

77

**Strike** 10:4
**string** 12:12
  27:13 32:18
  62:2
**strings** 32:19,23
  62:21
**stronger** 57:10
**stuff** 16:10
**subject** 45:16
  46:13
**submit** 53:6
**Suite** 1:16 2:5,11
**suited** 10:10
**sum** 30:22
**supervising** 9:17
**supervision**
  68:23
**support** 15:3
**supposed** 51:5
  54:10
**sure** 5:15 6:15
  14:15 19:6
  26:2 27:3 28:4
  28:5 31:5 41:3
  41:16,21 44:14
  58:3
**Suzette** 1:4 4:18
  8:22 38:8 43:1
  45:12 63:23
**Swipp** 41:14,24
**sworn** 4:11
**Szewczyk** 20:11
  20:12 26:13
  37:14

**T**

**T** 2:16 68:2,2
**tab** 19:13 21:15
  28:22 33:4
**take** 4:20 6:1
  10:18 11:24
  12:15 16:21,23
  24:21 34:15
  46:5 47:5
  53:24 55:8

56:24 66:16
**taken** 5:3 68:8
**talking** 24:7
  46:17 50:7
  53:21
**targeted** 61:16
  62:11
**targeting** 50:18
**targets** 17:24
  58:21 59:2
**team** 9:17 14:9
  21:23 31:11
  37:2 51:11,12
  51:12,12,13
  54:22 57:14
  58:5,20 59:17
  60:4 63:1 65:2
**teams** 34:10
  57:16,20
**technically** 60:2
**tell** 31:9 34:12
  61:6
**template** 18:1
  22:21 53:5
**terminated**
  20:11,21 35:18
**terms** 9:19 10:9
  10:19,20 16:3
  20:4 28:21
  35:9 50:4
  54:14 57:20
**testified** 4:12
**testifying** 6:5
**testimony** 7:7
  56:15
**thing** 5:14
**things** 36:15
  55:20 59:19
**think** 7:6,17
  8:17,19 10:10
  11:7 20:1
  24:17 25:13
  26:4 28:5,6,7
  32:6,7 39:5
  40:16,19,22,23

45:6 50:2,20
  52:18 53:21
  57:2,18 61:10
  62:19 65:16
  66:17
**thinking** 62:13
**third** 36:18,24
**Thomas** 39:21
  43:14
**thought** 11:9,10
  26:13 31:16
  39:4,4,6 41:23
  43:20 44:12
  60:11
**three** 2:10 17:22
  18:2 65:8
**throttle** 14:9
**time** 4:8,21 6:7
  8:9,20,24 10:7
  12:15 13:7
  14:6 16:21
  30:6 46:6 47:5
  50:23 51:5
  54:5,7,7 64:7
  65:23 66:21
  68:9
**timing** 35:16
  61:10
**title** 7:21
**today** 3:13 5:21
  8:13 55:8
**told** 48:8
**tomorrow** 53:8
**tool** 29:19
**top** 14:16 27:12
  27:16 32:24
  65:8
**totaling** 21:24
**totally** 8:2
**transcript** 68:7
  68:21
**transpired** 10:14
**trial** 4:8
**tried** 31:19
**true** 7:15 8:13

68:7
**truthful** 5:16 7:6
**try** 6:7,22
**trying** 9:1 16:8
  19:3 62:16
  64:6
**turn** 14:1
**two** 1:15 2:4
  20:1 21:21
  23:8,18 35:3
**two-minute**
  66:17
**type** 6:6
**typically** 11:17
**typing** 5:14

**U**

**uh-huh** 5:12,17
  10:23
**ultimately** 12:13
  26:14 39:2
  66:2
**underneath** 9:5
  24:14
**understand** 5:8
  5:17 6:14
  14:22
**understanding**
  15:4 28:1 54:9
**understood** 6:21
  47:1 54:24
**unfolded** 59:19
**UNITED** 1:1
**update** 33:4
**updates** 27:15
  45:7
**use** 18:2 29:19
  36:18 49:2
  54:15

**V**

**v** 1:5
**v8** 33:3
**various** 9:5
  17:17 19:1

47:9
**varying** 30:5
**verbal** 5:16
**verification** 50:6
**Verizon** 1:6,7
  2:17 4:19 7:10
  20:4 46:21
  57:19 66:3
**versus** 57:16,21
**video** 7:24
**view** 55:16,17
**VLDP** 46:18
**voluntarily** 66:2
**voluntary** 48:15
**volunteered**
  48:20

**W**

**waived** 4:6
**walk** 47:22
**Walker** 1:4 4:18
  8:22 12:20
  38:8 43:1
  45:12 63:23
  65:10,15
**Walker-14** 39:10
**want** 6:12 8:16
  10:16 13:16
  27:22 28:17
  31:23 42:4
  44:14 54:2
  59:16 62:3
  64:11
**wanted** 12:13
  58:3
**wants** 53:7
**wasn't** 27:13
  43:23 44:1
**way** 6:2,16 9:24
  12:7 29:20
  38:18 55:16
  59:21
**we'll** 11:24 46:18
  64:14
**we're** 5:10 15:23

JOSEPH MUCCILO

78

35:2 41:4
  44:17
**weaker** 57:11
**weakest** 58:5
**week** 27:22
**weekly** 17:13
  49:15 50:5
**weeks** 3:12
**went** 52:18
  59:21
**weren't** 57:8
**white** 63:1,16
  65:2 66:10
**William** 8:11
  27:17
**willing** 31:21
  32:5 48:24
**willingness** 32:1
  48:14,21
**Wireless** 20:4
**witness** 3:4 4:23
  36:2 40:5,8,14
  42:10,21 53:19
  57:24 58:12
  63:5 64:22
  65:6,14,18
  67:2
**work** 3:14 9:20
  14:24 15:13
  16:6,8,12
  36:20 37:4,23
  58:18
**worked** 61:13
**working** 8:23
  13:8,12 14:6
  15:12 16:5,9
**works** 12:8
**worksheet** 18:6
**wouldn't** 20:21
  51:19
**writes** 14:8

---

**X**

**X** 62:19

---

**Y**

**yeah** 8:19 21:13
  28:10 32:12
  34:4,7,11,24
  35:3,15 37:7
  40:22 44:12
  45:20 47:19
  49:11 50:2
  55:13 61:5,9
  62:7 66:1
**year** 11:13 60:5
**years** 61:15
  62:10,20 63:23
  64:18,19 65:10
**Yep** 5:1 16:2
  19:21 37:19
**yesterday** 53:4

---

**Z**

**zero** 29:4

---

**0**

---

**1**

**1** 20:10 23:15
  36:19 37:15
**1/21/15** 3:14
**1/22/15** 3:12
**100** 11:10,22
  14:14 21:3
  26:2 27:2
  33:12
**12** 3:12 21:24
  22:5 38:18,24
  39:1,3 41:3
  43:17 44:5
  47:14 48:3,7
  56:5
**128** 1:16 2:5
**13** 39:6 44:10,13
  44:13
**1372** 1:23
**13th** 48:7
**14** 39:6 41:4
  44:13

---

**15** 3:14
**15-4031** 1:7
**155** 15:2,5
**16** 3:17
**165** 46:18 47:1
  47:14,23 48:3
**17** 29:24
**1717** 2:10
**19020** 1:17 2:5
**19058-1372** 1:23
**19103** 2:11

---

**2**

**2** 3:12 19:22
  23:12 29:3
**2/4/15** 3:23
**2:12** 1:17
**2014** 7:17 11:8
**2015** 8:17,18,22
  10:19 11:4,11
  11:21 13:18
  14:19 52:21
**2016** 1:10
**20th** 17:14
**215** 1:24,24 2:6
  2:12
**21st** 13:17
**22nd** 14:19
**23** 30:1
**24** 1:10
**241-7990** 2:12
**25th** 21:21
**26** 3:18
**2651** 55:7
**28** 38:17,17

---

**3**

**3** 37:20 38:5
  50:1,3
**3/20/15-3/26/15**
  3:20
**3/23/15-3/26/15**
  3:17,18
**3/26/15** 33:1
**3:44** 67:5

---

**3100** 2:11
**3131** 12:20
**31st** 52:21
**32** 3:20
**3331** 1:15 2:4
**34** 38:18
**35** 27:19 28:1,1
  28:14 31:6
  35:22
**36** 13:21
**37** 63:23 65:17
**37.3** 65:14
**37.7** 65:19
**39** 33:5

---

**4**

**4** 3:6 29:4
**4/15/15-4/16/15**
  3:21
**40** 42:5
**4169** 22:16,17
**4173** 28:18,20
**4179** 34:16,17
  45:2
**436** 18:16
**436.5** 18:18
**45** 3:21
**499** 33:5,22,23

---

**5**

**5/25** 47:1,13
  48:2
**500** 30:23
**509** 18:15,17

---

**6**

**6** 24:9 30:2
**61** 3:23
**63** 13:22
**639-0801** 2:6
**64** 13:23

---

**7**

**7** 24:9,10
**7.7** 33:5,9 34:5
**759** 39:21,23

---

**766** 39:24
**772** 40:10
**775** 41:11
**780** 42:6
**786** 42:12
**791** 42:17
**798** 43:1
**7T** 24:5

---

**8**

**8** 30:1
**802** 43:4
**807** 43:7
**813** 43:13

---

**9**

**946-7009** 1:24
**949-1867** 1:24
**97** 36:4

# Exhibit G

# Condensed Transcript
# Testimony of:

# CARL FRANK GROSS

## Date: August 24, 2016

Suzette Walker v. Verizon Services Corporation, et al.

No.:  USDC E.D.PA 15-4031

R&K Reporting Inc.
Court Reporting Services
P.O. Box 1372
Levittown, Pennsylvania 19058
Phone: 215-946-7009
email:  rkreporting@gmail.com

CARL FRANK GROSS

Pages 1 to 4

## Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3   .              *   *   *
 4  SUZETTE WALKER          :
                            :
 5           v.             :
                            :
 6  VERIZON SERVICES CORPORATION :
              and            :
 7  VERIZON PENNSYLVANIA, INC.  :  NO. 15-4031
 8
 9              *   *   *
10           August 24, 2016
11              *   *   *
12
13        Oral deposition of CARL FRANK GROSS
14  held in the Law Offices of Karpf, Karpf &
15  Cerutti, PC, 3331 Street Road, Two Greenwood
16  Square, Suite 128, Bensalem, Pennsylvania
17  19020, commencing at 10:16 a.m., on the above
18  date, before Hope Agosto, a Professional Court
19  Reporter and a Notary Public.
20
21              *   *   *
22           R&K REPORTING
          Court Reporting Services
23             PO Box 1372
        Levittown, Pennsylvania 19058-1372
24  Phone (215) 946-7009   Fax (215) 949-1867
```

## Page 2

```
 1  A P P E A R A N C E S :
 2
 3   KARPF, KARPF & CERUTTI, PC
     BY:  CHRISTINE E. BURKE, ESQUIRE
 4   3331 Street Road
     Two Greenwood Square
 5   Suite 128
     Bensalem, Pennsylvania 19020
 6   (215) 639-0801
     CBurke@karpf-law.com
 7   -- Counsel for the Plaintiff
 8
 9   REED SMITH, LLP
     BY:  JOEL S. BARRAS, ESQUIRE
10   Three Logan Square
     1717 Cherry Street
11   Suite 3100
     Philadelphia, Pennsylvania 19103
12   (215) 241-7990
     JBarras@reedsmith.com
13   -- Counsel for the Defendants
14
15  A L S O   P R E S E N T :
16   HARVETTA NERO, ESQUIRE
     -- Assistant General Counsel, Verizon
17
18
19
20
21
22
23
24
```

## Page 3

```
 1              *   *   *
 2              INDEX
 3              *   *   *
 4  WITNESS                            PAGE NO.
    CARL FRANK GROSS
 5      By Ms. Burke                         5
 6      By Mr. Barras                       70
 7
 8              *   *   *
 9              EXHIBITS
10
11  NO.       DESCRIPTION            PAGE NO.
12  Gross-1  2/4/15 Email re:  Open SR    15
13           Daily Report
14
    Gross-2  Spreadsheet                   24
15
16  Gross-3  Stinson 2013 Year-End         48
             Performance Review
17
    Gross-4  Boudman 2014 Year-End         50
18           Performance Review
19  Gross-5  Mulhern 2014 Year-End         51
             Performance Review
20  Gross-6  Portion of Capizzi Performance 54
             Review
21  Gross-7  Portion of Dehaven Performance 56
             Review
22
    Gross-8  Ramos 2014 Year-End           60
23           Performance Review
24
```

## Page 4

```
 1              *   *   *
 2              EXHIBITS
 3              *   *   *
 4  NO.       DESCRIPTION            PAGE NO.
 5  Gross-9  Stinson 2014 Year-End         61
             Performance Review
 6
 7  Gross-10 Wojton 2014 Year-End          62
             Performance Review
 8  Gross-11 Rennie 2013 Year-End          66
             Performance Review
 9
10       (MARKED DURING PREVIOUS DEPOSITIONS)
11  Verizon-14  Rate and Rank RIF Documents  70
12
13
14
15
16
17
18
19
20
21
22
23
24
```

R&K REPORTING, INC.

Phone: 215-946-7009                    email: rkreporting@gmail.com

CARL FRANK GROSS

Page 5

1                    * * *
2          (It is hereby stipulated and
3      agreed by and between counsel for the
4      respective parties that the signing,
5      sealing, filing and certification are
6      waived; and that all objections, except
7      as to the form of the question, be
8      reserved until the time of trial.)
9                    * * *
10         CARL FRANK GROSS, after having
11     been first duly sworn, was examined and
12     testified as follows:
13                   * * *
14             EXAMINATION
15                   * * *
16     BY MS. BURKE:
17         Q.   Mr. Gross, we're going to get started
18     with your deposition. I know that I introduced
19     myself off the record but just for purposes of
20     the record, my name is Christine Burke and I
21     represent Suzette Walker in a civil lawsuit
22     that she's brought against her former employer,
23     Verizon. Okay?
24         A.   Okay.

Page 6

1          Q.   Have you ever had your deposition
2      taken before?
3          A.   Yes.
4          Q.   When was the most recent occasion?
5          A.   Maybe a year ago.
6          Q.   Was it in connection with your
7      employment with Verizon or for personal
8      reasons?
9          A.   It was with Verizon.
10         Q.   And what was the nature of the suit?
11         A.   A pole hit.
12         Q.   Any other occasions that you have
13     been deposed in a civil lawsuit?
14         A.   No.
15         Q.   Roughly a year ago isn't too far
16     back, so I'm sure you understand how the
17     process works, right?
18         A.   Uh-huh.
19         Q.   So I'm just going to reiterate the
20     short version of the instructions so we can get
21     out of here. You just said uh-huh. We don't
22     want there to be any confusion or arguments
23     about what the nature of your response was. So
24     if you say to me uh-huh, I get you right now,

Page 7

1      but at a later date, there will be a dispute
2      over what your actual answer was. Okay?
3          A.   Got you.
4          Q.   When you leave here, you'll be saying
5      yes or no out loud all day, but I'm sure your
6      counsel will remind you.
7          A.   Okay.
8          Q.   During the course of the deposition,
9      your counsel may be making objections. He and
10     I will resolve the issue, but when you hear an
11     objection, then just stop testifying because
12     Hope can only type down what one person is
13     saying at a time. Okay?
14         A.   Okay.
15         Q.   You may anticipate what my question
16     is before I even get it out of my mouth, but
17     let me get my question on the record before you
18     answer. Okay?
19         A.   Okay.
20         Q.   And I'll try not to interrupt you as
21     well. There were a very large number of
22     documents produced during the course of
23     discovery. There may be some exhibits which I
24     will show you today, but if I do, you're

Page 8

1      allowed to take the opportunity to review them
2      and take as much time as you need before you
3      answer any questions. Okay?
4          A.   Okay.
5          Q.   If you don't understand one of my
6      questions, you can let me know that. Nobody is
7      asking you to guess or speculate, but you can
8      give estimates in anything that you have a
9      rationale basis for answering. Okay?
10         A.   Okay.
11         Q.   If you need a break at any point, you
12     can do that. The only I would ask is that you
13     answer the question that's on the table before
14     you leave the room. All right?
15         A.   Okay.
16         Q.   Are you currently employed with
17     Verizon?
18         A.   I am.
19         Q.   What's your position right now, Mr.
20     Gross?
21         A.   Manager of engineering.
22         Q.   How long have you held that specific
23     title?
24         A.   Since 1999.

CARL FRANK GROSS

Page 9

1    Q.   Are you assigned a particular
2 geographic region?
3    A.   I am.
4    Q.   What is that right now?
5    A.   Eastern north Pennsylvania.
6    Q.   How long have you been assigned the
7 eastern north Pennsylvania region?
8    A.   15 years.
9    Q.   Has the scope of that geographic
10 location changed in any way over the last 15
11 years?
12   A.   Yes.
13   Q.   At what point in time did it change?
14   A.   Five years ago the area got larger.
15   Q.   The scope of your geographic location
16 now, is it fairly the same as it was in early
17 2015?
18   A.   When you say scope of the --
19   Q.   What geographic areas you're
20 responsible for overseeing as the manager of
21 engineering.
22   A.   Five years ago it grew but the
23 responsibility is the same, just the area got
24 larger.

Page 10

1    Q.   Well, five years ago the area got
2 larger, correct?
3    A.   Correct.
4    Q.   From five years through now has the
5 geographic region gotten any larger than it did
6 five years ago?
7    A.   No.
8    Q.   So it's remained pretty consistent
9 over the past five years in terms of the areas
10 that you're responsible for overseeing?
11   A.   Yes.
12   Q.   You have a team of engineers that
13 report to you?
14   A.   Yes.
15   Q.   The number has fluctuated over the
16 years, correct?
17   A.   Yes.
18   Q.   What do you consider your job
19 responsibilities as the manager of engineering
20 for eastern north Pennsylvania?
21   A.   Budgets, job accuracy, customer care.
22 That's pretty much the scope of the job.
23   Q.   Do any of your employees work
24 remotely?

Page 11

1    A.   Yes.
2    Q.   How often do you have a full team
3 meeting with your engineers, if at all?
4    A.   We meet in the office once a week on
5 Tuesday and generally have a staff meeting once
6 a month.
7    Q.   This Tuesday weekly meeting, how long
8 have you been doing that for?
9    A.   For two years.
10   Q.   So if we're in August 2016, did you
11 start doing that sometime in or about August of
12 2014?
13   A.   Closer to July, I believe.  July of
14 2014 is when they made us go hoteling, where we
15 meet once a week in the office and stay remote
16 four days.
17   Q.   Now, the staff meeting that occurs
18 once a month, is there a different purpose for
19 that meeting?
20   A.   No.
21   Q.   Does it include any other employees
22 than those assigned to your team in the eastern
23 north Pennsylvania region?
24   A.   Yes.

Page 12

1    Q.   What additional employees does it
2 include?
3    A.   Supporting personnel for my
4 engineers.
5    Q.   So just using Mr. Magee, you know who
6 Brian Magee is?
7    A.   I do.
8    Q.   Your weekly meetings, do they include
9 him or his team members?
10   A.   No.
11   Q.   Staff meetings once a month, do they
12 include Mr. Magee or his team members?
13   A.   No.
14   Q.   You identified that some of the your
15 engineers work remotely.  Do you work remotely?
16   A.   Four out of five days.
17   Q.   From your home?
18   A.   Yes.
19   Q.   How long has that been true for, sir?
20   A.   Since July of 2014.
21   Q.   Just generally speaking, prior to
22 July of 2014, did you simply work remotely as
23 business needs dictated?
24   A.   Yes.

R&K REPORTING, INC.

CARL FRANK GROSS

Page 13

1     Q.  Would it be fair to say you were in
2  the office more prior to July of 2014?
3     A.  Absolutely.
4     Q.  The nature in which you monitored
5  your engineers' work performance, were there a
6  series of reports generated on either a daily,
7  weekly or monthly basis?
8     A.  Yes.
9     Q.  What types of reports would you look
10  at in order to monitor the success of your
11  engineers and the SRs that they were working on
12  or handling?
13     A.  Spreadsheets that provide service
14  order intervals.
15     Q.  Anything that reflects the SR
16  interval?
17     A.  Job status, budgets.
18     Q.  Did you associate a particular name
19  to any of these reports?
20     A.  Say that again.
21     Q.  Did you call the reports anything or
22  just what you're using right now during the
23  deposition?
24     A.  No particular name.

Page 14

1     Q.  When you say job status, is that the
2  same thing as when you would get a report
3  reflecting open SRs?
4     A.  Sort of.  That's one of the reports.
5     Q.  The report you first identified for
6  SR intervals, would you be able to see the
7  averages for varying engineer managers under
8  Muccilo?
9     A.  Yes.
10     Q.  So you didn't just have access to how
11  your own team was doing; you could see how
12  other teams were doing as well, right?
13     A.  Yes.
14     Q.  That's also true with the report for
15  open SRs, right?
16     A.  Yes.
17     Q.  Same thing with budgets?
18     A.  Yes.
19     Q.  I just want to discuss one particular
20  example report.  I don't have any other things
21  that we'll need to do on this computer, so I'd
22  like to get it out of the way.  Just for the
23  record, we're looking at a spreadsheet that was
24  marked during discovery as DEF Walker 1034.

Page 15

1              * * *
2       (Whereupon, Exhibit Gross-1 was
3     marked for identification.)
4              * * *
5  BY MS. BURKE:
6     Q.  Mr. Gross, take a look at that email
7  before we take a look at the spreadsheet that
8  was attached to it.  This is an email dated
9  February 4th, 2015 to James Dewey and it
10  appears that you were copied on this email in
11  the cc area, if you take a look there.  For the
12  record, this is Bates stamped 1032 to 1033.
13       Who is James Dewey, sir?
14     A.  He is a report specialist.
15       MR. BARRAS:  I have a question.
16     The third page on this looks like
17     it's from unrelated.
18       MS. BURKE:  I don't even have a
19     third page.  Just rip that off.
20  BY MS. BURKE:
21     Q.  Mr. Dewey is a report specialist?
22     A.  Yes.
23     Q.  It appears that the individuals
24  listed in the to section, these are various

Page 16

1  team members under certain engineering manager,
2  correct?
3     A.  That would be correct.
4     Q.  It includes people within your team
5  but also people from Mr. Magee's team as an
6  example?
7     A.  Yes.
8     Q.  This attachment is labeled SR open
9  daily report.  Do you see that, for
10  attachments?
11     A.  Yes.
12     Q.  Would you get an SR open report on a
13  daily basis?
14     A.  Yes.
15     Q.  Would it be generally from Mr. Dewey?
16     A.  Yes.
17     Q.  And just from your perspective, when
18  you would get these types of reports, what
19  exactly were you looking for?
20     A.  Well, I would usually concentrate on
21  my team and take a look at the status of the
22  jobs.
23     Q.  If you go to dashboard SR details,
24  that particular tab.

CARL FRANK GROSS

Page 17

1    A.   Okay.
2        Q.   It will identify for you this report
3    at least by engineer, so those are the
4    individuals on your team and it looks like
5    other team members as well, right?
6        A.   Correct.
7        Q.   And it identifies these are all open
8    reports; is that correct?
9        A.   I believe they're all open SRs.
10       Q.   So when you are able to view that
11   there is, in fact, an open report, I guess
12   you're looking for what the rationale is for
13   why that report may still remain open?
14       A.   Yes.
15       Q.   When your engineers handle a
16   particular SR or when they handle it's called,
17   what, LOC, when they actually complete it?  An
18   SR is a service request, right, from a
19   customer?
20       A.   That's correct.
21       Q.   When they handle it and they're not
22   able to complete it within the particular time
23   interval expected, are they supposed to put
24   some kind of notes in the system as to what the

Page 18

1    basis for the delay is?
2        A.   Yes.
3        Q.   Now, just looking at this report as a
4    general example from early February 2015, do
5    you recognize any of your team members on here?
6        A.   I do see one.
7        Q.   Is Mr. Chirag Jagwani one of your
8    team members?
9        A.   He was.
10       Q.   Would you get notification of an open
11   report from one of your team members on a daily
12   basis or are there occasions where your team
13   might not show up at all?
14       A.   They would show up generally on this
15   report, because on any given day there has to
16   be service requests in there.
17       Q.   The reflection of the either red,
18   yellow or orange, what does that mean to you?
19       A.   I don't know.  Based on this, it
20   looks like red would be late, yellow getting
21   close to being late, and I'm not even sure what
22   brown is.  This is not the way it's handled
23   anymore.
24       Q.   I don't want you to guess so the one

Page 19

1    that's reflected in orange, you're not sure
2    what that means?
3        A.   No.  I'm not sure what the red means
4    either, but based on other stuff, red usually
5    means late.
6        Q.   If you go to the tab for SR open
7    daily report, if you go to the very top of this
8    spreadsheet, there's columns all the way
9    through T.  Up to T, it will just say FAC
10   verification days.
11       A.   Uh-huh.
12       Q.   Do you see that?  Sorry, you have to
13   say yes or no out loud.
14       A.   I see it, yes.
15       Q.   Is that the number of days pending
16   between when the service request was initiated
17   and how long it's been open for?
18       A.   Yes.
19       Q.   With respect to these daily reports,
20   you're able to see how stale they are, right?
21       A.   Yes.
22       Q.   Now, the first tab average facility
23   verification days, this is part of the daily
24   report that you would receive, right, sir?

Page 20

1        A.   Yes.
2        Q.   And based on this, you're able to see
3    for each particular manager of engineering the
4    average and the individual lag time for each of
5    their respective engineers, right?
6        A.   Yes.
7        Q.   Looking at this particular report,
8    these averages associated with each person --
9    so you, it looks like you're 15.38.  Do you
10   see?
11       A.   Yes.
12       Q.   And Magee is 16.30.  Do you see that?
13           MR. BARRAS:  We just lost it.
14               * * *
15           (Whereupon, a brief recess was
16       held at this time.)
17               * * *
18   BY MS. BURKE:
19       Q.   I was just looking at the averages
20   with you.
21       A.   Yes.
22       Q.   Just to make sure that we're talking
23   about the same area of the document, your
24   average here is 15.38?

CARL FRANK GROSS

Page 21

1      A.   Yes.
2      Q.   We go down to Magee, his is 16.30,
3   right?
4      A.   Yes.
5      Q.   So your team, on average, was doing a
6   little better, right?
7      A.   Yes.
8      Q.   These, would you get every day?
9      A.   I believe so.
10     Q.   Now, we'll get into it because you
11   reference it in some of your performance
12   evaluations for your team members, would you
13   get averages for the entire district each
14   quarter?
15     A.   Daily, because it comes on this
16   report.
17     Q.   So if you go to the very bottom it
18   says grand total?
19     A.   Yes.
20     Q.   Do you see the 16.26?
21     A.   Yes.
22     Q.   Is that for the entire district?
23     A.   I would say yes.
24     Q.   So on any given day, could you see

Page 22

1   the average for the entire district?
2      A.   Yes.
3      Q.   Now, in addition to any daily
4   reports, did you get a summary of any kind of
5   monthly averages that you could use when you
6   started to do performance reviews?
7      A.   Yes.
8      Q.   At any point in time did you directly
9   supervise Suzette Walker?
10     A.   No.
11     Q.   At any point in time did you complete
12   any actual performance evaluations for her?
13     A.   No.
14     Q.   With respect to either her 2013 or
15   2014 year end reviews, did you help Mr. Magee
16   complete those evaluations?
17     A.   No.
18     Q.   Once you started working remotely on
19   a regular basis beginning in or about July of
20   2014, how often, if at all, did you see Suzette
21   Walker?
22     A.   Maybe once a year.
23     Q.   You knew who Suzette Walker was
24   though, right?

Page 23

1      A.   Yes.
2      Q.   How long had you known her within the
3   Verizon organization?
4            MR. BARRAS:  From what time
5            point?  Could you define what you're
6            talking about?
7   BY MS. BURKE:
8      Q.   Total, how long had you known her?
9      A.   I'd say from the mid 1990s is a
10   guesstimate.
11     Q.   Had you ever submitted any complaints
12   to anyone at Verizon on her behalf?
13     A.   No.
14     Q.   Had you given any negative feedback
15   to any of her managers since the 1990s
16   regarding her work performance?
17     A.   No.
18     Q.   Had you formed an opinion one way or
19   the another whether or not you thought she was
20   an honest or dishonest employee?
21     A.   No.
22     Q.   No, you had not formed an opinion,
23   correct?
24     A.   No, I had not formed an opinion.

Page 24

1      Q.   Did you form an opinion one way or
2   the other whether or not she was a good team
3   player?
4      A.   No.
5      Q.   No, you had not formed an opinion?
6      A.   No, I had not formed an opinion.
7      Q.   I asked you about honesty, but had
8   you formed any opinion one way or another about
9   her sense of integrity?
10     A.   No.
11            *  *  *
12        (Whereupon, Exhibit Gross-2 was
13        marked for identification.)
14            *  *  *
15   BY MS. BURKE:
16     Q.   In lieu of the entire spreadsheet,
17   which reflected a headcount in 2015 for every
18   single person under Muccilo's indirect
19   supervision, this is a spreadsheet that was
20   toggled just based on supervisors, so if you
21   look at the first sheet, it just reflects those
22   individuals on Mr. Magee's team.  Do you see
23   that?
24     A.   Yes, I do.

CARL FRANK GROSS

Page 25

1      Q.    Then if you look at the second sheet,
2   it has your name there under supervisor name.
3   Do you see that?
4      A.   Yes.
5      Q.    Now, first of all, focusing on your
6   spreadsheet, which is the second page, Ed
7   Macintosh isn't reflected here and I'm still
8   working to get his personnel information in
9   terms of dates of employment, et cetera.  When
10  was he actually on your team?
11     A.   I believe 2013 or 2014 he started
12  working for me and I don't know the exact date.
13     Q.    Then, did he voluntarily resign from
14  Verizon in the fall of 2015?
15     A.   Yes, he did.
16     Q.    A retirement package or something?
17     A.   Yes.
18     Q.    From in or about 2013 through 2014 he
19  remained on your team through his requirement?
20     A.   Yes.
21     Q.    Did you complete performance
22  evaluations for him like you did every other
23  team member?
24     A.   Yes.

Page 26

1      Q.    The gentleman whose name we looked at
2   a moment ago, Chirag Jagwani, you know that
3   is?
4      A.   Yes.
5      Q.    Was he on your team at some point in
6   time?
7      A.   Yes.
8      Q.    What period of time, approximately?
9      A.   I want to say from approximately
10  2008, 2009 time frame until probably 2014,
11  2015.
12     Q.    So you're not exactly sure, right?
13     A.   I'm not sure when he left or when he
14  came, but he was on the team for five, six,
15  seven years.
16     Q.    What was the reason why he
17  transitioned off your team?
18     A.   Why he left the team?
19     Q.   Yes.
20     A.   He went to Wireless.
21     Q.    Do you keep organizational charts for
22  your team?
23     A.   No.
24     Q.   Why not?

Page 27

1      A.   I have no need for them.
2      Q.    In terms of the list of individuals
3   that you're overseeing on any particular basis,
4   do you maintain any sort of list?
5      A.   The system does, so at any moment in
6   time I can click on my name and get a complete
7   listing of all the people that report to me.
8      Q.    From a general headcount list?
9      A.   From a Verizon perspective, I go to
10  the home page, I select my name and it shows
11  all the employees that report to me.
12     Q.    Does that also show the specific
13  geographic locations they're assigned to
14  handle?
15     A.   No.
16     Q.    How, if at all, did you keep track of
17  the physical work areas that these engineers
18  were assigned to handle SRs for?
19     A.   A separate spreadsheet.
20     Q.    Was that your personal spreadsheet?
21     A.   No.
22     Q.    What was that?
23     A.   Jim Dewey prepared a report for that.
24     Q.    So Chirag joined your team before Ed

Page 28

1   MacIntosh, right?
2      A.   Yes.
3      Q.    Was Mr. MacIntosh the newest member
4   of your team in comparison to all these other
5   individuals on the list?
6      A.   Yes.
7      Q.    When he joined your team, he wasn't,
8   in fact, new to Verizon though, correct?
9      A.   Correct.
10     Q.    What department did he come from?
11     A.   I believe it was the DRC, dispatch
12  reporting center.
13     Q.    So in terms of Verizon seniority, do
14  you even know how many years of service he had?
15     A.   Approximately 30 years.
16     Q.    Which is more than some of these
17  people on your team though, right?
18     A.   Yes.
19     Q.    But in terms of team seniority, he
20  had the lowest seniority for your team, right?
21     A.   Yes.
22     Q.    How was it that the first
23  notification came to your attention that any
24  one may, in fact, have to be RIF'ed as it

CARL FRANK GROSS

Page 29

1    pertained to your team?
2        A.   A manager call.
3        Q.   By who?
4        A.   Joe Muccilo.
5        Q.   And approximately when did he give
6    you a call to mention that a RIF might be
7    occurring?
8        A.   Early part of 2015.
9        Q.   Before I get into what transpired
10   thereafter, the actual internal discussions
11   with upper management about exactly what the
12   headcount would be the percentage of
13   individuals who needed to be RIF'ed, were you
14   privy to those conversations?
15       A.   No.
16       Q.   Bill Bragg, was he the executive
17   director at the time over Mr. Muccilo?
18       A.   I believe so.
19       Q.   But you reported directly to Mr.
20   Muccilo, correct?
21       A.   Yes.
22       Q.   So prior to the time that you
23   received a phone call from your manager, Mr.
24   Muccilo, respecting a RIF, you hadn't been

Page 30

1    involved any management transactions regarding
2    headcounts and who may stay and who may go?
3        A.   No.
4        Q.   Tell me about your call with Mr.
5    Muccilo.
6        A.   All the managers were on the call and
7    it was announced that there was going to be a
8    headcount reduction, otherwise known as RIF,
9    reduction in force.
10       Q.   I know what it is.  Is that all that
11   was said on the call?
12       A.   Yes.
13       Q.   So he got all the managers on the
14   call and said I want to let you know there's
15   going to be headcount reduction?
16       A.   Yes.
17       Q.   Is that all he said?
18       A.   No.
19       Q.   What else, if anything, can you
20   recall from that call?
21       A.   Soft canvas your team for any
22   potential volunteers.
23       Q.   Respecting any of the other
24   engineering managers that were your

Page 31

1    counterparts, did any of their team members
2    volunteer?
3        A.   I don't know.
4        Q.   You weren't privy to that?
5        A.   No.
6        Q.   Did you soft canvas your team?
7        A.   Yes.
8        Q.   Any interest from anyone?
9        A.   No.
10       Q.   How did you go about soft canvassing
11   your team?  Did you send out a group email?
12   How did you do it?
13       A.   Staff meeting, team meeting.
14       Q.   What did you say, there is going to
15   be a RIF, is anyone looking to volunteer for an
16   early retirement package or something?
17       A.   I advised there's a potential of a
18   reduction in force coming, does anybody have
19   any interest in leaving?
20       Q.   So was this at one of your weekly or
21   monthly meetings?
22       A.   Yes.
23       Q.   During that initial call with Joe
24   Muccilo, other than telling you to soft canvas

Page 32

1    your team for any potential volunteers, what,
2    if anything, else did he relay during that
3    call?
4        A.   I don't remember.
5        Q.   Did he give specific numbers?
6        A.   No.
7        Q.   Did he go at all beyond doing the
8    inquiry about any volunteers?
9        A.   No.
10       Q.   How long after that call did you
11   conduct a survey of your team?
12       A.   Within a week.
13       Q.   Did you report back?
14       A.   Yes.
15       Q.   How did you do that?
16       A.   I had no volunteers.
17       Q.   Right.  How did you relay that to Mr.
18   Muccilo?
19       A.   I don't remember.  Either a phone
20   call or I stopped in his office.  I don't
21   remember.
22       Q.   Did you and he work at the same
23   location when you were, in fact, at the office?
24       A.   Yes.

R&K REPORTING, INC.

CARL FRANK GROSS

Page 33

1  Q.  Same floor?
2  A.  Yes.
3  Q.  What was the next conversation then
4  that you had with Mr. Muccilo or when you
5  reported to him you didn't have any volunteers,
6  what was the nature of that discussion?
7  A.  I just told him I had no volunteers.
8  Q.  Did he say anything at that point?
9  A.  No.
10  Q.  Just took note of it?
11  A.  Yep.
12  Q.  When was the next conversation, if at
13  all, that you had with Mr. Muccilo respecting a
14  RIF, or is that the last you heard of it from
15  him?
16  A.  Well, I had a discussion because we
17  had to rank all the engineers from 1 to X and
18  he had asked me who the bottom of the list was
19  at a subsequent talk.  I don't know exactly
20  when that took place, but at some point he had
21  asked me who my -- if I had to perform a RIF,
22  who would be my candidate.
23  Q.  I just want to stay in chronological
24  order as much as possible.  You queried your

Page 34

1  team, no volunteers, right?
2  A.  Correct.
3  Q.  You reported that back to Muccilo?
4  A.  Yep.
5  Q.  At that time you don't recall any
6  specific response that he had?
7  A.  Correct.
8  Q.  At that time did he tell you, well,
9  then I need you to review your team members and
10  rank them?
11  A.  At some point in time that happened.
12  Q.  The discussion that you had with Mr.
13  Muccilo where you believe you were advised that
14  you had to rank your team members, was that
15  with anyone else on the call or in a meeting or
16  that was a private conversation?
17  A.  Private conversation.
18  Q.  Did you, in fact, rank your team
19  members?
20  A.  I did.
21  Q.  Did you work with an HR business
22  partner to do that?
23  A.  No.
24  Q.  Why not?

Page 35

1  A.  There wasn't any need to.
2  Q.  Mr. Muccilo did not direct you to do
3  that?
4  A.  No.
5  Q.  No, he did not?
6  A.  No, he did not.
7  Q.  That you could just rank them
8  informally?
9  A.  Yes.
10  Q.  What process were you given to rank
11  your team members or did you come up with your
12  own process?
13  A.  I come up with my own process.
14  Q.  Was your process seniority?
15  A.  No.
16  Q.  By seniority I mean the last one in
17  on your team?
18  A.  That was one of the basis.
19  Q.  So it wasn't the only basis?
20  A.  Correct.
21  Q.  So you came up with your own system.
22  One basis was team seniority, correct?
23  A.  Yes.
24  Q.  What were the other bases?

Page 36

1  A.  Workload, response time on SRs,
2  overall engineering knowledge.
3  Q.  Workload, does that specifically
4  equate to number of SR requests?
5  A.  That's one aspect of workload.
6  Q.  What are any other aspects of
7  workload?
8  A.  Volume of work orders issued.
9  Q.  Response time on SR, that's the FAC
10  verification, right?
11  A.  Yes.
12  Q.  Measured daily, you could see it
13  weekly, monthly, right?
14  A.  Correct.
15  Q.  And the whole district's average?
16  A.  Yes.
17  Q.  Any other criterion that you haven't
18  identified for me?
19  A.  That's it.
20  Q.  Where did you put this information?
21  A.  Where did I put it?  I didn't put it
22  anywhere.
23  Q.  You had 15 team members at that time,
24  right?

R&K REPORTING, INC.

CARL FRANK GROSS

Page 37

1    A.  I don't know.  Did I?
2    Q.  **If you look at Gross-2, the one for**
3  **your particular team?**
4         MR. BARRAS:  Do we have a date
5         when this was applicable?
6         MS. BURKE:  For the record, I'll
7         give you the Bates stamp number.
8         THE WITNESS:  This spreadsheet
9         says '13.
10  BY MS. BURKE:
11   Q.  **Ed MacIntosh isn't on there, right?**
12   A.  No, he's not.
13   Q.  **Chirag Jagwani is not on there,**
14  **right?**
15   A.  No, he is not.
16         MS. BURKE:  Hold on one second so
17         I can answer your counsel's question
18         before we move on.  Counsel, this
19         documents were Bates stamped Walker
20         818, which is a list of headcount
21         that you provided to us for Mr.
22         Muccilo during the time period in
23         question.
24         MR. BARRAS:  I'm just going to

Page 38

1         point out I think the time period in
2         question was a broader span of time
3         than the day of, the day before the
4         reduction in force, so whatever time
5         period is represented, I have no
6         problem with him answering how many
7         people were on his team.  I just want
8         to point out that it is not the
9         number of people necessarily that he
10         evaluated for part of the reduction.
11         MS. BURKE:  I'm going ask him
12         that, but thank you for testifying
13         for him.
14  BY MS. BURKE:
15   Q.  **Mr. Gross, was Ed MacIntosh part of**
16  **your assessment of your RIF once no one**
17  **volunteered?**
18   A.  Yes.
19   Q.  **Was Chirag Jagwani?**
20   A.  I don't believe he was on the team at
21  that time.  But I don't remember when he left,
22  so I can't really answer that adequately.
23   Q.  **What about Ken Wojton?**
24   A.  He was on the team.

Page 39

1    Q.  **What about Sam Capizzi?**
2    A.  He was on the team.
3    Q.  **What about EJ Battista?**
4    A.  He was on the team.
5    Q.  **What about Vincent Palwicki?**
6    A.  Yes.
7    Q.  **What about Paul Mulhern?**
8    A.  Yes.
9    Q.  **David Stinson?**
10   A.  Yes.
11   Q.  **What about James Rennie?**
12   A.  Yes.
13   Q.  **What about David Dehaven?**
14   A.  Yes.
15   Q.  **Alex Ramos?**
16   A.  Yes.
17   Q.  **He had actually come on your team**
18  **from Mr. Magee's team, right?**
19   A.  That's correct.
20   Q.  **Mark Williams?**
21   A.  No.
22   Q.  **What about Edward Boudman?**
23   A.  Yes.
24   Q.  **Jeffrey Kramer?**

Page 40

1    A.  Yes.
2    Q.  **What about Barbara Whitham?**
3    A.  No.
4    Q.  **Now, when you say where did you keep**
5  **it, what, if any, documentation do you have in**
6  **the whole world that would show that you ranked**
7  **these employees?**
8    A.  There was a spreadsheet provided to
9  us that we had to fill out.
10   Q.  **That was from HR, right?**
11   A.  No.
12   Q.  **Who did it come from?**
13   A.  I believe Diane Redilla.
14   Q.  **Who is she?**
15   A.  She works for Joe Muccilo and is the
16  area integration manager.
17   Q.  **The spreadsheet that you were asked**
18  **to fill out, did it have the categories you**
19  **were asked to assess?**
20   A.  No.
21   Q.  **What was in the spreadsheet then?**
22   A.  The names and a column for ranking.
23   Q.  **So just their name and the order in**
24  **which you rank them?**

CARL FRANK GROSS

Page 41

1    A.   Correct.
2        Q.   I'm going to show you a spreadsheet
3    and just let me know if you have ever seen it
4    before or if this is the one that you're
5    referring to.  I don't believe it is but you
6    can certainly let me know.  That's Bates
7    stamped DEF Walker 2651.  Have you ever seen
8    that before?
9        A.   No.
10       Q.   That's not the spreadsheet you're
11   talking about that you filled in with your
12   ranking of employees?
13       A.   No.
14       Q.   Did you turn it in to Diane Redilla
15   or did you turn it in to Joe Muccilo?
16       A.   Diane Redilla.
17       Q.   Who ranked at the bottom?
18       A.   Ed Macintosh.
19       Q.   Who ranked at the top?
20       A.   I don't remember.
21       Q.   Did you keep a copy of that
22   spreadsheet for yourself?
23       A.   Not sure.
24       Q.   Other than Redilla, who else did you

Page 42

1    share it with?
2        A.   Nobody.
3        Q.   Did you ever share with it Mr.
4    Muccilo?
5        A.   Well, Diane collected it for Jim
6    Muccilo.
7        Q.   Did you ever personally share to it
8    Mr. Muccilo?
9        A.   Me personally, no.
10       Q.   Did you email it to him, hand deliver
11   it to him, anything like that?
12       A.   I don't believe so.
13       Q.   How do you know that Ms. Redilla
14   actually gave it to Mr. Muccilo?
15       A.   I don't know that for a fact.
16       Q.   After you ranked your employees and
17   sent it to Ms. Redilla, which you believe was
18   sent to Mr. Muccilo, right?
19       A.   Correct.
20       Q.   Was that the sole involvement that
21   you had with respect to the RIF in the spring
22   of 2015?
23       A.   No.
24       Q.   What was your next involvement, if at

Page 43

1    all, with any discussions related to the RIF?
2        A.   A discussion with Brian Magee.
3        Q.   Who initiated that call?
4        A.   I don't remember.
5        Q.   Was it a telephone call?
6        A.   Yes.
7        Q.   What happened during that call?
8        A.   We compared notes on the bottom two
9    people from his group and my group.
10       Q.   Who were they?
11       A.   Suzette Walker from his group and Ed
12   Macintosh from my group.
13       Q.   Between the two of you, did you
14   determine that Suzette Walker would go or did
15   Mr. Magee make that decision?
16       A.   Mr. Magee made that decision.
17       Q.   Do you know what her most recent FAC
18   verification scores were at that time?
19       A.   No.
20       Q.   Did you know anything about her most
21   recent performance evaluation?
22       A.   No.
23       Q.   Other than seniority, why did Ed
24   Macintosh rank at the bottom of your group?

Page 44

1        A.   Least engineering knowledge at that
2    point in time.
3        Q.   Was that based on education or
4    experience within the engineering role?
5        A.   Experience within the engineering
6    role.
7        Q.   In terms of the designation or the
8    band, all of the individuals you supervised,
9    they're band 7T, right?
10       A.   Correct.
11       Q.   The difference between an engineering
12   4 specialist and engineering III, what is that?
13       A.   Engineering IV is the pay band is
14   bigger.
15       Q.   Their salary is higher?
16       A.   The pay band is bigger.
17       Q.   Just looking at the individuals for
18   your team on that spreadsheet that you have,
19   Gross-2, you have some engineers III
20   specialists, they're all a band 7T.  You might
21   understand your response a little better than I
22   do.
23       A.   Pay band, their top salary could be
24   -- is generally larger.  So one might be 75 to

CARL FRANK GROSS

Page 45

1  100, the other would be 75 to 115.
2  **Q.   The range?**
3  A.   The range.
4  **Q.   So you did complete RIF documentation**
5  **for your team; you just don't have a copy of**
6  **it?**
7  A.   Yes.
8  **Q.   Yes, you don't have a copy?**
9  A.   Yes, I do not have a copy.
10  **Q.   But you did create it, right?**
11  A.   Yes.
12  **Q.   During Mr. Magee's deposition, he was**
13  **asked whether or not based on his conversations**
14  **with you he knew if you ranked your team.**
15  **Okay? I just want to read you his response**
16  **which starts at Page 145, Line 20: All I know**
17  **is what he told me. He said he picked Ed**
18  **MacIntosh because he was the newest on his**
19  **team. He felt like everyone on his team was,**
20  **you know, great and he felt Ed was great. He**
21  **just said he had no other way to split it.**
22      **Is that true?**
23      MR. BARRAS: Objection. You can
24      answer.

Page 46

1  BY MS. BURKE:
2  **Q.   Is that true, sir?**
3  A.   That sounds correct.
4  **Q.   So did you pick Ed MacIntosh because**
5  **he was the least senior on your team?**
6  A.   Yes.
7  **Q.   Thank you.**
8      **You thought he was great, right?**
9  A.   Yes.
10  **Q.   You thought everyone on your team was**
11  **great?**
12  A.   Yes.
13  **Q.   To be fair, you just said whoever is**
14  **in the last one in the door?**
15  A.   No.
16  **Q.   No? So you did not pick him then**
17  **because he was the least senior on your team?**
18  A.   I picked him because he had the least
19  engineering experience at the time.
20  **Q.   So the level of time that he was on**
21  **your team was not then the reason?**
22      MR. BARRAS: Object but you can
23      answer.
24      THE WITNESS: The reason why he

Page 47

1  was at the bottom of the list is he
2  had the least engineering experience
3  at the time.
4  BY MS. BURKE:
5  **Q.   I want to go over some of your**
6  **employees' performance evaluations with you.**
7  **In your opinion, the most important aspect or**
8  **the biggest goal for your team, was it the FAC**
9  **verifications?**
10  A.   Yes.
11  **Q.   The SR interval. You had represented**
12  **to Mr. Capizzi in his evaluation that it was**
13  **the biggest goal of that year, correct?**
14  A.   Yes.
15  **Q.   For Alex Ramos, you told him FAC**
16  **verification is the most important, right?**
17  A.   Yes.
18  **Q.   Did you, in fact, even suggest to any**
19  **of your employees that they may have to, in**
20  **fact, sacrifice on performance to cover the**
21  **workload that was coming in?**
22  A.   I'm not sure I understand that
23  question.
24  **Q.   That the FAC verification or getting**

Page 48

1  **things done in a timely manner, they may have**
2  **to sacrifice on work performance?**
3  A.   I still don't follow the question.
4  **Q.   I'll show you the evaluation. Okay?**
5  A.   Okay.
6      * * *
7      (Whereupon, Exhibit Gross-3 was
8      marked for identification.)
9      * * *
10  BY MS. BURKE:
11  **Q.   This is Stinson's 2013 year end**
12  **review and it appears that it was completed on**
13  **February 17th, 2014, if you look at the very**
14  **last page.**
15      MR. BARRAS: Object to that
16      categorization of completed, but you
17      can answer.
18      THE WITNESS: I see that.
19  BY MS. BURKE:
20  **Q.   Did you complete this evaluation?**
21  A.   Yes, I did.
22  **Q.   For Mr. Stinson, right?**
23  A.   Yes.
24  **Q.   If you go to the second last page,**

CARL FRANK GROSS

Page 49

1  which is Bates stamped Walker l000.
2      A.   Okay.
3      Q.   The area that says Dave has had a
4  very busy workload and works extremely hard to
5  keep it under control.  He feels frustrated
6  sometimes, as he believes he is not giving our
7  customers his best performance, but I remind
8  him that workloads prevent that.  Do you see
9  that?
10     A.   Yes.
11     Q.   Did you identify that based on the
12  workload, they may have to sacrifice actual
13  performance?
14     A.   Yes.
15     Q.   Because no matter what, the thing
16  that you emphasized, at least throughout these
17  2013 year end reviews, was the SR interval,
18  right?
19     A.   That was the first priority.
20     Q.   We can go into them, but with respect
21  to some of your employees, you would identify
22  what their ranking was within the district,
23  right?
24     A.   The ranking within my group.

Page 50

1              * * *
2      (Whereupon, Exhibit Gross-4 was
3       marked for identification.)
4              * * *
5  BY MS. BURKE:
6      Q.   This is a 2014 year end performance
7  review for Ed Boudman.  It appears that you
8  completed this, if you look at the last page.
9  Did you, in fact, complete this evaluation?
10     A.   Yes, I did.
11     Q.   If you go to the second to last page
12  Bates stamped 875, I'll direct your attention.
13  Okay?  Are you on Page 875?
14     A.   I am.
15     Q.   The second to last sentence says, one
16  area I would like to see Ed improve on in the
17  coming year is to increase his percentage of
18  jobs issued within eight days of application.
19  Do you see that?
20     A.   I do.
21     Q.   That's the FAC verification, right?
22     A.   That's correct.
23     Q.   Then you say his percentage this year
24  was 31 percent, putting him in the bottom third

Page 51

1  of our district.  Do you see that?
2      A.   I do.
3      Q.   Is that solely for your team or is it
4  the entire district in comparison to each
5  manager that we saw on that chart earlier
6  today?
7      A.   I don't know for sure.
8      Q.   So you can't tell me as we sit here
9  right now whether or not 31 percent put him in
10  the bottom of the entire district?
11     A.   No, I don't know that for sure.
12             * * *
13     (Whereupon, Exhibit Gross-5 was
14      marked for identification.)
15             * * *
16  BY MS. BURKE:
17     Q.   This is a performance evaluation for
18  Paul Mulhern for the 2014 year end review.  It
19  look likes it was completed by you.
20     A.   Yes.
21     Q.   Did you complete this document?
22     A.   I did.
23     Q.   If you go to the second to last page,
24  which is Bates stamped 945.

Page 52

1      A.   Okay.
2      Q.   This second paragraph where it starts
3  with Paul does a good?
4      A.   Yes.
5      Q.   Paul does a good job of meeting all
6  the metrics that we have in place, but one area
7  that I need Paul to improve on is his eight day
8  facility verification objective that is in
9  place.  Same sentiment that you expressed to
10  Mr. Boudman, right?
11     A.   Correct.
12         MR. BARRAS:  Objection.
13  BY MS. BURKE:
14     Q.   Paul's percentage for doing this is
15  at 25 percent, which is the third lowest in the
16  district.  Do you see that?
17     A.   I do.
18     Q.   So his was actually worse than Mr.
19  Boudman's, right?
20         MR. BARRAS:  Objection.
21         THE WITNESS:  Correct.
22  BY MS. BURKE:
23     Q.   Same question with respect to this
24  evaluation for Mr. Mulhern.  This district

Page 53

1  you're referring to, is that all teams or is
2  this just your team or you don't know?
3      A.  I don't know.
4      Q.  For some of your employees, you
5  referenced within them that you would attach a
6  PDF reflecting the results, I guess for their
7  own verification purposes?
8      A.  Yes.
9      MR. BARRAS:  Objection.
10  BY MS. BURKE:
11      Q.  Do you keep those accompanied with
12  their evaluation?
13      A.  The system stores them.
14      Q.  If you went to look at any of your
15  employees' evaluations, whatever you attached
16  to them would still be there, right?
17      A.  Yes.
18      MR. BARRAS:  Wait until I'm done
19      objecting before you answer.  Give me
20      a minute to actually say a word and
21      then you can answer.
22      MS. NERO:  The objection is
23      actually important, just like what
24      the question is.

Page 54

1      THE WITNESS:  Okay.
2  BY MS. BURKE:
3      Q.  What emphasis, if any, did you place
4  on your engineers' use of contractors to do
5  work?
6      A.  I'm not sure I understand the
7  question.
8      Q.  Did your engineers, in fact, use any
9  contractors to assist in handling SRs?
10      A.  Yes.
11      Q.  What emphasis did you put on using
12  contractors to get the jobs issued?
13      A.  I didn't put any emphasis.  It's a
14  tool for them to use.
15      Q.  A good tool, right?
16      A.  Yes.
17      Q.  It helps generate revenue quicker,
18  right?
19      A.  It helps them get the job done.
20      * * *
21      (Whereupon, Exhibit Gross-6 was
22      marked for identification.)
23      * * *
24  BY MS. BURKE:

Page 55

1      Q.  This is just a portion, because most
2  of the evaluations you issued are very lengthy
3  so we would have thousands of pages here.
4  Other than Sam Capizzi, you didn't have any
5  other Sams on your team, right?
6      A.  Correct.
7      Q.  This is just a portion of one of his
8  evaluations bates stamped 879.  Here you write
9  in the manager comments area, the very last
10  sentence, Sam utilize contractors as much as
11  possible to get the jobs issued, therefore
12  bringing in the revenue as soon as possible.
13  Do you see that?
14      MR. BARRAS:  I'm going to object.
15      First, the document speaks for
16      itself.  More importantly, do we have
17      the year that is?
18      MS. BURKE:  I'll pull it up for
19      you.  Do you want to see the whole
20      evaluation, sir?
21      MR. BARRAS:  Do you need to see
22      the whole evaluation or would you
23      just be able to have the year?
24  BY MS. BURKE:

Page 56

1      Q.  I just want to ask you about your
2  opinion on your engineers using contractors and
3  what this phrase means, but if you want to see
4  the entire evaluation, you can.  Would you like
5  to?
6      A.  No, I don't need the full evaluation.
7      Q.  The phrase that you stated, Sam
8  utilizes contractors as much as possible to get
9  the jobs, therefore bringing in the revenue as
10  soon as possible, his use of contractors as
11  much as possible, that was a good thing, right?
12      A.  Correct.
13      Q.  Because it helped generate revenue
14  quickly?
15      A.  Yes.
16      Q.  That's all I was trying to find out.
17  I just wanted to give you that paper to
18  clarify.
19      * * *
20      (Whereupon, Exhibit Gross-7 was
21      marked for identification.)
22      * * *
23  BY MS. BURKE:
24      Q.  This is a portion of Dave Dehaven's

CARL FRANK GROSS

Page 57

1 evaluation for 2013 year end.  I just want to
2 focus your attention to the middle area,
3 there's a paragraph that's written that says
4 Dave has also made an effort.  Do you see where
5 I'm at?
6     A.  Yes.
7     Q.  Dave has also made an effort to
8 reduce costs but utilizing best practices, such
9 as using contractors when possible.  The
10 effective use of contractors greatly reduces
11 the overall cost of each work order.  Do you
12 agree with that?
13     A.  Yes.
14     Q.  Did each of your engineers have their
15 own particular contractors they could work with
16 or they had to share a certain number of
17 contractors?
18     A.  We used a vendor who selected the
19 contractor.
20     Q.  I do know that based on Mr. Magee's
21 deposition.  Let's just use Joe Smith.  If
22 there was a Joe Smith, could anyone on your
23 team utilize him from the vendor based on their
24 project?

Page 58

1     A.  It wouldn't be our call.
2     Q.  So it would based on the particular
3 SR at issue?
4     A.  No, it was based on the vendor
5 assigning it to a particular engineer or
6 contractor.
7     Q.  In completing the assignment, the
8 engineers reach out to vendor to identify that
9 they need their services?
10     A.  Correct.
11         * * *
12         (Whereupon, there was an
13     off-the-record discussion.)
14         * * *
15 BY MS. BURKE:
16     Q.  What emphasis, if any, did you place
17 on positive attendance in terms of measuring
18 your engineers' work performance?
19     A.  Say that again.
20     Q.  What emphasis did you put on positive
21 attendance in terms of measuring your
22 engineers' work?
23     A.  Positive attendance, you mean showing
24 up, going to work?

Page 59

1     Q.  Good attendance.
2     A.  Yes.
3     Q.  You didn't discourage them from
4 taking medical leave or anything, correct?
5     A.  No.
6     Q.  Gross-4, which is Boudman, do you
7 have his?
8     A.  I do.
9     Q.  When your employees put actual
10 comments in their performance review, do you
11 read them?
12     A.  I do.
13     Q.  Do you discuss them with them?
14     A.  Yes.
15     Q.  On Page 872 of Boudman's 2014 year
16 end review, in his employee
17 accomplishments/status, do you see that?
18     A.  You said 872?
19     Q.  Yes.
20     A.  Yes.
21     Q.  He puts in 2014 I had zero motor
22 vehicle accidents.  Obviously, that's a good
23 thing, right?
24     A.  Yes.

Page 60

1     Q.  Do they have a company car that they
2 drive?
3     A.  We have a fleet of cars.
4     Q.  That they're allowed to use for work
5 purposes?
6     A.  Yes.
7     Q.  Then he says and zero medical
8 absences.  Do you see that?
9     A.  Yes.
10     Q.  Was there any discussion, if at all,
11 how medical absences impacted their
12 performance?
13     A.  No.
14     Q.  So you don't know why he put that
15 there?
16     A.  No.
17     Q.  He's allowed to take medical absence,
18 right?
19     A.  He is.
20     Q.  He wouldn't be chastised for that?
21     A.  No.
22         * * *
23     (Whereupon, Exhibit Gross-8 was
24     marked for identification.)

R&K REPORTING, INC.

CARL FRANK GROSS

Page 61

1              * * *
2    BY MS. BURKE:
3        Q.   This is for Alejandro Ramos for 2014
4    year end.  I just want to direct your attention
5    to Page 975 under recognition.  Do you see
6    that?
7        A.   Page 975?
8        Q.   Yes.  Page 975, are you on that page?
9        A.   I'm on that page.
10       Q.   Under fuel our culture, there's an
11   employee accomplishments area.
12       A.   Yes.
13       Q.   This is what the employee fills out,
14   right?
15       A.   Correct.
16       Q.   He says at the bottom, zero absences,
17   100 percent perfect attendance, right?
18           MR. BARRAS:  Objection.
19           THE WITNESS:  Correct.
20             * * *
21       (Whereupon, Exhibit Gross-9 was
22        marked for identification.)
23             * * *
24   BY MS. BURKE:

Page 62

1        Q.   This is for Stinson for 2014.  Could
2    you go to page l005.  Are you there?
3        A.   I'm there.
4        Q.   Fuel our culture under employee
5    accomplishments, do the employees fill this
6    out?
7        A.   Yes.
8        Q.   For his accomplishments, 100 percent
9    attendance in 2014, right?
10           MR. BARRAS:  Objection.  The
11           document speaks for itself.  You can
12           answer.
13   BY MS. BURKE:
14       Q.   Right, sir?
15       A.   Yes.
16             * * *
17       (Whereupon, Exhibit Gross-10 was
18        marked for identification.)
19             * * *
20   BY MS. BURKE:
21       Q.   This is for Ken Wojton, page 1020.
22   Are you there, sir?
23       A.   I'm there.
24       Q.   We're under fuel our culture,

Page 63

1    employee accomplishments.  Do you see that?
2        A.   I do.
3        Q.   He talks about he attached a PDF for
4    results.  Do you see that?  See attached PDF
5    file for results.
6            MR. BARRAS:  Objection, but you
7            can answer.
8            THE WITNESS:  I do.
9    BY MS. BURKE:
10       Q.   I want to make sure we're on the same
11   page.  You seem hesitant.  On Page 1020 under
12   employee accomplishments/status, what's written
13   there is see attached PDF file for results,
14   right?
15       A.   Correct.
16       Q.   Did he attach something to his
17   evaluation?
18       A.   He must have.
19       Q.   If he did, in fact, do that, would
20   you have maintained that for personnel
21   purposes?
22       A.   The system would store it.
23       Q.   You didn't throw it away or anything,
24   right?

Page 64

1        A.   No.
2        Q.   And he also writes there, attended 14
3    training courses this year?
4        A.   No.
5        Q.   No motor vehicle accidents?
6            MR. BARRAS:  Objection.
7            THE WITNESS:  Correct.
8    BY MS. BURKE:
9        Q.   And no absences, right?
10           MR. BARRAS:  Objection.
11           THE WITNESS:  Correct.
12   BY MS. BURKE:
13       Q.   How, if at all, did absences impact
14   your engineers' ability with respect to the
15   workload?
16       A.   I don't understand the question.
17       Q.   If they were absent, how, if at all,
18   would that impact their ability to maintain the
19   workload?
20       A.   It would cause a problem.  If they're
21   not there, they can't do the job.
22       Q.   Did you have any of the employees out
23   on any kind of medical leave at all during
24   2014?

R&K REPORTING, INC.

CARL FRANK GROSS

Page 65

1    A.   Not that I'm aware of.
2    Q.   **What about during 2013?**
3    A.   Not that I'm aware of.
4    Q.   **If you have an employee out for**
5    **extended leave of absence, do you take that**
6    **into consideration in completing their**
7    **performance area?**
8    A.   No.
9    Q.   **Are you aware of an area that directs**
10   **you to do that if it's for a particular period**
11   **of time?**
12   A.   No.
13   Q.   **Do you still have Gross-10 in front**
14   **of you?**
15   A.   I do.
16   Q.   **The second to last page is Page 1023.**
17   **Do you see that?**
18   A.   I do.
19   Q.   **There's an area for leading,**
20   **performing, developing, new.  Do you see that?**
21   A.   I do.
22   Q.   **And there's certain bullet points.**
23   **Let's go to the last page.**
24   A.   (Witness complies with request.)

Page 66

1    Q.   **It says performing duties less than**
2    **three months of the year due to an authorized**
3    **absence or leave.  Have you seen that before?**
4         MR. BARRAS:  I don't see where
5         you are.
6    BY MS. BURKE:
7    Q.   **Page 1024.**
8         MR. BARRAS:  Thank you.  What was
9         the question?
10   BY MS. BURKE:
11   Q.   **Have you seen that before?**
12   A.   I did.
13   Q.   **Did you criticize Jim Rennie about**
14   **making sure he gets his prints out on time and**
15   **if customers have to wait, they'll move on and**
16   **you could lose the sale?**
17   A.   I probably had that discussion with
18   him.
19   Q.   **Did you also have concerns about his**
20   **schedule and working remotely and whether or**
21   **not you knew what his whereabouts were?**
22   A.   No.
23        * * *
24   (Whereupon, Exhibit Gross-11 was

Page 67

1    marked for identification.)
2         * * *
3    BY MS. BURKE:
4    Q.   **This is Gross-11.  This is Rennie's**
5    **2014 year end performance review.  First of**
6    **all, do you recognize this review as something**
7    **you completed?  His 2014 is also attached as**
8    **well.  If you go to Page 986, it might make it**
9    **a little easier to identify if that's your**
10   **electronic signature or not.**
11   A.   So 986 pertains to the 2013
12   performance year end.
13   Q.   **Which was issued in early 2014?**
14   A.   Correct.
15   Q.   **So if you go to Page 985, you give**
16   **some constructive criticism or feedback to Mr.**
17   **Rennie here, right?**
18        MR. BARRAS:  Objection.  You can
19        answer.
20        THE WITNESS:  Yes.
21   BY MS. BURKE:
22   Q.   **We discussed this a moment ago but**
23   **you did discuss the issuance of his prints?**
24   A.   Yes.

Page 68

1    Q.   **You were hoping he would get them out**
2    **the day before they're due?**
3    A.   Yes.
4    Q.   **You say the other thing I would like**
5    **to see improved for Jim is his schedule for the**
6    **week.  I should know where he is at when**
7    **working remotely and sometimes I find it**
8    **difficult to reach him.  Do you see that?**
9    A.   Yes.
10   Q.   **So because of that, you wanted and he**
11   **agreed to keep you informed more regularly of**
12   **what his schedule was, right?**
13   A.   Yes.
14   Q.   **Did you encourage any of your team**
15   **members to proceed with any further education?**
16   A.   I did.
17   Q.   **For what reason?**
18   A.   Knowledge is power.
19   Q.   **Thought it was an asset, right?**
20   A.   Uh-huh.
21   Q.   **Sorry, you have to say yes or no.**
22   A.   Yes.
23   Q.   **As an example, you had said that**
24   **particularly to Mr. Stinson, right?**

CARL FRANK GROSS

Page 69

1  A.  Yes.
2  Q.  You emphasized that to your team as
3  whole; he wasn't just singled out, right?
4  A.  Correct.
5  Q.  Have you told me everything you can
6  recall about the discussion that you had with
7  Ed Magee on that call about choice of
8  alternatives between Suzette Walker and Ed
9  Macintosh?
10  A.  I believe so.
11  Q.  Other than that conversation and once
12  that concluded, did you have any additional
13  conversations with anyone about the RIF?
14  A.  No.
15  Q.  No one on your team was impacted,
16  right?
17  A.  Correct.
18      MS. BURKE:  Off the record.
19      * * *
20      (Whereupon, there was an
21  off-the-record discussion.)
22      * * *
23  BY MS. BURKE:
24  Q.  Sir, I assume I know your answer but

Page 70

1  while you're here, I want to ask.  I'm going to
2  give you a document that's previously been
3  marked in other depositions in this case during
4  Mr. Magee's.  It was marked Verizon-14.  I just
5  want you to look at the first page of this
6  screen shot of a computer entry, which were
7  filled out in connection with some of the RIFs
8  done for Verizon.  Are you even familiar with
9  that or did you go into the system and input
10  any of that information?
11  A.  I don't believe I've ever seen this
12  document before.
13      MS. BURKE:  Sir, I don't have any
14      further questions for you.  Your
15      counsel may have follow-up and he may
16      not.
17      MR. BARRAS:  I do, but let's take
18      five minutes.
19      * * *
20      (Whereupon, a brief recess was
21  held at this time.)
22      * * *
23      EXAMINATION
24      * * *

Page 71

1  BY MR. BARRAS:
2  Q.  Can you get Exhibit Gross-3 in front
3  of you?
4  A.  Okay.
5  Q.  Page l000.
6  A.  Okay.
7  Q.  The manager performance summary.
8  A.  Yes.
9  Q.  The last sentence, concentrate on all
10  high bandwidth orders.  Do you see that?
11  A.  Yes.
12  Q.  Why did you tell Mr. Stinson he
13  should focus on all high bandwidth orders?
14  A.  Because at that time that was the
15  number one priority.
16  Q.  What was the number one priority?
17  A.  High bandwidth service orders and
18  interval reduction.
19  Q.  Did you tell all of your team members
20  that the priority was high bandwidth orders and
21  service reductions?
22  A.  I believe so.
23  Q.  When you say at that time, does that
24  include 2013?

Page 72

1      MS. BURKE:  I just want to be
2      clear, you said high bandwidth and
3      service reductions.  He said interval
4      reductions.
5      MR. BARRAS:  I'm sorry, I
6      misspoke.
7  BY MR. BARRAS:
8  Q.  Is it proper to say interval
9  reductions?
10  A.  As part of the high bandwidth orders,
11  yes.
12  Q.  So interval reductions are part of
13  the high bandwidth orders?
14  A.  Correct, that's facility verification
15  piece.
16  Q.  Why was high bandwidth a high
17  priority?
18  A.  Leadership focused on it.
19  Q.  Okay.  In your performance
20  evaluations, and we can take Gross-3 as an
21  example, on the last page, it looks like there
22  are four ways of rating employees; is that
23  correct?
24  A.  That is correct.

CARL FRANK GROSS

Page 73

1    Q.   Leading, performing, developing and
2   new, leading is the highest an employee can
3   achieve?
4    A.   Yes.
5    Q.   And developing is the worse someone
6   can achieve?
7    A.   Yes.
8    Q.   In 2013, did any of your employees
9   that you rated receive a developing?
10   A.   No.
11   Q.   In 2014 did any of your employees
12  receive a developing rating?
13   A.   No.
14   Q.   When you say 2014, I mean work
15  performed in 2014 and rated in 2015?
16   A.   No.
17   Q.   Same answer for 2015?
18   A.   Yes.
19   Q.   So no employees received a developing
20  in 2015?
21   A.   Correct.
22        MR. BARRAS:  That's it.
23        MS. BURKE:  We're good to go,
24     sir.

Page 74

1              * * *
2        (Witness excused.)
3              * * *
4        (Deposition concluded at
5     11:43 a.m.)
6              * * *
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 75

1              * * *
2        C E R T I F I C A T I O N
3              * * *
4      I, Hope Agosto, Professional Court
5   Reporter and Notary Public for the Commonwealth
6   of Pennsylvania, do hereby certify the
7   foregoing to be a true and accurate transcript
8   of my original stenographic notes taken at the
9   time and place hereinbefore set forth.
10
11
12
13        _____
14        Hope Agosto
15        Court Reporter
16        Notary Public
17
18
19
20    (The foregoing certification of this
21  transcript does not apply to any reproduction
22  of the same by any means, unless under direct
23  control and/or supervision of the certifying
24  reporter.)

CARL FRANK GROSS

## A

**a.m** 1:17 74:5
**ability** 64:14,18
**able** 14:6 17:10,22
   19:20 20:2 55:23
**absence** 60:17 65:5
   66:3
**absences** 60:8,11
   61:16 64:9,13
**absent** 64:17
**Absolutely** 13:3
**access** 14:10
**accidents** 59:22
   64:5
**accompanied** 53:11
**accomplishments**
   61:11 62:5,8 63:1
**accomplishments...**
   59:17 63:12
**accuracy** 10:21
**accurate** 75:7
**achieve** 73:3,6
**actual** 7:2 22:12
   29:10 49:12 59:9
**addition** 22:3
**additional** 12:1
   69:12
**adequately** 38:22
**advised** 31:17
   34:13
**ago** 6:5,15 9:14,22
   10:1,6 26:2 67:22
**Agosto** 1:18 75:4
   75:14
**agree** 57:12
**agreed** 5:3 68:11
**Alejandro** 61:3
**Alex** 39:15 47:15
**allowed** 8:1 60:4,17
**alternatives** 69:8
**and/or** 75:23
**announced** 30:7
**answer** 7:2,18 8:3
   8:13 37:17 38:22
   45:24 46:23 48:17

53:19,21 62:12
   63:7 67:19 69:24
   73:17
**answering** 8:9 38:6
**anticipate** 7:15
**anybody** 31:18
**anymore** 18:23
**appears** 15:10,23
   48:12 50:7
**applicable** 37:5
**application** 50:18
**apply** 75:21
**approximately** 26:8
   26:9 28:15 29:5
**area** 9:14,23 10:1
   15:11 20:23 40:16
   49:3 50:16 52:6
   55:9 57:2 61:11
   65:7,9,19
**areas** 9:19 10:9
   27:17
**arguments** 6:22
**asked** 24:7 33:18,21
   40:17,19 45:13
**asking** 8:7
**aspect** 36:5 47:7
**aspects** 36:6
**assess** 40:19
**assessment** 38:16
**asset** 68:19
**assigned** 9:1,6
   11:22 27:13,18
**assigning** 58:5
**assignment** 58:7
**assist** 54:9
**Assistant** 2:16
**associate** 13:18
**associated** 20:8
**assume** 69:24
**attach** 53:5 63:16
**attached** 15:8 53:15
   63:3,4,13 67:7
**attachment** 16:8
**attachments** 16:10
**attendance** 58:17

58:21,23 59:1
   61:17 62:9
**attended** 64:2
**attention** 28:23
   50:12 57:2 61:4
**August** 1:10 11:10
   11:11
**authorized** 66:2
**average** 19:22 20:4
   20:24 21:5 22:1
   36:15
**averages** 14:7 20:8
   20:19 21:13 22:5
**aware** 65:1,3,9

## B

**back** 6:16 32:13
   34:3
**band** 44:8,9,13,16
   44:20,23
**bandwidth** 71:10
   71:13,17,20 72:2
   72:10,13,16
**Barbara** 40:2
**Barras** 2:9 3:7
   15:15 20:13 23:4
   37:4,24 45:23
   46:22 48:15 52:12
   52:20 53:9,18
   55:14,21 61:18
   62:10 63:6 64:6
   64:10 66:4,8
   67:18 70:17 71:1
   72:5,7 73:22
**based** 18:19 19:4
   20:2 24:20 44:3
   45:13 49:11 57:20
   57:23 58:2,4
**bases** 35:24
**basis** 8:9 13:7 16:13
   18:1,12 22:19
   27:3 35:18,19,22
**bates** 15:12 37:7,19
   41:6 49:1 50:12
   51:24 55:8

**Battista** 39:3
**beginning** 22:19
**behalf** 23:12
**believe** 11:13 17:9
   21:9 25:11 28:11
   29:18 34:13 38:20
   40:13 41:5 42:12
   42:17 69:10 70:11
   71:22
**believes** 49:6
**Bensalem** 1:16 2:5
**best** 49:7 57:8
**better** 21:6 44:21
**beyond** 32:7
**bigger** 44:14,16
**biggest** 47:8,13
**Bill** 29:16
**bottom** 21:17 33:18
   41:17 43:8,24
   47:1 50:24 51:10
   61:16
**Boudman** 3:17
   39:22 50:7 52:10
   59:6
**Boudman's** 52:19
   59:15
**Box** 1:23
**Bragg** 29:16
**break** 8:11
**Brian** 12:6 43:2
**brief** 20:15 70:20
**bringing** 55:12 56:9
**broader** 38:2
**brought** 5:22
**brown** 18:22
**budgets** 10:21
   13:17 14:17
**bullet** 65:22
**Burke** 2:3 3:6 5:16
   5:20 15:5,18,20
   20:18 23:7 24:15
   37:6,10,16 38:11
   38:14 46:1 47:4
   48:10,19 50:5
   51:16 52:13,22

53:10 54:2,24
   55:18,24 56:23
   58:15 61:2,24
   62:13,20 63:9
   64:8,12 66:6,10
   67:3,21 69:18,23
   70:13 72:1 73:23
**business** 12:23
   34:21
**busy** 49:4

## C

**C** 2:1 75:2,2
**call** 13:21 29:2,6,23
   30:4,6,11,14,20
   31:23 32:3,10,20
   34:15 43:3,5,7
   58:1 69:7
**called** 17:16
**candidate** 33:22
**canvas** 30:21 31:6
   31:24
**canvassing** 31:10
**Capizzi** 3:19 39:1
   47:12 55:4
**car** 60:1
**care** 10:21
**CARL** 1:13 3:5
   5:10
**cars** 60:3
**case** 70:3
**categories** 40:18
**categorization**
   48:16
**cause** 64:20
**CBurke@karpf-l...**
   2:6
**cc** 15:11
**center** 28:12
**certain** 16:1 57:16
   65:22
**certainly** 41:6
**certification** 5:5
   75:20
**certify** 75:6

certifying 75:23
Cerutti 1:15 2:3
cetera 25:9
change 9:13
changed 9:10
chart 51:5
charts 26:21
chastised 60:20
Cherry 2:10
Chirag 18:7 26:2
  27:24 37:13 38:19
choice 69:7
Christine 2:3 5:20
chronological 33:23
civil 5:21 6:13
clarify 56:18
clear 72:2
click 27:6
close 18:21
Closer 11:13
collected 42:5
column 40:22
columns 19:8
come 28:10 35:11
  35:13 39:17 40:12
comes 21:15
coming 31:18 47:21
  50:17
commencing 1:17
comments 55:9
  59:10
Commonwealth
  75:5
company 60:1
compared 43:8
comparison 28:4
  51:4
complaints 23:11
complete 17:17,22
  22:11,16 25:21
  27:6 45:4 48:20
  50:9 51:21
completed 48:12,16
  50:8 51:19 67:7
completing 58:7

65:6
complies 65:24
computer 14:21
  70:6
concentrate 16:20
  71:9
concerns 66:19
concluded 69:12
  74:4
conduct 32:11
confusion 6:22
connection 6:6 70:7
consider 10:18
consideration 65:6
consistent 10:8
constructive 67:16
contractor 57:19
  58:6
contractors 54:4,9
  54:12 55:10 56:2
  56:8,10 57:9,10
  57:15,17
control 49:5 75:23
conversation 33:3
  33:12 34:16,17
  69:11
conversations
  29:14 45:13 69:13
copied 15:10
copy 41:21 45:5,8,9
CORPORATION
  1:6
correct 10:2,3,16
  16:2,3 17:6,8,20
  23:23 28:8,9
  29:20 34:2,7
  35:20,22 36:14
  39:19 41:1 42:19
  44:10 46:3 47:13
  50:22 52:11,21
  55:6 56:12 58:10
  59:4 61:15,19
  63:15 64:7,11
  67:14 69:4,17
  72:14,23,24 73:21

cost 57:11
costs 57:8
counsel 2:7,13,16
  5:3 7:6,9 37:18
  70:15
counsel's 37:17
counterparts 31:1
course 7:8,22
courses 64:3
Court 1:1,18,22
  75:4,15
cover 47:20
create 45:10
criterion 36:17
criticism 67:16
criticize 66:13
culture 61:10 62:4
  62:24
currently 8:16
customer 10:21
  17:19
customers 49:7
  66:15

---
**D**
daily 3:13 13:6 16:9
  16:13 18:11 19:7
  19:19,23 21:15
  22:3 36:12
dashboard 16:23
date 1:18 7:1 25:12
  37:4
dated 15:8
dates 25:9
Dave 49:3 56:24
  57:4,7
David 39:9,13
day 7:5 18:15 21:8
  21:24 38:3,3 52:7
  68:2
days 11:16 12:16
  19:10,15,23 50:18
decision 43:15,16
DEF 14:24 41:7
Defendants 2:13

define 23:5
Dehaven 3:21
  39:13
Dehaven's 56:24
delay 18:1
deliver 42:10
department 28:10
deposed 6:13
deposition 1:13
  5:18 6:1 7:8 13:23
  45:12 57:21 74:4
depositions 4:9
  70:3
DESCRIPTION
  3:12 4:4
designation 44:7
details 16:23
determine 43:14
developing 65:20
  73:1,5,9,12,19
Dewey 15:9,13,21
  16:15 27:23
Diane 40:13 41:14
  41:16 42:5
dictated 12:23
difference 44:11
different 11:18
difficult 68:8
direct 35:2 50:12
  61:4 75:22
directly 22:8 29:19
director 29:17
directs 65:9
discourage 59:3
discovery 7:23
  14:24
discuss 14:19 59:13
  67:23
discussed 67:22
discussion 33:6,16
  34:12 43:2 58:13
  60:10 66:17 69:6
  69:21
discussions 29:10
  43:1

dishonest 23:20
dispatch 28:11
dispute 7:1
district 1:1,2 21:13
  21:22 22:1 49:22
  51:1,4,10 52:16
  52:24
district's 36:15
document 20:23
  51:21 55:15 62:11
  70:2,12
documentation
  40:5 45:4
documents 4:10
  7:22 37:19
doing 11:8,11 14:11
  14:12 21:5 32:7
  52:14
door 46:14
DRC 28:11
drive 60:2
due 66:2 68:2
duly 5:11
duties 66:1

---
**E**
E 2:1,1,3,15,15
  75:2
earlier 51:5
early 9:16 18:4 29:8
  31:16 67:13
easier 67:9
eastern 1:2 9:5,7
  10:20 11:22
Ed 25:6 27:24
  37:11 38:15 41:18
  43:11,23 45:17,20
  46:4 50:7,16 69:7
  69:8
education 44:3
  68:15
Edward 39:22
effective 57:10
effort 57:4,7
eight 50:18 52:7

CARL FRANK GROSS

**either** 13:6 18:17
  19:4 22:14 32:19
**EJ** 39:3
**electronic** 67:10
**email** 3:13 15:6,8
  15:10 31:11 42:10
**emphasis** 54:3,11
  54:13 58:16,20
**emphasized** 49:16
  69:2
**employed** 8:16
**employee** 23:20
  59:16 61:11,13
  62:4 63:1,12 65:4
  73:2
**employees** 10:23
  11:21 12:1 27:11
  40:7 41:12 42:16
  47:19 49:21 53:4
  59:9 62:5 64:22
  72:22 73:8,11,19
**employees'** 47:6
  53:15
**employer** 5:22
**employment** 6:7
  25:9
**encourage** 68:14
**engineer** 14:7 17:3
  58:5
**engineering** 8:21
  9:21 10:19 16:1
  20:3 30:24 36:2
  44:1,4,5,11,12,13
  46:19 47:2
**engineers** 10:12
  11:3 12:4,15
  13:11 17:15 20:5
  27:17 33:17 44:19
  54:8 56:2 57:14
  58:8
**engineers'** 13:5
  54:4 58:18,22
  64:14
**entire** 21:13,22
  22:1 24:16 51:4

**51:10** 56:4
**entry** 70:6
**equate** 36:4
**ESQUIRE** 2:3,9,16
**estimates** 8:8
**et** 25:9
**evaluated** 38:10
**evaluation** 43:21
  47:12 48:4,20
  50:9 51:17 52:24
  53:12 55:20,22
  56:4,6 57:1 63:17
**evaluations** 21:12
  22:12,16 25:22
  47:6 53:15 55:2,8
  72:20
**exact** 25:12
**exactly** 16:19 26:12
  29:11 33:19
**EXAMINATION**
  5:14 70:23
**examined** 5:11
**example** 14:20 16:6
  18:4 68:23 72:21
**excused** 74:2
**executive** 29:16
**Exhibit** 15:2 24:12
  48:7 50:2 51:13
  54:21 56:20 60:23
  61:21 62:17 66:24
  71:2
**exhibits** 3:10 4:2
  7:23
**expected** 17:23
**experience** 44:4,5
  46:19 47:2
**expressed** 52:9
**extended** 65:5
**extremely** 49:4

**F**
**F** 75:2
**FAC** 19:9 36:9
  43:17 47:8,15,24
  50:21

**facility** 19:22 52:8
  72:14
**fact** 17:11 28:8,24
  32:23 34:18 42:15
  47:18,20 50:9
  54:8 63:19
**fair** 13:1 46:13
**fairly** 9:16
**fall** 25:14
**familiar** 70:8
**far** 6:15
**Fax** 1:24
**February** 15:9 18:4
  48:13
**feedback** 23:14
  67:16
**feels** 49:5
**felt** 45:19,20
**file** 63:5,13
**filing** 5:5
**fill** 40:9,18 62:5
**filled** 41:11 70:7
**fills** 61:13
**find** 56:16 68:7
**first** 5:11 14:5
  19:22 24:21 25:5
  28:22 49:19 55:15
  67:5 70:5
**five** 9:14,22 10:1,4
  10:6,9 12:16
  26:14 70:18
**fleet** 60:3
**floor** 33:1
**fluctuated** 10:15
**focus** 57:2 71:13
**focused** 72:18
**focusing** 25:5
**follow** 48:3
**follow-up** 70:15
**follows** 5:12
**force** 30:9 31:18
  38:4
**foregoing** 75:7,20
**form** 5:7 24:1
**formed** 23:18,22,24

**24:5,6,8
**former** 5:22
**forth** 75:9
**four** 11:16 12:16
  72:22
**frame** 26:10
**FRANK** 1:13 3:5
  5:10
**front** 65:13 71:2
**frustrated** 49:5
**fuel** 61:10 62:4,24
**full** 11:2 56:6
**further** 68:15 70:14

**G**
**general** 2:16 18:4
  27:8
**generally** 11:5
  12:21 16:15 18:14
  44:24
**generate** 54:17
  56:13
**generated** 13:6
**gentleman** 26:1
**geographic** 9:2,9,15
  9:19 10:5 27:13
**getting** 18:20 47:24
**give** 8:8 29:5 32:5
  37:7 53:19 56:17
  67:15 70:2
**given** 18:15 21:24
  23:14 35:10
**giving** 49:6
**go** 11:14 16:23 19:6
  19:7 21:2,17 27:9
  30:2 31:10 32:7
  43:14 47:5 48:24
  49:20 50:11 51:23
  53:14 62:2 65:23
  67:8,15 70:9
  73:23
**goal** 47:8,13
**going** 5:17 6:19
  30:7,15 31:14
  37:24 38:11 41:2

**55:14** 58:24 70:1
**good** 24:2 52:3,5
  54:15 56:11 59:1
  59:22 73:23
**gotten** 10:5
**grand** 21:18
**great** 45:20,20 46:8
  46:11
**greatly** 57:10
**Greenwood** 1:15
  2:4
**grew** 9:22
**Gross** 1:13 3:5 5:10
  5:17 8:20 15:6
  38:15
**Gross-1** 3:13 15:2
**Gross-10** 4:6 62:17
  65:13
**Gross-11** 4:8 66:24
  67:4
**Gross-2** 3:14 24:12
  37:2 44:19
**Gross-3** 3:15 48:7
  71:2 72:20
**Gross-4** 3:17 50:2
  59:6
**Gross-5** 3:18 51:13
**Gross-6** 3:19 54:21
**Gross-7** 3:21 56:20
**Gross-8** 3:22 60:23
**Gross-9** 4:5 61:21
**group** 31:11 43:9,9
  43:11,12,24 49:24
**guess** 8:7 17:11
  18:24 53:6
**guesstimate** 23:10

**H**
**hand** 42:10
**handle** 17:15,16,21
  27:14,18
**handled** 18:22
**handling** 13:12
  54:9
**happened** 34:11

43:7
**hard** 49:4
**HARVETTA** 2:16
**headcount** 24:17
  27:8 29:12 30:8
  30:15 37:20
**headcounts** 30:2
**hear** 7:10
**heard** 33:14
**held** 1:14 8:22
  20:16 70:21
**help** 22:15
**helped** 56:13
**helps** 54:17,19
**hereinbefore** 75:9
**hesitant** 63:11
**high** 71:10,13,17,20
  72:2,10,13,16,16
**higher** 44:15
**highest** 73:2
**hit** 6:11
**Hold** 37:16
**home** 12:17 27:10
**honest** 23:20
**honesty** 24:7
**Hope** 1:18 7:12
  75:4,14
**hoping** 68:1
**hoteling** 11:14
**HR** 34:21 40:10

**I**

**identification** 15:3
  24:13 48:8 50:3
  51:14 54:22 56:21
  60:24 61:22 62:18
  67:1
**identified** 12:14
  14:5 36:18
**identifies** 17:7
**identify** 17:2 49:11
  49:21 58:8 67:9
**III** 44:12,19
**impact** 64:13,18
**impacted** 60:11

69:15
**important** 47:7,16
  53:23
**importantly** 55:16
**improve** 50:16 52:7
**improved** 68:5
**include** 11:21 12:2
  12:8,12 71:24
**includes** 16:4
**increase** 50:17
**INDEX** 3:2
**indirect** 24:18
**individual** 20:4
**individuals** 15:23
  17:4 24:22 27:2
  28:5 29:13 44:8
  44:17
**informally** 35:8
**information** 25:8
  36:20 70:10
**informed** 68:11
**initial** 31:23
**initiated** 19:16 43:3
**input** 70:9
**inquiry** 32:8
**instructions** 6:20
**integration** 40:16
**integrity** 24:9
**interest** 31:8,19
**internal** 29:10
**interrupt** 7:20
**interval** 13:16
  17:23 47:11 49:17
  71:18 72:3,8,12
**intervals** 13:14 14:6
**introduced** 5:18
**involved** 30:1
**involvement** 42:20
  42:24
**issuance** 67:23
**issue** 7:10 58:3
**issued** 36:8 50:18
  54:12 55:2,11
  67:13
**IV** 44:13

**J**

**Jagwani** 18:7 26:2
  37:13 38:19
**James** 15:9,13
  39:11
**JBarras@reedsm...**
  2:12
**Jeffrey** 39:24
**Jim** 27:23 42:5
  66:13 68:5
**job** 10:18,21,22
  13:17 14:1 52:5
  54:19 64:21
**jobs** 16:22 50:18
  54:12 55:11 56:9
**Joe** 29:4 31:23
  40:15 41:15 57:21
  57:22
**JOEL** 2:9
**joined** 27:24 28:7
**July** 11:13,13 12:20
  12:22 13:2 22:19

**K**

**Karpf** 1:14,14 2:3,3
**keep** 26:21 27:16
  40:4 41:21 49:5
  53:11 68:11
**Ken** 38:23 62:21
**kind** 17:24 22:4
  64:23
**knew** 22:23 45:14
  66:21
**know** 5:18 8:6 12:5
  18:19 25:12 26:2
  28:14 30:10,14
  31:3 33:19 37:1
  41:3,6 42:13,15
  43:17,20 45:16,20
  51:7,11 53:2,3
  57:20 60:14 68:6
  69:24
**knowledge** 36:2
  44:1 68:18
**known** 23:2,8 30:8

**Kramer** 39:24

**L**

**L** 2:15
**l000** 49:1 71:5
**l005** 62:2
**labeled** 16:8
**lag** 20:4
**large** 7:21
**larger** 9:14,24 10:2
  10:5 44:24
**late** 18:20,21 19:5
**Law** 1:14
**lawsuit** 5:21 6:13
**Leadership** 72:18
**leading** 65:19 73:1
  73:2
**leave** 7:4 8:14 59:4
  64:23 65:5 66:3
**leaving** 31:19
**left** 26:13,18 38:21
**lengthy** 55:2
**let's** 57:21 65:23
  70:17
**level** 46:20
**Levittown** 1:23
**lieu** 24:16
**likes** 51:19
**Line** 45:16
**list** 27:2,4,8 28:5
  33:18 37:20 47:1
**listed** 15:24
**listing** 27:7
**little** 21:6 44:21
  67:9
**LLP** 2:9
**LOC** 17:17
**location** 9:10,15
  32:23
**locations** 27:13
**Logan** 2:10
**long** 8:22 9:6 11:7
  12:19 19:17 23:2
  23:8 32:10
**look** 13:9 15:6,7,11

16:21 24:21 25:1
  37:2 48:13 50:8
  51:19 53:14 70:5
**looked** 26:1
**looking** 14:23 16:19
  17:12 18:3 20:7
  20:19 31:15 44:17
**looks** 15:16 17:4
  18:20 20:9 72:21
**lose** 66:16
**lost** 20:13
**loud** 7:5 19:13
**lowest** 28:20 52:15

**M**

**Macintosh** 25:7
  28:1,3 37:11
  38:15 41:18 43:12
  43:24 45:18 46:4
  69:9
**Magee** 12:5,6,12
  20:12 21:2 22:15
  43:2,15,16 69:7
**Magee's** 16:5 24:22
  39:18 45:12 57:20
  70:4
**maintain** 27:4
  64:18
**maintained** 63:20
**making** 7:9 66:14
**management** 29:11
  30:1
**manager** 8:21 9:20
  10:19 16:1 20:3
  29:2,23 40:16
  51:5 55:9 71:7
**managers** 14:7
  23:15 30:6,13,24
**manner** 48:1
**Mark** 39:20
**marked** 4:9 14:24
  15:3 24:13 48:8
  50:3 51:14 54:22
  56:21 60:24 61:22
  62:18 67:1 70:3,4

matter 49:15
mean 18:18 35:16
  58:23 73:14
means 19:2,3,5
  56:3 75:22
Measured 36:12
measuring 58:17,21
medical 59:4 60:7
  60:11,17 64:23
meet 11:4,15
meeting 11:3,5,7,17
  11:19 31:13,13
  34:15 52:5
meetings 12:8,11
  31:21
member 25:23 28:3
members 12:9,12
  16:1 17:5 18:5,8
  18:11 21:12 31:1
  34:9,14,19 35:11
  36:23 68:15 71:19
mention 29:6
metrics 52:6
mid 23:9
middle 57:2
minute 53:20
minutes 70:18
misspoke 72:6
moment 26:2 27:5
  67:22
monitor 13:10
monitored 13:4
month 11:6,18
  12:11
monthly 13:7 22:5
  31:21 36:13
months 66:2
motor 59:21 64:5
mouth 7:16
move 37:18 66:15
Muccilo 14:8 29:4
  29:17,20,24 30:5
  31:24 32:18 33:4
  33:13 34:3,13
  35:2 37:22 40:15

41:15 42:4,6,8,14
  42:18
Muccilo's 24:18
Mulhern 3:18 39:7
  51:18 52:24

**N**

N 2:1,15 75:2
name 5:20 13:18,24
  25:2,2 26:1 27:6
  27:10 40:23
names 40:22
nature 6:10,23 13:4
  33:6
necessarily 38:9
need 8:2,11 14:21
  27:1 34:9 35:1
  52:7 55:21 56:6
  58:9
needed 29:13
needs 12:23
negative 23:14
NERO 2:16 53:22
new 28:8 65:20
  73:2
newest 28:3 45:18
north 9:5,7 10:20
  11:23
Notary 1:19 75:5
  75:16
note 33:10
notes 17:24 43:8
  75:8
notification 18:10
  28:23
number 7:21 10:15
  19:15 36:4 37:7
  38:9 57:16 71:15
  71:16
numbers 32:5

**O**

O 2:15 75:2
object 46:22 48:15
  55:14
objecting 53:19

objection 7:11
  45:23 52:12,20
  53:9,22 61:18
  62:10 63:6 64:6
  64:10 67:18
objections 5:6 7:9
objective 52:8
Obviously 59:22
occasion 6:4
occasions 6:12
  18:12
occurring 29:7
occurs 11:17
off-the-record
  58:13 69:21
office 11:4,15 13:2
  32:20,23
Offices 1:14
Okay 5:23,24 7:2,7
  7:13,14,18,19 8:3
  8:4,9,10,15 17:1
  45:15 48:4,5 49:2
  50:13 52:1 54:1
  71:4,6 72:19
once 11:4,5,15,18
  12:11 22:18,22
  38:16 69:11
open 3:13 14:3,15
  16:8,12 17:7,9,11
  17:13 18:10 19:6
  19:17
opinion 23:18,22
  23:24 24:1,5,6,8
  47:7 56:2
opportunity 8:1
Oral 1:13
orange 18:18 19:1
order 13:10,14
  33:24 40:23 57:11
orders 36:8 71:10
  71:13,17,20 72:10
  72:13
organization 23:3
organizational
  26:21

original 75:8
overall 36:2 57:11
overseeing 9:20
  10:10 27:3

**P**

P 2:1,1,15
package 25:16
  31:16
page 3:4,12 4:4
  15:16,19 25:6
  27:10 45:16 48:14
  48:24 50:8,11,13
  51:23 59:15 61:5
  61:7,8,8,9 62:2,21
  63:11,11 65:16,16
  65:23 66:7 67:8
  67:15 70:5 71:5
  72:21
pages 55:3
Palwicki 39:5
paper 56:17
paragraph 52:2
  57:3
part 19:23 29:8
  38:10,15 72:10,12
particular 9:1
  13:18,24 14:19
  16:24 17:16,22
  20:3,7 27:3 37:3
  57:15 58:2,5
  65:10
particularly 68:24
parties 5:4
partner 34:22
Paul 39:7 51:18
  52:3,5,7
Paul's 52:14
pay 44:13,16,23
PC 1:15 2:3
PDF 53:6 63:3,4,13
pending 19:15
Pennsylvania 1:2,7
  1:16,23 2:5,11 9:5
  9:7 10:20 11:23

75:6
people 16:4,5 27:7
  28:17 38:7,9 43:9
percent 50:24 51:9
  52:15 61:17 62:8
percentage 29:12
  50:17,23 52:14
perfect 61:17
perform 33:21
performance 3:16
  3:17,19,19,21,23
  4:5,7,8 13:5 21:11
  22:6,12 23:16
  25:21 43:21 47:6
  47:20 48:2 49:7
  49:13 50:6 51:17
  58:18 59:10 60:12
  65:7 67:5,12 71:7
  72:19
performed 73:15
performing 65:20
  66:1 73:1
period 26:8 37:22
  38:1,5 65:10
person 7:12 20:8
  24:18
personal 6:7 27:20
personally 42:7,9
personnel 12:3 25:8
  63:20
perspective 16:17
  27:9
pertained 29:1
pertains 67:11
Philadelphia 2:11
phone 1:24 29:23
  32:19
phrase 56:3,7
physical 27:17
pick 46:4,16
picked 45:17 46:18
piece 72:15
place 33:20 52:6,9
  54:3 58:16 75:9
Plaintiff 2:7

player 24:3
PO 1:23
point 8:11 9:13
    22:8,11 23:5 26:5
    33:8,20 34:11
    38:1,8 44:2
points 65:22
pole 6:11
portion 3:19,21
    55:1,7 56:24
position 8:19
positive 58:17,20
    58:23
possible 33:24
    55:11,12 56:8,10
    56:11 57:9
potential 30:22
    31:17 32:1
power 68:18
practices 57:8
prepared 27:23
pretty 10:8,22
prevent 49:8
PREVIOUS 4:9
previously 70:2
prints 66:14 67:23
prior 12:21 13:2
    29:22
priority 49:19
    71:15,16,20 72:17
private 34:16,17
privy 29:14 31:4
probably 26:10
    66:17
problem 38:6 64:20
proceed 68:15
process 6:17 35:10
    35:12,13,14
produced 7:22
Professional 1:18
    75:4
project 57:24
proper 72:8
provide 13:13
provided 37:21

40:8
Public 1:19 75:5,16
pull 55:18
purpose 11:18
purposes 5:19 53:7
    60:5 63:21
put 17:23 36:20,21
    36:21 51:9 54:11
    54:13 58:20 59:9
    60:14
puts 59:21
putting 50:24

**Q**

quarter 21:14
queried 33:24
question 5:7 7:15
    7:17 8:13 15:15
    37:17,23 38:2
    47:23 48:3 52:23
    53:24 54:7 64:16
    66:9
questions 8:3,6
    70:14
quicker 54:17
quickly 56:14

**R**

R 2:1,15 75:2
R&K 1:22
Ramos 3:22 39:15
    47:15 61:3
range 45:2,3
rank 4:10 33:17
    34:10,14,18 35:7
    35:10 40:24 43:24
ranked 40:6 41:17
    41:19 42:16 45:14
ranking 40:22
    41:12 49:22,24
Rate 4:10
rated 73:9,15
rating 72:22 73:12
rationale 8:9 17:12
reach 58:8 68:8
read 45:15 59:11

really 38:22
reason 26:16 46:21
    46:24 68:17
reasons 6:8
recall 30:20 34:5
    69:6
receive 19:24 73:9
    73:12
received 29:23
    73:19
recess 20:15 70:20
recognition 61:5
recognize 18:5 67:6
record 5:19,20 7:17
    14:23 15:12 37:6
    69:18
red 18:17,20 19:3,4
Redilla 40:13 41:14
    41:16,24 42:13,17
reduce 57:8
reduces 57:10
reduction 30:8,9,15
    31:18 38:4,10
    71:18
reductions 71:21
    72:3,4,9,12
REED 2:9
reference 21:11
referenced 53:5
referring 41:5 53:1
reflected 19:1 24:17
    25:7
reflecting 14:3 53:6
reflection 18:17
reflects 13:15 24:21
regarding 23:16
    30:1
region 9:2,7 10:5
    11:23
regular 22:19
regularly 68:11
reiterate 6:19
related 43:1
relay 32:2,17
remain 17:13

remained 10:8
    25:19
remember 32:4,19
    32:21 38:21 41:20
    43:4
remind 7:6 49:7
remote 11:15
remotely 10:24
    12:15,15,22 22:18
    66:20 68:7
Rennie 4:8 39:11
    66:13 67:17
Rennie's 67:4
report 3:13 10:13
    14:2,5,14,20
    15:14,21 16:9,12
    17:2,11,13 18:3
    18:11,15 19:7,24
    20:7 21:16 27:7
    27:11,23 32:13
reported 29:19 33:5
    34:3
reporter 1:19 75:5
    75:15,24
reporting 1:22,22
    28:12
reports 13:6,9,19
    13:21 14:4 16:18
    17:8 19:19 22:4
represent 5:21
represented 38:5
    47:11
reproduction 75:21
request 17:18 19:16
    65:24
requests 18:16 36:4
requirement 25:19
reserved 5:8
resign 25:13
resolve 7:10
respect 19:19 22:14
    42:21 49:20 52:23
    64:14
respecting 29:24
    30:23 33:13

respective 5:4 20:5
response 6:23 34:6
    36:1,9 44:21
    45:15
responsibilities
    10:19
responsibility 9:23
responsible 9:20
    10:10
results 53:6 63:4,5
    63:13
retirement 25:16
    31:16
revenue 54:17
    55:12 56:9,13
review 3:16,17,19
    3:20,21,23 4:5,7,8
    8:1 34:9 48:12
    50:7 51:18 59:10
    59:16 67:5,6
reviews 22:6,15
    49:17
RIF 4:10 29:6,24
    30:8 31:15 33:14
    33:21 38:16 42:21
    43:1 45:4 69:13
RIF'ed 28:24 29:13
RIFs 70:7
right 6:17,24 8:14
    8:19 9:4 13:22
    14:12,15 17:5,18
    19:20,24 20:5
    21:3,6 22:24
    26:12 28:1,17,20
    32:17 34:1 36:10
    36:13,24 37:11,14
    39:18 40:10 42:18
    44:9 45:10 46:8
    47:16 48:22 49:18
    49:23 50:21 51:9
    52:10,19 53:16
    54:15,18 55:5
    56:11 59:23 60:18
    61:14,17 62:9,14
    63:14,24 64:9

67:17 68:12,19,24 69:3,16
**rip** 15:19
**Road** 1:15 2:4
**role** 44:4,6
**room** 8:14
**Roughly** 6:15

**S**

**S** 2:1,9,15,15
**sacrifice** 47:20 48:2 49:12
**salary** 44:15,23
**sale** 66:16
**Sam** 39:1 55:4,10 56:7
**Sams** 55:5
**saw** 51:5
**saying** 7:4,13
**says** 21:18 37:9 49:3 50:15 57:3 60:7 61:16 66:1
**schedule** 66:20 68:5 68:12
**scope** 9:9,15,18 10:22
**scores** 43:18
**screen** 70:6
**sealing** 5:5
**second** 25:1,6 37:16 48:24 50:11,15 51:23 52:2 65:16
**section** 15:24
**see** 14:6,11 16:9 18:6 19:12,14,20 20:2,10,12 21:20 21:24 22:20 24:22 25:3 36:12 48:18 49:8 50:16,19 51:1 52:16 55:13 55:19,21 56:3 57:4 59:17 60:8 61:5 63:1,4,4,13 65:17,20 66:4 68:5,8 71:10

**seen** 41:3,7 66:3,11 70:11
**select** 27:10
**selected** 57:18
**send** 31:11
**senior** 46:5,17
**seniority** 28:13,19 28:20 35:14,16,22 43:23
**sense** 24:9
**sent** 42:17,18
**sentence** 50:15 55:10 71:9
**sentiment** 52:9
**separate** 27:19
**series** 13:6
**service** 13:13 17:18 18:16 19:16 28:14 71:17,21 72:3
**services** 1:6,22 58:9
**set** 75:9
**seven** 26:15
**share** 42:1,3,7 57:16
**sheet** 24:21 25:1
**short** 6:20
**shot** 70:6
**show** 7:24 18:13,14 27:12 40:6 41:2 48:4
**showing** 58:23
**shows** 27:10
**signature** 67:10
**signing** 5:4
**simply** 12:22
**single** 24:18
**singled** 69:3
**sir** 12:19 15:13 19:24 46:2 55:20 62:14,22 69:24 70:13 73:24
**sit** 51:8
**six** 26:14
**Smith** 2:9 57:21,22
**soft** 30:21 31:6,10

31:24
**sole** 42:20
**solely** 51:3
**soon** 55:12 56:10
**sorry** 19:12 68:21 72:5
**sort** 14:4 27:4
**sounds** 46:3
**span** 38:2
**speaking** 12:21
**speaks** 55:15 62:11
**specialist** 15:14,21 44:12
**specialists** 44:20
**specific** 8:22 27:12 32:5 34:6
**specifically** 36:3
**speculate** 8:7
**split** 45:21
**spreadsheet** 3:14 14:23 15:7 19:8 24:16,19 25:6 27:19,20 37:8 40:8,17,21 41:2 41:10,22 44:18
**Spreadsheets** 13:13
**spring** 42:21
**Square** 1:16 2:4,10
**SR** 3:13 13:15 14:6 16:8,12,23 17:16 17:18 19:6 36:4,9 47:11 49:17 58:3
**SRs** 13:11 14:3,15 17:9 27:18 36:1 54:9
**staff** 11:5,17 12:11 31:13
**stale** 19:20
**stamp** 37:7
**stamped** 15:12 37:19 41:7 49:1 50:12 51:24 55:8
**start** 11:11
**started** 5:17 22:6 22:18 25:11

**starts** 45:16 52:2
**stated** 56:7
**STATES** 1:1
**status** 13:17 14:1 16:21
**stay** 11:15 30:2 33:23
**stenographic** 75:8
**Stinson** 3:15 4:5 39:9 48:22 62:1 68:24 71:12
**Stinson's** 48:11
**stipulated** 5:2
**stop** 7:11
**stopped** 32:20
**store** 63:22
**stores** 53:13
**Street** 1:15 2:4,10
**stuff** 19:4
**submitted** 23:11
**subsequent** 33:19
**success** 13:10
**suggest** 47:18
**suit** 6:10
**Suite** 1:16 2:5,11
**summary** 22:4 71:7
**supervise** 22:9
**supervised** 44:8
**supervision** 24:19 75:23
**supervisor** 25:2
**supervisors** 24:20
**Supporting** 12:3
**supposed** 17:23
**sure** 6:16 7:5 18:21 19:1,3 20:22 26:12,13 41:23 47:22 51:7,11 54:6 63:10 66:14
**survey** 32:11
**Suzette** 1:4 5:21 22:9,20,23 43:11 43:14 69:8
**sworn** 5:11
**system** 17:24 27:5

35:21 53:13 63:22 70:9

**T**

**T** 2:15 19:9,9 75:2 75:2
**tab** 16:24 19:6,22
**table** 8:13
**take** 8:1,2 15:6,7,11 16:21 60:17 65:5 70:17 72:20
**taken** 6:2 75:8
**talk** 33:19
**talking** 20:22 23:6 41:11
**talks** 63:3
**team** 10:12 11:2,22 12:9,12 14:11 16:1,4,5,21 17:4,5 18:5,8,11,12 21:5 21:12 24:2,22 25:10,19,23 26:5 26:14,17,18,22 27:24 28:4,7,17 28:19,20 29:1 30:21 31:1,6,11 31:13 32:1,11 34:1,9,14,18 35:11,17,22 36:23 37:3 38:7,20,24 39:2,4,17,18 44:18 45:5,14,19 45:19 46:5,10,17 46:21 47:8 51:3 53:2 55:5 57:23 68:14 69:2,15 71:19
**teams** 14:12 53:1
**telephone** 43:5
**tell** 30:4 34:8 51:8 71:12,19
**telling** 31:24
**terms** 10:9 25:9 27:2 28:13,19 44:7 58:17,21

CARL FRANK GROSS

testified 5:12
testifying 7:11
    38:12
thank 38:12 46:7
    66:8
thing 14:2,17 49:15
    56:11 59:23 68:4
things 14:20 48:1
think 38:1
third 15:16,19
    50:24 52:15
thought 23:19 46:8
    46:10 68:19
thousands 55:3
three 2:10 66:2
throw 63:23
time 5:8 7:13 8:2
    9:13 17:22 20:4
    20:16 22:8,11
    23:4 26:6,8,10
    27:6 29:17,22
    34:5,8,11 36:1,9
    36:23 37:22 38:1
    38:2,4,21 43:18
    44:2 46:19,20
    47:3 65:11 66:14
    70:21 71:14,23
    75:9
timely 48:1
title 8:23
today 7:24 51:6
toggled 24:20
told 33:7 45:17
    47:15 69:5
tool 54:14,15
top 19:7 41:19
    44:23
total 21:18 23:8
track 27:16
training 64:3
transactions 30:1
transcript 75:7,21
transitioned 26:17
transpired 29:9
trial 5:8

true 12:19 14:14
    45:22 46:2 75:7
try 7:20
trying 56:16
Tuesday 11:5,7
turn 41:14,15
two 1:15 2:4 11:9
    43:8,13
type 7:12
types 13:9 16:18

## U

uh-huh 6:18,21,24
    19:11 68:20
understand 6:16
    8:5 44:21 47:22
    54:6 64:16
UNITED 1:1
unrelated 15:17
upper 29:11
use 22:5 54:4,8,14
    56:10 57:10,21
    60:4
usually 16:20 19:4
utilize 55:10 57:23
utilizes 56:8
utilizing 57:8

## V

v 1:5
various 15:24
varying 14:7
vehicle 59:22 64:5
vendor 57:18,23
    58:4,8
verification 19:10
    19:23 36:10 43:18
    47:16,24 50:21
    52:8 53:7 72:14
verifications 47:9
Verizon 1:6,7 2:16
    5:23 6:7,9 8:17
    23:3,12 25:14
    27:9 28:8,13 70:8
Verizon-14 4:10
    70:4

version 6:20
view 17:10
Vincent 39:5
Volume 36:8
voluntarily 25:13
volunteer 31:2,15
volunteered 38:17
volunteers 30:22
    32:1,8,16 33:5,7
    34:1

## W

wait 53:18 66:15
waived 5:6
Walker 1:4 5:21
    14:24 22:9,21,23
    37:19 41:7 43:11
    43:14 49:1 69:8
want 6:22 14:19
    18:24 26:9 30:14
    33:23 38:7 45:15
    47:5 55:19 56:1,3
    57:1 61:4 63:10
    70:1,5 72:1
wanted 56:17 68:10
wasn't 28:7 35:1,19
    69:3
way 9:10 14:22
    18:22 19:8 23:18
    24:1,8 45:21
ways 72:22
we'll 14:21 21:10
we're 5:17 11:10
    14:23 20:22 62:24
    63:10 73:23
week 11:4,15 32:12
    68:6
weekly 11:7 12:8
    13:7 31:20 36:13
went 26:20 53:14
weren't 31:4
whereabouts 66:21
Whitham 40:2
Williams 39:20
Wireless 26:20

Witness 3:4 37:8
    46:24 48:18 52:21
    54:1 61:19 63:8
    64:7,11 65:24
    67:20 74:2
Wojton 4:6 38:23
    62:21
word 53:20
work 10:23 12:15
    12:15,22 13:5
    23:16 27:17 32:22
    34:21 36:8 48:2
    54:5 57:11,15
    58:18,22,24 60:4
    73:14
working 13:11
    22:18 25:8,12
    66:20 68:7
workload 36:1,3,5
    36:7 47:21 49:4
    49:12 64:15,19
workloads 49:8
works 6:17 40:15
    49:4
world 40:6
worse 52:18 73:5
wouldn't 58:1
    60:20
write 55:8
writes 64:2
written 57:3 63:12

## X

X 33:17

## Y

year 6:5,15 22:15
    22:22 47:13 48:11
    49:17 50:6,17,23
    51:18 55:17,23
    57:1 59:15 61:4
    64:3 66:2 67:5,12
Year-End 3:15,17
    3:18,22 4:5,6,8
years 9:8,11,14,22
    10:1,4,6,9,16 11:9

26:15 28:14,15
yellow 18:18,20
Yep 33:11 34:4

## Z

zero 59:21 60:7
    61:16

## 0

## 1

1 33:17
10:16 1:17
100 45:1 61:17 62:8
1020 62:21 63:11
1023 65:16
1024 66:7
1032 15:12
1033 15:12
1034 14:24
11:43 74:5
115 45:1
128 1:16 2:5
13 37:9
1372 1:23
14 64:2
145 45:16
15 3:13 9:8,10
    36:23
15-4031 1:7
15.38 20:9,24
16.26 21:20
16.30 20:12 21:2
1717 2:10
17th 48:13
19020 1:17 2:5
19058-1372 1:23
19103 2:11
1990s 23:9,15
1999 8:24

## 2

2/4/15 3:13
20 45:16
2008 26:10
2009 26:10

CARL FRANK GROSS

**2013** 3:15 4:8 22:14
  25:11,18 48:11
  49:17 57:1 65:2
  67:11 71:24 73:8
**2014** 3:17,18,22 4:5
  4:6 11:12,14
  12:20,22 13:2
  22:15,20 25:11,18
  26:10 48:13 50:6
  51:18 59:15,21
  61:3 62:1,9 64:24
  67:5,7,13 73:11
  73:14,15
**2015** 9:17 15:9 18:4
  24:17 25:14 26:11
  29:8 42:22 73:15
  73:17,20
**2016** 1:10 11:10
**215** 1:24,24 2:6,12
**24** 1:10 3:14
**241-7990** 2:12
**25** 52:15
**2651** 41:7

---
**3**
**30** 28:15
**31** 50:24 51:9
**3100** 2:11
**3331** 1:15 2:4

---
**4**
**4** 44:12
**48** 3:15
**4th** 15:9

---
**5**
**5** 3:6
**50** 3:17
**51** 3:18
**54** 3:19
**56** 3:21

---
**6**
**60** 3:22
**61** 4:5
**62** 4:6

**639-0801** 2:6
**66** 4:8

---
**7**
**70** 3:7 4:10
**75** 44:24 45:1
**7T** 44:9,20

---
**8**
**818** 37:20
**872** 59:15,18
**875** 50:12,13
**879** 55:8

---
**9**
**945** 51:24
**946-7009** 1:24
**949-1867** 1:24
**975** 61:5,7,8
**985** 67:15
**986** 67:8,11

# Exhibit H

**Year-End Performance Assessment**

**2009 Performance Year**



| Employee Name (Last, First, MI)<br>WALKER, SUZETTE, E | Job Title/Band/Organization<br>SUPV-NETWORK ENGINEERING/7G |
|---|---|
| Appraisal Period | Start Date in Current Assignment<br>00/0000 |
| Start Date in Current Job Title or Equivalent<br>00/0000 | Start Date in Current Career Band or Equivalent<br>00/0000 |

**Instructions**
For instructions on completing this form, refer to the **Employee's Guide to the Verizon Performance Management Plan.**

**Section I – Results Achieved**

Record the results achieved by the employee for the most significant performance objectives with specific examples for each. The performance rating entered for this employee in the Compensation system will be displayed below. (Supervisors of VDSI employees should select the appropriate performance rating by placing an "x" in the appropriate box.) **In evaluating the employee's overall performance contribution, supervisors should consider the extent to which the employee demonstrated integrity and the competencies that support Verizon's core values. Compliance with the Code of Business Conduct and all Verizon policies should be a key consideration in the decision process.**
**Note:** Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved and demonstrated competencies.

**Results Achieved Rating Scale**

**L – Leading**
• Employee sustained performance above objectives, requirements and expectations.

**P – Performing**
• Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.

**N – New**
• Achievement relative to performance objectives cannot be evaluated due to short tenure in position.

**D – Developing**
• Employee met some but not all objectives, requirements and expectations, improvement needed.

**Summary of Results Achieved:**  ☐L  ☑P  ☐D  ☐N

| Performance Objectives | Results Achieved |
|---|---|
| Manage Employee Performance and Development (Applicable to Supervisors Only):<br><br>Manage employee performance consistent with the *Verizon Performance Management Plan* and create a work environment that motivates employees to excel. This objective fulfills the following Strategic Imperative:<br><br>   • Strengthen our culture | Suzette provides her Associates with the training and support needed to complete functional and attain results. |
| SOM Active Participation = Tracking<br>SOM Sold Participation = Tracking<br>SOM Revenue = $335<br>Broadband NATB = 103,252<br>Fiber to the Cell Site = 111<br>This objective fulfills the following Strategic Imperative: | SOM Active Participation = 100%<br>SOM Sold Participation = 75%<br>SOM Revenue = $410K<br>Broadband NATB = 91,581<br>Fiber to the Cell Site = 118 |

**CONFIDENTIAL**                                                    **VZ/WALKER 822**

- Increase revenue

| | |
|---|---|
| Total Prems passed Cum = 1,138,595<br>Total Prems Open for Sale Cum = 945,873<br>Video Prems Open for Sale Cum = 881,676<br># WCs Video Network Ready = 18<br><br>This objective fulfills the following Strategic Imperative:<br><br>   • Take share from our competition | Total Prems passed Cum = 1,139,760<br>Total Prems Open for Sale Cum = 951,711<br>Video Prems Open for Sale Cum = 906,054<br># WCs Video Network Ready = 18 |
| Core - E. PA- DE ($M) = $56.8<br>Core - Philadelphia ($M) = $10.3<br>FTTP- E. PA- DE ($M) = $168.9<br>FTTP - $ Cost per Prem Passed = $622<br>FTTP - $ cost per MDU NC = $837<br>FTTP - $ Cost per MTU NC = $1,246<br>Core - Expense - E.PA-DE ($M) = $10.7<br>Core - Expense - Philadelphia ($K) = $238<br>Retirements ($M) = $33.5<br><br>This objective fulfills the following Strategic Imperative:<br><br>   • Improve profitability | Core - E. PA- DE ($M) = $58<br>Core - Philadelphia ($M) = $10.9<br>FTTP- E. PA- DE ($M) = $165<br>FTTP - $ Cost per Prem Passed = $607<br>FTTP - $ cost per MDU NC = $779<br>FTTP - $ Cost per MTU NC = $1,121<br>Core - Expense - E.PA-DE ($M) = $12.4<br>Core - Expense - Philadelphia ($K) = $160<br>Retirements ($M) = $1.2 |
| Reduce Old Work<br>                Tracking<br>Increase ICGS Usage<br>              40%<br>Decrease Office<br>Expenditures          Tracking<br>Increase<br>Standardization<br>Tracking<br>Increase EWOs Drafted per<br>Drafter      200 Orders per<br>Drafter<br>Increase EWOs Posted per<br>Drafter      150<br>This objective fulfills the following Strategic Imperative:<br><br>   • Increase productivity | Significant impact on "old" routines and estimates with posting operations.<br>Lead efforts to recover materials resulting from office consuldation.  Also rationed paper to all parties.<br>Established processes that cross trained associates on daily functions.<br>Improved return times on work orders, especially hi-caps.<br>ICGS posting greatly improved in 2009. |
| DS1 CDDD = 92.2%<br>DS3 CDDD = 89%<br>OC-N CDDD = 81.8% | DS1 CDDD = 91.3%<br>DS3 CDDD = 88.1%<br>OC-N CDDD = 85.7%<br>%DD1 < 20 Days = 95.5% |

**CONFIDENTIAL**

**VZ/WALKER 823**

%DD1 < 20 Days = 96.5%
%DS3 < 20 Days = 85.6%
%OC-N < 45 Days = 85.2%
FTTP Total Held Orders = 6
- Capacity Related held orders = 2
- Installation turn-back orders = 4

This objective fulfills the following
Strategic Imperative:

- Provide the best customer service

%DS3 < 20 Days = 90.6%
%OC-N < 45 Days = 97%
FTTP Total Held Orders = 5.1
- Capacity Related held orders = 2.1
- Installation turn-back orders = 3

---

Employment Development

- Performance Management
  (Quarterly & YE) Tracking
- Associate Reviews (Mid-Year &
  YE)              Tracking
- Career Planning (Performance
  Agreement)  January 30th
- Training              Mandatory
  +2

Diversity                    Tracking
Absence Associate
<5.2%
This objective fulfills the following
Strategic Imperative:

- Create a culture of performance

Performance Management - Quarterly and Year End
Completed On-Time
Performance Agreement - Completed On-Time
Training:

- Wats
- AMTS
- Asset Mgmt
- Peoplesoft
- CAAR APM 7
- Master Certificate for ROI Technology

Diversity Training: Bronze Degree
Associate Absence: 6.64%
Diversity Training - Bronze Degree
100% Attendance

---

Overall summary of accomplishments:

- Implemented ICGS posting in Philadelphia (District wide resource)
- Successfully crossed trained team on 4824s, posting and issuing
- Directly resolved Held Orders
- Positive participation on committees - All Management Meeting and Employee Handbook creation
- Updated VBuild and Project Costing records
- Implemented new FTTP Inquiry process in Philadelphia
- Created Sell One More Bulletin Board
- Created Posting Transmittals Process
- Established a process to monitor "M" spending
- Continued to monitor absences
- Trained Engineers on the use of Aardwolf, Bulk Pr Recoveries and DSL Denials

Your leadership contributions through communication and driving our culture are:

- Gate keeper for Philadelphia Held Orders
- Continuous Learner - personal growth and career path education
- Lead resource for Philadelphia Office issues
- Distributed work to Re-engage Associates

Your opportunities for improvement are:

- Capital Budget
- Expense Budget
- DS0 CDDD
- Associate Absence Rate

**CONFIDENTIAL**                                                    **VZ/WALKER 824**

**Section II – Client Feedback –** *Optional*

Summarize client feedback gathered throughout the year regarding the employee's performance, including demonstration of competencies that support Verizon's values. The input of clients may be solicited by the employee or provided voluntarily by clients to the employee or supervisor. Generally, the supervisor should discuss client input with the employee before it is considered in the assessment of performance.

**Comments:**

☐ **Preliminary Assessment:** Place an "x" in the box to the left to indicate that preliminary performance information has been recorded for reference in finalizing the Year-End Performance Assessment.

**Note:** This section should be completed only when the supervisor recording preliminary performance information is not the supervisor who will be completing and signing the final Year-End Performance Assessment for the employee.

**Name of Supervisor Completing Preliminary Assessment:** **Date:**

**Signatures**

*Your signature indicates that you have read and discussed this assessment with your supervisor and that you have been given the opportunity to record your comments on the form provided for this purpose.*

| Employee: SUZETTE WALKER | Date: 2/16/2010 9:51:34 AM |
|---|---|
| Appraising Supervisor: BRIAN MAGEE | Date: 1/29/2010 8:02:56 AM |
| Approving Manager: JOSEPH SNYDER | Date: 1/29/2010 8:29:28 AM |

**CONFIDENTIAL**                                                                 **VZ/WALKER 825**

## Performance Document - Year-End Performance Review

Suzette E Walker , SEC MGR-NTWK ENG
Year-End Performance Review: 01/01/2010 - 12/31/2010
Performance Year:2010   Business Group:Wireline
Band:7G

Summarize the results achieved by the employee for any objectives established throughout the year. In evaluating the employee's overall performance contribution, supervisors should consider the extent to which the employee demonstrated behaviors that support the organization's core values.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

*NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW FORM AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.*

## Section 1 - Objectives

**1. Grow Revenues**

Sell One More % Active Participation YTD - Tracking
Sell One More % Sold Participation YTD - Tracking
Sell One More $ Sold Revenue YTD (000) - Tracking

- **Due Date :** 12/31/2010

- **Status:**

- **Percent Complete:** 0

  - **Performance Measures:**Scorecard

- **Imperatives:**Increase Revenue

- **Employee Accomplishments / Status:**-$515.88 Sell One More Sold Revenue

## 3. Increase Profitability

Manager Budget Core ($M)
Manager Expense ($M)
Late Supplements

- **Due Date :** 12/31/2010

- **Status:**

- **Percent Complete:** 0

  - **Performance Measures:**Scorecard

- **Imperatives:**Improve Profitability

- **Employee Accomplishments / Status:**-Monitor "M" work to control expense dollars
-0 Late Supplements

## 4. Improve Productivity

Increase Standardization (meet milestones)
-E1, Provisioning, PSF, FE/VM, Contract Adm, Plng, PM
Decrease Office Expenditures by 20%

- **Due Date :** 12/31/2010

- **Status:**

- **Percent Complete:** 0

  - **Performance Measures:**Scorecard

- **Imperatives:**Increase Productivity

- **Employee Accomplishments / Status:**-Monitor office expenses-supplies, postage, etc
-Institute scanning of all bills- no US mail or company mail delivery
-Redistribution of supplies/equipment to garages for in house use.
-Institute "sharing" of office supplies between various groups.
-Changed the Geo Tech process to an email process.
-Changed the PA One Call mail outs to achieve 48 hour delivery of prints.

## 5. Best Customer Experience

VPS
-LBW CDDD OTP @ 93.6%
-HBW CDDD OTP @ 92.7%
Hicaps Missed Report

**VZ/WALKER 827**

-DS3 CDDD @ 8
-OC-N CDDD @ 2
% Hi-cap Interval Reduction
-% LBW Complete in 9.96 Days
-% HBW Complete in 13.75 Days
% RequestNet Response
-DS3 @ 98%
-OC-N @ 98%
DS0 Held Orders (Daily Avg)
OSP @ 8
Total @ 130
FTTP Total Held Orders (Daily Avg)
-Capacity Related Held Orders
-Installation Turn-back Orders

- **Due Date :** 12/31/2010

- **Status:**

- **Percent Complete:** 0

  - **Performance Measures:**Scorecard

- **Imperatives:**Provide the Best Customer Service

- **Employee Accomplishments / Status:-**Provide drafting in support of DS1 CDDD
-Provide direction to ATs concerning service order and work order resolutions (In-house supervision)
-Resolve DSL issues, customer complaints and presidential complaints
-Resolve facility issues for new developments, businesses and residential customers
-Resolve FTTP address inquiries

---

## 6. Strengthen Our Culture

Employee Development
-Performance Management (Qtrly & YE Appraisals)
-Associate Perfomance Management (Mid & YE Appraisals)
-Career Planning (Performance Agreements)
-Training
Diversity
-Support Diversity Business Council and its Initiatives
Associate Absence (%) - 5.2%

- **Due Date :** 12/31/2010

- **Status:**

- **Percent Complete:** 0

  - **Performance Measures:**Scorecard

- **Imperatives:**Create a Culture of Performance

- **Employee Accomplishments / Status:-**Achieved Bronze Level Diversity Degree
-Train peers on Aardwolf, bulk pair recovery, Workbrain and dsl denial process
-Management Master Certificate for ROI Technology
-CAAR APM 7 Training

**VZ/WALKER 828**

## Section 2 - Manager Overall Assessment

**Performance Summary (Required)**

Suzette managed to juggle multiple projects and responsibilities in the first half of the year.  The second half of the year was more challenging, due to both Assignment and Drafting retirements. Suzette adjusted to the changed environment and modified several process flows to focus on District-Wide Services.  Regarding Assignment, Suzette continued to be a resource for DSL and general DS0 assignment issues.     Regarding

Drafting, Suzette supported a spike in Telco J design requests very well, which keep the work flowing from Engineering.

## Section 3 - Feedback from others

**Feedback from others (Optional)**

Summarize client feedback gathered throughout the year regarding the employee's performance, including demonstration of competencies that support Verizon's values.  The input of clients may be solicited by the employee or provided voluntarily by clients to the employee or supervisor.  Generally, the supervisor should discuss client input with the employee before it is considered in the assessment of performance.

## Section 4 - Employee Year-End Comments

**Employee Year-End Comments**

Comments:

## Section 5 - Performance Rating

| Leading | *Employee sustained performance above objectives, requirements and expectations.* |
|---|---|
| Performing | *Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.* |
| Developing | *Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed.* |
| New | *Achievement relative to performance objectives cannot be evaluated due to short tenure in position.*<br>*- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*<br>*- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

Performance Rating:**Performing**

Signatures :

Employee : Suzette Walker          Date: 2011-02-11

**CONFIDENTIAL**                                    **VZ/WALKER 830**

Manager : Brian Magee        Date: 2011-02-11

**CONFIDENTIAL**

## Performance Document - Year-End Performance Review

Suzette E Walker , Sec Mgr-Ntwk Eng
Year-End Performance Review: 01/01/2011 - 12/31/2011
Performance Year:2011   Business Group:Wireline
Band:7V

Summarize the results achieved by the employee for any objectives established throughout the year. In evaluating the employee's overall performance contribution, supervisors should consider the extent to which the employee demonstrated behaviors that support the organization's core values.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

*NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW FORM AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.*

## Section 1 - Objectives

### Supervisor Responsibilities

1. Sets and communicates objectives, manages the work, directs the employee, and conducts a year - end formal review to assess the contribution to the business.

2. Provides regular and ongoing performance feedback, training and development and takes appropriate action when employee does not meet performance standards.

- **Due Date :** 12/31/2011

- **Status:**

- **Percent Complete:** 0

- **Performance Measures:**
1. Employee receives a performance agreement/objectives, written year-end review and performance

 VZ/WALKER 832

discussion.

2. Places employee on performance improvement, recommends and administers discipline as appropriate

- **Imperatives:**Create a Culture of Performance

- **Employee Accomplishments / Status:**-Completed Associate performance agreements on time.
-Completed Associate Mid-Year Appraisals on time.

**Manager Comments (Optional)**

---

## 2. Leverage Best Network

Improve Network Reliability
- Meet CDD Objectives; LBW, HBW & OCN
- Meet HiCap Interval Reduction Initiatives - TBD
- Meet customer requirements through and always on, dependable, scalable network.
- Meet Objectives for Held Orders, DSL Requests, FAST Inquiries

- **Due Date :** 12/31/2011

- **Status:**

- **Percent Complete:** 0

  - **Performance Measures:**Scorecard

- **Imperatives:**Take Share from our Competition

- **Employee Accomplishments / Status:**

-Extensive research for problems created by ICGS conversion process in PA-DE
-COPA Project
-DSL escalations
-Customer complaints due to service order process flow creating roadblocks.  Coordinate with the APC and DRC to correct process flow issues and initiate additional training for associates.
-Loop qualification escalations
-Vbuild Committee to convert Aardwolf into vbuild for service orders
-Monitor held for cable service

orders in Aardwolf and vbuild for process flow
-Handle all DSL escalations for Philadelphia/Delaware
-Conduit drafting, posting and/or closings for Philadelphia
-Cable drafting and posting for Eastern North and Eastern South in respect to the needs of the business.
-Customer complaints due to service order process flow creating roadblocks.
-Coordinate with APC and DRC to correct process flow issues and initiate additional training

for associates and peers to provide cohesion to the process flow.
-Work on work order flow to and from contractors.
-ICGS Conversion assistance for Contractors
-FIOS assistance to technicians when needs of the business warrant.
-Maintain constant vigil on work orders requiring permits from City of Philadelphia due to high level of importance

---

**CONFIDENTIAL**

**VZ/WALKER 833**

**Manager Comments (Optional)**

---

## 3. Improve Productivity

Increase Standardization (meet milestones)
-E1, Provisioning, PSF, FE/VM, Contract Adm, Plng, PM
Decrease Office Expenditures by 20%

- **Due Date :** 12/31/2011

- **Status:**

- **Percent Complete:** 0

  - **Performance Measures:** Scorecard

  - **Imperatives:** Increase Productivity

- **Employee Accomplishments / Status:**

-Asset Management corrections for Philadelphia/Delaware corporate books
- Monitor held for cable service orders in Aardwolf and vbuild for process flow
-Reorganization of office equipment and supplies during office clean up
-Recycle paper and plastic for Go Green Project.
-Recycle supplies between offices due to budget constraints such as: colored paper, folders, etc.
-vBuild Committee to convert Aardwolf into vbuild for service

orders
-Non-converted ICGS plans to create a software package for the purpose of designing work prints.
-Conduit drafting and posting in PA-DE.
-Drafting for non-ICGS area in Eastern North and Eastern South
-Approve contractor bills in Vision only when proper documentations are included.
•Monitor purchases with the utmost scrutiny due to cost constraints
•Create template for GPIS requirement of the rebuild/replacement of

manholes.
•Pole Management committee for creation of software application to track pole placements and
removals.
•Non-converted ICGS plans to create a software package for the purpose of designing work prints
scheduled to cutover 2012
•Extensive research for problems created by ICGS conversion process in PA/DE
•Drafting for non-ICGS area in Eastern North and Eastern South
•Loop qualifications escalations
•Mediate CPC issues for loop

qualifications
•Negotiated with Pitney Bowes to waive late fees ($109.17)

**Manager Comments (Optional)**

---

## 4. Strengthen Our Culture

CONFIDENTIAL

Employee Development
-Performance Management (Qtrly & YE Appraisals)
-Career Planning (Performance Agreements)
 -Training
 Diversity
-Support Diversity Business Council and its Initiatives
Associate Absence (%) - 5.2%

 - **Due Date** : 12/31/2011

 - **Status:**

 - **Percent Complete:** 0

   - **Performance Measures:**Scorecard

 - **Imperatives:**Create a Culture of Performance

- **Employee Accomplishments / Status:**

•Training
•Domestic Violence
•Ensuring Network Reliability(Power of 1)
•PRS training
•Reducing Common IDDS troubles
•Preventable Outage Reduction-Improving the Customer Experience
•Supervisor Responsibilities under the American with Disabilities Act
•Attendance Matters Training: "With All Due Respect: Actions to Build an Inclusive and Productive Work Environment"
•Accommodations to AT for superior customer service
•Convert associates to

Outlook
•Implement additional training for associates
•Meetings and classes: Adaptive Leadership, Credo/Best Assets, Emergency Management and AMTs training

**Manager Comments (Optional)**

## Section 2 - Manager Overall Assessment

**Manager's Previous Performance Summary**

**Mid-Year Review**

Suzette continues to successfully lead her team and work functions. Between juggling work orders and service orders between Associates and Work Centers Suzette manages to keep the work flowing to the benefit of the Engineering Teams. Also with the advent of SOW Contractors Suzette as filled a role as

auditor of invoices.

## Performance Summary (Required)

Suzette continued in the second half of the year to give 110% to her Assignment and Drafting Supervisory Responsibilities.  Suzette exhibits a sense of ownership to her duties, which promotes efficiency and provides for creative solutions.  The Assignment process flow changed in 2011 with the migration to VBuild, Suzette helped implement the move for our District.  Suzette also continued to maximize the efficiencies between the
Drafting Teams within our District and the same on the Assignment side, but with the Western PA Team.

## You demonstrated "living the Credo" by (Required):

Instructions: Provide examples of how Credo behaviors were demonstrated in reaching top objectives. For example, "Working with a cross functional team, reduced the customer fulfillment process by 15%, pulled together as a team, worked with a sense of urgency, and delivered a solution ahead of plan."

Suzette demonstrates the Credo by paying close attention to economical issues and is always willing to make the hard "go" - "no go" decisions.  Examples are numerous, but DSL decisions in marginal areas and paper issues in the office are her shining examples.

## Section 3 - Feedback from others

## Feedback from others (Optional)

Summarize client feedback gathered throughout the year regarding the employee's performance, including demonstration of competencies that support Verizon's values.  The input of clients may be solicited by the employee or provided voluntarily by clients to the employee or supervisor.  Generally, the supervisor should discuss client input with the employee before it is considered in the assessment of performance.

**VZ/WALKER 836**

## Section 4 - Employee Year-End Comments

**Employee Year-End Comments**
    **Comments:**

## Section 5 - Performance Rating

| Leading | Employee sustained performance above objectives, requirements and expectations. |
|---|---|
| Performing | Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them. |
| Developing | Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed. |
| New | Achievement relative to performance objectives cannot be evaluated due to short tenure in position.<br>- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.<br>- Performing duties less than 3 months of the year due to an authorized absence or leave. |

**Performance Rating:Performing**

**CONFIDENTIAL**

**VZ/WALKER 837**

Signatures :

---

Employee : Suzette Walker        Date: 2012-02-16

---

Manager : Brian Magee        Date: 2012-02-16

---

**CONFIDENTIAL**

**VZ/WALKER 838**

## Performance Document - Year-End Performance Review

Suzette E Walker , Spec Eng-Ntwk Engrg
Year-End Performance Review: 01/01/2012 - 12/31/2012
Performance Year:2012   Business Group:Wireline
Band:7T

Summarize the results achieved by the employee for any objectives established throughout the year. In evaluating the employee's overall performance contribution, supervisors should consider the extent to which the employee demonstrated behaviors that support the organization's core values.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

*NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW FORM AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.*

## Section 1 - Objectives

**Be More Profitable**

Engineering Capital $s
Engineering Expense $s
Office Expenditures
Energy Reduction

- **Due Date :** 12/31/2012

- **Status:**

- **Percent Complete:** 0

  • **Performance Measures:**Monthly Scorecard

• **Employee Accomplishments / Status:**

Suzette was instrumental in the following areas:

-Reorganization of office equipment and supplies
-Recycling of paper and plastic items
-Recycling of supplies between offices and departments
-Monitoring purchases with the utmost scrutiny.
-Monitoring service orders for process flow to avoid multiple unnecessary dispatches.
-Coordinating with APC and DRC to correct process flow issues to provide cohesion to the process flow
-Negotiating the transfer of Pitney Bowes postage machine from Philadelphia to Exton office
-Maintaining the integrity of the plats drive for access for various engineering groups – construction, contractors and vendors.
-Evaluating contractor design problems
-Coordinating no parking signs, bollard requests and advance of pavement documentation
-PA One Call contractor calls for locates, markups and dig ups
-Calls from Verizon
technicians unable to access systems
-Providing prints for Verizon locates to duct watcher
-Responding to City of Philadelphia design request via email
-addressing assist tickets for associate computer issues.
-Handling building issue for 900 Race Street with Real Estate, Legal and Corporate Departments
-Processing of bills and vouchers for 900 Race Street
-Monitoring Transportation Operation open items, complaints or issues given to
City of Philadelphia
-PA One Call complaints
-PA One Call designs
Cordination of PC refresh issues and replacements

**Manager Comments (Optional)**

---

## Improve the Customer Experience

Prints Issued On Time
Permits/ROW Request On Time
DS0 Held Orders
DSL Held Orders
Associate Metrics/Stats

- **Due Date :** 12/31/2012

- **Status:**

- **Percent Complete:** 0

- **Performance Measures:** Monthly Scorecard

- **Employee Accomplishments / Status:**

Suzette's contribution to the improvement of the Customer Experience included the following items:
-Resolution of customer complaints due to service order process flow creating roadblocks
-Correction of process flow issues and initiate additional training for associates
-Resolution of loop qualification escalation for PA/DE expediently
-Monitoring held for cable service orders on the Dexter report, in vbuild for process flow, and
field turnbacks from Construction.
-Resolution of calls concerning DSL and DSO escalations for PA/DE immediately
-Maintaining constant vigilance on work orders requiring permits from City of Philadelphia due to a high

VZ/WALKER 840

level of importance (lane closures, sidewalk closures, Fairmount Park and Penn dot   permits)
-Monitoring work order issuing process for PA/DE
-Mediation of CPC issues requiring loop qualification updates prior to LAM

date
-Providing facility assistance for COPA project
-Providing facility assistance to technicians on FIOS orders when the needs of the business warrant.
-Auditing as-builts for conduit prints drawn by vendors and contractors services for accuracy.

Assignment technician results
ACD Calls 5,627
Vbuild service order resolved 1,660
Vbuild service orders completed 483

**Manager Comments (Optional)**

---

## Simplify Products, Policies and Processes

Estimate Administration
-Close Outs
-Posting
Routine Administration
-Close Outs
-Posting
SOW Contractor Administration
GPIS Administration

- **Due Date :** 12/31/2012

- **Status:**

- **Percent Complete:** 0

   - **Performance Measures:**Monthly Scorecard

- **Employee Accomplishments / Status:**

Suzette accomplished the following items to simplify products, policies and processes:
-Monitoring the drafting, posting and closing of conduit and cable work orders in PA/DE in various software applications
-Constantly monitor  Asset Management for corrections required for Philadelphia/DE corporate books.
-Diminishing the backlog of old work orders both cable and conduit by cancelling or closing the work prints.
-Implementing

training program for associates to update and enhance skill sets for work order preparation and posting, loop makeups, 4824s, etc.
-Processing as-builts for conduit expeditiously to meet time constraints once all the pertinent documentation (redlines and billing) is received.
-Scanning redline copies into vbuild immediately upon receipt.
-Performing Sarbanes Oxley -3 way match for audit purposes.

Drafting results
Loop makeups -

362
Items drafted - 192
Items posted - 227

**CONFIDENTIAL**

**VZ/WALKER 841**

Items CC'd 76
Items closed 122
4824 items - > 100

**Manager Comments (Optional)**

---

## Fuel Our Culture

Performance Agreements (Qtrly & YE Obj/Appraisals)
Associate Performance Agreement (Mid & YE Obj/Appraisals)
Absence Administration

 - **Due Date :** 12/31/2012

 - **Status:**

 - **Percent Complete:** 0

   - **Performance Measures:** Monthly Scorecard

 - **Employee Accomplishments / Status:**

In order to fuel our culture, Suzette performed and attended the for events:
-Creating associate performance and objectives
-Creating associate mid-year appraisals.

Meetings attended

PA/DE Assignment Technician work status
CAB Request Streamline Process
IDDS Conduit Conversion
First Family Practice of DE PUC complaint
Kent County ASWC
TPDS ADA Ramps Specifications for City of Philadelphia
Anthem Better Health
Wellness Clinc
Make

My Day
Improving Attendance Through work Relationships

Training

The ROI of Employee Engagement
The Sandwich Generation
Code of Conduit: Integrity in Action
NSOP – Navigation, View and Search
IDDS Non Converted Wire Center
PRS Training
EPM - Spreadsheet Training
ADA Training
Mid-Atlantic Medical Restriction Training

CONFIDENTIAL

VZ/WALKER 842

**Manager Comments (Optional)**

## Section 2 - Manager Overall Assessment

**Manager's Previous Performance Summary**

**Mid-Year Review**

Suzette has a small drafting team and 2 Assignment Technicians. Her team drafted approx 75 workorders and posted approx 45 workorders. Her AT's completed 71 Hi-Caps, 2489 misc assignments, 432 ewo assignments. Suzette works to organize, assemble and arrange resources to meet goals. Continues to seek and accept responsibilities.

**Performance Summary (Required)**

Suzette brings several years experience to the department and provides quality work. Suzette had a small drafting team and 2 Assignment Technicians. In her position, she not only works for her direct manager, but also all the other managers that she interacts with and supports. Suzette is a performer. Suzette worked extremely hard to ensure that the districts DS0 orders were processed and that the orders were flowing. Suzette has been reassigned to an engineer in the Philadelphia office.

**You demonstrated "living the Credo" by (Required):**

Instructions: Provide examples of how Credo behaviors were demonstrated in reaching top objectives. For example, "Working with a cross functional team, reduced the customer fulfillment process by 15%, pulled together as a team, worked with a sense of urgency, and delivered a solution ahead of plan."

Suzette works to ensure that customers receive their service in a timely fashion. She ensured that the DS0 orders were being worked.

CONFIDENTIAL

## Section 3 - Feedback from others

**Feedback from others (Optional)**

Summarize client feedback gathered throughout the year regarding the employee's performance, including demonstration of competencies that support Verizon's values.  The input of clients may be solicited by the employee or provided voluntarily by clients to the employee or supervisor.  Generally, the supervisor should discuss client input with the employee before it is considered in the assessment of performance.

## Section 4 - Employee Year-End Comments

**Employee Year-End Comments**

Comments:

## Section 5 - Performance Rating

| Leading | *Employee sustained performance above objectives, requirements and expectations.* |
| --- | --- |
| Performing | *Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.* |

**CONFIDENTIAL**

| Developing | Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed. |
| New | Achievement relative to performance objectives cannot be evaluated due to short tenure in position. <br> - New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee. <br> - Performing duties less than 3 months of the year due to an authorized absence or leave. |

Performance Rating:**Performing**

Signatures :

Employee : Suzette Walker        Date: 2013-02-21

Manager : Patricia McCoach        Date: 2013-02-21

**CONFIDENTIAL**

# Exhibit I

<u>2013 Performance</u>

## 2013 - Year-End Performance Review

Employee: Suzette E Walker , Engr III Spec-Ntwk Eng&Ops
Manager: Brian Magee, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.

## <u>Section 1 - Objectives</u>

living by the Credo

  - **Description and Measures:**Model the Credo in our daily work including by demonstrating integrity, customer focus, sense of urgency, personal accountability, and teamwork, and by complying with the Business Code of Conduct.

  - **Employee Accomplishments / Status:**

CONFIDENTIAL
Def_Walker_001

-Resolve customer complaints due to service order process flow creating roadblocks when assistance requested.
-Maintain the integrity of the plats drive for access for various engineering group – constructions, contractors, vendors, utilities, etc.
-Evaluate contractor design problems
-Coordinate no parking signs, bollard requests and advance of pavement documentation.
-Calls from Verizon technicians with facilities issues in need of

engineering assistance.
-Handle building issues for 900 Race Street with Real Estate, Legal and Corporate Departments
-PA One Call complaints and designs
-Maintain constant vigilance on work orders requiring permits for the City of Philadelphia due to a high level of importance (lane closures, sidewalk closures, Fairmount Park and Penndot permits)
-Diminish the backlog of old work orders both cable and conduit by researching their

status and proceeding to resolve the problems.
-Monitor Transportation Operations open items, complaints and/or issues concerning Verizon facilities
-Provide duct watchers with prints for Verizon locates when necessary.
-Coordinate the movement of Verizon facilities on Penndot Highway Jobs. (S0676, Richmond St., etc)
-Create CWO print for 3rd Party reimbursable work for CLECs
-Coordinate renovation for bridge reconstruction work.(Willow

Grove Ave., 40th St., etc.)
-Maintain a professional relationship with the City of Philadelphia to resolve facilities complaints, problems and concerns within the Philadelphia area.
-Use all available training offered to enhance efficiency and the work process
-Provide updated on changes in timeline to better coordinate the completion of work in a timely manner.
-Maintain a professional demeanor when confronted with issues and

attempting to resolve these issues internally and externally of the Verizon organization.
-Continue to ask questions concerning my new position. There is a need to absorb a great deal of terminology and processes that are required to become proficient in this job.

**Manager Comments (Optional)**

**Additional Revenue Growth**
   • **Description and Measures:** Assist with network expansion and facility build targets.
-SFU Greenfields
-MDU/MTU Overlays
-MDU/MTU Greenfields

Support new products and global product expansion
-FTTCS

- **Employee Accomplishments / Status:**

-Monitor conduit work order status
-Resolve open 4824 items quickly and effectively for accuracy without redundancy
-Coordinate with APC and DRC to correct or expedite issues that are being held due to roadblocks.
-Provide facility assistance to technicians on FIOS orders when the needs of the business warrant
-Audit as-built for conduit prints drawn by vendors and contractors for problems
-Provide information on problems from

FIOS customers to the proper individuals to provide customer satisfaction.

CONFIDENTIAL
Def_Walker_002

**Manager Comments (Optional)**

---

**Increase Profit Margin**

   **- Description and Measures:** -Capital Budget
-Expense Budget
-Estimate Administration
-Routine Work Administration
-CWO Administration
Aggressively control and reduce all operating and capital costs, meeting 2013 budget commitments.

**- Employee Accomplishments / Status:**

-Recycle paper and plastic items
-Recycle supplies between offices and departments
-Monitor purchases with the utmost scrutiny.
-Process bills and vouchers for 900 Race Street with speed and accuracy
-Monitor the cost effectiveness of doing a work order as opposed to a more cost effective resolution
-Provide assistance with new processes and procedures to create a smoother work flow for work orders
and service orders.
- Provide

engineers and marketing with information on new developments in the design stages
-Process reimbursable work prints with accuracy and efficiency to expedite payment.
-Evaluate all designs while paying close attention to cost and necessity.

**Manager Comments (Optional)**

---

**Leverage Best Network and Improve Customer Service**

   **- Description and Measures:** Leverage technology to deliver network and services reliability.
Apply a customer - first - attitude to all transactions, products and services.
-Support HiCapp Prints issued On Time -- 95% Objective
-Stay current with GPIS Reviews
-Stay current with 3rd Party Applications
-Increase knowledge of conduit design

**- Employee Accomplishments / Status:**

-Diminish the backlog of old work orders both cable and conduit by cancelling or closing the work
prints.
-PA One Call contractor calls for locates, markup and dig ups
-Direct design prints to the proper Engineers to expedite the completion of new developments in PA.
-Respond to City of Philadelphia design requests via email
-Respond to design requests for engineering firms and consultants via email
-GPIS jobs reviewed

-189
-3rd Party Applications - 20 CWO, 25 estimates
-Conduit Design request from engineering firms -- 46
-Verizon work prints - 20

CONFIDENTIAL
Def_Walker_003

Manager Comments (Optional)

**Create a Culture of Performance**

**- Description and Measures:** Get the job done the right way.
Be accountable for results, adhere to our core values and operate with a sense of urgency.
Drive change and innovation that brings results to the bottom line.
Complete Training as required.
Submit Mid Year and Year End Accomplishments as required.

**- Employee Accomplishments / Status:** -Attend training and meetings to enhance abilities.
vLicense Training
PRS Training
PAR Module Training
Antitrust Competition Law
How to Avoid Becoming a Distracted Driver
Building Shareholder Value
Keys for Safeguarding Privacy and Confidential Information
Requestnet
vLicense Conduit
CCP Training
vBuild - ISp and OSP
DC WEB Training
ESSM Requestnet Training
vImpact Training
CIAT Intergration

**Manager Comments (Optional)**

## Section 2 - Performance Agreement

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Comments (Optional)**

CONFIDENTIAL
Def_Walker_004

**Employee Comments (Optional)**

◇ Manager Signature & Release to Employee          Date: 02/21/2013

◇ Employee Signature                               Date: 02/21/2013

### Section 3 - Mid-Year Review

**Status:** Completed                    **Period:** January 1 - June 30

**Manager Performance Summary**

Suzette was moved to Conduit/Highway in the first half of the year due to existing knowledge of conduit and the City Permit process. GPIS review has been a positive transition, but conduit design has been hard to transition. Suzette has missed time due to an injury, which has made the transition difficult. The conduit area is still setup for the former Conduit Engineer and I have received complaints about the conduit

mailbox being full. We are not where the Conduit/Highway Team needs to be at this time.

The Phila/DE Team has mixed results on the FOC Metric: Missing DS1 and OCN, Making DS3 and Ethernet. The Phila/DE Team is also missing the Capital Metric.

**Employee Comments (Optional)**

◇ Manager Signature & Release to Employee          Date: 08/05/2013

CONFIDENTIAL
Def_Walker_005

◇ Employee Signature                          Date: 08/06/2013


## Section 4 - Year End Review

**Status:** Completed                    **Period:** January 1 - December 31


**Manager Performance Summary**

PA-DE had a very successful results year in 2013.  Capital, Expense, MDU/MTU, Prints Issued, Standard Interval Compliance were all positive.  FOC Intervals were a negative for both the District and Sub-District Teams.

Suzette made a transition at the end of 2012 to the Conduit Department from a Supervisory Role, she remained with Conduit all of 2013.  In the new job, Suzette adapted to the "Conflict Management" function

that was previously outsourced.  The Core function, "Conduit Design" was not performed by Suzette to the level necessary to demonstrate ownership.  This assignment was an opportunity for growth, but Suzette kept to a comfort zone and allowed the Contract Engineer to run the Conduit Department.


**Employee Comments (Optional)**



◇ Manager Signature & Release to Employee      **Date:** 02/24/2014

◇ Employee Signature                          **Date:** 02/24/2014


## Section 5 - Performance Rating


CONFIDENTIAL
Def_Walker_006

| Leading | *Employee sustained performance above objectives, requirements and expectations.* |
| Performing | *Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.* |
| Developing | *Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed.* |
| New | *Achievement relative to performance objectives cannot be evaluated due to short tenure in position.*<br>*- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*<br>*- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

**Performance Rating:Developing**

Signatures :

_____

Employee : Suzette Walker        Date: 2014-02-24

_____

Manager : Brian Magee        Date: 2014-02-24

_____

# Exhibit J

Metropolitan Life Insurance Company
MetLife Disability, P O Box 14590, Lexington, KY 40511
Phone: 1-800-638-4228   Fax: 1-800-230-9531



May 16, 2013

Suzette Walker                         RE: Employer: Verizon Communications
2748 N Judson Street                        Absence Number: MB151RD13352
Philadelphia, PA 19132                      ID Number: 774196109

Dear Ms. Suzette Walker:

**Why You Have Received This Letter:**
On May 16, 2013, we received a Health Care Provider Certification (HCPC) or other information related to this leave request certifying your need for leave beginning April 26, 2013.

**How Absences Related To This Leave Are Handled:**
Based on this information your leave request has been approved from April 26, 2013 through June 9, 2013.

These absences are counted as leave under the Family Medical Leave Act (FMLA), state family medical leave laws and/or Verizon's family and medical leave program, as applicable.

Regardless of the amount of leave you request, you are only entitled to the amount of leave available under the applicable leave programs listed above.

**Important Information You Should Know:**
Verizon will not require you to substitute or use paid leave during your family and medical leave if leave is to care for a qualified family member. If you are approved for family and medical leave due to your own serious health condition and you are approved for Short-Term Disability benefits (STD), family and medical leave will run concurrently with approved STD pay.

You may be required to present an authorization to return to work prior to returning to work. If such authorization is required but not received, your return to work may be delayed until the authorization is provided. A list of the essential functions of your position is not attached. If attached, the fitness-for-duty certification must address your ability to perform these functions.

**We May Need Additional Information:**
If your need for leave extends beyond June 9, 2013, you may need to provide additional information to support the extension. Under certain circumstances, MetLife may also request a recertification of your need for leave. MetLife will contact you in writing if your need for leave requires recertification.

**What To Do If You Have Questions:**
If you believe there is a workplace arrangement or accommodation that will enable you to return to work and perform your job, please contact your supervisor or complete an Accommodation Request (Form 20-1927) which can be found on About You at the following link:
http://myvzweb.verizon.com/formsportal/appmanager/verizon/forms

If you have questions regarding your leave and would like to speak to a MetLife representative, please contact MetLife's Total Absence Management Service Center Monday through Friday from 8:00 A.M. to 11:00 P.M. Eastern Time at 1-800-638-4228 or consult www.metlife.com/mybenefits.

For efficient and prompt claim handling, all documents or correspondence returned to us should contain your claim number.

CONFIDENTIAL                    VZ_WALKER_185

# Exhibit K

Metropolitan Life Insurance Company
MetLife Disability, P. O. Box 14590, Lexington, KY 40511
Phone: 1-800-638-4228   Fax: 1-800-230-9531



June 6, 2013

Suzette Walker                              RE: Employer: Verizon Communications
2748 N Judson Street                            Absence Number: MB151R013352
Philadelphia, PA 19132                          ID Number: 774196109

Dear Ms. Suzette Walker:

**Why You Have Received This Letter:**
On May 20, 2013, we received a Health Care Provider Certification (HCPC) or other information related to this leave request certifying your need for leave beginning April 26, 2013.

**How Absences Related To This Leave Are Handled:**
Based on this information your leave request has been approved from June 10, 2013 through July 14, 2013.

These absences are counted as leave under the Family Medical Leave Act (FMLA), state family medical leave laws and/or Verizon's family and medical leave program, as applicable.

Regardless of the amount of leave you request, you are only entitled to the amount of leave available under the applicable leave programs listed above.

**Important Information You Should Know:**
Verizon will not require you to substitute or use paid leave during your family and medical leave if leave is to care for a qualified family member. If you are approved for family and medical leave due to your own serious health condition and you are approved for Short-Term Disability benefits (STD), family and medical leave will run concurrently with approved STD pay.

You may be required to present an authorization to return to work prior to returning to work. If such authorization is required but not received, your return to work may be delayed until the authorization is provided. A list of the essential functions of your position is not attached. If attached, the fitness-for-duty certification must address your ability to perform these functions.

**We May Need Additional Information:**
If your need for leave extends beyond July 14, 2013, you may need to provide additional information to support the extension. Under certain circumstances, MetLife may also request a recertification of your need for leave. MetLife will contact you in writing if your need for leave requires recertification.

**What To Do If You Have Questions:**
If you believe there is a workplace arrangement or accommodation that will enable you to return to work and perform your job, please contact your supervisor or complete an Accommodation Request (Form 20-1927) which can be found on About You at the following link:
http://myvzweb.verizon.com/formsportal/appmanager/verizon/forms

If you have questions regarding your leave and would like to speak to a MetLife representative, please contact MetLife's Total Absence Management Service Center Monday through Friday from 8:00 A.M. to 11:00 P.M. Eastern Time at 1-800-638-4228 or consult www.metlife.com/mybenefits.

For efficient and prompt claim handling, all documents or correspondence returned to us should contain your claim number.

CONFIDENTIAL          VZ_WALKER_188

# Exhibit L

| Claim Number | Task Name | Task Status | Subject/ Comments | Comment Date | Comment | Scheduled Date | Completed Date | Completed By |
|---|---|---|---|---|---|---|---|---|
| 571304238497 | DPA Converted Diary Memo | Complete | ABSENCE MGMT RECORD SENT C | 07/16/2013 12:18 AM | TO: / / APPEAL RECV DT: / / APPEAL REFERRAL DT: / / APPL INTL 45 DAY END DT: / / APPL EXT REQ DT: / / APPL 45 DAY EXT END DT: / / APPL DETERMINE DT: / / APPEAL REFER TO CLAIMS DT: / /  ABSENCE MGMT RECORD SENT C SSN: 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 CLM: 571304238497 FEED DT: 07/16/2013 RPT: 310433 SUB: 1006 SUBPT: 0002 CLM TYP: STD TRX TYP: S TIMESTAMP: 2013-07-15-22.22.52.432080 EMP ID: 774196109 HIRE DT: 10/03/1978 CLM RPTD DT: 05/07/2013 FDA: 04/26/2013 STATUS: 02 CLM STAT RSN CD: 01 DENIAL RSN CD: WORK ST: PA DLW: 04/25/2013 RTW: / / EST RTW: / / RELATED CLAIMS TYPE RELATED CLAIMS TYPE (1) M8151RD13352 TAM (2) (3) (4) (5) (6) | 07/16/2013 12:18 AM | 07/16/2013 12:18 AM | Batch, UDS / System |
| 571304238497 | Info Received - IVR Submission | Complete | EE reported Future Part Time RTW 07/15/2013 | 07/11/2013 11:25 AM | | 07/11/2013 11:25 AM | 07/16/2013 03:38 PM | Astorga, Kimberly M / STD Clms Spec |
| 571304238497 | Info Received - IVR Submission | Complete | ER CONFIRMED EE RTW ON MONDAY 07/15/2013 WORKING | 07/16/2013 03:38 PM | FIVE HOURS PER DAY SPOKE WITH BRIAN | 07/11/2013 11:25 AM | 07/16/2013 03:38 PM | Astorga, Kimberly M / STD Clms Spec |
| 571304238497 | Subsequent Claim Decision | User Terminated | F/U FOR MEDICAL | 06/06/2013 11:21 AM | | 07/11/2013 11:21 AM | 07/16/2013 03:39 PM | Astorga, Kimberly M / |

CONFIDENTIAL          VZ_WALKER_215

Case 2:15-cv-04031-HB   Document 41-2   Filed 10/28/16   Page 264 of 548

# Exhibit M

(R) **ROTHMAN** INSTITUTE

OI# 571304 238497
F800-230-9531

1118 W. Baltimore Pike
Health Ctr, 3rd Floor
Media, PA 19063
800-321-9999

CHARLES L. GETZ, M.D.

For _Suzette Walter_          Date _9/10/13_

**Rx** Ms Walter will begin working
8hr/day on 10/1/13, 6hr/day on
11/1/13, 8hr/day on 12/1/13.

Renewal  1  2  3
MD 072654-L
BG 7865320
NPI 1965440627       Substitution Permissible _____ M.D.

In order for a Brand name product to be dispensed, the
prescriber must handwrite 'Brand necessary' or
'Brand medically necessary' in the space below.

If Rothman Logo is not visible in the background this Prescription is NOT VALID.

# Exhibit N

| Claim Number | Task Name | Task Status | Subject/ Comments | Comment Date | Comment | Scheduled Date | Completed Date | Completed By |
|---|---|---|---|---|---|---|---|---|
| 5713042384 | Claim Comment (M) | Complete | | | | 09/18/2013 09:34 AM | 09/18/2013 09:34 AM | Astorga, Kimberly M / STD Clms Spec |
| 5713042384 | Claim Comment (M) | Complete | CLAIM REVIEW | 09/18/2013 09:34 AM | | 09/18/2013 09:34 AM | 09/18/2013 09:34 AM | Astorga, Kimberly M / STD Clms Spec |
| 5713042384 | Incoming Call (M) | Complete | | | | 09/18/2013 09:37 AM | 09/18/2013 09:39 AM | Astorga, Kimberly M / STD Clms Spec |
| 5713042384 | Incoming Call (M) | Complete | INCOMING CALL FROM EE- ASKED CS TO RETURN HER CALL | 09/18/2013 09:39 AM | | 09/18/2013 09:37 AM | 09/18/2013 09:39 AM | Astorga, Kimberly M / STD Clms Spec |
| 5713042384 | Outgoing Communication | Complete | | | | 09/18/2013 09:39 AM | 09/18/2013 09:45 AM | Astorga, Kimberly M / STD Clms Spec |
| 5713042384 | Outgoing Communication | Complete | OUTGOING CALL TO EE- CS CALLED EE BACK | 09/18/2013 09:45 AM | CS TOLD HER SHE TRIED CALLING HER YESTERDAY. EE STATED THAT HER SUPERVISOR TOLD HER THAT SHE NEEDED TO RETURN FULL/TIME FULL DUTY ON 10/07/2013. ER ONLY ALLOWS 12 WEEKS OF REDUCED HOURS. EE UNDERSTOOD AND NEEDS TO SPECK WITH HER DR AND HAVE HER DR SEND OVER UPDATED MEDICAL. EE TOLD CS THAT THE | 09/18/2013 09:39 AM | 09/18/2013 09:45 AM | Astorga, Kimberly M / STD Clms Spec |

CONFIDENTIAL          VZ_WALKER_220

# Exhibit O

**Manager Comments (Optional)**

---

## Simplify Products, Policies, and Processes

- **Description and Measures:** Get the job done the right way.
Be accountable for results, adhere to our core values and operate with a sense of urgency.
Incorporate a CWS experiment.
Drive change and innovation that brings results to the bottom line.
100% Implementation of (IOF) EPM
Achieve WIG Objective
Implement 4 DX initiative
Reduce CIP %
Reduce work order variance %

- **Employee Accomplishments / Status:** participates in weekly WIG huddles, providing results and knows objective of achieving reductions in facility verifications.

**Manager Comments (Optional)**

---

## Fuel our culture

- **Description and Measures:** Employee Development - job related training-complete minimum (2) training sessions
• Complete (2) training courses
Safety-Motor Vehicle Accidents Objective - Zero Motor Vehicle Accidents
Absence (%)
• % Management Absence
• Individual Absence Ratio <1%
Recognition

- **Employee Accomplishments / Status:** In 2014 I had zero motor vehicle accidents and zero medical absence. I completed my training as needed.

**Manager Comments (Optional)**

---

## District Objectives

- **Description and Measures:** Meet all Chapter 30 requirements
Chapter 30 - Budget
C30 -BFRR - Regulatory On-Time
C30 - 2014 Regulatory Target

- **Employee Accomplishments / Status:** ongoing.

---

**CONFIDENTIAL**                                                    **VZ/WALKER 872**

**Manager Comments (Optional)**

## Simplify Products, Policies, and Processes

  **- Description and Measures:**Get the job done the right way.
Be accountable for results, adhere to our core values and operate with a sense of urgency.
Incorporate a CWS experiment.
Drive change and innovation that brings results to the bottom line.
100% Implementation of (IOF) EPM
Achieve WIG Objective
Implement 4 DX initiative
Reduce CIP %
Reduce work order variance %

  **- Employee Accomplishments / Status:**Continued High Level Focus on SR's to reduce interval and increase availability of products and services.

**Manager Comments (Optional)**

## Fuel our culture

  **- Description and Measures:**Employee Development - job related training-complete minimum (2) training sessions
• Complete (2) training courses
Safety-Motor Vehicle Accidents Objective - Zero Motor Vehicle Accidents
Absence (%)
• % Management Absence
• Individual Absence Ratio <1%
Recognition

**- Employee Accomplishments / Status:**100% attendance in 2014

0 days absent

**Manager Comments (Optional)**

## District Objectives

  **- Description and Measures:**Meet all Chapter 30 requirements
Chapter 30 - Budget
C30 -BFRR - Regulatory On-Time
C30 - 2014 Regulatory Target

CONFIDENTIAL

Incorporate a CWS experiment.
Drive change and innovation that brings results to the bottom line.
100% Implementation of (IOF) EPM
Achieve WIG Objective
Implement 4 DX initiative
Reduce CIP %
Reduce work order variance %

**- Employee Accomplishments / Status:**See attached PDF file for results.
Successfully achieved all WIG objects agreed to on our weekly calls.  For example, shorted all internals on SRs, Issue EWOs within 8 days of provisioning SRs, Meet with customers on all preset site survey. Provisioning test and turn up SRs without EWOs when equipment is available.

**Manager Comments (Optional)**

---

## Fuel our culture

**- Description and Measures:**Employee Development - job related training-complete minimum (2) training sessions
• Complete (2) training courses
Safety-Motor Vehicle Accidents Objective - Zero Motor Vehicle Accidents
Absence (%)
• % Management Absence
• Individual Absence Ratio <1%
Recognition

**- Employee Accomplishments / Status:**See attached PDF file for results.
Attended 14 training courses this year, no motor Vehicle accidents, and no absences.

**Manager Comments (Optional)**

---

## District Objectives

**- Description and Measures:**Meet all Chapter 30 requirements
Chapter 30 - Budget
C30 -BFRR - Regulatory On-Time
C30 - 2014 Regulatory Target

**- Employee Accomplishments / Status:**See attached PDF file for results.
Met all district objectives.

**Manager Comments (Optional)**

---

**CONFIDENTIAL**

**VZ/WALKER 1020**

Drive change and innovation that brings results to the bottom line.

100% Implementation of (IOF) EPM

Achieve WIG Objective

Implement 4 DX initiative

Reduce CIP %

Reduce work order variance %

- **Employee Accomplishments / Status:** *CREATED PROCESS FLOW FOR DS0 HELD ORDER IN VBUILD.
*CREATED HBW PROCESS FLOW FOR NEW EMPLOYEE.
* CWS COMPLIANT.
*PARTICIPATED IN 4 DX IINITIATIVES BRAINSTORMING SESSIONS.
*COACHED PEERS IN MY DEPARTMENT AS WELL AS OTHER DEPARTMENTS WITH OUTSIDE PLANT,
LFACS, TIRKS, AND ICGS KNOWLEDGE.

**Manager Comments (Optional)**

---

**Fuel our Culture**

   - **Description and Measures:** Employee Development - job related training-complete minimum (2) training
sessions

• Complete (2) training courses

Safety-Motor Vehicle Accidents Objective - Zero Motor Vehicle Accidents

Absence (%)

• % Management Absence

• Individual Absence Ratio <1%

Recognition

- **Employee Accomplishments / Status:** *COMPLETED ALL REQUIRED TRAINING WHICH INCLUDE
DRIVER SAFETY SERIES: SHARING THE ROAD, DRIVER SAFETY SERIES: DO NOT BE A TAILGATER,
DRIVER SAFETY SERIES: SAFE INTERSECTION TECHNIQUES, & 2014 ANTITRUST LAW
*ESSM TRAINING
*CNE TRAINING
*REQUESTNET TRAINING
*FUJITSU TRAINING
*COMPLETED ALL REQUIRED TRAINING IN 2014.
*COMPLETED MID YEAR REVIEW AS REQUIRED.
*COMPLETED END OF YEAR REVIEW AS REQUIRED.
*0 ABSENCES, 100 % PERFECT ATTENDANCE

**Manager Comments (Optional)**

---

**CONFIDENTIAL**                                                    **VZ/WALKER 975**

# Exhibit P

## *Delaware Engineering Organization List*

| 1/1/2014 | | | | | |
|---|---|---|---|---|---|
| *Responsibility* | *Engineer* | *E-Mail* | *Office* | *Cell* | *Out of hrs* |
| Manager | Brian Magee | REDACTED | ▬ | ▬ | ▬ |
| ROW / 3rd Party | Dee Reinholm | | REDACTED | | |
| Talleyville<br>Holly Oak | Ernie Padovani | REDACTED | | | |
| Wilmington<br>Penn Rose<br>Marshallton<br>New Castle | Mary Curtin | REDACTED | REDACTED | | REDACTED |
| Hockessin<br>Newark | Carl Bowman | REDACTED | REDACTED | REDACTED | |
| Wrangle Hill<br>Middletown | Scott Panichelli | REDACTED | REDACTED | REDACTED | REDACTED |
| Smyrna<br>Dover<br>Camden | John Shubrook | REDACTED | REDACTED | REDACTED | |
| Greenwood<br>Hartly<br>Felton<br>Fredrica<br>Georgetown<br>Harrington<br>Milton<br>Milford<br>Millsboro<br>Seaford | Sam Reinhardt | REDACTED | REDACTED | | |
| DE Highway<br>Angola<br>Bridgeville<br>Dagsboro<br>Delmar<br>Gumboro<br>Laurel<br>Lewes<br>Ocean View<br>Rehoboth<br>Selbyville | George Zang | REDACTED | REDACTED | REDACTED | |

CONFIDENTIAL        VZ_WALKER_814

## Main Line/Philadelphia Engineering Organization List

| 7/7/2014 | | | | |
|---|---|---|---|---|
| *Responsibility* | *Engineer* | *E-Mail* | *Office* | *Cell* |
| Manager | Brian Magee | REDACTED | ▮ | ▮ |
| Conduit/Highway | Anthony Portolese | ▮ | REDACTED | ▮ |
| Conduit/Highway | Gerry Slattery | ▮ | REDACTED | |
| Paoli<br>Wayne<br>Bryn Mawr | Paul Klauss | ▮ | REDACTED | ▮ |
| Ardmore<br>Bala Cynwyd<br>Kirklyn<br>Larchmont<br>Lansdowne<br>Springfield<br>Glenolden | Joe Scelsa | ▮ | REDACTED | ▮ |
| Market<br>Regent | Maria Cesare | ▮ | REDACTED | ▮ |
| Jefferson<br>Mayfair<br>Pilgrim<br>Orchard<br>Knights Rd | David Perry | ▮ | REDACTED | ▮ |
| Dewey<br>Eastwick<br>Saratoga | Steve Murphy | ▮ | REDACTED | ▮ |
| Evergreen<br>Sherwood<br>Trinity | Joe Hui | REDACTED | REDACTED | REDACTED |
| Locust<br>Pennypacker | Tom Hodge | REDACTED | REDACTED | REDACTED |
| Baldwin<br>Chestnut Hill<br>Davenport<br>Germantown<br>Ivy Ridge<br>Poplar<br>Waverly | Suzette Walker | REDACTED | REDACTED | REDACTED |

CONFIDENTIAL      VZ_WALKER_815

# Exhibit Q

Dave does an outstanding job at managing his workload.  He pays strict attention to all Service Requests that come in via requestnet, doing what is necessary to deliver our products on time and within budgets.  Dave also shares splitter add responsibility with his team mate Chiraq in getting orders released within a week of handoff, and ensures splitters are delivered on time to construction to allow their 14 day interval

to be met.  Dave embraces the new 360 degree engineering that we now do and likes the responsibilities that come with it.  Dave is an extremely talented engineer and likes to do things the right way.  I have had several discussions with Dave on the possibility of continuing his education as well as balancing his commitments at home, and at some point in the future, take a college level course that makes sense with his

career, as well as something he may like.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee                    **Date:** 08/07/2013

☒ Employee Signature                                         **Date:** 08/08/2013

## Section 4 - Year End Review

**Status:** Completed                         **Period:** January 1 - December 31

**Manager Performance Summary**

Dave has a very busy workload and works extremely hard to keep it under control.  He feels frustrated sometimes as he believes he is not giving our customers his best performance, but I remind him that workloads prevent that.  He knows our priorities and that is what I keep reinforcing with him.  Concentrate on all high bandwidth orders and that everything else will fall in place.

**Employee Comments (Optional)**

**CONFIDENTIAL**                                             **VZ/WALKER 1000**

☒ Manager Signature & Release to Employee                     **Date:** 02/17/2014

☒ Employee Signature                                         **Date:** 02/17/2014

## Section 5 - Performance Rating

| Leading | *Employee sustained performance above objectives, requirements and expectations.* |
|---|---|
| **Performing** | *Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.* |
| **Developing** | *Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed.* |
| **New** | *Achievement relative to performance objectives cannot be evaluated due to short tenure in position.*<br>*- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*<br>*- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

**Performance Rating:Performing**

Signatures :

Employee : David Stinson        Date: 2014-02-17

Manager : Carl Gross        Date: 2014-02-17

**CONFIDENTIAL**                                    **VZ/WALKER 1001**

# Exhibit R

<u>2014 Performance</u>

**2014 - Year-End Performance Review**

Employee: Suzette E Walker , Engr III Spec-Ntwk Eng&Ops
Manager: Brian Magee, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.

<u>Section 1 - Objectives</u>

**Living by the Credo**
• **Description and Measures:**Model the Credo in our daily work by demonstrating integrity, customer focus, sense of urgency, personal accountability, and by complying with the Code of Conduct.
• **Employee Accomplishments / Status:**

CONFIDENTIAL
Def_Walker_008

-Resolve customer complaints due to service order process flow creating roadblocks when assistance requested.
-Assist various departments with storm damage, problems and issues with outside facilities when needed.
-Maintain the integrity of the plats drive for access for various engineering groups - construction, contractors, vendors, utilities, etc.
-Evaluate engineering design problems for copper and fiber cables
-Resolve calls from

Verizon technicians with facility issues in need of clarification on work orders an, service orders, damage claims, etc.
-Handle building issues for 900 Race Street with Real Estate, Legal and Corporate Departments when they arise.
-Answer PA One Call complaints when requested
-Maintain constant vigilance on work orders for TLS and ON orders.
-Provide ductwatchers with prints for Verizon facilities when necessary
-Coordinated the

renovation for bridge reconstruction work at Willow Grove Ave.
-Continue to maintain a prfessional relationship with City of Philadelphia to resolve facility issues, complaints, problems and concerns within the Philadelphia area.
-Use all available training offered to enhance efficiency and the work process.
-Provide updates on changes in timeline to better coordinate the completion of work in a timely manner.
-Maintain a

professional demeanor when confronted with issues and attempt to resolve these issues internally and externally of the Verizon organization.
-Continue to ask questions concerning my new position. There is a need to absorb a great deal of terminology and processes that are required to become proficient in this job.
-Perform early site surveys efficiently for speedy processing of firm orders.
-Incorporate new processes for

Requestnet to maintain effectiveness.
-Adjust to the FTTP work flow process between departments to meet the HHs passed expectations.
-Apply for lane closure permits on arterial streets prior to the start of work.
-Resolve FTTP based problems using the proper processes to alleviate missing HHs.
-Increase interactions with leaders in other departments to demonstrate my ability to resolve problems.
-Visit customers to better align

resources and achieve cost effective results.
-Seek coaching to improve my ability to  achieve the best resolutions.


**Manager Comments (Optional)**

- Description and Measures:

  Meet/exceed network expansion and facility build targets.

Support new products and global product expansion.

Drive products on-net.

Accelerate speed to market and service delivery intervals.

CONFIDENTIAL
Def_Walker_009

Optimize broadband capabilities to stay ahead of increasing demand for bandwidth - enhance fios to provide converged communication, information, entertainment services.

Fiber to the Cell Site

Site Survey

EWOs Issued

FTTC E2E Macro

  Network Build

FTTC E2E Micro (Small Cell) Build

VzW Backbone Network Upgrades

Total Prems Passed Incr

Total Prems Open for Sale Incr

MXU Open for Sale Incr

MTU Open For Sales

**• Employee Accomplishments / Status:**

-Monitor work order status - FTTP, HBW, cell sites, etc.
-Resolve open 4824 items quickly and effectively for accuracy without redundancy
-Coordinate with APC, DRC, ATs, FIOS coordinators, etc.  to correct or expedite issues that are being held due to roadblocks.
-Manage PARs for vendors to survey, design and draft facilities for cell sites, SRs and building demolitions
-Provide facility assistance to technicians of FIOS orders

when the needs of the business warrant
-Provide information on problems from FIOS customers to the proper individuals to provide customer satisfaction.
-Take an active role to improve the alignment of resources in work processes.
-Participate in the Septa Dark Fiber Project
-Participate in the City of Philadelphia Project

**Manager Comments (Optional)**

---

**Be More Profitable**

**• Description and Measures:**

  Aggressively control and reduce all operating and capital costs, meeting 2014 budget commitments.

Consolidate systems, operations and facilities.

Increase productivity by simplifying, standardizing and automating processes.

Drive network convergence to improve capex and opex efficiency.

Cut energy, fuel and paper consumption to reduce costs and environmental impact.

CONFIDENTIAL
Def_Walker_010

Network Engr Capital ($M)

Total Budget Performance Core

Total Budget Performance FTTP (w/out PC, with Video)

Total Budget VZB

FTTCS Capital ($M)

FTTCS $ per site (6-month rolling avg cost) (000)

Core Unit Costs

DS1

DS3

OC-N

FTTP Unit Costs

12-mo Rolling $ Cost Per Prem Passed

12-mo Rolling $ Cost Per MDU NC

12-mo Rolling $ Cost Per MTU NC

Standard $ Cost Per Prem Passed

Standard $ Cost Per MDU NC

Network Reliability

Capital Spend

Expense

  Spend

Network Engineering Mgmt Headcount (FTE)

Energy Reduction

Retirements ($M)

Cost of Removal

- **Employee Accomplishments / Status:**

-Proper use of budget codes during the design of jobs as well as creating jobs within budget constraints.
-Recycle office supplies within the organization
-Monitor purchases with the utmost scrutiny
-Process bills, invoices and PARS with speed and accuracy.
-Monitor the cost effectiveness of doing a work order as opposed to a more cost effective resolution.
-Provide assistance with new processes and procedures to create a

smoother work flow for work orders and service orders.
-Provide engineers and marketing with information on new developments in design stages.
-Process reimbursable work prints with accuracy and efficiency to expedite payment.

CONFIDENTIAL
Def_Walker_011

-Evaluate all designs while paying close attention to cost and necessity.

**Manager Comments (Optional)**

## Improve the Customer Experience

- Description and Measures:

Improve network availability.

Meet SR Response Time, SI, Prints on time, ECCD and FAD objectives.

Leverage technology to deliver network and services reliability.

Apply a customer - first - attitude to all transactions, products and services.

Improve quality continuously across all departments including internal and external customer services.

Meet customer requirements through an always on, dependable and scalable network.

Request Net Intervals - SR Response On Time

SR Response Interval — Overall

SR Response Interval - Ethernet

DS1

DS3

OC-N

Ethernet

Standard Interval Compliance

Prints Issued On Time

FAD Scheduled Date Met

LBW & HBW

ECCD On Time Performance

LBW & HBW

- **Employee Accomplishments / Status:-** PA One Call contractor calls for locates, markups and dig ups
-Direct deign prints to the proper engineers to expedite the completion of new developments in PA.
-Respond to design requests
-Processed:
>164 invoices
>308 PARs
>10 designs from Contractors
31 GPIS requests

CONFIDENTIAL
Def_Walker_012

30 3rd Party request
> 15 PA One Call requests with conduit prints
>50 service order problems
4 Penndot milling jobs
>1163 pole jobs, SRs, surveys, deck jobs, FTTCS, splitter add, inquiries, 4824s ,etc.

**Manager Comments (Optional)**

---

**Simplify Products, Policies, and Processes**

• **Description and Measures:** Get the job done the right way.

Be accountable for results, adhere to our core values and operate with a sense of urgency.

Incorporate a CWS experiment.

Drive change and innovation that brings results to the bottom line.

100% implementation of (IOF) EPM

Achieve WIG Objective

Implement 4 DX initiative

Reduce CIP %

Reduce work order variance %

• **Employee Accomplishments / Status:**

-Provide assistance with new processes and procedures to create a smoother work flow for work orders and service orders.
-Provide engineers and marketing with information on new developments in design stages.
-Process reimbursable work prints with accuracy and efficiency to expedite payment.
-Evaluate all designs while paying close attention to cost and necessity.
-Monitor the cost effectiveness of doing a work order as opposed to

a more cost effective resolution.
-Provide information on problems from FIOS customers to the proper individuals to provide customer satisfaction.
-Process TLS and VON orders within the 8 day constraints.

**Manager Comments (Optional)**

---

**Fuel our Culture**

• **Description and Measures:** Employee Development - job related training-complete minimum (2) training sessions

CONFIDENTIAL
Def_Walker_013

• Complete (2) training courses

Safety-Motor Vehicle Accidents Objective - Zero Motor Vehicle Accidents

Absence (%)

• % Management Absence

• Individual Absence Ratio <1%

Recognition

• **Employee Accomplishments / Status:ESSM for Session**
ESSM for OSP
DRiver SAfety SEries:Do Not Be a Tailgator
GPON Augment
ESSM Funtionality
SR Q Coded
Antitrust Law
Driver Safety Series Part 2
Driver Safety Changing Lanes
Fujitsu Products
Requestnet Updates
Septa Project
City of Philadelphia Project
CPNI Training
CLLINET Training

**Manager Comments (Optional)**

## Section 2 - Performance Agreement

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Comments (Optional)**

**Employee Comments (Optional)**

CONFIDENTIAL
Def_Walker_014

◇ Manager Signature & Release to Employee        Date: 02/25/2014

◇ Employee Signature                             Date: 02/26/2014


## Section 3 - Mid-Year Review

**Status:** Completed                    **Period:** January 1 - June 30


### Manager Performance Summary

District Averages vs Your Averages @ Mid Year:
Prints Issued 136 vs 111
Hours Issued 6503 vs 3137
 # ODN HH 97 vs 0
 # NWC HH 223 vs 166
Average of Fac Verification 18.2 vs 10.3
SR Numbers 25 vs 6

Suzette your numbers look good considering your time in the Turf. Take ownership of your Turf and learn as much as you can during the remainder of this year on HBW. If you can get your Fac Verification under 8, you will be making a big contribution to the Team.


### Employee Comments (Optional)


◇ Manager Signature & Release to Employee        Date: 08/14/2014

◇ Employee Signature                             Date: 08/14/2014


CONFIDENTIAL
Def_Walker_015

## Section 4 - Year End Review

**Status:** Completed                         **Period:** January 1 - December 31

**Manager Performance Summary**

Your Average of Fac Verification 8.4 vs 12.7 Team's Average
Your # of SRs 25 vs 57 Team's Average

Suzette continued to grow into the Turf role in 2014. She took the HBW focus and moved her facility verification number to metric. Suzette utilizes and manages the SOW Contractors well, but would benefit from completing more of the HBW surveys herself. Also greater focus on the end product of the Contractors' product is necessary.

**Employee Comments (Optional)**

◈  Manager Signature & Release to Employee        **Date:** 02/26/2015

◈  Employee Signature                             **Date:** 02/26/2015

## Section 5 - Performance Rating

| Leading | Employee sustained performance above objectives, requirements and expectations. |
|---|---|
| Performing | Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them. |
| Developing | Performance did not meet objectives, requirements and expectations; some |

CONFIDENTIAL
Def_Walker_016

| | |
|---|---|
| | *or all objectives were not met and improvement is needed.* |
| New | *Achievement relative to performance objectives cannot be evaluated due to short tenure in position.*<br>*- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*<br>*- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

**Performance Rating: Performing**

Signatures :

Employee : Suzette Walker        Date: 2015-02-25

Manager : Brian Magee        Date: 2015-02-25

CONFIDENTIAL<br>Def_Walker_017

# Exhibit S

<u>2014 Performance</u>

**2014 - Year-End Performance Review**

Employee: Carl E Bowman JR, Engr III Spec-Ntwk Eng&Ops
Manager: Brian Magee, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress
made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the
employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information,
examples and observations pertinent to results achieved.

NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH
THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN
RESOURCES.

<u>Section 1 - Objectives</u>

**Living by the Credo**
  - **Description and Measures:**Model the Credo in our daily work by demonstrating integrity, customer focus,
sense of urgency, personal accountability, teamwork, and by complying with the Code of Conduct.

**- Employee Accomplishments / Status:**I treat every customer, both external and internal, with the utmost respect and try to deliver a superior customer experience through my actions in resolving their issues to their satisfaction. I continue to act as a SPOC for the DelDOT online permitting system. I have set up training for my peers with DelDOT for the online system to go over changes to the process.

**Manager Comments (Optional)**

---

## Grow Revenue

**- Description and Measures:**

Meet/exceed network expansion and facility build targets.

Support new products and global product expansion.

Drive products on-net.

Accelerate speed to market and service delivery intervals.

Optimize broadband capabilities to stay ahead of increasing demand for bandwidth - enhance fios to provide converged communication, information, entertainment services.

Fiber to the Cell Site

Site Survey

EWOs Issued

FTTC E2E Macro

   Network Build

FTTC E2E Micro (Small Cell) Build

VzW Backbone Network Upgrades

Total Prems Passed Incr

Total Prems Open for Sale Incr

MXU Open for Sale Incr

MTU Open For Sales

**- Employee Accomplishments / Status:**For 2014 I have issued 181 EWO's with the following breakdown:
35 Splitter Adds
6 SES over GPON Splitter Adds
62 Hicap orders (TLS, VON, DS1 over fiber,etc.)
29 FTTP jobs adding 372 more units to our network
13 CWO's
5 Equipment retirement jobs
10 Cellsite turn ups
15 Pole replacements

**Manager Comments (Optional)**

---

**Be More Profitable**

**- Description and Measures:**

Aggressively control and reduce all operating and capital costs, meeting 2014 budget commitments.

Consolidate systems, operations and facilities.

Increase productivity by simplifying, standardizing and automating processes.

Drive network convergence to improve capex and opex efficiency.

Cut energy, fuel and paper consumption to reduce costs and environmental impact.

Network Engr Capital ($M)

Total Budget Performance Core

Total Budget Performance FTTP (w/out PC, with Video)

Total Budget VZB

FTTCS Capital ($M)

FTTCS $ per site (6-month rolling avg cost) (000)

Core Unit Costs

DS1

DS3

OC-N

FTTP Unit Costs

12-mo Rolling $ Cost Per Prem Passed

12-mo Rolling $ Cost Per MDU NC

12-mo Rolling $ Cost Per MTU NC

Standard $ Cost Per Prem Passed

Standard $ Cost Per MDU NC

Network Reliability

Capital Spend

Expense

Spend

Network Engineering Mgmt Headcount (FTE)

Energy Reduction

Retirements ($M)

Cost of Removal

**- Employee Accomplishments / Status:** To date I have issued 13 CWO's totaling $268,456 with $0 be written off. I have issued 5 retirement jobs, 2 for old SLC PG systems and 3 for a mutiplexer, that has helped to reduce our energy costs and also resulted in retirement dollars.

**Manager Comments (Optional)**

---

## Improve the Customer Experience

**- Description and Measures:**

Improve network availability.

Meet SR Response Time, SI, Prints on time, ECCD and FAD objectives.

Leverage technology to deliver network and services reliability.

Apply a customer - first - attitude to all transactions, products and services.

Improve quality continuously across all departments including internal and external customer services.

Meet customer requirements through an always on, dependable and scalable

network.

Request Net Intervals - SR Response On Time

SR Response Interval – Overall

SR Response Interval - Ethernet

DS1

DS3

OC-N

Ethernet

Standard Interval Compliance

Prints Issued On Time

FAD Scheduled Date Met

LBW & HBW

ECCD On Time Performance

CONFIDENTIAL          VZ_WALKER_304

LBW & HBW

- **Employee Accomplishments / Status:** To date I have issued 62 Hicap EWO's, all EWO's meeting the prints on time and Standard Interval metrics. For the 2nd half of 2014 I answered 41 SR's with an average of 3.02 days to answer them. I was the first in Delaware to utilize a new multiplexer, FW7120, to meet a customers needs for new service.

**Manager Comments (Optional)**

## Simplify Products, Policies, and Processes

- **Description and Measures:** Get the job done the right way.

Be accountable for results, adhere to our core values and operate with a sense of urgency.

Incorporate a CWS experiment.

Drive change and innovation that brings results to the bottom line.

100% Implementation of (IOF) EPM

Achieve WIG Objective

Implement 4 DX initiative

Reduce CIP %

Reduce work order variance %

- **Employee Accomplishments / Status:** I pride myself on issuing EWO's that do not require any changes from the field. Only a little over 22% of the my issued EWO's have needed 4824's and over half of those have been to reduce footages of placed cable. I am working on exceeding the 4DX goals that have been set for my area.

**Manager Comments (Optional)**

## Fuel our Culture

- **Description and Measures:** Employee Development - job related training-complete minimum (2) training sessions

• Complete (2) training courses

Safety-Motor Vehicle Accidents Objective - Zero Motor Vehicle Accidents

Absence (%)

• % Management Absence

• Individual Absence Ratio <1%

Recognition

**- Employee Accomplishments / Status:**I have exceeded the required number of training courses. I have had a perfect driving record since the start of my career at Verizon thanks to the continued use of the driver training courses.

**Manager Comments (Optional)**

## Section 2 - Performance Agreement

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Comments (Optional)**

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 02/25/2014

☒ Employee Signature                               **Date:** 02/26/2014

## Section 3 - Mid-Year Review

**Status:** Completed                    **Period:** January 1 - June 30

CONFIDENTIAL          VZ_WALKER_306

**Manager Performance Summary**

District Averages vs Your Averages:
Prints Issued 136 vs 125
Hours Issued 6503 vs 5335
# ODN HH 97 vs 147
# NWC HH 223 vs 180
Average of Fac_Verification 18.2 vs 21.6
Average of SRs 25 vs 22

Carl, your results are fine, save the Facility Verification number.  The target is 8 and you are on the wrong side of the Team's Average.  There is not a more important target for you in the 2nd half of the year.  We need to have more frequent communication on your daily held SRs.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 08/15/2014

☒ Employee Signature          **Date:** 08/15/2014

## Section 4 - Year End Review

**Status:** Completed          **Period:** January 1 - December 31

**Manager Performance Summary**

Your Average of Fac_Verification 14.8 vs 12.7 Team Average
Your # of SRs 43 vs 57
Carl has made noticeable improvements in Customer contact. His knowledge of the SR process has also
improved. He needs to continue to put effort into driving down the Facility Verification hours. It was a year of
many changes and Carl was very supportive and engaged in the changes.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 02/23/2015

☒ Employee Signature                                **Date:** 02/23/2015

## Section 5 - Performance Rating

| Leading | *Employee sustained performance above objectives, requirements and expectations.* |
|---|---|
| Performing | *Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.* |
| Developing | *Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed.* |
| New | *Achievement relative to performance objectives cannot be evaluated due to short tenure in position.*<br>*- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*<br>*- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

**Performance Rating: Performing**

Signatures :

Employee : Carl Bowman          Date: 2015-02-23

Manager : Brian Magee          Date: 2015-02-23

CONFIDENTIAL          VZ_WALKER_309

# Exhibit T

## 2014 Performance

## 2014 - Year-End Performance Review

Employee: Ernest A Padovani , Engr III Spec-Ntwk Eng&Ops
Manager: Brian Magee, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.

## Section 1 - Objectives

**Living by the Credo**

 - **Description and Measures:**Model the Credo in our daily work by demonstrating integrity, customer focus, sense of urgency, personal accountability, teamwork, and by complying with the Code of Conduct.

CONFIDENTIAL        VZ_WALKER_343

**- Employee Accomplishments / Status:**

A) Get job done right the first time.
B) Get designs done in a timely manner
C) Project mange work.
D) Work with other engineers to solve engineering problems.
E) Work with other engineers on designs.
F) Work with construction, contract services on different projects.
G) Work on more then one project at a time.
H) Work with PennDot, municipalities, consultant and other utilities on different projects.
I)  Use adaptive

engineering.
J) Contact customers on SR's within 4 hours
K) Site Survey SR's with 72 hours
L) Answer SR's the same day as the survey.
M) Issue work orders for SR's on time.

**Manager Comments (Optional)**

---

**Grow Revenue**

**- Description and Measures:**

Meet/exceed network expansion and facility build targets.

Support new products and global product expansion.

Drive products on-net.

Accelerate speed to market and service delivery intervals.

Optimize broadband capabilities to stay ahead of increasing demand for bandwidth - enhance fios to provide converged communication, information, entertainment services.

Fiber to the Cell Site

Site Survey

EWOs Issued

FTTC E2E Macro
  Network Build

FTTC E2E Micro (Small Cell) Build

VzW Backbone Network Upgrades

Total Prems Passed Incr

Total Prems Open for Sale Incr

MXU Open for Sale Incr

MTU Open For Sales

**- Employee Accomplishments / Status:** A) watch project and work order so they stay on time and budget
B) Issued work orders early to so construction get have the work started early and finish early for possible early
deivvery of service
EWOs Issued for De and Pa =303

**Manager Comments (Optional)**

## Be More Profitable

**- Description and Measures:**

Aggressively control and reduce all operating and capital costs, meeting 2014 budget commitments.

Consolidate systems, operations and facilities.

Increase productivity by simplifying, standardizing and automating processes.

Drive network convergence to improve capex and opex efficiency.

Cut energy, fuel and paper consumption to reduce costs and environmental impact.

Network Engr Capital ($M)

Total Budget Performance Core

Total Budget Performance FTTP (w/out PC, with Video)

Total Budget VZB

FTTCS Capital ($M)

FTTCS $ per site (6-month rolling avg cost) (000)

Core Unit Costs

DS1

DS3

OC-N

FTTP Unit Costs

12-mo Rolling $ Cost Per Prem Passed

12-mo Rolling $ Cost Per MDU NC

12-mo Rolling $ Cost Per MTU NC

Standard $ Cost Per Prem Passed

Standard $ Cost Per MDU NC

Network Reliability

Capital Spend

Expense

  Spend

Network Engineering Mgmt Headcount (FTE)

Energy Reduction

Retirements ($M)

Cost of Removal

- **Employee Accomplishments / Status:**

A) Project mange work. Make sure work is issued and completed on time.
B) Funnel major projects to Contract Services. Contract costs are lower then Core cost.
C) Work with PennDot, Townships, County, developers, consultants and other utilities
    to minimize the affect on Verizon facilities.
D) Get job done right the first time.
E)  In some cases have developer or customer place Verizon provided conduit.
F) Sell One

More
G) Work on more then one project at a time.
H) Work with American U-Tel on bridge projects to keep cost down.
I)  Work with construction and contract services to keep cost down and have work
    done in timely manner and closed out.

**Manager Comments (Optional)**

---

**Improve the Customer Experience**

  - **Description and Measures:**

  Improve network availability.

Meet SR Response Time, SI, Prints on time,ECCD and FAD objectives.

Leverage technology to deliver network and services reliability.

Apply a customer - first - attitude to all transactions, products and services.

Improve quality continuously across all departments including internal and external customer services.

Meet customer requirements through an always on, dependable and scalable

  network.

Request Net Intervals - SR Response On Time

SR Response Interval ~ Overall

SR Response Interval - Ethernet

DS1

DS3

OC-N

Ethernet

Standard Interval Compliance

Prints Issued On Time

FAD Scheduled Date Met

LBW & HBW

ECCD On Time Performance

LBW & HBW

**- Employee Accomplishments / Status:** A) call customer within 4 hours after receiving the SR
B) schedule site survey within 72 hours of receiving the SR
C) answer the SR same day as survey
D) use PA-De interval reduction

**Manager Comments (Optional)**

---

## Simplify Products, Policies, and Processes

**- Description and Measures:** Get the job done the right way.

Be accountable for results, adhere to our core values and operate with a sense of urgency.

Incorporate a CWS experiment.

Drive change and innovation that brings results to the bottom line.

100% Implementation of (IOF) EPM

Achieve WIG Objective

Implement 4 DX initiative

Reduce CIP %

Reduce work order variance %

**- Employee Accomplishments / Status:**


**Manager Comments (Optional)**

**Fuel our Culture**

 **- Description and Measures:** Employee Development - job related training-complete minimum (2) training sessions

• Complete (2) training courses

Safety-Motor Vehicle Accidents Objective - Zero Motor Vehicle Accidents

Absence (%)

• % Management Absence

• Individual Absence Ratio <1%

Recognition

**- Employee Accomplishments / Status:**

**Manager Comments (Optional)**

---

## Section 2 - Performance Agreement

**Status:** Completed                          **Period:** January 1 - December 31

**Manager Comments (Optional)**

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee                **Date:** 02/25/2014

☒ Employee Signature                                      **Date:** 02/26/2014

## Section 3 - Mid-Year Review

**Status:** Completed                    **Period:** January 1 - June 30

**Manager Performance Summary**

District Averages vs Your Averages @ Mid Year:
Prints Issued 136 vs 171
Hours Issued 6503 vs 9262
 # ODN HH 97 vs 16
 # NWC HH 223 vs 23
Average of Fac_Verification 18.2 vs 25
Average of SRs 25 vs 33

Your numbers are solid except for Facility Verification.  Our target is 8 and you are on the wrong side
of our Team's Average.  You have gained alot of experience on HBW in the first half of the year, you
need

to put it into action and reduce this interval.  We are going to have to set up more frequet
conversation on your held SR.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee                **Date:** 08/15/2014

☒ Employee Signature                                      **Date:** 08/15/2014

## Section 4 - Year End Review

CONFIDENTIAL          VZ_WALKER_349

**Status:** Completed                    **Period:** January 1 - December 31

### Manager Performance Summary

Your Year End Average of Fac_Verification 16.5 vs 12.7
Your # of SRs 64 vs 57
Ernie needs to work on Customer communication;  it is your responsibility to keep customers informed and to stay in contact.  It is too easy in today's world to stay connected, this cannot be a fail point. Ernie also needs to get under his facility verification time, he should not be above the Team's average by 4 days.  On the positive
Ernie's volume of SRs was solid.  Also on the positive, his knowledgeable and wiliness to share his knowledge with the overall Team.

### Employee Comments (Optional)

☒ Manager Signature & Release to Employee          **Date:** 02/23/2015

☒ Employee Signature                               **Date:** 02/23/2015

### Section 5 - Performance Rating

| Leading | Employee sustained performance above objectives, requirements and expectations. |
|---|---|
| Performing | Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them. |
| Developing | Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed. |
| New | Achievement relative to performance objectives cannot be evaluated due to |

> *short tenure in position.*
> *- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*
> *- Performing duties less than 3 months of the year due to an authorized absence or leave.*

**Performance Rating: Performing**

Signatures :

Employee : Ernest Padovani          Date: 2015-02-23

Manager : Brian Magee          Date: 2015-02-23

# Exhibit U

## 2014 Performance

## 2014 - Year-End Performance Review

Employee: George W Zang , Engr III Spec-Ntwk Eng&Ops
Manager: Brian Magee, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress
made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the
employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information,
examples and observations pertinent to results achieved.

**NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH
THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN
RESOURCES.**

## Section 1 - Objectives

**Living by the Credo**

    **- Description and Measures:**Model the Credo in our daily work by demonstrating integrity, customer focus,
sense of urgency, personal accountability, teamwork, and by complying with the Code of Conduct.

**- Employee Accomplishments / Status:** Try to assist potential customers with orders and concerns as they arise.

**Manager Comments (Optional)**

## Grow Revenue

**- Description and Measures:**

Meet/exceed network expansion and facility build targets.

Support new products and global product expansion.

Drive products on-net.

Accelerate speed to market and service delivery intervals.

Optimize broadband capabilities to stay ahead of increasing demand for bandwidth - enhance fios to provide converged communication, information, entertainment services.

Fiber to the Cell Site

Site Survey

EWOs Issued

FTTC E2E Macro
 Network Build

FTTC E2E Micro (Small Cell) Build

VzW Backbone Network Upgrades

Total Prems Passed Incr

Total Prems Open for Sale Incr

MXU Open for Sale Incr

MTU Open For Sales

**- Employee Accomplishments / Status:** Continue to issue FTTP greenfields(triple play) for SFUs. Sending Networks Extension Letters to all others, per company policy. No MDU issued year to date. Waiting on some FTTCS surveys, until cell sites are built. Always supporting new hi-cap customer prem equipment.

**Manager Comments (Optional)**

## Be More Profitable

**- Description and Measures:**

Aggressively control and reduce all operating and capital costs, meeting 2014 budget commitments.

Consolidate systems, operations and facilities.

Increase productivity by simplifying, standardizing and automating processes.

Drive network convergence to improve capex and opex efficiency.

Cut energy, fuel and paper consumption to reduce costs and environmental impact.

Network Engr Capital ($M)

Total Budget Performance Core


Total Budget Performance FTTP (w/out PC, with Video)

Total Budget VZB

FTTCS Capital ($M)

FTTCS $ per site (6-month rolling avg cost) (000)

Core Unit Costs

DS1

DS3

OC-N

FTTP Unit Costs

12-mo Rolling $ Cost Per Prem Passed

12-mo Rolling $ Cost Per MDU NC

12-mo Rolling $ Cost Per MTU NC

Standard $ Cost Per Prem Passed

Standard $ Cost Per MDU NC

Network Reliability

Capital Spend

Expense

  Spend

Network Engineering Mgmt Headcount (FTE)

Energy Reduction

Retirements ($M)

Cost of Removal

**- Employee Accomplishments / Status:** Try to minimize highway expenses by downsizing and/or eliminating

copper cables where appropriate. Will continue to evaluate whether force migration is a viable option. I am always looking to consolidate and simplify our facilities, particularly at the customer prem. I am always looking to retire unused equipment.

**Manager Comments (Optional)**

## Improve the Customer Experience

- Description and Measures:

Improve network availability.

Meet SR Response Time, SI, Prints on time,ECCD and FAD objectives.

Leverage technology to deliver network and services reliability.

Apply a customer - first - attitude to all transactions, products and services.

Improve quality continuously across all departments including internal and external customer services.

Meet customer requirements through an always on, dependable and scalable

  network.

Request Net Intervals - SR Response On Time

SR Response Interval – Overall

SR Response Interval - Ethernet

DS1

DS3

OC-N

Ethernet

Standard Interval Compliance

Prints Issued On Time

FAD Scheduled Date Met

LBW & HBW

ECCD On Time Performance

LBW & HBW

- **Employee Accomplishments / Status:**I believe I have met all standard interval compliance as well as prints issued on time.

**Manager Comments (Optional)**

---

## Simplify Products,Policies, and Processes

- **Description and Measures:** Get the job done the right way.

Be accountable for results, adhere to our core values and operate with a sense of urgency.

Incorporate a CWS experiment.

Drive change and innovation that brings results to the bottom line.

100% Implementation of (IOF) EPM

Achieve WIG Objective

Implement 4 DX initiative

Reduce CIP %

Reduce work order variance %

- **Employee Accomplishments / Status:** I believe I am always focus with the goal of "getting the job done the right way" and protecting Verizons" interest.  I will try to reduce work order variances, especially on highway jobs.

**Manager Comments (Optional)**

---

## Fuel our Culture

- **Description and Measures:** Employee Development - job related training-complete minimum (2) training sessions

• Complete (2) training courses

Safety-Motor Vehicle Accidents Objective - Zero Motor Vehicle Accidents

Absence (%)

• % Management Absence

• Individual Absence Ratio <1%

Recognition

- **Employee Accomplishments / Status:** Have completed 3 training courses, year-to date.  No absences, accidents or recognition.

CONFIDENTIAL          VZ_WALKER_369

**Manager Comments (Optional)**

## Section 2 - Performance Agreement

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Comments (Optional)**

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 02/25/2014

☒ Employee Signature                               **Date:** 02/25/2014

## Section 3 - Mid-Year Review

**Status:** Completed                    **Period:** January 1 - June 30

**Manager Performance Summary**

CONFIDENTIAL          VZ_WALKER_370

District Averages vs Your Averages @ Mid Year:
Prints Issued 136 vs 118
Hours Issued 6503 vs 10,788
# ODN HH 97 vs 40
# NWC HH 223 vs 46
Average of Fac_Verification 18.2 vs 24.7
SR Number 25 vs 14

George you have gotten the State Highway jobs under control, now you have to get the Facility Verification interval under 8 days. You are currently much higher than our District Average. We are going to have to have more frequent conversations on your held SR.

## Employee Comments (Optional)

☒ Manager Signature & Release to Employee          **Date:** 08/15/2014

☒ Employee Signature                               **Date:** 08/15/2014

## Section 4 - Year End Review

**Status:** Completed                              **Period:** January 1 - December 31

## Manager Performance Summary

Your Average of Fac_Verification 16.9 vs 12.7 Team's Average
Your SR Number 23 vs 57 Team's Average

George was forced to handle a very difficult situation during 2015, which he handled with utmost class and professionalism. George keeps our Highway work current and is responsible for increasing our stature with the State. George also has kept the work flowing in Downstate, which was and is a huge positive. George needs to continue to learn and improve on SR and HBW responses.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee       **Date:** 02/23/2015

☒ Employee Signature       **Date:** 02/23/2015

## Section 5 - Performance Rating

| Leading | Employee sustained performance above objectives, requirements and expectations. |
|---|---|
| Performing | Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them. |
| Developing | Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed. |
| New | Achievement relative to performance objectives cannot be evaluated due to short tenure in position.<br>- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.<br>- Performing duties less than 3 months of the year due to an authorized absence or leave. |

**Performance Rating:Performing**

Signatures :

Employee : George Zang      Date: 2015-02-23

Manager : Brian Magee      Date: 2015-02-23

CONFIDENTIAL       VZ_WALKER_372

# Exhibit V

## 2014 Performance

## 2014 - Year-End Performance Review

Employee: Joseph Scelsa , Engr III Spec-Ntwk Eng&Ops
Manager: Brian Magee, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

**NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.**

## Section 1 - Objectives

**Living by the Credo**

  • **Description and Measures:**Model the Credo in our daily work by demonstrating integrity, customer focus, sense of urgency, personal accountability, teamwork, and by complying with the Code of Conduct.

CONFIDENTIAL     VZ_WALKER_407

**- Employee Accomplishments / Status:**Communicate and correspond with many customers on a daily basis with focus on taking accountability for job from start to finish.
Implement and project manage job from start to finish by utilizing all facets of Engineering and Construction team for faster service.
Coordinate with construction outside work groups for expediting multiple jobs for earlier service order dates and circuit turn-up.

**Manager Comments (Optional)**

## Grow Revenue

**- Description and Measures:**

Meet/exceed network expansion and facility build targets.

Support new products and global product expansion.

Drive products on-net.

Accelerate speed to market and service delivery intervals.

Optimize broadband capabilities to stay ahead of increasing demand for bandwidth - enhance fios to provide converged communication, information, entertainment services.

Fiber to the Cell Site

Site Survey

EWOs Issued

FTTC E2E Macro
  Network Build

FTTC E2E Micro (Small Cell) Build

VzW Backbone Network Upgrades

Total Prems Passed Incr

Total Prems Open for Sale Incr

MXU Open for Sale Incr

MTU Open For Sales

**- Employee Accomplishments / Status:**Issued 86 HBW jobs to construction to build for revenue generation. Issued 7 FTTCS jobs to construction for EWO opportunity. Issued multiple work orders for MDU and MTU open for sales generating revenue. Issued a total of 471 work orders which included HBW, MTU/MDU Overlay, Greenfield (SFU,MDU, MTU), CWO and other BAU work to construction.

**Manager Comments (Optional)**

## Be More Profitable

**- Description and Measures:**

Aggressively control and reduce all operating and capital costs, meeting 2014 budget commitments.

Consolidate systems, operations and facilities.

Increase productivity by simplifying, standardizing and automating processes.

Drive network convergence to improve capex and opex efficiency.

Cut energy, fuel and paper consumption to reduce costs and environmental impact.

Network Engr Capital ($M)

Total Budget Performance Core


Total Budget Performance FTTP (w/out PC, with Video)

Total Budget VZB

FTTCS Capital ($M)

FTTCS $ per site (6-month rolling avg cost) (000)

Core Unit Costs

DS1

DS3

OC-N

FTTP Unit Costs

12-mo Rolling $ Cost Per Prem Passed

12-mo Rolling $ Cost Per MDU NC

12-mo Rolling $ Cost Per MTU NC

Standard $ Cost Per Prem Passed

Standard $ Cost Per MDU NC

Network Reliability

Capital Spend

Expense

  Spend

Network Engineering Mgmt Headcount (FTE)

Energy Reduction

Retirements ($M)

Cost of Removal

**- Employee Accomplishments / Status:** Control budget and unnecessary spending by placing enough cable for the job and also for future services, by focusing on the customer future needs. Communicate with customers their capacity needs for future growth. Issued removal jobs and reused plugs and MUX equipment when available to save on the overall cost of HBW jobs. Also consolidated cable where applicable for IIP jobs or migrated to FIOS where available.

**Manager Comments (Optional)**

---

## Improve the Customer Experience

**- Description and Measures:**

Improve network availability.

Meet SR Response Time, SI, Prints on time, ECCD and FAD objectives.

Leverage technology to deliver network and services reliability.

Apply a customer - first - attitude to all transactions, products and services.

Improve quality continuously across all departments including internal and external customer services.

Meet customer requirements through an always on, dependable and scalable

network.

Request Net Intervals - SR Response On Time

SR Response Interval — Overall

SR Response Interval - Ethernet

DS1

DS3

OC-N

Ethernet

Standard Interval Compliance

Prints Issued On Time

FAD Scheduled Date Met

LBW & HBW

ECCD On Time Performance

LBW & HBW

CONFIDENTIAL                VZ_WALKER_410

**- Employee Accomplishments / Status:**Met all requirements and goals for calling customer and obtaining site survey dates.
Consistently  issued all HBW orders on time and on schedule for ECCD and FAD objectives. Sent all SR's well under 8 day interval for FAD.

**Manager Comments (Optional)**

---

## Simplify Products,Policies, and Processes

**- Description and Measures:**Get the job done the right way.

Be accountable for results, adhere to our core values and operate with a sense of urgency.

Incorporate a CWS experiment.

Drive change and innovation that brings results to the bottom line.

100% Implementation of (IOF) EPM

Achieve WIG Objective

Implement 4 DX initiative

Reduce CIP %

Reduce work order variance %

**- Employee Accomplishments / Status:**Follow 4DX model for reducing service order intervals for faster service to customers.
Initiate date for room ready that customer needs to adhere to, for customer desired date of  HBW circuit turn-up.
Coordinated shorter room ready  intervals to be met for HBW circuit  turn up.

**Manager Comments (Optional)**

---

## Fuel our Culture

**- Description and Measures:**Employee Development - job related training-complete minimum (2) training sessions

• Complete (2) training courses

Safety-Motor Vehicle Accidents Objective - Zero Motor Vehicle Accidents

Absence (%)

• % Management Absence

• Individual Absence Ratio <1%

Recognition

**- Employee Accomplishments / Status:**Completed all training classes required on time that were required. No sick absence days taken at Verizon since being hired in 2000.

**Manager Comments (Optional)**

## Section 2 - Performance Agreement

**Status:** Completed

**Period:** January 1 - December 31

**Manager Comments (Optional)**

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee

**Date:** 02/25/2014

☒ Employee Signature

**Date:** 02/26/2014

## Section 3 - Mid-Year Review

**Status:** Completed

**Period:** January 1 - June 30

**Manager Performance Summary**

District Averages vs Your Averages @ Mid Year:
Prints Issued 136 vs 266
Hours Issued 6503 vs 8358
 # ODN HH 91 vs 73
 # NWC HH 214 vs 123
Average of Fac_Verification 18.2 vs 21.1
SR Number 25 vs 41

Joe, you are producing solid numbers in all categories except Facility Verification.  Your average is above the Team's average and far away from the goal of 8 days.  I know we have talked about it before, but you have to get more aggressive with moving these orders.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 08/14/2014

☒ Employee Signature                                               **Date:** 08/14/2014

## Section 4 - Year End Review

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Performance Summary**

Your Average of Fac_Verification 17.9 vs 12.7 Team's Average
Your # of SRs 75 vs 57 Team's Average

Joe's facility verification metric was disappointing; a greater improvement from the Mid-Year was expected.  Joe handled a decent volume in his district which included HBW and FTTP.  His Customer interactions were positive.  Joe is properly engaged in communication with  Field Forces and stays current in the progress of the
Field.  In 2015 Joe needs to stay current with District Initiatives particularly around decreasing intervals.

**Employee Comments (Optional)**

Research further into formulation used for calculating facility verification, according to report generated for results based on Requestnet. CNE cases shouldn't be included in the results for amount of  time it takes to sell the case and build.

☒ Manager Signature & Release to Employee          **Date:** 02/25/2015

☒ Employee Signature                                **Date:** 02/25/2015

## Section 5 - Performance Rating

| Leading | *Employee sustained performance above objectives, requirements and expectations.* |
|---|---|
| Performing | *Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.* |
| Developing | *Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed.* |
| New | *Achievement relative to performance objectives cannot be evaluated due to short tenure in position.*<br>*- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*<br>*- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

**Performance Rating:Performing**

Signatures :

Employee : Joseph Scelsa        Date: 2015-02-25

Manager : Brian Magee          Date: 2015-02-25

# Exhibit W

<u>**2014 Performance**</u>

**2014 - Year-End Performance Review**

Employee: Joseph D Hui , Engr III Spec-Ntwk Eng&Ops
Manager: Brian Magee, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

**NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.**

<u>**Section 1 - Objectives**</u>

**Living by the Credo**

   **- Description and Measures:**Model the Credo in our daily work by demonstrating integrity, customer focus, sense of urgency, personal accountability, teamwork, and by complying with the Code of Conduct.

CONFIDENTIAL            VZ_WALKER_428

**- Employee Accomplishments / Status:** backing up co-workers
satisfied PUC & customer complaint

**Manager Comments (Optional)**

---

## Grow Revenue

**- Description and Measures:**

Meet/exceed network expansion and facility build targets.

Support new products and global product expansion.

Drive products on-net.

Accelerate speed to market and service delivery intervals.

Optimize broadband capabilities to stay ahead of increasing demand for bandwidth - enhance fios to provide converged communication, information, entertainment services.

Fiber to the Cell Site

Site Survey

EWOs Issued

FTTC E2E Macro
  Network Build

FTTC E2E Micro (Small Cell) Build

VzW Backbone Network Upgrades

Total Prems Passed Incr

Total Prems Open for Sale Incr

MXU Open for Sale Incr

MTU Open For Sales

**- Employee Accomplishments / Status:** (7) MDU overlays
(8) MDU greenfields

**Manager Comments (Optional)**

---

## Be More Profitable

**- Description and Measures:**

Aggressively control and reduce all operating and capital costs, meeting 2014 budget commitments.

Consolidate systems, operations and facilities.

Increase productivity by simplifying, standardizing and automating processes.

Drive network convergence to improve capex and opex efficiency.

Cut energy, fuel and paper consumption to reduce costs and environmental impact.

Network Engr Capital ($M)

Total Budget Performance Core

Total Budget Performance FTTP (w/out PC, with Video)

Total Budget VZB

FTTCS Capital ($M)

FTTCS $ per site (6-month rolling avg cost) (000)

Core Unit Costs

DS1

DS3

OC-N

FTTP Unit Costs

12-mo Rolling $ Cost Per Prem Passed

12-mo Rolling $ Cost Per MDU NC

12-mo Rolling $ Cost Per MTU NC

Standard $ Cost Per Prem Passed

Standard $ Cost Per MDU NC

Network Reliability

Capital Spend

Expense

  Spend

Network Engineering Mgmt Headcount (FTE)

Energy Reduction

Retirements ($M)

Cost of Removal

**- Employee Accomplishments / Status:**

**Manager Comments (Optional)**

## Improve the Customer Experience

**- Description and Measures:**

Improve network availability.

Meet SR Response Time, SI, Prints on time,ECCD and FAD objectives.

Leverage technology to deliver network and services reliability.

Apply a customer - first - attitude to all transactions, products and services.

Improve quality continuously across all departments including internal and external customer services.

Meet customer requirements through an always on, dependable and scalable network.

Request Net Intervals - SR Response On Time

SR Response Interval — Overall

SR Response Interval - Ethernet

DS1

DS3

OC-N

Ethernet

Standard Interval Compliance

Prints Issued On Time

FAD Scheduled Date Met

LBW & HBW

ECCD On Time Performance

LBW & HBW

**- Employee Accomplishments / Status:**(2) ATT cell sites
(26) TLS
(6) VON
(1) OC3
(1) VZW cell site

**Manager Comments (Optional)**

## Simplify Products,Policies, and Processes

- **Description and Measures:**Get the job done the right way.

Be accountable for results, adhere to our core values and operate with a sense of urgency.

Incorporate a CWS experiment.

Drive change and innovation that brings results to the bottom line.

100% Implementation of (IOF) EPM

Achieve WIG Objective

Implement 4 DX initiative

Reduce CIP %

Reduce work order variance %

- **Employee Accomplishments / Status:**

**Manager Comments (Optional)**

## Fuel our Culture

- **Description and Measures:**Employee Development - job related training-complete minimum (2) training sessions

• Complete (6) training courses

Safety-Motor Vehicle Accidents Objective – Zero Motor Vehicle Accidents

Absence (%)

• % Management Absence

• Individual Absence Ratio <1%

Recognition

- **Employee Accomplishments / Status:**Course Code: VZ47429
Course Code: VZ46633
Course Code: VZ46634
Course Code: VZ46635
Course Code: VZ46636
Course Code: VZ70871

Absence (0%)

**Manager Comments (Optional)**

## Section 2 - Performance Agreement

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Comments (Optional)**

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 02/25/2014

☒ Employee Signature                               **Date:** 02/25/2014

## Section 3 - Mid-Year Review

**Status:** Completed                    **Period:** January 1 - June 30

**Manager Performance Summary**

District Averages   vs Your Averages @ Mid Year:
Prints Issued 136  vs  131
Hours Issued 6503  vs  5962
 # ODN HH  91  vs  166
 # NWC HH  214  vs  402
Average of Fac_Verification  18.2  vs  32
SR Number 25  vs  26

Joe, your numbers are solid except for the Facility Verification number.   We have to work on reducing that interval down to 8 days.   You have gained alot of HBW experience over the last year, you have to put that
experience to action.   Insert yourself into this process and make this change happen.

**Employee Comments (Optional)**

☒  Manager Signature & Release to Employee          **Date:** 08/14/2014

☒  Employee Signature                                               **Date:** 08/14/2014


## Section 4 - Year End Review

**Status:** Completed                              **Period:** January 1 - December 31

**Manager Performance Summary**

Your Average of Fac Verification 25.2 vs 12.7 Team's Average
Your # of SRs 38 vs 57 Team's Average

Joe made progress in 2014 on HBW process, but was unable to significantly reduce the Facility
Verification interval.   Joe also got his first introduction to FTTP Greenfields in 2014, which was a
apartment complex where we were very late in serving.   These two items are the priority going forward
and Joe needs to improve
his knowledge and response to both disciplines.   Joe was also late responding to Grading Requests on
multiple occasions, this must be rectified in 2015.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 02/25/2015

☒ Employee Signature                              **Date:** 02/25/2015

## Section 5 - Performance Rating

| **Leading** | *Employee sustained performance above objectives, requirements and expectations.* |
|---|---|
| **Performing** | *Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.* |
| **Developing** | *Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed.* |
| **New** | *Achievement relative to performance objectives cannot be evaluated due to short tenure in position.*<br>*- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*<br>*- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

Performance Rating: **Performing**

CONFIDENTIAL          VZ_WALKER_435

Signatures :

Employee : Joseph Hui        Date: 2015-02-25

Manager : Brian Magee        Date: 2015-02-25

CONFIDENTIAL          VZ_WALKER_436

# Exhibit X

## 2014 Performance

## 2014 - Year-End Performance Review

Employee: Mary T Curtin , Engr III Spec-Ntwk Eng&Ops
Manager: Brian Magee, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.

## Section 1 - Objectives

**Living by the Credo**
  - **Description and Measures:**Model the Credo in our daily work by demonstrating integrity, customer focus, sense of urgency, personal accountability, teamwork, and by complying with the Code of Conduct.

CONFIDENTIAL          VZ_WALKER_470

**- Employee Accomplishments / Status:** Issued 6 PCM work orders to repair existing VZ plant that is deteriorated and focusing on the customer to ensure they have reliable phone service.

Worked as the FIOS On Call Engineer assisting Techs on installs ensuring the customer received service ontime

**Manager Comments (Optional)**

---

## Grow Revenue

**- Description and Measures:**

Meet/exceed network expansion and facility build targets.

Support new products and global product expansion.

Drive products on-net.

Accelerate speed to market and service delivery intervals.

Optimize broadband capabilities to stay ahead of increasing demand for bandwidth - enhance fios to provide converged communication, information, entertainment services.

Fiber to the Cell Site

Site Survey

EWOs Issued

FTTC E2E Macro
  Network Build

FTTC E2E Micro (Small Cell) Build

VzW Backbone Network Upgrades

Total Prems Passed Incr

Total Prems Open for Sale Incr

MXU Open for Sale Incr

MTU Open For Sales

**- Employee Accomplishments / Status:** Issued 10 FTTC work orders for VZW and Sprint.
Issued 4 work orders that accounted for 45 MTUs, which accelerates growth
Issued 38 splitter add work orders to avoid held FIOS service orders

**Manager Comments (Optional)**

---

## Be More Profitable

**- Description and Measures:**

Aggressively control and reduce all operating and capital costs, meeting 2014 budget commitments.

Consolidate systems, operations and facilities.

Increase productivity by simplifying, standardizing and automating processes.

Drive network convergence to improve capex and opex efficiency.

Cut energy, fuel and paper consumption to reduce costs and environmental impact.

Network Engr Capital ($M)

Total Budget Performance Core

Total Budget Performance FTTP (w/out PC, with Video)

Total Budget VZB

FTTCS Capital ($M)

FTTCS $ per site (6-month rolling avg cost) (000)

Core Unit Costs

DS1

DS3

OC-N

FTTP Unit Costs

12-mo Rolling $ Cost Per Prem Passed

12-mo Rolling $ Cost Per MDU NC

12-mo Rolling $ Cost Per MTU NC

Standard $ Cost Per Prem Passed

Standard $ Cost Per MDU NC

Network Reliability

Capital Spend

Expense

  Spend

Network Engineering Mgmt Headcount (FTE)

Energy Reduction

Retirements ($M)

Cost of Removal

**- Employee Accomplishments / Status:** ISSUED 4 retirement work orders for a total of $70,065 reimbursable

**Manager Comments (Optional)**

---

## Improve the Customer Experience

**- Description and Measures:**

Improve network availability.

Meet SR Response Time, SI, Prints on time,ECCD and FAD objectives.

Leverage technology to deliver network and services reliability.

Apply a customer - first - attitude to all transactions, products and services.

Improve quality continuously across all departments including internal and external customer services.

Meet customer requirements through an always on, dependable and scalable

network.

Request Net Intervals - SR Response On Time

SR Response Interval — Overall

SR Response Interval - Ethernet

DS1

DS3

OC-N

Ethernet

Standard Interval Compliance

Prints Issued On Time

FAD Scheduled Date Met

LBW & HBW

ECCD On Time Performance

LBW & HBW

**- Employee Accomplishments / Status:** Worked on the following projects:
moving OC12 private ring for Astra Zeneca
turning up a new OC192 ring for Incyte Corporation

Answered approximately 258 SRs both Inquiries and Firm orders

Issued 139 HBW work orders

**Manager Comments (Optional)**

---

## Simplify Products, Policies, and Processes

**- Description and Measures:** Get the job done the right way.

Be accountable for results, adhere to our core values and operate with a sense of urgency.

Incorporate a CWS experiment.

Drive change and innovation that brings results to the bottom line.

100% Implementation of (IOF) EPM

Achieve WIG Objective

Implement 4 DX initiative

Reduce CIP %

Reduce work order variance %

**- Employee Accomplishments / Status:**

**Manager Comments (Optional)**

---

## Fuel our Culture

**- Description and Measures:** Employee Development - job related training-complete minimum (2) training sessions

• Complete (7) training courses

Safety-Motor Vehicle Accidents Objective - Zero Motor Vehicle Accidents

Absence (%)

• % Management Absence

• Individual Absence Ratio <1%

Recognition

**- Employee Accomplishments / Status:** completed the courses:
Driver Safety Series: Changing Lanes
CPNI Annual Training 2014-2015
Driver Safety Series: Slow Down and Live
Driver Safety Series: Safe Intersection Techniques

2014 Antitrust Law
Driver Safety Series: Do Not Be a Tailgater
Drivers Safety Series: Sharing the Road

**Manager Comments (Optional)**

## Section 2 - Performance Agreement

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Comments (Optional)**

**Employee Comments (Optional)**

☒  Manager Signature & Release to Employee          **Date:** 02/25/2014

☒  Employee Signature                               **Date:** 02/25/2014

## Section 3 - Mid-Year Review

**Status:** Completed                    **Period:** January 1 - June 30

**Manager Performance Summary**

District Averages vs Your Averages @ Mid Year:
Prints Issued 136 vs 187
Hours Issued 6503 vs 9733
# ODN HH 97 vs 63
# NWC HH 223 vs 57
Average of Fac Verification 18.2 vs 19.3
SR Numbers 25 vs 64

Mary you have very good results, except for Fac Verification.  19.3 is not acceptable.  With your volume of orders and years in that turf, I would expect to see more Fac Yes replies.  We need to have more frequent conversations on your held SRs.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee        **Date:** 08/15/2014

☒ Employee Signature        **Date:** 08/15/2014

### Section 4 - Year End Review

**Status:** Completed        **Period:** January 1 - December 31

**Manager Performance Summary**

Your Average of Fac Verification 13.4 vs 12.7 Team's Average
Your SR Number 120 vs 57 Team's Average

Mary led the Team in the number of SRs worked in 2014, this was a huge achievement.  Mary's effort and drive are second to none.  She works collaboratively with fellow Engineers, Planners and Field Forces to succeed. Mary is a key asset in the Delaware and I am glad she is there!!

CONFIDENTIAL        VZ_WALKER_476

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 02/23/2015

☒ Employee Signature                              **Date:** 02/23/2015

## Section 5 - Performance Rating

| Leading | *Employee sustained performance above objectives, requirements and expectations.* |
|---|---|
| Performing | *Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.* |
| Developing | *Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed.* |
| New | *Achievement relative to performance objectives cannot be evaluated due to short tenure in position.*<br>*- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*<br>*- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

Performance Rating:**Performing**

Signatures :

Employee : Mary Curtin          Date: 2015-02-23

CONFIDENTIAL          VZ_WALKER_477

Manager : Brian Magee        Date: 2015-02-23

CONFIDENTIAL          VZ_WALKER_478

# Exhibit Y

<u>**2014 Performance**</u>

**2014 - Year-End Performance Review**

Employee: Maria C Cesare , Engr III Spec-Ntwk Eng&Ops
Manager: Brian Magee, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

**NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.**

<u>**Section 1 - Objectives**</u>

**Living by the Credo**

- **Description and Measures:**Model the Credo in our daily work by demonstrating integrity, customer focus, sense of urgency, personal accountability, teamwork, and by complying with the Code of Conduct.

CONFIDENTIAL          VZ_WALKER_449

**- Employee Accomplishments / Status:**

Customer focus is of the utmost importance, I apply a sense of urgency to anything that comes across my desk and remain accountable through the duration of the issue to completion.  Examples of this are Fios order follow up - that are not completed to fruition and require hand-holding in order for customers to be able to order service.  (622 N 2nd St and 738 S 11th St are two examples of tremendous follow thru for

ordering ability)

I have also played an integral role in the training and support of engineering intern - apprising him of our day to day functionality and assisting in any and all items that arise.

**Manager Comments (Optional)**

## Grow Revenue

**- Description and Measures:**

Meet/exceed network expansion and facility build targets.

Support new products and global product expansion.

Drive products on-net.

Accelerate speed to market and service delivery intervals.

Optimize broadband capabilities to stay ahead of increasing demand for bandwidth - enhance fios to provide converged communication, information, entertainment services.

Fiber to the Cell Site

Site Survey

EWOs Issued

FTTC E2E Macro

  Network Build

FTTC E2E Micro (Small Cell) Build

VzW Backbone Network Upgrades

Total Prems Passed Incr

Total Prems Open for Sale Incr

MXU Open for Sale Incr

MTU Open For Sales

**- Employee Accomplishments / Status:** I take a proactive approach on all site surveys and customer visits to insure the customer is positioned for future growth as well as recommmending any products or services that I think will be both beneficial to the customer while promoting the company.  My site surveys are completed as soon as possible in an attempt to provide outstanding service to the customer and start the revenue generation for the company.

**Manager Comments (Optional)**

---

## Be More Profitable

**- Description and Measures:**

Aggressively control and reduce all operating and capital costs, meeting 2014 budget commitments.

Consolidate systems, operations and facilities.

Increase productivity by simplifying, standardizing and automating processes.

Drive network convergence to improve capex and opex efficiency.

Cut energy, fuel and paper consumption to reduce costs and environmental impact.

Network Engr Capital ($M)

Total Budget Performance Core

Total Budget Performance FTTP (w/out PC, with Video)

Total Budget VZB

FTTCS Capital ($M)

FTTCS $ per site (6-month rolling avg cost) (000)

Core Unit Costs

DS1

DS3

OC-N

FTTP Unit Costs

12-mo Rolling $ Cost Per Prem Passed

12-mo Rolling $ Cost Per MDU NC

12-mo Rolling $ Cost Per MTU NC

Standard $ Cost Per Prem Passed

Standard $ Cost Per MDU NC

Network Reliability

Capital Spend

Expense

 Spend

CONFIDENTIAL          VZ_WALKER_451

Network Engineering Mgmt Headcount (FTE)

Energy Reduction

Retirements ($M)

Cost of Removal

**- Employee Accomplishments / Status:**Cost cutting and efficiency are always addressed and researched to meet the bottom line. Keeping paper, energy and fuel consumption to a minimum is a matter that is regularly visited not only for the bottom line but also for the environment. Paper copies are kept to a minimum and as many surveys that can be done on foot are.

**Manager Comments (Optional)**

---

## Improve the Customer Experience

**- Description and Measures:**

Improve network availability.

Meet SR Response Time, SI, Prints on time,ECCD and FAD objectives.

Leverage technology to deliver network and services reliability.

Apply a customer - first - attitude to all transactions, products and services.

Improve quality continuously across all departments including internal and external customer services.

Meet customer requirements through an always on, dependable and scalable

network.

Request Net Intervals - SR Response On Time

SR Response Interval – Overall

SR Response Interval - Ethernet

DS1

DS3

OC-N

Ethernet

Standard Interval Compliance

Prints Issued On Time

FAD Scheduled Date Met

LBW & HBW

ECCD On Time Performance

LBW & HBW

**- Employee Accomplishments / Status:**The customer is always first. SR response time and prints on time are the first matter of business every day.

**Manager Comments (Optional)**

---

**Simplify Products,Policies, and Processes**

**- Description and Measures:**Get the job done the right way.

Be accountable for results, adhere to our core values and operate with a sense of urgency.

Incorporate a CWS experiment.

Drive change and innovation that brings results to the bottom line.

100% Implementation of (IOF) EPM

Achieve WIG Objective

Implement 4 DX initiative

Reduce CIP %

Reduce work order variance %

**- Employee Accomplishments / Status:**Results and accountability are always at the forefront. WIG's are reviewed at all team meetings and their importance is reinforced.

**Manager Comments (Optional)**

---

**Fuel our Culture**

**- Description and Measures:**Employee Development - job related training-complete minimum (2) training sessions

• Complete (2) training courses

Safety-Motor Vehicle Accidents Objective - Zero Motor Vehicle Accidents

Absence (%)

• % Management Absence

• Individual Absence Ratio <1%

Recognition

**- Employee Accomplishments / Status:** Zero absence and all training has been completed.

**Manager Comments (Optional)**

## Section 2 - Performance Agreement

**Status:** Completed                                    **Period:** January 1 - December 31

**Manager Comments (Optional)**

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 02/25/2014

☒ Employee Signature                               **Date:** 02/25/2014

## Section 3 - Mid-Year Review

**Status:** Completed                                    **Period:** January 1 - June 30

**Manager Performance Summary**

District Averages vs Your Averages @ Mid Year:
Prints Issued 136 vs 349
Hours Issued 6503 vs 13,404
 # ODN HH 97 vs 50
 # NWC HH 223 vs 270
Average of Fac Verification 18.2 vs 13.8
SR Numbers 25 vs 40

Maria, your numbers are great so far this year.  They reflect your hard work and dedication!!  Your Facility
Verification is better than the Team's Average, but I need it to go lower, the goal is 8 calendar days.  Please
continue along this path success is near!!

**Employee Comments (Optional)**

☒  Manager Signature & Release to Employee              **Date:** 08/14/2014

☒  Employee Signature                                          **Date:** 08/14/2014

## Section 4 - Year End Review

**Status:** Completed                          **Period:** January 1 - December 31

**Manager Performance Summary**

Your Average of Fac Verification 12.5 vs 12.7 Team's Average
Your # of SRs 68  vs 57 Team's Average

Maria is fearless, she volunteered to take on one of the most difficult HBW Turfs at the time when 4DX was putting a greater emphasis on HBW.  She handled a high volume of SRs during the year and was able to move the Facility Verification Interval below the Team's Average, but fell short of moving it below the

metric of 8 days.  In 2014 Maria continued to grow in the Turf role, taking a leadership role with our Intern.  Maria guided and assisted in training him, facilitating a very quick upload of Engineering Training.  Maria has quickly become a key member of the Philadelphia Team, I am glad to have her on the Team!

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee        **Date:** 02/25/2015

☒ Employee Signature        **Date:** 02/25/2015

## Section 5 - Performance Rating

| Leading | *Employee sustained performance above objectives, requirements and expectations.* |
|---|---|
| Performing | *Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.* |
| Developing | *Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed.* |
| New | *Achievement relative to performance objectives cannot be evaluated due to short tenure in position.*<br>*- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*<br>*- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

**Performance Rating:Performing**

Signatures :

Employee : Maria Cesare       Date: 2015-02-25

Manager : Brian Magee        Date: 2015-02-25

CONFIDENTIAL          VZ_WALKER_457

# Exhibit Z

## 2014 Performance

## 2014 - Year-End Performance Review

Employee: Steven C Murphy , Engr III Spec-Ntwk Eng&Ops
Manager: Brian Magee, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

**NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.**

## Section 1 - Objectives

**Living by the Credo**

- **Description and Measures:**Model the Credo in our daily work by demonstrating integrity, customer focus, sense of urgency, personal accountability, teamwork, and by complying with the Code of Conduct.

CONFIDENTIAL          VZ_WALKER_535

**- Employee Accomplishments / Status:**

-I have actively assitsed other engineers with aspects of the job to to help them learn different unfamiliar functions of the job andif needed I have run with and done the EWO myself j (ie:litespan/SLC,TEO's,etc.,)

- I have handled most Litespan functions throughout the City including contacting the groups necessary to get the NAVY Litespan systems woken up  to be ready for fiber transfer work

-I actively engage others help

with areas I am not familiar with or new. this aids both

- always looking for a better way to do things and I will incorporate many ideas I see others use to help me be more effeicient myself and the customer

- I work closely with many people and groups inside Verizon as well as  customer/end user ,carrier ,contrctors( Verizon and customer)and   to get work accomplished

**Manager Comments (Optional)**

---

## Grow Revenue

**- Description and Measures:**

Meet/exceed network expansion and facility build targets.

Support new products and global product expansion.

Drive products on-net.

Accelerate speed to market and service delivery intervals.

Optimize broadband capabilities to stay ahead of increasing demand for bandwidth - enhance fios to provide converged communication, information, entertainment services.

Fiber to the Cell Site

Site Survey

EWOs Issued

FTTC E2E Macro

  Network Build

FTTC E2E Micro (Small Cell) Build

VzW Backbone Network Upgrades

Total Prems Passed Incr

Total Prems Open for Sale Incr

MXU Open for Sale Incr

MTU Open For Sales

**- Employee Accomplishments / Status:**-Cell site job for AT&T

- Issued one IOF backbone EWO

- Supplied Sales Reps FTTP leads
- 15+FTTCS sites:
-35 + FTTP sites mixed greenfield,Brownfield and .Overlay
- Engineered Dilworth Plaza facilities and worked to expedite the build to have ready for Grand Openeing
- assisted in planning FTTP layout for VZ FIOS Saleds  promo at 1500 Market
- 1900 Arch St FTTP service delivery job
- Handlesnumerous faciiity  move/trsfer/ removal jobs to make way for demo's

**Manager Comments (Optional)**

---

## Be More Profitable

### - Description and Measures:

Aggressively control and reduce all operating and capital costs, meeting 2014 budget commitments.

Consolidate systems, operations and facilities.

Increase productivity by simplifying, standardizing and automating processes.

Drive network convergence to improve capex and opex efficiency.

Cut energy, fuel and paper consumption to reduce costs and environmental impact.

Network Engr Capital ($M)

Total Budget Performance Core

Total Budget Performance FTTP (w/out PC, with Video)

Total Budget VZB

FTTCS Capital ($M)

FTTCS $ per site (6-month rolling avg cost) (000)

Core Unit Costs

DS1

DS3

OC-N

FTTP Unit Costs

12-mo Rolling $ Cost Per Prem Passed

12-mo Rolling $ Cost Per MDU NC

12-mo Rolling $ Cost Per MTU NC

Standard $ Cost Per Prem Passed

CONFIDENTIAL

VZ_WALKER_537

Standard $ Cost Per MDU NC

Network Reliability

Capital Spend

Expense
  Spend

Network Engineering Mgmt Headcount (FTE)

Energy Reduction

Retirements ($M)

Cost of Removal

**- Employee Accomplishments / Status:**-Reuse materials as appropriate and available( Muxs ,PICS) to cut down job expense.
- Examine and design jobs to make sure that they not only meet present customer needs but if possible will address future needs of that or other potential customers thereby reducing future work(. I was presently examing and had been in contact with bldg managers at high rises in Locust for addressing Next Gen mux needs at RDP Tecom rooms.

**Manager Comments (Optional)**

---

## Improve the Customer Experience

  **- Description and Measures:**

  Improve network availability.

Meet SR Response Time, SI, Prints on time,ECCD and FAD objectives.

Leverage technology to deliver network and services reliability.

Apply a customer - first - attitude to all transactions, products and services.

Improve quality continuously across all departments including internal and external customer services.

Meet customer requirements through an always on, dependable and scalable
  network.

Request Net Intervals - SR Response On Time

SR Response Interval – Overall

SR Response Interval - Ethernet

DS1

DS3

OC-N

Ethernet

Standard Interval Compliance

Prints Issued On Time

FAD Scheduled Date Met

LBW & HBW

ECCD On Time Performance

LBW & HBW

**- Employee Accomplishments / Status:**

- 65+ TLS SR's
- 35+ HBW SR's
- 6+ Equipment removal work orders
- 7 DS1 Fiber Initiative jobs
  Engineered and worked directly with the Verizon groups,GC's,State & local personnel to get the facilities for the new Courthouse at 1501 Arch St in place. This has been a challenge as there has been no one main contact person in regards to service requiremenst for this jobThis was not always an easy task as there was no

one point of contact.
- I have assisted outside work forces with engineering 4 +major cable failures including one feeding City Hall.
- Continuing to work and improve SR interval turnaround
-Meeting prints Issued requirement

**Manager Comments (Optional)**

---

## Simplify Products,Policies, and Processes

**- Description and Measures:**Get the job done the right way.

Be accountable for results, adhere to our core values and operate with a sense of urgency.

Incorporate a CWS experiment.

Drive change and innovation that brings results to the bottom line.

100% Implementation of (IOF) EPM

Achieve WIG Objective

Implement 4 DX initiative

Reduce CIP %

Reduce work order variance %

**- Employee Accomplishments / Status:**-Completed 1 CWS experiment job t 1760 Market St-flr 8 and assisted with one in Eastwick
- Have been handling ESS jobs regularly in many cases surveying prior to desired date .

- Working to DropSR turnaround time to work toward 4 DX initiative
- Meeting SR Interval reduction initiative
- Have met EWO issue date initiative

**Manager Comments (Optional)**

---

## Fuel our Culture

- **Description and Measures:**Employee Development - job related training-complete minimum (2) training sessions

• Complete (2) training courses

Safety-Motor Vehicle Accidents Objective - Zero Motor Vehicle Accidents

Absence (%)

• % Management Absence

• Individual Absence Ratio <1%

Recognition

- **Employee Accomplishments / Status:**Cpompleted 2 driving courses
- Completed 3 Coporate required courses
- Completed course on ICGS fiber splitting
- Attended several vendor initiated presentations tostay up with new equipment   Absences;0 ( Thank God)

**Manager Comments (Optional)**

---

## Section 2 - Performance Agreement

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Comments (Optional)**

CONFIDENTIAL          VZ_WALKER_540

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee       **Date:** 02/25/2014

☒ Employee Signature                            **Date:** 02/26/2014

### Section 3 - Mid-Year Review

**Status:** Completed                           **Period:** January 1 - June 30

**Manager Performance Summary**

District Averages vs Your Averages @ Mid Year:
Prints Issued 136 vs 163
Hours Issued 6503 vs 13,400
# ODN HH 97 vs 0
# NWC HH 223 vs 699
Average of Fac Verification 18.2 vs 20.5
SR Number 25 vs 45

Your numbers are strong, save your Fac Verification results.  The target for Fac Verification is 8 days and you are
North of the Team's Average of 18.2 days.  You have to get more aggressive with moving the SRs.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee       **Date:** 08/14/2014

CONFIDENTIAL            VZ_WALKER_541

☒ Employee Signature                          **Date:** 08/14/2014

## Section 4 - Year End Review

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Performance Summary**

Your Average of Fac Verification 15.7 vs 12.7 Team's Average
Your # of SRs 77 vs 57 Team's Average

Steve managed to reduce his Facility Verification interval, but still fell short of beating the Team's Average; this can not continue into 2015.    Steve also struggled with the FTTP component of his Locust Turf Area; in 2015 he will face a lessened demand and he must gain traction on changing the timetable of his
deliverables.  The last area of concern is the chronic late responses to Grading Updates.  Steve has talent and has done many positive items in 2014, but he needs to dig in and fix the negative trends.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee        **Date:** 02/24/2015
☒ Employee Signature                          **Date:** 02/24/2015

## Section 5 - Performance Rating

| Leading | *Employee sustained performance above objectives, requirements and expectations.* |
|---|---|
| Performing | *Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.* |
| Developing | *Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed.* |
| New | *Achievement relative to performance objectives cannot be evaluated due to short tenure in position.*<br>*- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*<br>*- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

**Performance Rating:Performing**

Signatures :

Employee : Steven Murphy        Date: 2015-02-24

Manager : Brian Magee        Date: 2015-02-24

# Exhibit AA

## 2014 Performance

**2014 - Year-End Performance Review**

Employee: Scott C Panichelli , Engr III Spec-Ntwk Eng&Ops
Manager: Brian Magee, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

**NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.**

## Section 1 - Objectives

**Living by the Credo**

- **Description and Measures:**Model the Credo in our daily work by demonstrating integrity, customer focus, sense of urgency, personal accountability, teamwork, and by complying with the Code of Conduct.

CONFIDENTIAL            VZ_WALKER_513

**- Employee Accomplishments / Status:**Customer focus and sense of urgency was demonstrated by quickly issuing 5 FTTP work orders last year from field employee referrals. All these resulted in sales.

**Manager Comments (Optional)**

## Grow Revenue

**- Description and Measures:**

Meet/exceed network expansion and facility build targets.

Support new products and global product expansion.

Drive products on-net.

Accelerate speed to market and service delivery intervals.

Optimize broadband capabilities to stay ahead of increasing demand for bandwidth - enhance fios to provide converged communication, information, entertainment services.

Fiber to the Cell Site

Site Survey

EWOs Issued

FTTC E2E Macro
  Network Build

FTTC E2E Micro (Small Cell) Build

VzW Backbone Network Upgrades

Total Prems Passed Incr

Total Prems Open for Sale Incr

MXU Open for Sale Incr

MTU Open For Sales

**- Employee Accomplishments / Status:**Fiber to the Cell Site 7

Site Survey 7

EWOs Issued 63

FTTC E2E Macro Network Build

FTTC E2E Micro (Small Cell) Build

VzW Backbone Network Upgrades 1

Total Prems Passed Incr 232

Total Prems Open for Sale Incr

MXU Open for Sale Incr 27

MTU Open For Sales

**Manager Comments (Optional)**

---

## Be More Profitable

### - Description and Measures:

Aggressively control and reduce all operating and capital costs, meeting 2014 budget commitments.

Consolidate systems, operations and facilities.

Increase productivity by simplifying, standardizing and automating processes.

Drive network convergence to improve capex and opex efficiency.

Cut energy, fuel and paper consumption to reduce costs and environmental impact.

Network Engr Capital ($M)

Total Budget Performance Core


Total Budget Performance FTTP (w/out PC, with Video)

Total Budget VZB

FTTCS Capital ($M)

FTTCS $ per site (6-month rolling avg cost) (000)

Core Unit Costs

DS1

DS3

OC-N

FTTP Unit Costs

12-mo Rolling $ Cost Per Prem Passed

12-mo Rolling $ Cost Per MDU NC

12-mo Rolling $ Cost Per MTU NC

Standard $ Cost Per Prem Passed

Standard $ Cost Per MDU NC

Network Reliability

Capital Spend

Expense
  Spend

Network Engineering Mgmt Headcount (FTE)

Energy Reduction

Retirements ($M)

Cost of Removal

**- Employee Accomplishments / Status:DS1 4**

DS3

OC-N

FTTP Unit Costs

12-mo Rolling $ Cost Per Prem Passed

12-mo Rolling $ Cost Per MDU NC

12-mo Rolling $ Cost Per MTU NC

Standard $ Cost Per Prem Passed $900

Standard $ Cost Per MDU NC $325

Network Reliability

Capital Spend

Expense Spend


Energy Reduction

Retirements ($M)

Cost of Removal

**Manager Comments (Optional)**

---

**Improve the Customer Experience**

  **- Description and Measures:**

  Improve network availability.

Meet SR Response Time, SI, Prints on time,ECCD and FAD objectives.

Leverage technology to deliver network and services reliability.

Apply a customer - first - attitude to all transactions, products and services.

Improve quality continuously across all departments including internal and external customer services.

Meet customer requirements through an always on, dependable and scalable
   network.

Request Net Intervals - SR Response On Time

SR Response Interval – Overall

SR Response Interval - Ethernet

DS1

DS3

OC-N

Ethernet

Standard Interval Compliance

Prints Issued On Time

FAD Scheduled Date Met

LBW & HBW

ECCD On Time Performance

LBW & HBW

**- Employee Accomplishments / Status:** Request Net Intervals - SR Response On Time

SR Response Interval – Overall 48 hrs

SR Response Interval - Ethernet 48hrs

DS1

DS3

OC-N

Ethernet

Standard Interval Compliance

Prints Issued On Time 100%

FAD Scheduled Date Met

LBW & HBW

ECCD On Time Performance

LBW & HBW

**Manager Comments (Optional)**

---

## Simplify Products, Policies, and Processes

- **Description and Measures:** Get the job done the right way.

Be accountable for results, adhere to our core values and operate with a sense of urgency.

Incorporate a CWS experiment.

Drive change and innovation that brings results to the bottom line.

100% implementation of (IOF) EPM

Achieve WIG Objective

Implement 4 DX Initiative

Reduce CIP %

Reduce work order variance %

- **Employee Accomplishments / Status:** Achieve WIG Objective

Implement 4 DX initiative

Reduce CIP %

Reduce work order variance %

**Manager Comments (Optional)**

---

## Fuel our Culture

- **Description and Measures:** Employee Development - job related training-complete minimum (2) training sessions

• Complete (2) training courses

Safety-Motor Vehicle Accidents Objective - Zero Motor Vehicle Accidents

Absence (%)

• % Management Absence

• Individual Absence Ratio <1%

Recognition

**- Employee Accomplishments / Status:**Completed 2 courses

No MV accidents

0 absence

**Manager Comments (Optional)**

## Section 2 - Performance Agreement

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Comments (Optional)**

**Employee Comments (Optional)**

☒  Manager Signature & Release to Employee          **Date:** 02/25/2014

☒  Employee Signature                    **Date:** 02/26/2014

## Section 3 - Mid-Year Review

**Status:** Completed                    **Period:** January 1 - June 30

CONFIDENTIAL          VZ_WALKER_519

**Manager Performance Summary**

District Averages vs Your Averages @ Mid Year:
Prints Issued 136 vs 74
Hours Issued 6503 vs 5364
 # ODN HH 97 vs 333
 # NWC HH 214 vs 370
Average of Fac Verification 18.2 vs 15.2
SR numbers 25 vs 11

Scott, your results are solid.  Your Fac Verification number was a nice surprise.  Keep up the good work and continue to drive that interval down.  8 is the goal for Fac Verification, let's make it happen by increasing the Fac Yes replies.

**Employee Comments (Optional)**

☒  Manager Signature & Release to Employee          **Date:** 08/15/2014

☒  Employee Signature          **Date:** 08/15/2014

## Section 4 - Year End Review

**Status:** Completed          **Period:** January 1 - December 31

**Manager Performance Summary**

Your Average of Fac Verification 8.6 vs 12.7 Team's Average
SR numbers 18 vs 57 Team's Average

Scott did very well with the demands and changes in procedures of 2014. He made a solid contribution to the Team with his Facility Verification hours. He also made a solid contribution to the District by working through the National Greenfield process. Scott continues to be a valuable member of the Delaware Team!

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee        **Date:** 02/23/2015

☒ Employee Signature                              **Date:** 02/23/2015

## Section 5 - Performance Rating

| Leading | *Employee sustained performance above objectives, requirements and expectations.* |
|---|---|
| Performing | *Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.* |
| Developing | *Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed.* |
| New | *Achievement relative to performance objectives cannot be evaluated due to short tenure in position.*<br>*- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*<br>*- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

**Performance Rating:Performing**

Signatures :

Employee : Scott Panichelli          Date: 2015-02-23

Manager : Brian Magee          Date: 2015-02-23

CONFIDENTIAL          VZ_WALKER_522

# Exhibit BB

<u>**2014 Performance**</u>

**2014 - Year-End Performance Review**

Employee: John Shubrook , Engr III Spec-Ntwk Eng&Ops
Manager: Brian Magee, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

**NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.**

<u>**Section 1 - Objectives**</u>

**Living by the Credo**
- **Description and Measures:**Model the Credo in our daily work by demonstrating integrity, customer focus, sense of urgency, personal accountability, teamwork, and by complying with the Code of Conduct.

CONFIDENTIAL     VZ_WALKER_385

- **Employee Accomplishments / Status:** MODELED THE CREDO

**Manager Comments (Optional)**

---

**Grow Revenue**

- **Description and Measures:**

Meet/exceed network expansion and facility build targets.

Support new products and global product expansion.

Drive products on-net.

Accelerate speed to market and service delivery intervals.

Optimize broadband capabilities to stay ahead of increasing demand for bandwidth - enhance fios to provide converged communication, information, entertainment services.

Fiber to the Cell Site

Site Survey

EWOs Issued

FTTC E2E Macro
  Network Build

FTTC E2E Micro (Small Cell) Build

VzW Backbone Network Upgrades

Total Prems Passed Incr

Total Prems Open for Sale Incr

MXU Open for Sale Incr

MTU Open For Sales

- **Employee Accomplishments / Status:** ISSUED 205 EWOS

53 3RD PARTY EWOS

6 COPPER EWOS

3 CWOS

6 DAMAGE EWOS

56 HBW EWOS

13 FTTCS EWOS

17 FIOS GREENFIELDS EWOS (305 UNITS)

3 FIOS MTUS EWOS (34 UNITS)

14 FIOS OVERLAY EWOS (97 UNITS)

34 SPLITTER ADDS

**Manager Comments (Optional)**

---

## Be More Profitable

**- Description and Measures:**

Aggressively control and reduce all operating and capital costs, meeting 2014 budget commitments.

Consolidate systems, operations and facilities.

Increase productivity by simplifying, standardizing and automating processes.

Drive network convergence to improve capex and opex efficiency.

Cut energy, fuel and paper consumption to reduce costs and environmental impact.

Network Engr Capital ($M)

Total Budget Performance Core

Total Budget Performance FTTP (w/out PC, with Video)

Total Budget VZB

FTTCS Capital ($M)

FTTCS $ per site (6-month rolling avg cost) (000)

Core Unit Costs

DS1

DS3

OC-N

FTTP Unit Costs

12-mo Rolling $ Cost Per Prem Passed

12-mo Rolling $ Cost Per MDU NC

12-mo Rolling $ Cost Per MTU NC

Standard $ Cost Per Prem Passed

Standard $ Cost Per MDU NC

Network Reliability

Capital Spend

Expense

  Spend

Network Engineering Mgmt Headcount (FTE)

Energy Reduction

Retirements ($M)

Cost of Removal

**- Employee Accomplishments / Status:** RETIRED UNUSED SONEPLEX AND LITESPAN EQUIPMENT FROM DOVER MALL. CREATED STANDARD MUX CABINETS TO REDUCE HBW INTERVALS.

**Manager Comments (Optional)**

---

## Improve the Customer Experience

**- Description and Measures:**

Improve network availability.

Meet SR Response Time, SI, Prints on time, ECCD and FAD objectives.

Leverage technology to deliver network and services reliability.

Apply a customer - first - attitude to all transactions, products and services.

Improve quality continuously across all departments including internal and external customer services.

Meet customer requirements through an always on, dependable and scalable

  network.

Request Net Intervals - SR Response On Time

SR Response Interval — Overall

SR Response Interval - Ethernet

DS1

DS3

OC-N

Ethernet

Standard Interval Compliance

Prints Issued On Time

CONFIDENTIAL     VZ_WALKER_388

FAD Scheduled Date Met

LBW & HBW

ECCD On Time Performance

LBW & HBW

- **Employee Accomplishments / Status:** 100% SR RESPONDED ON TIME

100% STANDARD AND REDUCED INTERVAL COMPLIANCE

100% PRINTS ISSUED ON TIME

**Manager Comments (Optional)**

## Simplify Products, Policies, and Processes

• **Description and Measures:** Get the job done the right way.

Be accountable for results, adhere to our core values and operate with a sense of urgency.

Incorporate a CWS experiment.

Drive change and innovation that brings results to the bottom line.

100% Implementation of (IOF) EPM

Achieve WIG Objective

Implement 4 DX initiative

Reduce CIP %

Reduce work order variance %

- **Employee Accomplishments / Status:** ATTENDED 4DX MEETING AND HELPED DEVELOP WIG OBJECTIVES.  TRAINED ENGINEERS ON EQUIPMENT FOR HBW ORDERS.

**Manager Comments (Optional)**

## Fuel our Culture

• **Description and Measures:** Employee Development - job related training-complete minimum (2) training sessions

• Complete (2) training courses

Safety-Motor Vehicle Accidents Objective - Zero Motor Vehicle Accidents

Absence (%)

• % Management Absence

• Individual Absence Ratio <1%

Recognition

- **Employee Accomplishments / Status:** COMPLETED REQUIRED TRAINING COURSES

ZERO ACCIDENTS

ZERO ABSENCES

RECIEVED RECOGNITION AWARD FROM DOUG SMITH FOR WORK ON JPMC PROJECT

**Manager Comments (Optional)**

## Section 2 - Performance Agreement

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Comments (Optional)**

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 02/25/2014

☒ Employee Signature                              **Date:** 02/26/2014

## Section 3 - Mid-Year Review

**Status:** Completed                    **Period:** January 1 - June 30

**Manager Performance Summary**

District Averages vs Your Averages Mid Year:
Prints Issued 136 vs 91
Hours Issued 6503 vs 6680
 # ODN HH 97 vs 242
 # NWC HH 223 vs 242
Average of Fac Verification 18.2 vs 15.1
SR Numbers 25 vs 21

John, your results are solid. The Fac Verification number is good, but it still needs to go lower. 8 days is the target that I need you to attain. You have the skills and education, you can figure this out.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 08/15/2014

☒ Employee Signature          **Date:** 08/15/2014

## Section 4 - Year End Review

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Performance Summary**

Your Average of Fac Verification 7.9 vs 12.7 Team Average
Your SR Number 43 vs 57 Team Average

John made a significant contribution to the HBW improvements projects of 2014. He managed to pull his Facility Verification number under the 2014 Objective. He also was a resource across my District on HBW issues. John was quick to help the Downstate Team with workload due to an Employees illness, which was great Teamwork. John is valuable employee and I am glad to have him in Delaware!

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 02/23/2015

☒ Employee Signature          **Date:** 02/23/2015

## Section 5 - Performance Rating

| Leading | *Employee sustained performance above objectives, requirements and expectations.* |
|---|---|
| Performing | *Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.* |
| Developing | *Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed.* |
| New | *Achievement relative to performance objectives cannot be evaluated due to short tenure in position.*<br>*- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*<br>*- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

Performance Rating:**Performing**

CONFIDENTIAL          VZ_WALKER_392

Signatures :

Employee : John Shubrook         Date: 2015-02-23

Manager : Brian Magee         Date: 2015-02-23

CONFIDENTIAL         VZ_WALKER_393

# Exhibit CC

<u>2014 Performance</u>

**2014 - Year-End Performance Review**

Employee: Paul Klauss , Engr III Spec-Ntwk Eng&Ops
Manager: Brian Magee, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

**NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.**

<u>Section 1 - Objectives</u>

**Living by the Credo**

- **Description and Measures:**Model the Credo in our daily work by demonstrating integrity, customer focus, sense of urgency, personal accountability, teamwork, and by complying with the Code of Conduct.

CONFIDENTIAL          VZ_WALKER_492

**- Employee Accomplishments / Status:** My default method of operation is to work with the customer in mind, to take ownership and personal responsibility of my work, to work quickly, efficiently and accurately as possible, to work ethically and to work with an awareness that I represent the company in all customer interactions.

**Manager Comments (Optional)**

---

## Grow Revenue

**- Description and Measures:**

Meet/exceed network expansion and facility build targets.

Support new products and global product expansion.

Drive products on-net.

Accelerate speed to market and service delivery intervals.

Optimize broadband capabilities to stay ahead of increasing demand for bandwidth - enhance fios to provide converged communication, information, entertainment services.

Fiber to the Cell Site

Site Survey

EWOs Issued

FTTC E2E Macro

  Network Build

FTTC E2E Micro (Small Cell) Build

VzW Backbone Network Upgrades

Total Prems Passed Incr

Total Prems Open for Sale Incr

MXU Open for Sale Incr

MTU Open For Sales

**- Employee Accomplishments / Status:** In my new turf, took over responsibility of 3 large Greenfield SFU developments.
I Issued all fiber to the cell site jobs in my territory on time. Ensured that all PICS and associated materials arrived on time.

Made sure orders arrived on time.

**Manager Comments (Optional)**

## Be More Profitable

**- Description and Measures:**

Aggressively control and reduce all operating and capital costs, meeting 2014 budget commitments.

Consolidate systems, operations and facilities.

Increase productivity by simplifying, standardizing and automating processes.

Drive network convergence to improve capex and opex efficiency.

Cut energy, fuel and paper consumption to reduce costs and environmental impact.

Network Engr Capital ($M)

Total Budget Performance Core

Total Budget Performance FTTP (w/out PC, with Video)

Total Budget VZB

FTTCS Capital ($M)

FTTCS $ per site (6-month rolling avg cost) (000)

Core Unit Costs

DS1

DS3

OC-N

FTTP Unit Costs

12-mo Rolling $ Cost Per Prem Passed

12-mo Rolling $ Cost Per MDU NC

12-mo Rolling $ Cost Per MTU NC

Standard $ Cost Per Prem Passed

Standard $ Cost Per MDU NC

Network Reliability

Capital Spend

Expense

  Spend

Network Engineering Mgmt Headcount (FTE)

Energy Reduction

Retirements ($M)

Cost of Removal

**- Employee Accomplishments / Status:** In my new turf, took over responsibility of 3 large Greenfield SFU developments.
I Issued all fiber to the cell site jobs in my territory on time.  Ensured that all PICS and associated materials arrived on time.

**Manager Comments (Optional)**

---

## Improve the Customer Experience

**- Description and Measures:**

Improve network availability.

Meet SR Response Time, SI, Prints on time,ECCD and FAD objectives.

Leverage technology to deliver network and services reliability.

Apply a customer - first - attitude to all transactions, products and services.

Improve quality continuously across all departments including internal and external customer services.

Meet customer requirements through an always on, dependable and scalable

network.

Request Net Intervals - SR Response On Time

SR Response Interval — Overall

SR Response Interval - Ethernet

DS1

DS3

OC-N

Ethernet

Standard Interval Compliance

Prints Issued On Time

FAD Scheduled Date Met

LBW & HBW

ECCD On Time Performance

LBW & HBW

**- Employee Accomplishments / Status:**

Met the SR overall response time in May with 24 SR's.

Stayed up to date with new technology. Issued an OC192 Ring in Paoli Central Office for Siemens Corporation, used new 4100 ES OC192 functionality.

For all SR's, I contacted the customer immediately and set up immediate site surveys. Looked for alternate ways to set up surveys if the site contact was unavailable.

I continued to keep the customer informed, after

the SR's were released. I stayed involved in the construction build and the circuit turn up to ensure that, in addition to meeting my personal measurements, the overall service order due dates were met.

**Manager Comments (Optional)**

---

## Simplify Products, Policies, and Processes

 - **Description and Measures:** Get the job done the right way.

Be accountable for results, adhere to our core values and operate with a sense of urgency.

Incorporate a CWS experiment.

Drive change and innovation that brings results to the bottom line.

100% Implementation of (IOF) EPM

Achieve WIG Objective

Implement 4 DX initiative

Reduce CIP %

Reduce work order variance %

 - **Employee Accomplishments / Status:** Issued all work orders on time.

Responded to customer deamand with a sense of urgency.

**Manager Comments (Optional)**

---

## Fuel our Culture

 - **Description and Measures:** Employee Development - job related training-complete minimum (2) training sessions

• Complete (2) training courses

Safety-Motor Vehicle Accidents Objective - Zero Motor Vehicle Accidents

Absence (%)

• % Management Absence

• Individual Absence Ratio <1%

Recognition

**- Employee Accomplishments / Status:**I stayed current on all methods and procedures for FIOS, Vbuild, Requestnet, and other engineering systems.  I participated in requestnet and vbuild training.

I completed all required saftey training.

I have zero absences.

**Manager Comments (Optional)**

## Section 2 - Performance Agreement

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Comments (Optional)**

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 02/25/2014

☒ Employee Signature                    **Date:** 02/25/2014

## Section 3 - Mid-Year Review

**Status:** Completed                          **Period:** January 1 - June 30

**Manager Performance Summary**

District Averages vs Your Averages @ Mid Year:
Prints Issued 136 vs 258
Hours Issued 6503 vs 11,245
 # ODN HH 97 vs 397
 # NWC HH 223 vs 791
Average of Fac Verification 18.2 vs 9.1
SR Number 25 vs 36

Paul your numbers look great.  Your volumes are high and you are doing fantastic with the Facility Verification Objective.  Keep up the good work and don't be shy about sharing your lessons learned on our WIG Calls.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 08/14/2014

☒ Employee Signature                               **Date:** 08/14/2014

## Section 4 - Year End Review

**Status:** Completed                          **Period:** January 1 – December 31

**Manager Performance Summary**

Your Average of Fac Verification 7.9 vs 12.7 Team's Average
Your # of SRs 70 vs 57 Team's Average

Paul succeeded in moving his Facility Verification number below the objective of 8 days. Paul owns the SR Process, his knowledge, experience and tenacity have put him in an elite category. Paul handles a high volume of work with a can do attitude. I am very glad to have Paul on the Team!!

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 02/25/2015

☒ Employee Signature          **Date:** 02/25/2015

## Section 5 – Performance Rating

| Leading | *Employee sustained performance above objectives, requirements and expectations.* |
|---|---|
| Performing | *Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.* |
| Developing | *Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed.* |
| New | *Achievement relative to performance objectives cannot be evaluated due to short tenure in position.*<br>*- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*<br>*- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

Performance Rating:**Performing**

CONFIDENTIAL          VZ_WALKER_499

Signatures :

| | |
|---|---|
| Employee : Paul Klauss | Date: 2015-02-25 |

| | |
|---|---|
| Manager : Brian Magee | Date: 2015-02-25 |

# Exhibit DD



# RATE AND RANK EMPLOYEES

# REDUCTION IN FORCE EMPLOYEE RATING FORM

**Plan:** Mgmt Prog Enterprise Wireline          **Business Case Number:** RIFV102777

**Anticipated Notification Date:** 4/23/2015

> For Partial Group Elimination after rating is complete indicate "RM"(Retained) or "IM" (Impacted) in last column. Complete Anticipated Notification Date for all "IM"s. Rating criteria/Competencies/Dimensions/Critical aspects of the job across the workgroup. Assure rating is Completed by individual(s) familiar with employee work history. Comment must be provided for scores of 1 or 5

**Ratings Completed By:** Parker,Melissa          **Phone:** 908/559-5544

*Skills Assessed in "Primary Skillset Proficiency" include:   HBW Proficiency - Request Net, Survey and Design

*Explain Criteria of "Other" Column Assessment:  FTTP Proficiency - Survey and Design

**Responsible HR Rep Name/Phone:** Parker,Melissa / 908/559-5544

---

**Business Case Number:** RIFV102777  **Setid :** COMMN  **Empid:** 1176609  **EmpName:** Panichelli,Scott C

**Primary Skills Comments:**

**Technical Knowledge Comments:**

**Credo Comments:**

**Others Comments:** Scott is an expert in FTTP Design (including ICGS and IVAPP) and Equipment.  He is responsible for the Fiber Deployment in the fastest growing area of Delaware.  He serves as a resource to the DE Team.

**Corrective Comments:**

---

**Business Case Number:** RIFV102777  **Setid :** COMMN  **Empid:** 1197215  **EmpName:** Walker,Suzette E

**Primary Skills Comments:**  Suzette Request Net knowledge is still developing (YTD FAC Verification 19 compared to Team average 10). She also does not possess the skills to survey and design all HBW orders.  Compared to the overall Team her skill set is lower than her peers.  Suzette received a D rating in 2013 as she hadn't learned the core engineering role as quickly as expected and was more administrative than proficient in the engineering role.

**Technical Knowledge Comments:** Suzette does not demonstrate a sufficient level of technical knowledge of the DS0 and HBW electronics in use today.  Suzette has received technical training but has not retained the training as expected and relies on others to complete the technical aspects of the role.

**Credo Comments:**

**Others Comments:** Suzette does not exhibit strong ICGS (records system) skills regarding design.  She is also developing in the ability to survey and design FTTP SFU, MDU and MTU properties as she has not become as proficient as necessary.

**Corrective Comments:**

---

**Business Case Number:** RIFV102777  **Setid :** COMMN  **Empid:** 1243368  **EmpName:** Hui,Joseph D

**Primary Skills Comments:**

**Technical Knowledge Comments:**

1

CONFIDENTIAL
Def_Walker_018

Credo Comments:

Others Comments:

Corrective Comments:

---

**Business Case Number:** RIFV102777  **Setld :** COMMN  **Empid:** 1256659  **EmpName:** Hodge JR,Thomas J

**Primary Skills Comments:**   Tom's Request Net Knowledge is advanced (YTD FAC Verification 8 compared to Team average 10).  Excellent knowledge of the HBW flow.  Acts as a resource to the Philadelphia Team on coding of SRs in RequestNet.

Technical Knowledge Comments:

Credo Comments:

Others Comments:

Corrective Comments:

---

**Business Case Number:** RIFV102777  **Setld :** COMMN  **Empid:** 1275909  **EmpName:** Murphy,Steven C

Primary Skills Comments:

Technical Knowledge Comments:

Credo Comments:

Others Comments:

Corrective Comments:

---

**Business Case Number:** RIFV102777  **Setld :** COMMN  **Empid:** 1304335  **EmpName:** Cesare,Maria C

Primary Skills Comments:

Technical Knowledge Comments:

Credo Comments:

Others Comments:

Corrective Comments:

---

**Business Case Number:** RIFV102777  **Setld :** COMMN  **Empid:** 1314072  **EmpName:** Curtin,Mary T

**Primary Skills Comments:**   Mary's knowledge of the Request Net Flow is advanced (YTD FAC Verification 7 compared to Team average 10).  She is also an excellent resource for HBW process and flow.  Mary manages the highest volume of orders in the District with great efficiency.

Technical Knowledge Comments:

Credo Comments:

Others Comments:

Corrective Comments:

---

**Business Case Number:** RIFV102777  **Setld :** COMMN  **Empid:** 1353185  **EmpName:** Bowman JR,Carl E

Primary Skills Comments:

Technical Knowledge Comments:

Credo Comments:

Others Comments:

Corrective Comments:

---

**Business Case Number:** RIFV102777  **Setld :** COMMN  **Empid:** 1367340  **EmpName:** Zang,George W

Primary Skills Comments:

2

CONFIDENTIAL
Def_Walker_019

Technical Knowledge Comments:

Credo Comments:

Others Comments:

Corrective Comments:

---

**Business Case Number: RIFV102777  SetId : COMMN  EmpId: 1368828  EmpName: Padovani,Ernest A**

Primary Skills Comments:

Technical Knowledge Comments:

Credo Comments:

Others Comments:

Corrective Comments:

---

**Business Case Number: RIFV102777  SetId : COMMN  EmpId: 1407427  EmpName: Shubrook,John**

Primary Skills Comments:   John is advanced in Request Net (YTD FAC Verification 4 compared to Team average 10).   He is also a District wide resource on HBW procedures.  His knowledge base is extensive and he shares it freely with the Team including Planning.

Technical Knowledge Comments:  John's experience in IOF and OSP is unmatched in the District today.  He is routinely called upon to offer advice to fellow Engineers across the District.

Credo Comments:

Others Comments:

Corrective Comments:

---

**Business Case Number: RIFV102777  SetId : COMMN  EmpId: 1409702  EmpName: Perry,David M**

Primary Skills Comments:   Dave has made great strides in learning the Request Net flow and is below  Team Average for Facility Verification YTD ( 9 versus Team Average 10) but is ranked above Suzette as he is gaining knowledge much more quickly. Dave still needs to expand his knowledge of HBW service types and the design of those orders.

Technical Knowledge Comments:

Credo Comments:

Others Comments: Dave is still developing his knowledge of ICGS and FTTP design but is learning quickly.

Corrective Comments:

---

**Business Case Number: RIFV102777  SetId : COMMN  EmpId: 1462649  EmpName: Scelsa,Joseph**

Primary Skills Comments:

Technical Knowledge Comments:

Credo Comments:

Others Comments:

Corrective Comments:

---

**Business Case Number: RIFV102777  SetId : COMMN  EmpId: 1498910  EmpName: Klauss,Paul**

Primary Skills Comments:   Paul is an expert in the HBW process flow.  He was transferred last year to a District with high demand for HBW services; he successfully made the transition and contributed to improvements in the District's HBW Results. Paul is called upon often by Team Members to assist with process questions.

Technical Knowledge Comments:

Credo Comments:

Others Comments: Paul is excellent in ICGS, IVAPP and FTTP Design.  He is able to survey and design his own developments, which results in quicker turnarounds of prints and higher quality.

3

**Corrective Comments:**

---

**Business Case Number:** RIFV102777  **SetId :** COMMN  **EmpId:** 1509712  **EmpName:** Portolese,Anthony S

**Primary Skills Comments:**

**Technical Knowledge Comments:**

**Credo Comments:**

**Others Comments:** Anthony is excellent with ICGS and FTTP Design.  He worked on the Overlay Team in the past and has stayed current with all design considerations.  He is a resource for the Team on FTTP issues.

**Corrective Comments:**

---

4

CONFIDENTIAL
Def_Walker_021

## RATE AND RANK EMPLOYEES

### REDUCTION IN FORCE EMPLOYEE RATING FORM

Plan: Mgmt Prog Enterprise Wireline

Business Case Number: RIFV103777

Anticipated Notification Date: 4/23/2015

For Partial Group Elimination after rating is complete indicate "RM"(Retained) or "IM" (Impacted) in last column. Complete Anticipated Notification Date for all "IM"s. Rating criteria/Competencies/Dimensions/Critical aspects of the job across the workgroup. Assure rating is Completed by individual(s) familiar with employee work history. Comment must be provided for scores of 1 or 5

Ratings Completed By: Parker, Melissa          Phone: 908/559-5544

*Skills Assessed in "Primary Skillset Proficiency" include:   HBW Proficiency - Request Net, Survey and Design

*Explain Criteria of "Other" Column Assessment: FTTP Proficiency - Survey and Design

Responsible HR Rep Name/Phone: Parker,Melissa / 908/559-5544

| Name | Job Title | Band | Location Description | Job Entry Date | 2014 Perf | 2015 Perf | Prim Skill | Tech Know | Credo | Others | Corr Action | Total | IM/ RM |
|------|-----------|------|---------------------|----------------|-----------|-----------|------------|-----------|-------|--------|-------------|-------|--------|
| Panichelli,Scott C | Engr III Spec-Ntwk Eng&Ops | 7T | Marshallton,DE | 3/4/2012 | 3 | 3 | 3 | 4 | 3 | 5 | 0 | 21 | RM |
| Walker,Suzette E | Engr III Spec-Ntwk Eng&Ops | 7T | Philadelphia,PA | 12/9/2012 | 1 | 3 | 2 | 2 | 3 | 2 | 0 | 13 | IM |
| Hu,Joseph D | Engr III Spec-Ntwk Eng&Ops | 7T | Philadelphia,PA | 5/31/2003 | 3 | 3 | 3 | 3 | 3 | 3 | 0 | 18 | RM |
| Hodge JR,Thomas J | Engr III Spec-Ntwk Eng&Ops | 7T | Philadelphia, PA | 11/11/2012 | 3 | 5 | 5 | 4 | 4 | 3 | 0 | 24 | RM |
| Murphy,Steven C | Engr III Spec-Ntwk Eng&Ops | 7T | Philadelphia, PA | 5/11/2003 | 3 | 3 | 3 | 3 | 3 | 2 | 0 | 17 | RM |
| Casare,Maria C | Engr III Spec-Ntwk Eng&Ops | 7T | Philadelphia,PA | 4/8/2007 | 3 | 3 | 3 | 3 | 3 | 2 | 0 | 17 | RM |
| Curtin,Mary T | Engr III Spec-Ntwk Eng&Ops | 7T | Exton,PA | 2/1/2004 | 3 | 5 | 5 | 4 | 4 | 3 | 0 | 22 | RM |
| Bowman JR,Carl E | Engr III Spec-Ntwk Eng&Ops | 7T | Exton,PA | 3/26/2006 | 3 | 3 | 3 | 3 | 3 | 3 | 0 | 18 | RM |
| Zang,George W | Engr III Spec-Ntwk Eng&Ops | 7T | Milford, DE | 2/15/2004 | 3 | 3 | 3 | 4 | 4 | 3 | 0 | 20 | RM |
| Padovani,Ernest A | Engr III Spec-Ntwk Eng&Ops | 7T | Marshallton,DE | 1/16/2005 | 3 | 3 | 3 | 3 | 3 | 3 | 0 | 18 | RM |

CONFIDENTIAL
Def_Walker_022

| Shubrook, John | Engr III Spec-Ntwk Eng&Ops | 7T | Marshallton, DE | 3/4/2012 | 3 | 3 | 5 | 5 | 3 | 3 | 0 | 22 | RM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Perry, David M | Engr III Spec-Ntwk Eng&Ops | 7T | Philadelphia, PA | 5/25/2014 | 1 | 3 | 2 | 4 | 3 | 2 | 0 | 15 | RM |
| Scelsa, Joseph | Engr III Spec-Ntwk Eng&Ops | 7T | Exton, PA | 11/23/2003 | 3 | 3 | 3 | 3 | 3 | 3 | 0 | 18 | RM |
| Klauss, Paul | Engr III Spec-Ntwk Eng&Ops | 7T | Philadelphia, PA | 2/23/2004 | 5 | 3 | 5 | 4 | 4 | 5 | 0 | 26 | RM |
| Portolese, Anthony S | Engr III Spec-Ntwk Eng&Ops | 7T | Philadelphia, PA | 4/27/2014 | 3 | 3 | 2 | 4 | 3 | 5 | 0 | 20 | RM |

CONFIDENTIAL
Def_Walker_023

# Exhibit EE

<u>**2014 Performance**</u>

**2014 - Year-End Performance Review**

Employee: Thomas J Hodge JR, Engr III Spec-Ntwk Eng&Ops
Manager: Brian Magee, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress
made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the
employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information,
examples and observations pertinent to results achieved.

**NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH
THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN
RESOURCES.**

<u>**Section 1 - Objectives**</u>

**Living by the Credo**

- **Description and Measures:**Model the Credo in our daily work by demonstrating integrity, customer focus,
sense of urgency, personal accountability, teamwork, and by complying with the Code of Conduct.

**- Employee Accomplishments / Status:**I work with & encourage my colleagues to operate efficiently & ethically to meet the customers expectations. Work with my newer colleagues to help them learn the daily work flow and the systems required. Help them prioritize their daily work load.

I had perfect attendance this year & schedule my vacation responsibly.

Expedited a new OC192 and FW9500 MUX on an expedited schedule to provision a GIGE VON for the Philadelphia Eagles season.

**Manager Comments (Optional)**

---

## Grow Revenue

**- Description and Measures:**

Meet/exceed network expansion and facility build targets.

Support new products and global product expansion.

Drive products on-net.

Accelerate speed to market and service delivery intervals.

Optimize broadband capabilities to stay ahead of increasing demand for bandwidth - enhance fios to provide converged communication, information, entertainment services.

Fiber to the Cell Site

Site Survey

EWOs Issued

FTTC E2E Macro
 Network Build

FTTC E2E Micro (Small Cell) Build

VzW Backbone Network Upgrades

Total Prems Passed Incr

Total Prems Open for Sale Incr

MXU Open for Sale Incr

MTU Open For Sales

**- Employee Accomplishments / Status:**Worked on an SFP /PICS process with an Engineering and SDA team to shorten intervals on hicap provisioning. Known as the "facility yes SR" process. This process is now rollingout to our entire district. Significant impact on our intervals.

**Manager Comments (Optional)**

**Be More Profitable**

- Description and Measures:

Aggressively control and reduce all operating and capital costs, meeting 2014 budget commitments.

Consolidate systems, operations and facilities.

Increase productivity by simplifying, standardizing and automating processes.

Drive network convergence to improve capex and opex efficiency.

Cut energy, fuel and paper consumption to reduce costs and environmental impact.

Network Engr Capital ($M)

Total Budget Performance Core

Total Budget Performance FTTP (w/out PC, with Video)

Total Budget VZB

FTTCS Capital ($M)

FTTCS $ per site (6-month rolling avg cost) (000)

Core Unit Costs

DS1

DS3

OC-N

FTTP Unit Costs

12-mo Rolling $ Cost Per Prem Passed

12-mo Rolling $ Cost Per MDU NC

12-mo Rolling $ Cost Per MTU NC

Standard $ Cost Per Prem Passed

Standard $ Cost Per MDU NC

Network Reliability

Capital Spend

Expense

  Spend

Network Engineering Mgmt Headcount (FTE)

Energy Reduction

Retirements ($M)

Cost of Removal

**- Employee Accomplishments / Status:**

Transitioned new a new turf to better manage the hicap work load. I was able to decrease the held orders and answer the orders quicker to actualize the revenue sooner.

I work with Planning to design our jobs to meet the existing customer's expectations and properly plan for the next customer. Most Locust buildings that I worked in this year now have new OC48 rings in the basement for easier hicap provisioning.

Example:

Phila Eagles & Phila Flyers. Both areana had orders for new GIGE VONS. We have several muxes at each location. Space & power are scarce. Installed the 1st FW9500 on an OC192 at the Eagles and the 1st FW4100ES on an OC192 at the Flyers. Both locations are well positioned for future growth at a reasonable cost.

To date I have completed 4 DS1 initiative fiber builds and 4 Chronic DS1 work orders. This will have a postive impact on reliability and reduce maintenance costs.

**Manager Comments (Optional)**

---

## Improve the Customer Experience

**- Description and Measures:**

Improve network availability.

Meet SR Response Time, SI, Prints on time,ECCD and FAD objectives.

Leverage technology to deliver network and services reliability.

Apply a customer - first - attitude to all transactions, products and services.

Improve quality continuously across all departments including internal and external customer services.

Meet customer requirements through an always on, dependable and scalable

network.

Request Net Intervals - SR Response On Time

SR Response Interval — Overall

SR Response Interval - Ethernet

DS1

DS3

OC-N

Ethernet

Standard Interval Compliance

Prints Issued On Time

FAD Scheduled Date Met

LBW & HBW

ECCD On Time Performance

LBW & HBW

**- Employee Accomplishments / Status:** 100% standard interval compliance.

100% prints issued on time.

Follow Requestnet bucket & Prints issued reports to verify that our Engineering Team is & stays compliant with the objectives.
When an EWO is completed before ECCD I have the service order DD pulled in for an earlier completion to actualize the revenue sooner.

**Manager Comments (Optional)**

---

## Simplify Products,Policies, and Processes

**- Description and Measures:** Get the job done the right way.

Be accountable for results, adhere to our core values and operate with a sense of urgency.

Incorporate a CWS experiment.

Drive change and innovation that brings results to the bottom line.

100% Implementation of (IOF) EPM

Achieve WIG Objective

Implement 4 DX initiative

Reduce CIP %

Reduce work order variance %

**- Employee Accomplishments / Status:** I was part of the initial 4DX roll out & helped our team to get up to speed & understand our WIG.

Worked on the SFP "facility yes" experiment to positively impact & shorten our hicap interval. District WIG.

**Manager Comments (Optional)**

---

**Fuel our Culture**

  **- Description and Measures:**Employee Development - job related training-complete minimum (2) training sessions

• Complete (2) training courses

Safety-Motor Vehicle Accidents Objective - Zero Motor Vehicle Accidents

Absence (%)

• % Management Absence

• Individual Absence Ratio <1%

Recognition

**- Employee Accomplishments / Status:**Completed all required VZLearn courses to date.

Attended 3 Vendor training seesions to update knowledge on Hicap electronics.

Completed required Motor Veicle VZleam courses with no MV accidents.

Perfect Attendance.

Tutored colleagues.

**Manager Comments (Optional)**

---

## Section 2 - Performance Agreement

**Status:** Completed                               **Period:** January 1 - December 31

**Manager Comments (Optional)**

CONFIDENTIAL          VZ_WALKER_563

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 02/25/2014

☒ Employee Signature          **Date:** 02/25/2014

## Section 3 - Mid-Year Review

**Status:** Completed          **Period:** January 1 - June 30

**Manager Performance Summary**

District Averages vs Your Averages @ Mid Year:
Prints Issued 136 vs 122
Hours Issued 6503 vs 4283
# ODN HH 97 vs 28
# NWC HH 223 vs 106
Average of Fac Verification 18.2 vs 4.8
SR Numbers 25 vs 22

Tom, your numbers look great, you are crushing the Facility Verification Objective.  You also did a great job with the SFPs to SDA initiative.   Also of note is the Leadership that you bring to the Team, you help drive behavior and helps me out a great deal.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 08/14/2014

☒ Employee Signature                                **Date:** 08/14/2014

## Section 4 - Year End Review

**Status:** Completed                          **Period:** January 1 - December 31

**Manager Performance Summary**

Your Average of Fac Verification 5.4 vs 12.7 Team's Average
SR Numbers 61 vs 57 Team's Average

Tom took hold of the 4DX principles and made radical changes in his, the Team's and the Districts handling of HBW orders.  Tom lead by example, reducing his Facility Verification interval down below target.  Tom also helped develop and institute the SFP Process that was implemented across EPA-DE. Tom was also relied upon

throughout the year to perform extra duties when issues arose, he was always willing and able to help out.  Tom is a key asset of the Philadelphia/Delaware Team.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 02/25/2015

☒ Employee Signature                                **Date:** 02/25/2015

## Section 5 - Performance Rating

| Leading | *Employee sustained performance above objectives, requirements and expectations.* |
|---|---|
| Performing | *Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.* |
| Developing | *Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed.* |
| New | *Achievement relative to performance objectives cannot be evaluated due to short tenure in position.*<br>*- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*<br>*- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

**Performance Rating:Leading**

Signatures :

Employee : Thomas Hodge          Date: 2015-02-25

Manager : Brian Magee          Date: 2015-02-25

CONFIDENTIAL          VZ_WALKER_566

# Exhibit FF

<u>**2014 Performance**</u>

**2014 - Year-End Performance Review**

Employee: David M Perry , Engr III Spec-Ntwk Eng&Ops
Manager: Brian Magee, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

**NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.**

<u>**Section 1 - Objectives**</u>

**Supervisor Responsibilities**
- **Description and Measures:**
As a Verizon leader, drive business results by building and developing a strong diverse team and

maximizing team performance.   Specific measures include:
1.    Setting and communicating objectives and priorities and providing ongoing direction
2.    Completing all required performance documents and conducting associated performance discussions (performance agreement/objectives, mid-year review, year-end review) by required

  deadlines
3.    Providing ongoing performance feedback, coaching, training and development
4.    Taking appropriate performance improvement action, or administering appropriate discipline when employees do not meet performance standards or expectations
5.    Ensuring a safe and ethical work environment by complying with the Code of Conduct and all Company policies

**- Employee Accomplishments / Status:**1st half 2014 I&M Local Manager (ranked in top 5% for overall performance)

1. completed 2014 performance agreements
2. completed 2013 EOY appraisals for direct reports
3. conducted monthly coaching and performance documentation
4. conducted quality assurance reviews and administered discipline accordingly
5. conducted all required safety training and code of conduct training

**Manager Comments (Optional)**

---

## Living by the Credo

**- Description and Measures:**Model the Credo in our daily work by demonstrating integrity, customer focus, sense of urgency, personal accountability, teamwork, and by complying with the Code of Conduct.

**- Employee Accomplishments / Status:**Utilizes knowledge of outside plant operations and dedication to improving the customer experience to cross-train in new OSP position.

**Manager Comments (Optional)**

---

## Improve Profitability:

**- Description and Measures:**Drive Profitability Higher.
Concentrate our energy on things that drive customer involvement and eliminate things that don't.

**- Employee Accomplishments / Status:**6 month period as OSP engineer

  Answered 78 HBW SRs
  Processed 212 EWOs for HBW/BAU/FTTP

**Manager Comments (Optional)**

**Innovation/Personal Commitment:**

  **- Description and Measures:** Roll-out and successfully implement the migrations plan.
Implement 2014 Communication Plan to drive consistent behavior, set expectations and explain the "Why".
Maximize all migration opportunities
Manage Customer Care Database by ensuring all maintenance plans are expedited.

**- Employee Accomplishments / Status:**

1st half worked as local manager in NJ for I&M and cable maintenance.
  -Stayed current w/ position requirements-safety/quality/coaching/meetings
  -Zero occupational injuries or motor vehicle accidents
  -Ranked in top 10 local managers statewide for overall performance
  -Instrumental in PPM programs in chronic trouble locations
  -Month over month improvement
Selected to a position w/ outside plant

engineering
  -Immediately assigned turf and began performing job functions
  -Diligently working with peers to become proficient 360 design engineer
  -Completed following NetLearn Courses
    -Intro to TIRKS
    -TIRKS-Netsuites Overview
    -Introduction to IDDS
    -all required departmental training.

**Manager Comments (Optional)**

## Section 2 - Performance Agreement

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Comments (Optional)**

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee        **Date:** 01/20/2014

☒ Employee Signature                             **Date:** 01/21/2014

## Section 3 - Mid-Year Review

**Status:** Completed                     **Period:** January 1 - June 30

**Manager Performance Summary**

District Averages Mid Year:
Prints Issued 136
Hours Issued 6503
 # ODN HH 97
 # NWC HH 223
Average of Fac_Verification 18.2%
Average of SRs 25

The above numbers give you an idea of the measureables.  The item that is the hottest for the remainder of the year is Facility Verifications completed within 8 days.  You have solid experience, you just need to continue to learn the Engineering systems and process flows.
I like that you are asking questions and are taking advantage of other Engineers to gain experience.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee        **Date:** 08/14/2014

☒ Employee Signature                             **Date:** 08/14/2014

## Section 4 - Year End Review

**Status:** Completed                    **Period:** January 1 - December 31

### Manager Performance Summary

Your Average of Fac_Verification  5.4* vs 12.7 Team's Average
Your # of SRs 20* vs 57 Team's Average

Dave completed six months in Engineering and was focused on HBW and driving down the Facility Verification Interval, which he succeeded in achieving the metric of <8.   This was a notable achievement and was a positive contribution to the Team.   Dave also made solid progress on learning the systems and flow of
Engineering.   Dave must keep an open dialogue with myself, his Teammates and our staff to ensure that he continues down a positive path.

### Employee Comments (Optional)

☒ Manager Signature & Release to Employee          **Date:** 02/24/2015

☒ Employee Signature                               **Date:** 02/24/2015

## Section 5 - Performance Rating

| Leading | *Employee sustained performance above objectives, requirements and expectations.* |
|---|---|
| Performing | *Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.* |

| Developing | *Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed.* |
|---|---|
| New | *Achievement relative to performance objectives cannot be evaluated due to short tenure in position.*<br>*- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*<br>*- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

**Performance Rating:Performing**

Signatures :

Employee : David Perry          Date: 2015-02-24

Manager : Brian Magee          Date: 2015-02-24

CONFIDENTIAL          VZ_WALKER_328

# Exhibit GG

<u>**2014 Performance**</u>

**2014 - Year-End Performance Review**

Employee: Anthony S Portolese , Engr III Spec-Ntwk Eng&Ops
Manager: Brian Magee, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

**NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.**

<u>**Section 1 - Objectives**</u>

| Supervisor Responsibilities |
| --- |
| - Description and Measures: |
| As a Verizon leader, drive business results by building and developing a strong diverse team and |

CONFIDENTIAL          VZ_WALKER_280

maximizing team performance.   Specific measures include:
1.     Setting and communicating objectives and priorities and providing ongoing direction
2.     Completing all required performance documents and conducting associated performance discussions (performance agreement/objectives, mid-year review, year-end review) by required deadlines
3.     Providing ongoing performance feedback, coaching, training and development
4.     Taking appropriate performance improvement action, or administering appropriate discipline when employees do not meet performance standards or expectations
5.     Ensuring a safe and ethical work environment by complying with the Code of Conduct and all Company policies

**- Employee Accomplishments / Status:**

1/1-14-5/24/14
C&X Supervisor
Performance agreements and objectives were created and covered with all of my team in the January timeframe. Since then I have continually communicated the expectations. I have met all midyear coverage expectations. I have conducted monthly safety meetings, inspections, coaching and technical training as necessary.   I hold my team accountable to the results and expectations and addresses issues

swiftly and appropriately.

5/25/14-Current
OSP Engineer
-Responsible for Conduit/Highway OSP Engineering for the City of Philadelphia.
-Responsible for all 3rd Party Lease Requests in the City of Philadelphia
-Responsible to review all GPIS Permit requests from other utility companies in the City of Philadelphia
-Serve as the Verizon point of contact for the Committee of Highway Supervisors in the City of Philadelphia.

**Manager Comments (Optional)**

---

**Living by the Credo**

**- Description and Measures:**Model the Credo in our daily work by demonstrating integrity, customer focus, sense of urgency, personal accountability, teamwork, and by complying with the Code of Conduct.

**- Employee Accomplishments / Status:**Worked with team and provided coaching to improve productivity numbers. Productivity has shown improvement from beginning of year.

-Serve as subject matter expert for Philadelphia Engineering team in ICGS, IDDS, IVAPP, NTAS, & BDMS.
-Help to facilitate team in conduit, FTTP, and HBW design.

**Manager Comments (Optional)**

---

**Grow Revenue**

**- Description and Measures:**

Meet/exceed network expansion and facility build targets.

Support new products and global product expansion.

Drive products on-net.

Accelerate speed to market and service delivery intervals.

Optimize broadband capabilities to stay ahead of increasing demand for bandwidth - enhance fios to provide converged communication, information, entertainment services.

Fiber to the Cell Site

Site Survey

EWOs Issued

FTTC E2E Macro

  Network Build

FTTC E2E Micro (Small Cell) Build

VzW Backbone Network Upgrades

Total Prems Passed Incr

Total Prems Open for Sale Incr

MXU Open for Sale Incr

MTU Open For Sales

**- Employee Accomplishments / Status:**Designed & Issued 60 conduit EWOs to facilitate HBW Orders, FTTP, and BAU work.

**Manager Comments (Optional)**

---

**Be More Profitable**

**- Description and Measures:**

  Aggressively control and reduce all operating and capital costs, meeting 2014 budget commitments.

Consolidate systems, operations and facilities.

Increase productivity by simplifying, standardizing and automating processes.

Drive network convergence to improve capex and opex efficiency.

Cut energy, fuel and paper consumption to reduce costs and environmental impact.

Network Engr Capital ($M)

Total Budget Performance Core

Total Budget Performance FTTP (w/out PC, with Video)

Total Budget VZB

**FTTCS Capital ($M)**

FTTCS $ per site (6-month rolling avg cost) (000)

Core Unit Costs

DS1

DS3

OC-N

FTTP Unit Costs

12-mo Rolling $ Cost Per Prem Passed

12-mo Rolling $ Cost Per MDU NC

12-mo Rolling $ Cost Per MTU NC

Standard $ Cost Per Prem Passed

Standard $ Cost Per MDU NC

Network Reliability

Capital Spend

Expense

  Spend

Energy Reduction

Retirements ($M)

Cost of Removal

**- Employee Accomplishments / Status:** Work with other Engineers to limit job cost by finding alternatives to replacing conduit. This is done by redesigning EWOs and cable paths to limit the cost of new conduit installation.

**Manager Comments (Optional)**

**Simplify Processes**

  **- Description and Measures:** Get the job done the right way.

Be accountable for results, adhere to our core values and operate with a sense of urgency.

Incorporate a CWS experiment.

Drive change and innovation that brings results to the bottom line.

Achieve WIG Objective

Implement 4 DX initiative

Reduce CIP %

Reduce work order variance %

**- Employee Accomplishments / Status:**-Processed 65 3rd Party lease request.
-Review 180 GPIS Permit requests for other utilities.
-Issue 60 conduit EWOs.

**Manager Comments (Optional)**

---

**Fuel Our Culture**

   **- Description and Measures:**Employee Development - job related training-complete minimum (2) training sessions

• Complete (2) training courses

Safety-Motor Vehicle Accidents Objective - Zero Motor Vehicle Accidents

Absence (%)

• Individual Absence Ratio <1%

**- Employee Accomplishments / Status:**-Completed 10 VZ Learn Courses.

**Manager Comments (Optional)**

---

## Section 2 - Performance Agreement

**Status:** Completed                  **Period:** January 1 - December 31

CONFIDENTIAL        VZ_WALKER_284

## Manager Comments (Optional)

I will use my leadership ability to generate meaningful impact and progress that has a direct correlation to our revenue growth and overall customer experience. My focus will be in the following areas:
Key Priorities

Deliver a Great Customer Experience
Grow Customers and Revenue
Drive Profitability Higher
By meeting or exceeding the following measures:
CXM_COPPER PRS JOINED PER HR GOAL     32.03
CXM_COPPER PRS RECON REWIR

PER HR GOAL     1.83
CXM_COPPER TRANSFER PER HR GOAL     7.53
CXM_COPPER TRIMOUT PER HR GOAL     27.12
CXM_DRAKA PLACEMENT RATE GOAL     13.68
CXM_FDT TAIL FT PER HR GOAL     85.49
CXM_FIBER FDT SPLICED PER HR GOAL     3.72
CXM_FIBERS JOINED PER HR GOAL     6.71
CXM_FIBER TRIM OUT PER HR GOAL     5.41
CXM_HRS PER FDH PLACED GOAL     7.91
CXM_HRS PER FDT PEND SPLICE TEST GOAL     8.93
CXM_HRS PER FDT PLACED

GOAL     3.55
CXM_HRS PER POLE PLACED GOAL     21.92
CXM_HRS PER POLE REMOVED GOAL     6.9
CXM_LP ELEC CABS PLACE PER HR GOAL     0.08
CXM_LP ELEC PLACED PER HR GOAL     0.67
CXM_LP ELEC REMOVED PER HR GOAL     3.3
CXM_LP ELEC TURNUP PER HR GOAL     0.09
CXM_M3 ONEPASS PLACEMENT RATE GOAL     12
CXM_SHEAT FT PER HR COPPER PL OR XFER GOAL     12.63
CXM_SHEATH FT PER HR COPPER REMOVED GOAL     30.35
CXM_SHEATH

FT PER HR FIBER PL OR XFER GOAL     42.9
CXM_SHEATH FT PER HR FIBER REMOVED GOAL     75.56
CXM_ECCD Met Overall Goal     93


Build our Culture
QUALITY INSPECTION GOAL     1 per tech/month
COACHING SESSION GOAL     1 per tech/month
SAFETY MEETING GOAL     1 per tech/month
SAFETY WO GOAL     2 per tech/month
LOST DAY RATE GOAL     1.77
MV INC RATE GOAL     4.03
OSHA INJ RATE GOAL     3.67

## Employee Comments (Optional)

☒ Manager Signature & Release to Employee          **Date:** 02/05/2014

☒ Employee Signature                               **Date:** 02/06/2014

## Section 3 - Mid-Year Review

**Status:** Completed                    **Period:** January 1 - June 30

**Manager Performance Summary**

Anthony settled into his new role of Conduit Engineer during the 2nd Quarter. Anthony possess the skills and education to perform the functions of the position. In 2nd half give extra priorty to any conduit issues involving HBW orders.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 08/14/2014

☒ Employee Signature                               **Date:** 08/14/2014

## Section 4 - Year End Review

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Performance Summary**

Anthony will expanded his knowledge of OSP Engineering with his assignment to the Conduit Role in Philadelphia. His education, experience and decision making ability are all put into practice in this position. He made solid ground in learning the new role and the processes/systems associated with the permits and 3rd Party. He also made a major impact on the design of "18th St relocation" which protected Verizon's interest and satisfied the Developer's needs.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee        **Date:** 02/25/2015

☒ Employee Signature                             **Date:** 02/25/2015

## Section 5 - Performance Rating

| Leading | Employee sustained performance above objectives, requirements and expectations. |
|---|---|
| Performing | Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them. |
| Developing | Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed. |
| New | Achievement relative to performance objectives cannot be evaluated due to short tenure in position.<br>- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.<br>- Performing duties less than 3 months of the year due to an authorized absence or leave. |

Performance Rating:**Performing**

CONFIDENTIAL          VZ_WALKER_287

Signatures :

Employee : Anthony Portolese          Date: 2015-02-25

Manager : Brian Magee          Date: 2015-02-25

CONFIDENTIAL          VZ_WALKER_288

# Exhibit HH

<u>2014 Performance</u>

**2014 - Year-End Performance Review**

Employee: Edward T Boudman , Engr III Spec-Ntwk Eng&Ops
Manager: Carl Gross, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.

<u>Section 1 - Objectives</u>

**Living by the Credo**

- **Description and Measures:**Model the Credo in our daily work by demonstrating integrity, customer focus, sense of urgency, personal accountability, teamwork, and by complying with the Code of Conduct.

**CONFIDENTIAL**                                                                **VZ/WALKER 869**

**- Employee Accomplishments / Status:**

For 2014 I 'lived the credo' by staying customer focused, working and living with integrity, working as a team with my Verizon counterparts, and developing my knowledge both personally and professionally to bring my best performance to work on a daily basis.

I especially met this goal as I took on the responsibility of the Allentown and Mountainville central office areas for half of the year due to retirements on our

team.  My counterparts and I worked and continue to work as a team to help each other through the additional workload and the hurdles of learning a new area.

**Manager Comments (Optional)**

## Grow Revenue

**- Description and Measures:**

  Meet/exceed network expansion and facility build targets.
Support new products and global product expansion.
Drive products on-net.
Accelerate speed to market and service delivery intervals.
Optimize broadband capabilities to stay ahead of increasing demand for bandwidth - enhance fios to provide converged communication, information, entertainment services.
Fiber to the Cell Site
Site Survey
EWOs Issued
FTTC E2E Macro Network

  Build
FTTC E2E Micro (Small Cell) Build
VzW Backbone Network Upgrades
Total Prems Passed Incr
Total Prems Open for Sale Incr
MXU Open for Sale Incr
MTU Open For Sales

**- Employee Accomplishments / Status:**

See attached scorecard and hbw results.

For 2014 I helped my team significantly reduce our high bandwidth service delivery by answering SRs and getting the work orders out to construction as quickly as possible.  I worked with my counterparts at AT&T and Verizon Wireless to deliver my FTTCS work prints to CXM on target.  I was able to refer several MDU/MTU opportunities to expand the network and I satisfied the FiOS

held orders that came across my desk in a timely manner to avoid service delays.

As residential developments continued to grow in 2014.  I worked with my counterparts and the builders in my area to ensure my prints were issued in a timely manner to allow construction enough time to complete their work to avoid held orders.
- 337 total EWO's issued in 2014

**Manager Comments (Optional)**

**CONFIDENTIAL**

VZ/WALKER 870

## Be more profitable

**- Description and Measures:**

Aggressively control and reduce all operating and capital costs, meeting 2014 budget commitments.
Consolidate systems, operations and facilities.
Increase productivity by simplifying, standardizing and automating processes.
Drive network convergence to improve capex and opex efficiency.
Cut energy, fuel and paper consumption to reduce costs and environmental impact.
Network Engr Capital ($M)
Total Budget Performance Core
Total Budget

Performance FTTP (w/out PC, with Video)
Total Budget VZB
FTTCS Capital ($M)
FTTCS $ per site (6-month rolling avg cost) (000)
Core Unit Costs
DS1
DS3
OC-N
FTTP Unit Costs
12-mo Rolling $ Cost Per Prem Passed
12-mo Rolling $ Cost Per MDU NC
12-mo Rolling $ Cost Per MTU NC
Standard $ Cost Per Prem Passed
Standard $ Cost Per MDU NC
Network Reliability
Capital Spend
Expense Spend
Network Engineering Mgmt Headcount

(FTE)
Energy Reduction
Retirements ($M)
Cost of Removal

**- Employee Accomplishments / Status:**Ongoing.

To meet these objectives I continued to work 'paperless' as much as possible to reduce consumption and capital costs. I looked for ways to provide fiber solutions versus copper service whenever possible, and I used 'adaptive engineering' to put the right job at the best cost out to construction.

**Manager Comments (Optional)**

## Improve the customer experience

**- Description and Measures:**

**- Employee Accomplishments / Status:**To improve my customers' experience I returned all voice and e-mails in timely manner. I treated all customers, both internal and external, the way I would like to be treated as a customer, and I followed up and made sure I delivered on any commitments I made.

**Manager Comments (Optional)**

---

## Simplify Products,Policies, and Processes

- **Description and Measures:**Get the job done the right way.
Be accountable for results, adhere to our core values and operate with a sense of urgency.
Incorporate a CWS experiment.
Drive change and innovation that brings results to the bottom line.
100% Implementation of (IOF) EPM
Achieve WIG Objective
Implement 4 DX initiative
Reduce CIP %
Reduce work order variance %

- **Employee Accomplishments / Status:**participates in weekly WIG huddles, providing results and knows objective of achieving reductions in facility verifications.

**Manager Comments (Optional)**

---

## Fuel our culture

- **Description and Measures:**Employee Development - job related training-complete minimum (2) training sessions
• Complete (2) training courses
Safety-Motor Vehicle Accidents Objective - Zero Motor Vehicle Accidents
Absence (%)
• % Management Absence
• Individual Absence Ratio <1%
Recognition

- **Employee Accomplishments / Status:**In 2014 I had zero motor vehicle accidents and zero medical absence.
I completed my training as needed.

**Manager Comments (Optional)**

---

## District Objectives

- **Description and Measures:**Meet all Chapter 30 requirements
Chapter 30 - Budget
C30 -BFRR - Regulatory On-Time
C30 - 2014 Regulatory Target

- **Employee Accomplishments / Status:**ongoing.

---

**CONFIDENTIAL**                                                    **VZ/WALKER 872**

**Manager Comments (Optional)**

---

**Network Reliability**

   - **Description and Measures:**IIP
Chronic DS-1
E911 Network Diversity
SS7 Network Diversity

- **Employee Accomplishments / Status:**To meet my objectives for Network Reliability in 2014 I ensured that I released any IIP jobs that came across my desk ASAP and I looked for fiber solutions whenever possible for the chronic DS1's in my areas.

**Manager Comments (Optional)**

---

## Section 2 - Performance Agreement

**Status:** Completed                        **Period:** January 1 - December 31

**Manager Comments (Optional)**

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee      **Date:** 02/26/2014

☒ Employee Signature                      **Date:** 02/27/2014

## Section 3 - Mid-Year Review

**Status:** Completed                          **Period:** January 1 - June 30

**Manager Performance Summary**

Ed engineers the Pottstown sub district for all BAU activities.  Ed also picked up 2 additional wire centers in the Allentown sub district because of early retirements of 2 engineers.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 08/12/2014

☒ Employee Signature                               **Date:** 08/13/2014

## Section 4 - Year End Review

**Status:** Completed                          **Period:** January 1 - December 31

**Manager Performance Summary**

**CONFIDENTIAL**                                    **VZ/WALKER 874**

Ed has the responsibility for the Pottstown sub district for 360 engineering.  In addition to that area Ed also picked up 2 additional wire centers in the Lehigh valley for the beginning of the year because of some employee retirements.  Ed is self motivated and does a great job at communicating his efforts to both construction and his peers.  Although I get few escalation's in his area, when they do come up, Ed

addresses them with a sense of urgency and follow them through till they are completed.  Ed had a relatively low volume of Sr's compared to the rest of the team but is a reflection of the area that he engineers in and has more of the whirl wind issues that go along with that area.  One area I would like to see Ed improve on in the coming year is to increase his percentage of jobs issued within 8 days of

application.  His percentage this year was at 31%, putting him in the bottom third of our district.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee      Date: 02/17/2015

☒ Employee Signature                           Date: 02/17/2015

## Section 5 - Performance Rating

| Leading | *Employee sustained performance above objectives, requirements and expectations.* |
|---|---|
| Performing | *Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.* |
| Developing | *Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed.* |
| New | *Achievement relative to performance objectives cannot be evaluated due to short tenure in position.*<br>*- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*<br>*- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

**CONFIDENTIAL**

VZ/WALKER 875

**Performance Rating:Performing**

Signatures :

Employee : Edward Boudman          Date: 2015-02-17

Manager : Carl Gross          Date: 2015-02-17

**CONFIDENTIAL**                                        **VZ/WALKER 876**

# Exhibit II

<u>2014 Performance</u>

**2014 - Year-End Performance Review**

Employee: Paul J Mulhern III, Engr III Spec-Ntwk Eng&Ops
Manager: Carl Gross, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

**NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.**

**<u>Section 1 - Objectives</u>**

**Living by the Credo**

- **Description and Measures:**Model the Credo in our daily work by demonstrating integrity, customer focus, sense of urgency, personal accountability, teamwork, and by complying with the Code of Conduct.

**CONFIDENTIAL**                                                                                    **VZ/WALKER 940**

**- Employee Accomplishments / Status:** Completion Notification for 2014 Antitrust Law.
Completion Notification for CPNI Annual Training 2014-2015.
Mandatory CPNI Consent Decree Training due Nov. 26, 2014.
RequestNet Release 17.6 Confirming Date and time.
Suttle Product Review and Demonstration.
Pennsylvania User Meeting Confirmation.
Assist CXM & Cops on cable damages.

**Manager Comments (Optional)**

## Grow Revenue

**- Description and Measures:**

Meet/exceed network expansion and facility build targets.
Support new products and global product expansion.
Drive products on-net.
Accelerate speed to market and service delivery intervals.
Optimize broadband capabilities to stay ahead of increasing demand for bandwidth - enhance fios to provide converged communication, information, entertainment services.
Fiber to the Cell Site
Site Survey
EWOs Issued
FTTC E2E Macro Network

Build
FTTC E2E Micro (Small Cell) Build
VzW Backbone Network Upgrades
Total Prems Passed Incr
Total Prems Open for Sale Incr
MXU Open for Sale Incr
MTU Open For Sales

**- Employee Accomplishments / Status:** See attached spreadsheet that includes all scorecard data as well as individual results.
EWOs issued.= 268+
#ODN HH = 217+
#NWC HH = 575+

**Manager Comments (Optional)**

## Be more profitable

**- Description and Measures:**

Aggressively control and reduce all operating and capital costs, meeting 2014 budget commitments.
Consolidate systems, operations and facilities.
Increase productivity by simplifying, standardizing and automating processes.
Drive network convergence to improve capex and opex efficiency.
Cut energy, fuel and paper consumption to reduce costs and environmental impact.

**CONFIDENTIAL**

VZ/WALKER 941

Network Engr Capital ($M)
Total Budget Performance Core
Total Budget

  Performance FTTP (w/out PC, with Video)
Total Budget VZB
FTTCS Capital ($M)
FTTCS $ per site (6-month rolling avg cost) (000)
Core Unit Costs
DS1
DS3
OC-N
FTTP Unit Costs
12-mo Rolling $ Cost Per Prem Passed
12-mo Rolling $ Cost Per MDU NC
12-mo Rolling $ Cost Per MTU NC
Standard $ Cost Per Prem Passed
Standard $ Cost Per MDU NC
Network Reliability
Capital Spend
Expense Spend
Network Engineering Mgmt Headcount

  (FTE)
Energy Reduction
Retirements ($M)
Cost of Removal

**- Employee Accomplishments / Status:** Ongoing and in progress.

**Manager Comments (Optional)**

---

**Improve the customer experience**

  **- Description and Measures:**

**- Employee Accomplishments / Status:**

**Manager Comments (Optional)**

---

**Simplify Products, Policies, and Processes**

  **- Description and Measures:** Get the job done the right way.
Be accountable for results, adhere to our core values and operate with a sense of urgency.
Incorporate a CWS experiment.
Drive change and innovation that brings results to the bottom line.
100% Implementation of (IOF) EPM
Achieve WIG Objective
Implement 4 DX initiative
Reduce CIP %

---

**CONFIDENTIAL**

**VZ/WALKER 942**

Reduce work order variance %

**- Employee Accomplishments / Status:**Message From Congressman Jim Gerlach.
Response from Senator Casey

**Manager Comments (Optional)**

---

## Fuel our culture

**- Description and Measures:**Safety-Motor Vehicle Accidents Objective - Zero Motor Vehicle Accidents
Absence (%)
• % Management Absence
• Individual Absence Ratio <1%
Recognition

**- Employee Accomplishments / Status:**Completed 188A testing.
Completion Notification for Driver Safety Series - Changing Lanes.
Completion Notification for Driver Safety Series - Slow Down and Live.
Completion Notification for Driver Safety Series- Do Not Be a Tailgater.
Completion Notification for Driver Safety Series- Safe Intersection Techniques.
CPR Class.
Incident Investigation for Case VM0000064545 (non-chargeable mv incident).
0 absence -- I think my last sick day was over 20 years ago.

**Manager Comments (Optional)**

---

## District Objectives

**- Description and Measures:**Meet all Chapter 30 requirements
Chapter 30 - Budget
C30 -BFRR - Regulatory On-Time
C30 - 2014 Regulatory Target

**- Employee Accomplishments / Status:**Ongoing and providing support when required.

**Manager Comments (Optional)**

---

## Network Reliability

**- Description and Measures:**IIP
Chronic DS-1
E911 Network Diversity
SS7 Network Diversity

---

- **Employee Accomplishments / Status:** Ongoing and providing support when required.

**Manager Comments (Optional)**

## Section 2 - Performance Agreement

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Comments (Optional)**

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee        **Date:** 02/26/2014

☒ Employee Signature                              **Date:** 02/26/2014

## Section 3 - Mid-Year Review

**Status:** Completed                    **Period:** January 1 - June 30

**Manager Performance Summary**

Paul does 360 engineering for the West Chester sub district, with paying special attention to all HBW services. Paul works hard to complete the facility verification piece within our 8 day target and is driving the customer ready date to get the service in as soon as possible.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 08/13/2014

☒ Employee Signature                               **Date:** 08/14/2014

## Section 4 - Year End Review

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Performance Summary**

Paul has responsibility for 360 degree engineering in the West Chester area, encompassing 4 wire centers. Paul's main focus is the reduction of the overall interval for all high bandwidth services while keeping control of the whirlwind that he deals with every day. Paul does a good job of communicating with his construction peers as well as keeping me informed of situations that are cause for concern. Paul does a good

job of meeting all the metric's that we have in place but one area that I need Paul to improve on is his 8 day facility verification objective that is in place. Paul's percentage for doing this is at 25% which is the 3rd lowest in the district. His overall average for facility verification is at 9 days, so with a concerted effort, am sure that he can drive his percentage up into the 50% range. I attached my eoy of scorecard for the group's overall achievements. Paul's biggest contribution for 2015 would be to work through any road blocks and get the jobs issued within 8 days where possible.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 02/18/2015

☒ Employee Signature                               **Date:** 02/18/2015

## Section 5 - Performance Rating

| Leading | *Employee sustained performance above objectives, requirements and expectations.* |
|---|---|
| Performing | *Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.* |
| Developing | *Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed.* |
| New | *Achievement relative to performance objectives cannot be evaluated due to short tenure in position.*<br>*- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*<br>*- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

**Performance Rating:Performing**

Signatures :

Employee : Paul Mulhern          Date: 2015-02-18

Manager : Carl Gross          Date: 2015-02-18

**CONFIDENTIAL**                              **VZ/WALKER 946**

# Exhibit JJ

## 2013 Performance

## 2013 - Year-End Performance Review

Employee: Samuel J Capizzi , Engr III Spec-Ntwk Eng&Ops
Manager: Carl Gross, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.

## Section 1 - Objectives

**Living by the Credo**

  - **Description and Measures:**Model the Credo in our daily work including by demonstrating integrity, customer focus, sense of urgency, personal accountability, and teamwork, and by complying with the Business Code of Conduct.

   VZ/WALKER 877

**- Employee Accomplishments / Status:**

Demonstrates the Credo daily in work ethic. Displays a sense of urgency with no misses in 2013 on Hi Cap orders. Takes personal accountability on a personal level by assuring all contractor prints returned to VZ Engineering are accurate and uphold the Verizon standard before issuing work to Construction. Sam complies fully with the Business Code of Conduit completing all mandatory online requirments yearly. Finally

this Engineer is wholly focused on the customer demand - going beyond when necessary to meet customer due dates on work required.

**Manager Comments (Optional)**

Sam lives by the credo by focusing outward on our customers everyday. Sam engineers a sub

district that is loaded with high revenue, high value customers and does what is necessary to keep

the orders moving. Because of the volume of orders that Sam deals with, he will be a key

component in reaching our biggest target of the year which is reducing intervals. I rely on Sam

because of his extensive OSP background and

the ability to process work as quickly as he does. Now we have to take that knowledge and figure

out a way to do it even quicker.

---

## Accelerate Revenue Growth

**- Description and Measures:** Meet/exceed network expansion and facility build targets.
- SFU Greenfields
- MDU/MTU Overlays
- MDU/MTU Greenfields
Accelerate speed to market and service delivery intervals.

**- Employee Accomplishments / Status:**

* Actively particpated in FAST inquires effectively qualifying as close to 100% of properties as possible.
* Engineer issued hi cap work orders in certain cases where customer requirements were not completely built but were promised thereby accelerating income.

* Project managed/designed total of 197 work authorities in 2013 including 101 Hi Cap orders such as DS3, TLS, VzON & OC3 level services.
* This included issuing 20

Chapter 63 work orders as well as, MxU, Digital, Billable & Service Orders

---

VZ/WALKER 878

**Manager Comments (Optional)**

Sam moves on all his hi cap work and FIOS builds because he knows the revenue at stake.  He does what is necessary to keep the orders moving, but does not get any breaks because it seems as fast as he answers one, several more keep coming his way.  Sam utilizes contractors as much as possible to gets the jobs issued, therefore bringing in the revenue as soon as possible.

## Support new products and global product expansion

- Description and Measures:FTTCS
MXU new products
Know products and be able to explain them to our customers
Optimize broadband capabilities to stay ahead of increasing demand for bandwidth.
Enhance FIOS to provide converged communication, information and entertainment services.

- Employee Accomplishments / Status:

Enegineer took advantage of using new products in the deployment of Hi Cap orders such as the newly released Adtran OPTI-6100 MUX forr customers with Ethernet requirments.

Effectively gets prints out in a timely manner to insure construction has enough time to complete in advance of the service order.

 Monitors our held order buckets for  respective central office's and makes sure there is a solution prior to the

date due to keep customer satisfaction at a high level.
In responding to FAST inquiries, assures that the addresses that validate are good and can be worked, avoiding customer disappointments down the road.
Actively pursued new products in FiOS and Digital


**Manager Comments (Optional)**

Sam works well with his other HBW engineers in deploying the latest and greatest technologies that are

available to us, giving our customers the advantage that our fiber networks allow.

## Increase Profit Margin

- Description and Measures:-Capital Budget
-Expense Budget
-Estimate Administration
-Routine Work Administration
-CWO Administration
Aggressively control and reduce all operating and capital costs, meeting 2013 budget commitments.
Consolidate systems, operations and facilities.
Increase productivity by simplifying, standardizing and automating processes.
Cut energy, fuel and paper consumption to reduce costs and environmental impacts.

- Employee Accomplishments / Status:

**VZ/WALKER 879**

* Managed Design Work for 5 C.O.s n LNLX & NRTW which included MDU/MTU Greenfield design and Overlays as well as digital.    Ability to grasp new function of being 360 Engineer is impeccable.

* Engineer had no unrecoverable money on CWO's.    Managed to collect 100% on all billable jobs thereby eliminating the need to expense uncollectable spending on CWO's.

* Met 0 Late supplements requirement with no Estimates

requiring supplements

* Designed and managed design contractors to succeed in 100% ICGS work order design

* Designed and/or project managed 101 hi cap work orders - this includes TLS, VzON, OC3 & DS3 orders that have very strict time frames.    Maintained a 0 miss productivity in high cap orders.

**Manager Comments (Optional)**

Sam scrutinizes all his jobs to make sure they are right, fall within budget and will meet customers expectations.

---

**Leverage Best Network and Improve Customer Service**

   **- Description and Measures:** Standard Interval Compliance – 99%
Prints Issued On Time – 99%
Pre-RID as % Total Pre-RID Pending - 95%

Requestnet Intervals - Firm Orders FOC
-%72 hrs (DS3,OCn & Ethernet) - 95%
-%24 hrs (DS1) – 95%

Improve network availability.
Meet ECCD objectives
Improve quality across all internal and external customer services.

**- Employee Accomplishments / Status:**

•Held orders- Contributed to the reduction of Norristown and Line Lexington held orders by working diligently with builders and developers to issue work orders in advance of service orders.

* Responsible for DSO coordination and DS3 and above and answers all pending orders in vBuild and Request Net to assure orders are able to flow through accurately.  This included 0 orders exceeding Engineering allowance of 72 hours held

without response on hi cap orders.

* Handles FAST inquiries in absence of regular coordinator and Express Firm and Firm Express TLS orders for VZB

---

**Manager Comments (Optional)**

Sam does whatever is possible to position our customers on our fiber network.  He is active in deploying multiplexers to the end user, giving them the best quality and best equipment available to maximize the fiber networks that we all know is the best in the world.

---

## Leverage technology to deliver network and services reliabil

- **Description and Measures:**Apply a customer - first - attitude to all transactions, products and services.
Improve network availability.
Meet ECCD objectives.
Improve teamwork across all internal and external customer services.

- **Employee Accomplishments / Status:**

•Held orders- both DSO and Hi Cap. Contributed to the reduction of both types of  held orders by working diligently with builders and developers as well as customers and vendors,  issue work orders in advance of service orders and in a timely fashion if in response to service order.

* Responsible for DSO coordination and answers all pending orders in vBuild to assure orders are able to flow through accurately.

*

Handles FAST inquiries in absence of regular coordinator.

* Reviews old work with Planning/ Construction to determine relevance of old routines. Assists in removing roadblock s prohibiting completion of estimates (i.e. releases, issue 2s..)

* Meets frequently with customers to determine their service needs and time requirements. Designs jobs in order to meet those requirements. Monitors work with construction and frequently

visits job sites to check on progress of new developments with builders promoting loyalty to Verizon.

* Works with CMC in order to assure cable and job materials are ordered and job is scheduled for on-time completion and escalates to Manager when necessary.

* Communicates daily with all Engineering disciplines such as Planning, Right of Way, and Drafting in order to project manage internal flow of work.

**Manager Comments (Optional)**

Sam stays engaged with our customers, keeping them informed and up to date on their expectations.  Sam knows that the quicker we provision the orders, the customers are happy, and Verizon benefits by bringing in the cash sooner.

---

## Create a Culture of Performance

- **Description and Measures:**Get the job done the right way.
Be accountable for results, adhere to our core values and operate with a sense of urgency.

---

Drive change and innovation that brings results to the bottom line.
Complete training has required
Effective communications using email, websites, staff meetings and site visits.
Meet all human resource deliverable timelines
meet al compliance initiatives.

**- Employee Accomplishments / Status:**

\* Designs work exclusively in ICGS

\* Reviews job pricing for accuracy. Works with Construction forces to determine the amount of labor required and makes necessary adjustments prior to billing customer in order to alleviate need for additional billing upon job completion. Details scope of job, requirements and cost to customer through detailed billing letters and on site job visits. Collects funding prior to issuing work order

and adheres to all CWO processes. Works with Construction Management Center and Contractors directly to facilitate completion of work for CWO customers

\* Designed/Project Managed 197 total engineering work orders in 2013.  This included 101 Hi Cap orders and 20 Chapter 63 orders as well as 12 CWO's.

\* Completed all supplements on time factoring in work in progress and securing appropriate capital to complete estimate.

\*

Adheres to all CWO guidelines and processes. Works diligently to collect reimbursable funds from customers by detailing work to be completed and cost in billing letter and through on site visits.

**Manager Comments (Optional)**

I have received several compliments from Sam's construction counterparts.  They all like the jobs that he

delivers and feels confident they can be built the way they were designed.

## Section 2 - Performance Agreement

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Comments (Optional)**

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 02/05/2013

☒ Employee Signature                               **Date:** 02/08/2013

## Section 3 - Mid-Year Review

**Status:** Completed                    **Period:** January 1 - June 30

**Manager Performance Summary**

Sam does an outstanding job in managing his 5 active central offices.  Sam took on the responsibility of 360 degree engineering in one of the most active areas in my district and managed to do it without missing any objectives.  Sam is extremely knowledgeable with respect to all parts of outside plant and is one of the main go to guys that we have in the district.  I continue to rely on Sam as a resource of knowledge and know that when I go to him, will get the right answer.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 08/05/2013

☒ Employee Signature                               **Date:** 08/05/2013

## Section 4 - Year End Review

**CONFIDENTIAL**                                   **VZ/WALKER 883**

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Performance Summary**

Sam engineers a very busy, high revenue district and does it well.  I know he continues to have the most SR's in the group that need to be worked and want to challenge him to drive the number down and shorten our intervals. I would like to see him work with Dave Dehaven, and Ken Wojton on ways to process the orders quicker, get the jobs issued sooner and shorten overall intervals to align with our biggest objective given to us this year.

**Employee Comments (Optional)**

☒  Manager Signature & Release to Employee          **Date:** 02/17/2014

☒  Employee Signature                              **Date:** 02/18/2014

## Section 5 - Performance Rating

| Leading | Employee sustained performance above objectives, requirements and expectations. |
|---|---|
| Performing | Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them. |
| Developing | Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed. |
| New | Achievement relative to performance objectives cannot be evaluated due to short tenure in position.<br>- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted |

|  | *employee.* |
|  | *- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

**Performance Rating:Performing**

Signatures :

Employee : Samuel Capizzi          Date: 2014-02-18

Manager : Carl Gross          Date: 2014-02-17

**CONFIDENTIAL**                                                    **VZ/WALKER 885**

# Exhibit KK

## 2013 Performance

### 2013 - Year-End Performance Review

Employee: David T Dehaven , Engr III Spec-Ntwk Eng&Ops
Manager: Carl Gross, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

**NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.**

## Section 1 - Objectives

**Living by the Credo**

**- Description and Measures:**Model the Credo in our daily work including by demonstrating integrity, customer focus, sense of urgency, personal accountability, and teamwork, and by complying with the Business Code of Conduct.

**CONFIDENTIAL**                                                                                     **VZ/WALKER 895**

**- Employee Accomplishments / Status:**

During 2013 Dave has modeled Verizon's Credo by focusing on the customer's needs and ensuring their requests are met. Dave has processed 145 SR's and has met each ECCD date on the orders. Dave works each SR in a timely manner attempting to issue work orders well before the the to be issued date allowing construction ample time to complete the work order. The meeting of the ECCD displays Dave's sense of urgency and

personal accountability in striving to meet the organizations and customer needs.

In order to meet the expectations of the customer Dave uses teamwork engaging all organizations throughout Verizon to complete the work. Often SR's require the coordination of sales, BRCC, customer contact, construction and system techs to make certain all parties are aware of the work required to complete the SR on time. Dave also

continually communicates with the customer to make certain their EUCR are complete and ready for installation. The constant communication ensures Verizon metrics and the customer's needs are met.

Dave has also worked to satisfy all BAU and FIOS customers including CWO, MDU, MTU, buried developments, pole work and copper services following the credo in each of the aforementioned instances to aid in satisfying the various

aspect of Verizon's customer base.

**Manager Comments (Optional)**

Dave models our credo every day by recognizing the importance of our customers and always puts them first.

Dave does his best to deliver to our customers what they want, when they want them, always keeping budgets

in mind. Dave has processed the most SR's on my team and continues to stay focused on all deliverables.

---

**Accelerate Revenue Growth**

- Description and Measures:Meet/exceed network expansion and facility build targets.
-SFU Greenfields
-MDU/MTU Overlays
-MDU/MTU Greenfields
Accelerate speed to market and service delivery intervals.

**- Employee Accomplishments / Status:**

Dave has met all deadlines and objectives for SFU and MXU projects. Dave has worked on each job interfacing with the customers, Marketing, Sales, contractors and construction to make certain each job has exceeded the metrics set for 2013. Dave continually attempts to complete all preliminary work such as road crossings, inside path creation and inner duct/conduit placement in a timely manner to make certain the job is

ready for construction when the job is approved. The ability to complete the preliminary work enables construction to complete the work within their allotted timeframe. Dave's ability to complete each job within the allocated time frame ensures Verizon's customers can order the desired services allowing revenue and profits to increase.

Dave's ability to work with each organization during the mxu process has enabled Verizon

to provide FIOS service to an additional 110 customer's at various properties throughout his turf.

**Manager Comments (Optional)**

Dave has issued in excess of 120 high bandwidth orders for 2013. He has the highest in the district for 360 engineers. He continues to look for ways to improve the cycle time for all service requests, while still keeping standard intervals in mind. Dave also understands the importance of delivering our products and services on our fiber platform, while trying to eliminate or migrate copper based services. By doing

this, he delivers to the customer the best possible product that Verizon can offer, on the most reliable network.

---

**Support new products and global product expansion**

 - **Description and Measures:**FTTCS
MXU new products
Know products and be able to explain them to our customers
Optimize broadband capabilities to stay ahead of increasing demand for bandwidth.
Enhance FIOS to provide converged communication, information and entertainment services.

- **Employee Accomplishments / Status:**

Dave has worked with each customer throughout 2013 to ensure not only their current needs are met but also discusses the possibility of future bandwidth demands. Dave analyzes the information and implements a plan to make certain all future needs of the customer are met using a cost effective installation methods such as placing multiplexers in controlled environment vaults minimizing fiber usage allowing a large serving area

to be provided high bandwidth service. The multiplexer installation is both beneficial to Verizon and the customer by decreasing future expense and providing superior service to each customer.

Dave has also worked to meet the demands of the FTTCS project including providing high bandwidth service to cell sites, meeting the metrics and timeframe set for the each project. Dave has engaged construction teams and contractors

to make certain the job will be complete on time allowing the future and current needs of Verizon wireless and other cell site carriers to be met.

**Manager Comments (Optional)**
Dave takes a hard look at all SR's that are processed and always takes into account the big picture. If he sees additional opportunities for services, he allows for short term growth to maximize on Verizon's investment. This allows for more flow through operations, better service to our customers and best costs to Verizon.

---

**Increase Profit Margin**

 - **Description and Measures:**-Capital Budget
-Expense Budget
-Estimate Administration
-Routine Work Administration

---

**CONFIDENTIAL**

-CWO Administration
Aggressively control and reduce all operating and capital costs, meeting 2013 budget commitments.
Consolidate systems, operations and facilities.
Increase productivity by simplifying, standardizing and automating processes.
Cut energy, fuel and paper consumption to reduce costs and environmental impacts.

**- Employee Accomplishments / Status:**

Dave reviews each job to make certain the work order is cost effective and written to provide optimal service at minimal cost. Dave is always cognizant of the effects each work order has on expense and evaluates alternatives to ensure cost is minimal while potential revenue and profits are maximized. Furthermore, Dave has worked to ensure he has zero late supplements. The ability to monitor each estimate and make

certain the job spends within the set cost parameters allows Verizon to reduce cost.

Dave has also made an effort to reduce cost by utilizing best practices such as using contractors when possible. The effective use of contractors greatly reduces the overall cost of each work order. When possible, Dave has also reduced the use of paper by creating online folders for each job. Moreover, Dave has written numerous slc

power down and plug removal jobs to enable Verizon to reduce energy costs. The reduction in energy cost will allow Verizon to realize reduced expenses and increased profit margins. Additionally, the power down initiative has reduced Verizon's environmental impact.

**Manager Comments (Optional)**

Since Dave processed the most SR's for my team, and the district, he has the best opportunity for growing

revenue and increasing profit margin's. Best way to do this is to capitalize on our investment to get the most

out of what we install. He is always thinking long term and doing the right job up front to minimize expenditures

on the back end. This is better for the customer and Verizon as it speeds delivery of service while keeping

costs at a minimum.

---

## Leverage Best Network and Improve Customer Service

**- Description and Measures:** Standard Interval Compliance – 99%
Prints Issued On Time – 99%
Pre-RID as % Total Pre-RID Pending - 95%

Requestnet Intervals - Firm Orders FOC
-%72 hrs (DS3,OCn & Ethernet) - 95%
-%24 hrs (DS1) – 95%

Improve network availability.
Meet ECCD objectives
Improve quality across all internal and external customer services.

**- Employee Accomplishments / Status:**

During 2013 Dave has worked 145 high bandwidth orders. Dave is 100% compliant in meeting the metrics of standard interval compliance, prints issued on time and meeting RID dates on all high bandwidth orders. Furthermore, Dave has met all FOC dates on each of the orders issued to construction. Dave has worked with construction and contract services to make certain each job is completed within the allotted

timeframe.

Dave has also worked with the planning team on each of the high bandwidth orders to not only satisfy the existing request but to perform an in depth analysis of the projected future high bandwidth needs of the particular serving area.   In several instances a decision was made to place a next generation mux in the CEV to save future capital dollars.   The decision to place the multiplexer enables future

customers in the serving area to be provided service at minimal cost to Verizon.   Additionally, in 2013 an initiative between Engineering and IOF using the 9500 in the central offices to provide TLS service throughout the serving area has greatly reduced fiber usage between offices.   The use of multiplexers to gain access to TLS switches reduces the need for costly fibers work orders.   The decision has enabled Verizon to

reduce expense and make certain the customer obtains the desired services in a timely manner.   The use of IOF multiplexers greatly reduces the build interval generating revenue in a shorter time frame.   Additionally, the decision to use IOF and CEV multiplexers will aid in meeting future ECCD objectives and improve network quality and availability in the particular serving area.

**Manager Comments (Optional)**

Dave recognizes the importance of Verizon's fiber network and does whatever is required to get our customers

on it.  Whenever possible, Dave looks for opportunity to migrate our customers off copper onto our fiber

network, which is the most reliable network in the country.   This keeps our customers happy and willing to stay

on our network.

---

## Leverage technology to deliver network and services reliabl

- **Description and Measures:** Apply a customer - first - attitude to all transactions, products and services.
Improve network availability.
Meet ECCD objectives.
Improve teamwork across all internal and external customer services.

- **Employee Accomplishments / Status:**

Dave has met all ECCD objectives throughout 2013.   Dave has made certain all prints and preliminary work is complete before the work orders to be issued date ensuring customers obtain the service by the set FOC date.   Dave has attempted to issue work orders before the to be issued date allowing Verizon's construction team to begin construction allowing for the early completion of many issued work orders.   The early

completion often leads to early turn up of CKTS and increases customer satisfaction.

  Dave has continually focused to work with internal and external stakeholders to ensure all metrics are met allowing increases in profits and revenue.   Additionally, the ability to orchestrate teamwork between various organizations enables the construction team to turn up the equipment before ECCD and improve the network availability to

several customers in the surrounding serving area.   Customer satisfaction is Dave's top goal.   Dave's ability to work with the customer and all parties needed to complete each service request guarantees each customer is satisfied when the work is complete.

**Manager Comments (Optional)**

Dave operates in wire centers that have been overlaid with FIOS. Dave takes this into consideration on every service order that he works with. Where he can deliver the requests on fiber, that is always first choice. In addition, where he can migrate the customer off of copper, he does that as well. Dave recognizes that once we get the last mile to the customer on fiber, provisioning going forward is much easier and quicker.

## Create a Culture of Performance

- **Description and Measures:** Get the job done the right way.
Be accountable for results, adhere to our core values and operate with a sense of urgency.
Drive change and innovation that brings results to the bottom line.
Complete training has required
Effective communications using email, websites, staff meetings and site visits.
Meet all human resource deliverable timelines
meet al compliance initiatives.

- **Employee Accomplishments / Status:**

Dave has worked to complete each job in a cost efficient manner while ensuring the future needs of the surrounding serving area will be met. Dave has implemented changes such as beginning to place multiplexers for high bandwidth TLS job in CEV's and working with IOF to make use of multiplexers in the IOF network. The usage of the multiplexer network allows future TLS orders and other high bandwidth requests to be

flowed through the requesnet system greatly reducing the CKT delivery date. Additionally, the usage of the multiplexers aids in reducing the standard interval date and allows CKTs to be turned up quickly. The reduction in TLS intervals enables Verizon to increase revenue and decrease expense by reducing the overall cost of the build.

Dave has completed all necessary training modules including building shareholder value, keys

for safeguarding privacy and confidential information, driver safety how to avoid becoming distracted driver, network survivability, antitrust and competition and exports, sanctions and embargoes training sessions.

Dave has communicated effectively with all Verizon departments, contractors, CLECs and customers to ensure all work orders written will meet the expectations of the end user. Dave has communicated regularly with all

parties using email, websites, staff meetings and site visits allowing each metric on the scorecard to be met in 2013.

**Manager Comments (Optional)**

Dave creates a culture of performance for himself as well as his teammates that surround him. Dave completed his masters degree this year and always demonstrates a willingness to learn.

## Section 2 - Performance Agreement

**Status:** Completed                              **Period:** January 1 - December 31

**Manager Comments (Optional)**

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee        **Date:** 02/05/2013

☒ Employee Signature                              **Date:** 02/26/2013

## Section 3 - Mid-Year Review

**Status:** Completed                              **Period:** January 1 - June 30

**Manager Performance Summary**

Dave does an outstanding job with all aspects of 360 degree engineering, that was adopted the first quarter of this year.  He was able to adjust to the new environment because of his skill sets that he obtained by doing all of the disciplines prior to going 360.  Dave has become my go to person when I absolutely have to get something done.  He always accepts any challenge and looks for ways to be very successful.

**Employee Comments (Optional)**

**CONFIDENTIAL**                                   **VZ/WALKER 901**

☒ Manager Signature & Release to Employee

☒ Employee Signature

**Date:** 07/31/2013

**Date:** 08/05/2013

## Section 4 - Year End Review

**Status:** Completed

**Period:** January 1 - December 31

**Manager Performance Summary**

Dave is a great team member and one that pushes out a lot of work.  I rely on him to act for me when I am out of the office and to take matters into his own hands without asking him.  He balances his work load demands, without sacrificing his duties at home and does a very good job with it.  Glad to have him on my team.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee

☒ Employee Signature

**Date:** 02/17/2014

**Date:** 02/21/2014

## Section 5 - Performance Rating

**CONFIDENTIAL**

**VZ/WALKER 902**

| Leading | *Employee sustained performance above objectives, requirements and expectations.* |
|---|---|
| Performing | *Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.* |
| Developing | *Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed.* |
| New | *Achievement relative to performance objectives cannot be evaluated due to short tenure in position.*<br>*- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*<br>*- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

**Performance Rating:Leading**

Signatures :

Employee : David Dehaven        Date: 2014-02-21

Manager : Carl Gross        Date: 2014-02-17

**CONFIDENTIAL**                                    **VZ/WALKER 903**

# Exhibit LL

<u>**2013 Performance**</u>

**2013 - Year-End Performance Review**

Employee: David M Perry , Local Mgr-I&M / Constr
Manager: Brian Magee, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7V

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

**NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.**

<u>**Section 1 - Objectives**</u>

**Supervisor Responsibilities**
**- Description and Measures:**
Build strong and diverse teams by actively managing talent, and supporting the performance and

development of my direct reports by:
1.   Setting and communicating objectives and priorities and providing ongoing direction.
2.   Completing all required performance documents and conducting associated performance discussions (performance agreement/objectives, mid-year review, year-end review) by required deadlines.
3.   Providing ongoing

performance feedback, coaching, training and development.
4.   Taking appropriate performance improvement action, or administering appropriate discipline when employees do not meet performance standards or expectations.

- **Employee Accomplishments / Status:**

**Manager Comments (Optional)**
Discipline and holding the technicians accountable for their results must improve.

---

**Living by the Credo**

- **Description and Measures:**Model the Credo in our daily work including by demonstrating integrity, customer focus, sense of urgency, personal accountability, and teamwork, and by complying with the Business Code of Conduct.

- **Employee Accomplishments / Status:**Dave maintains good customer relationships and focus. He also works well within his peer group.

**Manager Comments (Optional)**

---

**Grow Revenue**

- **Description and Measures:**Description:
Growth is more than just a number or a financial target ... it's everybody's job

Measures:
LTS participation->95%
Completion rate->95%
% sales to original due date met->90%
Adherence to T&M billing process

- **Employee Accomplishments / Status:**Currently enrolled in LTS

**Manager Comments (Optional)**

---

**Be More Profitable**

- **Description and Measures:**

Description:
Look at all your actions, products and investments through the lens of the shareholder

Measures:
Core to FTTP migrations- State target of 84,298
Migration completion rate- 80% overall
Core to VoiceLink migrations- 84,298
FiOS Hrs/GA less voice only- 4.9hrs by year end
FiOS Hrs/Mtce DSP- 1.7 or 4.7 all in
FIOS I JPD- 4.25
Core Combined JPD- 4.25
Core Returns- <10.8%
OEW- Contribute positively towards district

objective of 3.5
% to Expense- Contribution towards district objective of 98% CORE and 65% FIOS
Direct Expense- Contribution towards district objective of $75.6M

- **Employee Accomplishments / Status:** Core JPD YTD- 3.27
M Returns YTD- 6.85

**Manager Comments (Optional)**
Although JPD has improved December over January there is still room for improvement. Failures have been

removed from the cable technicians in order to reach the production requirements.

## Improve the Customer Experience

- **Description and Measures:** Description:
Provide a positive and compelling customer experience. Continually ask customers if there is anything else "I"
can do for you.

Measures:
Customer Calls to the FSC- Technician- 25
I-codes (Voice, HSI, FIOS)- 6.5%, 6%, 1.5% respectively
Repeats (Voice, HSI Repeats)- 7.5%, 7%, 3.5%
BB genius Usage->80%
MDU Checklist->95%
Skycreek compliance- >95%

- **Employee Accomplishments / Status:** I Codes YTD- 8.90%, 7.57%
M Codes YTD- 8.47%, 7.85%

**Manager Comments (Optional)**
The overall rework of this group must improve. None of the objectives have been met YTD

## Fuel our Culture

- **Description and Measures:**

Description:
Make embracing change a part of our culture and a competitive advantage-- live the Credo.

Measures:
Dsp NPS- Contribute to State objective of NPS >25
Reduce multi-repeats- no repeats greater than 2X by 4thqtr
Eliminate cultural issues causing long duration repairs- MTTR <48hrs
Reduce subsequents by creating a culture to serve- no subs greater than 3 by 4thqtr
OSHA injury rate- 4.25%
MV incident rate- 4%
Lead by

   Example. Follow up, complete "To Dos" before deadline, proactively address issues

**- Employee Accomplishments / Status:**OSHA Rate-5.25%
MV Rate- 0

**Manager Comments (Optional)**
Additional focus and observations will be necessary to improve the safety of this group

## Section 2 - Performance Agreement

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Comments (Optional)**

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee        **Date:** 01/22/2013

☒ Employee Signature                             **Date:** 01/22/2013

CONFIDENTIAL            VZ_WALKER_319

## Section 3 - Mid-Year Review

**Status:** Completed                    **Period:** January 1 - June 30

### Manager Performance Summary

Additional focus is required on the daily/monthly deliverables. These requirements are necessary for the tracking of results. Monthly sessions must be conducted with all associates on an individual basis regarding results and areas of improvement. This piece is key critical in order for the results to improve. Dave's day needs to have a more designed structure for this to be accomplished. It is imperative that what is being asked for is what is being delivered.

### Employee Comments (Optional)

☒ Manager Signature & Release to Employee          **Date:** 07/31/2013

☒ Employee Signature                              **Date:** 08/02/2013

## Section 4 - Year End Review

**Status:** Completed                    **Period:** January 1 - December 31

### Manager Performance Summary

CONFIDENTIAL          VZ_WALKER_320

Timely input of the monthly deliverables remain a challenge. Dave must improve his time management skills in order to stay on top of his requirements. There must be an increase in the scrutiny and oversight of this group as well as holding the low performers accountable for their lack of performance. The Area Manager cannot continue to remind and monitor these requirements. The accountability resides with Dave. Production has

improved, but it is not consistent number. The objective is a 4.25 and must be maintained in 2014.

Dave is currently on a performance improvement plan. Significant result improvements must happen quickly in 2014 in order for Dave to be removed from this plan.

**Employee Comments (Optional)**

Dispute this evaluation and requested a meeting w/ AOM and Director.

☒  Manager Signature & Release to Employee        **Date:** 02/25/2014

☒  Employee Signature                              **Date:** 02/28/2014

## Section 5 - Performance Rating

| Leading | Employee sustained performance above objectives, requirements and expectations. |
|---|---|
| Performing | Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them. |
| Developing | Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed. |
| New | Achievement relative to performance objectives cannot be evaluated due to short tenure in position.<br>- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.<br>- Performing duties less than 3 months of the year due to an authorized absence or leave. |

**Performance Rating:Developing**

Signatures :

Employee : David Perry     Date: 2014-02-28

Manager : Carol Shields     Date: 2014-02-25

CONFIDENTIAL     VZ_WALKER_322

# Exhibit MM

<u>2013 Performance</u>

## 2013 - Year-End Performance Review

Employee: Joseph Scelsa , Engr III Spec-Ntwk Eng&Ops
Manager: Brian Magee, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

**NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.**

<u>Section 1 - Objectives</u>

**Living by the Credo**

- **Description and Measures:**Model the Credo in our daily work including by demonstrating integrity, customer focus, sense of urgency, personal accountability, and teamwork, and by complying with the Business Code of Conduct.

- **Employee Accomplishments / Status:** Daily work responsibility includes meeting with customers onsite and communicating with them according to the credo. Job also entails modeling the credo in the office and taking personal accountability with each job. Teamwork is exemplified by going above and beyond normal work responsibility to meet multiple customer short timeframe demands. Furnishing equipment and expediting material shipments to meet customer deadlines is essential to establish customer relationships.

**Manager Comments (Optional)**

---

## Accelerate Revenue Growth

- **Description and Measures:** Meet/exceed network expansion and facility build targets.
Support new products and global product expansion
drive products on-net, accelerate speed to market and service delivery intervals
optimize broadband capabilities to stay ahead of increasing demand for bandwidth - enhance fios to provide converged communication, information, entertainment services.
Fiber to Cell Site (Achievable) - Targets per scorecard
  o Site Surveys
  o EWO's Issued

- **Employee Accomplishments / Status:**

In the timeframe from January 2nd to June 28th 165 work orders were issued to construction. Out of the 165 orders, there were a wide variety of jobs that were issued.
These ranged from pole jobs, splitter jobs, chapter 63 jobs, DS3, VON, TLS, and MDU/MTU overlay job. Many of these jobs entail site surveys for properly facilitating the service request according to the job detail. Kendal Crosslands relocation job in a

short time frame moved from existing copper circuits to Fios solution. This decision saved time splicing copper and brought the customer on FIOS.
In the timeframe from August until December of 2013 137 total work orders were issued.
Total number of work orders for the entire year was 302.
These work orders incorprated every type of service. Included out of all of them was one achievable cell site order which was

expedited and turned up on time.

**Manager Comments (Optional)**

---

## Increase Profit Margin

- **Description and Measures:**

Aggressively control and reduce all operating and capital costs, meeting 2013 budget commitments.
Consolidate systems, operations and facilities
Increase productivity by simplifying, standardizing and automating processes.
Drive network convergence to improve capex and opex efficiency.
Cut energy, fuel and paper consumption to reduce costs and environmental impact.
• Network Engr Capital ($M) – Core Budget Performance - District

target per scorecard

- FTTCS Capital – District target per scorecard
- FTTCS $ per site (6-mo rolling ave cost) – District target per scorecard
- Network Engr Expense – District target per scorecard

**- Employee Accomplishments / Status:**Engineer what is necessary on the job and reuse equipment where applicable. This was done in multiple scenarios for utilizing existing MUX cabinet frames. New equipment was ordered where necessary, but use the existing frame and space at customer and RT locations. Electronic work orders are issued and all plans are scanned reducing office costs. All customer plans are requested sent as PDF files to eliminate paper and space in the office.

**Manager Comments (Optional)**

---

## Leverage Best Network and Improve Customer Service

**- Description and Measures:**

Improve network availability
Meet SR Response Time, SI, Prints on time,ECCD and FAD objectives
Leverage technology to deliver network and services reliability
Apply a customer - first - attitude to all transactions, products and services.
Improve quality continuously across all departments including internal and external customer services.
Meet customer requirements through an always on, dependable and scalable network. Operate with a

sense of urgency

All %'s are subject to change based on Scorecard objectives
  % FAD – District target 95%.
- Standard Interval Compliance – District target 99%.
- Prints Issued on Time – 95%
- Engineering Backlog – Track contributions.
  - o Pre-RID as % of Tot Pending – District target 11.7%
  - o Post-RID as % of Tot Pending – District target 46.6%
  - o TFAS OTP-Tracking
-

  RequestNet SR Intervals OTP–Firm Orders / FOC – target 95%.
  - o DS1(24 hrs), DS3-48 hrs, OCn/Ethernet(72 hrs), FTTCS(24 hrs)
  - o Q Code Reduction (>90 days old - Tracking process TBD)
  Engineer Workload Volumes- Service orders resolved, EWO;s issued, NJUNS, etc.
Process 4824's in 24hrs to ensure customer service to Construction
Communication to all stakeholders

**- Employee Accomplishments / Status:**All prints pertaining to SR's for high bandwidth orders were issued ahead of time and within the dates requested. Turn ups were also on time with at customer locations to order due date.

**Manager Comments (Optional)**

## Create a Culture of Performance

**- Description and Measures:** Get the job done the right way.
Be accountable for results, adhere to our core values and operate with a sense of urgency.
Incorporate a CWS experiment
Drive change and innovation that brings results to the bottom line.
Utilize skills acquired from Adaptive Leadership Training.
Performance Development- Engage in training and development for yourself and your assigned partner in the creation of the 360 degree Engineer. ie. requestnet, Tirks, mSolve

**- Employee Accomplishments / Status:**

Extensive hands on training has been ongoing to accomplish and handle the 360 engineer concept. Learning multiple systems and integrating them all is challenging but rewarding to meet the demands of customers and management. Establish and implement new TLS/VON and MUX design for high revenue service orders. Accomplishes many customer requests for expediting service orders for circuit turn up. Utilizes multiple Engineering

systems (TIRKS, Requestnet, IDDS etc.) and works seamlessly with planning for designing high bandwidth work prints.

**Manager Comments (Optional)**

## Take Market Share

**- Description and Measures:** Meet/Exceed Network Expansion and facility built targets:
Total Premises passed
SFU
MXU
Total Premises Open for Sale
Both residential and commercial properties.

**- Employee Accomplishments / Status:**

The total number of premises passed from August to December are as follows.
Total SFU: 10
Total MXU network created: 1234 MDU, 114 MTU, 11 SBU.
Total number of SR's issued from August to December were 27. Total of 49 jobs were issued for the year. This included installing new MUX equipment designed for new TLS and VON services. SONET rings were also included on some of these jobs for high bandwidth orders. Asset

restoration jobs were issued for critical RT locations for battery and rectifier replacements.

**Manager Comments (Optional)**

## Section 2 - Performance Agreement

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Comments (Optional)**

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee        **Date:** 02/13/2013

☒ Employee Signature        **Date:** 02/20/2013

## Section 3 - Mid-Year Review

**Status:** Completed                    **Period:** January 1 - June 30

**Manager Performance Summary**

Joe continues to learn the new roles associated with the 360 degree engineering. Joe strives to communicate effectively to his construction counterparts. He works to ensure that they have the appropriate information. Joe is a performer who is up to the challenge of the 360 engineering.

In the 2nd half of 2013  Joe should continue to strives in the Vendor Management realm.  It is imperative that Joe documents the
errors that are made by the engineering vendors and communicate it back to them.

CONFIDENTIAL          VZ_WALKER_404

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee      **Date:** 07/31/2013

☒ Employee Signature      **Date:** 07/31/2013

## Section 4 - Year End Review

**Status:** Completed      **Period:** January 1 - December 31

**Manager Performance Summary**

PA-DE had a very successful results year in 2013.  Capital, Expense, MDU/MTU, Prints Issued, Standard Interval Compliance were all positive.  FOC intervals were a negative for both the District and Sub-District Teams.

In 2013 Joe continued to expand his talents, getting closer to the 360 Turf model.  He is very passionate and cares about the work he performs.  The HBW role is the area that Joe must impove upon;  he must become independent with SR movement, survey and design completion.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee      **Date:** 02/19/2014

☒ Employee Signature      **Date:** 02/19/2014

## Section 5 - Performance Rating

| Leading | *Employee sustained performance above objectives, requirements and expectations.* |
|---|---|
| Performing | *Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.* |
| Developing | *Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed.* |
| New | *Achievement relative to performance objectives cannot be evaluated due to short tenure in position.*<br>*- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*<br>*- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

Performance Rating:**Performing**

Signatures :

Employee : Joseph Scelsa        Date: 2014-02-19

Manager : Brian Magee        Date: 2014-02-19

CONFIDENTIAL        VZ_WALKER_406

# Exhibit NN

## 2013 Performance

## 2013 - Year-End Performance Review

Employee: Ernest A Padovani , Engr III Spec-Ntwk Eng&Ops
Manager: Brian Magee, Mgr-Ntwk Eng&Ops
Business Group:Wireline
Band:7T

-Review and update the employee's objectives as appropriate.
-Review the employee's accomplishments/status.
-Update the **Manager Comments** for each objective summarizing results achieved or progress made (optional).
-Summarize the overall results achieved in the **Manager Performance Summary** box.

In evaluating the employee's overall performance contribution, consider the extent to which the employee demonstrated behaviors that support Verizon's Credo.

Supervisors must substantiate performance ratings based on specific performance information, examples and observations pertinent to results achieved.

**NOTE: DO NOT PROVIDE OR DISCUSS THE REVIEW DOCUMENT AND/OR RATING WITH THE EMPLOYEE UNTIL YOU HAVE RECEIVED NOTIFICATION FROM HUMAN RESOURCES.**

## Section 1 - Objectives

**Living by the Credo**

   **- Description and Measures:**Model the Credo in our daily work including by demonstrating integrity, customer focus, sense of urgency, personal accountability, and teamwork, and by complying with the Business Code of Conduct.

**- Employee Accomplishments / Status:** Answer e-mails in timely manner.
Return calls in timely manner.
Do site surveys with customers in timely manner.
Fill in for other engineers who are off or on a project.
Work with developers to get Verizon facilities in their projects

**Manager Comments (Optional)**

## Accelerate Revenue Growth

**- Description and Measures:** Meet/exceed network expansion and facility build targets.
Support new products and global product expansion
drive products on-net, accelerate speed to market and service delivery intervals
optimize broadband capabilities to stay ahead of increasing demand for bandwidth - enhance fios to provide converged communication, information, entertainment services.
Fiber to Cell Site (Achievable) - Targets per scorecard
   o  Site Surveys
   o  EWO's Issued

**- Employee Accomplishments / Status:**

Total Jobs Issued : 188

A) Project manages work to come in on time and on cost.  Project manage work to be issued on time and completed on time to keep customer satisfied. Funnel work  for major projects to Contract services. Contract cost our lower then Core cost
B) Design best job at best cost.
C) Talk to contractors, developers, consultants about ordering Verizon services.
D) Issue work prints on time
E) Work with

PennDot, Townships, County, developers, consultants and other utilities  to minimize the affect on Verizon facilities

**Manager Comments (Optional)**

## Increase Profit Margin

**- Description and Measures:**

  Aggressively control and reduce all operating and capital costs, meeting 2013 budget commitments.
Consolidate systems, operations and facilities
Increase productivity by simplifying, standardizing and automating processes.
Drive network convergence to improve capex and opex efficiency.
Cut energy, fuel and paper consumption to reduce costs and environmental impact.
•    Network Engr Capital ($M) – Core Budget Performance - District

target per scorecard
•    FTTCS Capital – District target per scorecard
•    FTTCS $ per site (6-mo rolling ave cost) – District target per scorecard

CONFIDENTIAL          VZ_WALKER_336

- Network Engr Expense -- District target per scorecard

**- Employee Accomplishments / Status:**

A) Project mange work. Make sure work is issued and completed on time.
B) Funnel major projects to Contract Services. Contract costs are lower then Core cost.
C) Work with PennDot, Townships, County, developers, consultants and other utilities to minimize the affect on Verizon facilities.
D) Get job done right the first time.
E)  In some cases have developer or customer place Verizon provided conduit.
F) Issue work prints on

time
G) Work on more then one project at a time.
H) Work with American U-Tel on bridge projects to keep cost down.
I)  Work with construction and contract services to keep cost down and have work
    done in timely manner and closed out.

**Manager Comments (Optional)**

---

**Leverage Best Network and Improve Customer Service**

**- Description and Measures:**

Improve network availability
Meet SR Response Time, SI, Prints on time,ECCD and FAD objectives
Leverage technology to deliver network and services reliability
Apply a customer - first - attitude to all transactions, products and services.
Improve quality continuously across all departments including internal and external customer services.
Meet customer requirements through an always on, dependable and scalable network. Operate with a

sense of urgency

All %'s are subject to change based on Scorecard objectives
 % FAD -- District target 95%.
- Standard Interval Compliance -- District target 99%.
- Prints Issued on Time -- 95%
- Engineering Backlog -- Track contributions.
  o  Pre-RID as % of Tot Pending -- District target 11.7%
  o  Post-RID as % of Tot Pending -- District target 46.6%
  o  TFAS OTP-Tracking
-

 RequestNet SR Intervals OTP--Firm Orders / FOC -- target 95%.
      o  DS1(24 hrs), DS3-48 hrs, OCn/Ethernet(72 hrs), FTTCS(24 hrs)
      o  Q Code Reduction (>90 days old - Tracking process TBD)
 Engineer Workload Volumes- Service orders resolved, EWO;s issued, NJUNS, etc.
Process 4824's in 24hrs to ensure customer service to Construction
Communication to all stakeholders

**- Employee Accomplishments / Status:**SR work orders issued: 32
SR work inprogress :27
A) Answer SR's in a timely manner.
B) Issue HBW work orders before date of issuance.
C) Do site surveys with customers in timely manner
D) Look at different ways to service customer

E) Work with other engineers on engineering problems

**Manager Comments (Optional)**

---

**Create a Culture of Performance**

    - **Description and Measures:** Get the job done the right way.
Be accountable for results, adhere to our core values and operate with a sense of urgency.
Incorporate a CWS experiment
Drive change and innovation that brings results to the bottom line.
Utilize skills acquired from Adaptive Leadership Training.
Performance Development- Engage in training and development for yourself and your assigned partner in the creation of the 360 degree Engineer. ie Tirks, Requestnet, Msolve etc

- **Employee Accomplishments / Status:**

SME for VBUILD
SME for PRS
SME for VLicence
Help train engineers in VBuild, PRS and VLicenece
SPOC for PECO
SPOC for PennDot and townships
A) Get job done right the first time.
B) Get designs done in a timely manner
C) Project mange work.
D) Work with other engineers to solve engineering problems.
E) Work with other engineers on designs.
F) Work with construction, contract services on different projects.
G) Work on more

then one project at a time.
H) Work with PennDot, municipalities, consultant and other utilities on different projects.
I)   Use adaptive engineering.

**Manager Comments (Optional)**

---

**Take Market Share**

    - **Description and Measures:** Meet/Exceed Network Expansion and facility built targets:
Total Premises passed
SFU
MXU
Total Premises Open for Sale
Both residential and commercial properties.

- **Employee Accomplishments / Status:** SFU HH 58
MXU HH 176

A) Support other engineers on different projects and designs.
B) Talk to contractors, developers, consultants about ordering Verizon services.

---

CONFIDENTIAL        VZ_WALKER_338

C) Project manage work to get jobs issued and completed on time and on cost to satisfy customer.
D) Get job done right the first time.
E) Give best possible customer care and service.
F) Treat everyone as a Verizon customer

**Manager Comments (Optional)**

## Section 2 - Performance Agreement

**Status:** Completed                    **Period:** January 1 - December 31

**Manager Comments (Optional)**

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 02/13/2013

☒ Employee Signature          **Date:** 02/19/2013

## Section 3 - Mid-Year Review

**Status:** Completed                    **Period:** January 1 - June 30

**Manager Performance Summary**

Ernie continues to learn the new roles associated with the 360 degree engineering. Ernie always has the customer in mind when completing his tasks. Ernies experience and knowledge assist him to ensure that he is providing the services required by his customers. Ernie is a strong performer who completes his tasks and is always willing to take on more and assist other team members. Ernie has been an essential part of
the JU sub committee in assisting Stacey Culbreath in his new Joint Use position.

In the 2nd half of 2013  Ernie should continue to strives to communicate effectively to his audience and provide his customers including PECO.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 08/01/2013

☒ Employee Signature          **Date:** 08/01/2013

### Section 4 - Year End Review

**Status:** Completed          **Period:** January 1 - December 31

**Manager Performance Summary**

CONFIDENTIAL          VZ_WALKER_340

PA-DE had a very successful results year in 2013.   Capital, Expense, MDU/MTU, Prints Issued. Standard Interval Compliance were all positive.   FOC intervals were a negative for both the District and Sub-District Teams.

Ernie is a true Team Player, he accepted a transfer to a different turf, then accepted a larger turf without hesitation, he took a lead with Peco issues and he was quick to voice his opinion on District/process issues.   Ernie is a solid Engineer on BAU/FTTP issues, he contributed to the overall success of the Team in 2013.   Going forward, Ernie has room for growth on HBW/HiCap Issues, which is essential for success in the coming year.

**Employee Comments (Optional)**

☒ Manager Signature & Release to Employee          **Date:** 02/20/2014

☒ Employee Signature                                              **Date:** 02/21/2014

## Section 5 - Performance Rating

| Leading | *Employee sustained performance above objectives, requirements and expectations.* |
|---|---|
| Performing | *Employee sustained performance meeting objectives, requirements and expectations and periodically exceeded them.* |
| Developing | *Performance did not meet objectives, requirements and expectations; some or all objectives were not met and improvement is needed.* |
| New | *Achievement relative to performance objectives cannot be evaluated due to short tenure in position.*<br>*- New to Company (less than 6 months in position). Note: A "New" rating may not be used as an end-of-year rating for any transferred or promoted employee.*<br>*- Performing duties less than 3 months of the year due to an authorized absence or leave.* |

**Performance Rating:Performing**

Signatures :

Employee : Ernest Padovani        Date: 2014-02-21

Manager : Brian Magee        Date: 2014-02-20

CONFIDENTIAL        VZ_WALKER_342

# Exhibit OO

    B. The exact date or best available timeframe Defendant(s) can set forth as to when the decision to end or terminate Plaintiff(s) employment was made;[1] and

    C. The exact date upon which Defendant(s) contend Plaintiff(s) was first informed of the decision to end or terminate Plaintiff(s) employment and the method of communication about and concerning the termination notification (i.e. in person, via telephone, e-mail, text, etc...).

**RESPONSE:** Defendants object to this Interrogatory because it is compound, thereby comprising three separate Interrogatories, not one. Subject to and without waiver of Defendants' general and specific objections, Verizon submits:

    A. Brian Magee and Joseph Muccilo participated in the decision to end Plaintiff's employment with Defendants.

    B. Plaintiff was selected for separation as part of a reduction in force in or around April 2015.

    C. Plaintiff was informed of the decision to end her employment by Brian Magee in or around April 2015.

**INTERROGATORY NO. 4: [VERBAL OR WRITTEN DISCIPLINE INFORMATION]**

    If Defendant(s) contend Plaintiff(s) received any verbal or written reprimands or discipline during the course of Plaintiff(s) employment, identify with specificity:

    A. The exact dates of the verbal **or** written reprimand(s) or discipline;

    B. The names of the supervisor(s) or manager(s) who were involved with administering the reprimand(s) or discipline referenced in subpart (a) above;

    C. The nature or summary of reason(s) for the reprimand(s) or discipline referenced in subpart (A) above; and

---

[1] Defendant(s) should set forth an exact date and only identify a "timeframe" if it is incapable of setting forth an exact date.

## <u>VERIFICATION</u>

I, Brian Magee, am a Manager for Verizon Pennsylvania LLC and Verizon Services Corporation (Defendants), and I am authorized to execute this verification on Defendants' behalf. I verify that the statements made in the foregoing Answers to Interrogatories are true and correct to the best of my knowledge, information and belief.

The facts and matters stated therein are not exclusively within my personal knowledge or of any one individual at Defendant; rather, the facts stated therein have been assembled, on behalf of Defendant and with the assistance of counsel, by authorized employees of Defendant with personal knowledge of the subject matter of the response and/or information and belief as to the truth and/or accuracy thereof. Subject to the terms of this verification, I understand that the statements herein are subject to the penalties 18 Pa. Cons. Stat. §4904, relating to unsworn falsification to authorities.

Date: April 6, 2016

# Exhibit PP



Christine Burke <cburke@karpf-law.com>

## Defendants' Supplemental Document Production

**Christine Burke <cburke@karpf-law.com>**　　　　　　　　　　　　　　Mon, Aug 29, 2016 at 6:35 PM
To: "Brown, Valerie E." <vbrown@reedsmith.com>
Cc: "kristin@karpf-law.com" <kristin@karpf-law.com>, "Barras, Joel S." <JBarras@reedsmith.com>

Hi Val - confirming receipt.

As a follow up to Friday's conversation, the woman that Mr. Gross named as sending his own rate & rank list to was Diane Ridullo.
[Quoted text hidden]
[Quoted text hidden]



All information and attachments in this message contain privileged and confidential communication. If the reader of this message is not the intended recipient, or any employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer. Thank you.



**KARPF,
KARPF &
CERUTTI, P.C.**

Christine Burke <cburke@karpf-law.com>

## Walker v. Verizon

**Brown, Valerie E.** <vbrown@reedsmith.com>                    Thu, Oct 6, 2016 at 11:03 AM
To: Christine Burke <cburke@karpf-law.com>
Cc: "Barras, Joel S." <JBarras@reedsmith.com>, "kristin@karpf-law.com" <kristin@karpf-law.com>

Christine,

Verizon has searched its records and has not located a ranking from Brian Magee (sent to Diane Redilla or otherwise) from 2015 during the time period leading up to the RIF, as requested.

Can you please update us on the status of the request related to Ms. Walker's job offers and work history following her separation from Verizon as requested in our September 21 letter?

Thank you,

**Valerie E. Brown**

215.851.8859

vbrown@reedsmith.com

**ReedSmith LLP**

Three Logan Square

Suite 3100

1717 Arch Street

Philadelphia, PA  19103

+1 215 851 8100

Fax +1 215 851 1420

**From:** Christine Burke [mailto:cburke@karpf-law.com]
**Sent:** Thursday, September 22, 2016 11:19 AM
**To:** Brown, Valerie E.
**Cc:** Barras, Joel S.; kristin@karpf-law.com
**Subject:** Re: Walker v. Verizon

[Quoted text hidden]
[Quoted text hidden]

Case 2:15-cv-04031-HB   Document 41-2   Filed 10/28/16   Page 503 of 548

[Quoted text hidden]

All information and attachments in this message contain privileged and confidential communication. If the reader of this message is not the intended recipient, or any employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify the sender immediately by replying to the message and deleting it from your computer. Thank you.

10/24/2016

Case 2:15-cv-04031-HB   Document 41-2   Filed 10/28/16   Page 504 of 548
Karpf, Karpf & Cerutti, P.C. Mail - Walker v. Verizon



Christine Burke <cburke@karpf-law.com>

---

## Walker v. Verizon

**Christine Burke** <cburke@karpf-law.com>                          Thu, Oct 6, 2016 at 12:32 PM
To: "Brown, Valerie E." <vbrown@reedsmith.com>
Cc: "Barras, Joel S." <JBarras@reedsmith.com>, "kristin@karpf-law.com" <kristin@karpf-law.com>

Do you mean for Carl Gross?

Two points: your office still never responded about the outstanding issues respecting the final ediscovery I made.   I will
re-forward the email.

One:  I believe we have a formal response drafted which should go out today - re: your inquiry about
[Quoted text hidden]
[Quoted text hidden]



All information and attachments in this message contain privileged and confidential communication. If the reader of this
message is not the intended recipient, or any employee or agent responsible for delivering this message to the intended
recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly
prohibited. If you have received this communication in error, please notify the sender immediately by replying to the
message and deleting it from your computer. Thank you.



**KARPF,**
**KARPF &**
**CERUTTI, P.C.**

Christine Burke <cburke@karpf-law.com>

---

## Walker v. Verizon

---

**Brown, Valerie E.** <vbrown@reedsmith.com>                                    Thu, Oct 6, 2016 at 1:08 PM
To: Christine Burke <cburke@karpf-law.com>
Cc: "Barras, Joel S." <JBarras@reedsmith.com>, "kristin@karpf-law.com" <kristin@karpf-law.com>

For both Carl Gross and Brian Magee.


**Valerie E. Brown**

215.851.8859

vbrown@reedsmith.com


**ReedSmith LLP**

Three Logan Square

Suite 3100

1717 Arch Street

Philadelphia, PA  19103

+1 215 851 8100

Fax +1 215 851 1420



**From:** Christine Burke [mailto:cburke@karpf-law.com]
**Sent:** Thursday, October 06, 2016 12:33 PM

[Quoted text hidden]

[Quoted text hidden]

 **KARPF,**
**KARPF &**
**CERUTTI, P.C.**

Christine Burke <cburke@karpf-law.com>

## Defendants' Supplemental Document Production

**Brown, Valerie E.** <vbrown@reedsmith.com>                     Mon, Aug 15, 2016 at 10:52 AM
To: "cburke@karpf-law.com" <cburke@karpf-law.com>
Cc: "kristin@karpf-law.com" <kristin@karpf-law.com>, "Barras, Joel S." <JBarras@reedsmith.com>

Christine,

Please see the attached supplemental document production, which includes the requested performance evaluations for
the employees who reported to Carl Gross in 2013 and 2014. I am missing one employee – Chirag Jagwani—but will
supplement as soon as I receive his performance evaluations. I have also attached the performance evaluations you
requested for Ms. Walker. For the FAC Verification reports, we were able to pull the reports from June 2014 through
March 2015 in a condensed set rather than all of the individualized reports. It has the individualized information, it is just
in a single report for each year. The reports were not generated until August 2014 by the department, so we have the
report data going back to June 2014.

On the remaining outstanding items:

·    I am waiting on the additional org charts from Brian Magee and will send to you once I receive them.

·    I have also followed up with him to confirm whether he has any emails or documents submitted to
Parker regarding the RIF. I will also

·    There were no RIF reports generated for Carl Gross' team as part of the RIF in which Suzette was
affected.

·    I am finalizing the e-discovery and hope to have it to you in the next couple of days.

Please let me know if I am missing any other outstanding items I owe to you.

Thanks,

**Valerie E. Brown**

215.851.8859

vbrown@reedsmith.com

**ReedSmith LLP**

Three Logan Square

Suite 3100

1717 Arch Street

Philadelphia, PA  19103

+1 215 851 8100

Fax +1 215 851 1420

* * *

This E-mail, along with any attachments, is considered confidential and may well be legally privileged. If you have received it in error, you are on notice of its status. Please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

Disclaimer Version RS.US.201.407.01

**3 attachments**

**VZ_Walker_ Defendant_s Supplemental Document Production (819 -1024).PDF**
2503K

**VZ_Walker_ Defendant_s Supplemental Document Production (1025) (FAC Verification Report 6_2014-12_20.XLSX**
86K

**Defendants_ Supplemental Document Production (1026) (FAC Verification Report January - March 2015).XLSX**
46K

# Exhibit QQ

| RIF Code # | # of Days (Counting ee's on one side, or is this an available one) | Selection Manager (Manager completing / submfor case) | Justification Manager | Case Type (Individual Discharge / Functional Elimination / Rank & Yank) | Justification Date | Justification | Impacted Emp | Last, First Name | Title | Band | Director | Previous Director (if applicable) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

# Exhibit RR



**From:** Pescatore, Michael A (Mike)
**Sent:** Thursday, April 02, 2015 10:36 AM
**To:** Parker, Melissa (Missy)
**Cc:** Bragg, William F; O'Donoghue JR, Edward C (Colton); Muccilo, Joseph; Sisk JR, Thomas W (Tom Sisk)
**Subject:** RE: RIF Business Cases

Missy – As requested.

**From:** Parker, Melissa (Missy)
**Sent:** Tuesday, March 31, 2015 3:07 PM
**To:** Bragg, William F; O'Donoghue JR, Edward C (Colton); Muccilo, Joseph; Sisk JR, Thomas W (Tom Sisk)
**Cc:** Pescatore, Michael A (Mike)
**Subject:** FW: RIF Business Cases
**Importance:** High

All,

Based on our call yesterday, I have provided Mike with the template to submit employee names to me so that I can create the cases for you. Please try to have these to me by COB tomorrow if possible (no later than Thursday) to ensure your teams will have enough time to complete the cases in the system. Just as a recap of our call yesterday the process is as follows:

Step 1:            Mike will consolidate the names on the attached spreadsheet and send to Missy by COB Wednesday (04/01/15)
Step 2:            Missy creates a business case in the system
Step 3:            Missy sends the respective Director the assigned RIF business case #(s)
Step 4:            Director/selection manager goes into system and rates/ranks employees and adds comments as appropriate based on what we reviewed on the call yesterday (remember to include
                        comments for impacted employees even if they are not ranked a 1 or 5)

1

Step 5:        Director advises to Missy via email when cases are complete
Step 6:        Missy will reach out to the Director or manager to discuss and update the case to prepare for legal
review

**Quick link to the system:**
https://ps-
prdsso.ehr.verizon.com/psc/vzehpra/EMPLOYEE/HRMS/c/VERIZON_FORCE_MANAGEMENT.B_FMS_VLSS_BC.GBL?Folde
rPath=PORTAL_ROOT_OBJECT.VERIZON_FORCE_MANAGEMENT.VFMS_VLSS_MANAGEMENT.B_FMS_VLSS_BC_GBL_1&I
sFolder=false&IgnoreParamTempl=FolderPath%2cIsFolder&

Thanks,

M-

CONFIDENTIAL                                                                        Def_Walker_4608

| Ref Case # | # of Cases (combining certain one-time, one one-time, is a has in individual case) | Selection Manager (Former Manager) completing Business Case | Notification Manager | Case Level (reduction) Elimination / Provisional Elimination / Rank & Role) | Notification Date | Justification | Impacted EMPID | Last, First Name | Band | Defunct | Previous Director (if applicable) |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  | HI Plan Case | Frank Sciortino | Frank Sciortino | Rate and Rank | 4/23/2015 | Planning employees impacted. Their work will be absorbed by other Planners in the group. Was selected b/c of opportunity to downsize group. | 1162120 | Spitznagel, Lee | 7 | Sak |  |
|  | HI ROW Case | Shaun Cross | Shaun Cross | Rate and Rank | 4/29/2015 | Right of Way Engineering employees impacted. Their work will be absorbed by other ROW Engineer in the group, as well as outsourced when possible. Was selected since it is being considered for future consolidation state wide. | 1125061 | Flure, Richard | 7 | Sak |  |
|  | CNE Case | Karen Trenchard | Karen Trenchard | Rate and Rank | 4/24/2015 | Customer Network Engineering employees impacted. Their work will be absorbed by other CNE Engineer and Contingent Workers in the group, as well as outsourced when possible. Was selected since it is being considered for future consolidation state wide. | 1163866 | Frustaino, Janice | 7 | Sak |  |
|  | SPOC Case | Michael Procutore | Michael Procutore | Rate and Rank | 4/23/2015 | SPOC Provisioning Engineering employees impacted. Their work will be absorbed by other SPOC Engineers and Contingent Workers in the group, as well as outsourced when possible. Was selected b/c of opportunity to leverage outsourcing. | 1354516 | Tunalic, Valerie | 7 | Sak |  |
|  | FE Case | Karen Trenchard | Karen Trenchard | Rate and Rank | 4/23/2015 | Field Engineering employees impacted. Their work will be absorbed by other Field Engineers in the group, as well as outsourced when possible. Was selected b/c of opportunity to downsize group. | 1099591 | Sears, Tom | 7 | Sak |  |
|  | Combined Design Case | Tom Sak | Shaun Cross | Rate and Rank | 4/23/2015 | Design Engineering employees impacted. Their work will be absorbed by other Design Engineers and Contingent Workers in the group, as well as outsourced when possible. Was selected b/c of opportunity to downsize group and further outsourcing opportunities. | 1162120 | Auxel, Pete | 7 | Sak |  |
|  | Combined Design Case | Tom Sak | Linda Manno | Rate and Rank | 4/23/2015 | Design Engineering employees impacted. Their work will be absorbed by other Design Engineers and Contingent Workers in the group, as well as outsourced when possible. Was selected b/c of opportunity to downsize group and further outsourcing opportunities. | 1440774 | Berman, Mike | 7 | Sak |  |
|  | Combined Design Case | Tom Sak | Brian DeVriel | Rate and Rank | 4/23/2015 | Design Engineering employees impacted. Their work will be absorbed by other Design Engineers and Contingent Workers in the group, as well as outsourced when possible. Was selected b/c of opportunity to downsize group and further outsourcing opportunities. | 1277411 | Johnson,Ralph P | 7 | Sak |  |
|  | Combined Design Case | Tom Sak | Robert Schroeder | Rate and Rank | 4/23/2015 | Design Engineering employees impacted. Their work will be absorbed by other Design Engineers and Contingent Workers in the group, as well as outsourced when possible. Was selected b/c of opportunity to downsize group and further outsourcing opportunities. | 1521631 | Leonard,Lawrence R | 7 | Sak |  |

Title column (per row):
- Dsg IV Gdn-Ntwk Engr&Ops
- Engr III Spec-Ntwk Engr&Ops
- Engr III Spec-Ntwk Engr&Ops
- Engr III Spec-Ntwk Engr&Ops
- Engr III Spec-Ntwk Engr&Ops
- Engr III Spec-Ntwk Engr&Ops
- Engr III Spec-Ntwk Engr&Ops
- Engr III Spec-Ntwk Engr&Ops
- Engr III Spec-Ntwk Engr&Ops

CONFIDENTIAL

Def_Walker_4609

| Case | Mgr 1 | Mgr 2 | Category | Date | Description | ID | Name | Title | | Approver |
|---|---|---|---|---|---|---|---|---|---|---|
| Combined Design Case | Tom Sisk | Frank Scuorzo | Rate and Rank | 4/23/2015 | Design Engineering employees impacted. Their work will be absorbed by other Design Engineers and Contingent Workers in the group, as well as outsourced when possible. Was selected b/c of opportunity to downsize group and further outsource opportunities. | 1548899 | Berg JR,Richard | Engr III Spec-Ntwk Engr&Ops | 7 | Sisk |
| Combined Design Case | Tom Sisk | Frank Scuorzo | Rate and Rent | 4/27/2015 | Design Engineering employees impacted. Their work will be absorbed by other Design Engineers and Contingent Workers in the group, as well as outsourced when possible. Was selected b/c of opportunity to downsize group and further outsource opportunities. | 1373282 | Fisher,Fred M | Engr III Spec-Ntwk Engr&Ops | 7 | Sisk |
| Combined Design Case | Tom Sisk | Jason Capoot | Rate and Rent | 4/27/2015 | Design Engineering employees impacted. Their work will be absorbed by other Design Engineers and Contingent Workers in the group, as well as outsourced when possible. Was selected b/c of opportunity to downsize group and further outsource opportunities. | 1377113 | Jasper,Ronald A | Engr III Spec-Ntwk Engr&Ops | 7 | Sisk |
| Combined Design Case | Tom Sisk | Christopher Moore | Rate and Rank | 4/23/2015 | Design Engineering employees impacted. Their work will be absorbed by other Design Engineers and Contingent Workers in the group, as well as outsourced when possible. Was selected b/c of opportunity to downsize group and further outsource opportunities. | 1241982 | Scheideman,John M | Engr III Spec-Ntwk Engr&Ops | 7 | Sisk |
| Combined Robert Mor | Robert Morris | Robert Morris | Functional Elimination/R&R | 4/23/2015 | Reduction in Field Engineering and Vendor Mgmt groups. Work to be redistributed among Va team and MD DC resources | 1075489 | Crouch,Carl R | Engr III Spec-Ntwk Engr&Ops | 7 | O'Donoghue |
| Combined Robert Mor | Robert Morris | Robert Morris | Functional Elimination/R&R | 4/23/2015 | Reduction in Field Engineering and Vendor Mgmt Groups. Works to be redistributed among Va team and MD DC resources | 1187241 | Johnson,Thomas A | Engr III Spec-Ntwk Engr&Ops | 7 | O'Donoghue |
| Individual Case | Alye Fabryi | Alye Fabryi | Functional Elimination/R&R | 4/23/2015 | Reduction in Field Engineering and Vendor Mgmt Groups. Works to be redistributed among Va team and MD DC resources | 1250822 | Remlemery, Lee | Engr III Spec-Ntwk Engr&Ops | 7 | O'Donoghue |
| Individual Case | Rob Lamdin | Rob Lamdin | Functional Elimination/R&R | 4/23/2015 | Reduction in Hours Planning for the BMIT Hcup team. This will impact nightly metric and planning functions. Work will be reallocated to remaining planners on the team. | 1167742 | Kent,Soreen T | Engr IV Spec-Ntwk Engr&Ops | 7 | O'Donoghue |
| Combined Debbie Wilhe | Debbie Wilhelm | Debbie Wilhelm | Functional Elimination/R&R | 4/23/2015 | Reduction in the CIO Engineering team. Work will impact the processing of all CO Infrastructure growth and modernization. Work will be redistributed among the remaining team members. Additional OT by the remaining team is expected to manage volumes | 1503591 | Wood, Rashael | Engr III Spec-Ntwk Engr&Ops | 7 | O'Donoghue |
| Combined Debbie Wilhe | Debbie Wilhelm | Debbie Wilhelm | Functional Elimination/R&R | 4/23/2015 | Reduction in the CIO Engineering team. Work will impact the processing of all CO Infrastructure growth and modernization. Work will be redistributed among the remaining team members. Additional OT by the remaining team is expected to manage volumes. | 1287715 | Wright,Kimberly C | Engr III Spec-Ntwk Engr&Ops | 7 | O'Donoghue |
| Individual Case | David Grey | David Grey | Functional Elimination/R&R | 4/23/2015 | Reduction impacts the Eastern Shore Design Team. IT manages Engineering Assistants. Manager will realign associates to another supervisor | 1215256 | Byrne,Terrence M | Supr-Ntwk Engr&Ops | 7 | O'Donoghue |

CONFIDENTIAL

Def_Walker_4610

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Individual Case | William T Lee III | William T Lee III | Functional Elimination/R&R | 4/23/2015 | Reduction impacts the Engineering team in IGRE] in the Piedmont Va area. Workload will be redistributed within team. | 1963747 | Dollar Aterion Diana | Engr III Spec-Ntwk Eng&Ops | 7 | O'Donoghue |
| Individual Case | Michael Silvey | Michael Silvey | Functional Elimination/R&R | 4/23/2015 | Reduction impacts the NEW project management functions across Verizon. Employee supports labor provisioning process with TIRKS. Work will be redistributed within team. | 1180564 | Norwood Jr.James W | Engr IV Spec-Ntwk Eng&Ops | 7 | O'Donoghue |
| Individual Case | Frank Sarchiapone | Frank Sarchiapone | Functional Elimination/R&R | 4/23/2015 | Reduction will impact FOP Provisioning team supporting Frontier CBs. May delay FBER processing inertias. Work will be redistributed within Provisioning team. | 1203149 | Salcegus Alphette M | Engr III Spec-Ntwk Eng&Ops | 7 | O'Donoghue |
| Individual Case | Kenneth Crump | Kenneth Crump | Functional Elimination/R&R | 4/23/2015 | Reduction impacts FTTC Project Mgmt functions across district. Employee supports scheduling, tracking, and interfaces with Carriers, Engr Team and Construction. Work will be redistributed within team. | 1279992 | Whelton JR.Olives R. | Cslt-Prog/Proj Mgt | 7 | O'Donoghue |
| Individual Case | Ben Doyle | Ben Doyle | Functional Elimination/R&R | 4/23/2015 | Reduction impacts the Engineering team in IGRE] in the Eastern Va area. Work load will be redistributed within team. | 2380713 | Erdi,Barbara R | Engr III Spec-Ntwk Eng&Ops | 7 | O'Donoghue |
| Individual Case | Colton O'Donoghue | Colton O'Donoghue | Functional Elimination/R&R | 4/24/2015 | Reduction of Field Engineering Manager for the MD DC team. Impacts all Engineering and Installation functions for NW, IPTV, and PBXS growth. Work to be assumed by VA FE Manager | 1221984 | Fakely,Azeyumik I | Mgr-Ntwk Eng&Ops | 6 | O'Donoghue |
| Individual Case | John Healy | John Healy | Rank & Rate | 4/24/2015 | Northeast Design Team was selected due to ability to outsource and increased efficiency potential. Work will be absorbed and/or outsourced. | 1247165 | Miller, Thomas | Engr III Spec-Ntwk Eng | 7 | Joseph Muccilo |
| Individual Case | John Healy | John Healy | Rank & Rate | 4/25/2015 | Northeast Design Team was selected due to ability to outsource and increased efficiency potential. Work will be absorbed and/or outsourced. | 1222299 | Zimmerson, William | Engr III Spec-Ntwk Eng | 7 | Joseph Muccilo |
| Individual Case | Gary Small | Gary Small | Rank & Rate | 4/25/2015 | DS1 Provisioning Team was selected due to increased efficiency potential and ability to outsource. Work will be absorbed and/or outsourced. | 1207258 | McCue, Melissa | Engr III Spec-Ntwk Eng | 7 | Joseph Muccilo |
| Individual Case | Gary Small | Gary Small | Rank & Rate | 4/25/2015 | DS1 Provisioning Team was selected due to increased efficiency potential and ability to outsource. Work will be absorbed and/or outsourced. | 1162870 | Mencuk Jr, William | Engr III Spec-Ntwk Eng | 7 | Joseph Muccilo |
| Individual Case | Gary Small | Gary Small | Rank & Rate | 4/25/2015 | DS1 Provisioning Team was selected due to increased efficiency potential and ability to outsource. Work will be absorbed and/or outsourced. | 1148816 | Wilmeski, Norman | Engr III Spec-Ntwk Eng | 7 | Joseph Muccilo |
| Individual Case | Meg Loce | Meg Loce | Rank & Rate | 4/27/2015 | This reduction in the IOF team is due to expected expense savings; work will be absorbed. | 1353559 | Work, Thomas | Prin Eng-Ntwk Eng | 6 | Joseph Muccilo |
| Individual Case | Pat McCeoch | Pat McCeoch | Rank & Rate | 4/25/2015 | Center Engineer Team selected due to expected expense savings. work will be absorbed. | 1067649 | Low Sr, Ronald | Engr III Spec-Ntwk Eng | 7 | Joseph Muccilo |
| Individual Case | Jim Szewczyk | Jim Szewczyk | Rank & Rate | 4/25/2015 | FTTF Team selected due to increased efficiency potential; work will be absorbed or contracted out. | 1367027 | Brenard, Lopp Paul | Engr III Spec-Ntwk Eng | 7 | Joseph Muccilo |

CONFIDENTIAL

Def_Walker_4611

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Combined Cindy S | Cindy Swezperchelski | Cindy Swezperchelski | Rank & Rate | 4/23/2015 | Right of Way engineers are being downsized due to expense savings and ability to outsource. Work will be absorbed and/or outsourced. | | Grose, Glenn | Eng III Spec-Ntwk Eng | 7 | Joseph Muscato |
| Combined Cindy S | Cindy Swezperchelski | Cindy Swezperchelski | Individual Elimination | 4/23/2015 | Third party function was selected due to the ability to be outsourced. | 1341878 | Jakes, Deedee | Eng III Spec-Ntwk Eng | 7 | Joseph Muscato |
| Individual Case | Brian Magee | Brian Magee | Rank & Rate | 4/28/2015 | Philadelphia Design Team was selected due to ability to outsource and potential for increased efficiency. Work will be absorbed and/or outsourced. | 1597215 | Weller, Suzette | Eng III Spec-Ntwk Eng | 7 | Joseph Muscato |
| Individual Case | John Healy | John Healy | Rank & Rate | 4/23/2015 | Pittsburgh Design Team was selected due to ability to outsource. Work will be absorbed and/or outsourced. | 1195464 | Browning, Charles | Eng III Spec-Ntwk Eng | 7 | Joseph Muscato |
| Individual Case | Douglas J Smith | Douglas J Smith | Rank & Rate | 4/23/2015 | Planning team selected due to increased efficiency potential. Work will be absorbed. | 1255728 | Drake, Judy | Eng III Cub-Ntwk Eng | 7 | Joseph Muscato |

CONFIDENTIAL

Def_Walker_4612

# Exhibit SS

# Condensed Transcript
# Testimony of:

## MELISSA PARKER

## Date: August 24, 2016

## Suzette Walker v. Verizon Services Corporation, et al.

## No.:  USDC E.D.PA 15-4031

R&K Reporting Inc.
PO Box 1372
Levittown, Pennsylvania 19058
Phone: 215-946-7009
Fax: 215-949-1867
Email: rkreporting@gmail.com

## 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 3   .              *   *   *
 4   SUETTE WALKER            :
                              :
 5           v.               :
                              :
 6   VERIZON SERVICES CORPORATION :
              and             :
 7   VERIZON PENNSYLVANIA, INC.  :  NO. 15-4031
 8
 9                *   *   *
10           August 24, 2016
11                *   *   *
12
13        Oral deposition of MELISSA PARKER,
14   held in the Law Offices of Karpf, Karpf &
15   Cerutti, PC, 3331 Street Road, Two Greenwood
16   Square, Suite 128, Bensalem, Pennsylvania
17   19020, commencing at 12:07 p.m., on the above
18   date, before Hope Agosto, a Professional Court
19   Reporter and a Notary Public.
20
                  *   *   *
21
22           R&K REPORTING
         Court Reporting Services
23            PO Box 1372
       Levittown, Pennsylvania 19058-1372
24   Phone (215) 946-7009   Fax (215) 949-1867
```

## 2

```
 1   A P P E A R A N C E S:
 2
 3      KARPF, KARPF & CERUTTI, PC
        BY:  CHRISTINE E. BURKE, ESQUIRE
 4      3331 Street Road
        Two Greenwood Square
 5      Suite 128
        Bensalem, Pennsylvania 19020
 6      (215) 639-0801
        CBurke@karpf-law.com
 7      -- Counsel for the Plaintiff
 8
 9      REED SMITH, LLP
        BY:  JOEL S. BARRAS, ESQUIRE
10      Three Logan Square
        1717 Cherry Street
11      Suite 3100
        Philadelphia, Pennsylvania 19103
12      (215) 241-7990
        JBarras@reedsmith.com
13      -- Counsel for the Defendants
14
15
16   A L S O   P R E S E N T:
17      HARVETTA NERO, ESQUIRE
        -- Assistant General Counsel, Verizon
18
19
20
21
22
23
24
```

## 3

```
 1                *   *   *
 2                INDEX
 3                *   *   *
 4   WITNESS                         PAGE NO.
 5   MELISSA PARKER
 6      By Ms. Burke                     4
 7
 8
 9
10
11                *   *   *
12                EXHIBITS
13                *   *   *
14   NO.     DESCRIPTION            PAGE NO.
15   Parker-1  3/31/15 Email from Parker re:   11
              FW:  RIF Business Cases
16
17   Parker-2  Severance Process for Management  16
              Employees - Manager Job Aid
18   (MARKED DURING PREVIOUS DEPOSITIONS)
19   Verizon-14  Rate and Rank RIF Documents    16
20
21
22
23
24
```

## 4

```
 1                *   *   *
 2           (It is hereby stipulated and
 3   agreed by and between counsel for the
 4   respective parties that the signing,
 5   sealing, filing and certification are
 6   waived; and that all objections, except
 7   as to the form of the question, be
 8   reserved until the time of trial.)
 9                *   *   *
10      MELISSA PARKER, after having been
11   first duly sworn, was examined and
12   testified as follows:
13                *   *   *
14           EXAMINATION
15                *   *   *
16   BY MS. BURKE:
17      Q.  Ms. Parker, I'm here to take your
18   deposition today because you have been
19   identified by the parties as someone who may
20   have discoverable information related to the
21   case.  Okay?
22      A.  Yes.
23      Q.  I represent Suzette Walker in a civil
24   lawsuit that she's brought against her former
```

MELISSA PARKER

5

1     employer, Verizon, and it's a question and
2     answer session but it is under oath.  Do you
3     understand that?
4         A.   Yes.
5         Q.   Have you ever had your deposition
6     taken before?
7         A.   No.
8         Q.   Hope is typing down every single
9     thing that you say and anything that I or your
10    counsel say, so just make sure that you keep
11    your responses verbal.  If you say uh-huh or
12    uh-uh or you nod, your response won't be
13    accurately reflected on the record so we'll
14    remind you.  Okay?
15        A.   Okay.
16        Q.   You may hear your counsel make
17    objections.  Most importantly, if you hear him
18    object, you have to stop testifying so he can,
19    A, put his objection on the record -- some
20    witnesses like to keep going -- and B, Hope can
21    only type what one person is saying at a time.
22    All right?
23        A.   Yep.
24        Q.   So if you hear my question and you

6

1     think you know where I'm going, just wait for
2     me to answer so there's a clear question on the
3     record.  I'll try not to interrupt you as well
4     during the course of your answers.  All right?
5             If I ask you a question and you don't
6     understand for some reason, you'd like me to
7     clarify or repeat, just let me know.  Nobody
8     wants you to guess about things that you don't
9     know.  These events didn't happen yesterday so
10    if you don't recall, you can tell me you don't
11    recall.  If there's an answer that you don't
12    know because you never knew, you can tell me
13    that as well.  Okay?
14        A.   Yes.
15        Q.   If I give you a document, you take
16    time to look at it before you answer any
17    questions.  I'm hoping to expedite your
18    deposition and get you out of here as soon as
19    possible, but if you need a break, you can let
20    us know that and we'll go off the record, but I
21    just ask that you answer the question that's
22    pending before you leave the room.  Okay?
23        A.   Okay.
24        Q.   Are you still an employee of Verizon?

7

1         A.   Yes.
2         Q.   What's your title right now?
3         A.   Senior manager, HR business partner.
4         Q.   Do you have a physical office
5     location that you work out of?
6         A.   Basking Ridge, One Verizon way.
7         Q.   Did you come from there today?
8         A.   No.
9         Q.   Did you come right from home?
10        A.   Yes.
11        Q.   How long have you held that title,
12    ma'am?
13        A.   Since October 2013.
14        Q.   Have your job duties been fairly
15    consistent since October 2013 through the
16    present?
17        A.   Yes.
18        Q.   Have you always worked out of the
19    Basking Ridge location since October of 2013 to
20    the present?
21        A.   Yes.
22        Q.   What are your job responsibilities as
23    a senior manager HR business partner?
24        A.   I manage a team of business partners,

8

1     as well as have any own clients.
2         Q.   Clients that you're directly
3     responsible for, have they been the same since
4     October of 2013 or they've changed in some way?
5         A.   The clients that I'm responsible for
6     have been the same since 2013.
7         Q.   Which clients are you directly
8     responsible for?
9         A.   The Maureen Davis organization.
10        Q.   Where is that located or what area
11    does it cover?
12        A.   She covers the dispatch operations
13    organization.  The organization itself has gone
14    through a lot of reorganization.  Right now
15    that's what she covers.
16        Q.   You have been directly responsible
17    for Ms. Davis' organization?
18        A.   Yes, I have.
19        Q.   Since October of 2013?
20        A.   Yes.
21        Q.   And how many HR business partners do
22    you oversee?
23        A.   Three.
24        Q.   What are their names?

R&K Reporting Inc.

MELISSA PARKER

9

1    A.   Right now, Marissa Ruggario, Cynthia
2 Barrett and Alejandra Rosales.
3    Q.   Has that changed at all since 2013?
4    A.   Yes.
5    Q.   How?
6    A.   We've gone through several
7 reorganizations from a client perspective, so
8 my director and I have changed the team around
9 depending on the support needed within the
10 organization.
11    Q.   Who is your director?
12    A.   Jason Sakowski.
13    Q.   Has he been your director since
14 October of 2013?
15    A.   Yes.
16    Q.   Other than the two RIF notification
17 dates in early May of 2015, have you been
18 involved in any other RIFs for the
19 organization?
20    A.   Yes.
21    Q.   I want to focus your attention today
22 on the RIFs that occurred in the spring of 2015
23 for the organization.  Okay?
24    A.   Yes.

10

1    Q.   You're aware that various RIFs
2 occurred within the engineering department at
3 least under Joe Muccilo or he was under Bill
4 Bragg?
5    A.   Yes.
6    Q.   Do you know who that is?
7    A.   Yes.
8    Q.   Both of those individuals?
9    A.   Yes.
10    Q.   Other than that arena, where else, if
11 at all, within Verizon were there RIFs
12 occurring in the spring of 2015?
13    A.   In spring of in 2015, the RIFs that
14 our organization was responsible for was under
15 Bob Mudge, who is the executive vice president,
16 so that would be the network operations
17 organization.
18    Q.   Under Bob Mudge?
19    A.   Yes.
20    Q.   Were there any more than two specific
21 notification dates in the spring of 2015?
22    A.   I'm not sure specifically.
23    Q.   Were there as many as ten?
24    A.   No.

11

1    Q.   Are you aware of any others besides
2 one in April and one in May?
3    A.   Not that I recall.
4    Q.   But you do recall those two
5 particular months at issue?
6    A.   Yes.
7    Q.   In terms of preliminary assessments
8 of how many individuals may, in fact, be
9 impacted or what the percentage of reduction
10 needs to be for each particular area, were you
11 involved in that?
12    A.   No.
13    Q.   Do you know who, if anyone, would be
14 involved in that for your organization?
15    A.   It typically would come from the
16 executive vice president, Bob Mudge, through
17 his chain of hierarchy, then to my management
18 team, to the best of my knowledge.
19         * * *
20   (Whereupon, Exhibit Parker-1 was
21   marked for identification.)
22         * * *
23 BY MS. BURKE:
24    Q.   Ms. Parker, I'm handing you an email

12

1 Bates stamped DEF Walker 2649 to 2650.  Those
2 are the numbers in the bottom right-hand
3 corner, just for your reference.  This is an
4 email dated March 21st, 2015 it appears to be
5 from you to various Verizon employees.  Take a
6 moment to take a look at it and let me know
7 when you're ready.
8    A.   Okay.
9    Q.   Is this an email that you drafted?
10    A.   Yes.
11    Q.   Now, Mike Pescatore, who is that?
12    A.   He performed a staff function under
13 Bill Bragg.
14    Q.   What about Tom Sisk, who is that?
15    A.   Tom Sisk is a director that reported
16 to Bill Bragg.
17    Q.   Who is Edward O'Donoghue?
18    A.   He is also a director that reported
19 to Bill.
20    Q.   So did you have a call with all the
21 recipients on this email, including Mike
22 Pescatore?
23    A.   Yes.
24    Q.   Bill Bragg, Ed O'Donoghue, Joe

MELISSA PARKER

Pages 13 to 16

13

1    **Muccilo, Tom Sisk?**
2        A.   Yes.
3        **Q.   I have provided Mike with the**
4    **template to submit employee names to me so that**
5    **I can create the cases for you.  Please try to**
6    **have these to me by close of business tomorrow,**
7    **if possible, no later than Thursday, to ensure**
8    **that your teams will have enough time to**
9    **complete the cases in the system.**
10       **Is your computer on, ma'am?**
11       A.   No.
12       **Q.   Shake a mouse and see if that works.**
13       A.   (Witness complies with request.)
14       **Q.   This is the attachment to this email.**
15   **Do you agree with that?**
16       A.   Yes.
17       **Q.   You say, I have provided Mike with**
18   **the template to submit employee names to me so**
19   **that I can create the cases for you.**
20       **Let me make sure I'm on the same page**
21   **as you.  This says HR VP use only.  Did you**
22   **make this up yourself, this template?**
23       A.   No.
24       **Q.   Just something you had previously**

14

1    **created in the system or had access to?**
2        A.   Somebody on the team did it just as a
3    tool to gather information.
4        **Q.   Where in the form did you want him to**
5    **submit employee names?**
6        A.   In column H, I and J.
7        **Q.   Did anyone, in fact, utilize your**
8    **template and identify the names?**
9        A.   Yes.
10       **Q.   Put in the spreadsheet that you asked**
11   **for?**
12       A.   Yes.
13       **Q.   Where do you keep that?**
14       A.   On our hard drive.
15       **Q.   You're providing Mike with a template**
16   **to submit employee names to me.  What kind of**
17   **employee names?**
18       A.   The employee names that they
19   determined would be impacted within their
20   organization.
21       **Q.   Now, was that before or after they**
22   **were ranked with you or one of your HR business**
23   **partners?**
24       A.   The email contains also a job aid

15

1    that provides instructions on how to rate and
2    rank or how to do a business case in the
3    system, and so they would be following the
4    instructions on how to do that in tandem of
5    filling out and providing us the information on
6    the spreadsheet.
7        MS. BURKE:  Can you read back her
8        response, please, Hope?
9        * * *
10       (Whereupon, the court reporter
11       read back the pertinent testimony.)
12       * * *
13   BY MS. BURKE:
14       **Q.   So when you say supply the names,**
15   **they can't do that until after they do the**
16   **proper rate and rank though, correct?**
17       A.   If they followed the instructions on
18   the job aid.
19       **Q.   Now, the job aid, are you talking**
20   **about the substance of this email or something**
21   **in a particular spreadsheet?**
22       A.   Substance of the email.  It was an
23   attachment to the email.
24       **Q.   You're not talking about this, are**

16

1    **you?  (Indicating.)**
2        A.   Yes, I am.
3        MS. BURKE:  We'll mark this then.
4        * * *
5        (Whereupon, Exhibit Parker-2 was
6        marked for identification.)
7        * * *
8    BY MS. BURKE:
9        **Q.   Now, when you say send me the names**
10   **so I can create the cases, before we even get**
11   **to the case, them sending you the name would**
12   **involve them following the manager job aid you**
13   **sent and rate and ranking the employees?**
14       A.   Correct.
15       **Q.   Then only at that time do you even**
16   **create a business case in the system?**
17       A.   That's correct.
18       **Q.   This has been previously marked as**
19   **Verizon-14.  It's a collection of various RIF**
20   **documents, but the very first page 1 of 2**
21   **identifies create managed business case.  Do**
22   **you see that?**
23       A.   Yes.
24       **Q.   Is this a screen shot of a particular**

MELISSA PARKER

17

1  business case?
2      A.  Yes.
3      Q.   Who, if anyone, fills out the actual
4  information within the screen for the business
5  case?
6      A.   This particular screen is what you're
7  asking me about?
8      Q.   Sure, we'll start with that one.
9      A.   This particular screen is filled out
10  by the HR business partner.  It's also updated
11  at some point by the subject matter expert, our
12  SME contact, to ensure the wording on the
13  screen is appropriate for that particular RIF
14  notification.
15      Q.   Your SME, is that an attorney?
16      A.   No.  Well, it's somebody internal in
17  the HR business partner organization who does
18  work with an attorney, yes.
19      Q.   I just want to go to an example of
20  one that did you.  If you could to Page 787,
21  there's an HRBP and it says Melissa Parker.  Do
22  you see that?
23      A.   Yes.
24      Q.   Then there's an HRBP manager.  Do you

18

1  see that?
2      A.  Yes.
3      Q.   That's who you identified earlier
4  that you report to, right, Jason?
5      A.  Correct.
6      Q.   If your name is identified in the
7  particular document as the HRBP, does that mean
8  you completed this particular business case?
9      A.  Yes.
10      Q.   Did you do all the business cases for
11  Joe Muccilo's organization because someone else
12  was out on leave?
13      A.  Yes.
14      Q.   I just wanted to be sure we were on
15  the right page about what constituted the
16  business case.  You can put Verizon-14 aside
17  for a moment.  I want to focus on this email
18  that you sent out.
19      A.   (Witness complies with request.)
20      Q.   I have provided Mike with the
21  template to submit employee names to me so I
22  can create the cases for you.  Do you still
23  have the template up on your screen?
24      A.  Yes.

19

1      Q.    Now, other than them inputting the
2  employee name, are you asking anyone else to
3  fill out any of these areas?
4      A.   The client fills out the entire
5  spreadsheet except for the first column.
6      Q.   B through M?
7      A.  Yes.
8      Q.   So you have a completed version of
9  this somewhere?
10      A.  Yes.
11      Q.   Based on them following the
12  instructions, they were only supposed to
13  provide you with names after they had done a
14  proper rate and rank, correct?
15      A.   Yes.
16      Q.   The justification, is that just
17  absorbed, redistributed or eliminated, or is
18  that an explanation of why that particular
19  employee would, in fact, be impacted?
20      A.   What column are you on?
21      Q.   G, I'm sorry.
22      A.   It would be an explanation of why the
23  organization was eliminating the position.
24      Q.    Can you go to Page 787 in your

20

1  business case packet, which is Verizon-14?
2      A.   (Witness complies with request.)
3      Q.   Are you there?
4      A.   Uh-huh.
5      Q.   Sorry, you have to say yes or no out
6  loud.
7      A.   Yes.
8      Q.   The area that identifies comments, is
9  that something that you entered?
10          MR. BARRAS:  What area are you
11      referring to?
12  BY MS. BURKE:
13      Q.   The very bottom that identifies
14  comments, center engineering group, work with
15  Turk vendors and prepare price quotes.  Ron has
16  expressed a willingness to leave.
17      A.   Typically, the organization will put
18  in a reasoning in there and if we need to add
19  anything as a business partner, then we can add
20  comments as well.
21      Q.   Did you draft this particular
22  comment?
23      A.   The part where it says Ron has a
24  willing expressed a willingness to leave, I

MELISSA PARKER

---

21

1  would have added that.
2      Q.   But the first sentence, where did you
3  get that from?
4      A.   I don't recall.
5      Q.   You had referenced --
6          MS. BURKE:  Can you read back her
7      last response where she said
8      director?
9                * * *
10         (Whereupon, the court reporter
11     read back the pertinent testimony.)
12               * * *
13  BY MS. BURKE:
14     Q.   That first sentence in the comments
15 box, when you say the organization, do you mean
16 the actual selection manager, Patricia McCoach,
17 or do you mean the director in this particular
18 substance?
19     A.   The person that is completing the
20 business case, which typically is the selection
21 manager.
22     Q.   So they typically fill out the
23 comments area and if you feel it's necessary,
24 you add something?

---

22

1      A.   Correct.
2      Q.   If there is nothing in the comments
3  area, why would that be?
4      A.   I don't know.
5      Q.   Just use Page 781 as an example.
6      A.   I don't recall.
7      Q.   May that be because there was no
8  commentary provided by that particular
9  selection manager?
10     A.   It could be.
11     Q.   If they did provide comments, would
12 you include them?
13     A.   They would have included them.
14     Q.   So where are you pulling the comments
15 from, this particular spreadsheet that was
16 completed?
17     A.   I'm not entering the comments in
18 typically.
19     Q.   Who enters them?
20     A.   Like I stated before, it's typically
21 the selection manager that would do that.
22     Q.   Actually goes into the system and
23 inputs the comments?
24     A.   Yes.

---

23

1      Q.   I'm not asking for any conversations
2  that were had with legal.  Does every case get
3  discussed with legal?
4      A.   Not always.
5      Q.   At what point did you determine when
6  you were going to discuss a case with legal?
7      A.   We provide legal with the knowledge
8  that the case is ready for review, make time
9  with them if they feel discussion is needed.
10 However, they have the option to approve the
11 case if they don't feel that any additional
12 discussion is needed on a particular case.
13     Q.   Do you make a record of that
14 somewhere if you do have, in fact, have
15 discussion with legal?
16     A.   No.
17     Q.   Is that a telephone discussion
18 between you and the attorney?
19     A.   Yes, or in person if they're
20 available.
21     Q.   Do you bring in the selection manager
22 for that discussion as well or is that
23 something that you handle?
24     A.   Typically, it's between the business

---

24

1  partner and the attorney.  The selection
2  manager can be brought into the discussion if
3  necessary.
4      Q.   Respecting Suzette Walker, was an
5  attorney brought in on her business case?
6          MR. BARRAS:  Objection.
7          THE WITNESS:  Yes.
8          MR. BARRAS:  Objection.  We're
9      getting into privileged
10     communications.
11         MS. BURKE:  There's no
12     communications at all being
13     discussed.  It's whether or not an
14     attorney was consulted respecting
15     Suzette Walker.
16         THE WITNESS:  Can you restate the
17     question?
18 BY MS. BURKE:
19     Q.   For all these business cases that
20 we're discussing -- are you on the same page as
21 me?
22     A.   Yes.
23     Q.   I want to make sure you're following
24 me.  Sometimes an attorney would actually give

---

R&K Reporting Inc.

MELISSA PARKER

25

1  input and sometimes an attorney would not,
2  correct?
3      A.   Correct.
4      Q.   Did you send every single case to the
5  attorney for review?
6      A.   Yes.
7      Q.   So no matter what case is in this
8  packet, you sent it to legal for review?
9      A.   Correct.
10     Q.   Did you get feedback from legal on
11 every single case?
12     A.   Not always.
13     Q.   Do you know if you got any feedback
14 on Suzette Walker?
15         MR. BARRAS:  Objection.  That is
16         privileged.
17         MS. BURKE:  She either did or she
18         didn't.
19         MR. BARRAS:  She just testified
20         that sometimes she got feedback,
21         sometimes she did not.  Therefore,
22         the fact that she got feedback at all
23         is privileged.
24         MS. BURKE:  There's no privileged

26

1          communication.  She hasn't even
2          identified if such communication was
3          had.  If she didn't have any
4          communications or feedback from
5          legal, then there's no privilege to
6          invoke.  I'm just asking her if she
7          did, in fact, get feedback.  There's
8          no privileged communication to be
9          shared in answering that question.
10         MR. BARRAS:  We have an objection
11         to the question.  You can answer
12         whether or not you discussed the case
13         with legal.
14         THE WITNESS:  Yes.
15 BY MS. BURKE:
16     Q.   And who was present?  Was Brian Magee
17 present?
18         MR. BARRAS:  Objection.
19 BY MS. BURKE:
20     Q.   Was Brian Magee present?
21     A.   No.
22     Q.   Was Joe Muccilo present?
23         MR. BARRAS:  Objection.  You can
24         answer.

27

1          THE WITNESS:  No.
2  BY MS. BURKE:
3      Q.   Just you and legal, ma'am?
4      A.   Yes.
5      Q.   These business cases that you draft,
6  what do you do with them once they're
7  completed?
8      A.   Can you restate the question?
9      Q.   Once a business case is completed,
10 what, if anything, do you do with it?
11     A.   Completed meaning?
12     Q.   Fill out all the information, you
13 send it to the director, right?
14     A.   Yes.
15     Q.   And it gets a case number?
16     A.   Correct.
17     Q.   Then what system does it go into?
18     A.   The internal severance system.
19     Q.   The what?
20     A.   The internal severance system.
21     Q.   Is that where these screen shots are
22 pulled from?
23     A.   Yes.
24     Q.   The advice, if any, that you obtain

28

1  from counsel in connection with the RIF cases,
2  do you memorialize that somewhere?
3          MR. BARRAS:  Objection.  It would
4          be work product if she did, it's
5          privileged.
6  BY MS. BURKE:
7      Q.   Do you memorialize it anywhere?
8          MR. BARRAS:  I'm going to object.
9          Don't answer that.  We're getting
10         into privilege and work product.
11         MS. BURKE:  We're not getting
12         into anything that's privileged.
13         First of all, she's not an attorney
14         so she can't create work product.
15         I'm asking if she, after getting
16         advice from the attorney,
17         memorialized it somewhere.
18         MR. BARRAS:  Right, did she
19         memorialized privileged
20         communications?
21         MS. BURKE:  How is that
22         privileged in any fashion if she
23         actually wrote it down somewhere?
24         I'm not asking what she said or what

MELISSA PARKER

29

1      it includes.
2            MR. BARRAS:  Well, then it's
3      irrelevant.
4            MS. BURKE:  No, it's not
5      irrelevant because you guys have
6      claimed privilege in a particular
7      document and I believe that it's
8      inappropriate.
9            MS. NERO:  She's memorializing
10     guidance that was given at the
11     direction of counsel.
12           MS. BURKE:  No, I'm not.
13           What was my last question so we
14     can preserve the record?
15                  * * *
16           (Whereupon, the court reporter
17     read back the pertinent testimony.)
18                  * * *
19           MS. BURKE:  So you're instructing
20     her not to answer?
21           MR. BARRAS:  You're talking about
22     the one document -- can we go off the
23     record for a moment?
24           MS. BURKE:  No.  I'm not even

30

1      talking about that.  I'm just asking
2      you if you're instructing her not to
3      answer if when she did, in fact,
4      speak with counsel, she memorialized
5      it anywhere, that's the question.
6            MR. BARRAS:  I'm instructing her
7      not to answer whether or not she
8      memorialized those privileged
9      comments from counsel.
10           MS. BURKE:  You don't want her to
11     answer the question?
12           MR. BARRAS:  Correct.  If you'd
13     like to go off the record and talk
14     about the one document that you
15     emailed me about, I'd be happy to do
16     that.
17           MS. BURKE:  No, I don't want to
18     talk about it off the record.
19           Ma'am, I'm going to ask you to
20     step out really quick while your
21     counsel and I contact the judge.
22           (Whereupon, the witness left the
23     room.)
24           MR. BARRAS:  Off the record for a

31

1      moment.
2                  * * *
3            (Whereupon, there was an
4      off-the-record discussion.)
5                  * * *
6      BY MS. BURKE:
7            Q.   You still have Verizon-14 in front of
8      you, right?
9            A.   Yes.
10           Q.   Just to be clear, let's just use the
11     first one as an example, okay.  Are you on Page
12     755?
13           A.   Yes.
14           Q.   This particular document that we're
15     looking at a screen shot of is the internal
16     severance system; it's a program?
17           A.   It's the system that we use to put
18     severance cases in, yes.
19           Q.   Now, the tab that identifies rate and
20     rank employees, is that reflective of Walker
21     757, if you flip two pages?
22           A.   The rate -- this is not the rate and
23     rank tab.  This is the result of what was
24     inputted on the tab.

32

1            Q.   Now, the employee names that you were
2      provided in your spreadsheet, do you still have
3      that in front of you, ma'am?  In what format
4      did they fill out or rank their employees?
5            A.   I don't know.
6            Q.   So this document that you are looking
7      at here that's in Verizon-14, that's Walker
8      757?
9            A.   Yes.
10           Q.   Who fills this out in terms of the
11     comments area?
12           A.   What page are you on again?
13           Q.   757.
14           A.   This information as far as the
15     comments is filled out by the selection
16     manager.
17           Q.   Do they actually type it into the
18     system?
19           A.   Yes.
20           Q.   Does that happen though before step
21     two, before you even create a business case?
22           A.   In the system?
23           Q.   Yes.
24           A.   A business case has to be created in

MELISSA PARKER

33

1  the system and then the manager adds their
2  comments to the system.  There has to be a
3  numeric value for them to reference in order
4  for them to input the comments.
5      Q.   So step one, consolidating the names
6  on the spreadsheet, do they do an informal
7  method of rate and ranking before they gave the
8  names to you?
9      A.   I don't know.
10      Q.   You never saw it?
11      A.   No.
12      Q.   So you get a list of names, right?
13      A.   Yes.
14      Q.   You create a business case, right?
15      A.   Yes.
16      Q.   Which gives them the ability to go in
17  and input numerical scores?
18      A.   Correct.
19      Q.   Let's look at Walker 759 as an
20  example.
21      A.   Okay.
22      Q.   The numerical scores here, the ones
23  for performance or corrective action, are they
24  automatically generated through the system?

34

1      A.   For corrective action?
2      Q.   Yes.
3      A.   I don't believe so.
4      Q.   How are those numbers generated then?
5      A.   I believe managers can add that.
6      Q.   The performance scores, are those
7  automatically generated through the system?
8      A.   Yes.
9      MR. BARRAS:  When you say
10  performance, are you talking about
11  the performance evaluation for 2013,
12  2014?
13      MS. BURKE:  On Page 759 it says
14  2014 and 2015.
15      MR. BARRAS:  The 6 and 7 column.
16      THE WITNESS:  So under 2014 and
17  2015 performance, that's generated
18  automatically by the system.
19  BY MS. BURKE:
20      Q.   But every other column for a
21  numerical area you're saying the manager would
22  input that number?
23      A.   That's correct.
24      Q.   From a zero to a 5?

35

1      A.   A 1 to 5.
2      Q.   Well, corrective action, there's a
3  zero there, right?
4      A.   Because there was none.
5      Q.   So the numbers could range from zero
6  of 5 to be reflected on the screen?
7      A.   Yes.
8      Q.   All the commentary that's reflected,
9  again, we're just using 757 as an example, you
10  didn't type up any of this?
11      A.   It would be inputted by the manager
12  if there was any corrections or discussion
13  where they needed to make a correction, we
14  would have the ability to do that in the system
15  with them.  The initial input is inputted by
16  the manager.
17      Q.   Page 795, this is a rate and rank or
18  a reduction in information employer rating form
19  for Brian Magee's team?
20      A.   Yes.
21      Q.   Did you input all this commentary on
22  here, if any, or did Mr. Magee do that?
23      A.   Mr. Magee.
24      Q.   You're saying after a business case

36

1  was generated, that gave him the ability to go
2  into the system and then type in the comments
3  that he wanted?
4      A.   That's correct.
5      Q.   Do you know why a business case was
6  not created for Mr. Gross?
7      A.   No.
8      Q.   Did you have any discussions with
9  Muccilo or any other members of management
10  about why a business case was not created for
11  Mr. Gross?
12      A.   No, I did not.
13      Q.   When you created the business case in
14  the system, just for Suzette Walker as an
15  example, which starts on Page 792.  Do you see
16  that?
17      A.   Yes.
18      Q.   Where did you obtain the other
19  employees whom she was ranked against?
20      A.   You enter the job code on the first
21  page in the middle and the peers underneath
22  that manager automatically populate into the
23  system.
24      Q.   Which page are you referring to?  Can

MELISSA PARKER

37

1  you refer to Bates stamp numbers that you're
2  referring to job code?
3      A.   On 792, it's directly in the middle
4  of the page and it says job code, CTNGT2.
5      Q.   CTNGT2, is that for all engineering
6  III specialists network engineering and ops, or
7  is that just assigned to Magee?
8      A.   The job code would be populated based
9  on the employees that roll up to Magee.
10     Q.   So does that number correlate to Mr.
11  Magee then, his team only?
12     A.   Yes.
13     Q.   Next to it it just says engineering
14  III specialist network, engineering and ops?
15     A.   Yes.
16     Q.   Is there a job code for Mr. Gross?
17     A.   He would have a job code.
18     Q.   Would he for his team?
19     A.   For the people who roll up to him,
20  yes.
21     Q.   Right.  Would he have a job code?
22     A.   Yes.  Job codes are based on the
23  individual, not his entire team.
24     Q.   You mean are based on the manager?

38

1      A.   I mean are based on the individual.
2  Everyone could have a different job that they
3  do under the same manager.  They don't
4  necessarily have just one job code for an
5  entire team.
6      Q.   For this particular business case,
7  how did you pick this job code?
8      A.   Because he provided it in the
9  template back to me.
10     Q.   Who did, Mr. Magee?
11     A.   Yes.
12     Q.   Who assigns job codes?
13     A.   At the corporate level.
14     Q.   Just because I'm confused, when you
15  say that there could be more than one job code
16  per individual, is that what you said?
17     A.   No, it's by individual.
18     Q.   So Mr. Magee could have more than one
19  job code assigned to him?
20     A.   Assigned to his team.
21     Q.   Based on what, do you know?
22     A.   Their job responsibilities.
23     Q.   Do you know if he did, in fact, have
24  more than one job code assigned to his team?

39

1      A.   I don't know.
2      Q.   We're back on Parker-1, the email.
3  When you say based on our call yesterday, I
4  have provided Mike with the template to submit
5  employee names to me so that I can create a
6  business case, what employee names are you
7  talking about?
8      A.   The employee names that will be
9  impacted on their team.
10     Q.   How would they know who is impacted
11  if you have to create a business case which
12  gives them the ability to go in and do all the
13  column and all the scoring?
14     A.   Because as I stated before, they
15  would be going through the job aid and
16  following the instructions on how to select the
17  employees on their team.
18     Q.   So once you create the business case,
19  is it your testimony that literally all they're
20  doing at that point is filling in the exact
21  same information in the system that you've
22  authorized them now to utilize?
23     A.   I don't understand question.
24     Q.   In order to get a name, they would

40

1  have to do the proper RIF criterion, right?
2  Follow all these instructions in Exhibit
3  Parker-2, right?
4      A.   That's the resource provided for them
5  to do that, yes.
6      Q.   They're supposed to follow this and
7  then come up with the name of the employee
8  that's going to be impacted, right?
9      A.   Correct.
10     Q.   And then you give them the business
11  case?
12     A.   The numeric value, yes, that's set up
13  in the system, yes.
14     Q.   You set up one of these, the front
15  page of Verizon-14, correct?
16     A.   Correct.
17     Q.   And then they go into system and
18  they're supposed to input what they've already
19  done on their own though, right?
20     A.   You would have to ask the hiring
21  manager, in this case Brian, exactly what he
22  did outside of the system.  I wouldn't be able
23  to provide that information.
24     Q.   So during his deposition, Mr. Magee

MELISSA PARKER

41

1   was looking at this same RIF documentation that
2   you and I are looking at, and starting on Page
3   147, Line 18, he says, I don't believe I typed
4   any of that into the comments area.  It could
5   have been a verbal.  I think she interviewed me
6   over the phone.  I don't recall.  And I will
7   check if I sent her an email, like with it
8   written out, but I know it wasn't in the
9   system.  I had a phone call with Melissa where
10  she, you know, questioned me on everything and
11  whether that was she took that from our phone
12  call or she asked me to email the information.
13          Do you believe that he's inaccurate
14  and that he, in fact, was the one who went into
15  the system and inputted at all information?
16      A.   I don't recall.
17      Q.   So it could be what you said earlier,
18  it could be what he's saying; you're just not
19  sure?
20      A.   Can you restate that?
21      Q.   You said that you believe the manager
22  went in and typed everything in based on the
23  business case that you created, right?
24      A.   That is typically how it works, yes.

42

1       Q.   Are you sure that's how it
2   happened with Mr. Magee?
3       A.   I don't recall.
4       Q.   Could you have had a telephone
5   conversation with him and then just inputted
6   information based on a phone call?
7       A.   It would be the information he
8   provided if it happened that way, yes.
9       Q.   Do you do that with any of the
10  individuals for the RIFs, talk to the manager
11  over the phone and then just input the
12  information in yourself?
13      A.   I don't recall.  I do way too many of
14  these.
15      Q.   Is that ever your practice?
16      A.   I don't recall.
17      Q.   What your practice is?
18      A.   Typically, that is not how it's done.
19      Q.   Parker-1, you asked for the names by
20  the close of business that following Wednesday,
21  which would be 4/1/15.  Do you see that?
22      A.   Yes.
23      Q.   Did he meet that deadline?
24      A.   I don't recall.

43

1       Q.   Did you ever get a list of names from
2   him so you could go in and create your business
3   cases?
4       A.   I received a consolidated list from
5   Mike Pescatore.
6       Q.   Do you still have that list?
7       A.   Yes.
8       Q.   Where would you keep it?
9       A.   On my computer.
10      Q.   Just so I'm clear, step four is
11  what's being done in the system, but based on
12  your understanding, they have already rated and
13  ranked their employees to come up with a
14  particular name; is that fair?
15      A.   Yes.
16      Q.   Step 5, the director advises you via
17  email when the cases are complete.  Do you see
18  that?
19      A.   Yes.
20      Q.   Did that transpire with Joe Muccilo?
21      A.   In this case I believe it came
22  directly from Mike Pescatore.
23      Q.   Did you have any involvement or
24  responsibility for counting how many people

44

1   were actually impacted or was it your job to
2   just make sure the business cases were created
3   and properly filled out and reviewed?
4       A.   Can you restate that?
5       Q.   Other than ensuring that the business
6   cases were created, properly filled out and
7   then reviewed, what other responsibility, if
8   any, did you have with factoring headcount or
9   percentages of individuals retained?
10      A.   I don't have any responsibility in
11  deciding the number of people that are impacted
12  during this particular round.  I did keep track
13  of it on a spreadsheet.
14      Q.   Do you still have that spreadsheet?
15      A.   Yes.
16      Q.   Do you know if it was 12 that were
17  impacted within Muccilo's organization?
18      A.   I don't recall.
19      Q.   Do you remember if it was as many as
20  200?
21      A.   In Joe's organization, it would not
22  have been that number.
23      Q.   It was on your spreadsheet though,
24  the number that were ultimately impacted?

MELISSA PARKER

---

45

1  A.   It was not at the director level.
2  Oh, on this spreadsheet, yes, in front of us.
3      MR. BARRAS:  Why don't we be
4  clear, what spreadsheet are you
5  referring to?
6  BY MS. BURKE:
7  Q.   She's talking about 2651, all these
8  blue columns here.
9  A.   The one on --
10  Q.   Do you see it says 2651?
11  A.   Yes, sorry, the number of employees
12  -- the names would have been on there so you
13  would be --
14  Q.   This is the blank one, right, but you
15  ended up getting a completed one back?
16  A.   Correct.
17  Q.   You didn't have any actual role or
18  involvement in identifying who would be
19  impacted or what their scores would be, did
20  you?
21  A.   No.
22  Q.   In order for a manager to determine
23  if any discipline impacted a particular
24  employee, what would they have to do to find

---

46

1  that?
2  A.   They would have their own employee
3  record if they did a written warning or
4  something like that.
5  Q.   So they would just have to be candid
6  about what the score was?
7  A.   Yes.
8  Q.   You weren't cross referencing that,
9  were you?
10  A.   If there was something provided in
11  that column, then we would have the discussion
12  about it, yes.
13  Q.   Did you even cross reference every
14  time there was a zero put there?
15  A.   No.
16  Q.   You referenced this earlier,
17  employees in the Mudge organization, that was
18  for the individual above Bill Bragg, right?
19  A.   Bob Mudge is the executive vice
20  president.
21  Q.   He was over Bill Bragg?
22  A.   Ultimately, yes.
23  Q.   Can you just use Page 1 as an
24  example, we're on Verizon-14, Page 755, there

---

47

1  would be an area in the system that would
2  reflect if the business case was approved; is
3  that right?
4  A.   I didn't hear you, I'm sorry.
5  Q.   Are you on Verizon-14, Page 755?
6  A.   Yes.
7  Q.   There would be an area that would
8  identify if the business case was, in fact,
9  approved?
10  A.   Yes.
11  Q.   If it says self approved and it has
12  your name here, next to it says approved
13  Harvey, and I think someone said his name
14  earlier, Reingold?
15      MS. NERO:  Rumeld, R-U-M-E-L-D.
16  BY MS. BURKE:
17  Q.   What does this reflect?
18  A.   This reflects that I approved the
19  case and that Harvey in legal approved it as
20  well.
21  Q.   Do you know who Diane Redilla is?
22  A.   I know her name.
23  Q.   Did you receive any information from
24  her directly in relation to preparing your

---

48

1  business cases?
2  A.   I don't recall.
3  Q.   For the employees, using Page 798 as
4  an example, was their job entry date something
5  that automatically populated or is that
6  something that the manager would input?
7  A.   That is automatically populated.
8  Q.   Same thing with location description?
9  A.   Yes.
10      MS. BURKE:  Ms. Parker, I don't
11  have any further questions for you.
12  Your counsel may have some follow-up
13  and he may not.
14      MR. BARRAS:  I don't have
15  anything.
16      * * *
17  (Witness excused.)
18      * * *
19  (Deposition concluded at
20  1:15 p.m.)
21      * * *
22
23
24

---

MELISSA PARKER

49

```
 1                    *   *   *
 2              C E R T I F I C A T I O N
 3                    *   *   *
 4          I, Hope Agosto, Professional Court
 5     Reporter and Notary Public for the Commonwealth
 6     of Pennsylvania, do hereby certify the
 7     foregoing to be a true and accurate transcript
 8     of my original stenographic notes taken at the
 9     time and place hereinbefore set forth.
10
11
12
13
14                    _____
15                    Hope Agosto
16                    Court Reporter
17                    Notary Public
18
19
20        (The foregoing certification of this
21     transcript does not apply to any reproduction
22     of the same by any means, unless under direct
23     control and/or supervision of the certifying
24     reporter.)
```

R&K Reporting Inc.

MELISSA PARKER

**A**

**ability** 33:16
   35:14 36:1
   39:12
**able** 40:22
**absorbed** 19:17
**access** 14:1
**accurate** 49:7
**accurately** 5:13
**action** 33:23
   34:1 35:2
**actual** 17:3
   21:16 45:17
**add** 20:18,19
   21:24 34:5
**added** 21:1
**additional** 23:11
**adds** 33:1
**advice** 27:24
   28:16
**advises** 43:16
**Agosto** 1:18 49:4
   49:15
**agree** 13:15
**agreed** 4:3
**aid** 3:17 14:24
   15:18,19 16:12
   39:15
**Alejandra** 9:2
**and/or** 49:23
**answer** 5:2 6:2
   6:11,16,21
   26:11,24 28:9
   29:20 30:3,7
   30:11
**answering** 26:9
**answers** 6:4
**appears** 12:4
**apply** 49:21
**appropriate**
   17:13
**approve** 23:10
**approved** 47:2,9
   47:11,12,18,19
**April** 11:2

**area** 8:10 11:10
   20:8,10 21:23
   22:3 32:11
   34:21 41:4
   47:1,7
**areas** 19:3
**arena** 10:10
**aside** 18:16
**asked** 14:10
   41:12 42:19
**asking** 17:7 19:2
   23:1 26:6
   28:15,24 30:1
**assessments** 11:7
**assigned** 37:7
   38:19,20,24
**assigns** 38:12
**Assistant** 2:17
**attachment**
   13:14 15:23
**attention** 9:21
**attorney** 17:15
   17:18 23:18
   24:1,5,14,24
   25:1,5 28:13
   28:16
**August** 1:10
**authorized**
   39:22
**automatically**
   33:24 34:7,18
   36:22 48:5,7
**available** 23:20
**aware** 10:1 11:1

**B**

**B** 5:20 19:6
**back** 15:7,11
   21:6,11 29:17
   38:9 39:2
   45:15
**BARRAS** 2:9
   20:10 24:6,8
   25:15,19 26:10
   26:18,23 28:3

**28:**8,18 29:2
   29:21 30:6,12
   30:24 34:9,15
   45:3 48:14
**Barrett** 9:2
**based** 19:11 37:8
   37:22,24 38:1
   38:21 39:3
   41:22 42:6
   43:11
**Basking** 7:6,19
**Bates** 12:1 37:1
**believe** 29:7 34:3
   34:5 41:3,13
   41:21 43:21
**Bensalem** 1:16
   2:5
**best** 11:18
**Bill** 10:3 12:13
   12:16,19,24
   46:18,21
**blank** 45:14
**blue** 45:8
**Bob** 10:15,18
   11:16 46:19
**bottom** 12:2
   20:13
**box** 1:23 21:15
**Bragg** 10:4
   12:13,16,24
   46:18,21
**break** 6:19
**Brian** 26:16,20
   35:19 40:21
**bring** 23:21
**brought** 4:24
   24:2,5
**Burke** 2:3 3:6
   4:16 11:23
   15:7,13 16:3,8
   20:12 21:6,13
   24:11,18 25:17
   25:24 26:15,19
   27:2 28:6,11
   28:21 29:4,12

**28:**8,18 29:2
**29:**19,24 30:10
   30:17 31:6
   34:13,19 45:6
   47:16 48:10
**business** 3:15
   7:3,23,24 8:21
   13:6 14:22
   15:2 16:16,21
   17:1,4,10,17
   18:8,10,16
   20:1,19 21:20
   23:24 24:5,19
   27:5,9 32:21
   32:24 33:14
   35:24 36:5,10
   36:13 38:6
   39:6,11,18
   40:10 41:23
   42:20 43:2
   44:2,5 47:2,8
   48:1

**C**

**C** 2:1 49:2,2
**call** 12:20 39:3
   41:9,12 42:6
**candid** 46:5
**case** 4:21 15:2
   16:11,16,21
   17:1,5 18:8,16
   20:1 21:20
   23:2,6,8,11,12
   24:5 25:4,7,11
   26:12 27:9,15
   32:21,24 33:14
   35:24 36:5,10
   36:13 38:6
   39:6,11,18
   40:11,21 41:23
   43:21 47:2,8
   47:19
**cases** 3:15 13:5,9
   13:19 16:10
   18:10,22 24:19
   27:5 28:1

**31:**18 43:3,17
   44:2,6 48:1
**CBurke@kar...**
   2:6
**center** 20:14
**certification** 4:5
   49:20
**certify** 49:6
**certifying** 49:23
**Cerutti** 1:15 2:3
**chain** 11:17
**changed** 8:4 9:3
   9:8
**check** 41:7
**Cherry** 2:10
**CHRISTINE**
   2:3
**civil** 4:23
**claimed** 29:6
**clarify** 6:7
**clear** 6:2 31:10
   43:10 45:4
**client** 9:7 19:4
**clients** 8:1,2,5,7
**close** 13:6 42:20
**code** 36:20 37:2
   37:4,8,16,17
   37:21 38:4,7
   38:15,19,24
**codes** 37:22
   38:12
**collection** 16:19
**column** 14:6
   19:5,20 34:15
   34:20 39:13
   46:11
**columns** 45:8
**come** 7:7,9 11:15
   40:7 43:13
**commencing**
   1:17
**comment** 20:22
**commentary**
   22:8 35:8,21
**comments** 20:8

20:14,20 21:14
21:23 22:2,11
22:14,17,23
30:9 32:11,15
33:2,4 36:2
41:4
**Commonwealth**
49:5
**communication**
26:1,2,8
**communications**
24:10,12 26:4
28:20
**complete** 13:9
43:17
**completed** 18:8
19:8 22:16
27:7,9,11
45:15
**completing**
21:19
**complies** 13:13
18:19 20:2
**computer** 13:10
43:9
**concluded** 48:19
**confused** 38:14
**connection** 28:1
**consistent** 7:15
**consolidated**
43:4
**consolidating**
33:5
**constituted**
18:15
**consulted** 24:14
**contact** 17:12
30:21
**contains** 14:24
**control** 49:23
**conversation**
42:5
**conversations**
23:1
**corner** 12:3

**corporate** 38:13
**CORPORATI...**
1:6
**correct** 15:16
16:14,17 18:5
19:14 22:1
25:2,3,9 27:16
30:12 33:18
34:23 36:4
40:9,15,16
45:16
**correction** 35:13
**corrections**
35:12
**corrective** 33:23
34:1 35:2
**correlate** 37:10
**counsel** 2:7,13
2:17 4:3 5:10
5:16 28:1
29:11 30:4,9
30:21 48:12
**counting** 43:24
**course** 6:4
**court** 1:1,18,22
15:10 21:10
29:16 49:4,16
**cover** 8:11
**covers** 8:12,15
**create** 13:5,19
16:10,16,21
18:22 28:14
32:21 33:14
39:5,11,18
43:2
**created** 14:1
32:24 36:6,10
36:13 41:23
44:2,6
**criterion** 40:1
**cross** 46:8,13
**CTNGT2** 37:4,5
**Cynthia** 9:1

**D**

**date** 1:18 48:4
**dated** 12:4
**dates** 9:17 10:21
**Davis** 8:9
**Davis'** 8:17
**deadline** 42:23
**deciding** 44:11
**DEF** 12:1
**Defendants** 2:13
**department** 10:2
**depending** 9:9
**deposition** 1:13
4:18 5:5 6:18
40:24 48:19
**DEPOSITIONS**
3:18
**description** 3:14
48:8
**determine** 23:5
45:22
**determined**
14:19
**Diane** 47:21
**different** 38:2
**direct** 49:22
**direction** 29:11
**directly** 8:2,7,16
37:3 43:22
47:24
**director** 9:8,11
9:13 12:15,18
21:8,17 27:13
43:16 45:1
**discipline** 45:23
**discoverable**
4:20
**discuss** 23:6
**discussed** 23:3
24:13 26:12
**discussing** 24:20
**discussion** 23:9
23:12,15,17,22
24:2 31:4
35:12 46:11
**discussions** 36:8

**dispatch** 8:12
**DISTRICT** 1:1
1:2
**document** 6:15
18:7 29:7,22
30:14 31:14
32:6
**documentation**
41:1
**documents** 3:19
16:20
**doing** 39:20
**draft** 20:21 27:5
**drafted** 12:9
**drive** 14:14
**duly** 4:11
**duties** 7:14

**E**

**E** 2:1,1,3,16,16
49:2
**earlier** 18:3
41:17 46:16
47:14
**early** 9:17
**EASTERN** 1:2
**Ed** 12:24
**Edward** 12:17
**either** 25:17
**eliminated** 19:17
**eliminating**
19:23
**email** 3:15 11:24
12:4,9,21
13:14 14:24
15:20,22,23
18:17 39:2
41:7,12 43:17
**emailed** 30:15
**employee** 6:24
13:4,18 14:5
14:16,17,18
18:21 19:2,19
32:1 39:5,6,8
40:7 45:24

46:2
**employees** 3:17
12:5 16:13
31:20 32:4
36:19 37:9
39:17 43:13
45:11 46:17
48:3
**employer** 5:1
35:18
**ended** 45:15
**engineering** 10:2
20:14 37:5,6
37:13,14
**ensure** 13:7
17:12
**ensuring** 44:5
**enter** 36:20
**entered** 20:9
**entering** 22:17
**enters** 22:19
**entire** 19:4 37:23
38:5
**entry** 48:4
**ESQUIRE** 2:3,9
2:17
**evaluation** 34:11
**events** 6:9
**exact** 39:20
**exactly** 40:21
**EXAMINATI...**
4:14
**examined** 4:11
**example** 17:19
22:5 31:11
33:20 35:9
36:15 46:24
48:4
**excused** 48:17
**executive** 10:15
11:16 46:19
**Exhibit** 11:20
16:5 40:2
**EXHIBITS** 3:12
**expedite** 6:17

MELISSA PARKER

52

**expert** 17:11
**explanation** 19:18,22
**expressed** 20:16 20:24

**F**

**F** 49:2
**fact** 11:8 14:7 19:19 23:14 25:22 26:7 30:3 38:23 41:14 47:8
**factoring** 44:8
**fair** 43:14
**fairly** 7:14
**far** 32:14
**fashion** 28:22
**Fax** 1:24
**feedback** 25:10 25:13,20,22 26:4,7
**feel** 21:23 23:9 23:11
**filing** 4:5
**fill** 19:3 21:22 27:12 32:4
**filled** 17:9 32:15 44:3,6
**filling** 15:5 39:20
**fills** 17:3 19:4 32:10
**find** 45:24
**first** 4:11 16:20 19:5 21:2,14 28:13 31:11 36:20
**flip** 31:21
**focus** 9:21 18:17
**follow** 40:2,6
**follow-up** 48:12
**followed** 15:17
**following** 15:3 16:12 19:11 24:23 39:16

42:20
**follows** 4:12
**foregoing** 49:7 49:20
**form** 4:7 14:4 35:18
**format** 32:3
**former** 4:24
**forth** 49:9
**four** 43:10
**front** 31:7 32:3 40:14 45:2
**function** 12:12
**further** 48:11
**FW** 3:15

**G**

**G** 19:21
**gather** 14:3
**General** 2:17
**generated** 33:24 34:4,7,17 36:1
**getting** 24:9 28:9 28:11,15 45:15
**give** 6:15 24:24 40:10
**given** 29:10
**gives** 33:16 39:12
**go** 6:20 17:19 19:24 27:17 29:22 30:13 33:16 36:1 39:12 40:17 43:2
**goes** 22:22
**going** 5:20 6:1 23:6 28:8 30:19 39:15 40:8
**Greenwood** 1:15 2:4
**Gross** 36:6,11 37:16
**group** 20:14

**guess** 6:8
**guidance** 29:10
**guys** 29:5

**H**

**H** 14:6
**handing** 11:24
**handle** 23:23
**happen** 6:9 32:20
**happened** 42:2,8
**happy** 30:15
**hard** 14:14
**HARVETTA** 2:17
**Harvey** 47:13,19
**headcount** 44:8
**hear** 5:16,17,24 47:4
**held** 1:14 7:11
**hereinbefore** 49:9
**hierarchy** 11:17
**hiring** 40:20
**home** 7:9
**Hope** 1:18 5:8 5:20 15:8 49:4 49:15
**hoping** 6:17
**HR** 7:3,23 8:21 13:21 14:22 17:10,17
**HRBP** 17:21,24 18:7

**I**

**identification** 11:21 16:6
**identified** 4:19 18:3,6 26:2
**identifies** 16:21 20:8,13 31:19
**identify** 14:8 47:8
**identifying**

45:18
**III** 37:6,14
**impacted** 11:9 14:19 19:19 39:9,10 40:8 44:1,11,17,24 45:19,23
**importantly** 5:17
**inaccurate** 41:13
**inappropriate** 29:8
**include** 22:12
**included** 22:13
**includes** 29:1
**including** 12:21
**INDEX** 3:2
**Indicating** 16:1
**individual** 37:23 38:1,16,17 46:18
**individuals** 10:8 11:8 42:10 44:9
**informal** 33:6
**information** 4:20 14:3 15:5 17:4 27:12 32:14 35:18 39:21 40:23 41:12,15 42:6 42:7,12 47:23
**initial** 35:15
**input** 25:1 33:4 33:17 34:22 35:15,21 40:18 42:11 48:6
**inputs** 22:23
**inputted** 31:24 35:11,15 41:15 42:5
**inputting** 19:1
**instructing** 29:19 30:2,6
**instructions**

15:1,4,17 19:12 39:16 40:2
**internal** 17:16 27:18,20 31:15
**interrupt** 6:3
**interviewed** 41:5
**invoke** 26:6
**involve** 16:12
**involved** 9:18 11:11,14
**involvement** 43:23 45:18
**irrelevant** 29:3,5
**issue** 11:5

**J**

**J** 14:6
**Jason** 9:12 18:4
**JBarras@reed...** 2:12
**job** 3:17 7:14,22 14:24 15:18,19 16:12 36:20 37:2,4,8,16,17 37:21,22 38:2 38:4,7,12,15 38:19,22,24 39:15 44:1 48:4
**Joe** 10:3 12:24 18:11 26:22 43:20
**Joe's** 44:21
**JOEL** 2:9
**judge** 30:21
**justification** 19:16

**K**

**Karpf** 1:14,14 2:3,3
**keep** 5:10,20 14:13 43:8 44:12

MELISSA PARKER

**kind** 14:16
**knew** 6:12
**know** 6:1,7,9,12
  6:20 10:6
  11:13 12:6
  22:4 25:13
  32:5 33:9 36:5
  38:21,23 39:1
  39:10 41:8,10
  44:16 47:21,22
**knowledge** 11:18
  23:7

_____
**L**

**L** 2:16
**Law** 1:14
**lawsuit** 4:24
**leave** 6:22 18:12
  20:16,24
**left** 30:22
**legal** 23:2,3,6,7
  23:15 25:8,10
  26:5,13 27:3
  47:19
**let's** 31:10 33:19
**level** 38:13 45:1
**Levittown** 1:23
**Line** 41:3
**list** 33:12 43:1,4
  43:6
**literally** 39:19
**LLP** 2:9
**located** 8:10
**location** 7:5,19
  48:8
**Logan** 2:10
**long** 7:11
**look** 6:16 12:6
  33:19
**looking** 31:15
  32:6 41:1,2
**lot** 8:14
**loud** 20:6

_____
**M**

**M** 19:6
**ma'am** 7:12
  13:10 27:3
  30:19 32:3
**Magee** 26:16,20
  35:22,23 37:7
  37:9,11 38:10
  38:18 40:24
  42:2
**Magee's** 35:19
**manage** 7:24
**managed** 16:21
**management**
  3:16 11:17
  36:9
**manager** 3:17
  7:3,23 16:12
  17:24 21:16,21
  22:9,21 23:21
  24:2 32:16
  33:1 34:21
  35:11,16 36:22
  37:24 38:3
  40:21 41:21
  42:10 45:22
  48:6
**managers** 34:5
**March** 12:4
**Marissa** 9:1
**mark** 16:3
**marked** 3:18
  11:21 16:6,18
**matter** 17:11
  25:7
**Maureen** 8:9
**McCoach** 21:16
**mean** 18:7 21:15
  21:17 37:24
  38:1
**meaning** 27:11
**means** 49:22
**meet** 42:23
**Melissa** 1:13 3:5
  4:10 17:21
  41:9

**members** 36:9
**memorialize**
  28:2,7
**memorialized**
  28:17,19 30:4
  30:8
**memorializing**
  29:9
**method** 33:7
**middle** 36:21
  37:3
**Mike** 12:11,21
  13:3,17 14:15
  18:20 39:4
  43:5,22
**moment** 12:6
  18:17 29:23
  31:1
**months** 11:5
**mouse** 13:12
**Muccilo** 10:3
  13:1 26:22
  36:9 43:20
**Muccilo's** 18:11
  44:17
**Mudge** 10:15,18
  11:16 46:17,19

_____
**N**

**N** 2:1,16 49:2
**name** 16:11 18:6
  19:2 39:24
  40:7 43:14
  47:12,13,22
**names** 8:24 13:4
  13:18 14:5,8
  14:16,17,18
  15:14 16:9
  18:21 19:13
  32:1 33:5,8,12
  39:5,6,8 42:19
  43:1 45:12
**necessarily** 38:4
**necessary** 21:23
  24:3

**need** 6:19 20:18
**needed** 9:9 23:9
  23:12 35:13
**needs** 11:10
**NERO** 2:17 29:9
  47:15
**network** 10:16
  37:6,14
**never** 6:12 33:10
**nod** 5:12
**Notary** 1:19 49:5
  49:17
**notes** 49:8
**notification** 9:16
  10:21 17:14
**number** 27:15
  34:22 37:10
  44:11,22,24
  45:11
**numbers** 12:2
  34:4 35:5 37:1
**numeric** 33:3
  40:12
**numerical** 33:17
  33:22 34:21

_____
**O**

**O** 2:16 49:2
**O'Donoghue**
  12:17,24
**oath** 5:2
**object** 5:18 28:8
**objection** 5:19
  24:6,8 25:15
  26:10,18,23
  28:3
**objections** 4:6
  5:17
**obtain** 27:24
  36:18
**occurred** 9:22
  10:2
**occurring** 10:12
**October** 7:13,15
  7:19 8:4,19

  9:14
**off-the-record**
  31:4
**office** 7:4
**Offices** 1:14
**Oh** 45:2
**okay** 4:21 5:14
  5:15 6:13,22
  6:23 9:23 12:8
  31:11 33:21
**once** 27:6,9
  39:18
**ones** 33:22
**operations** 8:12
  10:16
**ops** 37:6,14
**option** 23:10
**Oral** 1:13
**order** 33:3 39:24
  45:22
**organization** 8:9
  8:13,13,17
  9:10,19,23
  10:14,17 11:14
  14:20 17:17
  18:11 19:23
  20:17 21:15
  44:17,21 46:17
**original** 49:8
**outside** 40:22
**oversee** 8:22

_____
**P**

**P** 2:1,1,16
**p.m** 1:17 48:20
**packet** 20:1 25:8
**page** 3:4,14
  13:20 16:20
  17:20 18:15
  19:24 22:5
  24:20 31:11
  32:12 34:13
  35:17 36:15,21
  36:24 37:4
  40:15 41:2

46:23,24 47:5
48:3
**pages** 31:21
**Parker** 1:13 3:5
3:15 4:10,17
11:24 17:21
48:10
**Parker-1** 3:15
11:20 39:2
42:19
**Parker-2** 3:16
16:5 40:3
**part** 20:23
**particular** 11:5
11:10 15:21
16:24 17:6,9
17:13 18:7,8
19:18 20:21
21:17 22:8,15
23:12 29:6
31:14 38:6
43:14 44:12
45:23
**parties** 4:4,19
**partner** 7:3,23
17:10,17 20:19
24:1
**partners** 7:24
8:21 14:23
**Patricia** 21:16
**PC** 1:15 2:3
**peers** 36:21
**pending** 6:22
**Pennsylvania**
1:2,7,16,23 2:5
2:11 49:6
**people** 37:19
43:24 44:11
**percentage** 11:9
**percentages** 44:9
**performance**
33:23 34:6,10
34:11,17
**performed** 12:12
**person** 5:21

21:19 23:19
**perspective** 9:7
**pertinent** 15:11
21:11 29:17
**Pescatore** 12:11
12:22 43:5,22
**Philadelphia**
2:11
**phone** 1:24 41:6
41:9,11 42:6
42:11
**physical** 7:4
**pick** 38:7
**place** 49:9
**Plaintiff** 2:7
**please** 13:5 15:8
**PO** 1:23
**point** 17:11 23:5
39:20
**populate** 36:22
**populated** 37:8
48:5,7
**position** 19:23
**possible** 6:19
13:7
**practice** 42:15
42:17
**preliminary**
11:7
**prepare** 20:15
**preparing** 47:24
**present** 7:16,20
26:16,17,20,22
**preserve** 29:14
**president** 10:15
11:16 46:20
**PREVIOUS**
3:18
**previously** 13:24
16:18
**price** 20:15
**privilege** 26:5
28:10 29:6
**privileged** 24:9
25:16,23,24

26:8 28:5,12
28:19,22 30:8
**Process** 3:16
**product** 28:4,10
28:14
**Professional**
1:18 49:4
**program** 31:16
**proper** 15:16
19:14 40:1
**properly** 44:3,6
**provide** 19:13
22:11 23:7
40:23
**provided** 13:3
13:17 18:20
22:8 32:2 38:8
39:4 40:4 42:8
46:10
**provides** 15:1
**providing** 14:15
15:5
**Public** 1:19 49:5
49:17
**pulled** 27:22
**pulling** 22:14
**put** 5:19 14:10
18:16 20:17
31:17 46:14

_____

**Q**

**question** 4:7 5:1
5:24 6:2,5,21
24:17 26:9,11
27:8 29:13
30:5,11 39:23
**questioned**
41:10
**questions** 6:17
48:11
**quick** 30:20
**quotes** 20:15

_____

**R**

**R** 2:1,16 49:2

**R-U-M-E-L-D**
47:15
**R&K** 1:22
**range** 35:5
**rank** 3:19 15:2
15:16 19:14
31:20,23 32:4
35:17
**ranked** 14:22
36:19 43:13
**ranking** 16:13
33:7
**rate** 3:19 15:1,16
16:13 19:14
31:19,22,22
33:7 35:17
**rated** 43:17
**rating** 35:18
**read** 15:7,11
21:6,11 29:17
**ready** 12:7 23:8
**really** 30:20
**reason** 6:6
**reasoning** 20:18
**recall** 6:10,11
11:3,4 21:4
22:6 41:6,16
42:3,13,16,24
44:18 48:2
**receive** 47:23
**received** 43:4
**recipients** 12:21
**record** 5:13,19
6:3,20 23:13
29:14,23 30:13
30:18,24 46:3
**Redilla** 47:21
**redistributed**
19:17
**reduction** 11:9
35:18
**REED** 2:9
**refer** 37:1
**reference** 12:3
33:3 46:13

**referenced** 21:5
46:16
**referencing** 46:8
**referring** 20:11
36:24 37:2
45:5
**reflect** 47:2,17
**reflected** 5:13
35:6,8
**reflective** 31:20
**reflects** 47:18
**Reingold** 47:14
**related** 4:20
**relation** 47:24
**remember** 44:19
**remind** 5:14
**reorganization**
8:14
**reorganizations**
9:7
**repeat** 6:7
**report** 18:4
**reported** 12:15
12:18
**reporter** 1:19
15:10 21:10
29:16 49:5,16
49:24
**Reporting** 1:22
1:22
**represent** 4:23
**reproduction**
49:21
**request** 13:13
18:19 20:2
**reserved** 4:8
**resource** 40:4
**respecting** 24:4
24:14
**respective** 4:4
**response** 5:12
15:8 21:7
**responses** 5:11
**responsibilities**
7:22 38:22

MELISSA PARKER

55

| | | | | |
|---|---|---|---|---|
| **responsibility** 43:24 44:7,10 | 41:18 | 13:1 | **substance** 15:20 15:22 21:18 | 35:19 37:11,18 37:23 38:5,20 |
| **responsible** 8:3 8:5,8,16 10:14 | **says** 13:21 17:21 20:23 34:13 | **SME** 17:12,15 | **Suite** 1:16 2:5,11 | 38:24 39:9,17 |
| **restate** 24:16 | 37:4,13 41:3 | **SMITH** 2:9 | **supervision** 49:23 | **teams** 13:8 |
| 27:8 41:20 | 45:10 47:11,12 | **somebody** 14:2 17:16 | **supply** 15:14 | **telephone** 23:17 42:4 |
| 44:4 | **score** 46:6 | **soon** 6:18 | **support** 9:9 | **tell** 6:10,12 |
| **result** 31:23 | **scores** 33:17,22 34:6 45:19 | **sorry** 19:21 20:5 45:11 47:4 | **supposed** 19:12 40:6,18 | **template** 13:4,18 13:22 14:8,15 |
| **retained** 44:9 | **scoring** 39:13 | **speak** 30:4 | **sure** 5:10 10:22 13:20 17:8 | 18:21,23 38:9 39:4 |
| **review** 23:8 25:5 25:8 | **screen** 16:24 17:4,6,9,13 | **specialist** 37:14 | 18:14 24:23 41:19 42:1 | **ten** 10:23 |
| **reviewed** 44:3,7 | 18:23 27:21 | **specialists** 37:6 | 44:2 | **terms** 11:7 32:10 |
| **Ridge** 7:6,19 | 31:15 35:6 | **specific** 10:20 | **Suzette** 1:4 4:23 24:4,15 25:14 | **testified** 4:12 25:19 |
| **RIF** 3:15,19 9:16 16:19 17:13 | **sealing** 4:5 | **specifically** 10:22 | 36:14 | **testifying** 5:18 |
| 28:1 40:1 41:1 | **see** 13:12 16:22 17:22 18:1 | **spreadsheet** 14:10 15:6,21 | **sworn** 4:11 | **testimony** 15:11 21:11 29:17 |
| **RIFs** 9:18,22 10:1,11,13 | 36:15 42:21 43:17 45:10 | 19:5 22:15 32:2 33:6 | **system** 13:9 14:1 15:3 16:16 | 39:19 |
| 42:10 | **select** 39:16 | 44:13,14,23 | 22:22 27:17,18 27:20 31:16,17 | **thing** 5:9 48:8 |
| **right** 5:22 6:4 7:2,9 8:14 9:1 | **selection** 21:16 21:20 22:9,21 | 45:2,4 | 32:18,22 33:1 33:2,24 34:7 | **things** 6:8 |
| 18:4,15 27:13 | 23:21 24:1 | **spring** 9:22 10:12,13,21 | 34:18 35:14 36:2,14,23 | **think** 6:1 41:5 47:13 |
| 28:18 31:8 | 32:15 | **Square** 1:16 2:4 | 39:21 40:13,17 | **Three** 2:10 8:23 |
| 33:12,14 35:3 | **self** 47:11 | 2:10 | 40:22 41:9,15 | **Thursday** 13:7 |
| 37:21 40:1,3,8 | **send** 16:9 25:4 | **staff** 12:12 | 43:11 47:1 | **time** 4:8 5:21 |
| 40:19 41:23 | 27:13 | **stamp** 37:1 | | 6:16 13:8 |
| 45:14 46:18 | **sending** 16:11 | **stamped** 12:1 | | 16:15 23:8 |
| 47:3 | **senior** 7:3,23 | **start** 17:8 | **T** | 46:14 49:9 |
| **right-hand** 12:2 | **sent** 16:13 18:18 | **starting** 41:2 | **T** 2:16 49:2,2 | **title** 7:2,11 |
| **Road** 1:15 2:4 | 25:8 41:7 | **starts** 36:15 | **tab** 31:19,23,24 | **today** 4:18 7:7 9:21 |
| **role** 45:17 | **sentence** 21:2,14 | **stated** 22:20 | **take** 4:17 6:15 12:5,6 | **Tom** 12:14,15 |
| **roll** 37:9,19 | **Services** 1:6,22 | 39:14 | **taken** 5:6 49:8 | 13:1 |
| **Ron** 20:15,23 | **session** 5:2 | **STATES** 1:1 | **talk** 30:13,18 | **tomorrow** 13:6 |
| **room** 6:22 30:23 | **set** 40:12,14 49:9 | **stenographic** 49:8 | 42:10 | **tool** 14:3 |
| **Rosales** 9:2 | **severance** 3:16 | **step** 30:20 32:20 | **talking** 15:19,24 29:21 30:1 | **track** 44:12 |
| **round** 44:12 | 27:18,20 31:16 | 33:5 43:10,16 | 34:10 39:7 | **transcript** 49:7 49:21 |
| **Ruggario** 9:1 | 31:18 | **stipulated** 4:2 | 45:7 | **transpire** 43:20 |
| **Rumeld** 47:15 | **Shake** 13:12 | **stop** 5:18 | **tandem** 15:4 | **trial** 4:8 |
| | **shared** 26:9 | **Street** 1:15 2:4 | **team** 7:24 9:8 | **true** 49:7 |
| **S** | **shot** 16:24 31:15 | 2:10 | 11:18 14:2 | **try** 6:3 13:5 |
| **S** 2:1,9,16,16 | **shots** 27:21 | **subject** 17:11 | | **Turk** 20:15 |
| **Sakowski** 9:12 | **signing** 4:4 | **submit** 13:4,18 | | **two** 1:15 2:4 |
| **saw** 33:10 | **single** 5:8 25:4 | 14:5,16 18:21 | | |
| **saying** 5:21 | 25:11 | 39:4 | | |
| 34:21 35:24 | **Sisk** 12:14,15 | | | |

9:16 10:20 11:4 31:21 32:21
**type** 5:21 32:17 35:10 36:2
**typed** 41:3,22
**typically** 11:15 20:17 21:20,22 22:18,20 23:24 41:24 42:18
**typing** 5:8

**U**

**uh-huh** 5:11 20:4
**uh-uh** 5:12
**ultimately** 44:24 46:22
**underneath** 36:21
**understand** 5:3 6:6 39:23
**understanding** 43:12
**UNITED** 1:1
**updated** 17:10
**use** 13:21 22:5 31:10,17 46:23
**utilize** 14:7 39:22

**V**

**v** 1:5
**value** 33:3 40:12
**various** 10:1 12:5 16:19
**vendors** 20:15
**verbal** 5:11 41:5
**Verizon** 1:6,7 2:17 5:1 6:24 7:6 10:11 12:5
**Verizon-14** 3:19 16:19 18:16 20:1 31:7 32:7 40:15 46:24

47:5
**version** 19:8
**vice** 10:15 11:16 46:19
**VP** 13:21

**W**

**wait** 6:1
**waived** 4:6
**Walker** 1:4 4:23 12:1 24:4,15 25:14 31:20 32:7 33:19 36:14
**want** 9:21 14:4 17:19 18:17 24:23 30:10,17
**wanted** 18:14 36:3
**wants** 6:8
**warning** 46:3
**wasn't** 41:8
**way** 7:6 8:4 42:8 42:13
**we'll** 5:13 6:20 16:3 17:8
**we're** 24:8,20 28:9,11 31:14 35:9 39:2 46:24
**We've** 9:6
**Wednesday** 42:20
**went** 41:14,22
**weren't** 46:8
**willing** 20:24
**willingness** 20:16,24
**witness** 3:4 13:13 18:19 20:2 24:7,16 26:14 27:1 30:22 34:16 48:17
**witnesses** 5:20

**wording** 17:12
**work** 7:5 17:18 20:14 28:4,10 28:14
**worked** 7:18
**works** 13:12 41:24
**wouldn't** 40:22
**written** 41:8 46:3
**wrote** 28:23

**X**

**Y**

**Yep** 5:23
**yesterday** 6:9 39:3

**Z**

**zero** 34:24 35:3 35:5 46:14

**0**

**1**

**1** 16:20 35:1 46:23
**1:15** 48:20
**11** 3:15
**12** 44:16
**12:07** 1:17
**128** 1:16 2:5
**1372** 1:23
**147** 41:3
**15-4031** 1:7
**16** 3:16,19
**1717** 2:10
**18** 41:3
**19020** 1:17 2:5
**19058-1372** 1:23
**19103** 2:11

**2**

**2** 16:20
**200** 44:20

**2013** 7:13,15,19 8:4,6,19 9:3,14 34:11
**2014** 34:12,14,16
**2015** 9:17,22 10:12,13,21 12:4 34:14,17
**2016** 1:10
**215** 1:24,24 2:6 2:12
**21st** 12:4
**24** 1:10
**241-7990** 2:12
**2649** 12:1
**2650** 12:1
**2651** 45:7,10

**3**

**3/31/15** 3:15
**3100** 2:11
**3331** 1:15 2:4

**4**

**4** 3:6
**4/1/15** 42:21

**5**

**5** 34:24 35:1,6 43:16

**6**

**6** 34:15
**639-0801** 2:6

**7**

**7** 34:15
**755** 31:12 46:24 47:5
**757** 31:21 32:8 32:13 35:9
**759** 33:19 34:13
**781** 22:5
**787** 17:20 19:24
**792** 36:15 37:3
**795** 35:17
**798** 48:3

**8**

**9**

**946-7009** 1:24
**949-1867** 1:24

# Exhibit TT

# ReedSmith

**Joel S. Barras**
Direct Phone: +1 215 241 7990
Email: jbarras@reedsmith.com

Reed Smith LLP
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA 19103
Tel +1 215 851 8100
Fax +1 215 851 1420
reedsmith.com

June 10, 2016

***VIA ELECTRONIC MAIL & U.S. MAIL***

Christine E. Burke, Esq.
Karpf, Karpf, & Cerutti, P.C.
3331 Street Road
Two Greenwood Square, Suite 128
Bensalem, PA 19020

Re:   **Suzette Walker v. Verizon et al.**
         **Civil Action No. 15-4031**

Dear Counsel:

Please accept this letter in response to your April 21, 2016 communication regarding the above-captioned matter.   Defendants in good faith hereby respond and supplement, where applicable, Defendants' Responses to Plaintiff's Discovery Requests, as follows:

- **Response to Interrogatory No. 6**: Defendants will provide the dates of employment, age, race, and status as an individual with a disability for the individuals listed in RIF Business Case No.: RIFV102777 in response to Interrogatory No. 6.   The individuals listed in the Business Case No. RIFV102777 are the Engineering III Specialists that were supervised by either Brian Magee or Carl Gross, under Director Dennis Muccillo.   The information is not based strictly upon a single location, but is based on a position title and band level under a given Director.   Thus for purposes of the reduction in force decision, Plaintiff was compared against other Engineering III Specialists (Band 7T) that reported to managers under Director Dennis Muccillo.

- **Response to Interrogatory No. 7**:   Please see Defendants' response to Interrogatory No. 6, above.

- **Response to Interrogatory No. 8**:   Per our phone conversation on June 10, 2016, Defendants will also produce information regarding all individuals within Director Dennis Muccillo's organization who were separated as part of the March – April 2015

# ReedSmith

June 10, 2016
Page 2

Reduction in Force, along with their dates of employment, ages, race, and status as an individual with a disability.

- **Response to Interrogatory No. 9:** I believe we have produced the information requested in this Interrogatory. Please confirm whether there is any documentation or information outstanding that you have requested.

- **Response to Document Request No. 5:** Defendants renew and restate their objections to this Request, nevertheless Defendants will supplemental with Plaintiff's performance reviews for 2010, 2011, and 2012.

- **Response to Document Request No. 9:** Defendants are conducting e-discovery in accordance with the terms discussed and agreed to between the parties and will produce non-privileged documents responsive to Plaintiffs' search terms and relevant to Plaintiffs' claims.

- **Response to Document Request No. 10:** Defendants refer Plaintiff to their response to Interrogatory Nos. 6 and 7, above. Defendants request, based upon its response to Interrogatory Nos. 6 and 7 above, that Plaintiff clarify the documents Plaintiff is requesting in response to Document Request No. 10.

- **Document Request No. 11:** Defendants renew and restate their objections to this Request, and specifically note that Plaintiff has failed to identify how Defendants' response to this Request is deficient. Defendants will produce documents reflecting any and all job postings or positions advertised for hire or transfer within Dennis Muccillo's organization from January 1, 2015 through present.

- **Document Request No. 12/14:** Defendants are conducting e-discovery in accordance with the terms discussed and agreed to between the parties and will produce non-privileged documents responsive to Plaintiffs' search terms and relevant to Plaintiffs' claims.

- **Document Request No. 15:** Defendants renew and restate their objections to this Request. Specifically, the request is unduly burdensome as Defendants have engaged in a number of reductions unrelated Director Dennis Muccillo's organization. Separation decisions for reductions in force are made within each individual organization. As such, producing the requested information from January 1, 2014 through July, 2015 for all reductions in force outside of Dennis Muccillo's organization is unduly burdensome. Nevertheless, Defendants will produce non-privileged responsive documents for reductions in force within Dennis Muccillo's organization from January 1, 2014 through July 1, 2015.

**ReedSmith**

June 10, 2016
Page 3

- **Document Request No. 18:** Defendants are conducting e-discovery in accordance with the terms discussed and agreed to between the parties and will produce non-privileged documents responsive to Plaintiffs' search terms and relevant to Plaintiffs' claims.

As we have repeatedly stated, please give us a call to discuss any specific concerns you have about our discovery responses.  We are confident we can resolve any outstanding issues without resorting to threats of sanctions or motions practice that will distract from the substance of the litigation and waste the Court's and our time.

Sincerely,

*/s/ Joel S. Barras*

Joel S. Barras


cc: Valerie E. Brown, Esq.
    Adam C. Lease, Esq.

# Exhibit UU

# Exhibit UU

(provided to the Court via CD, containing
VZ_Walker_818(2)

# Exhibit VV

# ReedSmith

**Joel S. Barras**
Direct Phone: +1 215 241 7990
Email: jbarras@reedsmith.com

Reed Smith LLP
Three Logan Square
Suite 3100
1717 Arch Street
Philadelphia, PA 19103
Tel +1 215 851 8100
Fax +1 215 851 1420
reedsmith.com

April 7, 2016

**_VIA ELECTRONIC MAIL & U.S. MAIL_**

Christine E. Burke, Esq.
Karpf, Karpf, & Cerutti, P.C.
3331 Street Road
Two Greenwood Square, Suite 128
Bensalem, PA 19020

Re:   **Suzette Walker v. Verizon et al.**
       **Civil Action No. 15-4031**

Dear Counsel:

Please accept this letter in response to your March 23, 2016 communication regarding the above-captioned matter.   Please find attached Defendants' document production bate-stamped Def_Walker_018-023, as well as Def_Walker_107-113. As a general matter, your deficiency letter does not specifically address why you find Defendants' responses to be deficient and do not challenge Defendants' objections to Plaintiff's Interrogatories or Requests, or the specific deficiency in the factual answer or documents provided. Nevertheless, Defendants in good faith hereby respond and supplement, where applicable, Defendants' Responses to Plaintiff's Discovery Requests, as follows:

- **Response to Interrogatory No. 4**: Defendants renew and restate their objections to this Interrogatory.  Defendants are not aware of, and did not base their decision to select Plaintiff for separation as part of the Reduction in Force on, any verbal or written discipline issued to Plaintiff.

- **Response to Interrogatory No. 5(B)**:  Defendants renew and restate their objections to this Interrogatory, and specifically note that Plaintiff has failed to identify how Defendants' answer to this Interrogatory is deficient.  By way of further answer, see Def_Walker_018-023 and Def_Walker_107.

- **Response to Interrogatory No. 6**: Defendants renew and restate their objections to this Interrogatory.  By way of further answer, see Def_Walker_018-023.  Defendants have not transferred any employees into the Engineering III Specialist title at the 900 Race

**ReedSmith**

April 7, 2016
Page 2

Street location since Plaintiff's separation. There have been no requisitions for the Engineering III Specialist title at the 900 Race Street location since Plaintiff's separation.

- **Interrogatory No. 7:** Defendants renew and restate their objections to this Interrogatory. By way of further answer, see Def_Walker_018-023. By way of further answer, Defendants have not transferred any employees into the Engineering III Specialist title at the 900 Race Street location since Plaintiff's separation. There have been no requisitions for the Engineering III Specialist title at the 900 Race Street location since Plaintiff's separation.

- **Interrogatory No. 8:** Defendants renew and restate their objections to this Interrogatory, and specifically note that Plaintiff has failed to identify how Defendants' answer to this Interrogatory is deficient. By way of further answer, see Def_Walker_018-023.

- **Interrogatory No. 9:** Defendants renew and restate their objections to this Interrogatory, and specifically note that Plaintiff has failed to identify how Defendants' answer to this Interrogatory is deficient. By way of further answer, Defendants will produce personnel files, performance evaluations and compensation information for the individuals against whom Plaintiff was compared for purposes of selection for separation as part of the Reduction in Force.

- **Document Request. No. 9:** Defendants renew and restate their objections to this Request. By way of further response, it is unclear what Plaintiff considered to be "incomplete" about their response to this Requests. Plaintiff's manager did not maintain a hard copy personnel file for Plaintiff. Defendants have produced electronic records relating to Plaintiff that are in Defendants possession. Defendants will continue to engage in a reasonable search of its records and supplement if Defendants discover any additional non-privileged, relevant and responsive documentation.

- **Document Request No. 10:** Defendants renew and restate their objections to this Request, and specifically note that Plaintiff has failed to identify how Defendants' response to this Request is deficient. By way of further answer, see Def_Walker_018-023.

- **Document Request No. 11:** Defendants renew and restate their objections to this Request, and specifically note that Plaintiff has failed to identify how Defendants' response to this Request is deficient. Defendants have not transferred any employees into the Engineering III Specialist title at the 900 Race Street location since Plaintiff's separation. There have been no requisitions for the Engineering III Specialist title at the 900 Race Street location since Plaintiff's separation.

- **Document Request No. 12:** Defendants renew and restate their objections to this Request, and specifically note that Plaintiff has failed to identify how Defendants' response to this Request is deficient. By way of further response, see Def_Walker_018-

**ReedSmith**

April 7, 2016
Page 3

023 and Def_Walker_107.  Defendants are continuing to search their systems for any electronic communications discussing Plaintiff's separation from employment and will produce non-privileged, relevant and responsive documentation that it discovers.

- **Document Request No. 14:** Defendants renew and restate their objections to this Request.  By way of further answer, Defendants are gathering and will produce personnel files, performance evaluations and compensation information for the individuals against whom Plaintiff was compared for purposes of selection for separation as part of the Reduction in Force.

- **Document Request No. 15:**  Defendants renew and restate their objections to this Request, and specifically note that Plaintiff has failed to identify how Defendants' response to this Request is deficient.  By way of further answer, see Def_Walker_018-023.

- **Document Request No. 18:** Defendants renew and restate their objections to this Request.  By way of further response, see Defendants' document production at Def_Walker_108-113.  Defendants have requested and are gathering additional documents responsive to this request and will supplement its production with non-privileged, responsive documents.

In addition, as discovery is ongoing, Defendants are preparing a supplemental production containing personnel documents for the employees against whom Ms. Walker was compared for purposes of the Reduction in Force, and have requested Plaintiff's disability file from Defendants' vendor, MetLife. As I have repeatedly stated, please give me a call to discuss any specific concerns you have about our discovery responses.  I am confident we can resolve any outstanding issues without resorting to threats of sanctions or motions practice that will distract from the substance of the litigation and waste the Court's and our time.

Sincerely,

*/s/ Joel S. Barras*

Joel S. Barras


cc: Valerie E. Brown, Esq.
    Adam C. Lease, Esq.